```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                           MIAMI DIVISION
                     CASE NO. 1:17-cr-20701-MCG-5
 3


 4    UNITED STATES OF AMERICA,

 5            Plaintiff,                    December 10, 2018
                                            9:05 a.m.
 6            vs.

 7    LEONARDO MIGUEL GARCIA MORALES,

 8            Defendant.                    Pages 1 THROUGH 109

 9    _____


10
                       TRANSCRIPT OF TRIAL DAY 5
11             BEFORE THE HONORABLE DONALD L. GRAHAM
                     UNITED STATES DISTRICT JUDGE
12                       And a Jury of 12

13
      Appearances:
14
      FOR THE GOVERNMENT:  IGNACIO JESUS VAZQUEZ, JR, AUSA
15                         UNITED STATES ATTORNEY'S OFFICE
                           99 Northeast 4th Street, Room 617
16                         Miami, Florida 33132

17
      FOR THE DEFENDANT:   Deric Zacca, PA
18                         DERIC ZACCA, ESQ.
                           110 Southeast 6th Street, Suite 1700
19                         Fort Lauderdale, Florida 33301

20
      COURT REPORTER:      Yvette Hernandez
21                         U.S. District Court
                           400 North Miami Avenue, Room 10-2
22                         Miami, Florida 33128
                           yvette_hernandez@flsd.uscourts.gov
23

24

25
```

2

1                      **I N D E X**

2      Certificate.................................       109

3
                     **W   I   T   N   E   S   S**
4

       **ON BEHALF OF THE GOVERNMENT:**                    PAGE
5      DETECTIVE JIM MCKEE
       DIRECT EXAMINATION BY MR. VAZQUEZ                    12
6      CROSS-EXAMINATION BY MR. ZACCA                       29
       REDIRECT EXAMINATION BY MR. VAZQUEZ                  37
7
       DETECTIVE STACEY HADLEY
8      DIRECT EXAMINATION BY MR. VAZQUEZ                    39

9      ALFREDO KINDELAND HERNANDEZ
       DIRECT EXAMINATION BY MR. VAZQUEZ                    44
10     CROSS-EXAMINATION BY MR. ZACCA                       83

11                   **E X H I B I T S**
       **GOVERNMENT'S EX. NO.:**            OFFERED   ADMITTED
12         43                                 22         22
           24                                 24         25
13         19                                 48         48
            9                                 63         63
14         10                                 63         63
           20                                 68         68
15         36                                 78         78
       **DEFENDANT'S EX. NO.:**              OFFERED   ADMITTED
16          3                                 92         93

17

18

19

20

21

22

23

24

25

3

```
1        (Call to order of the Court, 9:05 a.m.)

2        (Jury not present.)

3            THE COURT:  Good morning.

4            MR. VAZQUEZ:  Good morning, Judge.

5            THE COURT:  Do we have all of our jurors present?

6            COURT SECURITY OFFICER:  Missing one.

7            THE COURT:  Is it Ms. Espinosa?

8            COURT SECURITY OFFICER:  Right.

9        (Pause in proceedings.)

10            THE COURT:  The juror who is consistently late,

11   Ms. Espinosa, is late this morning.  Not sure what we need to

12   do about this.  We'll take this up later.

13            You-all have flooded me with numerous pleadings and

14   motions this morning.  I haven't had time to take a close look

15   at them, but it is a little unusual the way the facts are

16   coming in.  From what I could discern from a brief reading, the

17   Government agents and the investigator for the gold company

18   have been in touch with each other since 2012.  Is that

19   accurate?

20            MR. VAZQUEZ:  Let me just -- may I check with the ...

21            THE COURT:  Quickly, please.

22        (Pause in proceedings.)

23            MR. VAZQUEZ:  Your Honor, I don't believe it was that

24   early.  I don't know if it really makes a difference, because I

25   think it might have been '13 or '14 when they came in contact
```

1    with each other.  The private investigator was retained to help

2    the gold courier and he was scouting out information, trying to

3    conduct his own case, and he was offering his information --

4    parts of the information to different people.

5         The issue that we had is that when we asked him --

6    when our agents asked him:  "We need your materials," he didn't

7    give us the recording.  That is something he just, for whatever

8    reason --

9         THE COURT:  Did he tell the agents the substance of

10   his investigation and what he had been discussing with the

11   Defendant?

12        I may be wrong, but he met with the Defendant about

13   five times, the agent -- or rather, the investigator?  Is

14   that --

15        MR. VAZQUEZ:  The investigator met with him.

16        THE COURT:  About five times?

17        MR. VAZQUEZ:  Yeah.

18        THE COURT:  Then, at least the Defense asserts in its

19   pleading that they were conversing with one another.  Is that

20   accurate?

21        MR. VAZQUEZ:  That's what the investigator represents.

22        THE COURT:  What does that mean, that's what he

23   represents?

24        MR. VAZQUEZ:  I don't know.

25        THE COURT:  You don't think it's correct?

```
 1              MR. VAZQUEZ:  I don't know the nature because I wasn't

 2      there.  The investigator says --

 3              THE COURT:  Well, have you talked to the investigator?

 4              MR. VAZQUEZ:  Yes.

 5              THE COURT:  Do you suspect he's not being forthcoming?

 6              MR. VAZQUEZ:  I don't know why he wouldn't have given

 7      us this recording.  It's very strange to me that this was not

 8      turned over to us.  He spoke with the agents.

 9              THE COURT:  Did he impart the substance of the

10      conversation with the agents?

11              MR. VAZQUEZ:  He imparted that the Defendant wanted to

12      get benefits and would cooperate against certain subjects.  And

13      that is where any relationship with any law enforcement broke

14      down with this Defendant, because he was -- every time there

15      was an effort to talk to him, he made demands for immigration

16      benefits --

17              THE COURT:  Well, wait.  Is this every time the agents

18      wanted to talk with him or every time the investigator went to

19      talk to him?

20              MR. VAZQUEZ:  Every time any kind of law enforcement

21      person made any kind of contact with the Defendant, he was

22      making demands for things.  So there was no statement that

23      resulted.

24              THE COURT:  After he had an attorney, they were going

25      to interview him?  I'm not --
```

```
1            MR. VAZQUEZ:  From before our case started --

2            THE COURT:  All right.

3            MR. VAZQUEZ:  -- the investigator was contacted by

4    Morales, by the Defendant.

5            THE COURT:  The gold investigator?

6            MR. VAZQUEZ:  Yes.  The private investigator was

7    contacted by Morales.

8            THE COURT:  All right.

9            MR. VAZQUEZ:  Morales offering assistance, hoping to

10   get money and benefits.

11           The investigator attempted to pass this on to

12   people --

13           THE COURT:  You have to be a little more specific.

14           MR. VAZQUEZ:  Pass this on to law enforcement.

15           THE COURT:  All right.

16           MR. VAZQUEZ:  So local -- at one point, this Defendant

17   was offering information on an aspect of the case, which was

18   not part of his case, a human smuggling ring that he claimed to

19   have information about.  And this is pre-indictment, before our

20   case initiated.  And it just never materialized because he

21   always wanted something.  He always wanted benefits.  He always

22   wanted money --

23           THE COURT:  Was he imparting information about what he

24   could provide or --

25           MR. VAZQUEZ:  Excuse me?
```

7

```
 1            THE COURT:  Was he imparting information about what it
 2     was that he could provide in exchange for benefits?
 3            MR. VAZQUEZ:  Information about smuggling activities,
 4     information about kidnappings, things of that nature.
 5            THE COURT:  Wouldn't that be a statement of a
 6     Defendant?  So hypothetically, if the investigator is talking
 7     to the Defendant and he tells the investigator:  "I'm willing
 8     to help you.  I'm willing to tell you who did what, but I need
 9     money.  I need Y, Z," and then the investigator tells the
10     agent:  "We're -- I'm trying to talk to him.  He tells me he
11     will tell me about the offense, but he needs benefits" -- so at
12     least that you should have been aware of.
13            MR. VAZQUEZ:  What the agents got from all of these
14     efforts was it never materialized because he never --
15            THE COURT:  No.  No.  No.  Not materialized.  The fact
16     that the Defendant said something that was incriminating.
17            If someone says:  "I will tell you what happened if
18     you give me money" --
19            MR. VAZQUEZ:  Right.
20            THE COURT:  -- that's an admission.
21            MR. VAZQUEZ:  An admission to a third party, not to
22     one of our law enforcement officers.
23            THE COURT:  But it's an admission to the
24     investigator --
25            MR. VAZQUEZ:  Yes.
```

```
 1              THE COURT:  -- who imparts the information to the
 2      agents, correct?
 3              MR. VAZQUEZ:  Through the investigator.
 4              THE COURT:  Yes.
 5              MR. VAZQUEZ:  There was this statement.  But it was
 6      never corroborated.  It was never confirmed.
 7              THE COURT:  You don't have to have corroboration for a
 8      statement for it to be admitted.
 9              MR. VAZQUEZ:  The statement -- the agents never
10      reported to us that they got anything from this person, from
11      Mr. Morales.
12              THE COURT:  They didn't say -- I mean, based on what
13      you told me, the agents knew that the Defendant said:  "I will
14      help you."
15              MR. VAZQUEZ:  Yes.
16              THE COURT:  "I will give you information about the
17      particulars if you give me money."
18              MR. VAZQUEZ:  Yes.
19              THE COURT:  That in and of itself is incriminating.
20      You weren't told that?
21              MR. VAZQUEZ:  I did not -- there was one episode that
22      I knew about where we reached out to his public defender and
23      we -- our office attempted to communicate with him.  We had a
24      meeting --
25              THE COURT:  Communicate with who?
```

9

```
1              MR. VAZQUEZ:  The Defendant.

2              THE COURT:  All right.

3              MR. VAZQUEZ:  So we reached out to his attorney.

4              THE COURT:  So you told the attorney: --

5              MR. VAZQUEZ:  Yes.

6              THE COURT:  -- "The investigator has talked to your

7    client.  Your client has said he's willing to help us if we

8    will give him some money, et cetera, and we would like to talk

9    to him"?

10             MR. VAZQUEZ:  No.  What we said was pre-indictment --

11             THE COURT:  That's what you knew, though, right?

12             MR. VAZQUEZ:  Personally -- which I don't think makes

13   a legal difference -- I didn't know about this underlying

14   contact that didn't materialize into anything until recently.

15             THE COURT:  The Government?

16             MR. VAZQUEZ:  The Government.  Yes, the Government.

17             THE COURT:  The Government knew?

18             MR. VAZQUEZ:  The Government knew.

19             THE COURT:  Well, this is -- this is an odd scenario.

20   But based on what I've heard, I got to have a hearing.  I need

21   the investigator, the agents.  I need to know who knew what

22   because what you are saying now --

23             MR. VAZQUEZ:  Right.

24             THE COURT:  -- suggests that statements should have

25   been turned over to the Defense.
```

```
 1          MR. VAZQUEZ:  And Your Honor, we are not seeking to

 2   introduce any of the statements to the Defense investigator.

 3   We're not seeking to introduce that.  What we're seeking to

 4   introduce --

 5          THE COURT:  No.  You are seeking -- but you had the

 6   obligation to tell the Defense that the Defendant had made

 7   incriminating statements.  Maybe not the particulars, but you

 8   knew he was making admissions, saying:  "I know about what

 9   happened and I'm willing to tell you the particulars if you

10   give me a benefit."

11          MR. VAZQUEZ:  Respectfully, Your Honor, I do not

12   believe that his statements to the investigator are under our

13   discovery obligation.  I don't believe what one person says --

14          THE COURT:  It was imparted to the agents, you told

15   me.  That's what you just told me.

16          MR. VAZQUEZ:  Yes.  The agents had this contact with

17   him that did not result in a statement.  They didn't -- we're

18   not seeking to admit those demands from the Defendant.

19          THE COURT:  I'll have to have a hearing.  We're just

20   talking about possibilities.  I don't know who's going to say

21   what.  Even you don't know who's going to say what, from what

22   you have told me.  I don't know how I can resolve this issue

23   without having the investigator and the agents who were

24   involved and hearing that testimony.  And then I have to make a

25   decision.
```

```
 1              I'm not sure why this came up in the middle of trial.
 2     You knew enough to alert people that there was an issue.
 3              MR. VAZQUEZ:  I did not know that, Your Honor.  I
 4     personally did not know --
 5              THE COURT:  But when you say:  "Personally," were
 6     there other assistants in the case before you?
 7              MR. VAZQUEZ:  These contacts --
 8              THE COURT:  Were there other assistants in the case
 9     before you?
10              MR. VAZQUEZ:  Yes.  But nobody knew about this
11     contact, these contacts.
12              THE COURT:  When you say:  "Nobody," you told me that
13     the agents knew.
14              MR. VAZQUEZ:  The agents, yes.
15              THE COURT:  But that's the Government.
16              MR. VAZQUEZ:  Yes, Your Honor.
17              THE COURT:  You can't separate yourself.
18              MR. VAZQUEZ:  I agree with you, yes.
19              THE COURT:  That's why I'm saying:  Why are we
20     learning this now in the middle of trial?
21              No juror yet?
22              COURT SECURITY OFFICER:  Yes, sir.
23              THE COURT:  Oh, she's here?
24              All right.  Let's bring them in.  Let's get started.
25              As soon as they arrive, let me know.
```

```
 1          (Before the Jury, 9:17 a.m.)

 2               THE COURT:  Be seated, please.

 3               Good morning, Ladies and Gentlemen.

 4               We are now ready to continue with the trial.  We're

 5     getting started late again.  I understand there was some

 6     traffic issues with I-95 this morning.  So I'm not going to

 7     keep you the extra 20 minutes today.  But if we have too many

 8     of these incidents, then we'll have to rethink that.

 9               We're now ready to start.

10               MR. VAZQUEZ:  Yes, Your Honor.

11               The United States calls Detective Jim McKee, Coral

12     Gables Police Department.

13          DETECTIVE JIM MCKEE, GOVERNMENT WITNESS, SWORN

14                         DIRECT EXAMINATION

15     BY MR. VAZQUEZ:

16     Q.  Sir, if you would please introduce yourself to the Members

17     of the Jury.

18     A.  Good morning.  I'm Detective Jerry McKee of the Coral

19     Gables Police Department.

20     Q.  And what is your current assignment, sir?

21     A.  I am assigned to the Crimes Against Persons Unit.

22     Basically, Violent Crimes for the Coral Gables Police

23     Department.

24     Q.  And how long have you been assigned in that capacity?

25     A.  In that particular capacity, I've been assigned for 15
```

1    years almost.

2    Q.  And how long have you been a member of the Coral Gables

3    Police Department?

4    A.  Approximately, 20 years now.

5    Q.  Sir, I want to ask you about your service in the Crimes

6    Against Persons Unit.  What kinds of cases are those?

7    A.  We tend to do a broad scope of crimes, introductory

8    homicide, robbery, sexual batteries, and missing persons and

9    abuse cases generally.

10   Q.  I want to turn your attention to the date of October 12th

11   of 2012.  On that date, were you assigned as a person's

12   investigator with Coral Gables Police Department?

13   A.  Yes, I was.

14   Q.  On that date, did you have the opportunity to become

15   involved in a robbery investigation against a gold courier in

16   Coral Gables, Florida?

17   A.  Yes, I did.

18   Q.  And how is it that you came to serve in that case?

19   A.  On that morning of October 12th, at approximately 7:30, we

20   had gotten called that there was a robbery of basically a large

21   quantity of gold, as we ended up finding out at the time.  I

22   responded there and made contact directly with the victim at

23   that time and kind of directed the crime scene.

