1                      UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF FLORIDA
2                                (MIAMI)
                       CASE NO. 1:17-CR-20701-MGC-5
3

4    UNITED STATES OF AMERICA           Miami, Florida

5                                       December 7, 2018
              vs.                       Friday
6

7    LEONARDO MIGUEL GARCIA MORALES
                                        Scheduled for 9:00 a.m.
8                                       Held 9:00 a.m. - 11:28 a.m.
     _____
9

10                              **JURY TRIAL**
                                 **DAY 4**
11                              **PAGES 1 - 87**

12             BEFORE THE HONORABLE DONALD L. GRAHAM
                     UNITED STATES DISTRICT JUDGE
13

14   APPEARANCES:

15   FOR THE GOVERNMENT:      **IGNACIO JESUS VAZQUEZ, JR., AUSA**
                              **J. MACKENZIE DUANE, AUSA**
16                            United States Attorney's Office
                              Miami Special Prosecutions Section
17                            99 Northeast 4th Street
                              Room 806
18                            Miami, Florida  33132

19   FOR THE DEFENDANT:       **DERIC ZACCA, ESQ.**
                              Deric Zacca, P.A.
20                            110 Southeast 6th Street
                              110 Tower - Suite 1700
21                            Fort Lauderdale, Florida  33301

22
     STENOGRAPHICALLY
23   REPORTED BY:             GLENDA M. POWERS, FPR, CRR, FPR
                              Official Federal Court Reporter
24                            United States District Court
                              400 North Miami Avenue
25                            Miami, Florida  33128

```
 1                        I N D E X

 2
                                                   PAGE
 3
                    GOVERNMENT'S EVIDENCE
 4
     WITNESS
 5

 6   CRIMINALIST III JENNIFER RODRIGUEZ
         Direct Examination continued by Ms. Duane      5
 7       Cross-Examination by Mr. Zacca                  8
         Redirect Examination by Ms. Duane              9
 8

 9   OFFICER MATIAS WILSON
         Direct Examination by Mr. Vazquez             10
10       Cross-Examination by Mr. Zacca                15
         Redirect Examination by Mr. Vazquez           23
11

12   DETECTIVE JOHNATHON ZELLER
         Direct Examination by Ms. Duane               27
13

14   LIVAN OCHILL
         Direct Examination by Mr. Vazquez             34
15       Cross-Examination by Mr. Zacca                48
         Redirect Examination by Mr. Vazquez           60
16

17   ELIZABETH RONDON (THROUGH INTERPRETER)
         Direct Examination by Mr. Vazquez             64
18       Cross-Examination by Mr. Zacca                70
         Redirect Examination by Ms. Duane             71
19

20

21

22

23

24

25
```

```
 1                    E X H I B I T S

 2
     EXHIBIT                                          RECEIVED
 3                                                    IN EVIDENCE

 4
                       GOVERNMENT'S EXHIBITS
 5
     Exhibit 55                              7
 6
     Exhibit 23                                          8
 7
     Exhibit 16A                                        32
 8
     Exhibit 18                                         42
 9
     Exhibit 17                                         65
10
     Exhibit 53                                         67
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Call to the order of the Court:)

 2              (Defendant Leonardo Garcia Morales aided by

 3    Court-Certified Spanish Interpreters.)

 4              COURTROOM DEPUTY:  Rise for the jury.

 5              THE COURT:  Good morning and be seated, please.

 6              Mr. Garcia Morales?

 7              COURTROOM DEPUTY:  He is on his way.

 8              THE COURT:  Good morning, Mr. Garcia Morales.

 9              (Defendant entered courtroom at 9:06 a.m.)

10              THE COURT:  Mr. Garcia Morales, the Court was advised

11    yesterday that the interpreters are having a little difficulty

12    hearing, because your earphones are not on your ear; and when

13    it's on the side, it creates some difficulty for them.

14              So as not to interfere with their translation and so

15    that you can hear well, keep the earphones in your ear, and

16    that will solve all of our problems.  Alright.

17              Thank you very much.

18              Bring the jury in, please.

19              COURTROOM DEPUTY:  Yes, sir.

20              THE COURT:  Is the witness available?

21              MR. VAZQUEZ:  Yes, Your Honor.

22              THE COURT:  The witness may come in.

23              (Witness resumes stand.)

24              THE DEFENDANT:  The thing is that once a while, this

25    makes some noise that bothers my ears.
```

```
 1              THE COURT:  Let's see how we do; and if we have a
 2   problem, we will have to see if we can solve it.
 3              (Jury entered courtroom at 9:07 a.m.)
 4              THE COURT:  Be seated, ladies and gentlemen.  We're
 5   back now and ready to continue with the trial.
 6              (CRIMINALIST III JENNIFER RODRIGUEZ continued to
 7   testify as follows:)
 8                         DIRECT EXAMINATION (CONTINUED)
 9   BY MS. DUANE:
10   Q.  Good morning, Ms. Rodriguez.
11   A.  Good morning.
12   Q.  Yesterday when we broke for the day, we were discussing
13   what was in evidence as Government's Exhibit A through I, which
14   are the nine latent fingerprints that you analyzed.
15          Remind me again how many of those latent fingerprints were
16   latents of value.
17   A.  There were two.
18   Q.  Again, what is a "latent value"?
19   A.  A "latent value" is where you will be able to go on to the
20   next stage of comparison.
21   Q.  So yesterday we discussed Government's Exhibit -- I'm
22   sorry, Ms. Foster, would you mind turning on the Elmo -- we
23   discussed Government's Exhibit 27E; and remind me again, who
24   you were able to identify this fingerprint as belonging to?
25   A.   Impressions A and B was the left palm of Alfredo Kindelan
```

```
 1   Hernandez.
 2   Q.   Now, I want to move on to what's been admitted into
 3   evidence as Government's Exhibit 27H.  And yesterday you
 4   identified this exhibit as the second latent of value that you
 5   identified from this set of nine; is that correct?
 6   A.   Yes.
 7   Q.   Now, were you able to identify who this latent print
 8   belonged to in 27H?
 9   A.   I did.
10   Q.   And who was that?
11   A.   It was the left palm of Jean Marrero Lara.
12   Q.   And how did you reach that conclusion?
13   A.   I did a side-by-side comparison of the latent lifts, along
14   with the roll standard that I rolled and did a side-by-side,
15   which I'm looking for the unique characteristics in the
16   standard as I'm looking for in the latent.
17   Q.   I'm showing you what's been marked for identification as
18   Government's Exhibit 55 and Government's Exhibit 23.
19        Turning first to Government's Exhibit 55, do you recognize
20   this document?
21             THE COURT:  Is 55 in evidence?
22             MS. DUANE:  Marked for identification.
23             THE WITNESS:  Yes, I do.
24   BY MS. DUANE:
25   Q.   And what is Government's Exhibit 55 marked for
```

1   identification?

2   A.   It is the rolled fingerprints and the rolled palm prints

3   that I did of Jean Marrero Lara.

4          MS. DUANE:   Your Honor, at this time, the Government

5   would move to admit Government's Exhibit 55 marked for

6   identification into evidence.

7          MR. ZACCA:   No objection.

8          THE COURT:   Received.

9          (Government's Exhibit 55 received into evidence.)

10  BY MS. DUANE:

11  Q.   I'm now putting what's been admitted into evidence as

12  Government's Exhibit 55 onto the Elmo.   Just to be clear, this

13  is what you were referring to before, in your testimony?

14  A.   Yes, this is the roll standard of Jean Marrero Lara.

15  Q.   Now, I have also handed you what's been marked for

16  identification as Government's Exhibit 23.

17         Do you recognize the person in this photo?

18  A.   Yes, I do.

19  Q.   How do you recognize the person in this photo?

20  A.   I rolled his fingerprints and his palm prints here at the

21  courthouse.

22  Q.   Who is it?

23  A.   This is Jean Marrero Lara.

24         MS. DUANE:   At this time, the Government would move to

25  admit Government's Exhibit 23 marked for identification into

```
 1   evidence.
 2            MR. ZACCA:  No objection.
 3            THE COURT:  Received.
 4            (Government's Exhibit 23 received into evidence.)
 5   BY MS. DUANE:
 6   Q.  I'm now putting on the Elmo what's been admitted into
 7   evidence as Government's Exhibit 23.
 8            And again, who is this individual?
 9   A.  This is Jean Marrero Lara.
10   Q.  And so, just to be clear, Government's Exhibit 27E -- or
11   I'm sorry, H -- which I showed to you previously --
12   Government's 27H, which I showed you previously, who does this
13   print belong to?
14   A.  This impression is the left palm of Jean Marrero Lara.
15   Q.  And just to be clear, none of the other fingerprints
16   collected from Government's Exhibit 27A through 27I, except for
17   27E, which we have discussed, and 27H, which we've discussed,
18   were able to be compared to make any sort of match?
19   A.  That's correct.
20            MS. DUANE:  The Government tenders the witness,
21   Your Honor.
22                         CROSS-EXAMINATION
23   BY MR. ZACCA:
24   Q.  Good morning.
25   A.  Good morning.
```

1   Q.  So, just to be absolutely clear, you were given nine latent

2   fingerprint cards to examine in this case?

3   A.  Yes.

4   Q.  And of the nine latent fingerprint cards, did any of them

5   come back to Leonardo Garcia Morales?

6   A.  No.

7   Q.  I have in my hand what's been marked for identification as

8   Government Exhibit 9.

9       Have you ever seen Government's Exhibit 9?

10  A.  I don't know what Exhibit 9 is.

11  Q.  So the answer is no, you don't even know what it is?

12  A.  No.

13  Q.  Let me ask it this way, do you know what has been marked

14  for identification as Government Exhibit 9?

15  A.  No.

16  Q.  Have you ever been given a Colt -- let me announce it

17  correctly here -- a Colt .38 caliber firearm to examine?

18  A.  No.

19          MR. ZACCA:  No further questions.

20          MS. DUANE:  Very Briefly.

21                      REDIRECT EXAMINATION

22  BY MS. DUANE:

23  Q.  Just to be clear, Ms. Rodriguez, do you fingerprint items?

24  A.  You mean, do I process the items?

25  Q.  Yes.  Are you somebody who goes out to the crime scene?

1   A.   No, I do not.

2   Q.   What is your role?

3   A.   My role as Criminalist III is to analyze, compare, and

4   evaluate the latent prints, and unknown latent prints, from the

5   crime scene to the known standards.

6   Q.   And those latent prints are provided to you?

7   A.   Yes.

8           MS. DUANE:  Nothing further from the Government.

9           THE COURT:  Can the witness be permanently excused?

10          MR. ZACCA:  Nothing from the defense.

11          THE COURT:  Excused.

12          (Witness excused.)

13          MR. VAZQUEZ:  The United States calls Officer Matias

14   Wilson, from the Miramar Police Department.

15          COURTROOM DEPUTY:  Raise your right hand, please.

16          Do you solemnly swear to tell the truth, the whole

17   truth, and nothing but the truth, so help you God?

18          THE WITNESS:  I do.

19          (OFFICER MATIAS WILSON testified as follows:)

20                      DIRECT EXAMINATION

21   BY MR. VAZQUEZ:

22   Q.   Good morning, sir.

23   A.   Good morning.

24   Q.   Officer Matias Wilson, where are you employed?

25   A.   I'm employed by the City of Miramar Police Department.

1    Q.   What position do you hold?

2    A.   I'm a road patrol officer.

3    Q.   What are the typical duties that you have as a road patrol

4    officer?

5    A.   We respond to calls of service, basic traffic

6    investigations, respond to shootings, stuff like that, everyday

7    stuff.

8    Q.   And for how long have you held that position?

9    A.   Approximately, eight years.

10   Q.   Sir, I want to draw your attention to September 30th, 2012,

11   and the hours thereafter.  On that date, the late evening hours

12   of September 30th, 2012, on that date, were you serving with

13   the Miramar Police Department?

14   A.   Yes.

15   Q.   And on that date, did you have the opportunity to

16   participate in an investigation involving an individual named

17   Leonardo Garcia Morales?

18   A.   Yes.

19   Q.   How is it that you became involved in that case?

20   A.   We got a call to respond to a house in a residential area,

21   a call regarding a home invasion robbery.

22   Q.   I'm going to show you what's been admitted into evidence as

23   Government's Exhibit 1.  Do you see that?

24   A.   Yes.

25   Q.   What is it we're looking at on Government's Exhibit 1?

1  A.   That's the residence I responded to that night.  That's the

2  front door of the house.

3  Q.   And this home, where is it situated?

4  A.   It's in a gated community, residential area, in the west

5  side of Miramar.

6  Q.   When you received this call for service, what did you do?

7  A.   I responded to the scene, and myself and another officer

8  arrived within minutes, and that's when we observed an

9  individual laying in the front of the house screaming for help,

10  and we heard people screaming inside the house.

11  Q.   Now, what did you do after you observed that?

12  A.   Myself and the officers approached the residence, at which

13  point we saw an individual laying in the front, he was

14  screaming for help.  I could tell that he had been shot.

15      I saw a little bit of blood next to the individual laying

16  at the front door, and then a short time later we observed

17  people inside the house, the occupants of the house, running

18  back and forth in a little bit of a panic; and then we

19  established a contact team at the front of the house to

20  eventually get people outside the house.

21  Q.   In the span of your time on the scene, did you see what

22  happened to the individual who got shot?

23  A.   I did.  Again, like I stated before, I observed him to be

24  screaming for help, he'd been shot.

25      And then after I conducted an interior search of the house,

1    I observed the rescue, he was getting fire medical attention

2    for his injuries.

3    Q.   What did it look like when you walked around this house and

4    this scene, what did you see happening to the person that got

5    shot?

6    A.   It was very hectic, as you could imagine, they were trying

7    to -- from a medical standpoint, I guess, figure out what his

8    injuries were, and they were trying to rush him to the hospital

9    as soon as possible.

10   Q.   And physically, how did they go about doing that?

11   A.   The rescue, Miramar Fire Rescue, came in, they started

12   assessing injuries -- and again, I stepped back -- and there

13   was a crew of maybe five to six firefighters subsequently

14   working with the injured from the shooting.

15   Q.   Where did the defendant go, if you can recall?

16   A.   He was laying in front of the house from the previous

17   picture you showed, and they took him from the front of the

18   house, and they moved him to a fire rescue truck in order to

19   transport him to the hospital.

20   Q.   I'm showing you what's been admitted as Government's 1A,

21   Bate's 1753.  It's the first page of the exhibit.

22        Can you use the screen and kind of trace us through the

23   movement of the individual who was shot?

24   A.   So, the individual was laying right in this area, and

25   that's where the rescue crew was working him.

1       Eventually, they moved him from that area that I

2   highlighted to the street area -- which you can't really see

3   from this area where the rescue engine was -- and they put him

4   on a stretcher, moved him in this general vicinity.

5   Q.   And when you say the rescue vehicle was in the street,

6   where was it it at, in relation to where the home is?

7   A.   It was in front of the house, close by.

8   Q.   And how was the defendant -- when you say he was moved, how

9   were they able to physically move him to this rescue truck?

10  A.   They put him on a stretcher and they moved them there, from

11  there to the ambulance.

12  Q.   Okay.  After fire rescue moved him to the rescue truck,

13  what did you do?

14  A.   I was ordered to go with the shooting victim to the

15  hospital, standard protocol.  Any time that we get an

16  individual, trauma alert, stabbing, shooting, when they have

17  been involved in some sort of crime, we have to make sure we

18  follow the individual.

19  Q.   Now, Officer Wilson, I know it's been some time, do you

20  believe if you saw this person again you would be able to

21  identify that individual?

22  A.   Yes.

23  Q.   Officer, I'd ask you to look around the court, and if you

24  need me to move, or anything like that, let me know, and tell

25  us if you see the individual that you observed on that date.

1   A.   Yeah.  He's just behind you.

2   Q.   And could you identify the individual by an article of

3   clothing?

4   A.   Yeah, possibly.

5   Q.   And what is the person wearing, describe that article of

6   clothing.

7   A.   He's wearing a white -- I can't see because you're blocking

8   him -- he's wearing a white robe on top of his shirt.

9        MR. VAZQUEZ:  Let the record reflect the witness has

10  identified the defendant.

11        I tender the witness, Your Honor.

12                       CROSS-EXAMINATION

13  BY MR. ZACCA:

14  Q.   I'm going to show you the photograph that you the

15  photograph, I believe, we were just looking at, photograph 1A,

16  Bates stamped 1753, and we'll use this as a reference point

17  through the line of questioning; okay?

18  A.   Okay.

19  Q.   Alright.  Now, you were one of the first responding

20  officers to the scene; correct?

21  A.   Yes.

22  Q.   In fact, it was you and Officer Shimpeno; correct?

23  A.   Shimpeno.

24  Q.   Shimpeno, forgive me.

25  A.   That's okay.

```
 1   Q.   You kind of arrived at the same time; right?

 2   A.   He arrived just a little bit before I did, and I arrived

 3   just a short time later.

 4   Q.   Well, the call went out; right?

 5   A.   Yes.

 6   Q.   You were on road patrol driving around; correct?

 7   A.   Correct.

 8   Q.   How fast did you get there?

 9   A.   I mean, I don't have an exact reference on that, but it was

10   pretty quick due to the nature of the call.

11   Q.   Was it within minutes?

12   A.   I would say that's safe to say.

13   Q.   Less than 10 minutes?

14   A.   Yes, less than 10.

15   Q.   Okay.  Now, you and Officer Shimpeno arrived before fire

16   rescue got there; correct?

17   A.   That is correct.

18   Q.   So when you got there, it was -- you saw who you've already

19   identified as Mr. Garcia Morales here, in the front; correct?

20   A.   Correct.

21   Q.   Not inside the house, in the front of the house; correct?

22   A.   Right.

23   Q.   And no fire rescue; right?

24   A.   Not yet.

25   Q.   And wasn't Officer Aranda with you, too?
```

```
 1   A.   I believe Officer Aranda arrived after I did, a short time

 2   after that.

 3   Q.   But there were at least two of you on scene; correct?

 4   A.   Initially, yes.

 5   Q.   And how fast did Officer Aranda get there?

 6   A.   You can imagine, it's kind of hectic, hectic, I can't give

 7   you an exact time frame, but it was a short time after I

 8   arrived.

 9   Q.   How much time passed between the moment you got there and

10   the Miramar Fire Rescue arrived?

11   A.   I can't give you an exact answer, but based on protocol on

12   past calls, whenever we get a situation like that, fire rescue

13   needs to be cleared in order -- we have to deem the scene safe

14   for them to enter, so until we can establish that, they can't

15   go on scene.

16   Q.   Sir, how long have you been an officer?

17   A.   About eight years.

18   Q.   Eight years.  Now, you we're talking about an event that

19   occurred in 2012, so at the time of this event you were an

20   officer for two years; right?

21   A.   Yeah.

22   Q.   Okay.  I don't mean to --

23   A.   Yes.

24   Q.   It's yes, because it has to come clear on the record.

25   Forgive me.
```

1   A.   Yes.

2   Q.   Now, prior to -- well, prior to this event, you've had two

3   years as a police officer.  You went to the police academy;

4   correct?

5   A.   That is correct.

6   Q.   And how long is the police academy?

7   A.   Six months.

8   Q.   At the police academy you get trained; correct?

9   A.   We do.

10  Q.   You get trained on how to be an officer; correct?

11  A.   Yes.

12  Q.   You also get trained on collecting evidence; correct?

13  A.   Yes.

14  Q.   Preserving evidence; correct?

15  A.   Yes.

16  Q.   Maintaining evidence; correct?

17  A.   Yeah.  Yes.

18  Q.   Properly documenting evidence; correct?

19  A.   Correct.

20  Q.   You also are taught the importance of your police reports;

21  correct?

22  A.   Yes.

23  Q.   And these police reports are important because they serve

24  as a memorialization of what you did at any particular time;

25  correct?

 1   A.   Yes.

 2   Q.   And it helps to serve as -- to refresh your recollection

 3   later down the road, should you need to have your recollection

 4   refreshed; correct?

 5   A.   Yes.

 6   Q.   It just basically documents what you did; right?

 7   A.   Yes.

 8   Q.   And it's important to be as detailed as possible in your

 9   reports; correct?

10   A.   Right.

11   Q.   And you're trained to do all these things; right?

12   A.   Yes.

13   Q.   In your report, did you document the time fire rescue

14   arrived after you arrived?

15   A.   I did not.

16   Q.   Okay.  So, based on your best recollection, was it within

17   minutes, 30 minutes later, an hour later?

18   A.   From the time I arrived on scene?

19   Q.   Yes, sir.

20   A.   Very hectic situation, I can't give an accurate time on

21   that, but it shouldn't be more than 10 minutes.

22   Q.   Okay.  Now, as a police officer, do you carry a

23   department-issued camera?