24   Q.  Now, when you got this call, where did you go?

25   A.  I went directly to the listed residence of the victim,

1  which was 430 Valencia in Coral Gables, Florida.

2  Q.  And was this your crime scene?

3  A.  It was generally.  It was about -- a multi-unit apartment

4  building, and that's basically where we concentrated and around

5  the surrounding area as well.

6  Q.  Okay.  This location, can you tell us about it.  What kind

7  of area of town is this?

8  A.  It's -- actually would be considered residential, but it is

9  next to the downtown area of Coral Gables.  So there's a volume

10  of traffic, especially at that time of the morning.

11  Specifically to where the victim resided, basically it's a

12  multi-unit, just a two-level apartment building with a parking

13  lot in the rear.

14  Q.  And this location where the victim was robbed, what kind of

15  security measures does it have?

16  A.  Really, it doesn't have much, if any.  So it's kind of an

17  open parking lot.  There's an elevator in the back that takes

18  it up.  It also seemed to border along an alleyway where there

19  was a shrubbery fence, so it actually would prevent people kind

20  of from seeing in directly coming from the south.  If you were,

21  you would have a blocked view.

22  Q.  Were there any security guards that were there?

23  A.  No, there were not.

24  Q.  And prior to the date of the robbery, do you know if there

25  were any off-duty Coral Gables police officers or any other

15

1    type of law enforcement that worked there?

2    A.   There were none.

3    Q.   When you go to the crime scene, before you talked to the

4    victim, do you have an opportunity to look at the layout of the

5    roads that are surrounding the apartment complex?

6    A.   I didn't have a specific opportunity to look at the layout.

7    I am familiar with it from having worked -- and it's fairly

8    close to our station.  So probably within, I would want to say,

9    seven to eight blocks of our actual police station.  So I do

10   know the area myself quite well.

11   Q.   And the area -- and turning specific attention to the

12   roadways in the area.  What are the roadways like near this

13   apartment complex?

14   A.   Near there would probably be just normal residential

15   two-way traffic in one direction and one in the other, stop

16   signs, I believe.  I don't even think there's a traffic light

17   around specifically there, unless he gets closer to LeJeune

18   Road.

19   Q.   How far is it from LeJeune Road?

20   A.   About probably a block, I would say.

21   Q.   When you arrived on the scene, who did you meet?

22   A.   I met up with our crime scene investigator at the time, and

23   I believe my sergeant at the time was there as well.  But I was

24   also one of the first ones there after -- after initial patrol

25   officers.

```
 1   Q.  Aside from law enforcement, did you meet any civilians

 2   aside from the victim on that --

 3   A.  Aside from the victim, no.  I tried to -- I had the victim

 4   transported to our station and I tried to conduct a canvass,

 5   basically, where I was just trying to knock on doors and see if

 6   anybody had seen anything, witnessed a robbery, if anyone had

 7   seen any persons or vehicles in the area, and that's what I

 8   immediately did.

 9   Q.  Were you successful --

10   A.  No.  No.

11          MR. ZACCA:  Objection.  Calls for hearsay.

12          THE COURT:  Rephrase your question, sir.

13   BY MR. VAZQUEZ:

14   Q.  Were you able to speak with anyone that gave you any kind

15   of information?

16   A.  No.  There were no witnesses that we were able to find.  I

17   think most people had left for work.  And at that building,

18   like I said, due to the obstructed view, basically would have

19   to have been a resident at that building in order to have seen

20   anything.

21   Q.  What was the time that you arrived at the scene?

22   A.  It occurred around 7:30.  And I believe I probably got

23   there -- I'm sorry -- probably around, I want to say, 8:30, if

24   I remember correctly.

25   Q.  And when you say:  "7:30" and "8:30," is this a.m. or p.m.?
```

17

```
 1    A.   This is a.m.  I'm sorry.

 2    Q.   Did there come a point in time when you got to sit down and

 3    meet with the victim?

 4    A.   I did.  I met with him sometime after 9:00 a.m. on that

 5    morning in order to take a statement from him.

 6    Q.   How old was the victim?

 7    A.   The victim seemed to be in his late fifties, from what I

 8    remember.

 9    Q.   And how long was your interview with the victim?

10    A.   It was probably, I want to say, 45 minutes to an hour that

11    we spoke in total.  Could be a little longer.

12    Q.   As part of this investigation, did you identify a location

13    known as Republic Metals?

14    A.   I did.

15    Q.   What is Republic Metals?

16    A.   Republic Metals is basically a refinery for all types of

17    metals.  It's -- as it was explained to me, it's basically one

18    of the few --

19              MR. ZACCA:  Objection.  Calls for hearsay.  Explained?

20              THE COURT:  Sustained, the way the question was

21    presented and answered.

22    BY MR. VAZQUEZ:

23    Q.   Did you visit Republic Metals?

24    A.   I did.

25    Q.   And based on what you saw, what is it?
```

```
1    A.   A metal refinery.

2    Q.   And where is Republic Metals?

3    A.   Up towards the northeast part of the county, close to

4    Opa-Locka.

5    Q.   How far is Republic Metals from Coral Gables, Florida?

6    A.   It's quite a distance.  I would probably say roughly maybe

7    15 to 17 miles.

8    Q.   In the course of this investigation, aside from your

9    meeting with the victim, did you ever have a chance to speak

10   with other persons associated with the gold?

11   A.   As far as -- well, not directly associated with the

12   robbery, but those that brought information, yes.

13   Q.   Did you have a chance to speak -- do you know who this gold

14   is associated with?

15   A.   Yes.  It was associated with --

16            MR. ZACCA:  Objection.  Calls for hearsay.

17            THE COURT:  Overruled.

18            THE WITNESS:  I determined from the victim that it was

19   actually owned by a company -- a Bolivian company called Quari

20   Wasi.

21   BY MR. VAZQUEZ:

22   Q.   Does Quari Wasi -- aside from the victim who is here, did

23   you ever find any offices or any kind of presence in South

24   Florida?

25   A.   No, none.
```

```
1    Q.  And when you say it's a gold company, what does that mean?

2    A.  Well, as far as, it was a gold export company that

3    apparently they exported gold here into the United States.

4    Q.  Now, as part of your investigation, did you have a chance

5    to look at any kind of examples of what the gold looked like

6    before it was robbed?

7    A.  They did describe it to me.  And then they showed me some

8    photos --

9            MR. ZACCA:  Objection.  Calls for hearsay.

10           THE COURT:  If he saw something?

11           MR. ZACCA:  Description.

12           THE COURT:  Whatever he saw with his own eyes, he may

13   describe.  Overruled.

14           THE WITNESS:  I did see photos of what it would look

15   like.  And basically, it's an unrefined block of gold, in a

16   sense, has other impurities, and ...

17   BY MR. VAZQUEZ:

18   Q.  And when did you do that?

19   A.  That was done probably the same day of the robbery.

20       (Pause in proceedings.)

21   BY MR. VAZQUEZ:

22   Q.  Detective, I'm showing you what's been marked for

23   identification as Government's 36.  Would you please look

24   through it.

25   A.  (Witness complies.)
```

```
1    Q.  Do you recognize Government's 36 --

2    A.  I do.

3    Q.  -- for identification?

4    A.  Yes.

5    Q.  And what is Government's 36 for identification?

6    A.  It's an example of the unrefined gold that they would be

7    transporting.

8    Q.  When did you get a chance to see Government's 36?

9    A.  Originally, in the case, the day of the robbery.

10   Q.  Who presented it to you?

11   A.  It would have been actually the head of the Quari Wasi,

12   that he contacted me directly.

13   Q.  And why is it that you had a chance to see this?

14   A.  I actually asked him because I was unfamiliar with the

15   process as far as the transportation of gold.  So I wanted to

16   know what it was we were looking for, because we hadn't really

17   had, honestly, a robbery of that type where it was just

18   unrefined gold.

19        So usually, we'll take jewelry or certain other things and

20   other valuables, but something that can be traced a little

21   better.  But this one was different and something I personally

22   had not dealt with, so I wanted to know what it looked like.

23   Q.  Were there any leftover pieces of gold at the crime scene?

24   A.  Absolutely not.

25        MR. VAZQUEZ:  Your Honor, at this time, I would move
```

```
 1    to admit Government's 36 for identification into evidence.
 2              MR. ZACCA:  Objection, Judge.  Lack of predicate
 3    and --
 4              THE COURT:  There's not -- there's not an adequate
 5    foundation with this exhibit and the witness at this time.
 6    BY MR. VAZQUEZ:
 7    Q.  Now, aside from your personal investigation, did you reach
 8    out to any other law enforcement sources -- strike that -- any
 9    other law enforcement investigators in October of 2012, in the
10    months around that time?
11    A.  I did make contact with the Department of Corrections, and
12    they were the ones that I was working with very closely at that
13    time.
14    Q.  And why did you contact them?
15    A.  I was able to identify a subject in my case, and I
16    determined that he was actually on supervised release at the
17    time of the robbery.
18    Q.  And what did you receive from the Department of
19    Corrections?
20    A.  Basically, to explain it, it's almost like a list of GPS
21    coordinates and it will show where the subject was on any given
22    date and time.
23    Q.  Detective, I'm showing you what's been marked as
24    Government's 43 for identification.  Do you recognize it?
25    A.  Yes, I do.
```

1    Q.  And what is it?

2    A.  Basically, it looks like a CD tape of the same information

3    that we had from the Department of Corrections.

4    Q.  And through -- and through your investigation and review of

5    these materials, does this reflect the records that you

6    reviewed?

7    A.  It does.

8    Q.  And regarding the subject Raonel Valhuerdis?

9    A.  That does, yes.

10        MR. VAZQUEZ:  At this time, I would move Government's

11   43 into evidence.

12        MR. ZACCA:  No objection.

13        THE COURT:  Received.

14   (Government's Exhibit 43 received into evidence.)

15   BY MR. VAZQUEZ:

16   Q.  Now, in addition to the Department of Corrections, at any

17   point in time, did you come in contact with individuals from

18   the Miramar, Florida Police Department?

19   A.  That I came into direct contact with, no, but I did have

20   communication with them.

21   Q.  Okay.  And at any point in time, did you review your

22   records or the records you received from the Department of

23   Corrections with regard to GPS activity at -- in a residence in

24   Miramar, Florida on the date of September 30 of 2012?

25   A.  I did speak with Miramar Detective Bertrand.  And we did

1    discuss, due to the similarities of our cases --

2    Q.  Did you see -- your review of the GPS records, did it show

3    Valhuerdis in the Miramar area on September 30th of 2012?

4    A.  Yes, it did.

5    Q.  And in the course of this case, did you also review your

6    GPS records that you received from the Department of

7    Corrections, what's been admitted as Government's 43, for

8    presence of Valhuerdis in the Coral Gables area on October 12th

9    of 2012?

10   A.  I did.

11   Q.  Detective, while you were investigating this case, your

12   Coral Gables case, did you identify -- did you have information

13   regarding additional subjects who were involved in your robbery

14   effort?

15   A.  I did.

16   Q.  And did you share that information with members of law

17   enforcement, including the FBI, Department of Homeland

18   Security, and the investigators that they were working with?

19   A.  I did.

20   Q.  Detective, as a part of your investigation, did you

21   identify an individual by the name of Jean Marrero Lara as one

22   of your subjects?

23   A.  I did.

24   Q.  Did you identify an individual by the name of Alfredo

25   Kindelan as one of your subjects?

```
 1   A.   Yes, I did as well.

 2   Q.   Detective, I'm showing you what's been marked for

 3   identification as Government's 23.  Do you recognize it?

 4   A.   Yes, I do.

 5   Q.   And what is it?

 6   A.   It's a photo of Jean Marrero Lara.

 7   Q.   I'm showing you what's been marked for identification as

 8   Government's 22.  Do you recognize it?

 9   A.   Yes.  That's a photograph of Alfredo Kindelan.

10   Q.   Showing you what's been marked for identification as

11   Government 24.  Do you recognize it?

12   A.   Yes, I do.  That's the subject Raonel Valdez.

13            THE COURT:  Counsel, I want to be clear, because I

14   have 22 and 23 as having been received through Witness

15   Rodriguez on 12/6 and 7.

16   BY MR. VAZQUEZ:

17   Q.   Okay.  Detective, I'm going to publish what's been admitted

18   into evidence as Government's 22 and 23.  What are we looking

19   at here?

20   A.   Alfredo Kindelan.

21   Q.   And showing you what's an admitted as Government's 23.

22   A.   That would be Jean Marrero Lara.

23            MR. VAZQUEZ:  And at this time, I would move to admit

24   Government's 24.

25            THE COURT:  Any objection to 24 for identification?
```

```
 1              MR. ZACCA:  Oh.  Forgive me, Judge.  No objection.
 2              THE COURT:  Received.
 3        (Government's Exhibit 24 received into evidence.)
 4              MR. VAZQUEZ:  Permission to publish?
 5   BY MR. VAZQUEZ:
 6   Q.  And what are we looking at now?
 7   A.  Raonel Valdez Valhuerdis.
 8        (Pause in proceedings.)
 9   BY MR. VAZQUEZ:
10   Q.  Detective, when you responded to the Coral Gables scene,
11   did you identify any gunfire, any spent casings that were
12   involved?
13   A.  No.  There were none.
14   Q.  And during the investigation, at any point in time, did you
15   look at whether or not there were any 911 calls for service
16   regarding gunshots being discharged around the time of this
17   robbery?
18   A.  As part of my investigation, I checked our 911 system and
19   our records system, as far as for previous calls in the area or
20   specifically at the victim's residence, as I was gathering
21   information.  And no, we did not find anything.
22   Q.  Now, when you got the GPS records in evidence, with regard
23   to Mr. Valhuerdis, what were you using them for?
24   A.  I was using them specifically to place him at the scene and
25   determine whether it matched the information and identification
```

```
1   I had received, and in order to confirm him as a subject in my

2   case.

3   Q.  And did you also look at his movements, where he would go?

4   A.  I did look at it prior to and afterward.

5   Q.  And why were you doing that?

6   A.  I wanted to see if he had been at the location previously.

7   Q.  And what did you find when you did that?

8   A.  He had been at the location several times over the previous

9   month.

10  Q.  And did you also look at his movements with regard to the

11  Miramar scene and its frequency?

12  A.  It also had a similar pattern.

13  Q.  So you saw Valhuerdis going to the Miramar scene?

14  A.  Correct.

15  Q.  And did you have a chance to look at the GPS and its -- any

16  connection to the Republic Metals location?

17  A.  I also did, yes.

18  Q.  And what did you find from your review?

19  A.  He also apparently had been there multiple times over the

20  previous month prior to my robbery.

21  Q.  Did you identify any potential -- like home bases for the

22  Defendant, where he might live or rest or sleep?

23  A.  He had a -- I know that he was staying at a location in

24  Hialeah, which is where we ended up arresting him at.

25  Q.  And how far is Hialeah from Coral Gables, Florida?
```

1    A.  Hialeah is probably at least 12 to 14 miles, and a far

2    greater distance with traffic.

3    Q.  And did you see movement with the GPS, repeated movement to

4    the Coral Gables area?

5    A.  I did.

6    Q.  Did you attempt to find any kind of relevant -- or

7    investigate to see if Mr. Valhuerdis had any relevant work

8    history in the Coral Gables area?

9    A.  I did.  And as far as I knew, he had no -- at least no

10   significant employment.  We never found him with any employment

11   records.

12   Q.  Did you find any -- were you able to find anything that had

13   a legitimate legal reason for him to be in the Coral Gables

14   area?