24   A.   No.

25   Q.   Do you have a cell phone?

```
 1   A.   Yes, I have a cell phone.

 2   Q.   Well, more importantly, did you have a cell phone back in

 3   2012?

 4   A.   I'm sure I did, yeah.

 5   Q.   Did that cell phone have the capability to take pictures?

 6   A.   I'm not sure if I had a Blackberry or phone back then, to

 7   be honest with you.

 8   Q.   Would it be difficult for you to photograph the scene prior

 9   to rescue arriving?

10   A.   No, that wasn't my responsibility that day.

11   Q.   Whose responsibility would that be?

12   A.   Crime scene technicians from our department.

13   Q.   In your eight years as a police officer, have you ever

14   photographed a scene?

15   A.   No.

16   Q.   You never used your camera?

17   A.   Not to document a crime scene.

18   Q.   Well, at any point in time, have you ever used your camera

19   as a police officer?

20   A.   In the capacity as a police officer?

21   Q.   Yeah.

22   A.   But not to document a crime scene.

23   Q.   Let's not get tangled up --

24   A.   A simple answer to your question, yes.

25   Q.   Okay, so as --
```

1    A.   Yeah.

2    Q.   -- as a police officer, you have used a camera to

3    photograph something; correct?

4    A.   Yes.

5    Q.   And you did that in your capacity as a police officer;

6    right?

7    A.   Yes.

8    Q.   So it's not something you've never done before as a police

9    officer; right?

10   A.   That's correct.

11   Q.   Now, you described it in direct testimony, and I want to

12   recreate this as best as possible.

13        You arrive at this location here, and you describe it as a

14   hectic scene; correct?

15   A.   Yes.

16   Q.   And it gets more hectic when fire rescue arrives; correct?

17   A.   Yes.

18   Q.   In fact, you said there were five or six fire rescuers

19   there; correct?

20   A.   Yes, that's what I said.

21   Q.   All in this area here?   (Indicating.)

22   A.   Yes.

23   Q.   All working on Garcia Morales; correct?

24   A.   Yes.

25   Q.   Is there any regard to what they're doing with him?

1    A.   No, once he's getting medical treatment, I just let them do

2    their thing, I step away from what they're doing, to the side.

3    Q.   In fact, they're cutting his clothes; correct?

4    A.   That's standard, that's what they do.

5    Q.   In fact, there were some scissors; right?

6    A.   Yes.

7    Q.   In fact, in their hastiness, they left some scissors there;

8    correct?

9    A.   I would assume so.

10   Q.   Things were being moved around and tossed around?

11   A.   That's fair.

12   Q.   Now, you stated in direct testimony that there was -- and I

13   wrote it down -- correct me if I'm wrong -- "a little bit of

14   blood."  Did you say that?

15   A.   There was a little bit of blood on scene.

16   Q.   A little bit of blood on scene, or a lot of blood on scene

17   it was --

18   A.   There was blood.

19   Q.   Well, let's be clear here.

20        Is it fair to say that there was a pool of blood here,

21   where Leonardo Garcia Morales lie?

22   A.   It was there where he was laying down.

23   Q.   You've given testimony before in this case; haven't you?

24   A.   Yes.

25   Q.   In fact, you have given deposition testimony in this case;

1   correct?

2   A.   Correct.

3   Q.   And you may not remember the date, but do you have any

4   reason to disbelieve that the date that you gave this

5   deposition testimony was September 2nd, 2015?

6   A.   That sounds about right.

7   Q.   Right.  2015 is, obviously, closer to 2012 than we are

8   today; correct?

9   A.   Yes.

10   Q.   And during this deposition testimony, did you ever describe

11   the area where Mr. Garcia Morales lay as a "pool of blood"?

12   A.   Yes.

13   Q.   Okay.  When you -- when I hear "pool of blood," that's a

14   lot of blood; right?

15   A.   Yes.

16   Q.   I don't want to quibble here, but let's agree here, there's

17   a lot of blood on the scene?

18   A.   Correct.

19        MR. ZACCA:  Alright.  I have no further questions.

20   Thank you.

21                    REDIRECT EXAMINATION

22   BY MR. VAZQUEZ:

23   Q.   Officer Wilson, when you arrived at the scene, what kind of

24   call were you responding to?

25   A.   We received multiple calls that day regarding that house,

1    went from shots-fired call to possible home invasion, I forgot

2    the other one, they were just --

3    Q.  So you pull up to this home thinking this might have been a

4    home invasion; right?

5    A.  Yes.

6    Q.  When you pulled up to the home, do you know if everyone had

7    been caught who attempted to home-invade this residence?

8         MR. ZACCA:  I'm going to object to the leading form of

9    this questioning.

10        THE COURT:  Sustained.  Rephrase.

11        MR. VAZQUEZ:  Yes, Your Honor.

12   BY MR. VAZQUEZ:

13   Q.  What did you notice about the scene when you pulled up?

14   A.  It was a possible home invasion, and we -- my safety and

15   training kicked in, I didn't want to breach the house

16   immediately, due to the fact that there might be other people

17   outstanding.

18   Q.  How many subjects did you know about?

19   A.  I don't recall exactly how many people were there or how

20   many people committed the home invasion.

21   Q.  How many guns were involved?

22   A.  I didn't have that information, initially.

23   Q.  When you walked up to the door and you saw Mr. Garcia

24   Morales, had you figured out how many suspects might have been

25   involved?

1   A.   No.

2   Q.   Had you figured out how many guns might have been involved?

3   A.   No.

4   Q.   Not knowing how many suspects, how many guns, why didn't

5   you stop to take a picture of Mr. Garcia Morales?

6   A.   That wouldn't be -- that would be unsafe to do.  I was

7   focused on other people in the house, if there were other

8   subjects around the house; it was a very hectic on the scene,

9   so the last thing I would do is take a picture.

10  Q.   What were the lighting conditions inside this home?

11  A.   It was dark, not the best lit area.

12  Q.   Prior to this incident, Mr. Zacca asked you about the

13  timing and fire rescue.  Prior to this incident, had you

14  responded to other firearm injury and shooting scenes?

15  A.   Yes.

16  Q.   And when a gunshot -- when a human being sustains a

17  gunshot, typically, when fire rescue is called, how long do

18  they have to arrive before somebody bleeds out and dies?

19          MR. ZACCA:  Objection.  Calls for speculation.

20          THE COURT:  Do you know the answer to that question or

21  not?

22          THE WITNESS:  I could answer it.

23          THE COURT:  Overruled.

24          THE WITNESS:  It doesn't -- if they're hit -- if

25  they're struck by a bullet in the right area, it does not take

1    a long time to bleed out.

2    BY MR. VAZQUEZ:

3    Q.   When you cleared the house, were the lights still off?

4    A.   Inside the house?

5    Q.   Yes, sir.

6    A.   Yes, they were off.

7    Q.   When you cleared the house and you came outside, was fire

8    rescue there?

9    A.   Yes.  They were staging, and once we cleared the inside of

10   the house and we deemed it safe, that's when we said fire

11   rescue could enter.

12   Q.   What was your job at this scene?

13   A.   Initially, my job was to secure the inside of the house.

14   Once we secured the house, I was told to go to the hospital.

15   Q.   When fire rescue had finished staging the scene and you had

16   turned it over to them, why didn't you ask them to pose for

17   some pictures while they worked on the defendant?

18   A.   They were trying to rush the defendant to the hospital as

19   soon as possible.

20   Q.   What were they trying to do to the defendant?

21   A.   Save his life.

22        MR. VAZQUEZ:  Your Honor, I have no further questions

23   for the witness.

24        THE COURT:  Permanent excusal for the witness?

25        MR. VAZQUEZ:  Yes, on behalf of the Government.

1           MR. ZACCA:  Nothing from the defense, Your Honor.

2           THE COURT:  You are excused.

3           (Witness excused.)

4           COURTROOM DEPUTY:  Please raise your right hand.

5           Do you solemnly swear to tell the truth, the whole

6    truth, and nothing but the truth, so help you God?

7           THE WITNESS:  I do.

8           COURTROOM DEPUTY:  Thank you.

9           (DETECTIVE JOHNATHON ZELLER testified as follows:)

10                          DIRECT EXAMINATION

11   BY MS. DUANE:

12   Q.  Good morning, Detective Zeller.

13   A.  Good morning.

14   Q.  Could you please introduce yourself to the jury and spell

15   your first and last name for the court reporter.

16   A.  Johnathon Zeller, J-O-H-N-A-T-H-O-N, Z-E-L-L-E-R.

17   Q.  Detective Zeller, where do you work?

18   A.  I work for the City of Miramar Police Department.

19   Q.  How long have you worked for the City of Miramar?

20   A.  Just over 18 years.

21   Q.  Can you walk the jurors through your career since you

22   joined Miramar.

23   A.  I started out on regular road patrol back in 2000.

24        In 2006, I became a detective in our property crimes

25   division.

1       In 2007, I was dispatched to work a gang case that we had

2   in Miramar.

3       In 2009, I became part of the homicide unit, and that's

4   where I've been ever since.

5   Q.   So what are your duties and responsibilities as a homicide

6   detective?

7   A.   Well, I wear a lot of hats as a homicide detective; not

8   only do I investigate homicide crimes against persons --

9   stabbings, or shootings, or things like that -- I do gun

10  investigations as well, and I also do forensic examinations of

11  electronic devices.

12  Q.   Can you tell -- focusing on the last part you said, can you

13  tell the jurors what you do in forensics, what training you've

14  received for that?

15  A.   I've received a lot of training, whether they're cell

16  phones, in particular, cellular devices, I'm starting to get

17  into the computers, to do forensic examinations on that.

18  Q.   So what do you do with the cell phones?

19  A.   Well, it depends on what we're looking for.

20      So what we try to do is we -- for example, the cell phone

21  that we get for a particular crime, we forensically download

22  the phone, so we can have almost like a mirror image of the

23  phone and have that -- instead of actually tampering into the

24  phone and going into the phone.

25  Q.   Are you familiar with the Cellebrite technology?

1   A.   I am.

2   Q.   Is that one of the tools that you use?

3   A.   Yes.

4   Q.   What is "Cellebrite technology"?

5   A.   "Cellebrite technology" is a piece of equipment that we use

6   in order to extract information from a cell phone, or for a

7   cellular device.

8   Q.   So as you were working as a homicide detective, did there

9   come a time where you became involved in the investigation of

10   the defendant, Leonardo Garcia Morales?

11   A.   Yes.

12   Q.   How was that?

13   A.   I remember when the call came in and I responded to the

14   scene, but not to the actual scene of the house, it was more

15   like the perimeter point.

16        We had the other officers taking care of of that.

17        At some point, that's when I got involved, as far as the

18   phone aspect of it.

19   Q.   So just to be clear, you responded to the general area that

20   night?

21   A.   Yeah, the perimeter area, yes.

22   Q.   Did you go to the home?

23   A.   No, I did not.

24   Q.   Did you go inside the home?

25   A.   No.

1    Q.   Did you speak to any of the victims?

2    A.   No.

3    Q.   Any of the suspects?

4    A.   No.

5    Q.   So what did you do at the perimeter point?

6    A.   Just waited there, waited for instructions to see what the

7    detective wanted for us to do.

8    Q.   So what else did you do in this particular case?

9    A.   Later that night, or morning, I was handed a phone by

10   Detective Bertrand and asked for a forensic download to be

11   completed on it.

12   Q.   I'm showing you what's been admitted into evidence as

13   Government Exhibit 15.  This is the evidence bag, and this is

14   that phone.  Do you recognize this phone?

15   A.   I do.

16   Q.   And how do you recognize it?

17   A.   This is the phone that was given to me by Detective

18   Bertrand.

19   Q.   So walk the jurors through what you did with this phone.

20   A.   So I have to leave the scene with the phone and go back to

21   the office.  What I do, in simple, simple, plain English, is I

22   hook up the phone to this device we have, the Cellebrite, and

23   allow it to do its job and to extract the information that, you

24   know, is on the phone and give it to us in a format we can read

25   without having us go into the phone, or tampering with the

 1   phone, or anything like that.

 2   Q.   So, just to be clear, approximately, it's a download of

 3   that information from the phone?

 4   A.   Correct.

 5   Q.   What form does that download come in?

 6   A.   Meaning?

 7   Q.   Is it a report?

 8   A.   Yes, you generate a report.  You can do it in different

 9   formats, whether it's Word or PDF.  Yes.

10   Q.   And how do you know the information generated in that

11   report is from this phone?

12   A.   I compared it to make sure the serial number was the same.

13   Q.   And just to be clear, you did a download of this phone?

14   A.   That's correct.

15   Q.   What date did you do that download?

16   A.   That was on October 1st, 2012.

17   Q.   Now, I'm handing you what's been marked for identification

18   as Government's Exhibit 16 and what's been marked for

19   identification as Government's Exhibit 16A.

20        Now, turning first to what's been marked for identification

21   as Government's Exhibit 16.

22   A.   Yes.

23   Q.   Do you recognize that disk?

24   A.   I do.

25   Q.   How do you recognize it?

1    A.   My initials and my ID number are on the disk.

2    Q.   And what is contained on that disk?

3    A.   That is the download of the phone.

4    Q.   And now turning -- and did you have an opportunity to

5    review that download?

6    A.   I did.

7    Q.   And now, turning to what's been marked for identification

8    as Government's Exhibit 16A, do you recognize that document?

9    A.   Yes, I do.

10   Q.   And what is that document?

11   A.   That is the examination report.

12   Q.   How do you recognize that document?

13   A.   This is the same as what's on the disk.

14         MS. DUANE:  Your Honor, at this time, the Government

15   would move to admit Government's Exhibit 16A into evidence.

16         MR. ZACCA:  No objection.

17         THE COURT:  Received.

18         (Government's Exhibit 16A received into evidence.)

19   BY MS. DUANE:

20   Q.   And just to be clear, with regards to 16A, again, that is

21   an excerpt of the report from the disk?

22   A.   Yes.

23   Q.   And certain redactions have been made to that report?

24   A.   To my understanding, yes.

25   Q.   Just to be clear, so what is that report, exactly?

1   A.   This report, this is the report that's generated from the

2   extraction of the phone, which will give you the properties of

3   the phone, the serial number and whatnot.

4        It also has all your contacts that are in there, your text

5   messages, your call logs, for the most part.

6   Q.   And that is the Government Exhibit 16, the phone you

7   received on October 1st, contacts?

8   A.   Yes.

9   Q.   Have you done any analysis to the phone report?

10  A.   No.

11  Q.   And why is that?

12  A.   The way that I do -- when you talk about analysis of

13  phones, if this was a case that belonged to me, if it was my

14  investigation and I know what I want to look for, then I would.

15       In this particular case, I did the download -- I was not

16  the lead detective in the case.  So once that was done, they

17  were handed over to Detective Bertrand -- since he's the

18  lead -- and he would know what he was looking for in this case.

19  Q.   So what was your role in this investigation?

20  A.   Download the phone.

21           MS. DUANE:  The Government tenders the witness.

22           MR. ZACCA:  No questions.

23           THE COURT:  May the witness be permanently excused?

24           MS. DUANE:  Yes, on behalf of the United States.

25           THE COURT:  You may be excused.

```
 1              MR. ZACCA:  And on behalf of defense, Judge, yes.

 2              THE WITNESS:  Thank you.

 3              (Witness excused.)

 4              MS. DUANE:  The United States calls Livan Ochill as its

 5    next witness.

 6              COURTROOM DEPUTY:  Raise your right hand.  Do you

 7    solemnly swear the testimony you're about to give will be the

 8    truth and nothing but the truth, so help you God?

 9              THE WITNESS:  I do.

10              (LIVAN OCHILL, being sworn, testified as follows:)

11                        DIRECT EXAMINATION

12    BY MR. VAZQUEZ:

13    Q.  Good morning, sir.

14    A.  Good morning.

15    Q.  If you would please introduce yourself to the members of

16    the jury.

17    A.  Yes.  Livan Ochill.

18    Q.  Mr. Ochill, where do you live, what area of town?

19    A.  In Hialeah.

20    Q.  And how long have you lived in the Hialeah, South Florida,

21    area?

22    A.  About 11 years now.

23    Q.  And prior to that, where did you live?

24    A.  In Cuba.

25    Q.  Now, sir, how are you employed?
```

```
 1   A.   I drive a tow truck.
 2   Q.   And how long have you been employed in that capacity?
 3   A.   About five or six years.
 4   Q.   Sir, I want to draw your attention to the fall -- in the
 5   late summer, early fall of the year 2012.
 6        Do you recall that time?
 7   A.   Yes.
 8   Q.   In that time frame, were you familiar with a person known
 9   to you as Leonardo Miguel Morales?
10   A.   Yes.
11   Q.   And how did you know that individual?
12   A.   In Cuba.
13   Q.   And did you know him in the United States as well?
14   A.   Yes.
15   Q.   Sir, in the late summer and early fall of 2012, did you
16   have occasion to meet with Mr. Leonardo Miguel Morales and an
17   individual known to you as Celia Gonzalez?
18   A.   Yes.
19   Q.   Mr. Ochill, can you tell the members of the jury, how is it
20   that you came to participate in this meeting regarding Celia
21   Gonzalez and Leonardo Morales?
22   A.   I was working on my tow truck, and Celia Gonzalez calls me;
23   and we met around Okeechobee and Hialeah, and there, that's
24   when he -- she asked me --
25        MR. ZACCA:  I'm sorry.
```

1          Mr. Morales says he can't hear the testimony.

2          THE INTERPRETER:  Your Honor, he does not need to

3   listen to the headsets.  We can speak Spanish loud, and he can

4   hear the Spanish from my microphone.

5          MR. ZACCA:  Perhaps, I think it could be solved if

6   Mr. Ochill speaks into the microphone.

7          He's saying he can't hear.

8          THE COURT:  Let's try again.  Let's speak directly into

9   the microphone, Mr. Ochill.

10  BY MR. VAZQUEZ:

11  Q.  So, Mr. Ochill, I think where we left off, your answer, you

12  received a phone call from Ms. Gonzalez, you went to meet her,

13  and then there was a break in your testimony.

14         If you can start from that point.

15  A.  I was working with my tow truck and Celia Gonzalez calls

16  me.

17  Q.  After Ms. Gonzalez called you, where did you go?

18  A.  Where she was, at a home of a friend of hers, that she was

19  there.

20  Q.  What happened once you were there?

21  A.  She greeted me and said hello, and then she asked me for

22  Leonardo's phone number.

23  Q.  What happened after you had that exchange with Ms. Celia

24  Gonzalez?

25  A.  We spoke, and then she spoke with him, and then Leonardo

1   and Celia picked me up at my home.

2        I put away the tow truck and they picked me up in a van.

3   Q.   When you say "they picked you up," who is "they"?

4   A.   Celia and Leonardo.

5   Q.   Now, sir, if you saw the individual that you referred to as

6   Leonardo again, would you be able to identify him?

7   A.   Yes.

8   Q.   So what I would ask you to do is, please, look around the

9   courtroom and let us know if you see Leonardo.

10  A.   I do.

11  Q.   Could you please identify the person you know as Leonardo

12  by an article of clothing?

13  A.   Like a sheet around him, like a white blanket around him.

14        MR. VAZQUEZ:   Let the record reflect the witness has

15  identified the defendant.

16  BY MR. VAZQUEZ:

17  Q.   Now, sir, who was driving that white van that you were

18  referring to?

19  A.   Leonardo.

20  Q.   And where was Celia?

21  A.   As a passenger.

22  Q.   Now, could you tell the members of the jury what this van

23  looked like?

24  A.   It was a white van.  It was a closed van used for work.

25  Q.   When you say "closed," what does that mean?

1    A.   That is for work -- that's used for work.  It's not a

2    passenger van.

3    Q.   And when you got picked up in this white van driven around

4    by Mr. Morales, where did you go inside of it?

5    A.   I sat in the van, in the back part, and we left.  We left.

6    Q.   When you sit down in this van, is there a seat for you?

7    A.   No, no.

8    Q.   So what are you sitting on?

9    A.   On that edge where the rear tire goes.

10   Q.   When you're sitting on this rear tire hub, what can you

11   see, as far as what's going on on the outside?

12   A.   You can't really see anything because it is closed.

13   Q.   Now, when you are in this car and you're picked up, where

14   do you go?

15   A.   I don't know, because I don't know where we were going.

16   I didn't know exactly where we were going, I couldn't see out

17   from where I was.

18   Q.   Where did you think you were going?

19   A.   You're asking me where I thought we were going?

20   Q.   Yes, sir.

21   A.   To have a beer.

22   Q.   Did you, ultimately, go and have a beer?

23   A.   Yes.

24   Q.   Now, do you -- after you go and have a beer, what happens

25   to you?

1    A.    I stay at home.

2    Q.    And how do you get home?

3    A.    They bring me back home.

4    Q.    From the time that you get picked up to the time that you

5    get dropped off, does Mr. Morales speak about anything in your

6    presence?

7    A.    No.  I remained in my home.  I had some drinks, and so I

8    stay at home and I fall asleep.

9    Q.    Mr. Ochill, I'm asking you from the time you get picked up,

10   to the time you go to the bar, to the time you get dropped off,

11   do you hear Mr. Morales talk to Celia about anything?