15             MR. ZACCA:  Objection.

16             THE COURT:  Sustained.

17   BY MR. VAZQUEZ:

18   Q.  Did you find -- did you see if there were any terms of

19   employment or purposes for Mr. Valhuerdis to be in the

20   Opa-Locka area near Republic Metals?

21   A.  Not that I was --

22             MR. ZACCA:  Objection.

23             THE COURT:  Sustained.

24   BY MR. VAZQUEZ:

25   Q.  Did you try and find if Mr. Valhuerdis had any kind of

1    employment in Opa-Locka?

2    A.  I did not discover any for him.

3    Q.  Did you try and find if he had any homes or friends that

4    lived in Opa-Locka?

5              MR. ZACCA:  Objection.

6              THE COURT:  Come sidebar, please.

7         (At sidebar on the record.)

8              THE COURT:  Sir, isn't this entire line of questioning

9    hearsay?  Do you have documents?  Do you have a custodian of

10   records saying he worked somewhere?  Do you have --

11             MR. VAZQUEZ:  He's going to say:  "I didn't find

12   anything.  I couldn't find anything."

13             THE COURT:  Well, but it's not the answer he's

14   objecting to.  It's the question that you're asking.  And you

15   don't have a basis to ask the question because you don't have

16   the actual evidence of what you're asking him.

17             MR. VAZQUEZ:  I know that he tried, and there's --

18             THE COURT:  The objection is sustained.

19             Please.

20             MR. VAZQUEZ:  Yes, Your Honor.

21        (End of discussion at sidebar.)

22        (Pause in proceedings.)

23             MR. VAZQUEZ:  Your Honor, tender the witness.

24

25

```
 1                        CROSS-EXAMINATION

 2   BY MR. ZACCA:

 3   Q.  Good morning.

 4   A.  Good morning, Counsel.

 5   Q.  We have never met before, right?

 6   A.  No, sir.

 7   Q.  You work for the Coral Gables Police Department, correct?

 8   A.  I do.

 9   Q.  You said you worked there for 15 years.  Is that 15 years

10   as of 2012 or as of now?

11   A.  As of now.  That was 15 years that I've been in the unit

12   I'm assigned in currently.

13   Q.  Now, you testified that on October 12th, 2012, the date of

14   the robbery, you were working that day, correct?

15   A.  I was, sir.

16   Q.  And in fact, you're the lead investigator for the Coral

17   Gables Police Department, correct?

18   A.  On that matter, yes.

19   Q.  On that matter.  On this particular case, right?

20   A.  Correct, sir.

21   Q.  Okay.  So as a lead investigator, all information about the

22   case filters through you, correct?

23   A.  In theory it should, yes.

24   Q.  Well, that's the design of it, correct?

25   A.  Yes, sir.
```

1  Q.  Because you have a responsibility as a lead investigator,

2  correct?

3  A.  I do.

4  Q.  And your responsibility is simple:  Find those responsible

5  for the robbery, correct?

6  A.  Yes, sir.

7  Q.  And that's what you tried to do, correct?

8  A.  Correct.

9  Q.  So, you know, you mentioned that you started your

10  investigation in 2012 and you had various communications with

11  other law enforcement agencies; is that right?

12  A.  Yes, sir.

13  Q.  Some of those agencies -- one of those agencies, rather,

14  was the Miramar Police Department, correct?

15  A.  Yes.

16  Q.  Detective Bertrand?

17  A.  Correct.

18  Q.  And another law enforcement agency is the Federal Bureau of

19  Investigation, correct?

20  A.  Correct.

21  Q.  And it's typical in law enforcement to share information,

22  correct?

23  A.  It is.

24  Q.  Right?  When you're trying to solve a crime, yes?

25  A.  Yes.

31

```
 1   Q.  So it's very normal in the business to:  "Hey, what do you
 2   have?  This is what I have," correct?
 3   A.  Correct.
 4   Q.  Now, you said -- okay.  Let's look at Government's Exhibit
 5   24.  We were looking at this photograph of this gentleman here.
 6   This is Mr. Valhuerdis, correct?
 7   A.  Yes, sir.
 8   Q.  Right.  Mr. Valhuerdis, is somebody you identified as being
 9   responsible for the robbery, correct?
10   A.  Yes, sir.
11   Q.  When did you identify him?
12   A.  I identified him probably several days after the robbery
13   occurred, in my investigation.
14   Q.  Several days -- so quick, quickly?
15   A.  Fairly.
16   Q.  We're talking October of 2012?
17   A.  Fairly quickly, yes.
18   Q.  Now, before we move on to the other two gentlemen, let's --
19   Mr. Valhuerdis was arrested at some point, correct?
20   A.  Yes, he was.
21   Q.  When was he arrested?
22   A.  He was arrested -- I don't remember the exact date, but in
23   October of that year.
24   Q.  Did you make the arrest?
25   A.  I did.
```

```
1    Q.  So you arrested Mr. Valhuerdis in October 2012, you

2    personally?

3    A.  Correct.

4    Q.  I'm going to show you now Government Exhibit 23, Mr. Jean

5    Marrero Lara.  You testified that you identified him as being

6    responsible for this robbery, correct?

7    A.  I identified him as a possible subject, but I was never

8    able to get a physical identification of him being directly

9    involved in my robbery.

10   Q.  Okay.  Possible subject.  So does that mean that somebody

11   that is -- could be involved, but you're just not sure.  What

12   do you mean by "subject"?

13   A.  A subject basically in the sense that I had reason to

14   believe that he was involved, but I did not have concrete

15   evidence in order to pinpoint him directly involved.  So I

16   could not arrest him.

17   Q.  And when did you identify him as a subject?

18   A.  The information I received was at the same time as

19   Mr. Valhuerdis.

20   Q.  So you identified him as a subject in October 2012, right?

21   A.  Correct.

22   Q.  Government Exhibit 22.  This is Alfredo Kindelan, correct?

23   A.  Yes, sir.

24   Q.  Did you identify him as a subject, like Jean Marrero Lara,

25   or somebody concretely responsible, like Valhuerdis?
```

1   A.  He was on the same status as Mr. Lara.

2   Q.  Okay.  So he was a subject.

3       When did you identify Mr. Alfredo Kindelan as a subject?

4   A.  At the exact same time.  All three of them were basically

5   identified as potential subjects at the same time.

6   Q.  Again, October 2012, right?

7   A.  Yes, sir.

8   Q.  Do you know the name David Bolton?

9   A.  I do.

10  Q.  In fact, you know that name well, don't you?

11  A.  I do.

12  Q.  Is he somebody that helped you in your investigation?

13  A.  He was a person that was in contact with me because he was

14  a private investigator that was hired by Quari Wasi.

15  Q.  And again, Quari Wasi was the gold mining company, the

16  victim company here, correct?

17  A.  Yes.  That's correct.

18  Q.  All right.  So Mr. Bolton was hired as a private

19  investigator by the gold mining company to do what?

20  A.  I believe to find out facts on their own and determine

21  where their gold had gone.

22  Q.  Find out who's responsible and where is the gold, right?

23  A.  As far as specific objectives, I can't answer for him.  But

24  I know it seemed to be to find the stolen gold.

25  Q.  Now, you had -- well, did you have communications with

```
1    Mr. Bolton in 2012?

2    A.  I did.

3    Q.  Did you have communications with Mr. Bolton in 2013?

4    A.  Possibly.  I don't remember for certain, though.

5    Q.  Okay.  Did you have communications with Mr. Bolton in 2014?

6    A.  I don't believe so.

7    Q.  So you certainly had communications with him in 2012,

8    right?

9    A.  Correct.

10   Q.  You believe, but you're not sure if you had communications

11   in 2013?

12   A.  The only other time -- to specify for the jury, I spoke to

13   him while the investigation was ongoing.  And then we spoke

14   again when the subject in my investigation -- he basically was

15   on the run, and he was discovered in Belize.  And then we had

16   communication again because he was the one who called me and

17   told me about that.

18   Q.  So the jury understands, the subject we're talking about is

19   Mr. Valhuerdis?

20   A.  Yes.  Mr. Valhuerdis.

21   Q.  So he wasn't a subject.  He was a target --

22   A.  He had already been arrested at that point.

23   Q.  Right.  Because you used the term "subject" before.  I

24   don't want to confuse the terms.

25   A.  I apologize.
```

```
 1    Q.  So Mr. Valhuerdis was a fugitive and you were trying to
 2    find him?
 3    A.  Correct.
 4    Q.  That was in 2013, right?
 5    A.  Yes.
 6    Q.  So you had communications with Mr. Bolton in 2013?
 7    A.  If that was the time that he was taken back, yes.  While he
 8    was a fugitive, then yes.
 9    Q.  And in your investigative report, did you note every time
10    that you spoke to Mr. Bolton?
11    A.  I'm sorry?
12    Q.  Forgive me.  I'll repeat the question.
13         In your -- did you ever note the times that you spoke with
14    Mr. Bolton?
15    A.  No, I did not.
16    Q.  So it's nowhere in your report?
17    A.  No.  If he called me on my cell phone, then I probably
18    would not have noted that.
19    Q.  So these questions that you're answering right now, you're
20    just relying upon your own recollection?
21    A.  I am.
22    Q.  Okay.  How many times did you speak with Mr. Bolton in
23    total?
24    A.  In total?
25    Q.  Yes.
```

```
 1    A.   To the best of my recollection, I would probably say

 2    maybe -- could be maybe 30 times in total.

 3    Q.   Thirty times.  So 2012 to 2013, you spoke with Mr. Bolton

 4    30 times?

 5    A.   Correct.  He would call me frequently to try and find out

 6    status of the case on behalf of the victim.

 7    Q.   When's the last time you spoke with Mr. Bolton?

 8    A.   I believe I saw him on the streets of Coral Gables in

 9    Miracle Mile when I was working an off-duty detail myself, and

10    he just told me hello.  He saw me working and he said hello.

11    Q.   So that was a nice casual hello?

12    A.   Right.

13    Q.   Let's be more specific then.  When is the last time -- you

14    said approximately 30 times you had communications with

15    Mr. Bolton.  The thirtieth time, the last time you spoke with

16    Mr. Bolton, when was that -- about this case, not about casual

17    niceties?

18    A.   Well, it wasn't about specific details, but I believe he

19    called me about six or seven months ago.  But again, it wasn't

20    anything as far as the investigation.  He was telling me

21    something about a -- that he was writing a newspaper article or

22    a book and he was just letting me know.

23             MR. ZACCA:  No further questions.

24

25
```

REDIRECT EXAMINATION

BY MR. VAZQUEZ:

Q.  Detective McKee, during your investigation of this case,

did you consider Mr. Bolton a part of your investigative team?

A.  No, I did not.

Q.  Do you -- did you have access to all the material that he

had collected?

A.  I don't believe so.

Q.  And did you tell Mr. Bolton everything that you knew about

the case?

A.  No.  I would not.  Mr. Bolton's a private investigator and

not law enforcement.  So I definitely would not have the same

confidence in him as I would in another law enforcement

investigator.

Q.  And are you writing a book about this investigation?

A.  No, I'm not.

Q.  Now, did you ever receive information, any kind of

recordings, documents, anything like that, from Mr. Bolton that

you found significant in any way?

A.  No.  Mr. Bolton never turned over any statements,

documents, or any recordings whatsoever to me.

Q.  Did you ask for any materials that may be helpful to be

given to you?

A.  No, I did not.

Q.  And why not?

1    A.   Basically, I would have to discuss it with the state -- and

2    depending on the manner that he collected it, since we have

3    certain regulations as far as how we collect evidence and what

4    can be used.

5    Q.   When you spoke with Mr. Bolton these times, what were you

6    telling him?

7    A.   Basically, it was just constant status updates, as far as

8    where the investigation was going.  And then he particularly --

9    you know, he used to call -- especially when Mr. Valhuerdis was

10   a fugitive.  Then he would call telling me that he heard a

11   rumor that he was --

12            MR. ZACCA:  Objection to hearsay.

13            THE COURT:  Sustained.

14   BY MR. VAZQUEZ:

15   Q.   At any point in time, during any of these conversations,

16   did any of them lead to you acquiring any kind of record

17   evidence of any kind from Mr. Bolton?

18   A.   No.  Nothing was used in the record from him.

19            MR. VAZQUEZ:  Your Honor, no further questions for the

20   witness.

21            THE COURT:  All right.  Permanent excusal?

22            MR. VAZQUEZ:  Yes.

23            MR. ZACCA:  Not from the Defense, Judge.  We may

24   recall him.

25            THE COURT:  All right, sir.  You are excused subject

```
 1    to recall.

 2            Was the original subpoena issued by the Defense or by

 3    the Government?

 4            MR. VAZQUEZ:  The United States.

 5            MR. ZACCA:  The original subpoena is by the United

 6    States, but I'm presently trying to serve a subpoena today on

 7    Mr. McKee.

 8            THE COURT:  Well, stay in touch with him and let him

 9    know that you expect him to be a witness.

10            MR. ZACCA:  Yes, sir.

11            MR. VAZQUEZ:  United States calls Officer Stacey

12    Hadley as its next witness, from the Miramar Police Department.

13       DETECTIVE STACEY HADLEY, GOVERNMENT WITNESS, SWORN

14                        DIRECT EXAMINATION

15    BY MR. VAZQUEZ:

16    Q.  Good morning, ma'am.

17    A.  Good morning.

18    Q.  Would you kindly introduce yourself to the Members of the

19    Jury.

20    A.  I'm Stacey Hadley.  I work for City of Miramar.  I'm a

21    police officer.

22    Q.  And in what capacity do you currently serve?

23    A.  I'm a detective.

24    Q.  And what is your current assignment?

25    A.  I'm in the Street Crimes Unit.
```

1    Q.   What is the Street Crimes Unit?  What is that?  What kind

2    of cases do you do?

3    A.   We work proactive cases.  Like when hot calls come out, we

4    go.  We know who all the top offenders are in our city.

5    Q.   Okay.  I want to draw -- well, how long have you been in

6    service with the Miramar Police Department?

7    A.   Ten years.

8    Q.   And through your time with the Miramar Police Department,

9    what assignments have you held?

10   A.   Such as what?

11   Q.   Road patrol, detective, one unit or another?

12   A.   I was road patrol, and I've been in this unit for five or

13   six years now.