12           MR. ZACCA:  Objection to the form of the question.  The

13   bar never came up.  There's no mention of a bar.

14   A.    Before we went to the bar, we went to another place that I

15   don't know exactly where it is, and then -- I don't know if it

16   was around Broward, I don't know, but we went to see something

17   there.

18   Q.    And why did you go there?

19   A.    Because Celia went to SHOW Leonardo a house.

20   Q.    Did Leonardo ask anything about that house?

21   A.    No.

22   Q.    While you were on this trip and during this day, did the

23   subject of a person named "Frank "come up?

24   A.    Yes.

25   Q.    Who brought up Frank?

1   A.   Celia.

2   Q.   And did Leonardo ask any questions about Frank?

3   A.   Yes, whether he had a marijuana grow house.

4   Q.   And when that question was asked, did you know anything

5   about where this marijuana grow house might be?

6   A.   No.

7   Q.   After Leonardo asked about the marijuana grow house, where

8   did you go?

9   A.   To the cafeteria.

10   Q.   Did there come a point in time when Celia tried to show

11   Leonardo where this marijuana grow house was?

12   A.   Well, she pointed out a house to him.

13   Q.   And what general area was this house that she pointed him

14   towards?

15   A.   It was a house, but I couldn't see it, because I was unable

16   to look out because I was in the closed van.

17   Q.   Earlier you said that you drove to Broward.

18       Is this the area in Broward that you visited?

19   A.   Yes, yes, that's owned.

20   Q.   Now, Mr. Ochill, prior to -- on prior occasions, were there

21   times when you were asked about this meeting by the FBI?

22   A.   Yes.

23   Q.   And is it a fact that on other occasions you did not

24   acknowledge that you were present for this identification of a

25   house?

1   A.   Yes, that's true.

2   Q.   And that was false; correct?

3   A.   Yes, my answer was that I didn't know.

4   Q.   And, Mr. Ochill, in addition to that, did there come a

5   point in time where you were asked if you had a relationship, a

6   personal relationship with Celia?

7   A.   Yes.

8   Q.   And that was by the FBI?

9   A.   Yes.

10  Q.   And is it a fact that you denied that you had a personal,

11  intimate relationship with Celia?

12  A.   Yes.

13  Q.   And it is a fact that you, in fact, did have a personal and

14  intimate relationship with Celia; is that correct?

15  A.   Yes.  Yes.

16  Q.   Now, sir, I want to show you what's been marked for

17  identification as Government's 18, just for identification.

18           MS. DUANE:  It's not switching.

19           MR. VAZQUEZ:  It's not switching?  I will do it

20  personally.

21  BY MR. VAZQUEZ:

22  Q.   I will show you what's marked for identification as

23  Government's Exhibit 18.  Do you recognize it?

24  A.   Yes.

25  Q.   And what is depicted on Government's Exhibit 18?

1    A.   That's Celia Gonzalez.

2    Q.   It's a fair and accurate depiction of what Celia Gonzalez

3    looked like on what has been marked for identification

4    Government's Exhibit 18?

5    A.   Yes.

6         MR. VAZQUEZ:   Your Honor, at this time, I would move

7    what --

8         THE WITNESS:   Well, the picture is not -- she's not

9    like this picture shows her now, but it is she.

10        MR. VAZQUEZ:   At this time, I would move what's been

11   marked for identification into evidence, Your Honor.

12        MR. ZACCA:   No objection.

13        THE COURT:   Received.

14        (Government's Exhibit 18 received into evidence.)

15        MR. VAZQUEZ:   And I seek permission to publish with the

16   Elmo.

17   BY MR. VAZQUEZ:

18   Q.   Who is this?

19   A.   Celia Gonzalez.

20   Q.   Now, after this meeting and trip that you had with Celia

21   Gonzalez and the defendant, did there come a time that you saw

22   the defendant in a hospital?

23   A.   Yes.

24   Q.   Now, Mr. Ochill, after the defendant was in the hospital,

25   did you ever receive -- did you ever -- strike that.

1       What happened to your relationship with the defendant?

2           MR. ZACCA:  Objection to the form of the question, as

3   far as a reference time.

4           THE COURT:  Overruled.

5   A.  I went to see him at the hospital.

6   BY MR. VAZQUEZ:

7   Q.  And after your visit with the defendant in the case, did

8   the defendant ever implicate you in the events that led him to

9   be in the hospital?

10          MR. ZACCA:  Objection.  Objection to the form of the

11  question.

12          THE COURT:  Rephrase the question, please.

13  BY MR. VAZQUEZ:

14  Q.  Mr. Ochill, were you ever in verbal contact with the

15  defendant after he was in the hospital?

16  A.  I went to see him at the hospital.

17  Q.  And after your visit at the hospital, did you ever have

18  phone contact with him?

19  A.  Yes.

20  Q.  And what did you talk about with the defendant?

21  A.  I went to see him at the hospital.  At that time, he was in

22  serious condition.

23      And then afterwards, we -- that he was better, we began to

24  speak on the phone, and speak on the phone later.

25  Q.  And when you spoke on the phone, were you ever accused of

1    or threatened with being implicated in this robbery?

2              MR. ZACCA:  Objection to the form of the question.

3              THE COURT:  Why don't you just ask him what they talked

4    about.

5    BY MR. VAZQUEZ:

6    Q.  What did you talk about with the defendant after he was

7    released from the hospital?

8    A.  He told me that I needed to help him and give him $200.

9    Q.  Or what?

10   A.  Otherwise, he would tell the police that I was also

11   involved in the robbery.

12   Q.  Now, did you receive more than one communication to that

13   effect?

14             MR. ZACCA:  Object to the form of the question.

15             THE COURT:  Overruled.

16             THE INTERPRETER:  Excuse me, what was that?

17   BY MR. VAZQUEZ:

18   Q.  Did you get more than one communication to that effect?

19   A.  You mean the money?

20   Q.  Yes.

21   A.  Yes.

22   Q.  Did you make financial payments to the defendant or give

23   him any kind of benefits to avoid being implicated in this

24   robbery?

25   A.  Yes, because I was in fear.

1   Q.   And did you pay for benefits -- such as a phone -- for him?

2   A.   Yes, phone, $50 for the phone, and I would give him $150.

3   Q.   Mr. Ochill, how much money do you make?

4   A.   That varies, because I work with the tow truck, that varies

5   a month, that varies a year.

6   Q.   Can you give an estimate of what you make on a monthly

7   basis?

8   A.   A month, it could be like 2500.

9   Q.   And how much were you making in payments to the defendant

10  on a monthly basis total?

11  A.   $200.

12  Q.   Now, your knowledge of the grow house robbery, what did you

13  hear being said about the grow house that Celia and Leonardo

14  Garcia Morales were talking about?

15          MR. ZACCA:  Object to the form of the question.  It

16  also calls for hearsay as applied to Celia.

17          THE COURT:  Well, you need to fine tune it to make sure

18  there's no hearsay.

19          MR. VAZQUEZ:  I would offer a statement against

20  interest of Ms. Gonzalez; and if she's directing a grow house

21  robbery, she's speaking against her own interest.

22          THE COURT:  Sustained.

23          MR. VAZQUEZ:  Yes, Your Honor.

24  BY MR. VAZQUEZ:

25  Q.   Now, what did you hear Mr. Morales talking about with

 1   regard to the grow house robbery?

 2          MR. ZACCA:  Object to the form of the question, as far

 3   as timing.

 4          THE COURT:  I don't know what you mean by "the form of

 5   the question."

 6          MR. ZACCA:  He's asking dates.  Where was it, in the

 7   van?  Was it in the hospital?

 8          THE COURT:  Be more specific then.

 9   BY MR. VAZQUEZ:

10   Q.  Mr. Ochill, I want to take you back to the trip you had

11   with Celia and the defendant in late summer, early fall of

12   2012, and I want to -- I want to specifically talk to you about

13   what you heard the defendant asking about.

14   A.  They picked me up at my home, and I would go up on a drive

15   to Broward.  Celia Gonzalez points out a house to Leonardo,

16   that there was a marijuana grow house there.

17   Q.  In this time frame, what is the defendant asking about?

18   A.  Whether the marijuana grow house was there.

19   Q.  Did you hear the defendant asking about who might be in

20   possession of that marijuana grow house?

21   A.  Yes.

22   Q.  And who was that?

23   A.  Frank.

24   Q.  Did you hear the defendant talk at all about Frank and who

25   Frank was?

1   A.   Yes, he knew Frank.

2   Q.   And did he describe Frank at all?

3   A.   He knows him from Cuba.

4   Q.   And did he describe why he might want to do a robbery of

5   Frank?

6   A.   No.

7   Q.   Now, when you initially talked to the FBI about this

8   incident -- and failed to disclose what you've told these

9   jurors today -- were you still making payments to the

10  defendant?

11  A.   Yes.  Yes.

12  Q.   How long had you been making these payments to the

13  defendant?

14  A.   About six years.

15  Q.   And what was the frequency of making these payments, to

16  avoid being implicated in the robbery?

17  A.   Every month.

18  Q.   Were you ever late?

19  A.   No.

20  Q.   Did you ever get reminder phone calls?

21  A.   Yes.

22  Q.   Who would call you to remind you it was time to make

23  payment?

24  A.   Leonardo.

25  Q.   Mr. Ochill, when you had this trip with Celia -- just so

```
1    we're clear, when you had this trip with Celia and the

2    defendant in the early fall 2012, was this before he was

3    injured?

4    A.  No.

5         MR. VAZQUEZ:  Just so the record's clear, I think the

6    question might not have come across right.

7    BY MR. VAZQUEZ:

8    Q.  Was the defendant injured when he picked you up with Celia?

9    A.  You mean when I got in the van?

10   Q.  Yes, sir.

11   A.  No, no, he was not injured.

12        MR. VAZQUEZ:  One moment.

13        (Brief pause in the proceedings.)

14        MR. VAZQUEZ:  I tender the witness.

15                    CROSS-EXAMINATION

16   BY MR. ZACCA:

17   Q.  Mr. Ochill, have we ever met before?

18   A.  No.

19   Q.  This is the first time that we're talking; correct?

20   A.  Yes.

21   Q.  Now, I want to go over certain sections of your direct

22   testimony.  And, first of all, you don't deny that you have

23   known Mr. Garcia Morales for many years; correct?

24   A.  No.  No, I do not deny that.  I do not deny that.

25   Q.  In fact, you've known him for over 25 years; correct?
```

1    A.   Since Cuba, yes.

2    Q.   Since Cuba?

3    A.   Since Cuba.

4    Q.   You guys grew up in the same neighborhood; correct?

5    A.   I am in Santiago de las Vegas, and he's from Majagua.

6    Q.   Well, let's put it in perspective.

7         How old are you now, sir?

8    A.   46 years old.

9    Q.   And when you first met Mr. Garcia Morales, how old were

10   you, approximately?

11   A.   Approximately, 25, 30 years old, could be.

12   Q.   You were close friends; correct?

13   A.   Yes.

14   Q.   Best of friends?

15   A.   No.  It was that we knew each other very well because we

16   had a motorcycle, and we would see each other as we were going

17   by, and so we had this relationship and such.

18   Q.   So you started this friendship with Mr. Garcia Morales back

19   in Cuba; right?

20   A.   Yes.

21   Q.   And you continued that friendship here, in the

22   United States; correct?

23   A.   Yes.

24   Q.   And you were friends at the time of the events that you

25   testified to just a moment ago; correct?

```
 1   A.   The word friend-friend, no.  But well, a person that was

 2   known to me, him and I, we knew each other.

 3   Q.   Well, I thought you said you were close friends.

 4        Are you close friends?

 5   A.   Friends, yes, from the neighborhood.  From the

 6   neighborhood.

 7   Q.   Alright.  So, you've come to court and you've testified,

 8   under oath; correct?

 9   A.   Yes.

10   Q.   But you haven't always told the truth; have you?

11   A.   I have always told the truth.

12   Q.   You've always told the truth about the events --

13   A.   I --

14   Q.   Let me finish the question, forgive me.

15        Are you saying you've always told the truth about the

16   events you just testified to?

17   A.   Yes.

18   Q.   Well, right there, that's a lie; isn't it?

19   A.   Why?

20   Q.   Why?  Well, let's go through it.

21        On August 28th of this year FBI agents knocked on your door

22   and visited you; correct?

23   A.   Yes.

24   Q.   Do you see them here in the courtroom?  Look around.

25        Do you see the ones who came to see you that day?
```

```
 1   A.   Can I point at them?

 2   Q.   Please.  Stand up, if you can --

 3   A.   (Witness complies.)

 4        On the first day, the gentleman there went with another

 5   gentleman, two more gentlemen from the FBI.

 6   BY MR. ZACCA:

 7   Q.   This gentleman here, at counsel's table?

 8   A.   Right.

 9   Q.   He came to your house that day; right?

10   A.   Yes.

11   Q.   With two other agents that you don't see here today; right?

12   A.   But two agents, yes.

13   Q.   So a total of three agents went to your home on August

14   28th, 2018; right?

15   A.   Can I sit down?

16   Q.   Yes.

17        Can you answer the question?

18   A.   Tell me, what do I tell you?

19   Q.   No, I just want you to answer the question.  I'll repeat

20   the question.

21   A.   Uh-huh.

22   Q.   On August 28th, 2018, three FBI agents visited you at your

23   house; correct?

24   A.   Yes.

25   Q.   And they asked you questions; correct?
```

```
 1   A.   Yes.
 2   Q.   Some of the questions were some of the very same questions
 3   you were asked by Mr. Vazquez a moment ago; correct?
 4   A.   When they went to my house the first time, they showed me
 5   pictures, they asked me some questions; and then they went on
 6   another day, and then they went three or four times.
 7   Q.   Mr. Ochill, let's stick with one question at a time because
 8   we will talk about the other one in just a moment.
 9        During that first visit on August 28th, 2018, they asked
10   you about this trip you took with Mr. Garcia Morales and Celia
11   in the white van; didn't they?
12   A.   Yes.
13   Q.   And you denied it; correct?
14   A.   Yes.
15   Q.   They asked you about Frank; correct?
16   A.   I do not remember.  I do not remember if they asked me
17   about Frank.  I do not remember.
18   Q.   But they certainly asked you about whether, at any point in
19   time during this trip in the white van, whether Celia pointed
20   out a house to -- Celia Gonzalez, they asked you about that?
21   A.   To me, she didn't show me.
22        It was to Leonardo that she pointed out the house to.
23   Q.   Understood.  But let's answer the question.
24   A.   Yes.
25   Q.   This agent, along with two other agents, asked you about
```

```
 1    it, and you denied knowing anything about it; correct?

 2    A.   Yes, because I was afraid.  I felt afraid.

 3    Q.   We'll talk about that in a moment, too.

 4         So we talked about August 28th, 2018.

 5         There came another day that FBI agents knocked on your

 6    door; correct?

 7    A.   They went to my house, yes.

 8    Q.   And this date was October 11th, 2018; correct?

 9    A.   I do not recall exactly the date they went, but they did

10    go.

11    Q.   Do you see any of the agents that came to your home that

12    day back here?

13    A.   Yes.

14    Q.   Which ones?  Can you point them out, what, in the back row?

15    A.   Yes.

16    Q.   Is it the gentleman to the left or to the right?

17    A.   To the right.

18    Q.   To the right, he came to your home?

19    A.   Yes.

20    Q.   And who else?

21    A.   With another agent.

22    Q.   So two agents came this time; right?

23    A.   Two agents, yes.

24    Q.   And this time, on this second day, the agents were more

25    persistent in their questioning; correct?
```

1  A.  They came to talk to me, and they told for me to show up at

2  the Hialeah Police Department at nine a.m. the following

3  morning.

4  Q.  Say that again.  I'm sorry, I missed that.

5  A.  They went to my house in the afternoon, and they asked me

6  to go to them at 9:30 in the morning at the Hialeah Police

7  Station.

8  Q.  And were you questioned at the Hialeah Police Station?

9  A.  Yes.

10  Q.  And again, they asked you questions about this trip that

11  you testified to in the white van; correct?

12  A.  Yes.

13  Q.  And again, you denied it; right?

14  A.  Yes.

15  Q.  And they asked you whether you knew about any discussion

16  about a grow house with Celia and Leonardo; correct?

17  A.  Yes.

18  Q.  And again, you denied it; correct?

19  A.  Yes.

20  Q.  And they asked you about Frank; correct?

21  A.  Who, the police?

22  Q.  Yes.

23  A.  Yes.

24  Q.  And they asked you if you overheard any conversation

25  between Celia Gonzalez and Leonardo Garcia Morales about Frank;

1  correct?

2  A.   Uh-huh.   Yes.

3  Q.   And again, you denied that conversation; correct?

4  A.   Yes.

5  Q.   And, again, you're in the second day of questioning.

6      They asked you if you ever took a ride with Celia and

7  Leonardo Garcia Morales to Broward, and again, you denied it;

8  correct?

9  A.   Yes.

10  Q.   Alright.   Now, what's remarkable here is that prior to the

11  second day of questioning at the Hialeah Police Department, you

12  had already spoken to Celia on the phone just a few days

13  before; correct?

14  A.   No.

15  Q.   No?

16  A.   No.   She called me.

17  Q.   Okay.   So just so we have it in reference here, between the

18  first meeting you had with the FBI and the second meeting you

19  had with the FBI, Celia called you in between those two

20  meetings; correct?

21  A.   Yes.

22  Q.   And you spoke to her; right?

23  A.   She told me that the FBI had been to her house.

24  Q.   And you, naturally, talked about what Celia talked about to

25  the FBI; correct?

1    A.   No, no.  She calls me over the phone and she tells me,

2    well, the FBI had come by.  She called me.  She said that the

3    FBI had been by her house.

4         And I did not talk, I did not answer anything to her.  I

5    just heard what she had to tell me.

6    Q.   Okay.  Well, do you normally speak to the FBI in your

7    everyday life?

8    A.   No.

9    Q.   No.  This is a pretty surprising event in your life; isn't

10   it?

11   A.   Yes.

12   Q.   So when Celia calls you and tells you the FBI came and

13   talked to me, she told you what they talked about; correct?

14   A.   No.  She told me the FBI had gone to her house.  That was

15   all.

16   Q.   And then you went on, and what, talked about the weather,

17   talked about other things?

18   A.   No, no.  Then this is when I finished talking.

19        After that, I did not speak anymore to her.

20   Q.   Sir, she told you precisely what she told the FBI; didn't

21   she?

22        MR. VAZQUEZ:  Objection.  Asked and answered and calls

23   for hearsay.

24   BY MR. ZACCA:

25   Q.   You can answer, sir.

1    A.   That she told me?

2    Q.   What she told the FBI.

3    A.   The only thing she told me was that the FBI had been to her

4    house, that was it, I did not speak to her about anything else.

5    Q.   You and Celia are lovers; aren't you?

6    A.   We had a relationship.

7    Q.   You still have that relationship?

8    A.   No.

9    Q.   When's the last time you spoke to Celia?

10   A.   The day she called me.

11   Q.   And never since?

12   A.   Never again.

13   Q.   So, on two separate occasions two weeks apart, you openly

14   lied to the FBI; is that your testimony?

15   A.   I did not lie to them.  What happened was that I was

16   afraid, I was feeling afraid.

17   Q.   Well, I understand that's how you felt, sir.  But again,

18   let's not mince words here.

19        You lied?

20   A.   I lied, but I was feeling afraid, on my part.

21   Q.   Well -- so after this second meeting with the FBI, then you

22   have a third meeting with the FBI; correct?

23   A.   Yes.

24   Q.   Now, did they tell you -- and let me be clear here.

25        Did the FBI tell you that lying to a federal agent is a

1   crime in and of itself?

2   A.   Yes.

3   Q.   Did they tell you that at the first meeting?

4   A.   No, no, no.  The first time they went to my office, they

5   showed me pictures, but at that time they did not tell me.

6        Until the FBI told me it was a crime, I did not know that

7   that was a crime either.

8   Q.   Okay.  You've already testified that you know it is a crime

9   to lie to the FBI; right?  Right?

10  A.   I did not know.

11  Q.   No, no.  You just testified that you knew.

12       I'm just trying to establish when you knew that; correct?

13  A.   That it was a crime?

14  Q.   Yes.

15       Did the FBI tell you that it was a crime the second time

16  that they met with you?

17  A.   Yes.  Then, yes.

18  Q.   So they tell you during this second meeting that it's a

19  crime to lie to the FBI, and yet you, still, according to you,

20  maintain your lie; correct?

21  A.   I told you, I was afraid.  I told you that I was afraid, I

22  was feeling afraid.

23  Q.   So this third meeting you had with the FBI, did they tell

24  you that you were going to get charged with a crime for lying

25  to the FBI?

1    A.    No.

2    Q.    But they challenged you; correct?

3    A.    I already felt okay, so I told everything that I had to

4    tell the FBI.

5    Q.    Did you tell the FBI what they wanted to hear because you

6    didn't want to get charged with a crime?