14   Q.   I want to draw your attention to a date, March 4th of 2014.

15   On that date, what was your assignment?

16   A.   I was in the same unit.

17   Q.   Okay.  On that date, did you have the occasion to

18   participate in an operation at 11201 Southwest 55th Street

19   Miramar, Florida?

20   A.   Yes.

21   Q.   And why were you there?

22   A.   We were assisting Probation & Parole.

23   Q.   And on that assistance, on the date of that operation, did

24   you have the opportunity to come in contact with a person who

25   later became known to you as Dairon Marrero Pena?

```
 1    A.   Yes.

 2    Q.   And why is it that you came in contact with that person?

 3    A.   Probation was doing a probation check on him.

 4    Q.   And what was your role?

 5    A.   I was just there for her safety.

 6    Q.   And in the course of that operation, did you have the

 7    opportunity to collect a firearm?

 8    A.   Yes.

 9    Q.   Detective, I'm showing you what's been marked as

10    Government's 9 for identification.  Do you recognize

11    Government's 9?

12    A.   Yes.

13    Q.   What is it?

14    A.   It's a firearm.

15    Q.   And is this the firearm you recovered on March 4th of 2014?

16    A.   Yes.

17    Q.   And I'm showing you what's been marked for identification

18    as Government's 9.  Do you recognize these images?

19    A.   Yes.

20    Q.   And what are they?

21    A.   That's the firearm in the box.

22    Q.   And ma'am, how is it that you had the opportunity to

23    acquire this item, this firearm, what's been marked for

24    identification as Government's 9?

25    A.   Probation & Parole --
```

```
 1              THE COURT:  Ma'am, you're going to have to lean
 2     forward and speak into the microphone, please.
 3              THE WITNESS:  When Probation & Patrol went -- I'm
 4     sorry -- Probation & Parole went in to check his room, they
 5     found the firearm in his closet.
 6     BY MR. VAZQUEZ:
 7     Q.  And what was your role after the firearm was found?
 8     A.  I just placed into our Property for Probation & Parole.
 9              MR. VAZQUEZ:  Your Honor, at this time, I would move
10     to admit Government's 9 and 10 into evidence.
11              MR. ZACCA:  At this point, objection, foundation,
12     relevance.
13              THE COURT:  Has any other witness identified this
14     item?
15              MR. VAZQUEZ:  We have -- I will offer it subject to
16     linkup.
17              THE COURT:  No.  No.  I'm saying --
18              MR. VAZQUEZ:  Not yet.
19              THE COURT:  -- has any other witness testified
20     previously?
21              MR. VAZQUEZ:  Not yet, no.
22              THE COURT:  All right.  So at this time, it is not
23     received.  The objection is sustained.
24     BY MR. VAZQUEZ:
25     Q.  Now, this weapon, is this the weapon that came from the
```

```
 1   probationer Dairon Marrero Pena?

 2   A.  Yes.

 3   Q.  And you were at his residence on March 4th, 2014?

 4   A.  Yes.

 5            MR. VAZQUEZ:  Your Honor, I tender the witness.

 6            MR. ZACCA:  No questions.

 7            THE COURT:  Permanent excusal?

 8            MR. VAZQUEZ:  Yes, on behalf of the Government, Your

 9   Honor.

10            THE COURT:  You are excused.

11       (Witness excused.)

12            MR. VAZQUEZ:  Your Honor, our next witness is

13   in-custody inmate Alfredo Kindelan.

14       (Pause in proceedings.)

15            THE COURT:  Is it going to take some time to get the

16   witness in?

17            MR. VAZQUEZ:  I was told that he's there.  I don't

18   know how long exactly it takes to shimmy him out.

19            THE COURT:  Let's take a short recess while we get the

20   witness into the courtroom.

21            We'll be in recess just momentarily.

22       (Jury not present, 10:05 a.m.)

23       (Recess from 10:05 a.m. to 10:15 a.m.)

24            THE COURT:  Bring the jury in, please.

25            COURT SECURITY OFFICER:  Yes, sir.
```

44

```
 1            (Before the Jury, 10:15 a.m.)

 2                 THE COURT:  Be seated, Ladies and Gentlemen.

 3            Please proceed.

 4            COURTROOM DEPUTY:  Raise your right hand.

 5       ALFREDO KINDELAN HERNANDEZ, GOVERNMENT WITNESS, SWORN

 6                      DIRECT EXAMINATION

 7  BY MR. VAZQUEZ:

 8  Q.  Good morning, sir.

 9  A.  (Through Interpreter.)  Good morning.

10  Q.  Would you please introduce yourself to the Members of the

11  Jury.

12  A.  My name is Alfredo Kindelan Hernandez.

13  Q.  Mr. Kindelan, where do you live right now?

14  A.  In federal prison.

15  Q.  And your time in federal prison, what does that relate to?

16  A.  Because of a crime I committed some time ago.  I have two

17  charges and four cases.

18  Q.  Now, prior to testifying today, have you been prosecuted by

19  the United States on two different occasions?

20  A.  Yes.

21  Q.  Those prosecutions -- are you here to offer testimony about

22  some of the events that led to those convictions?

23  A.  Yes.

24  Q.  Through the crimes that bring you to court today, did you

25  become familiar with an individual -- individuals by the name
```

1   of Jean Marrero Lara, Raonel Valhuerdis, and others?

2   A.  Yes.  Miguelito.  Leonardo Miguel.

3   Q.  And do you see the individual you've referred to as

4   Miguelito in court today?

5   A.  Yes.  It is the gentleman that is over there.  It is the

6   gentleman that is sitting down in the wheelchair.

7   Q.  Now, I want to focus first on the crimes that you committed

8   through these two prosecutions.

9       Now, your association with Jean Lara and Raonel Valhuerdis,

10  what crimes were you committing with them?

11  A.  Many crimes, such as assaults, robberies, drug sales.

12  Q.  Now, as part of that effort, did you participate in an

13  event or planning for robberies in the year 2012, one in

14  Miramar, Florida and one in Coral Gables, Florida?

15  A.  Yes.

16  Q.  In addition to robberies, and your association with Jean

17  Lara and Raonel Valhuerdis and others, did you also participate

18  in any kidnappings?

19  A.  Yes.  Robberies, assault, kidnappings.

20  Q.  How many times have you participated in a kidnapping, sir?

21  A.  Three times.

22  Q.  Did you participate in a kidnapping of an individual named

23  Juan De Dios or Juan Garcia?

24  A.  Yes.

25  Q.  An individual known as Nacho?

1    A.   Yes.

2    Q.   And an individual named Alex Mesa?

3    A.   Yes.

4    Q.   And where did three kidnappings occur?

5    A.   In Cancun, Mexico.

6    Q.   Now, you also told the Members of the Jury that, through

7    your association with Lara and his associates, including

8    Mr. Valhuerdis, that there were the theft of drugs, sale of

9    drugs, things of that nature; is that correct?

10   A.   Yes.

11   Q.   Now, as part of that, did you and your associates steal

12   boats?

13   A.   Yes.  Boats as well.  Boats.

14   Q.   And how were boats used by Mr. Lara and his associates,

15   this group that you were part of?

16   A.   We would buy the stolen boats here.  We would send them to

17   Mexico.  We would sell them there.  We would also use them to

18   traffic individuals from Cuba to here as well.

19   Q.   Now, through your association with this group, I want to

20   draw your attention to two specific events that you have

21   previously pled guilty for.

22        We briefly touched -- we briefly touched upon your

23   involvement in a Coral Gables robbery in 2012.

24   A.   Yes.

25   Q.   How did you become involved in that event?

1  A.  Jean Marrero Lara called me, that we were going to do a

2  robbery, an event in Coral Gables.

3  Q.  Now, Mr. Kindelan, before this phone call, had you been

4  participating in these strings of crimes with Lara and his

5  associates?

6  A.  Yes.

7  Q.  What did Mr. Lara want to talk to you about with regard to

8  this Coral Gables robbery?

9  A.  About a gold robbery.

10  Q.  And when you say that:  "A gold robbery," did you ever find

11  out where that gold robbery was going to affect -- where you

12  were going to attempt to do your robbery?

13  A.  Yes.  Yes.  We were going to do the robbery at a refinery

14  in Opa-Locka.

15  Q.  I'm going to show you what's been admitted into evidence as

16  Government's 23.  And who is this?

17  A.  Jean Marrero Lara.

18  Q.  When Mr. Lara contacted you about this gold robbery, did

19  anyone else get involved in it?

20  A.  Also the ones that were called were Carlos Miranda, Raonel

21  Valdez, Leonardo Miguel, and Camilo Montalban, Raonel Valdez.

22  Q.  Showing you what's been admitted as Government's 24.

23  A.  Raonel Valdez.

24  Q.  Now, when you had these discussions -- well, when you say

25  they were involved -- strike that.

```
 1        When you said they were involved, how were they involved?
 2   A.   We would hold a meeting every two or three days to know
 3   what we were going to do the following day.
 4   Q.   And who was involved in these meetings?
 5   A.   The people that were mentioned before:  Raonel Valdez, Jean
 6   Marrero Lara, Leonardo Miguel, and Camilo Montalban.
 7   Q.   I'm showing you what's been marked for identification as
 8   Government's 19.
 9        Do you recognize it?
10   A.   Camilo Montalban.
11   Q.   Is this a fair and accurate depiction of Camilo Montalban?
12   A.   Yes.
13             MR. VAZQUEZ:  Your Honor, at this time, I would move
14   to admit what's been marked for identification as Government's
15   19 into evidence.
16             MR. ZACCA:  No objection.
17             THE COURT:  Received.
18        (Government's Exhibit 19 received into evidence.)
19             MR. VAZQUEZ:  Permission to publish?
20             THE COURT:  Yes.
21   BY MR. VAZQUEZ:
22   Q.   What are we looking at now, sir?
23   A.   Camilo Montalban.
24   Q.   How many meetings did you have before this robbery actually
25   happened in Coral Gables, Florida?
```

1    A.   Twenty, thirty meetings.

2    Q.   And aside from talking, what did you do to make this

3    robbery happen through these meetings?

4    A.   About some other things, if there were, such as sale and

5    robbery of marijuana, then that was done.

6    Q.   Let me ask you:  How did you execute the Coral Gables

7    robbery?

8    A.   With planning, with all of those that I mentioned before.

9    Q.   So when you're planning, when you're preparing in the days

10   and months leading up to this Coral Gables robbery, what were

11   you doing to make it happen?

12   A.   We would meet.  We would follow the people that would exit

13   the refinery.

14   Q.   And when you say:  "We," who was participating in those

15   steps?

16   A.   The people mentioned before:  Leonardo, Jean, Camilo,

17   Raonel, me.

18        We would follow the people.  When they arrived to the

19   refinery, we would follow the people.  The people would arrive

20   with a package.  When I refer to a package, they would arrive

21   with a backpack or a suitcase.  Depending on the size of the

22   suitcase, we would see the size of the quantity of gold that

23   they were bringing.  If we saw that the suitcase was very

24   large, that was then the individual to follow -- to be

25   followed.

```
1        We would follow the individual.  We would place a
2   localizing device in the car to check the movements the person
3   would make during the daytime.  We would do that to several
4   individuals during the daytime.
5        The individual that would come with more frequency to the
6   refinery, with a greater amount of gold, that would be the
7   individual we would focus the most on.  Until we saw an
8   individual.  This individual would come to the refinery more
9   often with a large amount of gold.  We focused directly on this
10  individual, and we were practically focused for 40, 50 days on
11  that single individual.  We knew what this individual did every
12  day, all of this person's movements.
13       Until one day, we all agreed -- because he then did the
14  right move so that we would carry out the assault on that day,
15  the robbery.
16  Q.  Now, Mr. Kindelan, I want to focus on each of the
17  individuals in the case.  The person who's depicted on
18  Government's 19, what are some of the examples of what you saw
19  this person doing?
20  A.  This person would follow the individuals, the victims, to
21  get them when the opportunity arose.  He would surveil them.
22  He was practically the shadow of these individuals.
23  Q.  And the individual depicted on Government's 24, what are
24  examples of what he did to accomplish the Coral Gables robbery?
25  A.  He would do 24-hour surveillance, the most he could.
```

51

```
 1   Q.  And what does that mean, when you say:  "Surveillance"?

 2   How would you do surveillance on these victims?

 3   A.  We -- they had -- we would place a localizing device in the

 4   cars of these individuals.  We knew all the movements this

 5   person made.  That way, we had that person under control.

 6   Q.  And the individual depicted on Government's 23, what did he

 7   do?

 8   A.  He -- with another individual, they would organize.  They

 9   would tell us what we had to do.

10         MR. ZACCA:  Objection to "they."  He asked a

11   question -- it's not responsive to the question.

12         THE COURT:  Let's be specific.  I don't whether this

13   is a proper "they" or not.

14   BY MR. VAZQUEZ:

15   Q.  What did this person tell the participants in this robbery

16   plan to do?

17   A.  It was for us to take the gold in any way possible, commit

18   robberies, to hit people.

19   Q.  Was this person a participant in the surveillance efforts

20   for the group?

21   A.  Yes.

22   Q.  Mr. Kindelan, what did you do to make this robbery happen?

23   A.  I would follow these individuals.  I would be given the

24   license plate of these individuals, and through someone I would

25   get the addresses of these individuals.
```

52

```
1    Q.  Who would give you the addresses?

2    A.  An individual that worked with license plates.

3    Q.  Now, were you present when the Defendant participated in

4    this gold robbery plan?

5    A.  Yes.

6    Q.  What did you see him do?

7    A.  He is a very intelligent individual.  So along with Jean

8    Marrero Lara, they would tell us what we had to do.

9    Q.  Did the Defendant participate in surveillance of the

10   victim?

11   A.  Yes.

12   Q.  How many times did you see the Defendant participate in

13   surveillance of the victim?

14   A.  Practically every day, because the Defendant was the one

15   that lived closest to the home of the victim.  So he was the

16   one that would get there the fastest.

17       There were days when Jean could not go.  So he would

18   practically then tell us what we had to do.

19   Q.  Now, while you were preparing to commit this gold robbery,

20   did there come a point in time where you had the opportunity to

21   commit a separate robbery in September of 2012 -- September

22   30th of 2012, to be precise?

23   A.  Yes.

24   Q.  Now, Mr. Kindelan, this gold robbery and this Miramar

25   robbery, these are both crimes that you have admitted to
```

```
 1    committing; is that correct?

 2    A.  Yes.

 3    Q.  And Mr. Kindelan, what are you currently sentenced to as a

 4    result of your crimes?

 5    A.  Sixteen years and eight months.

 6    Q.  And prior to receiving your sentence, did you have an

 7    agreement with the Government about what both sides would ask

 8    for?

 9    A.  Yes.  The prosecution asked for 25 years.

10    Q.  And who decided that you would get less than 25 years?

11    A.  The lady judge.

12    Q.  Now, Mr. Kindelan, as part of your conviction and plea to

13    the crimes, are you under an agreement to cooperate with the

14    Government?

15    A.  No.

16    Q.  Did you sign a Plea Agreement saying that you were going to

17    cooperate with the Government?

18    A.  I do not understand the question.

19    Q.  When you pled guilty in this case, did you sign an

20    agreement with the Government pleading guilty?

21    A.  For 25 years.

22    Q.  And as part of that agreement, did you agree not to falsely

23    implicate anyone in any crimes?

24    A.  Exactly.

25    Q.  And that you would provide truthful testimony to courts and
```

```
 1    investigations going forward?
 2              MR. ZACCA:  Objection to the leading form of the
 3    question.
 4              THE COURT:  Repeat the question, please, sir.
 5    BY MR. VAZQUEZ:
 6    Q.  And as part of your Plea Agreement, were you to provide
 7    truthful testimony to investigators and any courts?
 8    A.  Yes.
 9    Q.  Now, Mr. Kindelan, before your most recent conviction, were
10    you prosecuted for one of your kidnapping events?
11    A.  Yes.
12    Q.  And at that point in time, did you offer your cooperation?
13    A.  No.
14    Q.  Did you agree to speak with law enforcement after you were
15    convicted in that first kidnapping case?
16    A.  Yes.
17    Q.  Did you offer the information that you knew that was
18    responsive to the questions that were posed to you?
19    A.  Yes.
20    Q.  And after you provided that information, were you
21    prosecuted for the gold robbery and the Miramar robbery and
22    related crimes?
23    A.  Yes.
24    Q.  Do you understand that you're testifying now and that if
25    you provided false testimony you could be prosecuted again a
```

1   third time?

2   A.   Yes.

3   Q.   Now, Mr. Kindelan, we were talking about the crimes that

4   you had admitted to, specifically in this most recent

5   prosecution, specific events.   How did this September 30th,

6   2012 robbery that we briefly touched upon -- how did that come

7   up?

8   A.   The Miramar one?

9   Q.   Yes.   How did that come up in the middle of your gold

10  robbery plan?

11  A.   Some days before the robbery of the gold, Leonardo Miguel,

12  the gentleman that is sitting there, he tells us that he had

13  been told that he had a marijuana grow house, that we were

14  going to be taking the marijuana from there.