7    A.    Well, the thing is that I have not committed any crime.

8    Q.    Just answer the question, sir.

9          Did you tell the FBI what they wanted to hear because you

10   were afraid you were going to otherwise be charged with a

11   crime?

12   A.    I was the one that called the FBI to tell them

13   everything -- to talk to them to tell them everything that this

14   happened.

15   Q.    Because you did not want to get charged with a crime for

16   lying to the FBI; is that why?

17   A.    And to clarify everything, to tell them everything that I

18   knew.

19   Q.    To make sure that it goes along with what they believed you

20   did; correct?

21   A.    How is that -- can you repeat that, please?

22   Q.    Sure.  You felt that it was important enough to call them

23   after the second meeting because you were aware that if you

24   didn't go along with what the FBI believed you did, you were

25   going to get charged with a crime?

1   Q.   Oh, I already decided to tell the truth to the FBI.

2   Q.   As you sit here today, are you hoping that you don't get

3   charged with a crime?

4   A.   I believe that it will not be.

5   Q.   I'm sorry?

6   A.   I think it will not be.

7   Q.   Well, in fact, you hope it won't not be; correct?

8   A.   Yes.

9   Q.   You testified, the payments to Mr. Morales, I think you

10  testified to $200 a month; is that right?

11  A.   Yes.  Yes.

12  Q.   And isn't it a fact that you made those payments because

13  you were his friend?

14  A.   It was because I was afraid.  I was afraid because he once

15  told me that he was going to tell the police that I was

16  involved in the robbery.

17          MR. ZACCA:  Judge, if I can just have a moment.

18          (Brief pause in the proceedings.)

19          MR. ZACCA:  I have no further questions.

20                      REDIRECT EXAMINATION

21  BY MR. VAZQUEZ:

22  Q.   Mr. Ochill, you had just talked to defense counsel about

23  your fear of what Mr. Garcia Morales told you about being

24  implicated in the robbery.

25          Do you recall that?

1    A.   Uh-huh, yes.

2    Q.   Mr. Ochill, did you hold that fear when you first met with

3    the FBI?

4    A.   For the first time?

5    Q.   Yes.  Were you afraid if you said the wrong thing

6    Mr. Morales would implicate you in a robbery?

7    A.   Yes.

8    Q.   Did you hold that same fear when you met with the FBI the

9    second time?

10   A.   Yes.

11   Q.   And, Mr. Ochill, what made you want to tell the FBI,

12   ultimately, the truth about your role in this plan?

13   A.   I decided to tell the truth to the FBI.

14   Q.   Mr. Ochill, around the time that you called the FBI to tell

15   the truth, did you also receive calls from the defendant?

16   A.   At that time, no; but some days later, yes.

17   Q.   Mr. Ochill, you have been paying $200 a month for several

18   years; is that correct?

19   A.   Yes.

20   Q.   So when you decided to talk to the police, you've been

21   paying the defendant; correct?

22   A.   Yes.

23   Q.   And you've been threatened by the defendant; correct?

24        MR. ZACCA:  Object to leading the witness.

25        THE COURT:  Sustained.

```
 1   BY MR. VAZQUEZ:

 2   Q.   Were you being threatened prior to calling the FBI and

 3   telling them the truth?

 4   A.   Once he called me, I don't know if it was from the court,

 5   or the FBI, a lady or gentleman called me.

 6   Q.   And prior, just before you called the FBI to tell them the

 7   whole truth, you were also paying the defendant; correct?

 8   A.   Yes.

 9   Q.   Have you been paying the defendant since you told the FBI

10   the truth?

11   A.   No.

12   Q.   Have you been threatened by the defendant after you told

13   the FBI the truth?

14   A.   Once.

15   Q.   And has that stopped?

16   A.   Yes.

17           MR. VAZQUEZ:   No further questions for the witness,

18   Your Honor.

19           THE COURT:   Is that all?

20           MR. VAZQUEZ:   Yes, on behalf of the United States.

21           MR. ZACCA:   Yes, on behalf of the defense.

22           THE COURT:   You're excused.

23           (Witness excused.)

24           THE COURT:   Can I have the attorneys come sidebar for a

25   moment?
```

```
 1              (Sidebar discussion held as follows:)

 2          THE COURT:  The U.S. Marshals are having an event

 3    today, an awards program, I think it begins at 11:30, so I

 4    guess I'm going to have to recess early.  I guess the question

 5    is, when should I recess?  How long is your next witness?

 6          MR. VAZQUEZ:  I have little witnesses that I can

 7    sprinkle in.

 8          THE COURT:  Do you want to put a couple of those on?

 9          MR. VAZQUEZ:  Yes, I can do that.

10          THE COURT:  I will see if we can stay 15 or 20 minutes

11    before we break for the day.

12          MR. VAZQUEZ:  Yes, sir.

13          THE COURT:  Do you have any problems with me telling

14    the jurors that the Marshals are having an award's show?

15          MR. VAZQUEZ:  No, Your Honor.

16          (Sidebar concluded, the following held in open court:)

17          THE COURT:  Ladies and gentlemen, one of our federal

18    agencies housed in this building, the United States Marshals,

19    are having an awards program today.

20              This is an annual event, and they always send notices

21    around asking judges not to hold hearings on this particular

22    day.  Of course, I've already violated that order, but I don't

23    want to go beyond a certain time.

24              What I'm contemplating is that we can stay in session

25    for another 15 to 20 minutes, and then we are going to recess
```

1    for the day.  Does anyone need to use the restroom facilities

2    now or can we stay in for 15 minutes more?

3              (Jury collectively nodded affirmatively.)

4              THE COURT:  Okay.

5              Let's bring in the next witness, please.

6              MR. VAZQUEZ:  The United States calls Elizabeth Rondon.

7              COURTROOM DEPUTY:  Please raise your right hand.

8              Do you solemnly swear to tell the truth, the whole

9    truth, and nothing but the truth, so help you God?

10             THE WITNESS:  I do.

11             (ELIZABETH RONDON testified as follows:)

12                        DIRECT EXAMINATION

13   BY MR. VAZQUEZ (THROUGH INTERPRETER):

14   Q.  Good morning, ma'am.

15   A.  Good morning.

16   Q.  Ma'am, would you please introduce yourself to the members

17   of our jury.

18   A.  My name is Elizabeth Rondon.

19   Q.  Ma'am, where do you work?

20   A.  I have a cellular business.

21   Q.  And what's the name of that cellular business?

22   A.  E.R. Wireless, Inc.

23   Q.  And where is that located?

24   A.  In 995 Hialeah Drive, in Hialeah, Florida  33010.

25   Q.  How long have you been working with that business?

1    A.   Eight years.

2    Q.   Ma'am, I want to approach with what's been marked for

3    identification as Government's 17.   Do you recognize it?

4    A.   Yes, certainly.

5    Q.   And what is it?

6    A.   A customer of my business.

7    Q.   And do you know the name associated with this customer?

8    A.   No.

9    Q.   Is this a fair and accurate representation of that

10   customer?

11   A.   Perfectly well, yes.

12          MR. VAZQUEZ:   Your Honor, at this time, I would move

13   Government's Exhibit 17 into evidence.

14          MR. ZACCA:   No objection.

15          THE COURT:   Received.

16          (Government's Exhibit 17 received into evidence.)

17          MR. VAZQUEZ:   May I have permission to publish it for

18   the jury -- and aid of the Elmo -- for Government's Exhibit 17.

19   BY MR. VAZQUEZ:

20   Q.   Ma'am, what are we looking at here?

21   A.   That's the picture of the customer.

22   Q.   And how do you know this person?

23   A.   Because every month he would go to my business to make

24   payment on his cellular phone.

25   Q.   And when you say "every month," how long has that been

1   going on every month?

2   A.   Approximately, five years now.

3   Q.   And what kind of phones do you sell at this store, or phone

4   services do you sell at this store?

5   A.   Only prepaid services.

6   Q.   Ma'am, I'm going to show you what has been marked for

7   identification as Number 53.

8        Do you recognize the items in Government's 53?

9   A.   Yes.

10  Q.   Prior to today's date, have you had a chance to review

11  Government's Exhibit 53?

12  A.   Yes.

13  Q.   What is Government's marked for identification as

14  Exhibit 53?

15  A.   The evidence of payment for that period of time for that

16  phone.

17  Q.   Does what is marked as Government's Exhibit 53 -- are these

18  records that are maintained in the normal course of your

19  business, at your business, E.R. Wireless?

20  A.   Yes.

21       MR. VAZQUEZ:   At this time, I would move what is marked

22  as Exhibit 53 into evidence.

23       MR. ZACCA:   Judge, I believe, a further predicate on

24  relevance connecting these records to -- unless I missed that

25  question.

1          THE COURT:  Do you have a response?

2          MR. VAZQUEZ:  The prior witness said he's been paying

3    months for phone service.  This individual will testify that

4    these phone records were for the individual that he just

5    testified about.

6          THE COURT:  Is this the photo of the last witness?

7    Alright.

8          What's your position now, sir?

9          MR. ZACCA:  No objection, Judge.

10         THE COURT:  Alright, received as marked.

11         (Government's Exhibit 53 received into evidence.)

12         MR. VAZQUEZ:  Permission to publish Government's 53

13   without the red arrow.

14   BY MR. VAZQUEZ:

15   Q.  Ms. Rondon, your screen has the ability to mark something

16   on it, so if there was something that you want to mark, feel

17   free to do it on the screen, if you want to do that for

18   something for your testimony.

19         We're looking at the first page of 53, Bate's number 2644.

20   Do you recognize it?

21   A.  Certainly, yes.

22   Q.  And above the line that I've just made on the screen, what

23   is that?

24   A.  My first name and my last name.

25   Q.  Now, the individual that you testified about earlier, where

1    did you see him in relation to the business and the resulting

2    records that we have in front of us?

3    A.   You're asking me where I saw him?  At my place of business

4    every month making payments on that line.

5    Q.   Did you ever hear him speaking with anyone?

6    A.   Once.

7    Q.   Did you hear the other side of the conversation?

8    A.   Yes, because he put him on speaker.

9    Q.   And what was -- could you tell anything about who the

10   caller was on the other side?

11   A.   Just that it was a male.

12   Q.   Now, these records here document your evidence of payments

13   that were made for this particular phone line; is that correct?

14   A.   That is correct.

15   Q.   So, for example, on Bate's number 2619, what is the amount

16   that was purchased, of phone service?

17   A.   The same payment was always billed, $50.

18   Q.   And on this record, for example, the page that is numbered

19   2619 on the screen, where, if anywhere, do you see that?

20   A.   It's indicated right there -- (In English) -- total sales,

21   $50.

22   Q.   Now, you said the words "total sale" in English, and I

23   appreciate that.  I'm just asking, throughout your testimony,

24   please use the benefits of our interpreter.  Thank you, ma'am.

25        So this says "total sale, $50"; is that correct?

1   A.   Yes, that's correct.

2   Q.   And at the top of the page, Bate's number 2619 from the

3   exhibit, Government's 53, as received into evidence, what does

4   this read at the top here?

5   A.   "Pin de Net10", and the phone number of the phone, and the

6   bill amount, and that's a reference I put there regarding the

7   customer.

8   Q.   And what does that reference?

9   A.   A young man who drove a red tow truck.

10  Q.   And on page 2620, we see more of the same records; correct?

11  A.   Yes.

12  Q.   And this goes on and on throughout what you were able to

13  pull from your records; is that correct?

14  A.   That's right, correct.

15  Q.   And to your recollection, is that for five years you've had

16  these kind of dealings with the man with the red tow truck; is

17  that correct?

18  A.   That is correct.

19  Q.   And that's the individual on Government's 17; correct?

20  A.   Yes, 100 percent.

21         MR. VAZQUEZ:   One moment, Your Honor.

22         (Brief pause in the proceedings.)

23         MR. VAZQUEZ:   I tender the witness, Your Honor.

24

25

```
 1                      CROSS-EXAMINATION

 2   BY MR. ZACCA:

 3   Q.  Good morning, Ms. Rondon.

 4   A.  Good morning.

 5   Q.  These records here, I'm going to take the first page that

 6   we were just looking at, 2619 Bate's stamp, all you noted was a

 7   guy in a red truck making this payment; correct?

 8   A.  Yes, yes.

 9   Q.  There's nothing in the record explaining why the payment

10   was made; correct?

11   A.  It's a prepaid service.

12   Q.  Yeah, but there's -- my question is, there's nothing in any

13   of these records that you've provided that explains why the

14   payment is being made; correct?

15   A.  No.  Well, on one occasion, I asked him, because I thought

16   that he was making the payments for the cell for his

17   girlfriend, and he commented that it was, "no, we're friends."

18   Q.  Okay.  So he told, you know, that he made these payments

19   for a friend; correct?

20   A.  Yes.

21   Q.  This man right here; correct?

22   A.  Yes.

23          MR. ZACCA:  No further questions.

24

25
```

```
 1                   REDIRECT EXAMINATION
 2   BY MR. VAZQUEZ:
 3   Q.  Ms. Rondon, did this man tell you what kind of friend this
 4   was for?
 5   A.  Never.
 6   Q.  Did he tell you how long he'd known him?
 7   A.  No, never.
 8   Q.  Give you background on their relationship?
 9   A.  A friend.
10   Q.  Did you ever have a deep, meaningful conversation with the
11   man with the red truck?
12   A.  No, never.
13              MR. VAZQUEZ:  No further questions for the witness.
14              THE COURT:  May the witness be permanently excused?
15              MR. VAZQUEZ:  Your Honor, yes, on behalf of the United
16   States.
17              THE COURT:  You may step down.
18              (Witness excused.)
19              THE COURT:  Ladies and gentlemen, we will end our
20   session today.  We will resume on Monday morning at 9:00 a.m.
21              Please remember not to discuss the case in any way, nor
22   permit anyone to discuss it with you.
23              Have a great weekend and we look forward to seeing you
24   on Monday morning.  Good day.
25              COURTROOM DEPUTY:  All rise for the jury.
```

1           (Jury exited courtroom at 11:16 a.m.)

2           THE COURT:  Any additional matters, counsel?

3           MR. VAZQUEZ:  Not on behalf of the United States.

4           MR. ZACCA:  Judge, Mr. Garcia Morales is insisting that

5      he address something with the Court.  I tried to deal with it,

6      but he insists that he wants to address you, Judge.

7           THE COURT:  Well, I should let you know, Mr. Garcia

8      Morales, that normally clients address the Court through their

9      attorneys, so that they can be very careful and precise about

10     what is said.

11          Sometimes defendants make statements that sometimes

12     negatively affect them; so with that caveat, I suggest you

13     speak to me through your counsel, but if you desire, I'm happy

14     to listen.

15          THE DEFENDANT:  I have a problem that has me very

16     concerned and afraid.  This has to do with the Marshals.

17     Yesterday afternoon, when I finished here, the Marshals, ever

18     since I got here, have put me in an office together with my

19     nurse.

20          THE COURT:  Excuse me, an office?

21          THE DEFENDANT:  Yes, in an office.

22          THE COURT:  Alright.

23          THE DEFENDANT:  Yesterday, without me meaning to, I

24     stepped on the foot of this gentleman that is here to my left

25     with my wheelchair.  The gentleman was very much disgusted with

1    me, he was upset.  It was not intentional.

2           And he put me in a cell all by myself.  I told him that

3    I had no way of communicating with anyone.  I have no way of

4    communicating to anyone whether my blood pressure is high or

5    low, or if something is happening to me.

6           So the second time I told him that I was not going to

7    get into the cell, because I had no way of pressing a button.

8           THE INTERPRETER:  Clarification for the interpreter.

9           (Interpreter and Defendant had discussion in Spanish.)

10          THE DEFENDANT:  The gentleman touched me on my shoulder

11   with his hand, and he told me he was going to hit me.

12          Immediately after, he called his boss and his boss hit

13   me around here, and he also said that they were going to hit

14   me.  That has me very concerned.

15          I have a condition, which is I panic when I am placed

16   in a place alone, in a small enclosed place.  All this took

17   place in front of my nurse.

18          So now I am in fear that they are going to hit me.

19   This is what I wanted to say to you.

20          THE COURT:  Alright.

21          Sir, well, the U.S. Marshals are in charge of custody,

22   and they make the decisions about where you are located.

23   I'm not sure I clearly understood your statement about being in

24   an office.  Maybe the nurse can help me.  I'm not sure, and I

25   think the deputy wants to say something as well.

1          THE MARSHAL:  Your Honor, if I could clarify, that the

2    first day he was here, we have a processing area where all new

3    arrestees come in to get fingerprinted, photographed, IDed, DNA

4    swabbed, et cetera, et cetera.  The defendant was placed in

5    there the first day alone with his nurse.

6          Now, it's not part of District protocol to put nurses

7    in there that aren't sworn law enforcement officers, being

8    potential for risk of being around other inmates, and possibly,

9    you know, being in some type of situation that they're not

10   adequately trained for.

11         We have a handicapped cell downstairs, Cell 63 on the

12   sixth floor, which is equipped to handle handicapped inmates.

13         The defendant was placed in that cell on Tuesday and

14   this morning around about 8:00 a.m., so he was in there for,

15   roughly, maybe 45 minutes up to an hour, until we came up here

16   to start the trial.

17         Yesterday, he was uncooperative, he did not want to

18   move his chair out the middle of the cell block.  We tried to

19   tell him, like, Hey, come back in the cell until the transport

20   vehicle gets here.  He refused to move.

21         I went and got my supervisor.  He refused to move for

22   the supervisor.  Around that time the transport vehicle came,

23   we took him downstairs, transported him back down to the

24   hospital.  That was it.

25         As far as him saying he's being in fear of someone is

1    going to hit him, I mean, if you look at his condition, why

2    would anybody want to hit him?  So that's my take on it.

3            THE COURT:  Alright, sir.

4            Alright.  Well, the Marshals are in charge of custody,

5    and if they -- the Marshals are in charge of custody, and if

6    they place you in a handicapped cell, that's the protocol, so I

7    can't tell them to put you in an office, et cetera.  Alright.

8            THE DEFENDANT:  That cell is not handicapped -- for

9    handicapped people.

10           THE COURT:  I don't make that determination, sir.

11           You can speak with your attorney, and he can talk to

12   the Marshals, but I don't decide what's a handicapped cell and

13   what's not.  I'm really not equipped, I don't have the

14   information to be able to make decisions in that regard.

15           So correspond with your attorney and let him know, and

16   if he thinks there's something that he wants to address with

17   the deputies -- or the U.S. Marshal, then he can handle that

18   for you.

19           That's a separate branch, and they are responsible for

20   custody, and the Court doesn't get involved in how the Marshals

21   perform their duties, as far as security, et cetera.

22           Alright.  Thank you all very much and have a good

23   weekend.

24           MR. ZACCA:  You too, Judge.

25           Have a good weekend.  Okay.

1          MR. VAZQUEZ:  Your Honor, do you want us here on Monday

2     at 8:30 to address any issues?

3          THE COURT:  I'm going to have you all -- we're actually

4     going to address those issues at the end of the day, so we will

5     have plenty of time and won't have to worry.

6          If you all have cases, it would be nice if you brought

7     them in in the morning, we're going to address the issue, the

8     Rule 16 issue, at the end of Monday.

9          After we excuse the jury, then we can take some time,

10    if you have some written pleadings, other causes, or something,

11    you can give those to us on Monday morning, so we can have an

12    opportunity to become familiar.

13         Have you done any case work on this?

14         MR. VAZQUEZ:  I have a motion, Judge.

15         THE COURT:  Do you have a key Eleventh Circuit case on

16    point?

17         MR. VAZQUEZ:  Your Honor, I think, also, from what we

18    learned yesterday, that this is probably something not under a

19    wiretap.  The way they explained, the recorder was out, and the

20    Court -- Mr. Zacca -- got a chance to interview him.

21         I'm going to approach it as a Rule 16 issue and address

22    any claims that Mr. Zacca has of a wiretap violation, because

23    the way that the investigator explained it to him, I sat down,

24    I took the recorder out, it wasn't surreptitious.  I think that

25    kind of knocked that issue out.

1          THE COURT:  How about just the Rule 16 issue, have you

2   found any good cases on that that you can list to that?

3          MR. VAZQUEZ:  I didn't know about it, so I'm trying to

4   find a case that anticipates such a strange new piece of

5   evidence coming in in the middle of the trial, so I'm

6   continuing to research that.

7          THE COURT:  We will address it on Monday morning.

8   Thank you and have a good weekend.

9          MR. ZACCA:  Thank you, Your Honor.

10          (Proceedings adjourned 11:28 a.m.)

11

12               C E R T I F I C A T E

13

      I hereby certify that the foregoing is an

14
   accurate transcription of the proceedings in the

15
   above-entitled matter.