15       He tells this to Jean Marrero Lara, Raonel Valdez, and me,

16  that we were going to go to a house where there was some

17  specific amount of marijuana, that he had already checked it

18  out, that he knew it was there.   And we told him, fine, that

19  whenever that was ready to let us know.

20       He did not comment about that anymore.   We continued

21  working on the gold thing, until all of a sudden he calls us

22  and tells us for us to go and rob the marijuana grow house.

23  Q.   Mr. Kindelan, I want to stop you there.

24       When you first received the information from the Defendant

25  about the marijuana grow house, where, if anywhere, did that

```
1    information come from?

2    A.  He tells us that two individuals provide that information

3    to him, a girl by the name of Celia Gonzalez and Ochil.  Those

4    two individuals, we know them both from Cuba.

5    Q.  I want to show you what's been admitted into evidence as

6    Government's 17 and Government's 18.

7         Showing you Government's 18.

8    A.  Celia Gonzalez.

9    Q.  And showing you Government's 17.  Who is that?

10   A.  Ochil.

11   Q.  Now, when this information got to you, had you ever --

12   strike that.

13        Had you ever talked to Ochil or Celia about any marijuana

14   grow house robberies?

15   A.  No.

16   Q.  And was Ochil or Celia part of your group that had been in

17   operation for sometime?

18   A.  No.

19   Q.  Did you receive information from the Defendant about this

20   location and why it was a good place to rob?

21   A.  Yes.  The Defendant told us that it was in Miramar.

22   Q.  And did the Defendant tell you anything about who was being

23   robbed in Miramar?

24   A.  Yes.  An individual that he knew that this person was gay.

25   Q.  And did you know that person's name?
```

```
 1    A.   Frank.  I believe that that was the person's name.

 2    Q.   Now, you were telling us about the day that you got the

 3    information to actually do this Miramar robbery.  What happened

 4    on the day of the Miramar robbery?

 5    A.   He tells us -- for us to go to his house.  We go to his

 6    house.  There, at his house, we agree that we were going to go

 7    to the house in Miramar to rob the marijuana.

 8    Q.   And when you say:  "We were going to his house," whose

 9    house did you meet at?

10    A.   At Miguel's -- Miguelito's house.

11    Q.   Who, if you recall, was at this first meeting prior to the

12    Miramar robbery actually happening?

13    A.   Jean Marrero, Raonel Valdez, and myself.

14    Q.   And what was discussed at this get-together?

15    A.   He told us that there was a marijuana grow house, that it

16    was easy to do the robbery, that the marijuana was already

17    placed in bags, that he had done the surveillance the days

18    before, and that he knew -- he already knew everything.

19    Q.   Now, why was it important that the marijuana was in bags?

20    A.   It was important because the marijuana had already gone

21    through the whole process.  It was already in bags in pounds.

22    Q.   And what was going to happen with that marijuana if you

23    were successful?

24    A.   We were going to sell it.  He was going to sell it.

25    Q.   Now, after you had this discussion, what happened next with
```

1    this marijuana robbery?

2    A.  We went to Miramar.

3    Q.  And where did you go in Miramar?

4    A.  We got to a park in a Miramar.  There, when we got to the

5    park, he told each one of us what we had to do.  To me, he told

6    me to get to the house and to turn off the light breaker.  To

7    Raonel, he told him to go in with him.

8        There -- to Jean, he told him to go around the house once,

9    that when people from inside the house would come out to see

10   why there was no light, we were going to go inside the house

11   and take the marijuana with us, that we would place it in the

12   trash bags or in sheets, bed sheets, and we would place it in

13   the van, in his van.

14   Q.  Now, you said:  "Van."  Who had a van?

15   A.  Him.  Leonardo Miguel had a van.  It is in this van that he

16   takes us to Miramar.

17       When we arrived there at the park, him, from the glove

18   compartment of the car, he takes a mask and a weapon.

19   Q.  Now, before we get to that part of the case, in addition to

20   a white van, did any person associated with this robbery --

21   were they driving a maroon SUV?

22   A.  Yes.

23   Q.  And who was that?

24   A.  My stepson.

25   Q.  And what role, if any, did that person have in this effort?

1    A.   He took Jean up to the place.

2    Q.   And through the course of this robbery, did he stay in the

3    area?

4    A.   No.

5    Q.   Now, you met at a park and talked about this robbery.  What

6    did you do next after this meeting?

7    A.   We went to the house.  We jumped a fence.  He told us the

8    position of each one, as he had done before already.  He showed

9    us the house.  I did what he told me to do, which was to turn

10   off the light, to shut off the breaker.

11   Q.   Okay.  Now I want to show you what's been admitted into

12   evidence as Government's 1.  What is depicted on the screen in

13   Government's 1, Page 1759?

14   A.   This is the home where the crime was committed.

15   Q.   Now, where were you with Mr. -- with the Defendant and the

16   others involved in this robbery in relation to what we see on

17   the screen?

18   A.   In front of the car in the garage.

19   Q.   Now, using your finger on the screen, can you show the

20   Members of the Jury where you were.

21   A.   Yes.

22   Q.   Would you please do that.

23            MR. VAZQUEZ:  Is it not working?

24   BY MR. VAZQUEZ:

25   Q.   If you touch the screen -- can you describe where you were.

1    A.   Underneath the light.

2            MR. VAZQUEZ:  Okay.  So for purposes of the record, on

3    Bates 1759, from Government's 1, I'm drawing a figure with my

4    finger.  It's a green dot underneath a light by the garage --

5    right garage door.

6    BY MR. VAZQUEZ:

7    Q.   Is that where you were positioned?

8    A.   Yes.

9    Q.   And where was Mr. Valhuerdis?

10   A.   He was at the door with Miguel, in this door that you see

11   that is open.

12   Q.   Okay.

13           MR. VAZQUEZ:  Marking Bates 1759, Government's 1, with

14   a green pair of lines by the center portion of the exhibit

15   where the door is open.

16   BY MR. VAZQUEZ:

17   Q.   Is this where the Defendant and Mr. Valhuerdis were?

18   A.   Yes.

19   Q.   And where was Mr. Lara?

20   A.   Mr. Lara was over to my side at the other door.

21   Q.   So with the same exhibit, 1759, I'm -- when you say:  "The

22   other door," is it this location here?  And I'm --

23           THE COURT:  Excuse me, sir.

24           MR. VAZQUEZ:  Your Honor?

25           THE COURT:  I want to make sure the jury is clear.

```
 1    This is Government's Exhibit 1, right?
 2            MR. VAZQUEZ:  Yes.
 3            THE COURT:  Because you keep saying:  "Government's
 4    1759."
 5            MR. VAZQUEZ:  I apologize.
 6            THE COURT:  1759 is a Bates stamp, right?
 7            MR. VAZQUEZ:  Yes, Your Honor.
 8            THE COURT:  Have you explained to them what a Bates
 9    stamp is, so that they understand what's going on here?
10    BY MR. VAZQUEZ:
11    Q.  Mr. Kindelan, and for the benefit of the jury, when I'm
12    saying:  "1759," there's a number on the page at the bottom
13    numbering the exhibit.  So you'll notice that for Government's
14    1 there are multiple pages and they're different.  So the way
15    that we can tell them apart when I'm referring to them,
16    Mr. Kindelan, is to use the number that's at the bottom.  Okay?
17    A.  Yes.
18    Q.  So turning back to Government's 1, at Bates Number 1759,
19    you indicated that Mr. Lara was near the second garage.  And
20    I'm going to point to the left side of the page.
21        Is this the door that you're referring to and where
22    Mr. Lara was positioned near?
23    A.  Yes.
24    Q.  Now, I'm going to stay on Government's 1.  And I'm going to
25    turn to Bates Number 1772 of the same exhibit, Government's 1.
```

```
 1        What do we see on the screen, sir?
 2   A.   The meter of the lights that I turned off.
 3   Q.   And how did you do that?
 4   A.   Miguelito had knowledge of what we were going to do, and he
 5   told me to turn off the breakers, to turn off the lights,
 6   because supposedly the people who were inside, the victims
 7   inside the house, were going to come out and look and see what
 8   was going on.
 9        They would be at the door when the victims were to come
10   out.  And they were at the door.  And so when the victims were
11   to come out, Miguelito and Raonel were going to go in.  And
12   after that, we'd go in.
13   Q.   Now, you stated that when you arrived at the scene to do
14   the robbery you saw the Defendant's gun and a mask; is that
15   correct?
16   A.   Yes.
17   Q.   I'm going to show you what's been marked for identification
18   as Government's 9.  Do you recognize what's been marked for
19   identification as Government's 9?
20   A.   That was the weapon that he had.
21   Q.   And when you say:  "He," who is that?
22   A.   Miguelito.
23   Q.   And I'm showing you also what's been marked for
24   identification as Government's 10.  Do you recognize the images
25   depicted in Government's 10?
```

```
1   A.  That's the gun that Miguelito had.

2   Q.  And sir, when you say:  "The gun that Miguelito had," is

3   this on the day of the September 30th, 2012 robbery?

4   A.  Yes.

5          MR. VAZQUEZ:  Your Honor, at this time, I would move

6   to admit Government's 9 and Government's 10.

7          MR. ZACCA:  No objection.

8          THE COURT:  Received.

9      (Government's Exhibits 9 and 10 received into evidence.)

10         MR. VAZQUEZ:  And I would ask for permission to

11  publish the exhibit with the aid of the ELMO.

12         MR. ZACCA:  Judge, I just have a question with the

13  prosecutor.  For just a moment, Judge.

14     (Pause in proceedings.)

15         MR. ZACCA:  No objection, Judge.

16  BY MR. VAZQUEZ:

17  Q.  What are we looking at, sir?

18  A.  That's Miguelito's gun.

19  Q.  Showing you Government's 10, Bates Number 2598.  What are

20  we looking at?

21  A.  The magazine and the gun.

22  Q.  And turning to the same exhibit, Government's 10, Bates

23  2604.  What are we looking at?

24  A.  The gun.

25  Q.  Now I'm showing you Bates -- same Government Exhibit --
```

1    Government's 10, Bates Number 26 double zero.  What are we

2    looking at here?

3    A.  The gun.

4    Q.  And I'm showing you Bates 2605 from Government's Exhibit

5    10.  What are we looking at here?

6    A.  The gun.

7    Q.  Mr. Kindelan, after you cut the power to the house, what

8    did you do next?

9    A.  We remained in the position that I previously mentioned,

10   waiting for the door to be opened in order to go in.  We

11   remained there approximately 15 to 20 minutes.  Miguel had told

12   us that we were going to be there for just a short while.  And

13   it wasn't like he said.  It was -- it took longer.

14       We all said to him that we should leave, that it was taking

15   too long.  Raonel, who was at his side, kept on telling him:

16   "Let's go.  Let's go."  And he would say:  "No.  No," that the

17   idea is for us to remain there and go in and get the marijuana.

18   Q.  After you waited, what happened?

19   A.  Well, Raonel says -- we tell Raonel that we should go,

20   to -- let's go.  And he goes to where we were and he says:

21   "No, that Miguelito says that he's going to kick in the door to

22   open it."

23       And then a little bit later, about three minutes later, we

24   heard the shots and so we took off running.  When we're

25   running, we quickly get in the van and we leave.

1    Q.  Now, Mr. Kindelan, I'm going to back up.

2         Did you see what happened at the front door of the

3    residence?

4    A.  I heard a shot.  And when we leave running, we see that

5    somebody is on the ground, on the floor.

6    Q.  Now, did you see what was happening at the front door of

7    the Miramar residence?

8    A.  No.  No.  I did not have vision there or I did not have

9    visibility to see there.

10   Q.  And you told us that Mr. Valhuerdis was at the front door

11   with the Defendant.  You were by the victim's car.  Was

12   Mr. Lara closer or further away than you were to the front

13   door?

14   A.  Lara was next to me.  Valhuerdis and Miguelito were at the

15   front door.

16   Q.  Prior to going to the door, prior to the attempt to do to

17   robbery, did you or anyone else talk about the firearm and how

18   it would be used in this case?

19   A.  Just Miguelito had the face mask and the gun.

20   Q.  Did anything -- did you discuss doing anything with the

21   firearm?

22   A.  Raonel said that he was going to take the bullets out of

23   the gun.  And Miguelito said that there was no problem because

24   the person that lived there was really defenseless and he was

25   gay.

```
 1    Q.  Why were the bullets taken out?

 2    A.  (In English.) I don't know.

 3        (Through Interpreter.)  I don't know.  I don't know.

 4    Q.  When the shooting happened, did you get a chance to see

 5    Raonel Valhuerdis?

 6    A.  Yes.

 7    Q.  And what did you see when you looked at Mr. Valhuerdis?

 8    A.  Miguel on the floor.

 9    Q.  And was Mr. Valhuerdis carrying anything?

10    A.  He had the gun.

11    Q.  Did you hear Raonel Valhuerdis' gun go off?

12    A.  No.

13    Q.  I want to show you what's been admitted into evidence as

14    Government's 1A and marked at Bates Number 1789 from that

15    composite exhibit.  What are we looking at now?

16    A.  The face mask that Miguelito had.

17    Q.  Did you ever wear this mask?

18    A.  No.

19    Q.  Did you see anyone else wearing this mask?

20    A.  No.

21    Q.  At any point in time, did you or anyone else that was

22    involved in this robbery have any contact with the victims of

23    the Miramar robbery?

24    A.  No.

25    Q.  After the shooting happened, what did you do?
```

1    A.  We ran to the van.

2    Q.  And what did you do then?

3    A.  We left from that scene, we hid the gun, and each one went

4    to their home.

5    Q.  Now, the individuals that participated in this robbery --

6    do you know an individual by the name of Celia?

7    A.  Yes.

8    Q.  Were you -- are you friendly with her?

9    A.  I know her.  I'm friendly with her.

10   Q.  Did you ever talk to her about this marijuana robbery?

11   A.  No.

12   Q.  Do some of the individuals who are part of this plan have

13   nicknames?

14   A.  Yes.

15   Q.  Do you know anyone who uses the nickname Alfre?

16   A.  That's me.

17   Q.  Do you know anyone who uses the nickname Matojito?

18   A.  Raonel Valdez.

19   Q.  Do you know anyone who uses the nickname Matatan?

20   A.  Jean Marrero.

21   Q.  Now, after the robbery was failed in your attempt, what did

22   you -- after getting together, what was the next thing that

23   this group did?

24   A.  The following day, we met and I went to look for the gun.

25   We decided to look for the gun and I hid it in my home.

1    Q.  And when you say:  "The gun," are you referring to

2    Government's 9?

3    A.  Yes.

4    Q.  After you hid the gun in your home, do you know what

5    happened to it?

6    A.  Sometime later, there was a problem and one of -- my wife's

7    nephew took it from where it was.

8    Q.  And do you know the name of that person?

9    A.  Yes.

10   Q.  And what is it?

11   A.  Dairon Marrero.

12   Q.  Mr. Kindelan, I want to show you what's been marked for

13   identification as Government's 20.  Do you recognize it?

14   A.  Dairon Marrero.

15           MR. VAZQUEZ:  Your Honor, at this time, I would move

16   to admit Government's 20 into evidence.

17           MR. ZACCA:  No objection.

18           THE COURT:  Received.

19       (Government's Exhibit 20 received into evidence.)