16

17
   December 24th, 2019  /s/Glenda M. Powers
18                       GLENDA M. POWERS, RPR, CRR, FPR
                         United States District Court
19                       400 North Miami Avenue, 08S33
                         Miami, Florida 33128
20

21

22

23

24

25

## $

**$150** [1] - 45:2
**$200** [4] - 44:8, 45:11, 60:10, 61:17
**$50** [4] - 45:2, 68:17, 68:21, 68:25

## /

**/s/Glenda** [1] - 77:17

## 0

**08S33** [1] - 77:19

## 1

**1** [3] - 1:11, 11:23, 11:25
**10** [4] - 2:9, 16:13, 16:14, 19:21
**100** [1] - 69:20
**11** [1] - 34:22
**110** [2] - 1:20, 1:20
**11:16** [1] - 72:1
**11:28** [2] - 1:8, 77:10
**11:30** [1] - 63:3
**11th** [1] - 53:8
**15** [5] - 2:10, 30:13, 63:10, 63:25, 64:2
**16** [6] - 31:18, 31:21, 33:6, 76:8, 76:21, 77:1
**16A** [6] - 3:7, 31:19, 32:8, 32:15, 32:18, 32:20
**17** [6] - 3:9, 65:3, 65:13, 65:16, 65:18, 69:19
**1700** [1] - 1:20
**1753** [2] - 13:21, 15:16
**18** [7] - 3:8, 27:20, 41:17, 41:23, 41:25, 42:4, 42:14
**1:17-CR-20701-MGC-5** [1] - 1:2
**1A** [2] - 13:20, 15:15
**1st** [2] - 31:16, 33:7

## 2

**20** [2] - 63:10, 63:25
**2000** [1] - 27:23
**2006** [1] - 27:24
**2007** [1] - 28:1
**2009** [1] - 28:3
**2012** [10] - 11:10, 11:12, 17:19, 20:3, 23:7, 31:16, 35:5,

**35:15, 46:12, 48:2**
**2015** [2] - 23:5, 23:7
**2018** [6] - 1:5, 51:14, 51:22, 52:9, 53:4, 53:8
**2019** [1] - 77:17
**23** [7] - 2:10, 3:6, 6:18, 7:16, 7:25, 8:4, 8:7
**24th** [1] - 77:17
**25** [2] - 48:25, 49:11
**2500** [1] - 45:8
**2619** [4] - 68:15, 68:19, 69:2, 70:6
**2620** [1] - 69:10
**2644** [1] - 67:19
**27** [1] - 2:12
**27A** [1] - 8:16
**27E** [3] - 5:23, 8:10, 8:17
**27H** [4] - 6:3, 6:8, 8:12, 8:17
**27I** [1] - 8:16
**28th** [5] - 50:21, 51:14, 51:22, 52:9, 53:4
**2nd** [1] - 23:5

## 3

**30** [2] - 19:17, 49:11
**30th** [2] - 11:10, 11:12
**32** [1] - 3:7
**33010** [1] - 64:24
**33128** [2] - 1:25, 77:19
**33132** [1] - 1:18
**33301** [1] - 1:21
**34** [1] - 2:14
**38** [1] - 9:17

## 4

**4** [1] - 1:10
**400** [2] - 1:24, 77:19
**42** [1] - 3:8
**45** [1] - 74:15
**46** [1] - 49:8
**48** [1] - 2:15
**4th** [1] - 1:17

## 5

**5** [1] - 2:6
**53** [11] - 3:10, 66:7, 66:8, 66:11, 66:14, 66:17, 66:22, 67:11, 67:12, 67:19, 69:3
**55** [8] - 3:5, 6:18, 6:19, 6:21, 6:25, 7:5, 7:9, 7:12

## 6

**60** [1] - 2:15
**63** [1] - 74:11
**64** [1] - 2:17
**65** [1] - 3:9
**67** [1] - 3:10
**6th** [1] - 1:20

## 7

**7** [2] - 1:5, 3:5
**70** [1] - 2:18
**71** [1] - 2:18

## 8

**8** [2] - 2:7, 3:6
**806** [1] - 1:17
**87** [1] - 1:11
**8:00** [1] - 74:14
**8:30** [1] - 76:2

## 9

**9** [5] - 2:7, 9:8, 9:9, 9:10, 9:14
**99** [1] - 1:17
**995** [1] - 64:24
**9:00** [3] - 1:7, 1:8, 71:20
**9:06** [1] - 4:9
**9:07** [1] - 5:3
**9:30** [1] - 54:6

## A

**a.m** [10] - 1:7, 1:8, 4:9, 5:3, 54:2, 71:20, 72:1, 74:14, 77:10
**ability** [1] - 67:15
**able** [9] - 5:19, 5:24, 6:7, 8:18, 14:9, 14:20, 37:6, 69:12, 75:14
**above-entitled** [1] - 77:15
**absolutely** [1] - 9:1
**academy** [3] - 18:3, 18:6, 18:8
**according** [1] - 58:19
**accurate** [4] - 19:20, 42:2, 65:9, 77:14
**accused** [1] - 43:25
**acknowledge** [1] - 40:24
**actual** [1] - 29:14
**addition** [1] - 41:4
**additional** [1] - 72:2
**address** [9] - 72:5,

72:6, 72:8, 75:16, 76:2, 76:4, 76:7, 76:21, 77:7
**adequately** [1] - 74:10
**adjourned** [1] - 77:10
**admit** [3] - 7:5, 7:25, 32:15
**admitted** [6] - 6:2, 7:11, 8:6, 11:22, 13:20, 30:12
**advised** [1] - 4:10
**affect** [1] - 72:12
**affirmatively** [1] - 64:3
**afraid** [13] - 53:2, 57:16, 57:20, 58:21, 58:22, 59:10, 60:14, 61:5, 72:16
**afternoon** [2] - 54:5, 72:17
**afterwards** [1] - 43:23
**agencies** [1] - 63:18
**agent** [3] - 52:25, 53:21, 57:25
**agents** [17] - 50:21, 51:11, 51:12, 51:13, 51:22, 52:25, 53:5, 53:11, 53:22, 53:23, 53:24
**ago** [2] - 49:25, 52:3
**agree** [1] - 23:16
**aid** [1] - 65:18
**aided** [1] - 4:2
**alert** [1] - 14:16
**Alfredo** [1] - 5:25
**allow** [1] - 30:23
**almost** [1] - 28:22
**alone** [2] - 73:16, 74:5
**alright** [13] - 4:16, 15:19, 23:19, 50:7, 55:10, 67:7, 67:10, 72:22, 73:20, 75:3, 75:4, 75:7, 75:22
**ambulance** [1] - 14:11
**AMERICA** [1] - 1:4
**amount** [2] - 68:15, 69:6
**analysis** [2] - 33:9, 33:12
**analyze** [1] - 10:3
**analyzed** [1] - 5:14
**announce** [1] - 9:16
**annual** [1] - 63:20
**answer** [13] - 9:11, 17:11, 20:24, 25:20, 25:22, 36:11, 41:3, 51:17, 51:19, 52:23, 56:4, 56:25, 59:8
**answered** [1] - 56:22
**anticipates** [1] - 77:4
**apart** [1] - 57:13

**APPEARANCES** [1] - 1:14
**applied** [1] - 45:16
**appreciate** [1] - 68:23
**approach** [2] - 65:2, 76:21
**approached** [1] - 12:12
**Aranda** [3] - 16:25, 17:1, 17:5
**area** [17] - 11:20, 12:4, 13:24, 14:1, 14:2, 14:3, 21:21, 23:11, 25:11, 25:25, 29:19, 29:21, 34:18, 34:21, 40:13, 40:18, 74:2
**arrestees** [1] - 74:3
**arrive** [2] - 21:13, 25:18
**arrived** [12] - 12:8, 16:1, 16:2, 16:15, 17:1, 17:8, 17:10, 19:14, 19:18, 23:23
**arrives** [1] - 21:16
**arriving** [1] - 20:9
**arrow** [1] - 67:13
**article** [3] - 15:2, 15:5, 37:12
**asleep** [1] - 39:8
**aspect** [1] - 29:18
**assessing** [1] - 13:12
**associated** [1] - 65:7
**assume** [1] - 22:9
**attempted** [1] - 24:7
**attention** [3] - 11:10, 13:1, 35:4
**attorney** [2] - 75:11, 75:15
**Attorney's** [1] - 1:16
**attorneys** [2] - 62:24, 72:9
**August** [5] - 50:21, 51:13, 51:22, 52:9, 53:4
**AUSA** [2] - 1:15, 1:15
**available** [1] - 4:20
**Avenue** [1] - 1:24, 77:19
**avoid** [2] - 44:23, 47:16
**award's** [1] - 63:14
**awards** [2] - 63:3, 63:19
**aware** [1] - 59:23

## B

**background** [1] - 71:8
**bag** [1] - 30:13
**bar** [4] - 39:10, 39:13,

39:14
based [2] - 17:11, 19:16
basic [1] - 11:5
basis [2] - 45:7, 45:10
Bate's [5] - 13:21, 67:19, 68:15, 69:2, 70:6
Bates [1] - 15:16
became [4] - 11:19, 27:24, 28:3, 29:9
become [1] - 76:12
beer [3] - 38:21, 38:22, 38:24
BEFORE [1] - 1:12
began [1] - 43:23
begins [1] - 63:3
behalf [7] - 26:25, 33:24, 34:1, 62:20, 62:21, 71:15, 72:3
behind [1] - 15:1
belong [1] - 8:13
belonged [2] - 6:8, 33:13
belonging [1] - 5:24
benefits [3] - 44:23, 45:1, 68:24
Bertrand [3] - 30:10, 30:18, 33:17
best [4] - 19:16, 21:12, 25:11, 49:14
better [1] - 43:23
between [4] - 17:9, 54:25, 55:17, 55:19
beyond [1] - 63:23
bill [1] - 69:6
billed [1] - 68:17
bit [6] - 12:15, 12:18, 16:2, 22:13, 22:15, 22:16
Blackberry [1] - 20:6
blanket [1] - 37:13
bleed [1] - 26:1
bleeds [1] - 25:18
block [1] - 74:18
blocking [1] - 15:7
blood [12] - 12:15, 22:14, 22:15, 22:16, 22:18, 22:20, 23:11, 23:13, 23:14, 23:17, 73:4
boss [2] - 73:12
bothers [1] - 4:25
branch [1] - 75:19
breach [1] - 24:15
break [2] - 36:13, 63:11
Brief [3] - 48:13, 60:18, 69:22
Briefly [1] - 9:20

bring [3] - 4:18, 39:3, 64:5
broke [1] - 5:12
brought [2] - 39:25, 76:6
Broward [5] - 39:16, 40:17, 40:18, 46:15, 55:7
building [1] - 63:18
bullet [1] - 25:25
business [9] - 64:20, 64:21, 64:25, 65:6, 65:23, 66:19, 68:1, 68:3
button [1] - 73:7
BY [35] - 1:23, 5:9, 6:24, 7:10, 8:5, 8:23, 9:22, 10:21, 15:13, 23:22, 24:12, 26:2, 27:11, 32:19, 34:12, 36:10, 37:16, 41:21, 42:17, 43:6, 43:13, 44:5, 44:17, 45:24, 46:9, 48:7, 48:16, 51:6, 56:24, 60:21, 62:1, 65:19, 67:14, 70:2, 71:2

## C

cafeteria [1] - 40:9
caliber [1] - 9:17
caller [1] - 68:10
camera [4] - 19:23, 20:16, 20:18, 21:2
capability [1] - 20:5
capacity [3] - 20:20, 21:5, 35:2
car [1] - 38:13
cards [2] - 9:2, 9:4
care [1] - 29:16
career [1] - 27:21
careful [1] - 72:9
carry [1] - 19:22
case [15] - 9:2, 11:19, 22:23, 22:25, 28:1, 30:8, 33:13, 33:15, 33:16, 33:18, 43:7, 71:21, 76:13, 76:15, 77:4
CASE [1] - 1:2
cases [2] - 76:6, 77:2
caught [1] - 24:7
causes [1] - 76:10
caveat [1] - 72:12
Celia [38] - 35:17, 35:20, 35:22, 36:15, 36:23, 37:1, 37:4, 37:20, 39:11, 39:19, 40:1, 40:10, 41:6,

41:11, 41:14, 42:1, 42:2, 42:19, 42:20, 45:13, 45:16, 46:11, 46:15, 47:25, 48:1, 48:8, 52:10, 52:19, 52:20, 54:16, 54:25, 55:6, 55:12, 55:19, 55:24, 56:12, 57:5, 57:9
cell [18] - 19:25, 20:1, 20:2, 20:5, 28:15, 28:18, 28:20, 29:6, 70:16, 73:2, 73:7, 74:11, 74:13, 74:18, 74:19, 75:6, 75:8, 75:9
Cell [1] - 74:11
Cellebrite [4] - 28:25, 29:4, 29:5, 30:22
cellular [5] - 28:16, 29:7, 64:20, 64:21, 65:24
certain [3] - 32:23, 48:21, 63:23
certainly [3] - 52:18, 65:4, 67:21
Certified [1] - 4:3
certify [1] - 77:13
cetera [4] - 74:4, 75:7, 75:21
chair [1] - 74:18
challenged [1] - 59:2
chance [2] - 66:10, 76:20
characteristics [1] - 6:15
charge [3] - 73:21, 75:4, 75:5
charged [6] - 58:24, 59:6, 59:10, 59:15, 59:25, 60:3
Circuit [1] - 76:15
City [3] - 10:25, 27:18, 27:19
claims [1] - 76:22
clarification [1] - 73:8
clarify [2] - 59:17, 74:1
clear [15] - 7:12, 8:10, 8:15, 9:1, 9:23, 17:24, 22:19, 29:19, 31:2, 31:13, 32:20, 32:25, 48:1, 48:5, 57:24
cleared [4] - 17:13, 26:3, 26:7, 26:9
clearly [1] - 73:23
clients [1] - 72:8
close [14] - 14:7, 49:12, 50:3, 50:4
closed [4] - 37:24,

37:25, 38:12, 40:16
closer [1] - 23:7
clothes [1] - 22:3
clothing [3] - 15:3, 15:6, 37:12
collected [1] - 8:16
collecting [1] - 18:12
collectively [1] - 64:3
Colt [2] - 9:16, 9:17
coming [1] - 77:5
commented [1] - 70:17
committed [2] - 24:20, 59:7
communicating [2] - 73:3, 73:4
communication [2] - 44:12, 44:18
community [1] - 12:4
compare [1] - 10:3
compared [2] - 8:18, 31:12
comparison [2] - 5:20, 6:13
completed [1] - 30:11
complies [1] - 51:3
computers [1] - 28:17
concerned [2] - 72:16, 73:14
concluded [1] - 63:16
conclusion [1] - 6:12
condition [3] - 43:22, 73:15, 75:1
conditions [1] - 25:10
conducted [1] - 12:25
connecting [1] - 66:24
contact [3] - 12:19, 43:14, 43:18
contacts [2] - 33:4, 33:7
contained [1] - 32:2
contemplating [1] - 63:24
continue [1] - 5:5
continued [3] - 2:6, 5:6, 49:21
CONTINUED [1] - 5:8
continuing [1] - 77:6
conversation [4] - 54:24, 55:3, 68:7, 71:10
correct [96] - 6:5, 8:19, 15:20, 15:22, 16:6, 16:7, 16:16, 16:17, 16:19, 16:20, 16:21, 17:3, 18:4, 18:5, 18:8, 18:10, 18:12, 18:14, 18:16, 18:18, 18:19, 18:21, 18:25, 19:4, 19:9,

21:3, 21:10, 21:14, 21:16, 21:19, 21:23, 22:3, 22:8, 22:13, 23:1, 23:2, 23:8, 23:18, 31:4, 31:14, 41:2, 41:14, 48:19, 48:23, 48:25, 49:4, 49:12, 49:22, 49:25, 50:8, 50:22, 51:23, 51:25, 52:3, 52:13, 52:15, 53:1, 53:6, 53:8, 53:25, 54:11, 54:16, 54:18, 54:20, 55:1, 55:3, 55:8, 55:13, 55:20, 55:25, 56:13, 57:22, 58:12, 58:20, 59:2, 59:20, 60:7, 61:18, 61:21, 61:23, 62:7, 68:13, 68:14, 68:25, 69:1, 69:10, 69:13, 69:14, 69:17, 69:18, 69:19, 70:7, 70:10, 70:14, 70:19, 70:21
correctly [1] - 9:17
correspond [1] - 75:15
counsel [2] - 60:22, 72:2, 72:13
counsel's [1] - 51:7
couple [1] - 63:8
course [2] - 63:22, 66:18
court [5] - 14:23, 27:15, 50:7, 62:4, 63:16
COURT [59] - 1:1, 4:5, 4:8, 4:10, 4:20, 4:22, 5:1, 5:4, 6:21, 7:8, 8:3, 10:9, 10:11, 24:10, 25:20, 25:23, 26:24, 27:2, 32:17, 33:23, 33:25, 36:8, 42:13, 43:4, 43:12, 44:3, 44:15, 45:17, 45:22, 46:4, 46:8, 61:25, 62:19, 62:22, 62:24, 63:2, 63:8, 63:10, 63:13, 63:17, 64:4, 65:15, 67:1, 67:6, 67:10, 71:14, 71:17, 71:19, 72:2, 72:7, 72:20, 72:22, 73:20, 75:3, 75:10, 76:3, 76:15, 77:1, 77:7
Court [10] - 1:23, 1:24, 4:1, 4:3, 4:10, 72:5, 72:8, 75:20, 76:20, 77:18

**Court-Certified** [1] - 4:3
**courthouse** [1] - 7:21
**COURTROOM** [9] - 4:4, 4:7, 4:19, 10:15, 27:4, 27:8, 34:6, 64:7, 71:25
**courtroom** [5] - 4:9, 5:3, 37:9, 50:24, 72:1
**creates** [1] - 4:13
**crew** [2] - 13:13, 13:25
**crime** [21] - 9:25, 10:5, 14:17, 20:12, 20:17, 20:22, 28:21, 58:1, 58:6, 58:7, 58:8, 58:13, 58:15, 58:19, 58:24, 59:6, 59:7, 59:11, 59:15, 59:25, 60:3
**crimes** [2] - 27:24, 28:8
**CRIMINALIST** [2] - 2:6, 5:6
**Criminalist** [1] - 10:3
**CROSS** [4] - 8:22, 15:12, 48:15, 70:1
**Cross** [4] - 2:7, 2:10, 2:15, 2:18
**CROSS-EXAMINATION** [4] - 8:22, 15:12, 48:15, 70:1
**Cross-Examination** [4] - 2:7, 2:10, 2:15, 2:18
**CRR** [2] - 1:23, 77:18
**Cuba** [4] - 34:24, 35:12, 47:3, 49:1, 49:2, 49:3, 49:19
**custody** [4] - 73:21, 75:4, 75:5, 75:20
**customer** [5] - 65:6, 65:7, 65:10, 65:21, 69:7
**cutting** [1] - 22:3

### D

**dark** [1] - 25:11
**date** [10] - 11:11, 11:12, 11:15, 14:25, 23:3, 23:4, 31:15, 53:8, 53:9, 66:10
**dates** [1] - 46:6
**DAY** [1] - 1:10
**days** [2] - 55:12, 61:16
**de** [2] - 49:5, 69:5
**deal** [1] - 72:5
**dealings** [1] - 69:16

**December** [1] - 77:17
**december** [1] - 1:5
**decide** [1] - 75:12
**decided** [3] - 60:1, 61:13, 61:20
**decisions** [2] - 73:22, 75:14
**deem** [1] - 17:13
**deemed** [1] - 26:10
**deep** [1] - 71:10
**Defendant** [3] - 4:2, 4:9, 73:9
**defendant** [36] - 13:15, 14:8, 15:10, 26:17, 26:18, 26:20, 29:10, 37:15, 42:21, 42:22, 42:24, 43:1, 43:7, 43:8, 43:15, 43:20, 44:6, 44:22, 45:9, 46:11, 46:13, 46:17, 46:19, 46:24, 47:10, 47:13, 48:2, 48:8, 61:15, 61:21, 61:23, 62:7, 62:9, 62:12, 72:4, 74:13
**DEFENDANT** [7] - 1:19, 4:24, 72:15, 72:21, 72:23, 73:10, 75:8
**defendants** [1] - 72:11
**defense** [5] - 10:10, 27:1, 34:1, 60:22, 62:21
**denied** [7] - 41:10, 52:13, 53:1, 54:13, 54:18, 55:3, 55:7
**deny** [3] - 48:22, 48:24
**department** [2] - 19:23, 20:12
**Department** [6] - 10:14, 10:25, 11:13, 27:18, 54:2, 55:11
**department-issued** [1] - 19:23
**depicted** [1] - 41:25
**depiction** [1] - 42:2
**deposition** [3] - 22:25, 23:5, 23:10
**deputies** [1] - 75:17
**DEPUTY** [9] - 4:4, 4:7, 4:19, 10:15, 27:4, 27:8, 34:6, 64:7, 71:25
**deputy** [1] - 73:25
**DERIC** [1] - 1:19
**Deric** [1] - 1:19
**describe** [5] - 15:5, 21:13, 23:10, 47:2, 47:4
**described** [1] - 21:11