20           MR. VAZQUEZ:  Publishing what's been admitted as

21   Government's 20.

22   BY MR. VAZQUEZ:

23   Q.  Who is this?

24   A.  Dairon Marrero.

25   Q.  Do you know if this individual is also known as Dairon

```
1    Marrero Pena?

2    A.  Yes.

3    Q.  What happened to the firearm when this individual took it?

4    A.  He kept it.  And sometime later he was on probation and the

5    Probation officer went to his home and carried out a search and

6    found the weapon.

7             MR. ZACCA:  Objection.  Calls for hearsay.

8             THE COURT:  It does appear that way, Counsel.  I'm

9    going to sustain the objection.

10   BY MR. VAZQUEZ:

11   Q.  Did you have access to the firearm for the October 12th,

12   2012 robbery?

13   A.  No.

14   Q.  Did you continue -- after the shooting of -- or after the

15   September 30th, 2012 robbery, did you continue planning the

16   gold robbery in Coral Gables?

17   A.  Yes.

18   Q.  Prior to committing the gold robbery, did you have any

19   contact with the Defendant?

20   A.  Yes.

21   Q.  And what was that?

22   A.  I went to visit him -- but no, I didn't have any contact

23   with him before the robbery in Coral Gables.

24   Q.  After the September 30th robbery in Miramar, did anyone get

25   added to the team to commit the gold robbery?
```

1    A.   Yes.

2    Q.   Who was that?

3    A.   Camilo Montalban.  He had previously been there and then he

4    had left.  And so Leonardo Miguel asked him to take over for

5    him his position.

6    Q.   How do you know that?

7    A.   Because Leonardo Miguel contacted us -- he contacted us --

8    or actually he contacted Jean so that Jean would do that, and

9    Camilo Montalban.

10   Q.   How many times after, that you're aware of, did the

11   Defendant contact Jean or anyone to follow up on this robbery?

12   A.   Many times.

13   Q.   Now, what you know, where does that come from?  Did you

14   ever speak to the Defendant about that?

15   A.   I don't understand your question.

16   Q.   Did you personally talk to the Defendant before the gold

17   robbery happened?

18             MR. ZACCA:  Objection.

19             THE COURT:  Let's be precise, please.  What are you

20   talking about?

21   BY MR. VAZQUEZ:

22   Q.   From the time of the Miramar robbery, to the time of the

23   Coral Gables robbery, did you personally ever talk to the

24   Defendant?

25   A.   No.

```
 1    Q.  Everything you know about the Defendant's communication

 2    between those two time periods, September 30th, 2012 and

 3    October 12th, 2012, where does that come from?

 4               MR. ZACCA:  Objection.

 5               THE COURT:  All right.  Let's take our morning break,

 6    and I'll entertain this during the break.

 7          (Jury not present, 11:29 a.m.)

 8               THE COURT:  Y'all may step down if you like.

 9               You want to take him out or -- I'm not quite able to

10    follow, Government.  Are you suggesting these are

11    co-conspirator statements in furtherance of the conspiracy or

12    not?

13               MR. VAZQUEZ:  Yes.

14               THE COURT:  So when you ask a question, you have to

15    let us know where you're going.  So what question do you want

16    to ask and what answer do you anticipate?

17               MR. VAZQUEZ:  I am asking if in the time frame between

18    October 12th and September 30th, if he knew the Defendant was

19    somehow contacting Jean Lara.  And I want to make it clear that

20    what he knows about the Defendant's contact was through Jean

21    Lara, a co-conspirator, who had been planning to do this

22    robbery.  I'm just take trying to make it clear --

23               THE COURT:  But you're trying to suggest that the

24    Defendant spoke to Jean Lara, who told him A, B, C, D, correct?

25               MR. VAZQUEZ:  Correct.
```

```
1              THE COURT:  All right.  So why don't you ask the
2    question that way.
3              So now, to that line of questioning, what is your
4    objection?
5              MR. ZACCA:  Well, that's what I'm trying to figure
6    out.  Where was the source of this information?  It has to be
7    from a co-conspirator.
8              MR. VAZQUEZ:  That's what my question was, Your Honor,
9    is like:  This is from Jean Lara.  You know, I'm just --
10             THE COURT:  I understand that.  But the way you
11   presented your question, sir --
12             MR. VAZQUEZ:  Yes, Your Honor.
13             THE COURT:  -- it wasn't clear where you were going
14   with this.  So let's try to be as specific as we can.
15             Thank you.
16             MR. ZACCA:  Judge, how long is the break?
17             THE COURT:  I'm sorry?
18             MR. ZACCA:  How long is the break, sir?
19             THE COURT:  Ten minutes.
20             MR. ZACCA:  Thank you.
21        (Recess from 11:31 a.m. to 11:56 a.m.)
22             THE COURT:  Bring the jury in, please.
23             COURT SECURITY OFFICER:  Yes, sir.
24        (Before the Jury, 11:57 a.m.)
25             THE COURT:  Be seated, Ladies and Gentlemen.
```

```
 1              Mr. Vazquez.

 2              MR. VAZQUEZ:  Thank you, Your Honor.

 3    BY MR. VAZQUEZ:

 4    Q.  Mr. Kindelan, I want to turn back to your contacts with

 5    Jean Marrero Lara after September 30th of 2012, and after the

 6    Miramar robbery.  From September 30th, 2012, did you hear about

 7    contacts involving the Defendant from Jean Lara?

 8    A.  Yes.

 9    Q.  Did you have any personal contact with the Defendant?

10    A.  No.

11    Q.  So after the Miramar robbery on September 30th of 2012,

12    what did your group do to accomplish the Coral Gables gold

13    robbery?

14    A.  The work was already -- we had done many things.  The

15    work -- we practically -- each one of us knew what each one had

16    to do.  One day, the victim comes from where he came from, from

17    Bolivia.  He arrives at the airport, goes to Coral Gables, and

18    goes back to take the victim to the airport.

19         Automatically, Jean tells us that that is the day we're

20    going to do the robbery.  We got up in the morning, Jean

21    Marrero, Camilo Montalban, Raonel Valdez, and myself. We went

22    to the victim's house in Coral Gables.  We arrived there at

23    approximately 5:30 in the morning.  When we got there, we

24    waited for the victim to awake.  We were in front of the

25    victim's house.  We saw when the victim turned on the light,
```

1    when the victim woke up.  There, each one of the four of us

2    knew what each one had to do.  Each one took up his position.

3    Q.  And what was your position?

4    A.  I was going to drive, drive the car.

5        Automatically, I got up ahead a few meters from the house.

6    When we saw the victim coming out, the victim was going to take

7    the elevator to go down.  They told me that any which way the

8    idea was to take away the gold.

9    Q.  Were you going to see the robbery physically happening?

10   A.  No.

11   Q.  Prior to the Coral Gables robbery happening, do you know if

12   the group had access to guns?

13   A.  Yes.  We did have access to guns.

14   Q.  Did you use the firearm that was involved in the September

15   30th, 2012 robbery in Miramar during the Coral Gables robbery?

16   A.  No.

17   Q.  Why not?

18   A.  No.  Because the person was an older person and we decided

19   not use a weapon.

20   Q.  Did you see the people as they -- your codefendants, your

21   co-conspirators, did you see them physically commit the

22   robbery?

23   A.  No.

24   Q.  Do you know how they physically did the robbery, based on

25   what you were able to see?

```
 1              MR. ZACCA:  Objection.  He just said he didn't see the
 2    robbery.
 3              THE COURT:  Well, I'm going to overrule it.  But let's
 4    see what the answer is.
 5              THE WITNESS:  Yes.
 6    BY MR. VAZQUEZ:
 7    Q.  What did you see?
 8    A.  They -- their idea was to take the gold.  They were not
 9    armed, but we were going to take the gold after all.
10              THE COURT:  And the question, sir, is:  What did you
11    see?  You told us that you drove the car beyond the house.
12    What did you observe with regard to anything that those who
13    were you with did?
14              THE WITNESS:  No.  I did not see anything because I
15    was separated from them.
16    BY MR. VAZQUEZ:
17    Q.  Were you able to hear anything during the robbery's
18    commission in Coral Gables?
19    A.  The screaming of the victim as the victim were being
20    attacked.
21    Q.  Who is responsible for attacking the victim?
22              MR. ZACCA:  Object to the form of the question.
23              THE COURT:  Overruled.
24              THE WITNESS:  Jean Marrero, Camilo Montalban, and
25    Raonel Valdez.
```

76

```
1    BY MR. VAZQUEZ:

2    Q.  After you heard the victim scream, what happened next?

3    A.  Each one of them arrives with a suitcase of the gold that

4    they had taken away from the victim.

5    Q.  And what happened next?

6    A.  We got on the car.  I am driving, and we arrive to Raonel

7    Valdez's house.  There, they take the gold from the suitcases.

8    Q.  Now, Mr. Kindelan, as part of this robbery, did you

9    become -- as part of this Coral Gables robbery in October 12th

10   of 2012, did you become familiar with the participation of a

11   person named Leer Prieto?

12   A.  Yes.

13   Q.  And what, if any, role did that person have in this robbery

14   effort in Coral Gables, Florida?

15   A.  That person would be in the surrounding area with a second

16   car, in case our case -- our car would fail.

17   Q.  Now, prior to your effort to complete the Coral Gables

18   robbery, did you talk about how it would be physically done,

19   how would you accomplish the robbery?

20   A.  Yes.

21   Q.  How was it physically going to be done?

22   A.  Whichever way it had to be to be aggressive with the

23   victim, take away the gold.  The idea was to take the gold with

24   us.

25   Q.  Mr. Kindelan, when you stepped into your car, and planned
```

1    to commit the October 12th, 2012 Coral Gables robbery, did you

2    understand you were going to be using violence to accomplish

3    that robbery?

4    A.  Yes.

5    Q.  After you were able to -- your group was able to grab the

6    gold, you talked to the Members of the Jury about a meeting

7    that you had afterwards.  Do you recall that?

8    A.  After each one got the gold, we met and we divided the gold

9    in five parts.

10   Q.  Did you get a chance to look at the gold?

11   A.  Yes.

12   Q.  I'm showing you what's been marked for identification as

13   Government's 36.  Do you see what's depicted on Government's

14   36 --

15   A.  Yes.

16   Q.  -- for identification?

17       What do you see depicted on Government's 36 for

18   identification?

19          THE COURT:  Sir, I think 36 is in evidence.

20          MR. VAZQUEZ:  I'm sorry, Your Honor.  I thought it was

21   not.  I apologize.

22          MR. ZACCA:  Judge --

23          THE COURT:  It was not accepted.  You were going to

24   introduce it.

25          MR. VAZQUEZ:  Subject to linkup.

```
 1              THE COURT:  Subject to linkup.

 2              MR. VAZQUEZ:  Yes, Your Honor.

 3              THE COURT:  And I guess you're doing the link now?

 4              MR. VAZQUEZ:  Yes, sir.

 5              THE COURT:  All right.  Continue.

 6              It is not in evidence.

 7    BY MR. VAZQUEZ:

 8    Q.  What is depicted in Government's 36 for identification?

 9    A.  The sample -- that was how the gold we got was.

10    Q.  Do the images depicted in Government's 36 look like the

11    gold that you acquired by robbery on October 12th of 2012?

12    A.  Yes.

13              MR. VAZQUEZ:  Your Honor, at this time, I would move

14    to admit what's been marked for identification as Government's

15    36 into evidence.

16              MR. ZACCA:  No objection.

17              THE COURT:  Received.

18         (Government's Exhibit 36 received into evidence.)

19              MR. VAZQUEZ:  And ask permission to publish with the

20    ELMO.

21              THE COURT:  Yes, sir.

22    BY MR. VAZQUEZ:

23    Q.  Mr. Kindelan, what are we looking at here on Government's

24    36, Bates numbered at 545?

25    A.  The sample.  This is how the gold was that we got when we
```

1    robbed.

2    Q.  And showing you Page 546 -- Bates Number 546 of

3    Government's 36.  What do we see here?

4    A.  That is the same gold.  That is how we got it.

5    Q.  Did you hold the gold that was taken during the robbery at

6    any point in time?

7    A.  I had it for a few days.

8    Q.  Did you feel how heavy the gold was in the bags that it was

9    contained in?

10   A.  It was very heavy.

11   Q.  When you went to this meeting, right after the gold

12   robbery, you were telling the Members of the Jury, what did you

13   do with the gold at that point in time?  Was it literally cut

14   into pieces at that meeting?

15   A.  We divided it into five parts.

16   Q.  And when the division was done, what did the members of the

17   robbery, Coral Gables robbery plan, do with their five parts?

18   A.  Raonel Valdez got his part.  Camilo Montalban got his.

19   Jean Marrero took his part and Miguelito's part.

20   Q.  Why did Miguelito get a part?

21   A.  Because supposedly he had done the work for that.  And

22   because we had done a robbery a few days before in Miramar, and

23   he had gotten shot, we got his part because he had done the

24   work for the robbery in Coral Gables, even though he did not go

25   there.

1  Q.  Who decided that Miguelito would get a share?

2  A.  The whole group did.

3  Q.  What was done with the shares of the gold after they were

4  divided between the participants in the robbery in Coral

5  Gables?

6  A.  From there, we went to an address in Hialeah.  We melted

7  the gold and turned it into bars because it was raw.  There,

8  everybody got the same amount.  Jean Marrero, with Carlos

9  Miranda, every day we would give him a specific amount so that

10 he would sell that to a specific individual.

11 Q.  And were you able to see money as a result of any of those

12 sales?

13 A.  We got -- each one of us got $340,000.

14 Q.  Did you actually have over $300,000 in cash in your

15 presence?

16 A.  Yes.

17 Q.  Now, what -- you talked about Miguelito's share of the

18 gold, the Defendant's share of the gold.  Were you ever

19 informed about what happened to the Defendant's share of the

20 gold?

21 A.  Yes.  Yes.  Jean gave -- the part that corresponded to him,

22 he gave that to him.

23 Q.  Did there ever come a time where you spoke to the Defendant

24 after he was shot?

25 A.  Yes.  I went to his house to visit him and I saw him.

```
1    Q.   What happened during this meeting with the Defendant?

2    A.   He told me that we should not be worried, that he was not

3    going to say anything about what had happened to him in

4    Miramar, that Jean had not really done good with him, that he

5    had not given him all the money, but that Camilo had given him

6    a part of what he had gotten, and asked me whether I could also

7    give him some as well.

8         And I told him that -- no, that he had received enough,

9    that everybody had gotten equal parts of it.  He became upset

10   with me from that day on and we did not afterwards have --

11   we're not in touch any longer.

12   Q.   Mr. Kindelan, at any point in time, did you have a

13   discussion with the Defendant about what he wanted to do with

14   his share of the proceeds from the robbery?

15   A.   Yes.

16   Q.   And what was that?

17   A.   He told me that he wanted to buy an apartment for his son

18   and his wife.  And the rest of it, that he was going to invest

19   that in whatever it may be in any type of illegal business.

20   Q.   Did the Defendant ever talk to you about the use of those

21   proceeds for cocaine?

22   A.   Yes.

23   Q.   Did the Defendant ever explain to you how, after having

24   been shot, he was going to be able to get cocaine and

25   participate in the cocaine business?
```

1   A.   He was going to buy the kilo of cocaine for a price of 20

2   to 27,000 dollars to later on sell it at the price that it was

3   sold then, which was $36,000.

4   Q.   And who, if anyone, was going to help him do this?

5   A.   He is a santeria priest, a babalao, so he has many godsons.

6   He has many godsons because he belongs to a santeria religion.

7   Q.   Mr. Kindelan, if I can break in with a question ...

8   A.   And his godson -- he had many godsons.

9   Q.   Did you ever hear from the Defendant that he would use a

10  godson to buy the cocaine?

11  A.   Yes.

12  Q.   Now, when you were having discussions with the Defendant

13  about money and what he felt he was owed, what happened to your

14  relationship with this Defendant?