**desire** [1] - 72:13
**detailed** [1] - 19:8
**DETECTIVE** [2] - 2:12, 27:9
**Detective** [4] - 27:12, 30:10, 30:17, 33:17
**detective** [7] - 27:17, 27:24, 28:6, 28:7, 29:8, 30:7, 33:16
**determination** [1] - 75:10
**device** [2] - 29:7, 30:22
**devices** [2] - 28:11, 28:16
**dies** [1] - 25:18
**different** [1] - 31:8
**difficult** [1] - 20:8
**difficulty** [2] - 4:11, 4:13
**DIRECT** [5] - 5:8, 10:20, 27:10, 34:11, 64:12
**direct** [3] - 21:11, 22:12, 48:21
**Direct** [5] - 2:6, 2:9, 2:12, 2:14, 2:17
**directing** [1] - 45:20
**directly** [1] - 36:8
**disbelieve** [1] - 23:4
**disclose** [1] - 47:8
**discuss** [2] - 71:21, 71:22
**discussed** [4] - 5:21, 5:23, 8:17
**discussing** [1] - 5:12
**discussion** [3] - 54:15, 63:1, 73:9
**disgusted** [1] - 72:25
**disk** [5] - 31:23, 32:1, 32:2, 32:13, 32:21
**dispatched** [1] - 28:1
**District** [3] - 1:24, 74:6, 77:18
**DISTRICT** [3] - 1:1, 1:1, 1:12
**division** [1] - 27:25
**DNA** [1] - 74:3
**document** [8] - 6:20, 19:13, 20:17, 20:22, 32:8, 32:10, 32:12, 68:12
**documenting** [1] - 18:18
**documents** [1] - 19:6
**DONALD** [1] - 1:12
**done** [4] - 21:8, 33:9, 33:16, 76:13
**door** [5] - 12:2, 12:16, 24:23, 50:21, 53:6

**down** [8] - 19:3, 22:13, 22:22, 38:6, 51:15, 71:17, 74:23, 76:23
**download** [10] - 28:21, 30:10, 31:2, 31:5, 31:13, 31:15, 32:3, 32:5, 33:15, 33:20
**downstairs** [2] - 74:11, 74:23
**draw** [2] - 11:10, 35:4
**drinks** [1] - 39:7
**Drive** [1] - 64:24
**drive** [2] - 35:1, 46:14
**driven** [1] - 38:3
**driving** [2] - 16:6, 37:17
**dropped** [2] - 39:5, 39:10
**drove** [2] - 40:17, 69:9
**Duane** [4] - 2:6, 2:7, 2:12, 2:18
**DUANE** [19] - 1:15, 5:9, 6:22, 6:24, 7:4, 7:10, 7:24, 8:5, 8:20, 9:20, 9:22, 10:8, 27:11, 32:14, 32:19, 33:21, 33:24, 34:4, 41:18
**due** [2] - 16:10, 24:16
**during** [5] - 23:10, 39:22, 52:9, 52:19, 58:18
**duties** [3] - 11:3, 28:5, 75:21

### E

**E.R** [2] - 64:22, 66:19
**ear** [2] - 4:12, 4:15
**early** [5] - 35:5, 35:15, 46:11, 48:2, 63:4
**earphones** [2] - 4:12, 4:15
**ears** [1] - 4:25
**edge** [1] - 38:9
**effect** [2] - 44:13, 44:18
**eight** [5] - 11:9, 17:17, 17:18, 20:13, 65:1
**either** [1] - 58:7
**electronic** [1] - 28:11
**Eleventh** [1] - 76:15
**ELIZABETH** [2] - 2:17, 64:11
**Elizabeth** [2] - 64:6, 64:18
**Elmo** [5] - 5:22, 7:12, 8:6, 42:16, 65:18
**employed** [4] - 10:24, 10:25, 34:25, 35:2

**enclosed** [1] - 73:16
**end** [3] - 71:19, 76:4, 76:8
**enforcement** [1] - 74:7
**engine** [1] - 14:3
**English** [3] - 30:21, 68:20, 68:22
**enter** [2] - 17:14, 26:11
**entered** [2] - 4:9, 5:3
**entitled** [1] - 77:15
**equipment** [1] - 29:5
**equipped** [2] - 74:12, 75:13
**ESQ** [1] - 1:19
**establish** [2] - 17:14, 58:12
**established** [1] - 12:19
**estimate** [1] - 45:6
**et** [4] - 74:4, 75:7, 75:21
**evaluate** [1] - 10:4
**evening** [1] - 11:11
**event** [6] - 17:18, 17:19, 18:2, 56:9, 63:2, 63:20
**events** [4] - 43:8, 49:24, 50:12, 50:16
**eventually** [2] - 12:20, 14:1
**everyday** [2] - 11:6, 56:7
**evidence** [28] - 5:13, 6:3, 6:21, 7:6, 7:9, 7:11, 8:1, 8:4, 8:7, 11:22, 18:12, 18:14, 18:16, 18:18, 30:12, 30:13, 32:15, 32:18, 42:11, 42:14, 65:13, 65:16, 66:15, 66:22, 67:11, 68:12, 69:3, 77:5
**EVIDENCE** [2] - 2:3, 3:3
**exact** [3] - 16:9, 17:7, 17:11
**exactly** [5] - 24:19, 32:25, 38:16, 39:15, 53:9
**Examination** [13] - 2:6, 2:7, 2:7, 2:9, 2:10, 2:10, 2:12, 2:14, 2:15, 2:15, 2:17, 2:18, 2:18
**examination** [1] - 32:11
**EXAMINATION** [13] - 5:8, 8:22, 9:21, 10:20, 15:12, 23:21,

27:10, 34:11, 48:15, 60:20, 64:12, 70:1, 71:1
**examinations** [2] - 28:10, 28:17
**examine** [2] - 9:2, 9:17
**example** [3] - 28:20, 68:15, 68:18
**except** [1] - 8:16
**excerpt** [1] - 32:21
**exchange** [1] - 36:23
**excusal** [1] - 26:24
**excuse** [3] - 44:16, 72:20, 76:9
**excused** [12] - 10:9, 10:11, 10:12, 27:2, 27:3, 33:23, 33:25, 34:3, 62:22, 62:23, 71:14, 71:18
**EXHIBIT** [1] - 3:2
**Exhibit** [48] - 3:5, 3:6, 3:7, 3:8, 3:9, 5:13, 5:21, 5:23, 6:3, 6:18, 6:19, 6:25, 7:5, 7:9, 7:12, 7:16, 7:25, 8:4, 8:7, 8:10, 8:16, 9:8, 9:9, 9:10, 9:14, 11:23, 11:25, 30:13, 31:18, 31:19, 31:21, 32:8, 32:15, 32:18, 33:6, 41:23, 41:25, 42:4, 42:14, 65:13, 65:16, 65:18, 66:11, 66:14, 66:17, 66:22, 67:11
**exhibit** [4] - 3:10, 6:4, 13:21, 69:3
**EXHIBITS** [1] - 3:4
**exited** [1] - 72:1
**explained** [2] - 76:19, 76:23
**explaining** [1] - 70:9
**explains** [1] - 70:13
**extract** [2] - 29:6, 30:23
**extraction** [1] - 33:2

## F

**facilities** [1] - 64:1
**fact** [14] - 15:22, 21:18, 22:3, 22:5, 22:7, 22:25, 24:16, 40:23, 41:10, 41:13, 48:25, 60:7, 60:12
**failed** [1] - 47:8
**fair** [4] - 22:11, 22:20, 42:2, 65:9
**fall** [6] - 35:4, 35:5, 35:15, 39:8, 46:11,

48:2
**false** [1] - 41:2
**familiar** [3] - 28:25, 35:8, 76:12
**far** [6] - 29:17, 38:11, 43:3, 46:2, 74:25, 75:21
**fast** [2] - 16:8, 17:5
**FBI** [46] - 40:21, 41:8, 47:7, 50:21, 51:5, 51:22, 53:5, 55:18, 55:19, 55:23, 55:25, 56:2, 56:3, 56:6, 56:12, 56:14, 56:20, 57:2, 57:3, 57:14, 57:21, 57:22, 57:25, 58:6, 58:9, 58:15, 58:19, 58:23, 58:25, 59:4, 59:5, 59:9, 59:12, 59:16, 59:24, 60:1, 61:3, 61:8, 61:11, 61:13, 61:14, 62:2, 62:5, 62:6, 62:9, 62:13
**fear** [6] - 44:25, 60:23, 61:2, 61:8, 73:18, 74:25
**Federal** [1] - 1:23
**federal** [2] - 57:25, 63:17
**felt** [4] - 53:2, 57:17, 59:3, 59:22
**few** [1] - 55:12
**figure** [1] - 13:7
**figured** [2] - 24:24, 25:2
**financial** [1] - 44:22
**fine** [1] - 45:17
**fingerprint** [4] - 5:24, 9:2, 9:4, 9:23
**fingerprinted** [1] - 74:3
**fingerprints** [5] - 5:14, 5:15, 7:2, 7:20, 8:15
**finish** [1] - 50:14
**finished** [3] - 26:15, 56:18, 72:17
**fire** [14] - 13:1, 13:18, 14:12, 16:15, 16:23, 17:12, 19:13, 21:16, 21:18, 25:13, 25:17, 26:7, 26:10, 26:15
**Fire** [2] - 13:11, 17:10
**firearm** [2] - 9:17, 25:14
**fired** [1] - 24:1
**firefighters** [1] - 13:13
**first** [21] - 6:19, 13:21, 15:19, 27:15, 31:20, 48:19, 48:22, 49:9,

51:4, 52:4, 52:9, 55:18, 58:3, 58:4, 61:2, 61:4, 67:19, 67:24, 70:5, 74:2, 74:5
**five** [5] - 13:13, 21:18, 35:3, 66:2, 69:15
**floor** [1] - 74:12
**FLORIDA** [1] - 1:1
**Florida** [7] - 1:4, 1:18, 1:21, 1:25, 34:20, 64:24, 77:19
**focused** [1] - 25:7
**focusing** [1] - 28:12
**follow** [1] - 14:18
**following** [2] - 54:2, 63:16
**follows** [6] - 5:7, 10:19, 27:9, 34:10, 63:1, 64:11
**foot** [1] - 72:24
**FOR** [2] - 1:15, 1:19
**foregoing** [1] - 77:13
**forensic** [3] - 28:10, 28:17, 30:10
**forensically** [1] - 28:21
**forensics** [1] - 28:13
**forgive** [3] - 15:24, 17:25, 50:14
**forgot** [1] - 24:1
**form** [10] - 24:8, 31:5, 39:12, 43:2, 43:10, 44:2, 44:14, 45:15, 46:2, 46:4
**format** [1] - 30:24
**formats** [1] - 31:9
**Fort** [1] - 1:21
**forth** [1] - 12:18
**forward** [1] - 71:23
**foster** [1] - 5:22
**four** [1] - 52:6
**FPR** [3] - 1:23, 77:18
**frame** [3] - 17:7, 35:8, 46:17
**Frank** [13] - 39:23, 39:25, 40:2, 46:23, 46:24, 46:25, 47:1, 47:2, 47:5, 52:15, 52:17, 54:20, 54:25
**free** [1] - 67:17
**frequency** [1] - 47:15
**Friday** [1] - 1:5
**friend** [7] - 36:18, 50:1, 60:13, 70:19, 71:3, 71:9
**friend-friend** [1] - 50:1
**friends** [7] - 49:12, 49:14, 49:24, 50:3, 50:4, 50:5, 70:17

**friendship** [2] - 49:18, 49:21
**front** [12] - 12:2, 12:9, 12:13, 12:16, 12:19, 13:16, 13:17, 14:7, 16:19, 16:21, 68:2, 73:17

## G

**gang** [1] - 28:1
**Garcia** [23] - 4:2, 4:6, 4:8, 4:10, 9:5, 11:17, 16:19, 21:23, 22:21, 23:11, 24:23, 25:5, 29:10, 45:14, 48:23, 49:9, 49:18, 52:10, 54:25, 55:7, 60:23, 72:4, 72:7
**GARCIA** [1] - 1:7
**gated** [1] - 12:4
**general** [3] - 14:4, 29:19, 40:13
**generate** [1] - 31:8
**generated** [3] - 31:10, 33:1
**gentleman** [8] - 51:4, 51:5, 51:7, 53:16, 62:5, 72:24, 72:25, 73:10
**gentlemen** [4] - 5:4, 51:5, 63:17, 71:19
**girlfriend** [1] - 70:17
**given** [5] - 9:1, 9:16, 22:23, 22:25, 30:17
**GLENDA** [2] - 1:23, 77:18
**God** [4] - 10:17, 27:6, 34:8, 64:9
**Gonzalez** [15] - 35:17, 35:21, 35:22, 36:12, 36:15, 36:17, 36:24, 42:1, 42:2, 42:19, 42:21, 45:20, 46:15, 52:20, 54:25
**GOVERNMENT** [1] - 1:15
**Government** [11] - 7:4, 7:24, 8:20, 9:8, 9:14, 10:8, 26:25, 30:13, 32:14, 33:6, 33:21
**Government's** [45] - 5:13, 5:21, 5:23, 6:3, 6:18, 6:19, 6:25, 7:5, 7:9, 7:12, 7:16, 7:25, 8:4, 8:7, 8:10, 8:12, 8:16, 9:9, 11:23, 11:25, 13:20, 31:18, 31:19, 31:21, 32:8,

32:15, 32:18, 41:17, 41:23, 41:25, 42:4, 42:14, 65:3, 65:13, 65:16, 65:18, 66:8, 66:11, 66:13, 66:17, 67:11, 67:12, 69:3, 69:19
**GOVERNMENT'S** [2] - 2:3, 3:4
**GRAHAM** [1] - 1:12
**great** [1] - 71:23
**greeted** [1] - 36:21
**grew** [1] - 49:4
**grow** [12] - 40:3, 40:5, 40:7, 40:11, 45:12, 45:13, 45:20, 46:1, 46:16, 46:18, 46:20, 54:16
**guess** [3] - 13:7, 63:4
**gun** [1] - 28:9
**guns** [3] - 24:21, 25:2, 25:4
**gunshot** [2] - 25:16, 25:17
**guy** [1] - 70:7
**guys** [1] - 49:4

## H

**hand** [6] - 9:7, 10:15, 27:4, 34:6, 64:7, 73:11
**handed** [3] - 7:15, 30:9, 33:17
**handicapped** [6] - 74:11, 74:12, 75:6, 75:8, 75:9, 75:12
**handing** [1] - 31:17
**handle** [2] - 74:12, 75:17
**happy** [1] - 72:13
**hastiness** [1] - 22:7
**hats** [1] - 28:7
**headsets** [1] - 36:3
**hear** [14] - 4:15, 23:13, 36:1, 36:4, 36:7, 39:11, 45:13, 45:25, 46:19, 46:24, 59:5, 59:9, 68:5, 68:7
**heard** [3] - 12:10, 46:13, 56:5
**hearing** [1] - 4:12
**hearings** [1] - 63:21
**hearsay** [3] - 45:16, 45:18, 56:23
**hectic** [7] - 13:6, 17:6, 19:20, 21:14, 21:16, 25:8
**Held** [1] - 1:8
**held** [3] - 11:8, 63:1,

63:16
**hello** [1] - 36:21
**help** [9] - 10:17, 12:9, 12:14, 12:24, 27:6, 34:8, 44:8, 64:9, 73:24
**helps** [1] - 19:2
**hereby** [1] - 77:13
**Hernandez** [1] - 6:1
**Hialeah** [9] - 34:19, 34:20, 35:23, 54:2, 54:6, 54:8, 55:11, 64:24
**high** [1] - 73:4
**highlighted** [1] - 14:2
**hit** [7] - 25:24, 73:11, 73:12, 73:13, 73:18, 75:1, 75:2
**hold** [4] - 11:1, 61:2, 61:8, 63:21
**home** [24] - 11:21, 12:3, 14:6, 24:1, 24:3, 24:4, 24:6, 24:7, 24:14, 24:20, 25:10, 29:22, 29:24, 36:18, 37:1, 39:1, 39:2, 39:3, 39:7, 39:8, 46:14, 51:13, 53:11, 53:18
**home-invade** [1] - 24:7
**homicide** [5] - 28:3, 28:5, 28:7, 28:8, 29:8
**honest** [1] - 20:7
**Honor** [22] - 4:21, 7:4, 8:21, 15:11, 24:11, 26:22, 27:1, 32:14, 36:2, 42:6, 42:11, 45:23, 62:18, 63:15, 65:12, 69:21, 69:23, 71:15, 74:1, 76:1, 76:17, 77:9
**HONORABLE** [1] - 1:12
**hook** [1] - 30:22
**hope** [1] - 60:7
**hoping** [1] - 60:2
**hospital** [16] - 13:8, 13:19, 14:15, 26:14, 26:18, 42:22, 42:24, 43:5, 43:9, 43:15, 43:16, 43:17, 43:21, 44:7, 46:7, 74:24
**hour** [2] - 19:17, 74:15
**hours** [2] - 11:11
**house** [56] - 11:20, 12:2, 12:9, 12:10, 12:17, 12:19, 12:20, 12:25, 13:3, 13:16,

13:18, 14:7, 16:21, 23:25, 24:15, 25:7, 25:8, 26:3, 26:4, 26:7, 26:10, 26:13, 26:14, 29:14, 39:19, 39:20, 40:3, 40:5, 40:7, 40:11, 40:12, 40:13, 40:15, 40:25, 45:12, 45:13, 45:20, 46:1, 46:15, 46:16, 46:18, 46:20, 51:9, 51:23, 52:4, 52:20, 52:22, 53:7, 54:5, 54:16, 55:23, 56:3, 56:14, 57:4
**housed** [1] - 63:18
**hub** [1] - 38:10
**human** [1] - 25:16

## I

**ID** [1] - 32:1
**IDed** [1] - 74:3
**identification** [21] - 6:17, 6:22, 7:1, 7:6, 7:16, 7:25, 9:7, 9:14, 31:17, 31:19, 31:20, 32:7, 40:24, 41:17, 41:22, 42:3, 42:11, 65:3, 66:7, 66:13
**identified** [5] - 6:4, 6:5, 15:10, 16:19, 37:15
**identify** [6] - 5:24, 6:7, 14:21, 15:2, 37:6, 37:11
**IGNACIO** [1] - 1:15
**lll** [3] - 2:6, 5:6, 10:3
**image** [1] - 28:22
**imagine** [2] - 13:6, 17:6
**immediately** [2] - 24:16, 73:12
**implicate** [2] - 43:8, 61:6
**implicated** [4] - 44:1, 44:23, 47:16, 60:24
**importance** [1] - 18:20
**important** [3] - 18:23, 19:8, 59:22
**importantly** [1] - 20:2
**impression** [1] - 8:14
**impressions** [1] - 5:25
**IN** [1] - 3:3
**Inc** [1] - 64:22
**incident** [3] - 25:12, 25:13, 47:8
**indicated** [1] - 68:20
**Indicating** [1] - 21:21
**individual** [20] - 8:8,

11:16, 12:9, 12:13, 12:15, 12:22, 13:23, 13:24, 14:16, 14:18, 14:21, 14:25, 15:2, 35:11, 35:17, 37:5, 67:3, 67:4, 67:25, 69:19
**information** [6] - 24:22, 29:6, 30:23, 31:3, 31:10, 75:14
**initials** [1] - 32:1
**injured** [4] - 13:14, 48:3, 48:8, 48:11
**injuries** [3] - 13:2, 13:8, 13:12
**injury** [1] - 25:14
**inmates** [2] - 74:8, 74:12
**inside** [9] - 12:10, 12:17, 16:21, 25:10, 26:4, 26:9, 26:13, 29:24, 38:4
**insisting** [1] - 72:4
**insists** [1] - 72:6
**instead** [1] - 28:23
**instructions** [1] - 30:6
**intentional** [1] - 73:1
**interest** [2] - 45:20, 45:21
**interfere** [1] - 4:14
**interior** [1] - 12:25
**interpreter** [3] - 68:24, 73:8, 73:9
**INTERPRETER** [5] - 2:17, 36:2, 44:16, 64:13, 73:8
**Interpreters** [1] - 4:3
**interpreters** [1] - 4:11
**interview** [1] - 76:20
**intimate** [2] - 41:11, 41:14
**introduce** [1] - 27:14, 34:15, 64:16
**invade** [1] - 24:7
**invasion** [5] - 11:21, 24:1, 24:4, 24:14, 24:20
**investigate** [1] - 28:8
**investigation** [4] - 11:16, 29:9, 33:14, 33:19
**investigations** [2] - 11:6, 28:10
**investigator** [1] - 76:23
**involved** [10] - 11:19, 14:17, 24:21, 24:25, 25:2, 29:9, 29:17, 44:11, 60:16, 75:20
**involving** [1] - 11:16

**issue** [5] - 76:7, 76:8, 76:21, 76:25, 77:1
**issued** [1] - 19:23
**issues** [2] - 76:2, 76:4
**items** [3] - 9:23, 9:24, 66:8
**itself** [1] - 58:1