15  A.   He asked me whether I could give him money from the money

16  that I had obtained, and I said:  "No."

17  Q.   And what happened when you told the Defendant:  "No"?

18  A.   He is a person that really has this very quick temperament,

19  and he automatically became upset with me.  There was some

20  crossing of words between us two, and I automatically left his

21  house.

22  Q.   Mr. Kindelan, did the Defendant ever tell you that because

23  you were not giving him money he was going to tell the police

24  on you?

25          MR. ZACCA:   Objection to leading.

```
 1            THE COURT:  Sustained.
 2   BY MR. VAZQUEZ:
 3   Q.  Mr. Kindelan, were you ever threatened by the Defendant?
 4   A.  No.
 5   Q.  Were you ever in a conversation about law enforcement with
 6   the Defendant?
 7   A.  I do not understand that word.
 8   Q.  Did the Defendant ever raise the prospect of speaking to
 9   the police about you?
10            MR. ZACCA:  Objection to leading.
11            THE COURT:  Sustained.
12   BY MR. VAZQUEZ:
13   Q.  Mr. Kindelan, why did you stop talking to the Defendant?
14   A.  Because he told me why I was not giving him the money.  And
15   I said, no, because he had already gotten his share.  And he
16   told me:  "Remember, we did the Miramar thing and that is under
17   investigation."  And I told him:  "Do whatever you wish then,
18   but I'm not going to give you any share because you already
19   obtained your share."
20        (Pause in proceedings.)
21            MR. VAZQUEZ:  Your Honor, I tender the witness.
22                        CROSS-EXAMINATION
23   BY MR. ZACCA:
24   Q.  Good afternoon, sir.
25   A.  Good afternoon.
```

```
 1    Q.  What is the most important thing to you?

 2    A.  Life.

 3    Q.  Life?

 4    A.  (No verbal response.)

 5    Q.  Family?

 6    A.  Yes.

 7    Q.  Your life and your family's the most important thing to

 8    you?

 9    A.  Life is more important.

10    Q.  Are you living life behind bars right now?

11    A.  Yes.

12    Q.  Are you enjoying life?

13    A.  I am not enjoying life because I have a sentence which is

14    16 years and 8 months.

15    Q.  You discussed the crimes that you have pled guilty to

16    during your direct testimony, right?

17    A.  Yes.

18    Q.  You pled guilty to the gold robbery in Coral Gables,

19    correct?

20    A.  Yes.

21    Q.  And you pled guilty to the attempted robbery in Miramar,

22    correct?

23    A.  Yes.

24    Q.  And you've also told this jury that in an unrelated case

25    you pled guilty to the charge of kidnapping, correct?
```

```
 1   A.  Yes.

 2   Q.  So you're serving two sentences, correct?

 3   A.  Two sentences.

 4   Q.  Yes.

 5       A sentence for the kidnapping in Cancun, Mexico?

 6   A.  Yes.

 7   Q.  You nodded your head when I asked you that question.  Do

 8   you understand English?

 9   A.  No.

10   Q.  All right.  You don't speak any English?

11   A.  Nothing of English.

12   Q.  So you're serving one sentence for kidnapping and you're

13   serving another sentence for the gold robbery and the Miramar

14   robbery, correct?

15   A.  Yes.

16   Q.  We're going to go into that in more detail.  But there are

17   other crimes, other crimes that you are not being charged by

18   the US Government for.  Isn't that true?

19   A.  Well, all of the crimes that I have committed, I have been

20   charged by them.

21   Q.  Oh, I want to make sure I understood what you just said.

22       You have been charged for all the crimes you have told the

23   Government about.  Is that your testimony?

24   A.  Exactly.

25   Q.  Oh, all right.  Let's explore that.
```

1      Nacho.  You know what that means, right?

2            THE INTERPRETER:  For the interpreter, Counsel, can

3   you repeat that.

4            MR. ZACCA:  Sure.  Nacho.

5            THE WITNESS:  Yes.

6   BY MR. ZACCA:

7   Q.  That's a kidnapping that occurred in Cancun, Mexico.  Isn't

8   that true?

9   A.  Yes.

10  Q.  That happened, what, in 2010, 2011?

11  A.  Yes.

12  Q.  And that's a kidnapping that you have not been charged

13  with, correct?

14  A.  I was charged, and I signed for a sentence of 25 years for

15  all of those charges.

16  Q.  Okay.  So just so you're clear -- or just so we're clear,

17  rather, are you telling this jury that you pled guilty to the

18  kidnapping of Nacho in 2010 and 2011 and are serving a sentence

19  for that?

20  A.  Exactly, yes.

21  Q.  All right.  Well, Nacho was somebody that -- you went on a

22  plane and flew to Cancun, Mexico to commit the crime, correct?

23  A.  Yes.

24  Q.  You watched him, correct?

25  A.  Well, we committed the kidnapping and we had to do the work

```
 1    for it.  We followed him and we watched him, yeah.

 2    Q.  Oh, yeah.  And that's what I'm getting at.  Let's talk

 3    about that.

 4         You followed him, right?

 5    A.  Yes.

 6    Q.  You watched him, correct?

 7    A.  Of course.

 8    Q.  And you and your group physically grabbed him, correct?

 9    A.  Yes.

10    Q.  You blindfolded him?

11    A.  Yes.

12    Q.  You duct taped him?

13    A.  No.

14    Q.  No?

15         He was tied down, right?

16    A.  Yes.

17    Q.  He was tied down to a chair, right?

18    A.  Yes.

19    Q.  He was shot, right?

20    A.  Yes.

21    Q.  Nacho is dead, isn't he?

22    A.  No.

23    Q.  No?

24    A.  No.

25    Q.  It's your testimony that he still lives today?
```

1    A.  I don't know.  Dead?  I don't know whether he is or not.

2    Q.  He was handed over to some people in a boat somewhere in

3    Mexico, right?

4    A.  Yes.

5    Q.  And you did that for money, right?

6    A.  Yes.

7    Q.  You did that for ransom, right?

8    A.  Yes.

9    Q.  Now, that's the kidnapping -- just to keep count here,

10   that's the kidnapping of Nacho, right, that we just talked

11   about?

12   A.  Yes.

13   Q.  In 2014, you flew back to Cancun, Mexico, right?

14   A.  Yes.

15   Q.  And you participated in another kidnapping, right?

16   A.  Yes.

17   Q.  And again, while in Cancun, Mexico, you watched the target

18   of your kidnapping, correct?

19   A.  I don't understand your question.

20   Q.  Okay.  You didn't walk -- you know, walk the streets of

21   Cancun and randomly grab somebody and kidnap him, right?  You

22   had a target.

23   A.  Yes.

24   Q.  It's somebody that was surveilled, correct?

25   A.  Yes.

89

1    Q.   And there were preparations for this kidnapping, right?

2    A.   Yes.

3    Q.   And again, this was somebody who was forcefully taken,

4    correct?

5    A.   Yes.

6    Q.   Tied down, correct?

7    A.   There were three kidnappings that I committed in Mexico, in

8    Cancun.

9    Q.   Yeah.  Well, we're talking about the one in 2014 of Alex

10   Mesa, right?

11   A.   Okay.

12   Q.   Mr. Mesa was blindfolded, correct?

13   A.   We did, yes, blindfold.  We placed a hood over his head.

14   Q.   And he was tied down, right?

15   A.   No.

16   Q.   But he was kept in captivity, correct?

17   A.   At ease.

18   Q.   I'm sorry.  I missed that.

19            THE INTERPRETER:  Calm, at ease.

20   BY MR. ZACCA:

21   Q.   Oh, he was calm during the kidnapping?

22   A.   After we caught him, he at all times was at ease and we did

23   not have to tie him down.

24   Q.   Oh, okay.  But he wasn't free to walk around and leave,

25   right?

```
1    A.  No.

2    Q.  Right.  You held him in captivity?

3    A.  Yes.

4    Q.  It was a kidnapping after all, right?

5    A.  Yes.

6    Q.  A ransom was demanded from his family, right?

7    A.  Yes.

8    Q.  You did this for money, correct?

9    A.  Money.

10   Q.  And a ransom was paid, correct?

11   A.  Yes.

12   Q.  You also were in the stolen boat business, right?

13   A.  Yes.

14   Q.  Yeah.  And you stole boats, right?

15   A.  Yes.

16   Q.  And you would use some of these stolen boats and sell them

17   to other individuals, correct?

18   A.  Yes.

19   Q.  And these individuals were involved in smuggling people

20   into the United States?

21   A.  Yes.

22   Q.  Alien smuggling, correct?

23   A.  Yes.

24   Q.  You haven't been charged with those crimes, have you?

25   A.  Those crimes, yes.  They were charged, yes.  And that's why
```

```
 1   I was given 25 years.  If you would like, I can give you all of
 2   the different crimes that that's for the reason why I was given
 3   25 years.
 4   Q.  Well, we'll go over your Indictment, if this is an issue.
 5   We can do that.
 6       But is it your testimony that you have been charged with
 7   the crime of alien smuggling and are now doing a sentence for
 8   alien smuggling?
 9   A.  Yes.
10   Q.  Okay.  Well, you've done these crimes, correct?  Yes?
11   A.  Yes.
12   Q.  And you -- these are serious crimes, aren't they?
13   A.  Yes.  That's why I was to be given 25 years.
14   Q.  And you're serving 16 and some months, correct?
15   A.  But I signed for 25 years, and the judge was the one who
16   sentenced me for 16 years and 8 months.
17   Q.  And you are serving that 16-year-and-8-month sentence,
18   correct?
19   A.  Yes.
20   Q.  Now, you come here today and testify for something, aren't
21   you?
22   A.  In exchange for nothing.
23   Q.  You're just coming here because you're a good guy?
24   A.  No.  I come here because I have an agreement with the
25   Government that I will always state the truth.  And if I don't
```

1    say the truth, tell the truth, then they could have new charges

2    against me and that's why I'm telling you the truth.

3    Q.  Mr. Kindelan, tell this jury that you're hoping that after

4    your testimony today you get a sentence reduction.  Isn't that

5    what you want?

6    A.  No.

7    Q.  No?  You don't want that?

8    A.  (No verbal response.)

9    Q.  Let's look at your Plea Agreements.

10       (Pause in proceedings.)

11   BY MR. ZACCA:

12   Q.  I have in my hand what's been marked for identification as

13   Defendant's Exhibit 3.  That's your name, correct?

14   A.  Yes.

15   Q.  I'm going to turn to Page 7, the last page.  You recognize

16   that, correct?

17   A.  Yes.

18   Q.  That's your signature, right?

19   A.  Yes.

20   Q.  This is the Plea Agreement -- this is one of your two Plea

21   Agreements, correct?

22   A.  Yes.

23        MR. ZACCA:  At this time, the Defense moves what's

24   been marked as Exhibit Number 3 into evidence.

25        MR. VAZQUEZ:  No objection.

```
 1            THE COURT:  Received.

 2       (Defendant's Exhibit 3 received into evidence.)

 3  BY MR. ZACCA:

 4  Q.  Now, just to be clear, so the jury understands what we're

 5  looking at here, this is a Plea Agreement that you have with

 6  regard to the Cancun kidnapping in 2014, correct?

 7  A.  Yes.

 8  Q.  All right.  We'll get to the other Plea Agreement in a

 9  moment, but let's focus in on this one.

10       Now, I know -- I'm assuming you don't read English,

11  correct?

12  A.  That's correct.

13  Q.  Yes.  Because you don't speak it, correct?

14  A.  Yes.

15  Q.  And I'm just going to point out to certain sections of this

16  Plea Agreement, this agreement that you have with the US

17  Government.  Okay?

18  A.  Yes.

19  Q.  Paragraph 1 -- and I'm going to read it out, so that way

20  you understand what Paragraph 1 says, since you don't -- can't

21  read it.

22       It says that you agree to plead guilty to Count 2 of the

23  Indictment, which charges the Defendant with conspiracy to

24  commit kidnapping.  You see that there?

25  A.  Yes.
```

94

```
1    Q.  And we're going to start looking at the benefits that this

2    Plea Agreement gives you.

3        Already, on Paragraph 2, it says that this office -- you

4    don't have an office, right?

5    A.  No.

6    Q.  When it says:  "This office," you understand it to mean the

7    US Attorney's Office, correct?

8    A.  Okay.  Yes.

9    Q.  That in exchange for your guilty plea, in this Plea

10   Agreement, they are seeking dismissal of Counts 1 and 3 of your

11   Indictment.

12   A.  Yes.

13   Q.  And just so the jury understands, you were charged with

14   several crimes in this case, right?

15   A.  Yes.

16   Q.  And in exchange for your Plea Agreement, the Government

17   agreed to dismiss Counts 1 and 3 of the Indictment.

18   A.  Which are those charges?  Can you tell me?

19   Q.  Yeah.  I'd have to pull up your Indictment.  Give me a

20   moment, and I will.

21            MR. VAZQUEZ:  Here you go.

22            MR. ZACCA:  Thank you.

23   BY MR. ZACCA:

24   Q.  In the interest of time, I'm going to read it out.  But if

25   you want to look at it with your own eyes, we can do that too,
```

```
1    okay?
2         Count 1 charges you -- well, from December 31st, 2013
3    through March 29th, 2014, you and several other individuals,
4    including Jean Lara and Camilo Cardoza, conspired to commit the
5    offense of kidnapping, and to -- and I'm paraphrasing -- and to
6    unlawfully seize, confine, kidnap, abduct, carry away, and hold
7    for ransom a person, AM, in Cancun, Mexico.  Yes?
8    A.  I was sentenced for that charge by Judge Martinez.
9    Q.  Well, you pled guilty to Count 2, right?
10   A.  And I was sentenced for that charge regarding Carlos Mesa,
11   the kidnapping.
12   Q.  Okay.  But do you disagree that this count, Count 1, that I
13   just read to you in your Plea Agreement, was dismissed?
14   A.  No.  I do not disagree because this is talking about a
15   conspiracy.
16   Q.  Okay.  In Count 2, you were also charged with conspiracy to
17   commit kidnapping.  In other words, one of your two counts of
18   conspiracy were dismissed.
19   A.  Well, the conspiracy covers all.  And when it covers all,
20   then there would be just one charge.
21   Q.  Let's not get bogged down too much here, but you don't
22   disagree that one of the benefits of your Plea Agreement is to
23   have two counts of your Indictment dismissed, as it says in
24   Paragraph 2, correct?
25   A.  Okay.  Yes.
```

 1    Q.  Okay.  Let's focus in on Paragraphs 9 and 10.  That's like

 2    the meat of your Plea Agreement.  I want the jury to truly

 3    understand that.

 4        So Paragraph 9 -- and again, I'll read it for you -- reads

 5    as follows -- and I'll try to summarize it:  The Defendant

 6    agrees that he shall cooperate fully with this office by

 7    providing truthful and complete information and testimony, and

 8    producing documents, records, and other evidence when called

 9    upon by this office, whether in interviews before Grand Jury or

10    at any trial or other court proceeding.

11        And I'm going to skip to Paragraph Sub C for time purposes:

12    "If requested by this office, working in an undercover role

13    under the supervision and in compliance with law enforcement

14    officers and agents."

15        And it goes on further that you promise that you won't

16    protect any person or entity through false information or

17    omission.

18        You agree that Paragraph 9 is your promise, in your words,

19    to the Government that you will provide information to the

20    Government when called upon?

21    A.  Yes.

22    Q.  Including when called upon to testify in a trial, like you

23    are doing right now, right?