## J

**Jean** [6] - 6:11, 7:3, 7:14, 7:23, 8:9, 8:14
**JENNIFER** [2] - 2:6, 5:6
**JESUS** [1] - 1:15
**job** [3] - 26:12, 26:13, 30:23
**JOHNATHON** [3] - 2:12, 27:9, 27:16
**Johnathon** [1] - 27:16
**joined** [1] - 27:22
**JR** [1] - 1:15
**Judge** [6] - 34:1, 67:9, 72:4, 72:6, 75:24, 76:14
**judge** [2] - 60:17, 66:23
**JUDGE** [1] - 1:12
**judges** [1] - 63:21
**jurors** [5] - 27:21, 28:13, 30:19, 47:9, 63:14
**jury** [11] - 4:4, 4:18, 5:3, 27:14, 34:16, 35:19, 37:22, 64:17, 65:18, 71:25, 76:9
**Jury** [2] - 64:3, 72:1
**JURY** [1] - 1:10

## K

**keep** [1] - 4:15
**key** [1] - 76:15
**kicked** [1] - 24:15
**kind** [9] - 13:22, 16:1, 17:6, 23:23, 44:23, 66:3, 69:16, 71:3, 76:25
**Kindelan** [1] - 5:25
**knocked** [3] - 50:21, 53:5, 76:25
**knowing** [2] - 25:4, 53:1
**knowledge** [1] - 45:12
**known** [7] - 10:5, 35:8, 35:17, 48:23, 48:25, 50:2, 71:6
**knows** [1] - 47:3

## L

**ladies** [3] - 5:4, 63:17, 71:19
**lady** [1] - 62:5
**Lara** [6] - 6:11, 7:3, 7:14, 7:23, 8:9, 8:14
**las** [1] - 49:5
**last** [6] - 25:9, 27:15, 28:12, 57:9, 67:6, 67:24
**late** [5] - 11:11, 35:5, 35:15, 46:11, 47:18
**latent** [13] - 5:14, 5:15, 5:18, 5:19, 6:4, 6:7, 6:13, 6:16, 9:1, 9:4, 10:4, 10:6
**latents** [1] - 5:16
**Lauderdale** [1] - 1:21
**law** [1] - 74:7
**lay** [1] - 23:11
**laying** [6] - 12:9, 12:13, 12:15, 13:16, 13:24, 22:22
**lead** [2] - 33:16, 33:18
**leading** [2] - 24:8, 61:24
**learned** [1] - 76:18
**least** [1] - 17:3
**leave** [1] - 30:20
**led** [1] - 43:8
**left** [9] - 5:25, 6:11, 8:14, 22:7, 36:11, 38:5, 53:16, 72:24
**Leonardo** [26] - 4:2, 9:5, 11:17, 22:21, 29:10, 35:9, 35:16, 35:21, 36:25, 37:4, 37:6, 37:9, 37:11, 37:19, 39:19, 39:20, 40:2, 40:7, 40:11, 45:13, 46:15, 47:24, 52:22, 54:16, 54:25, 55:7
**LEONARDO** [1] - 1:7
**Leonardo's** [1] - 36:22
**less** [2] - 16:13, 16:14
**lie** [6] - 22:21, 50:18, 57:15, 58:9, 58:19, 58:20
**lied** [3] - 57:14, 57:19, 57:20
**life** [3] - 26:21, 56:7, 56:9
**lifts** [1] - 6:13
**lighting** [1] - 25:10
**lights** [1] - 26:3
**line** [4] - 15:17, 67:22, 68:4, 68:13
**list** [1] - 77:2

listen [2] - 36:3, 72:14
lit [1] - 25:11
LIVAN [1] - 2:14
Livan [2] - 34:4, 34:17
lIVAN [1] - 34:10
live [2] - 34:18, 34:23
lived [1] - 34:20
located [2] - 64:23, 73:22
location [1] - 21:13
logs [1] - 33:5
look [8] - 13:3, 14:23, 33:14, 37:8, 40:16, 50:24, 71:23, 75:1
looked [2] - 37:23, 42:3
looking [9] - 6:15, 6:16, 11:25, 15:15, 28:19, 33:18, 65:20, 67:19, 70:6
loud [1] - 36:3
lovers [1] - 57:5
low [1] - 73:5
lying [3] - 57:25, 58:24, 59:16

**M**

ma'am [7] - 64:14, 64:16, 64:19, 65:2, 65:20, 66:6, 68:24
MACKENZIE [1] - 1:15
maintain [1] - 58:20
maintained [1] - 66:18
maintaining [1] - 18:16
Majagua [1] - 49:5
male [1] - 68:11
man [5] - 69:9, 69:16, 70:21, 71:3, 71:11
marijuana [7] - 40:3, 40:5, 40:7, 40:11, 46:16, 46:18, 46:20
mark [2] - 67:15, 67:16
Marked [1] - 6:22
Marrero [6] - 6:11, 7:3, 7:14, 7:23, 8:9, 8:14
MARSHAL [1] - 74:1
Marshal [1] - 75:17
Marshals [10] - 63:2, 63:14, 63:18, 72:16, 72:17, 73:21, 75:4,

match [1] - 8:18
MATIAS [2] - 2:9, 10:19
Matias [2] - 10:13, 10:24
matter [1] - 77:15
matters [1] - 72:2
mean [8] - 9:24, 16:9, 17:22, 37:25, 44:19, 46:4, 48:9, 75:1
meaning [2] - 31:6, 72:23
meaningful [1] - 71:10
medical [3] - 13:1, 13:7, 22:1
meet [2] - 35:16, 36:12
meeting [11] - 35:20, 40:21, 42:20, 55:18, 57:21, 57:22, 58:3, 58:18, 58:23, 59:23
meetings [1] - 55:20
members [4] - 34:15, 35:19, 37:22, 64:16
memorialization [1] - 18:24
mention [1] - 39:13
messages [1] - 33:5
met [6] - 35:23, 48:17, 49:9, 58:16, 61:2, 61:24
MIAMI [1] - 1:2
Miami [7] - 1:4, 1:16, 1:18, 1:24, 1:25, 77:19, 77:19
microphone [2] - 36:4, 36:6, 36:9
middle [2] - 74:18, 77:5
might [8] - 24:3, 24:16, 24:24, 25:2, 40:5, 46:19, 47:4, 48:6
Miguel [2] - 35:9, 35:16
MIGUEL [1] - 1:7
mince [1] - 57:18
mind [1] - 5:22
minutes [10] - 12:8, 16:11, 16:13, 19:17, 19:21, 63:10, 63:25, 64:2, 74:15
Miramar [10] - 10:14, 10:25, 11:13, 12:5, 13:11, 17:10, 27:18, 27:19, 27:22, 28:2
mirror [1] - 28:22
missed [2] - 54:4, 66:24
moment [9] - 17:9,

48:12, 49:25, 52:3, 52:8, 53:3, 60:17, 62:25, 69:17
Monday [6] - 71:20, 71:24, 76:1, 76:8, 76:11, 77:7
money [2] - 44:19, 45:3
month [9] - 45:5, 45:8, 47:17, 60:10, 61:17, 65:23, 65:25, 66:1, 68:4
monthly [2] - 45:6, 45:10
months [2] - 18:7, 67:3
MORALES [1] - 1:7
Morales [33] - 4:2, 4:6, 4:8, 4:10, 9:5, 11:17, 16:19, 21:23, 22:21, 23:11, 24:24, 25:5, 29:10, 35:9, 35:16, 35:21, 36:1, 38:4, 39:5, 39:11, 45:14, 45:25, 48:23, 49:9, 49:18, 52:10, 54:25, 55:7, 60:9, 60:23, 61:6, 72:4, 72:8
morning [25] - 4:5, 4:8, 5:10, 5:11, 8:24, 8:25, 10:22, 10:23, 27:12, 27:13, 30:9, 34:13, 34:14, 54:3, 54:6, 64:14, 64:15, 70:3, 70:4, 71:20, 71:24, 74:14, 76:7, 76:11, 77:7
most [1] - 33:5
motion [1] - 76:14
motorcycle [1] - 49:16
move [13] - 6:2, 7:5, 7:24, 14:9, 14:24, 32:15, 42:6, 44:20, 65:12, 66:21, 74:18, 74:20, 74:21
moved [7] - 13:18, 14:1, 14:4, 14:8, 14:10, 14:12, 22:10
movement [1] - 13:23
MR [99] - 4:21, 7:7, 8:2, 8:23, 9:19, 10:10, 10:13, 10:21, 15:9, 15:13, 23:19, 23:22, 24:8, 24:11, 24:12, 25:19, 26:2, 26:22, 26:25, 27:1, 32:16, 33:22, 34:1, 34:12, 35:25, 36:5, 36:10, 37:14, 37:16, 39:12, 41:19, 41:21,

42:6, 42:10, 42:12, 42:15, 42:17, 43:2, 43:6, 43:10, 43:13, 44:2, 44:5, 44:14, 44:17, 45:15, 45:19, 45:23, 45:24, 46:2, 46:6, 46:9, 48:5, 48:7, 48:12, 48:14, 48:16, 51:6, 56:22, 56:24, 60:17, 60:19, 60:21, 61:24, 62:1, 62:17, 62:20, 62:21, 63:6, 63:9, 63:12, 63:15, 64:6, 64:13, 65:12, 65:14, 65:17, 65:19, 66:21, 66:23, 67:2, 67:9, 67:12, 67:14, 69:21, 69:23, 70:2, 70:23, 71:2, 71:13, 71:15, 72:3, 72:4, 75:24, 76:1, 76:14, 76:17, 77:3, 77:9
MS [18] - 5:9, 6:22, 6:24, 7:4, 7:10, 7:24, 8:5, 8:20, 9:20, 9:22, 10:8, 27:11, 32:14, 32:19, 33:21, 33:24, 34:4, 41:18
multiple [1] - 23:25

**N**

name [6] - 27:15, 64:18, 64:21, 65:7, 67:24
named [2] - 11:16, 39:23
naturally [1] - 55:24
nature [1] - 16:10
need [5] - 14:24, 19:3, 36:2, 45:17, 64:1
needed [1] - 44:8
needs [1] - 17:13
negatively [1] - 72:12
neighborhood [3] - 49:4, 50:5, 50:6
Net10 [1] - 69:5
never [8] - 20:16, 21:8, 39:13, 57:11, 57:12, 71:5, 71:7, 71:12
new [2] - 74:2, 77:4
next [5] - 5:20, 12:15, 34:5, 63:5, 64:5
nice [1] - 76:6
night [3] - 12:1, 29:20, 30:9
nine [5] - 5:14, 6:5, 9:1, 9:4, 54:2
NO [1] - 1:2

noise [1] - 4:25
none [1] - 8:15
normal [1] - 66:18
normally [2] - 56:6, 72:8
North [2] - 1:24, 77:19
Northeast [1] - 1:17
noted [1] - 70:6
Nothing [1] - 10:8
nothing [8] - 10:10, 10:17, 27:1, 27:6, 34:8, 64:9, 70:9, 70:12
notice [1] - 24:13
notices [1] - 63:20
number [8] - 31:12, 32:1, 33:3, 36:22, 67:19, 68:15, 69:2, 69:5
Number [1] - 66:7
numbered [1] - 68:18
nurse [4] - 72:19, 73:17, 73:24, 74:5
nurses [1] - 74:6

**O**

oath [1] - 50:8
object [5] - 24:8, 44:14, 45:15, 46:2, 61:24
objection [13] - 7:7, 8:2, 25:19, 32:16, 39:12, 42:12, 43:2, 43:10, 44:2, 56:22, 65:14, 67:9
observed [6] - 12:8, 12:11, 12:16, 12:23, 13:1, 14:25
obviously [1] - 23:7
occasion [2] - 35:16, 70:15
occasions [3] - 40:20, 40:23, 57:13
occupants [1] - 12:17
occurred [1] - 17:19
Ochill [22] - 34:4, 34:17, 34:18, 35:19, 36:6, 36:9, 36:11, 39:9, 40:20, 41:4, 42:24, 43:14, 45:3, 46:10, 47:25, 48:17, 52:7, 60:22, 61:2, 61:11, 61:14, 61:17
OCHILL [2] - 2:14, 34:10
October [3] - 31:16, 33:7, 53:8
OF [2] - 1:1, 1:4
offer [1] - 45:19

**office** [7] - 30:21, 58:4, 72:18, 72:20, 72:21, 73:24, 75:7
**Office** [1] - 1:16
**OFFICER** [2] - 2:9, 10:19
**Officer** [7] - 10:13, 14:19, 15:22, 16:15, 16:25, 17:1, 17:5
**officer** [17] - 10:24, 11:2, 11:4, 12:7, 14:23, 17:16, 17:20, 18:3, 18:10, 19:22, 20:13, 20:19, 20:20, 21:2, 21:5, 21:9, 23:23
**officers** [4] - 12:12, 15:20, 29:16, 74:7
**Official** [1] - 1:23
**Okeechobee** [1] - 35:23
**old** [4] - 49:7, 49:8, 49:9, 49:11
**once** [10] - 4:24, 22:1, 26:9, 26:14, 33:16, 36:20, 60:14, 62:4, 62:14, 68:6
**one** [12] - 15:19, 24:2, 29:2, 44:12, 44:18, 48:12, 52:7, 52:8, 59:12, 63:17, 69:21, 70:15
**ones** [2] - 50:25, 53:14
**open** [1] - 63:16
**openly** [1] - 57:13
**opportunity** [3] - 11:15, 32:4, 76:12
**order** [5] - 4:1, 13:18, 17:13, 29:6, 63:22
**ordered** [1] - 14:14
**otherwise** [2] - 44:10, 59:10
**outside** [3] - 12:20, 26:7, 38:11
**outstanding** [1] - 24:17
**overheard** [1] - 54:24
**overruled** [3] - 25:23, 43:4, 44:15
**own** [1] - 45:21
**owned** [1] - 40:19

**P**

**P.A** [1] - 1:19
**page** [6] - 13:21, 67:19, 68:18, 69:2, 69:10, 70:5
**PAGE** [1] - 2:2
**PAGES** [1] - 1:11

**palm** [5] - 5:25, 6:11, 7:2, 7:20, 8:14
**panic** [1] - 12:18, 73:15
**part** [6] - 28:3, 28:12, 33:5, 38:5, 57:20, 74:6
**participate** [2] - 11:16, 35:20
**particular** [7] - 18:24, 28:16, 28:21, 30:8, 33:15, 63:21, 68:13
**passed** [1] - 17:9
**passenger** [2] - 37:21, 38:2
**past** [1] - 17:12
**patrol** [4] - 11:2, 11:3, 16:6, 27:23
**pause** [3] - 48:13, 60:18, 69:22
**pay** [1] - 45:1
**paying** [5] - 61:17, 61:21, 62:7, 62:9, 67:2
**payment** [7] - 47:23, 65:24, 66:15, 68:17, 70:7, 70:9, 70:14
**payments** [11] - 44:22, 45:9, 47:9, 47:12, 47:15, 60:9, 60:12, 68:4, 68:12, 70:16, 70:18
**PDF** [1] - 31:9
**people** [8] - 12:10, 12:17, 12:20, 24:16, 24:19, 24:20, 25:7, 75:9
**percent** [1] - 69:20
**perfectly** [1] - 65:11
**perform** [1] - 75:21
**perhaps** [1] - 36:5
**perimeter** [3] - 29:15, 29:21, 30:5
**period** [1] - 66:15
**permanent** [1] - 26:24
**permanently** [3] - 10:9, 33:23, 71:14
**permission** [3] - 42:15, 65:17, 67:12
**permit** [1] - 71:22
**persistent** [1] - 53:25
**person** [10] - 7:17, 7:19, 13:4, 14:20, 15:5, 35:8, 37:11, 39:23, 50:1, 65:22
**personal** [3] - 41:6, 41:10, 41:13
**personally** [1] - 41:20
**persons** [1] - 28:8
**perspective** [1] - 49:6

**phone** [52] - 19:25, 20:1, 20:2, 20:5, 20:6, 28:20, 28:22, 28:23, 28:24, 29:6, 29:18, 30:9, 30:14, 30:17, 30:19, 30:20, 30:22, 30:24, 30:25, 31:1, 31:3, 31:11, 31:13, 32:3, 33:2, 33:3, 33:6, 33:9, 33:20, 36:12, 36:22, 43:18, 43:24, 43:25, 45:1, 45:2, 47:20, 55:12, 56:1, 65:24, 66:3, 66:16, 67:3, 67:4, 68:13, 68:16, 69:5
**phones** [4] - 28:16, 28:18, 33:13, 66:3
**photo** [3] - 7:17, 7:19, 67:6
**photograph** [5] - 15:14, 15:15, 20:8, 21:3
**photographed** [2] - 20:14, 74:3
**physically** [2] - 13:10, 14:9
**picked** [9] - 37:1, 37:2, 37:3, 38:3, 38:13, 39:4, 39:9, 46:14, 48:8
**picture** [6] - 13:17, 25:5, 25:9, 42:8, 42:9, 65:21
**pictures** [4] - 20:5, 26:17, 52:5, 58:5
**piece** [2] - 29:5, 77:4
**Pin** [1] - 69:5
**place** [6] - 39:14, 68:3, 73:16, 73:17, 75:6
**placed** [3] - 73:15, 74:4, 74:13
**plain** [1] - 30:21
**plan** [1] - 61:12
**pleadings** [1] - 76:10
**plenty** [1] - 76:5
**point** [13] - 12:13, 15:16, 20:18, 29:15, 29:17, 30:5, 36:14, 40:10, 41:5, 51:1, 52:18, 53:14, 76:16
**pointed** [4] - 40:12, 40:13, 52:19, 52:22
**points** [1] - 46:15
**Police** [8] - 10:14, 10:25, 11:13, 27:18, 54:2, 54:6, 54:8, 55:11
**police** [17] - 18:3,

18:6, 18:8, 18:20, 18:23, 19:22, 20:13, 20:19, 20:20, 21:2, 21:5, 21:8, 44:10, 54:21, 60:15, 61:20
**pool** [3] - 22:20, 23:11, 23:13
**pose** [1] - 26:16
**position** [3] - 11:1, 11:8, 67:8
**possession** [1] - 46:20
**possible** [6] - 13:9, 19:8, 21:12, 24:1, 24:14, 26:19
**possibly** [2] - 15:4, 74:8
**potential** [1] - 74:8
**Powers** [1] - 77:17
**POWERS** [2] - 1:23, 77:18
**precise** [1] - 72:9
**precisely** [1] - 56:20
**predicate** [1] - 66:23
**prepaid** [2] - 66:5, 70:11
**presence** [1] - 39:6
**present** [1] - 40:24
**preserving** [1] - 18:14
**pressing** [1] - 73:7
**pressure** [1] - 73:4
**pretty** [2] - 16:10, 56:9
**previous** [1] - 13:16
**previously** [2] - 8:11, 8:12
**print** [2] - 6:7, 8:13
**prints** [5] - 7:2, 7:20, 10:4, 10:6
**problem** [2] - 5:2, 72:15
**problems** [2] - 4:16, 63:13
**proceedings** [5] - 48:13, 60:18, 69:22, 77:10, 77:14
**process** [1] - 9:24
**processing** [1] - 74:2
**program** [2] - 63:3, 63:19
**properly** [1] - 18:18
**properties** [1] - 33:2
**property** [1] - 27:24
**Prosecutions** [1] - 1:16
**protocol** [4] - 14:15, 17:11, 74:6, 75:6
**provided** [2] - 10:6, 70:13
**publish** [3] - 42:15, 65:17, 67:12

**pull** [2] - 24:3, 69:13
**pulled** [2] - 24:6, 24:13
**purchased** [1] - 68:16
**put** [11] - 14:3, 14:10, 37:2, 49:6, 63:8, 68:8, 69:6, 72:18, 73:2, 74:6, 75:7
**putting** [2] - 7:11, 8:6

**Q**

**questioned** [1] - 54:8
**questioning** [5] - 15:17, 24:9, 53:25, 55:5, 55:11
**questions** [14] - 9:19, 23:19, 26:22, 33:22, 40:2, 51:25, 52:2, 52:5, 54:10, 60:19, 62:17, 70:23, 71:13
**quibble** [1] - 23:16
**quick** [1] - 16:10

**R**

**raise** [3] - 27:4, 34:6, 64:7
**Raise** [1] - 10:15
**reach** [1] - 6:12
**read** [2] - 30:24, 69:4
**ready** [1] - 5:5
**really** [3] - 14:2, 38:12, 75:13
**rear** [2] - 38:9, 38:10
**reason** [1] - 23:4
**receive** [3] - 42:25, 44:12, 61:15
**RECEIVED** [1] - 3:2
**received** [19] - 7:8, 7:9, 8:3, 8:4, 12:6, 23:25, 28:14, 28:15, 32:17, 32:18, 33:7, 36:12, 42:13, 42:14, 65:15, 65:16, 67:10, 67:11, 69:3
**recess** [3] - 63:4, 63:5, 63:25
**recognize** [13] - 6:19, 7:17, 7:19, 30:14, 30:16, 31:23, 31:25, 32:8, 32:12, 41:23, 65:3, 66:8, 67:6
**recollection** [4] - 19:2, 19:3, 19:16, 69:15
**record** [5] - 15:9, 17:24, 37:14, 68:18, 70:9
**record's** [1] - 48:5
**recorder** [2] - 76:19,