24    A.  Yes.

25    Q.  Now, let's look at Paragraph 10.  Again, I'm going to read

```
 1   it to you and try to summarize it for you.
 2             THE COURT:  All right, sir.  I'm going to stop you at
 3   that point.  Take notes of where we are, so that we can resume
 4   tomorrow morning at 9:00 a.m.  9:00 a.m.
 5             Please remember, Ladies and Gentlemen, not to discuss
 6   the case in any way.  We are in recess.
 7        (Jury not present, 1:00 p.m.)
 8             THE COURT:  You may be seated.
 9             You may take the witness out of the courtroom.
10             I have been trying to digest your pleadings with
11   regard to statements made by the Defendant, and I understand
12   that the investigator's files were turned over to the
13   Government.  Is that correct?
14             MR. VAZQUEZ:  Not completely.
15             THE COURT:  Well, some of the files.
16             MR. VAZQUEZ:  The agents asked for his materials.  We
17   received noteworthy materials, like the GPS records.  That led
18   us in a positive direction about GPS records that Mr. Bolton
19   had discovered.  And that was passed on to our federal agents.
20   He did not give us anything with regard to his interview of the
21   Defendant.  We didn't know about that.
22             THE COURT:  So when you say:  "Files," that's related
23   only to GPS records?
24             MR. VAZQUEZ:  May I just verify?  I want to make sure.
25        (Pause in proceedings.)
```

```
 1            MR. VAZQUEZ:  We only received GPS records from

 2   Bolton, the investigator.

 3            THE COURT:  All right.  To make this simple, why don't

 4   you provide to the Court all files that were turned over by the

 5   investigator to the Government.

 6            Now, the question is:  When can I litigate this issue?

 7            Was there a prosecutor -- and I think you told me

 8   this.  There was a prosecutor involved before you took over the

 9   case.

10            MR. VAZQUEZ:  There was a prosecutor that handled the

11   kidnapping investigation that you just heard about regarding

12   Alex Mesa.  That was the first interaction that we had with

13   this group at the US Attorney's Office.  And that spun into

14   bringing the rest of the group and the rest of the charges to

15   court.

16            So Mr. Dobbins had it.  I became his second chair

17   shortly after he indicted the case.  And I believe, to my

18   knowledge, we are the only two prosecutors that have worked on

19   the Defendants that are here.

20            THE COURT:  Who was the other prosecutor?

21            MR. VAZQUEZ:  Mr. Brian Dobbins.

22            THE COURT:  Dobbins?

23            MR. VAZQUEZ:  Dobbins.  D-O-B-B-I-N-S.

24            THE COURT:  Did he have any interaction with the

25   witness from Bolivia and/or the investigator who worked for the
```

1    company in Bolivia?

2         MR. VAZQUEZ:  Your Honor, I -- I don't believe that

3    is -- there was any contact.  I wouldn't -- want to be a

4    hundred percent sure.  I'd just to talk to him just to verify

5    if he talked to Mr. Bolton.  I don't believe that's true, but I

6    don't want to be wrong on an important point.

7         THE COURT:  So why don't you verify that.  And so, as

8    I understand it, the investigator was in touch with the

9    Government -- I'm not sure if it was the prosecutors or just

10   the agents -- going back to 2013.  Did I hear that correctly?

11        MR. VAZQUEZ:  The earliest contact that I have, that I

12   believe happened, would have been 2013, when the investigator

13   was reaching out, offering information that was incomplete,

14   that did not include this important fact.

15        And -- and the -- at that point in time, what he was

16   offering was on a smuggling side of the case that wasn't -- the

17   Defendant was positioning himself as a source of information.

18        THE COURT:  Wait a minute.  A smuggling side?

19        MR. VAZQUEZ:  Yes.

20        THE COURT:  I'm not sure I'm following you there.

21        MR. VAZQUEZ:  So part of the federal government's --

22   our investigation is that this group, it's a larger entity,

23   smuggles humans from Cuba to Mexico to the United States.

24   That's one of their revenue streams.

25        So the agents initially received information -- the

1   federal agents received information that Mr. Morales wanted to

2   help and wanted to talk to them about his knowledge of

3   individuals and smuggling.

4           As I recall, we don't -- we didn't have information

5   about him saying:  "I'm a Defendant and I want to tell you all

6   the bad stuff I've done."  He was offering information about

7   targets in the upper ends of the group.  And that's what I

8   understand --

9           THE COURT:  And how did he -- did he know about it

10  because he was involved or ...

11          MR. VAZQUEZ:  I believe our agents never learned that.

12          THE COURT:  I guess I'm unclear.

13          You first became aware of him after the shooting

14  that's involved in this case?

15          MR. VAZQUEZ:  When we were prosecuting the Alex Mesa

16  kidnapping that involved Jean Lara, Alfredo Kindelan, and

17  others, they sat down and provided interviews with us.

18          THE COURT:  So before that point, the Defendant --

19          MR. VAZQUEZ:  Unknown --

20          THE COURT:  -- had not provided any information to you

21  or to the investigator in Bolivia about this case.  Is that

22  accurate?

23          MR. VAZQUEZ:  According to the investigator, they had

24  this meeting in December of 2014.  We weren't -- I wasn't

25  working that case.  No one knew about that.

```
 1              I might have spoken with Lara and Kindelan in '16,

 2    when they turned, when they became cooperating witnesses, and

 3    they said:  "We did a Miramar robbery.  We've done other

 4    robberies.  One of our co-conspirators is named Morales."  We

 5    learned about him.  And then we believe --

 6              THE COURT:  That's how you put together the

 7    shooting --

 8              MR. VAZQUEZ:  Yes.

 9              THE COURT:  -- with the other -- okay.

10              So was the Defendant charged soon after the shooting

11    with the robbery attempt?

12              MR. VAZQUEZ:  Yes.  So initially, he was charged by

13    local authorities and was being prosecuted there.

14              THE COURT:  I see.

15              MR. VAZQUEZ:  It was unknown to them that this was

16    connected to anything, kidnappings, gold courier robberies.

17    They made the connection shortly thereafter between themselves

18    about the gold courier.  But it's only when we turned Lara and

19    Kindelan that we knew that they were the gold courier robbers

20    and had evidence against them and then put the whole thing

21    together.

22              THE COURT:  So he was in the state system --

23              MR. VAZQUEZ:  Yes.

24              THE COURT:  -- initially for -- I'm not sure what the

25    charges were.
```

1        MR. VAZQUEZ:  They charged him with burglary.

2        THE COURT:  Burglary?

3        MR. VAZQUEZ:  Yeah.

4        THE COURT:  All right.

5        MR. VAZQUEZ:  And he was serendipitously, and unknown

6   to anyone charged, by North Miami Beach for a period of time

7   when they got an unrelated piece of information about him

8   wanting to buy cocaine.  Once we knew who he was, we were able

9   to see how all these pieces came together and were part of a

10  course of criminal conduct.

11       THE COURT:  So in reading this statement that was

12  recorded and taken in 2014, the investigator seems to suggest

13  that he's in contact with the federal authorities and is trying

14  to get them to do certain things and suggesting that he -- that

15  the Defendant knows certain things.  I guess that's what makes

16  it a little confusing.

17       MR. VAZQUEZ:  Right.  The investigator -- and I don't

18  want to cast dispersions on anybody.  I think he had a

19  direction that he thought that our case -- that the

20  Government's investigation should have gone.  And he was --

21  felt that Coral Gables wasn't doing the job to his liking, and

22  that people weren't --

23       THE COURT:  Well, he talks about federal --

24       MR. VAZQUEZ:  Yeah.

25       THE COURT:  -- people too.

```
1          MR. VAZQUEZ:  He is trying to reach out to people and
2     he's trying to --
3          THE COURT:  But what was he telling the federal agents
4     about any statements, admissions, et cetera, if anything?
5          MR. VAZQUEZ:  I -- I don't believe he was -- from what
6     I understand, he was offering information inculpating other
7     people.
8          THE COURT:  No.  If you read that statement, he --
9     they're talking about the Defendant, and what the Defendant
10    knew, and what the Defendant was trying to use to get some
11    benefit from the Government just from the statement.  But I
12    mean, the statement may not be true.  I don't know.
13         Which, I guess, occasions -- the next point is I think
14    we have to have a hearing where the investigator comes in and
15    you-all can question the investigator and figure out what's
16    going on here.  And then I can decide to what extent, if any,
17    the federal government was involved in getting information
18    about the Defendant's statements, admissions against interest,
19    et cetera.
20         MR. VAZQUEZ:  Right.
21         THE COURT:  So as we have scheduled this, we know that
22    we are in session tomorrow.  I can be available Wednesday
23    morning for about two hours maximum.  So we could be in session
24    from 9:00 until 11:00, where I can elicit -- or you-all can
25    elicit testimony to prove the point you've raised in your
```

1   pleadings.  And I guess, based on what the investigator says,

2   that will dictate if any other witnesses need to be called,

3   such as federal agents or what have you, so that I can decide

4   the issues.

5          Now, what is it that you are -- so that I can narrow

6   my focus, what is it that you are seeking to introduce?  You're

7   seeking to introduce the statements made to the investigator?

8          MR. VAZQUEZ:  The statement made by the Defendant, in

9   the presence of Mr. Vargas and the investigator, that was

10  captured on a recording.

11         THE COURT:  Now, I'm not clear about that.  Does that

12  mean the recording or does it mean the statement that was made?

13  He heard certain things.  That's independent of the recording.

14  So what is it that you're seeking to introduce?

15         MR. VAZQUEZ:  Well, I would like to have -- I believe

16  they are one and the same.

17         THE COURT:  Well, no, they're not.  One is:  "I heard

18  him say."  The other is the recording of what he said.  And the

19  other day you told me that you didn't think you were seeking to

20  introduce the recording.  That's why I'm confused.

21         MR. VAZQUEZ:  Oh, no.  I'm not seeking to introduce

22  Mr. Bolton's multiple meetings with the Defendant.  I'm not

23  seeking to introduce that.

24         The one thing that I'm seeking to introduce was the

25  testimony of Mr. Guy Vargas, who was a participant at the

1    meeting, so he can testify as to:  "This is what I heard."  And

2    I'm seeking to introduce the recording that Mr. Guy Vargas can

3    authenticate and say:  "I was there.  That recording captures

4    the conversation that we had with the Defendant."

5         THE COURT:  And this is the recording -- or this is

6    this transcript that you provided me with, correct?

7         MR. VAZQUEZ:  Yes, Your Honor.

8         THE COURT:  All right.

9         So we can do that on Wednesday morning and we can see

10   where we go and how far it goes.  And then it may be only the

11   one witness.  I don't know.  We'll just have to wait and see

12   what the testimony is.

13        MR. VAZQUEZ:  If the Court wishes, I believe the

14   investigator is here in the building, if you want to address

15   this now to see if we can get him up here.

16        THE COURT:  I'm not going to have a hearing now.

17        MR. VAZQUEZ:  Okay.

18        THE COURT:  All right.  So we can do that Wednesday

19   morning at 9:00.

20        MR. VAZQUEZ:  Yes, Your Honor.

21        THE COURT:  All right.  And now, where do you think we

22   are in the schedule?

23        MR. VAZQUEZ:  Your Honor, I think that we are making

24   good progress.  Depending on how the cross goes, there might be

25   more witnesses, but I think we've got five to six witnesses to

```
 1   go.  So ...
 2            THE COURT:  You have a list of 40 people here.  So
 3   what, a lot of these witnesses are not going to be called?
 4            MR. VAZQUEZ:  I may not call them, depending on how
 5   Mr. Zacca defends the case.
 6            THE COURT:  So -- well, we don't know how he's going
 7   to defend it.  But just based on your knowledge, you think you
 8   only have five more witnesses?  Approximately.  I'm not asking
 9   you to be specific.  I'm just trying to get a general idea.
10            MR. VAZQUEZ:  Seven.  I'm sorry.  Seven or eight.
11   Yeah.
12            THE COURT:  So you would anticipate resting your case
13   about mid next week?
14            MR. VAZQUEZ:  It could happen, yes.
15            THE COURT:  Would that be fair?
16            MR. VAZQUEZ:  There may be a cross that requires us to
17   change.
18            THE COURT:  I understand.
19            All right.  How long do you anticipate the cross of
20   this particular witness?  Just a rough estimate?
21            MR. ZACCA:  Judge, I estimate at least another hour.
22   Another hour.  You know, it's -- he's a main witness, Judge.
23            THE COURT:  All right.  Is there anything else we
24   should discuss at this time?
25            MR. VAZQUEZ:  Not on behalf of the United States, Your
```

1   Honor.

2        MR. ZACCA:  Nothing from the Defense, Judge.

3        THE COURT:  All right.  Thank you—all very much.

4        MR. ZACCA:  Thank you.

5        Have a good day.

6        THE COURT:  One moment, Counsel.

7        While I have you here, because I was just given a

8   notice of reassignment, where a Vanessa Johannes filed a

9   pleading on August 22nd of this year basically saying that you,

10  Mr. Vazquez, are no longer assigned to the case.  And I didn't

11  hear you mention Ms. Johannes as being --

12       MR. VAZQUEZ:  I had a conflict over the summer with

13  another trial.  And so she was going to handle it.  And she

14  went into pregnancy.  She had -- went into birth of the baby.

15       THE COURT:  She went into labor?

16       MR. VAZQUEZ:  It's not clicking right now, Your Honor.

17  I apologize.

18       And she withdrew.  She's now on maternity leave.  But

19  she didn't have involvement in the investigation of the case.

20  I'm sorry.  It was a very short period of time that she was on

21  the case.

22       THE COURT:  So she was assigned the case, but just for

23  a short period.  Is that what you're saying?

24       MR. VAZQUEZ:  Yeah.  Yes.  I skipped over that because

25  we were asking -- I was, in my mind, thinking about the

1    investigation of the case in 2014.  And she had nothing -- she

2    was not involved.  She was just going to cover the case if I

3    was in conflict with another trial that I had.

4            THE COURT:  So she didn't talk to the agents about the

5    case and she didn't talk to the investigator.

6            MR. VAZQUEZ:  I know she didn't talk to the

7    investigator.  She would have talked to the agents when this

8    case was potentially going to go to trial.

9            THE COURT:  How long was she in the case?  Do you

10   know?

11           MR. VAZQUEZ:  Maybe, two months, if that.  Could be

12   less.

13           THE COURT:  Well, why don't you contact her and see if

14   she knows anything about these issues.

15           MR. VAZQUEZ:  Yes, Your Honor.

16           THE COURT:  From what you're saying, likely not, but

17   let's make sure.

18           All right.  Thank you.

19           MR. VAZQUEZ:  Bye, Judge.  Have a good day.

20       (Proceedings adjourned at 1:19 p.m.)

21

22

23

24

25

1  UNITED STATES OF AMERICA       )

2  ss:

3  SOUTHERN DISTRICT OF FLORIDA  )

4                    C E R T I F I C A T E

5         I, Yvette Hernandez, Certified Shorthand Reporter in

6  and for the United States District Court for the Southern

7  District of Florida, do hereby certify that I was present at

8  and reported in machine shorthand the proceedings had the 10th

9  day of December, 2018, in the above-mentioned court; and that

10  the foregoing transcript is a true, correct, and complete

11  transcript of my stenographic notes.

12         I further certify that this transcript contains pages

13  1 - 109.

14         IN WITNESS WHEREOF, I have hereunto set my hand at

15  Miami, Florida this 19th day of June, 2019.

16

17                         /s/Yvette Hernandez
                           Yvette Hernandez, CSR, RPR, CLR
18                         Certified Shorthand Reporter
                           400 North Miami Avenue, 10-2
19                         Miami, Florida 33128
                           (305) 523-5698
20                         yvette_hernandez@flsd.uscourts.gov

21

22

23

24

25