76:24

**records** [9] - 66:18, 66:24, 67:4, 68:2, 68:12, 69:10, 69:13, 70:5, 70:13

**recreate** [1] - 21:12

**red** [5] - 67:13, 69:9, 69:16, 70:7, 71:11

**redactions** [1] - 32:23

**redirect** [2] - 2:7, 2:18

**REDIRECT** [4] - 9:21, 23:21, 60:20, 71:1

**Redirect** [2] - 2:10, 2:15

**reference** [6] - 15:16, 16:9, 43:3, 55:17, 69:6, 69:8

**referred** [1] - 37:5

**referring** [2] - 7:13, 37:18

**reflect** [2] - 15:9, 37:14

**refresh** [1] - 19:2

**refreshed** [1] - 19:4

**refused** [2] - 74:20, 74:21

**regard** [3] - 21:25, 46:1, 75:14

**regarding** [4] - 11:21, 23:25, 35:20, 69:6

**regards** [1] - 32:20

**regular** [1] - 27:23

**relation** [2] - 14:6, 68:1

**relationship** [9] - 41:5, 41:6, 41:11, 41:14, 43:1, 49:17, 57:6, 57:7, 71:8

**released** [1] - 44:7

**relevance** [1] - 66:24

**remained** [1] - 39:7

**remarkable** [1] - 55:10

**remember** [6] - 23:3, 29:13, 52:16, 52:17, 71:21

**remind** [3] - 5:15, 5:23, 47:22

**reminder** [1] - 47:20

**repeat** [2] - 51:19, 59:21

**rephrase** [2] - 24:10, 43:12

**report** [11] - 19:13, 31:7, 31:8, 31:11, 32:11, 32:21, 32:23, 32:25, 33:1, 33:9

**REPORTED** [1] - 1:23

**reporter** [1] - 27:15

**Reporter** [1] - 1:23

**reports** [3] - 18:20,

18:23, 19:9

**representation** [1] - 65:9

**Rescue** [2] - 13:11, 17:10

**rescue** [20] - 13:1, 13:11, 13:18, 13:25, 14:3, 14:5, 14:9, 14:12, 16:16, 16:23, 17:12, 19:13, 20:9, 21:16, 25:13, 25:17, 26:8, 26:11, 26:15

**rescuers** [1] - 21:18

**research** [1] - 77:6

**residence** [3] - 12:1, 12:12, 24:7

**residential** [2] - 11:20, 12:4

**respond** [3] - 11:5, 11:6, 11:20

**responded** [5] - 12:1, 12:7, 25:14, 29:13, 29:19

**responding** [2] - 15:19, 23:24

**response** [1] - 67:1

**responsibilities** [1] - 28:5

**responsibility** [2] - 20:10, 20:11

**responsible** [1] - 75:19

**restroom** [1] - 64:1

**resulting** [1] - 68:1

**resume** [1] - 71:20

**resumes** [1] - 4:23

**review** [2] - 32:5, 66:10

**ride** [1] - 55:6

**rise** [1] - 71:25

**Rise** [1] - 4:4

**risk** [1] - 74:8

**road** [5] - 11:2, 11:3, 16:6, 19:3, 27:23

**robbery** [12] - 11:21, 44:1, 44:11, 44:24, 45:12, 45:21, 46:1, 47:4, 47:16, 60:16, 60:24, 61:6

**robe** [1] - 15:8

**Rodriguez** [2] - 5:10, 9:23

**RODRIGUEZ** [2] - 2:6, 5:6

**role** [4] - 10:2, 10:3, 33:19, 61:12

**roll** [2] - 6:14, 7:14

**rolled** [4] - 6:14, 7:2, 7:20

**Rondon** [5] - 64:6,

64:18, 67:15, 70:3, 71:3

**RONDON** [2] - 2:17, 64:11

**Room** [1] - 1:17

**roughly** [1] - 74:15

**row** [1] - 53:14

**RPR** [1] - 77:18

**Rule** [3] - 76:8, 76:21, 77:1

**running** [1] - 12:17

**rush** [2] - 13:8, 26:18

## S

**safe** [3] - 16:12, 17:13, 26:10

**safety** [1] - 24:14

**sale** [2] - 68:22, 68:25

**sales** [1] - 68:20

**Santiago** [1] - 49:5

**sat** [2] - 38:5, 76:23

**save** [1] - 26:21

**saw** [8] - 12:13, 12:15, 14:20, 16:18, 24:23, 37:5, 42:21, 68:3

**scene** [28] - 9:25, 10:5, 12:7, 12:21, 13:4, 15:20, 17:3, 17:13, 17:15, 19:18, 20:8, 20:12, 20:14, 20:17, 20:22, 21:14, 22:15, 22:16, 23:17, 23:23, 24:13, 25:8, 26:12, 26:15, 29:14, 30:20

**scenes** [1] - 25:14

**Scheduled** [1] - 1:7

**scissors** [2] - 22:5, 22:7

**screaming** [4] - 12:9, 12:10, 12:14, 12:24

**screen** [5] - 13:22, 67:15, 67:17, 67:22, 68:19

**search** [1] - 12:25

**seat** [1] - 38:6

**seated** [2] - 4:5, 5:4

**second** [11] - 6:4, 53:24, 55:5, 55:11, 55:18, 57:21, 58:15, 58:18, 59:23, 61:9, 73:6

**Section** [1] - 1:16

**sections** [1] - 48:21

**secure** [1] - 26:13

**secured** [1] - 26:14

**security** [1] - 75:21

**see** [28] - 5:1, 5:2, 11:23, 12:21, 13:4,

14:2, 14:25, 15:7, 30:6, 37:9, 38:11, 38:12, 38:16, 39:16, 40:15, 43:5, 43:16, 43:21, 49:16, 50:24, 50:25, 51:11, 53:11, 63:10, 68:1, 68:19, 69:10

**seeing** [1] - 71:23

**seek** [1] - 42:15

**sell** [2] - 66:3, 66:4

**send** [1] - 63:20

**separate** [2] - 57:13, 75:19

**September** [3] - 11:10, 11:12, 23:5

**serial** [2] - 31:12, 33:3

**serious** [1] - 43:22

**serve** [2] - 18:23, 19:2

**service** [5] - 11:5, 12:6, 67:3, 68:16, 70:11

**services** [2] - 66:4, 66:5

**serving** [1] - 11:12

**session** [2] - 63:24, 71:20

**set** [1] - 6:5

**several** [1] - 61:17

**sheet** [1] - 37:13

**Shimpeno** [4] - 15:22, 15:23, 15:24, 16:15

**shirt** [1] - 15:8

**shooting** [4] - 13:14, 14:14, 14:16, 25:14

**shootings** [2] - 11:6, 28:9

**short** [4] - 12:16, 16:3, 17:1, 17:7

**shot** [5] - 12:14, 12:22, 12:24, 13:5, 13:23

**shots** [1] - 24:1

**shots-fired** [1] - 24:1

**shoulder** [1] - 73:10

**show** [9] - 11:22, 15:14, 40:10, 41:16, 41:22, 52:21, 54:1, 63:14, 66:6

**SHOW** [1] - 39:19

**showed** [5] - 8:11, 8:12, 13:17, 52:4, 58:5

**showing** [3] - 6:17, 13:20, 30:12

**shows** [1] - 42:9

**side** [9] - 4:13, 6:13, 6:14, 12:5, 22:2, 68:7, 68:10

**side-by-side** [2] -

6:13, 6:14

**sidebar** [1] - 62:24

**Sidebar** [2] - 63:1, 63:16

**simple** [3] - 20:24, 30:21

**sit** [3] - 38:6, 51:15, 60:2

**sitting** [2] - 38:8, 38:10

**situated** [1] - 12:3

**situation** [3] - 17:12, 19:20, 74:9

**six** [5] - 13:13, 18:7, 21:18, 35:3, 47:14

**sixth** [1] - 74:12

**small** [1] - 73:16

**solemnly** [4] - 10:16, 27:5, 34:7, 64:8

**solve** [2] - 4:16, 5:2

**solved** [1] - 36:5

**someone** [1] - 74:25

**sometimes** [2] - 72:11

**soon** [2] - 13:9, 26:19

**sorry** [5] - 5:22, 8:11, 35:25, 54:4, 60:5

**sort** [2] - 8:18, 14:17

**sounds** [1] - 23:6

**South** [1] - 34:20

**Southeast** [1] - 1:20

**SOUTHERN** [1] - 1:1

**span** [1] - 12:21

**Spanish** [4] - 4:3, 36:3, 36:4, 73:9

**speaker** [1] - 68:8

**speaking** [2] - 45:21, 68:5

**speaks** [1] - 36:6

**Special** [1] - 1:16

**specific** [1] - 46:8

**specifically** [1] - 46:12

**speculation** [1] - 25:19

**spell** [1] - 27:14

**spoken** [1] - 55:12

**sprinkle** [1] - 63:7

**stabbing** [1] - 14:16

**stabbings** [1] - 28:9

**stage** [1] - 5:20

**staging** [2] - 26:9, 26:15

**stamp** [1] - 70:6

**stamped** [1] - 15:16

**stand** [2] - 4:23, 51:2

**standard** [5] - 6:14, 6:16, 7:14, 14:15, 22:4

**standards** [1] - 10:5

**standpoint** [1] - 13:7

start [2] - 36:14, 74:16
started [3] - 13:11, 27:23, 49:18
starting [1] - 28:16
statement [2] - 45:19, 73:23
statements [1] - 72:11
STATES [3] - 1:1, 1:4, 1:12
States [13] - 1:16, 1:24, 10:13, 33:24, 34:4, 35:13, 49:22, 62:20, 63:18, 64:6, 71:16, 72:3, 77:18
Station [2] - 54:7, 54:8
stay [5] - 39:1, 39:8, 63:10, 63:24, 64:2
STENOGRAPHICALLY [1] - 1:22
step [2] - 22:2, 71:17
stepped [2] - 13:12, 72:24
stick [1] - 52:7
still [4] - 26:3, 47:9, 57:7, 58:19
stop [1] - 25:5
stopped [1] - 62:15
store [2] - 66:3, 66:4
strange [1] - 77:4
street [2] - 14:2, 14:5
Street [2] - 1:17, 1:20
stretcher [1] - 14:4, 14:10
strike [1] - 42:25
struck [1] - 25:25
stuff [2] - 11:6, 11:7
subject [1] - 39:23
subjects [2] - 24:18, 25:8
subsequently [1] - 13:13
suggest [1] - 72:12
Suite [1] - 1:20
summer [3] - 35:5, 35:15, 46:11
supervisor [2] - 74:21, 74:22
surprising [1] - 56:9
surreptitious [1] - 76:24
suspects [3] - 24:24, 25:4, 30:3
sustained [3] - 24:10, 45:22, 61:25
sustains [1] - 25:16
swabbed [1] - 74:4
swear [4] - 10:16, 27:5, 34:7, 64:8
switching [2] - 41:18, 41:19

sworn [2] - 34:10, 74:7

T

table [1] - 51:7
tampering [1] - 28:23, 30:25
tangled [1] - 20:23
taught [1] - 18:20
team [1] - 12:19
technicians [1] - 20:12
technology [3] - 28:25, 29:4, 29:5
tender [3] - 15:11, 48:14, 69:23
tenders [2] - 8:20, 33:21
testified [14] - 10:19, 27:9, 34:10, 49:25, 50:7, 50:16, 54:11, 58:8, 58:11, 60:9, 60:10, 64:11, 67:5, 67:25
testify [2] - 5:7, 67:3
testimony [14] - 7:13, 21:11, 22:12, 22:23, 22:25, 23:5, 23:10, 34:7, 36:1, 36:13, 45:22, 57:14, 67:18, 68:23
text [1] - 33:4
THE [80] - 1:12, 1:15, 1:19, 4:5, 4:8, 4:10, 4:20, 4:22, 4:24, 5:1, 5:4, 6:21, 6:23, 7:8, 8:3, 10:9, 10:11, 10:18, 24:10, 25:20, 25:22, 25:23, 25:24, 26:24, 27:2, 27:7, 32:17, 33:23, 33:25, 34:2, 34:9, 36:2, 36:8, 42:8, 42:13, 43:4, 43:12, 44:3, 44:15, 44:16, 45:17, 45:22, 46:4, 46:8, 61:25, 62:19, 62:22, 62:24, 63:2, 63:8, 63:10, 63:13, 63:17, 64:4, 64:10, 65:15, 67:1, 67:6, 67:10, 71:14, 71:17, 71:19, 72:2, 72:7, 72:15, 72:20, 72:21, 72:22, 72:23, 73:8, 73:10, 73:20, 74:1, 75:3, 75:8, 75:10, 76:3, 76:15, 77:1, 77:7
thereafter [1] - 11:11

thinking [1] - 24:3
thinks [1] - 75:16
third [2] - 57:22, 58:23
threatened [4] - 44:1, 61:23, 62:2, 62:12
three [3] - 51:13, 51:22, 52:6
THROUGH [2] - 2:17, 64:13
throughout [2] - 68:23, 69:12
timing [2] - 25:13, 46:3
tire [2] - 38:9, 38:10
today [7] - 23:8, 47:9, 51:11, 60:2, 63:3, 63:19, 71:20
today's [1] - 66:10
together [1] - 72:18
took [6] - 13:17, 52:10, 55:6, 73:16, 74:23, 76:24
tools [1] - 29:2
top [3] - 15:8, 69:2, 69:4
tossed [1] - 22:10
total [5] - 45:10, 51:13, 68:20, 68:22, 68:25
touched [1] - 73:10
tow [7] - 35:1, 35:22, 36:15, 37:2, 45:4, 69:9, 69:16
towards [1] - 40:14
Tower [1] - 1:20
town [1] - 34:18
trace [1] - 13:22
traffic [1] - 11:5
trained [5] - 18:8, 18:10, 18:12, 19:11, 74:10
training [3] - 24:15, 28:13, 28:15
transcription [1] - 77:14
translation [1] - 4:14
transport [3] - 13:19, 74:19, 74:22
transported [1] - 74:23
trauma [1] - 14:16
treatment [1] - 22:1
trial [3] - 5:5, 74:16, 77:5
TRIAL [1] - 1:10
tried [3] - 40:10, 72:5, 74:18
trip [8] - 39:22, 42:20, 46:10, 47:25, 48:1, 52:10, 52:19, 54:10

truck [12] - 13:18, 14:9, 14:12, 35:1, 35:22, 36:15, 37:2, 45:4, 69:9, 69:16, 70:7, 71:11
true [1] - 41:1
truth [23] - 10:16, 10:17, 27:5, 27:6, 34:8, 50:10, 50:11, 50:12, 50:15, 60:1, 61:12, 61:13, 61:15, 62:3, 62:7, 62:10, 62:13, 64:8, 64:9
try [2] - 28:20, 36:8
trying [6] - 13:6, 13:8, 26:18, 26:20, 58:12, 77:3
Tuesday [1] - 74:13
tune [1] - 45:17
turned [1] - 26:16
turning [5] - 5:22, 6:19, 31:20, 32:4, 32:7
two [13] - 5:17, 17:3, 17:20, 18:2, 51:5, 51:11, 51:12, 52:25, 53:22, 53:23, 55:19, 57:13
type [1] - 74:9
typical [1] - 11:3
typically [1] - 25:17

U

U.S [3] - 63:2, 73:21, 75:17
ultimately [2] - 38:22, 61:12
unable [1] - 40:15
uncooperative [1] - 74:17
under [2] - 50:8, 76:18
understood [2] - 52:23, 73:23
unique [1] - 6:15
unit [1] - 28:3
UNITED [3] - 1:1, 1:4, 1:12
United [13] - 1:16, 1:24, 10:13, 33:24, 34:4, 35:13, 49:22, 62:20, 63:18, 64:6, 71:15, 72:3, 77:18
unknown [1] - 10:4
unless [1] - 66:24
unsafe [1] - 25:6
up [24] - 20:23, 24:3, 24:6, 24:13, 24:23, 30:22, 37:1, 37:2, 37:3, 38:3, 38:13,

39:4, 39:9, 39:13, 39:23, 39:25, 46:14, 48:8, 49:4, 51:2, 54:1, 74:15
upset [1] - 73:1

V

value [4] - 5:16, 5:18, 5:19, 6:4
van [15] - 37:2, 37:17, 37:22, 37:24, 38:2, 38:3, 38:5, 38:6, 40:16, 46:7, 48:9, 52:11, 52:19, 54:11
varies [3] - 45:4, 45:5
VAZQUEZ [61] - 1:15, 4:21, 10:13, 10:21, 15:9, 23:22, 24:11, 24:12, 26:2, 26:22, 26:25, 34:12, 36:10, 37:14, 37:16, 41:19, 41:21, 42:6, 42:10, 42:15, 42:17, 43:6, 43:13, 44:5, 44:17, 45:19, 45:23, 45:24, 46:9, 48:5, 48:7, 48:12, 48:14, 56:22, 60:21, 62:1, 62:17, 62:20, 63:6, 63:9, 63:12, 63:15, 64:6, 64:13, 65:12, 65:17, 65:19, 66:21, 67:2, 67:12, 67:14, 69:21, 69:23, 71:2, 71:13, 71:15, 72:3, 76:1, 76:14, 76:17, 77:3
Vazquez [6] - 2:9, 2:10, 2:14, 2:15, 2:17, 52:3
Vegas [1] - 49:5
vehicle [3] - 14:5, 74:20, 74:22
verbal [1] - 43:14
vicinity [1] - 14:4
victim [1] - 14:14
victims [1] - 30:1
violated [1] - 63:22
violation [1] - 76:22
visit [3] - 43:7, 43:17, 52:9
visited [3] - 40:18, 50:22, 51:22
vs [1] - 1:5

W

waited [2] - 30:6
walk [2] - 27:21, 30:19
walked [2] - 13:3,

24:23

**wants** [3] - 72:6, 73:25, 75:16
**wear** [1] - 28:7
**wearing** [3] - 15:5, 15:7, 15:8
**weather** [1] - 56:16
**weekend** [4] - 71:23, 75:23, 75:25, 77:8
**weeks** [1] - 57:13
**west** [1] - 12:4
**whatnot** [1] - 33:3
**wheelchair** [1] - 72:25
**white** [9] - 15:7, 15:8, 37:13, 37:17, 37:24, 38:3, 52:11, 52:19, 54:11
**whole** [4] - 10:16, 27:5, 62:7, 64:8
**WILSON** [2] - 2:9, 10:19
**Wilson** [4] - 10:14, 10:24, 14:19, 23:23
**Wireless** [2] - 64:22, 66:19
**wiretap** [2] - 76:19, 76:22
**witness** [24] - 4:20, 4:22, 4:23, 8:20, 10:9, 15:9, 15:11, 26:23, 26:24, 33:21, 33:23, 34:5, 37:14, 48:14, 51:3, 61:24, 62:17, 63:5, 64:5, 67:2, 67:6, 69:23, 71:13, 71:14
**Witness** [5] - 10:12, 27:3, 34:3, 62:23, 71:18
**WITNESS** [10] - 2:4, 6:23, 10:18, 25:22, 25:24, 27:7, 34:2, 34:9, 42:8, 64:10
**witnesses** [1] - 63:6
**Word** [1] - 31:9
**word** [1] - 50:1
**words** [2] - 57:18, 68:22
**worry** [1] - 76:5
**written** [1] - 76:10
**wrote** [1] - 22:13

## Y

**year** [3] - 35:5, 45:5, 50:21
**years** [18] - 11:9, 17:17, 17:18, 17:20, 18:3, 20:13, 27:20, 34:22, 35:3, 47:14,

48:23, 48:25, 49:8, 49:11, 61:18, 65:1, 66:2, 69:15
**yesterday** [8] - 4:11, 5:12, 5:21, 6:3, 72:17, 72:23, 74:17, 76:18
**young** [1] - 69:9
**yourself** [3] - 27:14, 34:15, 64:16

## Z

**Z-E-L-L-E-R** [1] - 27:16
**ZACCA** [40] - 1:19, 7:7, 8:2, 8:23, 9:19, 10:10, 15:13, 23:19, 24:8, 25:19, 27:1, 32:16, 33:22, 34:1, 35:25, 36:5, 39:12, 42:12, 43:2, 43:10, 44:2, 44:14, 45:15, 46:2, 46:6, 48:16, 51:6, 56:24, 60:17, 60:19, 61:24, 62:21, 65:14, 66:23, 67:9, 70:2, 70:23, 72:4, 75:24, 77:9
**Zacca** [8] - 1:19, 2:7, 2:10, 2:15, 2:18, 25:12, 76:20, 76:22
**Zeller** [3] - 27:12, 27:16, 27:17
**ZELLER** [2] - 2:12, 27:9