<pre>
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                             (MIAMI)
                    CASE NO. 1:17-CR-20701-MGC-5
 3

 4    UNITED STATES OF AMERICA          Miami, Florida

 5                                      December 11, 2018
              vs.                       Tuesday
 6

 7    LEONARDO MIGUEL GARCIA MORALES
                                        Scheduled for 9:00 a.m.
 8                                      Held 9:02 a.m. - 1:08 p.m.
      _____

 9

10                           JURY TRIAL
                               DAY 6
11                          PAGES 1 - 99

12          BEFORE THE HONORABLE DONALD L. GRAHAM
                 UNITED STATES DISTRICT JUDGE
13

14    APPEARANCES:

15    FOR THE GOVERNMENT:     IGNACIO JESUS VAZQUEZ, JR., AUSA
                              J. MACKENZIE DUANE, AUSA
16                            United States Attorney's Office
                              Miami Special Prosecutions Section
17                            99 Northeast 4th Street
                              Room 806
18                            Miami, Florida  33132

19    FOR THE DEFENDANT:      DERIC ZACCA, ESQ.
                              Deric Zacca, P.A.
20                            110 Southeast 6th Street
                              110 Tower - Suite 1700
21                            Fort Lauderdale, Florida  33301

22
      STENOGRAPHICALLY
23    REPORTED BY:            GLENDA M. POWERS, FPR, CRR, FPR
                              Official Federal Court Reporter
24                            United States District Court
                              400 North Miami Avenue
25                            Miami, Florida  33128
</pre>

1                           I N D E X

2
                                                        PAGE
3
                        GOVERNMENT'S EVIDENCE
4
WITNESS
5

6   ALFREDO KINDELAN
        Cross-Examination continued by Mr. Zacca        11
7        Redirect Examination by Mr. Vazquez            49

8
GUY VARGAS (THROUGH INTERPRETER)
9        Direct Examination by Ms. Duane                62

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          E X H I B I T S

2
     EXHIBIT                                          RECEIVED
3                                                     IN EVIDENCE

4
                         GOVERNMENT'S EXHIBITS
5
     Exhibit 37                                              74
6

7

8                        DEFENDANT'S EXHIBITS

9    Exhibit 22                                              11

10   Exhibit 4                                               35

11   Exhibit 1                                               37

12   Exhibit 2                                               38

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Call to the order of the Court:)

2          (Defendant Leonardo Garcia Morales aided by

3     Court-Certified Spanish Interpreters.)

4          COURTROOM DEPUTY:  United States District Court,

5     Southern District of Florida; the Honorable Donald L. Graham

6     presiding.

7          THE COURT:  Be seated.

8          We are still missing one juror, as usual, Ms. Espinosa.

9          I understand there is a matter the parties would like

10    to present.

11         MR. VAZQUEZ:  Yes, Your Honor.  We have a

12    out-of-country witness who flew in from Bolivia.  I spoke with

13    the defense, I don't believe there's an objection to this --

14         THE COURT:  There is or is not?

15         MR. VAZQUEZ:  There is not.

16         -- that we would present this witness as to the issues

17    of interstate commerce, issues not related to the statement

18    which is still pending before the Court, and then have the

19    right to recall the witness, to the extent that the Court deems

20    the statement admissible.

21         THE COURT:  So I ask, "temporary excusal," and you say

22    "temporary excusal."

23         MR. VAZQUEZ:  Yes, Your Honor.  I just wanted to

24    clear it with the Court.

25         THE COURT:  Are you calling him out-of-turn; and if you

```
 1    call him out-of-turn, are you going to interrupt the witness on

 2    the stand?

 3            MR. VAZQUEZ:  No.  When Mr. Kindelan finishes

 4    testifying, I'd like to call him with the right to re-call him.

 5            THE COURT:  Very well.

 6            (Sidebar discussion held with the Court and Mr. Zacca

 7    as follows:)

 8            THE COURT:  Mr. Zacca, could you come sidebar on a

 9    matter that you filed in --

10            MR. ZACCA:  Yes, sir.

11            THE COURT:  -- this proceeding under seal.

12            Mr. Zacca, you filed a Rule 17 for witnesses, which I

13    signed, however, you didn't proffer the Code of Federal

14    Regulations.  There are some special rules in subpoenaing

15    Government agents.

16            Frankly, I don't recall what they are, but there are

17    some specific steps we have to follow, so you might want to

18    take a look at the CFRs and make sure you're complying.  A lot

19    of times it's handled, they would all agree to bring the

20    witness.

21            Since this is under seal, then you will probably have

22    to follow the letter of the law so you don't encounter any

23    issues saying they can't testify because the Code wasn't

24    followed.

25            MR. ZACCA:  Just -- I can tell you this, just to put
```

6

```
 1    you at ease, I called Mr. Vazquez last night, and we spoke
 2    yesterday evening.  He knows I'm calling those two witnesses,
 3    he's looking to call them as well.  He's not going to provide
 4    them, in lieu -- instead of using the normal process server, I
 5    want to use the Marshals.
 6            THE COURT:  I have no -- I granted the motion.  I'm
 7    just alerting you that there are some special rules -- that you
 8    need to take a look at the CFR -- that what you're doing is
 9    precisely what you should be doing.
10            MR. ZACCA:  Thank you, Judge.  Very well.
11            THE COURT:  One additional matter.
12            Do you think you will be presenting a case; and if so,
13    how long do you think the case would take?
14            MR. ZACCA:  A lot depends on Your Honor's ruling on the
15    tape.  If the tape comes in, I anticipate presenting a case,
16    and I anticipate that my case would probably last -- on a
17    four-hour schedule -- one to two days.
18            THE COURT:  Alright.  Thank you.
19            MR. ZACCA:  Thank you, Judge.
20            (Sidebar concluded, the following held in open court:)
21            THE COURT:  Let us know as soon as Ms. Espinosa
22    arrives, please.
23            (Brief pause in proceedings.)
24            MR. VAZQUEZ:  Your Honor, I just wanted to alert the
25    Court that the Marshals are in the process of bringing up the
```

```
 1    in-custody witness, so he's being brought in.

 2            THE COURT:  In other words, the witness is not here.

 3            MR. VAZQUEZ:  He's in the building, but they have to

 4    move him from one -- they have to keep him and the defendant

 5    separated.

 6            THE COURT:  It's already 9:00, so --

 7            THE MARSHAL:  He's coming up right now.

 8            THE COURT:  I've seen an amended exhibit list.  I'm

 9    already using an exhibit list, so I don't intend to go back and

10    markup and.

11            MR. VAZQUEZ:  No, Your Honor, I just added --

12            THE COURT:  You added someone?

13            MR. VAZQUEZ:  I added 59 and 60, and noted that 58,

14    Ms. Nicole.

15            THE COURT:  So why don't you give me the amended page,

16    so that I can attach it to the exhibit list I have.

17            Did you add them at the end?

18            MR. VAZQUEZ:  Yes, I added them at the end.

19            THE COURT:  So just tell me, what pages should I move

20    and append to the old ones?

21            MR. VAZQUEZ:  Yes.  I placed a new page six and a new

22    page seven.

23            THE COURT:  Is anyone interested in excusing

24    Ms. Espinosa?  This is beginning to be a problem, someone who

25    is late every morning.  I can understand traffic, issues
```

1   occurring, but to be late every morning is getting to be a

2   problem.  You all can think about that.

3          We can address it later.

4          MR. VAZQUEZ:  Yes, sir.

5          THE COURT:  Government, based on my view of the witness

6   list, it's only page seven that changes.  I haven't looked at

7   the interim numbers, but page seven now goes 57 through 60,

8   rather than just 57.

9          MR. VAZQUEZ:  Yes.  I know that we also corrected 55

10  and 56.

11         THE COURT:  55 and 56?

12         COURTROOM SECRETARY:  Yes, the fingerprints were

13  switched, they had the wrong fingerprints attributable to each.

14  So 55 should be J, M, L, and 56 should be A, K.

15         (Brief pause in proceedings.)

16         COURTROOM DEPUTY:  I just let her in.

17         THE COURT:  Do you all suggest that I call her in the

18  courtroom alone, so we can inquire of her?

19         MR. VAZQUEZ:  I'm going to object to that, Your Honor,

20  if this is going to continually be a problem.

21         MR. ZACCA:  No objection.

22         (The juror entered courtroom at 9:16 a.m.)

23         THE COURT:  Good morning, Ms. Espinosa.

24         Ms. Espinosa, as you are aware, we start each day at

25  9:00 a.m., and we have experienced some difficulty having you

1    here on time, so we want to inquire just what the problem seems

2    to be and whether or not you can abide by the times that we

3    have scheduled trial.

4         THE JUROR:  I mean, I don't know --

5         THE COURT:  Can we have a microphone?

6         THE JUROR:  I noticed there was a problem, it takes me

7    an hour and 40 minutes to get here.

8         THE COURT:  What that means is leave earlier --

9         THE JUROR:  I did.

10        THE COURT:  -- in order to provide time.

11        Do you catch a bus or drive?

12        THE JUROR:  I drive.

13        THE COURT:  Where do you drive from?

14        THE JUROR:  I drive from Hialeah Gardens.

15        THE COURT:  Hialeah -- what time do you typically

16   leave?

17        THE JUROR:  7:30.

18        THE COURT:  So that means in order to be here on time

19   you have to leave at 7:00, perhaps, or 5 after 7, and then -- I

20   don't want you to try to rush and then you get into an accident

21   and then you're frazzled when you get in because you're late

22   and you're rushing.

23        We want this to be an enjoyable and relaxing experience

24   and not start the day in a rushing mode.  So we'll ask that you

25   take heed to these words and leave earlier, so that you can get

```
 1    in, relax, have a cup of coffee, tea, hot chocolate, et cetera,

 2    and then be ready to come in.  Alright?

 3            THE JUROR:  Uh-huh.

 4            THE COURT:  Alright, thank you.

 5            (The juror exited courtroom at 9:18 a.m.)

 6            THE COURT:  Alright, we will monitor the scenario and

 7    then we will see how they do.

 8            Bring the jury in, please.

 9            (Witness resumes stand.)

10            COURT SECURITY OFFICER:  All rise.

11            (Jury entered courtroom at 9:19 a.m.)

12            THE COURT:  Be seated, ladies and gentlemen.  Good

13    morning.  I hope you are ready to resume with the presentation

14    of evidence in this cause.

15            We have been getting a little break in the schedule, I

16    think, and I will suggest maybe we should take a break at 10:30

17    and then maybe another about 11:45, without trying to take one

18    break.  What are your thoughts?  Is that a good idea?

19            Not a good idea?  It doesn't matter?  What's your

20    feeling?  Let's try that and see how it works then.

21            If you only want one, you can let me know.

22            Mr. Zacca.

23            MR. ZACCA:  Yes, sir.

24            (ALFREDO KINDELAN, previously sworn, continued to

25    testify as follows:)
```

                          CROSS-EXAMINATION

1

2    BY MR. ZACCA:

3    Q.  Good morning, Mr. Kindelan.

4    A.  Good morning.

5    Q.  I want to clear up some areas that you mentioned yesterday,

6    this morning before we go further in your testimony; okay?

7    A.  Yes.

8    Q.  Okay.  If I could have the Elmo.  In the interest of time,

9    let me do it this way.

10       I have in my hand what's been marked for identification as

11   Defendant's Exhibit 22.  It's the indictment from the 2015

12   kidnapping case involving Alex Mesa.

13       At this time, the defense moves Exhibit Number 22 into

14   evidence.

15            MR. VAZQUEZ:  No objection.

16            THE COURT:  Received.

17            (Defendant's Exhibit 22 received into evidence.)

18   BY MR. ZACCA:

19   Q.  Yesterday, I asked you about the kidnapping involving

20   Nacho.  Do you remember that?

21   A.  Yes.

22   Q.  And Nacho's real name is Joe Garcia?

23   A.  I don't know.

24   Q.  Oh, you never knew his name?

25   A.  No.

```
 1   Q.   So you stated yesterday that you pled guilty for the crime

 2   of kidnapping Nacho in your 2015 case.

 3        Do you remember saying that?

 4   A.   Yes.

 5   Q.   Okay.  And you also said that you pled guilty for the crime

 6   of alien smuggling; correct?

 7   A.   Yes.

 8   Q.   Okay.  Well, let's look at the indictment from 2015.

 9        Again, I know you don't read English, that's what you

10   testified to yesterday, so I'm going to summarize it for you.

11        And let's see if, in fact, what you stated is true, whether

12   you were charged with the kidnapping of Nacho and whether you

13   were charged with alien smuggling; okay?

14        I'm going to look at each count where your name appears.

15   That's you right there; right?

16   A.   Yes.

17   Q.   This is Count 1 -- and again, I'm going to zoom in on

18   what's important.

19        Between December 31st and March 29th, 2014, you

20   conspired -- I'm going to flip the page -- to commit the

21   offense of kidnapping, and hold for ransom, A.M.; correct?

22   A.   Yes.

23   Q.   That's Alex Mesa; correct?

24   A.   Yes.

25   Q.   That's Count 1.
```

1        Let's go to Count 2 now.  We're now looking at Count 2 --

2   see if we can get a nice zoom in -- now we're at Count 2.

3        There's your name, and again, you conspired, kidnapped, and

4   hold for ransom, A.M?

5        I'll zoom out.  I don't want to cut off any language.

6        Do you see that?

7   A.   Yes.

8   Q.   There's no mention of Nacho; correct?

9   A.   No.

10  Q.   Okay.  So let's go to Count 3, see if your name appears

11  there.  It does.  Count 3, same time period -- similar time

12  period -- excuse me -- March 25th, 2014, to March 26th, 2014.

13       Flipping the page to page five, there's your name, again,

14  you're charged with unlawfully kidnapping, hold for ransom,

15  A.M., Alex Mesa; right?

16  A.   Yes.

17  Q.   Okay.  No mention of Nacho; right?

18  A.   Yes.

19  Q.   So far, no mention of alien smuggling; right?

20  A.   No.

21  Q.   Okay.  So, let's continue.  We are now going to page six --

22  and we're at the end, that's it.

23       And the rest are just supplementary pages.

24       In fact, let's look at a summary sheet.  Here, three

25  charges:  Count 1, Count 2, and Count 3.

1      Count 1 says "conspiracy to kidnap a person in a foreign

2   country."

3      Count 2 says "conspiracy" to kidnap -- "to commit

4   kidnapping."

5      And Count 3 is "kidnapping" -- all relating to A.M.,

6   Alex Mesa; correct?  Sir --

7   A.   You see --

8   Q.   Sir, yes or no?

9   A.   Yes.

10   Q.   What were you saying?

11   A.   If you see, there is a conspiracy from one day to another

12   of word "kidnapping."

13   Q.   Okay.  Sir, yesterday you said that in the 2015 case you

14   were charged and pled guilty to the kidnapping of Nacho and for

15   alien smuggling; that's not true?

16      We just looked at your indictment.

17         MR. VAZQUEZ:  Objection.  Misstatement of the facts.

18         THE COURT:  Overruled.

19         THE WITNESS:  It was a conspiracy, and I was given

20   25 years for that conspiracy.

21   BY MR. ZACCA:

22   Q.   Sir, let's just keep it simple.

23      The indictment we just looked at, you were not charged for

24   the kidnapping of Nacho; correct?

25   A.   Yes, I was accused of it.

```
 1    Q.   Do you want to show me where in this indictment you were?
 2    Which count?
 3    A.   At here.  I don't have it.
 4    Q.   Okay.  I have it, it's right here.
 5         Let's not play games, sir.
 6         Did you see the name "Nacho" in this indictment?
 7    A.   It's a conspiracy, it is not going name-by-name on the
 8    crimes.
 9    Q.   Okay.  Did you see "alien smuggling" in this indictment?
10    A.   You are an attorney, and you have knowledge that conspiracy
11    is everything.
12    Q.   Okay.  Sir, isn't it a fact that the Government is giving
13    you a pass for the charge of alien smuggling in exchange for
14    your testimony today?
15    A.   The Government has not given me anything at any time.
16    Q.   Isn't it a fact that in exchange for your testimony today
17    you will never be charged for the kidnapping of Nacho?
18    A.   It is a conspiracy, and I've said it over three times, and
19    in that conspiracy, Nacho's kidnapping is included.
20    Q.   You know, Mr. Kindelan, you haven't always been truthful to
21    the Government; have you?
22    A.   I don't understand the question.
23    Q.   Okay.  I'll make it more simple.
24         You have lied to the Government in your past communications
25    with them; haven't you?
```

1   A.   I've never lied.  I've always told the truth.

2   Q.   You've never lied, you've always told the truth; is that

3   what you just said?

4   A.   Yes.

5   Q.   Okay.  Let's explore that.

6        You remember the date March 19th, 2015; correct?

7   A.   Yes.

8   Q.   That was the date you were arrested for the 2015

9   kidnapping; correct?

10  A.   Yes.

11  Q.   How could you forget that date, that's an important date in

12  your life; right?

13  A.   Yes.

14  Q.   And on that date, you went to the FBI office in Miramar;

15  correct?

16  A.   Yes.

17  Q.   And when you went to the FBI office in Miramar, you were

18  asked questions about the Alex Mesa kidnapping; correct?

19  A.   Yes.

20  Q.   And when you were asked about it, you stated the following:

21       You told the FBI that you did not know who Alex Mesa was

22  and that you were not involved in any kidnapping in Cancun,

23  Mexico; right?

24  A.   Could be.

25  Q.   Let's not play games, sir.  It's either a yes or a no.

1       You lied to the FBI on the date of your arrest when they

2   asked you about the Cancun kidnapping of Alex Mesa; didn't you?

3   A.   I told them that I was going to be speaking in front of my

4   attorney.

5   Q.   Sir, I didn't ask you about an attorney.

6       Let's be straight -- give me a straightforward answer to

7   the straightforward question.

8       You lied to the FBI on the date of your arrest when they

9   asked you whether you were involved in the kidnapping of Alex

10   Mesa in Cancun, Mexico; yes?

11   A.   I did not know what they were talking about to me at that

12   time, because a long time had gone by.

13   Q.   A long time had gone by.

14       The kidnapping occurred in 2014.  Are you getting your

15   kidnappings confused?

16       I don't understand.  It's a straightforward question.

17       They asked you about the Alex Mesa kidnapping in Cancun,

18   Mexico.  You said you weren't involved.

19       You lied.  Just say it.

20   A.   I did not know what they were talking to me about at that

21   time.

22   Q.   Alright.  Did they ask you about the Alex Mesa kidnapping?

23   A.   Yes, they did ask me.

24   Q.   And what did you say, yes, I did it; no, I didn't?

25       What did you say?

1   A.   That I had not done it.

2   Q.   So you lied, yes; that's true?

3   A.   I lied, and I pled guilty for that charge?

4   Q.   You're asking me?

5        I'm asking you.  You lied, right?

6        You said it, you just admitted it; right?

7   A.   I pled guilty to that charge.  And if I pled guilty to that

8   charge, it means that I did not lie.

9   Q.   Okay.  Sir, you pled guilty after the fact.

10       On the date of your arrest you lied, so you have lied to

11  the Government before; correct?

12  A.   It is not correct, because in the end, I pled guilty.

13  Q.   Alright.  Another area that I want to clear up today is, I

14  asked you yesterday, and I think we left off looking at your

15  plea agreement.  We're going to continue looking through your

16  plea agreement.

17       If I remember correctly, you stated that you weren't

18  looking for anything for your testimony today; correct?

19  A.   Correct.

20  Q.   But that isn't true either; is it?

21  A.   Yes, it is true.

22  Q.   Okay.  We're going to revisit what's already been entered

23  into evidence as Defense's Exhibit 3.

24       It's your plea agreement in the 2015 kidnapping case of

25  Alex Mesa.  I'm going to zero in an important paragraph to you.

1          Paragraph 10.  This plea agreement -- you're familiar with

2    this plea agreement; aren't you?

3    A.  Yes.

4    Q.  Yeah.  You reviewed it with your lawyer; correct?

5    A.  Yes.

6    Q.  You reviewed it with the Court, the Judge; correct?

7    A.  Yes.

8    Q.  It was translated to you; correct?

9    A.  Yes.

10   Q.  And you signed it; correct?

11   A.  Yes.

12          MR. ZACCA:  Judge, I need to have a moment.

13          (Brief pause in proceedings.)

14   BY MR. ZACCA:

15   Q.  Alright.  You said it was translated, you reviewed it with

16   your lawyer, you reviewed it with the Court; correct?  Right?

17   A.  Yes.

18   Q.  And yesterday we saw how you signed the last page; right?

19   A.  Yes.

20   Q.  And this plea agreement is a contract you have with the

21   Government; correct?

22   A.  Yes.

23   Q.  Alright.  So, I want to go through it so the jury can

24   understand it.

25          Paragraph 10, probably the most important paragraph to you.

```
 1          Let me see if I can summarize it for you and then ask you
 2   questions.  It reads:
 3          "This office reserves the right" -- and again, "this
 4   office" means the U.S. Attorney's Office; correct?
 5   A.   Yes.
 6   Q.   "Reserves the right to evaluate the nature and extent of
 7   the defendant's cooperation and to make that cooperation, or
 8   lack thereof, known to the Court at the time of sentencing."
 9          I'm going to stop right there because the next sentence is
10   pretty long, but let's analyze that sentence for a second.
11          The Government has the right to evaluate "the nature and
12   extent" of your "cooperation," that's what that sentence says;
13   correct?
14   A.   Yes.
15   Q.   You don't get to determine the value of your cooperation;
16   the Government gets to determine it; right?
17   A.   It's the Judge.
18   Q.   Well -- alright, we're going to come back to that.
19          Let's go to the second sentence.
20          "If in the sole and unreviewable judgment of this office"
21   -- let's stop right there.
22          "The sole and unreviewable judgment of this office," again,
23   "this office" means the U.S. Attorney's Office; right?
24   A.   Yes.
25   Q.   So they, the Government, has the "sole and unreviewable"
```

1    power to judge your cooperation; correct?  Right?

2         That's what the sentence says; right?

3    A.   Yes.

4    Q.   Okay.

5         "The defendant's cooperation is of such quality and

6    significance to the investigation or prosecution of other

7    criminal matters as to warrant the Court's downward departure

8    from the advisory sentencing range calculated under the

9    sentencing guidelines and/or any applicable minimum mandatory

10   sentence."

11        And here's the crucial part.  Here's the crucial part:

12        "May make a motion prior to sentencing or" -- and I'm

13   skipping over the legalese -- "or subsequent to sentencing

14   pursuant to Rule 35 of the Federal Rules of Criminal Procedure,

15   informing the Court that the defendant has provided substantial

16   assistance" -- and I wanted to circle that with an asterisk as

17   best I can, circle it -- "and recommending that the defendant's

18   sentence be reduced."  I'm going to circle it.

19        So what you're looking for is what's called a "Rule 35."

20   You know precisely what a "Rule 35 is"; don't you?

21   A.   Yes.

22   Q.   Yes.  Yes.  So let's talk about a Rule 35.

23        I've cleared it.

24        There's a Rule 35 right there, "or subsequent to

25   sentencing."

1        So the jury fully understands, you're serving two

2  sentences; correct?

3  A.   Yes.

4  Q.   And now that you already been sentenced, serving two

5  sentences, what you're looking for is a Rule 35, where the

6  Government files a motion with the Court recommending to the

7  Court that your sentence be reduced.  That's precisely why

8  you're testifying today; isn't it?  You want that Rule 35?

9  A.   I am giving this testimony because I always swore to say

10  the truth, and only the truth.

11  Q.   Well, you have a contract with the Government for -- where

12  the Government, if it sees fit, that they're to file a Rule 35

13  asking the Court to reduce your sentence in exchange for your

14  testimony today; right?

15  A.   It's a contract that I made with the prosecution and the

16  Government of this country was to help, to tell the truth, and

17  that is what I am doing at this very time, required by

18  everything that happened.

19  Q.   Yesterday you testified about Lier Prieto; right?

20  A.   Yes.

21  Q.   And let's remind ourselves who Lier Prieto is.

22        Lier Prieto was driving the second car, a maroon-colored

23  car; is that right?

24  A.   Yes.

25  Q.   Lier Prieto was, in relation to the gold robbery -- you

```
1   testified that his role was to drive a second, essentially,

2   get-away car?

3   A.   Yes.

4   Q.   He's like a backup get-away driver; right?

5   A.   Yes.

6   Q.   You've known Lier Prieto for a long time?

7   A.   No.

8   Q.   No?  Okay.  But he was clearly part of, according to you,

9   the conspiracy to make this whole robbery; correct?

10  A.   Yes.

11  Q.   You know Jean Lara, correct, we talked about him?

12  A.   Yes.

13  Q.   Lier Prieto is friends with Jean Lara; right?

14  A.   Yes.

15  Q.   And he's also good friends with Jean's brother, Ronaldo;

16  right?

17  A.   You're mistaken.

18  Q.   Okay.  Is it Jean Lara's uncle then?

19  A.   You are mistaken.  You are getting the names confused.

20  Q.   Okay.  But what's important is that Lier Prieto is friends

21  with Jean Lara; correct?

22  A.   Yes.

23  Q.   And Lier Prieto -- and you know Lier Prieto is serving a

24  sentence in Federal prison; correct?

25  A.   I have no knowledge of that; but so far, I knew that he was
```

1    in jail.

2    Q.   Have you seen him across the street at the Federal

3    Detention Center?

4    A.   No, because I am imprisoned here.

5    Q.   Well, you are staying across the street at the Federal

6    Detention Center; aren't you?

7    A.   No, I do not have a way to see out to the street.

8    Q.   Were you driven here, or did you walk here?

9    A.   This is my house now.  This is where I live now, in this

10   prison.

11   Q.   In this courthouse, or do you live in the jail across the

12   street?

13   A.   Across the street, in the jail.

14   Q.   Okay.  What floor are you on?

15   A.   10 West -- 10 East.

16   Q.   Which is it, 10 West or 10 East?

17   A.   East.

18   Q.   Is Lier -- sorry, microphone isn't very loud, it's a

19   wake-up call.

20        Is Lier Prieto on the 10th floor?

21   A.   I have never seen him.  I don't know where he is at.

22   Q.   Okay.  Going back to the Rule 35, let's see it in action.

23   I have in my hand what's been marked for identification as

24   Defendant's Exhibit 23.

25        It is a motion in the case of *United States of America*

1    *versus Lier Prieto* --

2            MR. VAZQUEZ:  I'm going to object as to relevance to

3    this witness.

4            THE COURT:  Overruled.

5    BY MR. ZACCA:

6    Q.   It's a motion filed by the U.S. Government, pursuant to

7    Rule 35, in the case of *United States of America versus Lier*

8    *Prieto*.

9        We're going to take a look at this.  Forgive me, Judge.

10           THE COURT:  First, let's find out if he knows about the

11   terms, if you can.

12   BY MR. ZACCA:

13   Q.   Do you have any familiarity -- let me use a better word.

14       Do you know about the Rule 35 motion filed in Lier Prieto's

15   case?

16   A.   I don't know anything about Lier Prieto.

17   Q.   You don't know anything about him?

18   A.   Nothing about him.

19   Q.   Back at the jail, the Federal Detention Center -- that's

20   the name of it, what you described earlier, okay -- Rule 35s

21   are talked about all the time; aren't they?

22           MR. VAZQUEZ:  Objection.  Calls for hearsay.

23           THE COURT:  Overruled.

24           THE WITNESS:  Yes.

25   BY MR. ZACCA:

1   Q.   It's talked about because, after all, who doesn't want a

2   reduction in their sentence; correct?

3   A.   When you're a prisoner, you speak about everything.

4   Q.   Including, How can I get my sentenced reduced; right?

5   That's a popular topic?

6   A.   Speak about everything, I already stated that.

7   Q.   Okay, good.

8        And amongst the things that we always talk about --

9        THE COURT:  Let's restrict it to just what he is

10  talking about.

11       MR. ZACCA:  Excuse me, Judge?  I missed that.

12       COURTROOM DEPUTY:  He said he didn't hear that.

13       MR. ZACCA:  I'm sorry, I missed that.

14       THE COURT:  Let's gear the comments towards what he's

15  talking about.

16       MR. ZACCA:  Very well.

17  BY MR. ZACCA:

18  Q.   You mentioned, you talk about everything at the Federal

19  Detention Center; correct?

20  A.   Yes.

21  Q.   And you've already established that Rule 35s are part of

22  everything?

23  A.   Yes.

24  Q.   You know, I asked you about Lier Prieto, but you're on the

25  same floor as Jean Lara; aren't you?

1   A.   No.

2   Q.   How about Raonel Valhuerdis?

3   A.   No.

4   Q.   How about Humberto Gonzalez?

5   A.   Not him either.

6   Q.   Yesterday you testified about the Miramar robbery, and you

7   made various statements that I'd like to examine.

8        I have a photo from Government's Exhibit 1, it's Bates

9   stamped 1759.  So it's a specific photograph from the set of

10  photographs.

11       I believe this is the set we were looking at yesterday.

12  And I want to use this as a reference point.

13       So -- you testified that you went to Leonardo Garcia

14  Morales' house before leaving to Miramar; is that right?

15  A.   Yes.

16  Q.   He didn't pick you up, you drove there; right?

17  A.   Yes.

18  Q.   Now, you have met with the Government several times in

19  preparation for your testimony today; right?

20  A.   Yes.

21  Q.   You would have sessions with the agents; right?

22  A.   Yes.

23  Q.   You had sessions with the Government prosecutors; correct?

24  A.   Yes.

25  Q.   They asked you questions and you gave answers; right?

1    A.   Yes.

2    Q.   In the past, have you ever described it differently, where

3    you stated that Mr. Garcia Morales picked you up before the

4    robbery?

5    A.   Well, Garcia, we went to his home, we were at his home.

6    Q.   Okay.  It's a simple question.

7       Had you described it differently, where you stated you were

8    picked up, rather than -- by Mr. Garcia Morales, rather than

9    going to Garcia Morales' house?

10    A.   I don't understand.  You're confusing me, I really don't

11    understand what you're trying to say.

12    Q.   The last thing -- I don't want to confuse you, sir.

13       I'm just asking you a simple question.

14       Have you described that aspect, whether you got picked up

15    or whether you drove to Mr. Garcia Morales' house, differently,

16    in the past?

17    A.   I went to Garcia Morales' home.

18    Q.   Okay.  Now, you mentioned somebody else yesterday in your

19    direct testimony -- someone's stepson.

20       Is it your stepson or Jean Lara's stepson?

21       Is that the -- and forgive my pronouncement of the name --

22    is it Dairon Abel Benitez?

23    A.   Yes, Dairon Abel Benitez.

24    Q.   Now, you stated yesterday that he -- that your stepson

25    dropped off Jean Lara in Miramar; correct?

```
 1    A.   Yes.

 2    Q.   Did he also have a role as a look-out?

 3    A.   No.

 4    Q.   No, he just drove off?

 5    A.   Yes.

 6    Q.   So, he had no involvement in the Miramar robbery; is that

 7    your testimony?

 8    A.   Yes.

 9    Q.   Are you protecting your stepson?

10    A.   No.

11    Q.   Wasn't he a look-out, a second look-out for that robbery?

12    A.   No.

13    Q.   Now, to be clear, yesterday, you did not see what happened

14    at the front door; correct?

15    A.   No.

16    Q.   No, you did; or no, you didn't?

17    A.   I did not see it.

18    Q.   Because you were, like, I think you said, somewhere around

19    here; correct?

20    A.   Yes.

21    Q.   You just heard shots; right?

22    A.   Yes.

23    Q.   And after you heard those shots, you saw Raonel run with a

24    gun in his hand; correct?

25    A.   Yes.
```

```
 1   Q.   I think you testified yesterday -- in my hand is
 2   Government's 9.  You testified that you saw this Colt firearm
 3   in the hands of Raonel after you heard those shots; right?
 4   A.   Yes.
 5   Q.   Now, there's something that's a little unclear to me.
 6        You stated that -- you described the white van; right?
 7   A.   Yes.
 8   Q.   And it's -- the white van belongs to Mr. Garcia Morales,
 9   according to your testimony; right?
10   A.   Yes.
11   Q.   And Mr. Garcia Morales took you, Raonel, to a location near
12   the home; correct?
13   A.   Yes.
14   Q.   And you just stated your stepson dropped off Jean Lara to a
15   location; correct?
16   A.   Yes.
17   Q.   And then you stated after the shooting, you, Jean, and
18   Raonel fled; correct?
19   A.   Yes, we left.
20   Q.   And you left in the white van?
21   A.   Yes.
22   Q.   The white van that supposedly Mr. Garcia Morales was
23   driving?
24   A.   Yes.
25   Q.   What happened, did Raonel grab the keys from Mr. Garcia
```

1   Morales after he was shot?  What happened?

2   A.   Mr. Garcia Morales left the keys under the mat in the car.

3   Q.   Now, you state -- it was during your direct testimony, you

4   talked about a mask.  Where was your mask?

5   A.   I never had a mask.

6   Q.   Where is a -- did Jean Lara have a mask?

7   A.   He didn't either.

8   Q.   How about Raonel, did he have a mask?

9   A.   He didn't either.

10  Q.   Also, you mentioned something about bullets being removed

11  from the gun; right?  You were asked about that.

12  A.   Yes.

13  Q.   And, again, just so we're absolutely clear, not to go

14  around it again, but you're talking about the Colt firearm;

15  correct?

16  A.   Yes.

17  Q.   The Colt firearm that you say was in Mr. Garcia Morales'

18  hand; correct?

19  A.   Yes.

20       MR. ZACCA:  Alright.  Now, I want to make sure I got

21  this right, so bear with me.

22       (Brief pause in proceedings.)

23       MR. ZACCA:  Okay.  Found it.

24  BY MR. ZACCA:

25  Q.   Oh, you stated that -- I remember Mr. Vazquez's line of

1    questioning.  You stated that the bullets were removed from the

2    Colt firearm; correct?

3    A.   Yes.

4    Q.   And you stated -- and then Mr. Vazquez asked you, Well, why

5    was that -- why did that happen; right?  Yes?

6    A.   Yes.

7    Q.   And your answer was you didn't know why; right?

8    A.   Yes.

9    Q.   But didn't you say back on October 26th, 2018, when you met

10   with Agent Ordoñez -- sitting here in the back row -- and

11   Special Agent Aaron Spielvogel -- do you recognize them; right?

12   A.   Yes.

13   Q.   And you've met with both of them; haven't you?

14   A.   Yes.

15   Q.   Spoke about your involvement in the case; correct?

16   A.   Yes.

17   Q.   And one of those dates was October 26th, 2018; right?

18   A.   I don't remember, but if it's on the papers, yes, it could

19   be.

20   Q.   And the topic of the bullets in the gun came up, and you

21   stated that it was your idea to remove the bullets from the

22   gun; didn't you tell me that?

23   A.   I could have stated that, yes.

24   Q.   So, do you know -- well, I guess the answer's obvious.

25        You don't know what Raonel Valhuerdis did with the Colt

 1   firearm, do you, at the moment the shots were fired because you

 2   didn't see it; right?

 3   A.   Yes.

 4   Q.   Okay.  Let's move on to the gold heist robbery, and I want

 5   to go over some of the stuff you testified to.

 6        Again, I wrote down notes as you were testifying, so I'm

 7   going to refer to those notes.

 8        Did you say that you were the get-away driver for the gold

 9   robbery?

10   A.   Yes.

11   Q.   You didn't do the physical robbing of the gold; correct?

12   A.   Yes.

13   Q.   When you were -- going back to the meetings you had with

14   the agents and -- by the way, it's not just these agents that

15   you met with, Mr. Ordoñez and Spielvogel, you've met with other

16   federal agents going back to 2015; correct?

17   A.   Yes.

18   Q.   And I have reports in my hand.  Would you agree that you've

19   spoken and met with the agents at least eight times?

20   A.   I have not kept count of the number of times that I've met

21   with them.

22   Q.   Because there have been many of them; right?

23   A.   Yes.

24   Q.   I want to focus in on a few things here.

25            THE COURT:  Let's take our morning break.  We're in

1   recess until 11:00.

2          (Witness steps down.)

3          COURT SECURITY OFFICER:  All rise.

4          (Jury exited courtroom at 10:25 a.m.)

5          (Recess taken from 10:24 a.m. to 10:44 a.m.)

6          COURT SECURITY OFFICER:  All rise.

7          (Witness resumes stand.)

8          THE COURT:  Are we ready to begin?

9          We are starting to look at the instructions

10         For the Hobbs Act conspiracy, it appears as though you

11  knowingly agreed and willfully joined in on at least one

12  occasion.  So I want you to take a look at that and make sure

13  it's not willfully agreeing and willfully joining in.  Look at

14  the statute.

15         It looks like it's knowingly agreeing with at least one

16  other person and, in addition, you have to willfully join on

17  at least one occasion.  So take a look at that distinction and

18  give me your positions when we go over the instructions.

19         Bring the jury in, please.

20         COURT SECURITY OFFICER:  All rise.

21         (Jury entered courtroom at 10:44 a.m.)

22         THE COURT:  Be seated, ladies and gentlemen.

23         You may continue.

24  BY MR. ZACCA:

25  Q.  Before the break we were talking about the numerous -- I

1    think you even stated there were many of moments that you met

2    with agents and prosecutors to talk about your involvement in

3    the case; correct?

4    A.   Yes.

5    Q.   Okay.  So I want to do a little timeline here; okay?

6         I have in my hand what's been marked as Defendant's Exhibit

7    Number 4.  It is the judgment and sentence in your 2015

8    kidnapping case.

9         At this time, the defense moves what has been marked as

10   Defendant's Exhibit Number 4 for identification purposes into

11   evidence.

12            MR. VAZQUEZ:  No objection, Your Honor.

13            THE COURT:  Received as marked.

14            (Defendant's Exhibit 4 received into evidence.)

15   BY MR. ZACCA:

16   Q.   Now, what I want to do is look at the dates.

17        So this is the judgment.  This is the indictment that we

18   looked at earlier this morning.

19        The indictment was filed on March 18th, 2015 -- actually,

20   filed March 17th, 2015.

21        You entered your plea just four months later.

22        And now we're looking at Defendant's Exhibit Number 3,

23   which is already in evidence, on July 2015; right?

24   A.   Yes.

25   Q.   So, March of 2015, you're charged; July 2015, you entered

1    your contract with the Government; you pled guilty; correct?

2    A.   Yes.

3    Q.   I'm going to put this like this so we can see it when we

4    keep referencing it.

5         Now, on July 21st, 2015, you met with the Government and

6    spoke about your criminal activity in the kidnapping case, the

7    Alex Mesa kidnapping?

8    A.   Yes.

9    Q.   Okay.  So, using this as a reference point, July 21st, so

10   I'm going to put here -- as a reference point, put it in

11   between here, just before you pled guilty.

12        In that meeting you met with Special Agent Andrew Duval,

13   Carlos Morales, they're not here.

14        You also met with Assistant United States Attorney Brian

15   Dauberts, and your attorney was also present.

16        Do you remember that meeting?

17   A.   Yes.

18   Q.   Okay.  So, in that meeting you were asked questions about

19   the Alex Mesa kidnapping, and you were also asked questions

20   about the gold robbery that occurred in Coral Gables; correct?

21   A.   Yes.

22   Q.   And on that date, July 21st, 2015, you were asked who was

23   involved in the Coral Gables gold robbery, and you answered

24   Jean, Camilo, and Raonel.

25        You never, ever mentioned Leonardo Garcia Morales as being

37

```
 1   involved in the gold robbery on that date; isn't that a fact?

 2   A.   Yes.

 3   Q.   So, you are then -- you enter your guilty plea on 07-27,

 4   and now in my hand is Defendant's Exhibit 4, which is the

 5   judgment and sentence in the Alex Mesa kidnapping, which you

 6   were sentenced on -- well, you were sentenced on October 15th,

 7   2015, but it was filed on October 16th, 2015.

 8        And you were sentenced to 180 months; correct?

 9   A.   Yes.

10   Q.   So, moving along, you were charged in this case on October

11   2nd, 2017; right?

12   A.   Yes.

13   Q.   And when you were charged in this case you were already in

14   federal prison serving your sentence; correct?

15   A.   Yes.

16   Q.   And in this case, you pled guilty on April 10th, 2018.

17   A.   Yes.

18   Q.   So let's -- in my hand, marked for identification purposes

19   as Defendant's Exhibit Number 1, is the plea agreement in your

20   case.

21        At this time, the defense moves defense -- what's been

22   marked for identification as Exhibit 1 into evidence?

23             MR. VAZQUEZ:  No objection.

24             THE COURT:  Received.

25             (Defendant's Exhibit 1 received into evidence.)
```

1    BY MR. ZACCA:

2    Q.  So I'm going to move this here.  Here's our timeline, and

3    here's the date, and this is this case here.

4        And then finally, you were sentenced in this case on June

5    28th, 2015; correct?

6    A.  Yes.

7    Q.  And I have in my hand what's been marked for identification

8    purposes as Defendant's Exhibit Number 2, it's your judgment

9    and sentence.

10       At this time, the defense moves Defendant's Exhibit

11   Number 2 into evidence.

12           MR. VAZQUEZ:  No objection.

13           THE COURT:  Receive it.

14           (Defendant's Exhibit 2 received into evidence.)

15   BY MR. ZACCA:

16   Q.  And it says here June 28th, 2018, is your judgment and

17   sentence in this case.

18       Now, in this case, you were sentenced a little long;

19   weren't you?

20       You were sentenced to a total term of 200 months; correct?

21   A.  Yes.

22   Q.  So, in fact, you're serving a 200-month sentence; correct?

23   A.  Yes.

24   Q.  And what's that about, 18 years?

25   A.  16 years and eight months.

1   Q.   Okay.  So, going back to the timeline that we've

2   established here, you continued to meet with the Government,

3   and on -- if I can get the right date -- here it is.

4       We talked about the date of July 11th, 2015, and you've

5   already testified that when you were asked about the gold

6   heist, you never mentioned Leonardo Garcia Morales; right?

7   We've established that; correct?

8   A.   When I was asked who had -- who of us had participated at

9   that time, who of us have taken the gold on the day of the

10  robbery -- not on the conspiracy that was used for everything.

11  Q.   Wait a minute.  That's -- are you just trying to change

12  your answer now?

13      MR. VAZQUEZ:  Objection, as to the argumentative form

14  of the question.

15      THE COURT:  Overruled.

16      THE WITNESS:  No.

17  BY MR. ZACCA:

18  Q.   No?

19  A.   No.

20  Q.   Well, wait a minute, yesterday -- I'm going to get my notes

21  here.  When you were asked about the gold heist and you were

22  asked about Mr. Garcia Morales' participation, you described

23  him as someone who was very intelligent, and that, along with

24  Jean Lara, he told you what you had to do.

25      That's what you said yesterday?

1    A.   Yes.

2    Q.   You described him as an organizer, essentially, you

3    described him as a leader; correct?

4    A.   Yes.

5    Q.   That's someone that's, obviously, very important; correct?

6    Yes?

7    A.   Yes.

8    Q.   But you never mention him to the FBI on July 11th, 2015.

9    You mention Jean, but you don't mention him; correct?

10   A.   Why don't I mention him?  Because a few days before, he had

11   been shot because of a robbery that we had made in Miramar.

12   Q.   Well, that's -- let me give you another reason why you

13   mentioned him later on.

14        On April 16th, 2018 -- let's write that date down.

15        On April 16th, 2018, you met with agents again.

16        You met with Special Agent Aaron Spielvogel, you also met

17   with Special Agent Hector Ortiz, and you met with Mr. Vazquez.

18        You remember that; right?

19   A.   Yes.

20   Q.   Okay.  And now that you've pled guilty in two different

21   cases, serving a sentence in one case, facing sentencing in

22   another case, for the first time, you mention the name Leonardo

23   Garcia Morales as being involved in the gold robbery; correct?

24   A.   Yes.

25   Q.   You did it out of convenience to save and reduce your

 1   sentence?  Yes?

 2   A.   No.

 3   Q.   No.   Alright.   So, by the way, I think you've already

 4   testified that you had an attorney for the kidnapping Alex Mesa

 5   case; correct?

 6   A.   Yes.

 7   Q.   And you have an attorney for this case; right?

 8   A.   Yes.

 9   Q.   And in the Alex Mesa case, your attorney gave you discovery

10   in the case; correct?

11   A.   Yes.

12   Q.   And let me make sure the jury understands what we are

13   referring to as "discovery."

14        "Discovery" are reports; yes?

15   A.   Yes.

16   Q.   Law enforcement reports; correct?

17   A.   Yes.

18   Q.   And you also got discovery in this case; correct?

19   A.   Yes.

20   Q.   And you reviewed that discovery with your lawyer; correct?

21   A.   Yes.

22   Q.   So you get to learn information about the case; correct?

23   A.   Yes.

24   Q.   Information that you can later use to testify in the case;

25   correct?

1   A.   Yes.

2   Q.   To testify about as if you actually knew it; correct?

3   A.   Yes.

4        MR. ZACCA:   Judge, may I have a moment?

5        (Brief pause in proceedings.)

6   BY MR. ZACCA:

7   Q.   So yesterday you talked about money, money collected from

8   the gold robbery; right?

9   A.   Yes.

10  Q.   And yesterday you testified that at some point you went to

11  visit Mr. Garcia Morales; correct?

12  A.   Yes.

13  Q.   Was that at the hospital or at his house?

14  A.   At his house.

15  Q.   When was it?

16  A.   I don't have the date.

17  Q.   Well, you testified that the robbery occurred on October

18  12th, 2012.  It's now 2018.  Did it occur -- this meeting that

19  you say happened, did it occur in 2013?  Or 2014?  Or 2015?

20  A.   A few days after he exited the hospital.

21  Q.   What year was that?

22  A.   A few days after, a few days after he left the hospital.

23  I don't know.

24  Q.   Well, did he leave the hospital in 2012?

25  A.   About a couple of months later, a few days after what had

1    happened.

2    Q.   Alright.  And you testified that Jean never gave him any

3    money; is that right?

4    A.   Jean gave him the money, that is the statement I gave.

5    Q.   I thought yesterday you testified that he asked you for

6    money because he wasn't given any money, and you refused it;

7    correct?

8    A.   It's not correct.

9    Q.   Did you give him money?

10   A.   I did not give him money.

11   Q.   Okay.  Yesterday you didn't testify that he was asking you

12   for money because Jean hadn't given him money?

13   A.   That Jean had not given him the full amount of money to

14   him.

15   Q.   How much money did you understand he received at that

16   moment when you visited him at his house?

17   A.   Who?

18   Q.   The person we're talking about, Leonardo Garcia Morales.

19   A.   Who gave money to whom?

20   Q.   You visited, when he left the hospital, at his house;

21   correct?

22   A.   Yes.

23   Q.   He asked you for money; yes?

24   A.   Yes.

25   Q.   You said no; correct?

1    A.   Yes.

2    Q.   He asked you for money because Jean hadn't given him all

3    the money, according to you; correct?

4    A.   Yes.

5    Q.   At that moment in time, how much money did Jean give him?

6    A.   $150,000.

7    Q.   Did you see it?

8    A.   When he gave it to him, no.

9    Q.   Did you ever see this cash that he allegedly gave Leonardo

10   Garcia Morales?

11   A.   No.

12   Q.   So you never saw it; right?

13   A.   Leonardo Garcia Morales told me that Jean had given him

14   $150,000, and he asked me why I hadn't given him more money.

15   Q.   But that's what you were told.

16        You never saw the cash; correct?

17   A.   Yes.

18   Q.   Now, you also mentioned something about a conversation

19   about the purchase of cocaine; correct?

20   A.   Yes.

21   Q.   Was this conversation at the same time as this conversation

22   about the money?

23   A.   Yes.

24   Q.   Are you sure?

25   A.   Sure.

 1   Q.   So -- and he told you that he was going to use a godson to

 2   purchase cocaine, that's what you said?

 3   A.   Yes.

 4   Q.   We looked at, in detail, the plea agreement you had in the

 5   Alex Mesa kidnapping.  The one thing that we hadn't looked at

 6   is the second plea agreement, or contract, you have with the

 7   Government.  That's Defendant's Exhibit Number 1.

 8        I'm going to zero in on certain language here.

 9        By the way, that's your signature there; correct?

10   A.   Yes.

11   Q.   It's on the last page, page nine of this document; right?

12   A.   Yes.

13   Q.   And again, you had this document translated to you; right?

14   A.   Yes.

15   Q.   You reviewed it; correct?

16   A.   Yes.

17   Q.   You understood it; right?

18   A.   Yes.

19   Q.   You reviewed it with your lawyer; correct?

20   A.   Yes.

21   Q.   And you also had the opportunity to review it with the

22   Court; correct?

23   A.   Yes.

24   Q.   So again, it's like the document you had before, a contract

25   with the Government; right?

```
 1    A.   Yes.

 2    Q.   Okay.  And that has, again, the same language we looked at

 3    before; right?

 4    A.   Yes.

 5    Q.   This time, it appears in paragraph 16 with regard to a

 6    Rule 35; yes?

 7    A.   Yes.

 8    Q.   "In the sole and unreviewable judgment of the

 9    U.S. Attorney's Office."  You remember that language; correct?

10    A.   Yes.

11    Q.   As you've been testifying now for the past two days, has

12    that been going on in your mind, about how well your testimony

13    is being received by the Government?

14    A.   I don't understand the question.

15         I don't understand what you've said.

16    Q.   Okay.  Let me see if I can use some different language.

17         As your plea agreement says, you know, the Government is

18    evaluating your testimony; correct?

19    A.   Yes.

20    Q.   Isn't that going on in the back of your mind, how they're

21    evaluating your testimony?

22    A.   I don't understand what you are trying to say again.

23    Q.   Sure.  Are you worried that after your testimony today the

24    Government will not file that Rule 35 you're looking for?

25    A.   I am not worried about anything, because here, I only came
```

 1    to tell the truth.

 2    Q.   And you don't want anything for your testimony; is that

 3    your testimony?

 4    A.   If I'm given something, I will accept that, but what I came

 5    here for was to tell the truth, to speak the truth.

 6    Q.   You'd accept it; right?  You're not going to reject a

 7    reduction in your 200-month sentence; correct?

 8    A.   Yes.

 9    Q.   You'll gladly accept that; correct?

10    A.   Yes.

11    Q.   And only the Government can file that motion; correct?

12    A.   Yes.

13    Q.   You can't file it; right?

14    A.   No.

15          MR. ZACCA:  Judge, if I can have a moment, please.

16          (Brief pause in proceedings.)

17    BY MR. ZACCA:

18    Q.   Do you remember the first question I asked you yesterday in

19    the beginning of your cross-examination?

20    A.   Yes.

21    Q.   I asked you, "What is the most important thing to you?"

22          Do you remember that?

23    A.   Yes.

24    Q.   And you said "life;" right?

25    A.   Yeah.

```
 1   Q.   "Life."

 2        And to enjoy life, you need freedom; don't you?

 3   A.   Yes.

 4   Q.   Now, you kidnapped for money; correct?

 5   A.   Yes.

 6   Q.   You committed alien smuggling for money; correct?

 7   A.   Yes.

 8   Q.   But money is not the most important thing to you; is it?

 9   It's your freedom; isn't it?

10   A.   My life.

11   Q.   Your life.

12        So if you're willing to kidnap, if you're willing to commit

13   alien smuggling, you're certainly willing to lie for your life;

14   wouldn't you?

15   A.   I'm not lying.

16   Q.   No, but -- I mean, look, money is not the most important

17   thing, and you did terrible things for it; right?

18   A.   Yes.

19   Q.   So what's a lie, to do and save the most important thing to

20   you, your life; correct?

21        You would be willing to do that; right?

22   A.   I don't understand what you're trying to say.

23   Q.   Would you lie to save your life?

24   A.   I would not lie.  I am here to tell the truth.  I don't

25   understand what one thing has to do with the other.
```

1    Q.   Simple, yes or no, and I'll sit down.

2         Would you lie -- would you lie to save your life?

3    A.   I cannot say yes or no, because I don't understand what

4    you're trying to ask me.

5              MR. ZACCA:  No further questions, Judge.

6                        REDIRECT EXAMINATION

7    BY MR. VAZQUEZ:

8    Q.   Mr. Kindelan, are you a lawyer?

9    A.   No.

10   Q.   Are you fluent in legalese?

11   A.   No.

12   Q.   I want to draw your attention to a line of questioning that

13   defense counsel raised to you regarding what you admitted to

14   when you pled guilty in the two cases that have you in custody.

15        I want to show you what's been marked for identification as

16   Government's 60.  Do you recognize it?

17   A.   Yes.

18   Q.   Do you recognize your signature?

19   A.   Yes.

20   Q.   When you pled guilty in the case that has you most recently

21   convicted, did you have to sign a factual proffer to Her Honor,

22   Judge Cooke?

23   A.   Yes.

24   Q.   And in that factual proffer, did you have to explain what

25   your conspiracy, and what you were doing with your

```
 1    conspirators, consisted of?
 2    A.   Yes.
 3         MR. VAZQUEZ:   Your Honor, at this time, I would move
 4    Government's 60 into evidence, pursuant to 801(d)(1)(B), as a
 5    prior consistent statement.
 6         MR. ZACCA:   Objection, Judge.  I don't believe you need
 7    to rule.
 8         THE COURT:   Counsel, come to sidebar.
 9         (Sidebar discussion held as follows:)
10         THE COURT:   Prior consistent statement.  So you're
11    seeking to admit this as a prior consistent statement because
12    your position would be that that counters a recent fabrication;
13    is that correct?
14         MR. VAZQUEZ:   Defense counsel alleged that he stated
15    something false and this established that what he said was
16    correct, that he admitted to his conduct.
17         THE COURT:   The Rule addresses a recent fabrication;
18    isn't that the --
19         MR. VAZQUEZ:   I think the prior consistent statement is
20    to address the fact that he has challenged the veracity of the
21    witness' testimony.
22         THE COURT:   I don't know, when I ask you a question and
23    you can't seem to answer my question -- I will let you espouse.
24         MR. VAZQUEZ:   Yes, Your Honor.
25         Yes, Your Honor, he's accused him of fabricating.
```

1          THE COURT:  The Rule?

2          MR. VAZQUEZ:  Yes.

3          THE COURT:  So what is it about this statement that

4    shows that the prior statement is not a recent fabrication?

5    That's what I'm trying to grasp.

6          MS. DUANE:  It might be helpful if he addresses you,

7    specifically, to what defense counsel was asking you about.

8          THE COURT:  What do you want me to read, starting with

9    this paragraph?

10         MR. VAZQUEZ:  Yes, he explained -- Your Honor, may I

11   grab something from my desk real quick?

12         THE COURT:  Human trafficking and human smuggling, and

13   prior instances where they accepted money for controlled

14   substances, and then as a participant.  Alright.

15         MR. VAZQUEZ:  The witness was challenged, that he just

16   made up -- recently fabricated -- this whole line of what he

17   admitted to --

18         THE COURT:  Be specific.

19         MR. VAZQUEZ:  -- that he did not admit to kidnappings,

20   that he did not admit to human smuggling.

21         THE COURT:  Wait a minute.  I thought whether or not

22   what he did was part of the prior charges.

23         MR. VAZQUEZ:  And --

24         THE COURT:  Wait a moment.  All of these other things,

25   were they part of the charges that he was charged with?  That

```
1    was the question.
2           MR. VAZQUEZ:  Yes, our view, that this Hobbs Act
3    conspiracy, extortion, and alleged --
4           THE COURT:  No, no, there were specific items we talked
5    about.
6           MR. VAZQUEZ:  The Nacho kidnapping and the --
7           THE COURT:  One other point, the human smuggling -- was
8    human smuggling --
9           MR. VAZQUEZ:  Yes, yes.
10          THE COURT:  -- was that part of the indictment?
11          MR. VAZQUEZ:  Yes, yes, it's in the conspiracy.
12          THE COURT:  I don't want to have your view.  I want you
13   to tell me.  Let me get the indictment.
14          Because the question was whether these items were
15   charged, there was a very narrow point -- I'm not sure the
16   defendant understood -- but be that as it may, show me where he
17   was charged in the indictment in human trafficking, and what
18   was the other --
19          MR. VAZQUEZ:  The Nacho kidnapping.
20          THE COURT:  -- the Nacho kidnapping, right.
21          MR. VAZQUEZ:  We argue it falls under Count 1.
22          THE COURT:  Show me, that's what I'm asking you.
23          MR. VAZQUEZ:  We understand that extortions can be
24   charged.  It's not alleged that way, Your Honor, it's not.
25          THE COURT:  Well, then that's the answer to the
```

1    question, see, that's the answer.  I know you want to expound,

2    but it's a very narrow point:  Were you charged in the

3    indictment with these crimes?  And he said he was.

4         That was the question, so this didn't rebut -- your

5    point doesn't rebut recent fabrication of the question asked,

6    alright, so your objection is overruled.

7         MR. ZACCA:  Sustained, you mean?

8         THE COURT:  Your objection is sustained to his

9    question.  I'm sorry.

10         (Sidebar concluded, the following held in open court:)

11         THE COURT:  The objection is sustained.

12   BY MR. VAZQUEZ:

13   Q.  So, Mr. Kindelan, when you pled guilty to your Hobbs Act

14   prosecution before Judge Cooke in the case that you're

15   testifying on, did you acknowledge that you were part of a

16   criminal organization?

17         MR. ZACCA:  Objection to the form of the question.

18         THE COURT:  Overruled.

19         THE WITNESS:  Yes.

20   BY MR. VAZQUEZ:

21   Q.  Did you acknowledge that that criminal organization engaged

22   in kidnappings?

23   A.  Yes.

24   Q.  Robberies?

25   A.  Yes.

```
 1    Q.   Human trafficking?

 2              MR. ZACCA:   Objection.

 3              THE COURT:   Overruled.

 4              THE WITNESS:   Yes.

 5    BY MR. VAZQUEZ:

 6    Q.   Human smuggling?

 7    A.   Yes.

 8    Q.   Instances where members accepted money for the commission

 9    of crimes of violence?

10    A.   Yes.

11    Q.   The distribution of drugs?

12    A.   Yes.

13    Q.   Did you also tell Her Honor, Judge Cooke, that you engaged

14    in these activities, though, you didn't know the date of those

15    offenses?

16    A.   Yes.

17    Q.   And you told Her Honor that before you were sentenced,

18    through the factual proffer; is that correct?

19              THE INTERPRETER:   Counsel, for the interpreter, please

20    repeat the question.

21    BY MR. VAZQUEZ:

22    Q.   And you told Her Honor all of these facts about what you

23    had done for this criminal group before your factual proffer?

24    A.   Yes.

25    Q.   Did you also tell Her Honor that your involvement in the
```

1   kidnapping of Mr. Mesa was part of your participation in this

2   group?

3   A.   Yes.

4   Q.   What was the maximum you could have been exposed to for the

5   charges that you had in front of Judge Cooke?

6   A.   25 years.

7   Q.   Now, you had an agreement with the Government; correct?

8   A.   Yes.

9   Q.   And that agreement with the Government, what were you

10   asking for, for Her Honor to sentence you?

11   A.   It was an agreement for 25 years.

12   Q.   Now, defense counsel admitted Government's -- excuse me,

13   Defense Exhibit 1.  Do you see that?

14   A.   Yes.

15   Q.   This is the plea agreement for your case that you were

16   recently sentenced on; correct?

17   A.   Yes.

18   Q.   And I want to turn to page two of that agreement, paragraph

19   six, and in that paragraph, it says:

20       As to Count 4 -- which is your firearm count -- you

21   understand that the minimum term could be no less than seven

22   years, and that you had a statutory maximum of up to life in

23   prison; is that correct?

24   A.   Yes.

25   Q.   Now, defense counsel asked you about all these breaks that

 1  you got.  What was the most that you could have been sentenced

 2  to?

 3  A.   Life.

 4  Q.   And who made the decision about whether or not you were

 5  going to serve life in prison for all of these crimes that you

 6  admitted to committing?

 7  A.   The Judge.

 8  Q.   Mr. Zacca, the defense counsel, asked you about what you're

 9  thinking about and your willingness to lie.

10       Do you remember that line of questioning?

11  A.   Yes.

12  Q.   How many times have you been charged by the United States

13  Government, sir?

14  A.   Twice.

15  Q.   So you started offering information, and you got indicted

16  again; correct?

17          MR. ZACCA:  Object to leading.

18          THE COURT:  Sustained.

19  BY MR. VAZQUEZ:

20  Q.   What happened after you started offering information,

21  Mr. Kindelan?

22  A.   Nothing.

23  Q.   Were you charged after you started offering information?

24  A.   Yes.

25  Q.   Do you understand that it would be a crime for you to lie

```
 1    under oath?

 2    A.  Yes.

 3    Q.  Do you have any doubt that the Government would charge you

 4    again, for a third time?

 5    A.  Yes, I know.

 6    Q.  You understand that you would be charged if you were lying?

 7           MR. ZACCA:  Objection to leading.

 8           THE COURT:  Sustained.

 9    BY MR. VAZQUEZ:

10    Q.  Mr. Kindelan, can you clarify your answer?

11         What did you mean by your last response?

12    A.  That I know that the Government can present charges against

13    me, once again, if I lie.

14    Q.  Now, you were asked by defense counsel about the Miramar

15    robbery.  Do you remember that line of questioning?

16    A.  Yes.

17    Q.  And he also asked you about the Coral Gables robbery; do

18    you recall that?

19    A.  Yes.

20    Q.  During the planning for the Coral Gables robbery, which

21    contained, in the date range, the Miramar robbery, did you have

22    many meetings with the defendant?

23    A.  Yes.

24    Q.  Do you remember what you were wearing in all of them?

25    A.  No.
```

```
 1   Q.   Do you remember what you had for lunch on any given day?

 2   A.   No.

 3   Q.   Do you remember that you did a Miramar robbery and a Coral

 4   Gables robbery with the defendant's help?

 5   A.   Yes.

 6   Q.   Before the Miramar robbery, who knew Frank?

 7   A.   Miguelito.

 8   Q.   Miguelito, the defendant?

 9   A.   Yes.

10   Q.   Frank didn't know you?

11   A.   No.

12   Q.   Did Frank know Jean?

13   A.   No.

14   Q.   Did he know Raonel?

15   A.   No.

16   Q.   So if you went to do a robbery with Frank, would he know

17   who you were?

18            MR. ZACCA:  Objection.

19            THE COURT:  To that question, sustained.  I think

20   you've asked it.

21   BY MR. VAZQUEZ:

22   Q.   Had Frank ever seen your face?

23            MR. ZACCA:  Objection.

24            THE COURT:  Maybe you can ask him if he had seen

25   Frank's face.
```

1   BY MR. VAZQUEZ:

2   Q.   Had you ever been in Frank's presence and seen his face?

3   A.   No, I don't know who he is.

4   Q.   Why didn't you wear a mask to rob someone you didn't know?

5   A.   Because Miguelito told us that he was the one that was

6   going to use that face mask, because he was the one that was

7   known to him.

8   Q.   Now, Mr. Kindelan, in this investigation, you've met with

9   law enforcement and prosecutors on a lot of occasions; is that

10   correct?

11   A.   Yes.

12   Q.   And have you been asked a lot of different questions?

13   A.   Yes.

14   Q.   Have some of those questions been very specific about

15   certain people and certain dates?

16   A.   Yes.

17   Q.   Who physically did the Coral Gables robbery?

18   A.   Jean Marrero, Raonel Valhuerdis, Camilo Montalvan, and

19   Alfredo Kindelan, myself.

20   Q.   Was the defendant physically present when the Coral Gables

21   robbery happened?

22   A.   No.

23   Q.   Before you were charged in this case, did you know what it

24   meant to be in a "conspiracy" -- or the prior indictment?

25   A.   No.

```
 1    Q.   When you were charged in the first Mesa kidnapping case,
 2    what was the most you could have been exposed to?
 3    A.   Life.
 4    Q.   And did you admit to the details of the Mesa kidnapping to
 5    His Honor, Judge Martinez?
 6    A.   Yes.
 7    Q.   Did you receive a life sentence?
 8    A.   No.
 9    Q.   And who decided what your sentence was going to be?
10    A.   The Judge, His Honor Martinez.
11    Q.   Now, you were asked about what you might get, or what you
12    hope to get as a result of conversation, do you understand
13    that?  Do you remember that line of questioning?
14    A.   Yes.
15    Q.   Mr. Kindelan, did you get more or less time than what the
16    Government asked for, for your crimes associated with this
17    recent indictment?
18    A.   I was given less time than what the U.S. Attorney's Office
19    asked for.
20    Q.   And you were also asked about what may happen to you in any
21    kind of sentence, motion, or anything like that.
22         Do you remember that?
23    A.   Yes.
24    Q.   Who would make the ultimate decision on your sentence and
25    if it would be reduced at all?
```

```
 1    A.   The Judge.

 2    Q.   And you have two Judges to consider; correct?

 3    A.   Yes.

 4    Q.   Do you understand that what you're saying right now is

 5    being recorded?

 6    A.   Yes.

 7    Q.   Do you understand that if you are caught lying that could

 8    result in a new charge and certainly affect your ability to get

 9    any --

10              MR. ZACCA:  Objection to leading.

11              THE COURT:  Sustained.

12    BY MR. VAZQUEZ:

13    Q.   Mr. Kindelan, what would happen to you if you were found to

14    be lying in the record that's being created as you speak?

15              MR. ZACCA:  Objection.  Calls for speculation.

16              THE COURT:  Overruled.

17              THE WITNESS:  Yes, I know what would happen.

18    BY MR. VAZQUEZ:

19    Q.   What is that?

20    A.   They could open up a new case against me for lying to --

21    before the Judge.

22    Q.   Would it help you to get a sentence reduction if you are

23    recorded lying?

24    A.   No.

25              MR. VAZQUEZ:  No further questions of the witness,
```

1   Your Honor.

2            THE COURT:  May the witness be permanently excused?

3            MR. VAZQUEZ:  Yes, Judge.

4            THE COURT:  Let's take a 10-minute break.

5            (Jury exited courtroom at 11:50 a.m.)

6            (Witness excused.)

7            (Recess taken from 11:50 a.m. to 12:09 p.m.)

8            THE COURT:  Bring in the jury.

9            (Jury entered courtroom at 12:09 p.m.)

10           THE COURT:  Call your next witness.

11           MS. DUANE:  The Government calls Guy Vargas.

12           COURTROOM DEPUTY:  Please raise your right hand.

13      Do you solemnly swear the testimony you're about to

14   give is the truth, the whole truth, and nothing but the truth,

15   so help you God?

16           THE WITNESS:  Yes, I do.

17           COURTROOM DEPUTY:  Thank you.  You may be seated.

18           (GUY VARGAS, through Interpreter, testified as

19   follows:)

20                    DIRECT EXAMINATION

21   BY MS. DUANE (THROUGH INTERPRETER):

22   Q.   Good afternoon, Mr. Vargas.

23   A.   Good morning.

24   Q.   Could you please state your full name and spell it for the

25   court reporter?

1    A.   My full name is Guy Alberto Martin Vargas Astiaz.   So it's

2    G-U-Y, A-L-B-E-R-T-O, M-A-R-T-I-N, V-A-R-G-A-S, A-S-T-I-A-Z.

3    Q.   Thank you.

4         Mr. Vargas, where are you from?

5    A.   From Bolivia.

6    Q.   Where do you live now?

7    A.   Bolivia.

8    Q.   Have you lived in Bolivia your whole life?

9    A.   Yes.

10   Q.   Are you in the United States now only to testify in

11   connection with this case?

12   A.   Yes.

13   Q.   Mr. Vargas, what do you do for a living?

14   A.   I work in the commercialization of precious metals, gold.

15   Q.   How long have you worked in the gold industry?

16   A.   For, approximately, 10 years.

17   Q.   What is the name of your current business?

18   A.   The current one is Quari Wasi, but now we have a new

19   company which is called Yellow Tree.

20   Q.   Sorry, so just to be clear, which is the current company

21   you work for?

22   A.   Yellow Tree.

23   Q.   And where were you working in 2012?

24   A.   Quari Wasi.

25   Q.   When did Quari Wasi open?

1    A.   August 2012.

2    Q.   Is Quari Wasi still an active company?

3    A.   It is in the process of being under investigation because

4    we had an issue with a shipment that was stolen.

5    Q.   As a result of that shipment being stolen, how has that

6    impacted Quari Wasi?

7    A.   It had a total, full impact because we owe money, we owe

8    merchandise.  We are in the process of investigation because

9    merchandise went out of the country and money did not come in,

10   the same thing with Customs.

11   Q.   And, Mr. Vargas, we're going to discuss this more, but is

12   this the October 11th, 2012, shipment you're discussing?

13   A.   Yes, that is correct.

14   Q.   What was the approximate value of that shipment of gold?

15   A.   Approximately, $2,300,000.

16   Q.   Now, I want to focus on the business Quari Wasi and the

17   gold business, just to explain to the jurors how it works.

18   A.   Okay.

19   Q.   Was Quari Wasi a registered company?

20   A.   Yes, this is a company that is legally established in my

21   country and has an export permit.

22   Q.   So it is registered in Bolivia; is that correct?

23   A.   Yes, that is correct.

24   Q.   And it had a permit to export what?

25   A.   Gold.

1   Q.   Can you give the jurors a bit of background about how the

2   gold industry works in Bolivia?

3   A.   Yes.  Gold is extracted in an artisanal way, and this is

4   obtained by very companies and several groups and companies.

5   Q.   After the gold is extracted, what happens?

6   A.   We gather the ore, we then standardize the metal, and we

7   prepare it for export to sell it subsequently.

8   Q.   So, focusing on Quari Wasi, back in 2012, what did Quari

9   Wasi do in the gold industry?

10  A.   What do you mean?

11  Q.   What did Quari Wasi do in the gold industry?

12  A.   To summarize, Quari Wasi would buy gold, it would

13  standardize it, and then export it.

14  Q.   Where would Quari Wasi export the gold?

15  A.   To the United States, to a smelter in Opa Locka.

16  Q.   Did this gold all get exported to the United States and to

17  this -- I'm sorry, what was the word that you used in

18  Opa Locka?

19  A.   "Smelter."  Republic Metals, in Opa Locka.

20  Q.   So, just to be clear, the gold would be exported from

21  Bolivia to the United States?

22  A.   Yes, that is correct.

23  Q.   Was all of the gold exported to the Miami area?

24  A.   Yes.  At that time, yes.

25  Q.   And typically, where was the gold delivered in the Miami

1    area?

2    A.   The gold was delivered to the refining company, a metal

3    refining company in Opa Locka, Republic Metal.

4    Q.   When the gold was initially received by Quari Wasi, what

5    form was the gold in?

6    A.   In Bolivia, you mean?

7    Q.   In Bolivia.

8    A.   We were to receive the gold in the natural state, and then

9    we would turn it into some kind of popcorn-like shape, because

10   this was the manner in which it had to be exported.

11   Q.   Back in 2012, how did the gold travel from Bolivia to the

12   United States?

13   A.   Back then, following the regulations that were in place

14   then, it had to come with an individual that would bring it as

15   a carry-on luggage.

16   Q.   Was Quari Wasi responsible for the transportation of the

17   gold from Bolivia to the United States?

18   A.   Yes.

19   Q.   And it would go on an airplane to reach the United States?

20   A.   Yes.

21   Q.   Is this a private or commercial airline?

22   A.   Commercial.

23   Q.   What would happen to the gold once it reached the

24   United States via airplane?

25   A.   Once it would land here, then it would proceed through

```
 1    Customs; and there, in Customs, together with the broker, we
 2    worked with Customs to do this exporting process.
 3         Then once it was approved, it was withdrawn from Customs.
 4    Q.   And then what would happen?
 5    A.   Once it was taken from Customs, it was taken over to the
 6    refining company.
 7    Q.   Was Quari Wasi involved at all in refining gold?
 8    A.   Refining, no, just the commercialization of gold.
 9    Q.   And the exportation of gold?
10    A.   Yes.
11    Q.   When the gold was traveling from Bolivia to the United
12    States, what was the security like for the gold?
13    A.   Once it was on the plane -- well, there was no way the gold
14    could be taken from the plane.  Back then, there was a direct
15    flight from La Paz to the United States.
16         There were no stops in between.
17    Q.   So no armed guard associated with the gold?
18    A.   One cannot take weapons on board a plane; and in Bolivia,
19    we had several individuals that would be part of the security
20    that would accompany the gold to the plane.
21    Q.   Once it reached the United States and cleared Customs, was
22    there any security associated with the gold?
23    A.   No, there wasn't.
24    Q.   Who would bring gold from Bolivia to the United States?
25    A.   We had two individuals as couriers that would bring over
```

1    the material.

2    Q.   What were their names?

3    A.   One was Juan Villegas.

4         Another one was Erika Kumar (phonetic), and then the rest

5    were members of the company that were relatives that -- they

6    would depend, it would be one or another that would bring it

7    over.

8    Q.   So tell me about Quari Wasi.  How many people worked there?

9    A.   We are a family business and, internally, we were about

10   eight people that worked there, plus the couriers.

11   Q.   What was the relationship between the employees?

12   A.   It was me, my wife, my brother-in-law, my sister-in-law, my

13   father-in-law, his wife, my sister-in-law, and two people very

14   close to our family.

15   Q.   Now, did Quari Wasi have a -- an office, rather, in Miami?

16   A.   No, that was not necessary.

17   Q.   Was there a point of contact for Quari Wasi in Miami?

18   A.   Point of contact or individual that was a point of contact

19   was Jorge Villegas.

20   Q.   And who is Jorge Villegas?

21   A.   This was an individual that would help us with the

22   transportation and with the logistics here in Miami.

23   Q.   So just to be clear, when the gold would arrive in Miami

24   from Bolivia, where would it go?

25   A.   The gold would arrive in two airlines, one that would come

```
 1    here early in the morning and one that would come in the

 2    afternoon.

 3         If it would come in the morning, it would go directly to

 4    the smelting plant to be processed there, or else, if it came

 5    in the afternoon, it would either make it to the smelting place

 6    or it would go to the house of Jorge Villegas so he could

 7    receive the delivery the following day.

 8    Q.   Where was Jorge Villegas' house, where he lived?

 9    A.   Jorge Villegas lived in Coral Gables.

10    Q.   How do you know that?

11    A.   I have gone -- or, rather, I went to his house back then

12    several times.

13    Q.   So, when the gold couldn't be delivered directly to

14    Republic Metals, it would typically go to Jorge Villegas' house

15    in Coral Gables?

16    A.   Yes, that is correct.

17    Q.   And then the gold would go the following day to Republic

18    Metals?

19    A.   Correct.

20    Q.   So, I want to focus your attention on the gold shipment

21    that came into the United States on October 11th, 2012.

22         Do you remember that shipment?

23    A.   Yes.

24    Q.   What did that shipment consist of?

25    A.   That shipment was 50 kilos of gold in 10 bags, five kilos
```

1    each.

2    Q.   So, 50 kilograms of gold; is that correct?

3    A.   Yes.

4    Q.   And 10 bags; is that what you said?

5    A.   Yes.

6    Q.   And what form was the gold in?

7    A.   The gold would come in the format of that popcorn-like

8    shape that would be placed in a five kilo ziplock, and then it

9    would come sealed with tape.

10   Q.   So I'm showing you what's already been admitted into

11   evidence as Government's Exhibit 36.

12        And just to be clear, these aren't photographs of the

13   October 11th, 2012, shipment; correct?

14   A.   No, no, no.  It's similar to this.

15   Q.   So, is this the popcorn-like shape that you were referring

16   to?

17   A.   Yes, that is correct.

18   Q.   I'm turning to the next photograph -- and it says Bates

19   stamped 546 -- what are we looking at here?

20   A.   Yes, that is gold.

21   Q.   Just more gold?

22   A.   Yes.

23   Q.   And turning to what's been marked 457, how much gold are we

24   looking at in this photograph?

25   A.   This is a different shipment.  Those are two kilos of gold.

1  Q.  And how many kilos of gold were brought in on the October

2  11th, 2012, shipment?

3  A.  50 kilos being put in 10 bags, each one containing five

4  kilos.

5  Q.  Looking at 548, is this showing the gold being placed in

6  those ziplock bags?

7  A.  Yes, that is correct.

8  Q.  And finally, looking at 549, is this, again, just a example

9  of how the gold was packaged?

10 A.  Yes, that is correct, that's how it was.

11 Q.  Again, what was the approximate value of the October 11th,

12 2012, shipment?

13 A.  $2,300,000.

14 Q.  Did you have any role in that shipment in Bolivia?

15      THE INTERPRETER:  Did you have --

16 BY MS. DUANE:

17 Q.  Any role in that shipment in Bolivia?

18 A.  Yes, I was involved.  I made all the preparations to put

19 the gold into the -- do the packaging of the gold, and I also

20 did the paperwork so that the gold would be ready to leave the

21 country.

22 Q.  Where did you do this paperwork?

23 A.  In Bolivia.

24 Q.  Where in Bolivia?

25 A.  In our offices.

```
 1    Q.   Did you go to the airport?

 2    A.   Yes.

 3    Q.   What did you do at the airport?

 4    A.   At the airport, we have to take the material to Customs and

 5    immigration so that it could get the proper authorization to

 6    leave the country legally.

 7    Q.   Who was the courier for this particular shipment?

 8    A.   Juan Villegas.

 9    Q.   Now, I'm handing you what has been marked for

10    identification as Government's Exhibit 37.

11         Do you recognize these documents?

12    A.   Yes.  This is an excerpt that I prepared of all the

13    shipments sent from the onset of the company to the date when

14    the robbery took place.

15    Q.   Is that the first document?

16    A.   Yes.

17    Q.   And what are the remaining documents?

18    A.   The second document is the document that the broker in

19    Miami prepared for the authorization of the gold to leave the

20    country --

21    Q.   And the next --

22    A.   -- and to come into Miami.

23    Q.   And the next?

24    A.   And the third one is a policy issued by the Bolivian

25    Government authorizing the export of the gold.
```

1    Q.   And the next?

2    A.   And the third one is a document prepared by Customs in

3    Bolivia, which gives the -- mentions who is the courier for the

4    shipment and giving an itemized detail of what this person is

5    transporting.

6    Q.   And the next document?

7    A.   Is the export invoice.

8         And the third one is an invoice that includes the itemized

9    gold placed in the bag, the quantity of fine gold, and the

10   quantity that each bag has and the amount of money that

11   corresponds to each one.

12   Q.   And the next document?

13   A.   The next document is a document that is requested by the

14   Customs there, which is a packaging list.

15   Q.   And the next document?

16   A.   The third document is the lab report that reports the

17   purity of the gold that also appears on the invoice of the

18   shipment.

19   Q.   Now, were each of these documents made and kept in the

20   course of your business?

21   A.   Yes.  These documents were required for the export of it.

22        MS. DUANE:  Your Honor, at this time, the Government

23   would move to admit what has been marked for identification as

24   Government's Exhibit 37 into evidence.

25        MR. ZACCA:  No objection.

1           THE COURT:  Received.

2           (Government's Exhibit 37 received into evidence.)

3  BY MS. DUANE:

4  Q.   I'm showing you the first page of what's been admitted into

5  evidence as Government's Exhibit 37, and that is Bates

6  stamped 427.  What is this document?

7  A.   Yes, this is a document prepared by me that shows all the

8  export shipments done from the opening of the company until the

9  robbery that occurred in October of 2012.  It had --

10  Q.   Sorry, go ahead.

11  A.   It had the name of the couriers who took the gold and the

12  person that would do the delivery to Republic.

13  Q.   You mentioned earlier that Quari Wasi opened in August of

14  2012?

15  A.   Yes, that is correct.

16  Q.   Prior to August of 2012, had you been involved in other

17  shipments working for other companies of gold?

18  A.   Yes, that is correct.

19  Q.   Did those companies also use Republic Metals?

20  A.   Yes, that is correct.

21  Q.   So, focusing on the last line of this document, the October

22  11th, 2012, shipment again, what was the value of that

23  shipment?

24  A.   $2,246,428.80.

25  Q.   And that shipment left on what day?

1    A.   It left Bolivia on October 11th -- no, on October 12th.

2    Q.   Who brought that gold to the United States?

3    A.   Juan Villegas.

4    Q.   And what happened once the gold reached the United States?

5    A.   The ore arrived, but it took a long time to go through

6    Customs, so it was already late.  So Juan Villegas handed the

7    gold to his brother, Jorge Villegas, to take it the following

8    day to Republic.

9    Q.   And Republic, is that what is indicated here, where it says

10   "R.M.C."?

11   A.   Yes.  Those are the initials for Republic Metals Company.

12   Q.   And what date was the gold supposed to be delivered to

13   Republic Metals?

14   A.   On October the 12th.

15   Q.   Now, I'm showing you what's been stamped 445.

16        What is this document?

17   A.   This is a lab analysis that shows the purity of the metal

18   that is being sent to the United States.

19   Q.   And what was the purity of this shipment?

20   A.   The purity was 79.04.

21   Q.   And what impact does the purity have on the gold?

22   A.   Well, each bag is five kilograms of gold that had to have

23   gold -- that the purity of that gold was 79.04 percent was the

24   gold that that bag contained.

25        The rest was other ore that came with it.

1   Q.   Does the purity impact the value of the gold?

2   A.   Of course.   The greater the purity, the greater the value

3   of that material.

4   Q.   Now, looking at what's been stamped 444, what is this

5   document?

6   A.   Yes, this is a shipment list that Customs in Bolivia

7   required that has the heading of where the gold was shipment

8   was going to, and it had had the number of packages that that

9   shipment included and the unit price of that material.

10   Q.   And what's stamped 443, what is this?

11   A.   This is a commercial invoice.   This includes the -- each

12   individual five-kilogram bag that the shipment included and the

13   purity that it had, and it was 127.006 ounces of gold.

14   Q.   Where is that located?   You can actually circle on the

15   screen.

16   A.   (Witness complied.)

17   Q.   And what is this number down here?

18   A.   This is the total price of the shipment.

19       If we take the value per bag and the amount and how much

20   each bag was priced at, then you have the addition of all of

21   them, which gives you the total price.

22   Q.   Now, I just want to go through these quickly.

23       What is this document stamped 439?

24   A.   This is a document of which we have a copy.

25       This is the document that the broker presents, and it's

```
 1    handed to Customs here.

 2    Q.   In the United States?

 3    A.   Yes, in the United States.

 4    Q.   And 440, what is this?

 5    A.   This is a document of a Bolivian Customs authorizing the

 6    export to here -- authorizing the export.

 7    Q.   The export of this particular shipment of gold?

 8    A.   Yes, that is correct, it has there the 10 bags and all the

 9    information -- corresponding information.

10    Q.   Now, I want to direct your attention to October 12th, 2012.

11    Do you remember that day?

12    A.   Yes.

13    Q.   Where were you on October 12th, 2012?

14    A.   In Bolivia.

15    Q.   And what happened that day?

16    A.   We were in Bolivia, and early in the morning I received a

17    call from Jorge Villegas.

18    Q.   Do you recall, approximately, at what time you received

19    that call?

20    A.   Approximately, 8:00 a.m. in the morning.

21    Q.   Can you describe how Mr. Villegas sounded when he called

22    you that morning?

23    A.   Yes, he was very nervous at the beginning, one could not

24    understand anything of what he was saying.

25         I told him to calm down and to explain to me what had
```

1   happened.

2   Q.   And did Mr. Villegas explain to you what had happened?

3   A.   Yes, in a very nervous way, he told me that --

4        MR. ZACCA:   Objection, hearsay.

5        MS. DUANE:   Excited utterance, Your Honor.

6        THE COURT:   Sustained.   Good try, though.

7        MS. DUANE:   Thank you.

8   BY MS. DUANE:

9   Q.   So without telling me what Mr. Villegas said to you that

10  morning, what did you tell Mr. Villegas?

11  A.   To be -- to calm down, to get calm, and to try to explain

12  to me what had happened.

13  Q.   Aside from Mr. Villegas, did you speak to anybody else that

14  morning?

15  A.   My family, to explain what had happened, and Jorge put me

16  over the phone with the Coral Gables detective that had started

17  the investigation.

18  Q.   So you spoke that morning to Mr. Villegas and then a Coral

19  Gables detective; is that correct?

20  A.   Yes, that is correct.   Yes, with Detective McKee.

21  Q.   Who else did you speak to that morning?

22  A.   We talked to the company that was to receive the material.

23  Q.   What company was that?

24  A.   Republic Metals.

25  Q.   And what did you tell Republic Metals?

```
1   A.   That we had been the victims of a robbery and that that was

2   under investigation.

3   Q.   Now, typically, when these shipments were received by

4   Republic Metals, what would happen?

5   A.   Usually, it would reach the company, and they, again, would

6   melt it.  They would get the purity.  And based on that, they

7   would then make the money transfer to us through a bank

8   transfer.

9   Q.   Did that happen with the October 11th, 2012, shipment?

10  A.   No, because it never reached Republic.

11  Q.   Did you ever receive this shipment back?

12  A.   No.

13  Q.   How has this robbery impacted Quari Wasi's business?

14           MR. ZACCA:  Objection, relevance.

15           THE COURT:  Restate your question, please.

16  BY MS. DUANE:

17  Q.   How has this robbery impacted Quari Wasi's business?

18           MR. ZACCA:  Same objection, Judge.

19           THE COURT:  The objection is relevance?

20           MR. ZACCA:  Yes, relevance, Judge.

21           THE COURT:  Come sidebar quickly, please.

22           (Sidebar discussion held as follows:)

23           THE COURT:  So what is the relevance of the impact on

24  the business from a robbery?

25           MS. DUANE:  It's one of the mentions -- of the business
```

```
 1    -- that impacted foreign commerce, and their business had to

 2    shutdown completely, this business.

 3            THE COURT:  Is that impact on?

 4            MR. ZACCA:  Disrupted, delay.

 5            THE COURT:  Whoa, whoa, whoa.

 6            MR. ZACCA:  Yes, Your Honor.

 7            THE COURT:  So it was interstate or foreign commerce,

 8    and it was removed from commerce, which shows a disruption,

 9    interference, et cetera, but how did the value have an impact

10    on interstate commerce or foreign commerce?

11            MS. DUANE:  Do you mean the value -- the fact that it

12    was $2.3 million or --

13            THE COURT:  Well, you said that the impact of the loss,

14    essentially, caused the business to close.

15            How does that impact foreign commerce?

16            MS. DUANE:  So, from the document that I just placed,

17    you can see that this business was doing consistent business

18    with the United States, they were doing consistent shipments --

19    so moving in interstate and foreign commerce -- and then, as a

20    result of the robbery --

21            THE COURT:  Isn't it the robbery that impacted the

22    commerce, not the result of value of the robbery, the fact that

23    they interfered with commerce by stealing it and removing it

24    from commerce?

25            MS. DUANE:  Yes, that's certainly part of it, but it
```

 1    also impacted commerce in that this business was no longer

 2    operating in commerce because of the robbery.

 3             THE COURT:  Do you have a case on that?  It sounds like

 4    one step removed, but do you have a case on that --

 5             MS. DUANE:  I certainly don't have the case on top of

 6    my --

 7             THE COURT:  -- where the loss affects the commerce?

 8             MS. DUANE:  Your Honor, if you think about the

 9    practical way of Hobbs Act, for example, usually, we will show

10    that the gas station was closed for a period of time, that's

11    within interstate, it's the same type of concept.

12             THE COURT:  I haven't heard that argument before so,

13    I mean, you could be right.  I don't -- so here's what I'm

14    going to do.  I'm going to sustain the objection, however, if

15    you bring me a case in that stands for the proposition you are

16    asserting, then I will allow that fact.

17             In other words, I guess -- why don't you tell us what

18    the answer would be?  He would say what?

19             MS. DUANE:  He would say as a result of this robbery,

20    Quari Wasi is no longer in operation.  He had to close down

21    because they were out $2.3 million dollars.

22             THE COURT:  What are you going to --

23             MS. DUANE:  It affects interstate commerce, not only

24    that it is in interstate commerce, but it is a company that is

25    in --

82

1          THE COURT:  I'm not sure how to do this, because he's

2    leaving the country.  I will say I'm going to sustain it, he

3    may come back and answer the question, show me a case.

4          Do we have any suggestion how to preserve that issue?

5          MS. DUANE:  I guess we can preserve it, if he does come

6    back, I think the points have been made.

7          THE COURT:  Has this been resolved, if he comes back,

8    I will let him testify.  If he doesn't come back, how do you

9    propose?

10         MS. DUANE:  I think we probably laid the groundwork for

11   this argument in what his testimony has been so far.  I just

12   think this would be further evidence of an impact on interstate

13   commerce.

14         THE COURT:  You show me a case, I'm happy to

15   understand.

16         MS. DUANE:  Your Honor, the only other thing I want to

17   raise is would it be possible to finish this witness?

18         I only have one more question.

19         MR. ZACCA:  I don't think I'm going to ask him any

20   questions.

21         THE COURT:  Alright.  Thank you.

22         (Sidebar concluded, the following held in open court:)

23         THE COURT:  The Court is going to reserve ruling on

24   this issue.

25

```
 1   BY MS. DUANE:

 2   Q.   Mr. Vargas, how much more did Quari Wasi lose as a result

 3   of October 12th, 2012, robbery?

 4   A.   Approximately, the $2,300,000; we did not recover anything.

 5        MS. DUANE:   Your Honor, the Government would tender the

 6   witness at this time.

 7        MR. ZACCA:   No questions.

 8        THE COURT:   May the witness be excused?

 9        MS. DUANE:   Temporarily, Your Honor.

10        THE COURT:   Alright, the witness is excused, subject to

11   recall.  You may step down.

12        (Witness excused, subject to recall.)

13        THE COURT:   Alright.  Ladies and gentlemen, we are

14   going to recess for the day and the week.  The lawyers and I

15   have some work to do tomorrow on this matter, so we can be here

16   on those issues, but for you it will not be necessary to attend

17   tomorrow or Friday, and we will resume on Monday at 9:00 a.m.

18        Monday at 9:00 a.m.  Please remember not to discuss the

19   case in any way.  Enjoy the remaining few days you have this

20   week and weekend, and we will look forward to seeing you on

21   Monday.  You are excused.

22        COURT SECURITY OFFICER:   All rise.

23        (Jury exited courtroom at 1:00 p.m.)

24        THE COURT:   Any additional matters by the parties?

25        MS. DUANE:   Your Honor, the only additional issue I
```

1    wanted to raise is that Mr. Vazquez was actually able to find a

2    case in the time period in which Mr. Vargas got off the stand.

3           If I could provide that to you, just so we're allowed

4    to argue it, at least, in closing.  That is *United States*

5    *versus Alexander,* 850 Fed 2d, 1500, Eleventh Circuit, 1988.

6           COURT REPORTER:  Could you repeat that?

7           MS. DUANE:  *United States versus Alexander*, and that's

8    850 Fed 2d, 1500, Eleventh Circuit, 1988.

9           THE COURT:  Alright.  We will take a look at it and --

10   as you said, the evidence is there, frankly, and you could

11   argue it, that case is convincing, and maybe the witness will

12   be back to even further elaborate.

13          MS. DUANE:  Yes, and it is actually a string cite, so I

14   can provide additional cases should Your Honor want them.

15   Thank you.

16          THE COURT:  Anything further?

17          MR. ZACCA:  Not from defense.

18          THE COURT:  May I have the attorneys come sidebar.

19          We are in recess.

20          (Sidebar discussion held as follows:)

21          THE COURT:  So, just a couple of pointers.

22          So I find that issue interesting, and I'm happy to read

23   the cases.  This is the first time I've heard that argument, so

24   let's hope it's a good one.

25          There were a couple of objections.

```
 1              There's a little leading.  Mr. Vazquez, you have to

 2      remember, you can't suggest an answer in your question.

 3              Now, if it's the second time around, if the witness has

 4      said something previously, and then you state it again, and in

 5      a follow-up question, then I don't find that objectionable.

 6      The first time, I do.

 7              There was one objection to his question:  "Are you

 8      trying to change your answer?"  That's like, you know, "Did you

 9      say something before?" -- I didn't find that really

10      argumentative, and so your objection was overruled.

11              I get this objection a lot.  You're misstating facts.

12      You objected to one of his questions.  So, on

13      cross-examination, the purpose of it is to test the witness'

14      memory.  So you ask the witness, "Is the sky blue?"

15              And on cross he asked:  "Didn't you say the sky was

16      red?"

17              Well, you can't say that's not facts in issue, that's

18      incorrect, because he can test the witness to see if he will

19      say the same thing again.

20              He might say "The sky is red," and he can argue "He

21      told me red" -- and he told you blue -- if he says "blue" -- or

22      he said the same thing to both.

23              So, you know, you can't -- I don't find that as a

24      proper objection is the point.

25              UNIDENTIFIED SPEAKER:  What I was trying to get at --
```

1  Your Honor, I'm certainly mindful of that, the premise that was

2  offered as the facts that were coming in did not sound correct

3  to me.

4       THE COURT:  But the witness said it many times, you're

5  wrong, in essence, so that's the point.  Take it for what it's

6  worth, objection, excited utterance.

7       The witness has to be so excited and so distraught that

8  he couldn't possibly make something up, so if you look at -- I

9  couldn't tell exactly when the call was made.

10      Most cases, you know, if it's an hour, that's not an

11  excited utterance.  So that's really the point, so for what

12  it's worth, ladies and gentlemen.

13      So how are we coming along?

14      MR. VAZQUEZ:  I think we're doing well, Your Honor.

15      THE COURT:  I'm trying to figure out, before Christmas

16  or come back after Christmas?

17      MR. VAZQUEZ:  I think we have a shot of being done

18  before.  I don't know the defense's case.  They have raised

19  some of the cooperating indicted coconspirators in this case.

20      THE COURT:  They listed as witnesses?

21      MR. VAZQUEZ:  Yes.  So, if those people are called,

22  they've got a lot to say, so...

23      THE COURT:  I think the good news is, if we have to

24  come back, I think we'll finish that week; so my next case up,

25  I'm going to be in good shape, so I'm trying to see if we might

```
1   finish or not.  I don't think it's important one way or the

2   other.  If we get really close to the end, then we may just

3   wait and come back for your closing arguments.

4          I don't want to break those up between, before and

5   after Christmas, so we'll see how close we are, and let's

6   assume that we're very, very close to the end, but the jury

7   would have to come back and deliberate.

8          It seems to me that it might be best to come back and

9   do the closings before the deliberations.

10         I don't know what you all think about that.

11         I'm a little reluctant to have them take a seven --

12  a week break and then come back and just start the

13  deliberations.  It seems to me maybe it's better to have the

14  closings and the instructions immediately before they retire to

15  deliberate.

16         MR. VAZQUEZ:  I do think that's a good idea.

17         I think if we get to that stage, we may want to

18  consider -- Your Honor may want to consider allowing them to

19  decide, the days after Christmas, if they're in the --

20  at least, in deliberation, they may want to get it over with,

21  that's my only thought.

22         THE COURT:  I don't want to do that, but if we have to

23  come back on the 2nd to do that, then we could.

24         MR. VAZQUEZ:  I think having them contiguous is a good

25  idea.
```

1          THE COURT:  Anything else?

2          MR. VAZQUEZ:  Not from the Government.

3          (Sidebar concluded, the following held in open court:)

4          THE COURT:  See you all tomorrow morning.

5          MR. ZACCA:  Thank you, Your Honor.

6          (Proceedings adjourned at 1:08 p.m.)

7

8                    C E R T I F I C A T E

9

10     I hereby certify that the foregoing is an

       accurate transcription of the proceedings in the

11

       above-entitled matter.

12

13

       January 18th, 2020  /s/Glenda M. Powers

14                          GLENDA M. POWERS, RPR, CRR, FPR
                            United States District Court
15                          400 North Miami Avenue, 08S33
                            Miami, Florida 33128
16

17

18

19

20

21

22

23

24

25

**$**

**$150,000** [2] - 44:6, 44:14
**$2,246,428.80** [1] - 74:24
**$2,300,000** [3] - 64:15, 71:13, 83:4

**/**

**/s/Glenda** [1] - 88:13

**0**

**07-27** [1] - 37:3
**08S33** [1] - 88:15

**1**

**1** [13] - 1:11, 3:11, 12:17, 12:25, 13:25, 14:1, 27:8, 37:19, 37:22, 37:25, 45:7, 52:21, 55:13
**10** [11] - 19:1, 19:25, 24:15, 24:16, 63:16, 69:25, 70:4, 71:3, 77:8
**10-minute** [1] - 62:4
**10:24** [1] - 34:5
**10:25** [1] - 34:4
**10:30** [1] - 10:16
**10:44** [2] - 34:5, 34:21
**10th** [2] - 24:20, 37:16
**11** [3] - 1:5, 2:6, 3:9
**110** [2] - 1:20, 1:20
**11:00** [1] - 34:1
**11:45** [1] - 10:17
**11:50** [2] - 62:5, 62:7
**11th** [10] - 39:4, 40:8, 64:12, 69:21, 70:13, 71:2, 71:11, 74:22, 75:1, 79:9
**127.006** [1] - 76:13
**12:09** [2] - 62:7, 62:9
**12th** [6] - 42:18, 75:1, 75:14, 77:10, 77:13, 83:3
**1500** [2] - 84:5, 84:8
**15th** [1] - 37:6
**16** [2] - 38:25, 46:5
**16th** [3] - 37:7, 40:14, 40:15
**17** [1] - 5:12
**1700** [1] - 1:20
**1759** [1] - 27:9
**17th** [1] - 35:20
**18** [1] - 38:24
**180** [1] - 37:8

**18th** [2] - 35:19, 88:13
**1988** [2] - 84:5, 84:8
**19th** [1] - 16:6
**1:00** [1] - 83:23
**1:08** [2] - 1:8, 88:6
**1:17-CR-20701-MGC-5** [1] - 1:2

**2**

**2** [9] - 3:12, 13:1, 13:2, 13:25, 14:3, 38:8, 38:11, 38:14
**2.3** [2] - 80:12, 81:21
**200** [1] - 38:20
**200-month** [2] - 38:22, 47:7
**2012** [19] - 42:18, 42:24, 63:23, 64:1, 64:12, 65:8, 66:11, 69:21, 70:13, 71:2, 71:12, 74:9, 74:14, 74:16, 74:22, 77:10, 77:13, 79:9, 83:3
**2013** [1] - 42:19
**2014** [5] - 12:19, 13:12, 17:14, 42:19
**2015** [22] - 11:11, 12:2, 12:8, 14:13, 16:6, 16:8, 18:24, 33:16, 35:7, 35:19, 35:20, 35:23, 35:25, 36:5, 36:22, 37:7, 38:5, 39:4, 40:8, 42:19
**2017** [1] - 37:11
**2018** [8] - 1:5, 32:9, 32:17, 37:16, 38:16, 40:14, 40:15, 42:18
**2020** [1] - 88:13
**21st** [3] - 36:5, 36:9, 36:22
**22** [4] - 3:9, 11:11, 11:13, 11:17
**23** [1] - 24:24
**25** [3] - 14:20, 55:6, 55:11
**25th** [1] - 13:12
**26th** [3] - 13:12, 32:9, 32:17
**28th** [2] - 38:5, 38:16
**29th** [1] - 12:19
**2d** [2] - 84:5, 84:8
**2nd** [2] - 37:11, 87:23

**3**

**3** [6] - 13:10, 13:11, 13:25, 14:5, 18:23, 35:22
**31st** [1] - 12:19

**33128** [2] - 1:25, 88:15
**33132** [1] - 1:18
**33301** [1] - 1:21
**35** [14] - 3:10, 21:14, 21:19, 21:20, 21:22, 21:24, 22:5, 22:8, 22:12, 24:22, 25:7, 25:14, 46:6, 46:24
**35s** [2] - 25:20, 26:21
**36** [1] - 70:11
**37** [6] - 3:5, 3:11, 72:10, 73:24, 74:2, 74:5
**38** [1] - 3:12

**4**

**4** [6] - 3:10, 35:7, 35:10, 35:14, 37:4, 55:20
**40** [1] - 9:7
**400** [2] - 1:24, 88:15
**427** [1] - 74:6
**439** [1] - 76:23
**440** [1] - 77:4
**443** [1] - 76:10
**444** [1] - 76:4
**445** [1] - 75:15
**457** [1] - 70:23
**49** [1] - 2:7
**4th** [1] - 1:17

**5**

**5** [1] - 9:19
**50** [3] - 69:25, 70:2, 71:3
**546** [1] - 70:19
**548** [1] - 71:5
**549** [1] - 71:8
**55** [3] - 8:9, 8:11, 8:14
**56** [3] - 8:10, 8:11, 8:14
**57** [2] - 8:7, 8:8
**58** [1] - 7:13
**59** [1] - 7:13

**6**

**6** [1] - 1:10
**60** [4] - 7:13, 8:7, 49:16, 50:4
**62** [1] - 2:9
**6th** [1] - 1:20

**7**

**7** [1] - 9:19
**74** [1] - 3:5
**79.04** [2] - 75:20,

75:23
**7:00** [1] - 9:19
**7:30** [1] - 9:17

**8**

**801(d)(1)(B** [1] - 50:4
**806** [1] - 1:17
**850** [2] - 84:5, 84:8
**8:00** [1] - 77:20

**9**

**9** [1] - 30:2
**99** [2] - 1:11, 1:17
**9:00** [5] - 1:7, 7:6, 8:25, 83:17, 83:18
**9:02** [1] - 1:8
**9:16** [1] - 8:22
**9:18** [1] - 10:5
**9:19** [1] - 10:11

**A**

**A-S-T-I-A-Z** [1] - 63:2
**A.M** [4] - 12:21, 13:4, 13:15, 14:5
**a.m** [15] - 1:7, 1:8, 8:22, 8:25, 10:5, 10:11, 34:4, 34:5, 34:21, 62:5, 62:7, 77:20, 83:17, 83:18
**Aaron** [2] - 32:11, 40:16
**Abel** [2] - 28:22, 28:23
**abide** [1] - 9:2
**ability** [1] - 61:8
**able** [1] - 34:1
**above-entitled** [1] - 88:11
**absolutely** [1] - 31:13
**accept** [3] - 47:4, 47:6, 47:9
**accepted** [2] - 51:13, 54:8
**accident** [1] - 9:20
**accompany** [1] - 67:20
**according** [3] - 23:8, 30:9, 44:3
**accurate** [1] - 88:10
**accused** [2] - 14:25, 50:25
**acknowledge** [2] - 53:15, 53:21
**Act** [4] - 34:10, 52:2, 53:13, 81:9
**action** [1] - 24:22
**active** [1] - 64:2
**activities** [1] - 54:14

**activity** [1] - 36:6
**add** [1] - 7:17
**added** [4] - 7:11, 7:12, 7:13, 7:18
**addition** [2] - 34:16, 76:20
**additional** [4] - 6:11, 83:24, 83:25, 84:14
**address** [2] - 8:3, 50:20
**addresses** [2] - 50:17, 51:6
**adjourned** [1] - 88:6
**admissible** [1] - 4:20
**admit** [5] - 50:11, 51:19, 51:20, 60:4, 73:23
**admitted** [4] - 18:6, 49:13, 50:16, 51:17, 55:12, 56:6, 70:10, 74:4
**advisory** [1] - 21:8
**affect** [1] - 61:8
**affects** [2] - 81:7, 81:23
**afternoon** [3] - 62:22, 69:2, 69:5
**Agent** [2] - 32:10, 32:11, 36:12, 40:16, 40:17
**agents** [8] - 5:15, 27:21, 33:14, 33:16, 33:19, 35:2, 46:6
**agree** [2] - 5:19, 33:18
**agreed** [1] - 34:11
**agreeing** [2] - 34:13, 34:15
**agreement** [15] - 18:15, 18:16, 18:24, 19:1, 19:2, 19:20, 37:19, 45:4, 45:6, 46:17, 55:7, 55:9, 55:11, 55:15, 55:18
**ahead** [2] - 74:10
**aided** [1] - 4:2
**airline** [1] - 66:21
**airlines** [1] - 68:25
**airplane** [2] - 66:19, 66:24
**airport** [3] - 72:1, 72:3, 72:4
**Alberto** [1] - 63:1
**ALBERTO** [1] - 63:2
**alert** [1] - 6:24
**alerting** [1] - 6:7
**Alex** [17] - 11:12, 12:23, 13:15, 14:6, 16:18, 16:21, 17:2, 17:9, 17:17, 17:22, 18:25, 36:7, 36:19,

37:5, 41:4, 41:9,
45:5
**Alexander** [2] - 84:5,
84:7
**Alfredo** [1] - 59:19
**ALFREDO** [2] - 2:6,
10:24
**alien** [8] - 12:6, 12:13,
13:19, 14:15, 15:9,
15:13, 48:6, 48:13
**alleged** [3] - 50:14,
52:3, 52:24
**allegedly** [1] - 44:9
**allow** [1] - 81:16
**allowed** [1] - 84:3
**allowing** [1] - 87:18
**alone** [1] - 8:18
**alright** [18] - 6:18,
10:2, 10:4, 10:6,
17:22, 18:13, 19:15,
19:23, 20:18, 31:20,
41:3, 43:2, 51:14,
53:6, 82:21, 83:10,
83:13, 84:9
**amended** [2] - 7:8,
7:15
**America** [2] - 24:25,
25:7
**AMERICA** [1] - 1:4
**amount** [3] - 43:13,
73:10, 76:19
**analysis** [1] - 75:17
**analyze** [1] - 20:10
**Andrew** [1] - 36:12
**answer** [11] - 17:6,
32:7, 39:12, 50:23,
52:25, 53:1, 57:10,
81:18, 82:3, 85:2,
85:8
**answer's** [1] - 32:24
**answered** [1] - 36:23
**answers** [1] - 27:25
**anticipate** [2] - 6:15,
6:16
**APPEARANCES** [1] -
1:14
**append** [1] - 7:20
**applicable** [1] - 21:9
**approved** [1] - 67:3
**approximate** [2] -
64:14, 71:11
**April** [3] - 37:16,
40:14, 40:15
**area** [3] - 18:13, 65:23,
66:1
**areas** [1] - 11:5
**argue** [4] - 52:21,
84:4, 84:11, 85:20
**argument** [3] - 81:12,
82:11, 84:23

**argumentative** [2] -
39:13, 85:10
**arguments** [1] - 87:3
**armed** [1] - 67:17
**arrest** [3] - 17:1, 17:8,
18:10
**arrested** [1] - 16:8
**arrive** [2] - 68:23,
68:25
**arrived** [1] - 75:5
**arrives** [1] - 6:22
**artisanal** [1] - 65:3
**aside** [1] - 78:13
**aspect** [1] - 28:14
**asserting** [1] - 81:16
**assistance** [1] - 21:16
**Assistant** [1] - 36:14
**associated** [3] -
60:16, 67:17, 67:22
**assume** [1] - 87:6
**asterisk** [1] - 21:16
**Astiaz** [1] - 63:1
**attach** [1] - 7:16
**attend** [1] - 83:16
**attention** [3] - 49:12,
69:20, 77:10
**Attorney** [1] - 36:14
**attorney** [7] - 15:10,
17:4, 17:5, 36:15,
41:4, 41:7, 41:9
**Attorney's** [1] - 1:16,
20:4, 20:23, 46:9,
60:18
**attorneys** [1] - 84:18
**attributable** [1] - 8:13
**August** [3] - 64:1,
74:13, 74:16
**AUSA** [2] - 1:15, 1:15
**authorization** [2] -
72:5, 72:19
**authorizing** [3] -
72:25, 77:5, 77:6
**Avenue** [2] - 1:24,
88:15
**aware** [1] - 8:24

**B**

**background** [1] - 65:1
**backup** [1] - 23:4
**bag** [7] - 73:9, 73:10,
75:22, 75:24, 76:12,
76:19, 76:20
**bags** [5] - 69:25, 70:4,
71:3, 71:6, 77:8
**bank** [1] - 79:7
**based** [2] - 8:5, 79:6
**Bates** [3] - 27:8,
70:18, 74:5
**bear** [1] - 31:21

**BEFORE** [1] - 1:12
**begin** [1] - 34:8
**beginning** [3] - 7:24,
47:19, 77:23
**belongs** [1] - 30:8
**Benitez** [2] - 28:22,
28:23
**best** [2] - 21:17, 87:8
**better** [2] - 25:13,
87:13
**between** [5] - 12:19,
36:11, 67:16, 68:11,
87:4
**bit** [1] - 65:1
**blue** [3] - 85:14, 85:21
**board** [1] - 67:18
**Bolivia** [24] - 4:12,
63:5, 63:7, 63:8,
64:22, 65:2, 65:21,
66:6, 66:7, 66:11,
66:17, 67:11, 67:18,
67:24, 68:24, 71:14,
71:17, 71:23, 71:24,
73:3, 75:1, 76:6,
77:14, 77:16
**Bolivian** [2] - 72:24,
77:5
**break** [8] - 10:15,
10:16, 10:18, 33:25,
34:25, 62:4, 87:4,
87:12
**breaks** [1] - 55:25
**Brian** [1] - 36:14
**Brief** [6] - 6:23, 8:15,
19:13, 31:22, 42:5,
47:16
**bring** [9] - 5:19, 10:8,
34:19, 62:8, 66:14,
67:24, 67:25, 68:6,
81:15
**bringing** [1] - 6:25
**broker** [3] - 67:1,
72:18, 76:25
**brother** [2] - 23:15,
68:12, 75:7
**brother-in-law** [1] -
68:12
**brought** [3] - 7:1,
71:1, 75:2
**building** [1] - 7:3
**bullets** [4] - 31:10,
32:1, 32:20, 32:21
**bus** [1] - 9:11
**business** [15] - 63:17,
64:16, 64:17, 68:9,
73:20, 79:13, 79:17,
79:24, 79:25, 80:1,
80:2, 80:14, 80:17,
81:1
**buy** [1] - 65:12

**BY** [34] - 1:23, 11:2,
11:18, 14:21, 19:14,
25:5, 25:12, 25:25,
26:17, 31:24, 34:24,
35:15, 38:1, 38:15,
39:17, 42:6, 47:17,
49:7, 53:12, 53:20,
54:5, 54:21, 56:19,
57:9, 58:21, 59:1,
61:12, 61:18, 62:21,
71:16, 74:3, 78:8,
79:16, 83:1

**C**

**calculated** [1] - 21:8
**calm** [3] - 77:25, 78:11
**Camilo** [2] - 36:24,
59:18
**Cancun** [4] - 16:22,
17:2, 17:10, 17:17
**cannot** [2] - 49:3,
67:18
**car** [4] - 22:22, 22:23,
23:2, 31:2
**Carlos** [1] - 36:13
**carry** [1] - 66:15
**carry-on** [1] - 66:15
**case** [51] - 6:12, 6:13,
6:15, 6:16, 11:12,
12:2, 14:13, 18:24,
24:25, 25:7, 25:15,
32:15, 35:3, 35:8,
36:6, 37:10, 37:13,
37:16, 37:20, 38:3,
38:4, 38:17, 38:18,
40:21, 40:22, 41:5,
41:7, 41:9, 41:10,
41:18, 41:22, 41:24,
49:20, 53:14, 55:15,
59:23, 60:1, 61:20,
63:11, 81:3, 81:4,
81:5, 81:15, 82:3,
82:14, 83:19, 84:2,
84:11, 86:18, 86:19,
86:24
**CASE** [1] - 1:2
**cases** [5] - 40:21,
49:14, 84:14, 84:23,
86:10
**cash** [2] - 44:9, 44:16
**catch** [1] - 9:11
**caught** [1] - 61:7
**caused** [1] - 80:14
**Center** [4] - 24:3, 24:6,
25:19, 26:19
**certain** [3] - 45:8,
59:15
**certainly** [5] - 48:13,
61:8, 80:25, 81:5,

86:1
**Certified** [1] - 4:3
**certify** [1] - 88:9
**cetera** [2] - 10:1, 80:9
**CFR** [1] - 6:8
**CFRs** [1] - 5:18
**challenged** [2] -
50:20, 51:15
**change** [2] - 39:11,
85:8
**changes** [1] - 8:6
**charge** [6] - 15:13,
18:3, 18:7, 18:8,
57:3, 61:8
**charged** [19] - 12:12,
12:13, 13:14, 14:14,
14:23, 15:17, 35:25,
37:10, 37:13, 51:25,
52:15, 52:17, 52:24,
53:2, 56:12, 56:23,
57:6, 59:23, 60:1
**charges** [5] - 13:25,
51:22, 51:25, 55:5,
57:12
**chocolate** [1] - 10:1
**Christmas** [4] - 86:15,
86:16, 87:5, 87:19
**circle** [4] - 21:16,
21:17, 21:18, 76:14
**Circuit** [2] - 84:5, 84:8
**cite** [1] - 84:13
**clarify** [1] - 57:10
**clear** [4] - 4:24, 11:5,
18:13, 29:13, 31:13,
63:20, 65:20, 68:23,
70:12
**cleared** [2] - 21:23,
67:21
**clearly** [1] - 23:8
**close** [6] - 68:14,
80:14, 81:20, 87:2,
87:5, 87:6
**closed** [1] - 81:10
**closing** [2] - 84:4,
87:3
**closings** [2] - 87:9,
87:14
**cocaine** [2] - 44:19,
45:2
**coconspirators** [1] -
86:19
**Code** [2] - 5:13, 5:23
**coffee** [1] - 10:1
**collected** [1] - 42:7
**colored** [1] - 22:22
**Colt** [5] - 30:2, 31:14,
31:17, 32:2, 32:25
**coming** [3] - 7:7, 86:2,
86:13
**comments** [1] - 26:14

**commerce** [17] - 4:17, 80:1, 80:7, 80:8, 80:10, 80:15, 80:19, 80:22, 80:23, 80:24, 81:1, 81:2, 81:7, 81:23, 81:24, 82:13
**commercial** [3] - 66:21, 66:22, 76:11
**commercialization** [2] - 63:14, 67:8
**commission** [1] - 54:8
**commit** [3] - 12:20, 14:3, 48:12
**committed** [1] - 48:6
**committing** [1] - 56:6
**communications** [1] - 15:24
**companies** [4] - 65:4, 74:17, 74:19
**Company** [1] - 75:11
**company** [15] - 63:19, 63:20, 64:2, 64:19, 64:20, 66:2, 66:3, 67:6, 68:5, 72:13, 74:8, 78:22, 78:23, 79:5, 81:24
**completely** [1] - 80:2
**complied** [1] - 76:16
**complying** [1] - 5:18
**concept** [1] - 81:11
**concluded** [4] - 6:20, 53:10, 82:22, 88:3
**conduct** [1] - 50:16
**confuse** [1] - 28:12
**confused** [2] - 17:15, 23:19
**confusing** [1] - 28:10
**connection** [1] - 63:11
**consider** [3] - 61:2, 87:18
**consist** [1] - 69:24
**consisted** [1] - 50:1
**consistent** [6] - 50:5, 50:10, 50:11, 50:19, 80:17, 80:18
**conspiracy** [16] - 14:1, 14:3, 14:11, 14:19, 14:20, 15:7, 15:10, 15:18, 15:19, 23:9, 34:10, 39:10, 49:25, 52:3, 52:11, 59:24
**conspirators** [1] - 50:1
**conspired** [2] - 12:20, 13:3
**contact** [3] - 68:17, 68:18
**contained** [2] - 57:21, 75:24
**containing** [1] - 71:3

**contiguous** [1] - 87:24
**continually** [1] - 8:20
**continue** [3] - 13:21, 18:15, 34:23
**continued** [3] - 2:6, 10:24, 39:2
**contract** [6] - 19:20, 22:11, 22:15, 36:1, 45:6, 45:24
**controlled** [1] - 51:13
**convenience** [1] - 40:25
**conversation** [4] - 44:18, 44:21, 60:12
**convicted** [1] - 49:21
**convincing** [1] - 84:11
**Cooke** [4] - 49:22, 53:14, 54:13, 55:5
**cooperating** [1] - 86:19
**cooperation** [6] - 20:7, 20:12, 20:15, 21:1, 21:5
**copy** [1] - 76:24
**Coral** [11] - 36:20, 36:23, 57:17, 57:20, 58:3, 59:17, 59:20, 69:9, 69:15, 78:16, 78:18
**correct** [112] - 12:6, 12:21, 12:23, 13:8, 14:6, 14:24, 16:6, 16:9, 16:15, 16:18, 18:11, 18:12, 18:18, 18:19, 19:4, 19:6, 19:8, 19:10, 19:16, 19:21, 20:4, 20:13, 21:1, 22:2, 23:9, 23:11, 23:21, 23:24, 26:2, 26:19, 27:23, 28:25, 29:14, 29:19, 29:24, 30:12, 30:15, 30:18, 31:15, 31:18, 32:2, 32:15, 33:11, 33:16, 35:3, 36:1, 36:20, 37:8, 37:14, 38:5, 38:20, 38:22, 39:7, 40:3, 40:5, 40:9, 40:23, 41:5, 41:10, 41:16, 41:18, 41:20, 41:22, 41:25, 42:2, 42:11, 43:7, 43:8, 43:21, 43:25, 44:3, 44:16, 44:19, 45:9, 45:15, 45:19, 45:22, 46:9, 46:18, 47:7, 47:9, 47:11, 48:4, 48:6, 48:20, 50:13, 50:16, 54:18, 55:7, 55:16, 55:23,

56:16, 59:10, 61:2, 64:13, 64:22, 64:23, 65:22, 69:16, 69:19, 70:2, 70:13, 70:17, 71:7, 71:10, 74:15, 74:18, 74:20, 77:8, 78:19, 78:20, 86:2
**corrected** [1] - 8:9
**correctly** [1] - 18:17
**corresponding** [1] - 77:9
**corresponds** [1] - 73:11
**counsel** [8] - 49:13, 50:14, 51:7, 54:19, 55:12, 55:25, 56:8, 57:14
**Counsel** [1] - 50:8
**count** [4] - 12:14, 15:2, 33:20, 55:20
**Count** [15] - 12:17, 12:25, 13:1, 13:2, 13:10, 13:11, 13:25, 14:1, 14:3, 14:5, 52:21, 55:20
**counters** [1] - 50:12
**country** [9] - 4:12, 14:2, 22:16, 64:9, 64:21, 71:21, 72:6, 72:20, 82:2
**couple** [3] - 42:25, 84:21, 84:25
**courier** [2] - 72:7, 73:3
**couriers** [3] - 67:25, 68:10, 74:11
**course** [2] - 73:20, 76:2
**Court** [20] - 1:23, 1:24, 4:1, 4:3, 4:4, 4:18, 4:19, 4:24, 5:6, 6:25, 19:6, 19:16, 20:8, 21:15, 22:6, 22:7, 22:13, 45:22, 82:23, 88:14
**court** [5] - 6:20, 53:10, 62:25, 82:22, 88:3
**COURT** [119] - 1:1, 4:7, 4:14, 4:21, 4:25, 5:5, 5:8, 5:11, 6:6, 6:11, 6:18, 6:21, 7:2, 7:6, 7:8, 7:12, 7:15, 7:19, 7:23, 8:5, 8:11, 8:17, 8:23, 9:5, 9:8, 9:10, 9:13, 9:15, 9:18, 10:4, 10:6, 10:10, 10:12, 11:16, 14:18, 25:4, 25:10, 25:23, 26:9, 26:14, 33:25, 34:3, 34:6, 34:8, 34:20, 34:22,

35:13, 37:24, 38:13, 39:15, 50:8, 50:10, 50:17, 50:22, 51:1, 51:3, 51:8, 51:12, 51:18, 51:21, 51:24, 52:4, 52:7, 52:10, 52:12, 52:20, 52:22, 52:25, 53:8, 53:11, 53:18, 54:3, 56:18, 57:8, 58:19, 58:24, 61:11, 61:16, 62:2, 62:4, 62:8, 62:10, 74:1, 78:6, 79:15, 79:19, 79:21, 79:23, 80:3, 80:5, 80:7, 80:13, 80:21, 81:3, 81:7, 81:12, 81:22, 82:1, 82:7, 82:14, 82:21, 82:23, 83:8, 83:10, 83:13, 83:22, 83:24, 84:6, 84:9, 84:16, 84:18, 84:21, 86:4, 86:15, 86:20, 86:23, 87:22, 88:1, 88:4
**Court's** [1] - 21:7
**Court-Certified** [1] - 4:3
**courthouse** [1] - 24:11
**courtroom** [9] - 8:18, 8:22, 10:5, 10:11, 34:4, 34:21, 62:5, 62:9, 83:23
**COURTROOM** [6] - 4:4, 8:12, 8:16, 26:12, 62:12, 62:17
**created** [1] - 61:14
**crime** [3] - 12:1, 12:5, 56:25
**crimes** [5] - 15:8, 53:3, 54:9, 56:5, 60:16
**criminal** [5] - 21:7, 36:6, 53:16, 53:21, 54:23
**Criminal** [1] - 21:14
**cross** [3] - 47:19, 85:13, 85:15
**Cross** [1] - 2:6
**CROSS** [1] - 11:1
**cross-examination** [2] - 47:19, 85:13
**CROSS-EXAMINATION** [1] - 11:1
**Cross-Examination** [1] - 2:6
**CRR** [2] - 1:23, 88:14
**crucial** [2] - 21:11

**cup** [1] - 10:1
**current** [1] - 63:17, 63:18, 63:20
**custody** [2] - 7:1, 49:14
**Customs** [14] - 64:10, 67:1, 67:2, 67:3, 67:5, 67:21, 72:4, 73:2, 73:14, 75:6, 76:6, 77:1, 77:5
**cut** [1] - 13:5

**D**

**Dairon** [2] - 28:22, 28:23
**date** [19] - 16:6, 16:8, 16:11, 16:14, 17:1, 17:8, 18:10, 36:22, 37:1, 38:3, 39:3, 39:4, 40:14, 42:16, 54:14, 57:21, 72:13, 75:12
**dates** [3] - 32:17, 35:16, 59:15
**Dauberts** [1] - 36:15
**DAY** [1] - 1:10
**days** [9] - 6:17, 40:10, 42:20, 42:22, 42:25, 46:11, 83:19, 87:19
**December** [1] - 12:19
**december** [1] - 1:5
**decide** [1] - 87:19
**decided** [1] - 60:9
**decision** [2] - 56:4, 60:24
**deems** [1] - 4:19
**DEFENDANT** [1] - 1:19
**defendant** [6] - 7:4, 21:15, 52:16, 57:22, 58:8, 59:20
**Defendant** [1] - 4:2
**defendant's** [5] - 20:7, 21:5, 21:17, 35:14, 58:4
**DEFENDANT'S** [1] - 3:8
**Defendant's** [13] - 11:11, 11:17, 24:24, 35:6, 35:10, 35:22, 37:4, 37:19, 37:25, 38:8, 38:10, 38:14, 45:7
**defense** [14] - 4:13, 11:13, 35:9, 37:21, 38:10, 49:13, 50:14, 51:7, 55:12, 55:25, 56:8, 57:14, 84:17
**Defense** [1] - 55:13

**defense's** [1] - 86:18
**Defense's** [1] - 18:23
**delay** [1] - 80:4
**deliberate** [2] - 87:7, 87:15
**deliberation** [1] - 87:20
**deliberations** [2] - 87:9, 87:13
**delivered** [4] - 65:25, 66:2, 69:13, 75:12
**delivery** [1] - 69:7, 74:12
**departure** [1] - 21:7
**DEPUTY** [5] - 4:4, 8:16, 26:12, 62:12, 62:17
**DERIC** [1] - 1:19
**Deric** [1] - 1:19
**describe** [1] - 77:21
**described** [8] - 25:20, 28:2, 28:7, 28:14, 30:6, 39:22, 40:2, 40:3
**desk** [1] - 51:11
**detail** [2] - 45:4, 73:4
**details** [1] - 60:4
**detective** [2] - 78:16, 78:19
**Detective** [1] - 78:20
**Detention** [4] - 24:3, 24:6, 25:19, 26:19
**determine** [2] - 20:15, 20:16
**different** [4] - 40:20, 46:16, 59:12, 70:25
**differently** [3] - 28:2, 28:7, 28:15
**difficulty** [1] - 8:25
**DIRECT** [1] - 62:20
**direct** [4] - 28:19, 31:3, 67:14, 77:10
**Direct** [1] - 2:9
**directly** [2] - 69:3, 69:13
**discovery** [5] - 41:9, 41:13, 41:14, 41:18, 41:20
**discuss** [2] - 64:11, 83:18
**discussing** [1] - 64:12
**discussion** [4] - 5:6, 50:9, 79:22, 84:20
**disrupted** [1] - 80:4
**disruption** [1] - 80:8
**distinction** [1] - 34:17
**distraught** [1] - 86:7
**distribution** [1] - 54:11
**DISTRICT** [3] - 1:1,

1:1, 1:12
**District** [4] - 1:24, 4:4, 4:5, 88:14
**document** [23] - 45:11, 45:13, 45:24, 72:15, 72:18, 73:2, 73:6, 73:12, 73:13, 73:15, 73:16, 74:6, 74:7, 74:21, 75:16, 76:5, 76:23, 76:24, 76:25, 77:5, 80:16
**documents** [4] - 72:11, 72:17, 73:19, 73:21
**dollars** [1] - 81:21
**DONALD** [1] - 1:12
**Donald** [1] - 4:5
**done** [4] - 18:1, 54:23, 74:8, 86:17
**door** [1] - 29:14
**doubt** [1] - 57:3
**down** [9] - 33:6, 34:2, 40:14, 49:1, 76:17, 77:25, 78:11, 81:20, 83:11
**downward** [1] - 21:7
**draw** [1] - 49:12
**drive** [5] - 9:11, 9:12, 9:13, 9:14, 23:1
**driven** [1] - 24:8
**driver** [2] - 23:4, 33:8
**driving** [2] - 22:22, 30:23
**dropped** [2] - 28:25, 30:14
**drove** [3] - 27:16, 28:15, 29:4
**drugs** [1] - 54:11
**DUANE** [28] - 1:15, 51:6, 62:11, 62:21, 71:16, 73:22, 74:3, 78:5, 78:7, 78:8, 79:16, 79:25, 80:11, 80:16, 80:25, 81:5, 81:8, 81:19, 81:23, 82:5, 82:10, 82:16, 83:1, 83:5, 83:9, 83:25, 84:7, 84:13
**Duane** [1] - 2:9
**during** [2] - 31:3, 57:20
**Duval** [1] - 36:12

**E**

**early** [2] - 69:1, 77:16
**ease** [1] - 6:1
**East** [2] - 24:15, 24:16
**east** [1] - 24:17
**eight** [3] - 33:19,

38:25, 68:10
**either** [6] - 16:25, 18:20, 27:5, 31:7, 31:9, 69:5
**elaborate** [1] - 84:12
**Eleventh** [2] - 84:5, 84:8
**Elmo** [1] - 11:8
**employees** [1] - 68:11
**encounter** [1] - 5:22
**end** [6] - 7:17, 7:18, 13:22, 18:12, 87:2, 87:6
**enforcement** [2] - 41:16, 59:9
**engaged** [2] - 53:21, 54:13
**English** [1] - 12:9
**enjoy** [2] - 48:2, 83:19
**enjoyable** [1] - 9:23
**enter** [1] - 37:3
**entered** [7] - 8:22, 10:11, 18:22, 34:21, 35:21, 35:25, 62:9
**entitled** [1] - 88:11
**Erika** [1] - 68:4
**Espinosa** [5] - 4:8, 6:21, 7:24, 8:23, 8:24
**espouse** [1] - 50:23
**ESQ** [1] - 1:19
**essence** [1] - 86:5
**essentially** [3] - 23:1, 40:2, 80:14
**established** [5] - 26:21, 39:2, 39:7, 50:15, 64:20
**et** [2] - 10:1, 80:9
**evaluate** [2] - 20:6, 20:11
**evaluating** [2] - 46:18, 46:21
**evening** [1] - 6:2
**EVIDENCE** [2] - 2:3, 3:3
**evidence** [18] - 10:14, 11:14, 11:17, 18:23, 35:11, 35:14, 35:23, 37:22, 37:25, 38:11, 38:14, 50:4, 70:11, 73:24, 74:2, 74:5, 82:12, 84:10
**exactly** [1] - 86:9
**examination** [2] - 47:19, 85:13
**EXAMINATION** [3] - 11:1, 49:6, 62:20
**Examination** [3] - 2:6, 2:7, 2:9
**examine** [1] - 27:7

**example** [2] - 71:8, 81:9
**excerpt** [1] - 72:12
**exchange** [3] - 15:13, 15:16, 22:13
**excited** [4] - 78:5, 86:6, 86:7, 86:11
**excusal** [2] - 4:21, 4:22
**excuse** [3] - 13:12, 26:11, 55:12
**excused** [6] - 62:2, 62:6, 83:8, 83:10, 83:12, 83:21
**excusing** [1] - 7:23
**EXHIBIT** [1] - 3:2
**exhibit** [3] - 7:8, 7:9, 7:16
**Exhibit** [29] - 3:5, 3:9, 3:10, 3:11, 3:12, 11:11, 11:13, 11:17, 18:23, 24:24, 27:8, 35:6, 35:10, 35:14, 35:22, 37:4, 37:19, 37:22, 37:25, 38:8, 38:10, 38:14, 45:7, 55:13, 70:11, 72:10, 73:24, 74:2, 74:5
**EXHIBITS** [2] - 3:4, 3:8
**exited** [5] - 10:5, 34:4, 42:20, 62:5, 83:23
**experience** [1] - 9:23
**experienced** [1] - 8:25
**explain** [6] - 49:24, 64:17, 77:25, 78:2, 78:11, 78:15
**explained** [1] - 51:10
**explore** [1] - 16:5
**export** [12] - 64:21, 64:24, 65:7, 65:13, 65:14, 72:25, 73:7, 73:21, 74:8, 77:6, 77:7
**exportation** [1] - 67:9
**exported** [4] - 65:16, 65:20, 65:23, 66:10
**exporting** [1] - 67:2
**exposed** [2] - 55:4, 60:2
**expound** [1] - 53:1
**extent** [3] - 4:19, 20:6, 20:12
**extortion** [1] - 52:3
**extortions** [1] - 52:23
**extracted** [2] - 65:3, 65:5

**F**

**fabricated** [1] - 51:16
**fabricating** [1] - 50:25
**fabrication** [4] - 50:12, 50:17, 51:4, 53:5
**face** [4] - 58:22, 58:25, 59:2, 59:6
**facing** [1] - 40:21
**fact** [11] - 12:11, 13:24, 15:12, 15:16, 18:9, 37:1, 38:22, 50:20, 80:11, 80:22, 81:16
**facts** [5] - 14:17, 54:22, 85:11, 85:17, 86:2
**factual** [4] - 49:21, 49:24, 54:18, 54:23
**falls** [1] - 52:21
**false** [1] - 50:15
**familiar** [1] - 19:1
**familiarity** [1] - 25:13
**family** [3] - 68:9, 68:14, 78:15
**far** [3] - 13:19, 23:25, 82:11
**father** [1] - 68:13
**father-in-law** [1] - 68:13
**FBI** [6] - 16:14, 16:17, 16:21, 17:1, 17:8, 40:8
**Fed** [2] - 84:5, 84:8
**Federal** [8] - 1:23, 5:13, 21:14, 23:24, 24:2, 24:5, 25:19, 26:18
**federal** [2] - 33:16, 37:14
**few** [5] - 33:24, 40:10, 42:20, 42:22, 42:25, 83:19
**figure** [1] - 86:15
**file** [4] - 22:12, 46:24, 47:11, 47:13
**filed** [7] - 5:9, 5:12, 25:6, 25:14, 35:19, 35:20, 37:7
**files** [1] - 22:6
**finally** [2] - 38:4, 71:8
**fine** [1] - 73:9
**fingerprints** [2] - 8:12, 8:13
**finish** [3] - 82:17, 86:24, 87:1
**finishes** [1] - 5:3
**firearm** [5] - 30:2, 31:14, 31:17, 32:2, 33:1, 55:20

**fired** [1] - 33:1
**first** [8] - 25:10, 40:22, 47:18, 60:1, 72:15, 74:4, 84:23, 85:6
**fit** [1] - 22:12
**five** [6] - 13:13, 69:25, 70:8, 71:3, 75:22, 76:12
**five-kilogram** [1] - 76:12
**fled** [1] - 30:18
**flew** [1] - 4:12
**flight** [1] - 67:15
**flip** [1] - 12:20
**flipping** [1] - 13:13
**floor** [3] - 24:14, 24:20, 26:25
**FLORIDA** [1] - 1:1
**Florida** [6] - 1:4, 1:18, 1:21, 1:25, 4:5, 88:15
**fluent** [1] - 49:10
**focus** [3] - 33:24, 64:16, 69:20
**focusing** [2] - 65:8, 74:21
**follow** [3] - 5:17, 5:22, 85:5
**follow-up** [1] - 85:5
**followed** [1] - 5:24
**following** [9] - 6:20, 16:20, 53:10, 66:13, 69:7, 69:17, 75:7, 82:22, 88:3
**follows** [6] - 5:7, 10:25, 50:9, 62:19, 79:22, 84:20
**FOR** [2] - 1:15, 1:19
**foregoing** [1] - 88:9
**foreign** [6] - 14:1, 80:1, 80:7, 80:10, 80:15, 80:19
**forget** [1] - 16:11
**forgive** [2] - 25:9, 28:21
**form** [4] - 39:13, 53:17, 66:5, 70:6
**format** [1] - 70:7
**Fort** [1] - 1:21
**forward** [1] - 83:20
**four** [2] - 6:17, 35:21
**four-hour** [1] - 6:17
**FPR** [3] - 1:23, 88:14
**Frank** [5] - 58:6, 58:10, 58:12, 58:16, 58:22
**Frank's** [2] - 58:25, 59:2
**frankly** [2] - 5:16, 84:10

**frazzled** [1] - 9:21
**freedom** [2] - 48:2, 48:9
**Friday** [1] - 83:17
**friends** [3] - 23:13, 23:15, 23:20
**front** [3] - 17:3, 29:14, 55:5
**full** [4] - 43:13, 62:24, 63:1, 64:7
**fully** [1] - 22:1

## G

**Gables** [11] - 36:20, 36:23, 57:17, 57:20, 58:4, 59:17, 59:20, 69:9, 69:15, 78:16, 78:19
**games** [2] - 15:5, 16:25
**Garcia** [23] - 4:2, 11:22, 27:13, 28:3, 28:5, 28:8, 28:9, 28:15, 28:17, 30:8, 30:11, 30:22, 30:25, 31:2, 31:17, 36:25, 39:6, 39:22, 40:23, 42:11, 43:18, 44:10, 44:13
**GARCIA** [1] - 1:7
**Gardens** [1] - 9:14
**gas** [1] - 81:10
**gather** [1] - 65:6
**gear** [1] - 26:14
**gentlemen** [4] - 10:12, 34:22, 83:13, 86:12
**get-away** [3] - 23:2, 23:4, 33:8
**given** [11] - 14:19, 15:15, 43:6, 43:12, 43:13, 44:2, 44:13, 44:14, 47:4, 58:1, 60:18
**gladly** [1] - 47:9
**GLENDA** [1] - 1:23, 88:14
**God** [1] - 62:15
**godson** [1] - 45:1
**gold** [84] - 22:25, 33:4, 33:8, 33:11, 36:20, 36:23, 37:1, 39:5, 39:9, 39:21, 40:23, 42:8, 63:14, 63:15, 64:14, 64:17, 64:25, 65:2, 65:3, 65:5, 65:9, 65:11, 65:12, 65:14, 65:16, 65:20, 65:23, 65:25, 66:2, 66:4, 66:5, 66:8,

66:11, 66:17, 66:23, 67:7, 67:8, 67:9, 67:11, 67:12, 67:13, 67:17, 67:20, 67:22, 67:24, 68:23, 68:25, 69:13, 69:17, 69:20, 69:25, 70:2, 70:6, 70:7, 70:20, 70:21, 70:23, 70:25, 71:1, 71:5, 71:9, 71:19, 71:20, 72:19, 72:25, 73:9, 73:17, 74:11, 74:17, 75:2, 75:4, 75:7, 75:12, 75:21, 75:22, 75:23, 75:24, 76:1, 76:7, 76:13, 77:7
**Gonzalez** [1] - 27:4
**Government** [38] - 5:15, 8:5, 15:12, 15:15, 15:21, 15:24, 18:11, 19:21, 20:11, 20:16, 20:25, 22:6, 22:11, 22:12, 22:16, 25:6, 27:18, 27:23, 36:1, 36:5, 39:2, 45:7, 45:25, 46:13, 46:17, 46:24, 47:11, 55:7, 55:9, 56:13, 57:3, 57:12, 60:16, 62:11, 72:25, 73:22, 83:5, 88:2
**GOVERNMENT** [1] - 1:15
**GOVERNMENT'S** [2] - 2:3, 3:4
**Government's** [10] - 27:8, 30:2, 49:16, 50:4, 55:12, 70:11, 72:10, 73:24, 74:2, 74:5
**grab** [2] - 30:25, 51:11
**Graham** [1] - 4:5
**GRAHAM** [1] - 1:12
**granted** [1] - 6:6
**grasp** [1] - 51:5
**greater** [2] - 76:2
**groundwork** [1] - 82:10
**group** [2] - 54:23, 55:2
**groups** [1] - 65:4
**guard** [1] - 67:17
**guess** [3] - 32:24, 81:17, 82:5
**guidelines** [1] - 21:9
**guilty** [16] - 12:1, 12:5, 14:14, 18:3, 18:7, 18:9, 18:12, 36:1, 36:11, 37:3, 37:16, 40:20, 49:14, 49:20,

53:13
**gun** [4] - 29:24, 31:11, 32:20, 32:22
**Guy** [2] - 62:11, 63:1
**GUY** [3] - 2:8, 62:18, 63:2

## H

**hand** [11] - 11:10, 24:23, 29:24, 30:1, 31:18, 33:18, 35:6, 37:4, 37:18, 38:7, 62:12
**handed** [2] - 75:6, 77:1
**handing** [1] - 72:9
**handled** [1] - 5:19
**hands** [1] - 30:3
**happy** [2] - 82:14, 84:22
**heading** [1] - 76:7
**hear** [1] - 26:12
**heard** [5] - 29:21, 29:23, 30:3, 81:12, 84:23
**hearsay** [2] - 25:22, 78:4
**Hector** [1] - 40:17
**heed** [1] - 9:25
**heist** [3] - 33:4, 39:6, 39:21
**held** [8] - 5:6, 6:20, 50:9, 53:10, 79:22, 82:22, 84:20, 88:3
**Held** [1] - 1:8
**help** [5] - 22:16, 58:4, 61:22, 62:15, 68:21
**helpful** [1] - 51:6
**hereby** [1] - 88:9
**Hialeah** [2] - 9:14, 9:15
**Hobbs** [4] - 34:10, 52:2, 53:13, 81:9
**hold** [3] - 12:21, 13:4, 13:14
**home** [4] - 28:5, 28:17, 30:12
**Honor** [33] - 4:11, 4:23, 6:24, 7:11, 8:19, 35:12, 49:21, 50:3, 50:24, 50:25, 51:10, 52:24, 54:13, 54:17, 54:22, 54:25, 55:10, 60:5, 60:10, 62:1, 73:22, 78:5, 80:6, 81:8, 82:16, 83:5, 83:9, 83:25, 84:14, 86:1, 86:14, 87:18, 88:5

**Honor's** [1] - 6:14
**Honorable** [1] - 4:5
**HONORABLE** [1] - 1:12
**hope** [3] - 10:13, 60:12, 84:24
**hospital** [5] - 42:13, 42:20, 42:22, 42:24, 43:20
**hot** [1] - 10:1
**hour** [3] - 6:17, 9:7, 86:10
**house** [12] - 24:9, 27:14, 28:9, 28:15, 42:13, 42:14, 43:16, 43:20, 69:6, 69:8, 69:11, 69:14
**human** [8] - 51:12, 51:20, 52:7, 52:8, 52:17, 54:1, 54:6
**Humberto** [1] - 27:4

## I

**idea** [5] - 10:18, 10:19, 32:21, 87:16, 87:25
**identification** [9] - 11:10, 24:23, 35:10, 37:18, 37:22, 38:7, 49:15, 72:10, 73:23
**IGNACIO** [1] - 1:15
**immediately** [1] - 87:14
**immigration** [1] - 72:5
**impact** [9] - 64:7, 75:21, 76:1, 79:23, 80:3, 80:9, 80:13, 80:15, 82:12
**impacted** [6] - 64:6, 79:13, 79:17, 80:1, 80:21, 81:1
**important** [11] - 12:18, 16:11, 18:25, 19:25, 23:20, 40:5, 47:21, 48:8, 48:16, 48:19, 87:1
**imprisoned** [1] - 24:4
**IN** [1] - 3:3
**in-custody** [1] - 7:1
**included** [3] - 15:19, 76:9, 76:12
**includes** [2] - 73:8, 76:11
**including** [1] - 26:4
**incorrect** [1] - 85:18
**indicated** [1] - 75:9
**indicted** [2] - 56:15, 86:19
**indictment** [15] - 11:11, 12:8, 14:16,

14:23, 15:1, 15:6,
15:9, 35:17, 35:19,
52:10, 52:13, 52:17,
53:3, 59:24, 60:17
**individual** [4] - 66:14,
68:18, 68:21, 76:12
**individuals** [2] -
67:19, 67:25
**industry** [4] - 63:15,
65:2, 65:9, 65:11
**information** [7] -
41:22, 41:24, 56:15,
56:20, 56:23, 77:9
**informing** [1] - 21:15
**initials** [1] - 75:11
**inquire** [2] - 8:18, 9:1
**instances** [2] - 51:13,
54:8
**instead** [1] - 6:4
**instructions** [3] -
34:9, 34:18, 87:14
**intelligent** [1] - 39:23
**intend** [1] - 7:9
**interest** [1] - 11:8
**interested** [1] - 7:23
**interesting** [1] - 84:22
**interfered** [1] - 80:23
**interference** [1] - 80:9
**interim** [1] - 8:7
**internally** [1] - 68:9
**Interpreter** [1] - 62:18
**INTERPRETER** [4] -
2:8, 54:19, 62:21,
71:15
**interpreter** [1] - 54:19
**Interpreters** [1] - 4:3
**interrupt** [1] - 5:1
**interstate** [8] - 4:17,
80:7, 80:10, 80:19,
81:11, 81:23, 81:24,
82:12
**investigation** [6] -
21:6, 59:8, 64:3,
64:8, 78:17, 79:2
**invoice** [4] - 73:7,
73:8, 73:17, 76:11
**involved** [9] - 16:22,
17:9, 17:18, 36:23,
37:1, 40:23, 67:7,
71:18, 74:16
**involvement** [4] -
29:6, 32:15, 35:2,
54:25
**involving** [2] - 11:12,
11:19
**issue** [6] - 64:4, 82:4,
82:24, 83:25, 84:22,
85:17
**issued** [1] - 72:24
**issues** [5] - 4:16, 4:17,

5:23, 7:25, 83:16
**itemized** [2] - 73:4,
73:8
**items** [2] - 52:4, 52:14

## J

**jail** [4] - 24:1, 24:11,
24:13, 25:19
**January** [1] - 88:13
**Jean** [22] - 23:11,
23:13, 23:18, 23:21,
26:25, 28:20, 28:25,
30:14, 30:17, 31:6,
36:24, 39:24, 40:9,
43:2, 43:4, 43:12,
43:13, 44:2, 44:5,
44:13, 58:12, 59:18
**Jean's** [1] - 23:15
**JESUS** [1] - 1:15
**Joe** [1] - 11:22
**join** [1] - 34:16
**joined** [1] - 34:11
**joining** [1] - 34:13
**Jorge** [9] - 68:19,
68:20, 69:6, 69:8,
69:9, 69:14, 75:7,
77:17, 78:15
**JR** [1] - 1:15
**Juan** [4] - 68:3, 72:8,
75:3, 75:6
**judge** [3] - 19:12,
21:1, 47:15
**JUDGE** [1] - 1:12
**Judge** [21] - 6:10,
6:19, 19:6, 20:17,
25:9, 26:11, 42:4,
49:5, 49:22, 50:6,
53:14, 54:13, 55:5,
56:7, 60:5, 60:10,
61:1, 61:21, 62:3,
79:18, 79:20
**Judges** [1] - 61:2
**judgment** [8] - 20:20,
20:22, 35:7, 35:17,
37:5, 38:8, 38:16,
46:8
**July** [7] - 35:23, 35:25,
36:5, 36:9, 36:22,
39:4, 40:8
**June** [2] - 38:4, 38:16
**juror** [3] - 4:8, 8:22,
10:5
**JUROR** [7] - 9:4, 9:6,
9:9, 9:12, 9:14, 9:17,
10:3
**jurors** [2] - 64:17, 65:1
**jury** [13] - 10:8, 10:11,
19:23, 22:1, 34:4,
34:19, 34:21, 41:12,

62:5, 62:8, 62:9,
83:23, 87:6
**JURY** [1] - 1:10

## K

**keep** [3] - 7:4, 14:22,
36:4
**kept** [2] - 33:20, 73:19
**keys** [2] - 30:25, 31:2
**kidnap** [3] - 14:1,
14:3, 48:12
**kidnapped** [2] - 13:3,
48:4
**kidnapping** [35] -
11:12, 11:19, 12:2,
12:12, 12:21, 13:14,
14:4, 14:5, 14:12,
14:14, 14:24, 15:17,
15:19, 16:9, 16:18,
16:22, 17:2, 17:9,
17:14, 17:17, 17:22,
18:24, 35:8, 36:6,
36:7, 36:19, 37:5,
41:4, 45:5, 52:6,
52:19, 52:20, 55:1,
60:1, 60:4
**kidnappings** [3] -
17:15, 51:19, 53:22
**kilo** [1] - 70:8
**kilogram** [1] - 76:12
**kilograms** [2] - 70:2,
75:22
**kilos** [6] - 69:25,
70:25, 71:1, 71:3,
71:4
**kind** [2] - 60:21, 66:9
**Kindelan** [10] - 5:3,
15:20, 49:8, 53:13,
56:21, 57:10, 59:8,
59:19, 60:15, 61:13
**KINDELAN** [2] - 2:6,
10:24
**kindelan** [1] - 11:3
**knowingly** [2] - 34:11,
34:15
**knowledge** [2] -
15:10, 23:25
**known** [3] - 20:8, 23:6,
59:7
**knows** [2] - 6:2, 25:10
**Kumar** [1] - 68:4

## L

**lab** [2] - 73:16, 75:17
**lack** [1] - 20:8
**ladies** [4] - 10:12,
34:22, 83:13, 86:12
**laid** [1] - 82:10

**land** [1] - 66:25
**language** [5] - 13:5,
45:8, 46:2, 46:9,
46:16
**Lara** [8] - 23:11,
23:13, 23:21, 26:25,
28:25, 30:14, 31:6,
39:24
**Lara's** [1] - 23:18,
28:20
**last** [7] - 6:1, 6:16,
19:18, 28:12, 45:11,
57:11, 74:21
**late** [4] - 7:25, 8:1,
9:21, 75:6
**Lauderdale** [1] - 1:21
**law** [7] - 5:22, 41:16,
59:9, 68:12, 68:13
**lawyer** [5] - 19:4,
19:16, 41:20, 45:19,
49:8
**lawyers** [1] - 83:14
**leader** [1] - 40:3
**leading** [4] - 56:17,
57:7, 61:10, 85:1
**learn** [1] - 41:22
**least** [4] - 33:19,
34:11, 34:15, 34:17,
84:4, 87:20
**leave** [8] - 9:8, 9:16,
9:19, 9:25, 42:24,
71:20, 72:6, 72:19
**leaving** [2] - 27:14,
82:2
**left** [8] - 18:14, 30:19,
30:20, 31:2, 42:22,
43:20, 74:25, 75:1
**legalese** [2] - 21:13,
49:10
**legally** [2] - 64:20,
72:6
**Leonardo** [8] - 4:2,
27:13, 36:25, 39:6,
40:22, 43:18, 44:9,
44:13
**LEONARDO** [1] - 1:7
**less** [3] - 55:21, 60:15,
60:18
**letter** [1] - 5:22
**lie** [10] - 18:8, 48:13,
48:19, 48:23, 48:24,
49:2, 56:9, 56:25,
57:13
**lied** [11] - 15:24, 16:1,
16:2, 17:1, 17:8,
17:19, 18:2, 18:3,
18:5, 18:10
**Lier** [16] - 22:19,
22:21, 22:22, 22:25,
23:6, 23:13, 23:20,

23:23, 24:18, 24:20,
25:1, 25:7, 25:14,
25:16, 26:24
**lieu** [1] - 6:4
**life** [16] - 16:12, 47:24,
48:1, 48:2, 48:10,
48:11, 48:13, 48:20,
48:23, 49:2, 55:22,
56:3, 56:5, 60:3,
60:7, 63:8
**line** [11] - 31:25, 49:12,
51:16, 56:10, 57:15,
60:13, 74:21
**list** [6] - 7:8, 7:9, 7:16,
8:6, 73:14, 76:6
**listed** [1] - 86:20
**live** [3] - 24:9, 24:11,
63:6
**lived** [3] - 63:8, 69:8,
69:9
**living** [1] - 63:13
**located** [1] - 76:14
**location** [2] - 30:11,
30:15
**Locka** [4] - 65:15,
65:18, 65:19, 66:3
**logistics** [1] - 68:22
**look** [18] - 5:18, 6:8,
12:8, 12:14, 13:24,
25:9, 29:2, 29:11,
34:9, 34:12, 34:13,
34:17, 35:16, 48:16,
83:20, 84:9, 86:8
**look-out** [3] - 29:2,
29:11
**looked** [7] - 8:6,
14:16, 14:23, 35:18,
45:4, 45:5, 46:2
**looking** [15] - 6:3,
13:1, 18:14, 18:15,
18:18, 21:19, 22:5,
27:11, 35:22, 46:24,
70:19, 70:24, 71:5,
71:8, 76:4
**looks** [1] - 34:15
**lose** [1] - 83:2
**loss** [2] - 80:13, 81:7
**loud** [1] - 24:18
**luggage** [1] - 66:15
**lunch** [1] - 58:1
**lying** [6] - 48:15, 57:6,
61:7, 61:14, 61:20,
61:23

## M

**MACKENZIE** [1] - 1:15
**mandatory** [1] - 21:9
**manner** [1] - 66:10
**March** [7] - 12:19,

13:12, 16:6, 35:19, 35:20, 35:25
**marked** [12] - 11:10, 24:23, 35:6, 35:9, 35:13, 37:18, 37:22, 38:7, 49:15, 70:23, 72:9, 73:23
**markup** [1] - 7:10
**maroon** [1] - 22:22
**maroon-colored** [1] - 22:22
**Marrero** [1] - 59:18
**MARSHAL** [1] - 7:7
**Marshals** [2] - 6:5, 6:25
**Martin** [1] - 63:1
**MARTIN** [1] - 63:2
**Martinez** [2] - 60:5, 60:10
**mask** [7] - 31:4, 31:5, 31:6, 31:8, 59:4, 59:6
**mat** [1] - 31:2
**material** [5] - 68:1, 72:4, 76:3, 76:9, 78:22
**matter** [6] - 4:9, 5:9, 6:11, 10:19, 83:15, 88:11
**matters** [2] - 21:7, 83:24
**maximum** [2] - 55:4, 55:22
**McKee** [1] - 78:20
**mean** [8] - 9:4, 48:16, 53:7, 57:11, 65:10, 66:6, 80:11, 81:13
**means** [5] - 9:8, 9:18, 18:8, 20:4, 20:23
**meant** [1] - 59:24
**meet** [1] - 39:2
**meeting** [4] - 36:12, 36:16, 36:18, 42:18
**meetings** [2] - 33:13, 57:22
**melt** [1] - 79:6
**members** [2] - 54:8, 68:5
**memory** [1] - 85:14
**mention** [8] - 13:8, 13:17, 13:19, 40:8, 40:9, 40:10, 40:22
**mentioned** [9] - 11:5, 26:18, 28:18, 31:10, 36:25, 39:6, 40:13, 44:18, 74:13
**mentions** [2] - 73:3, 79:25
**merchandise** [2] - 64:8, 64:9

**Mesa** [20] - 11:12, 12:23, 13:15, 14:6, 16:18, 16:21, 17:2, 17:10, 17:17, 17:22, 18:25, 36:7, 36:19, 37:5, 41:4, 41:9, 45:5, 55:1, 60:1, 60:4
**met** [16] - 27:18, 32:9, 32:13, 33:15, 33:19, 33:20, 35:1, 36:5, 36:12, 36:14, 40:15, 40:16, 40:17, 59:8
**metal** [3] - 65:6, 66:2, 75:17
**Metal** [1] - 66:3
**metals** [1] - 63:14
**Metals** [9] - 65:19, 69:14, 69:18, 74:19, 75:11, 75:13, 78:24, 78:25, 79:4
**Mexico** [3] - 16:23, 17:10, 17:18
**MIAMI** [1] - 1:2
**Miami** [15] - 1:4, 1:16, 1:18, 1:24, 1:25, 65:23, 65:25, 68:15, 68:17, 68:22, 68:23, 72:19, 72:22, 88:15, 88:15
**microphone** [2] - 9:5, 24:18
**might** [6] - 5:17, 51:6, 60:11, 85:20, 86:25, 87:8
**MIGUEL** [1] - 1:7
**Miguelito** [3] - 58:7, 58:8, 59:5
**million** [2] - 80:12, 81:21
**mind** [2] - 46:12, 46:20
**mindful** [1] - 86:1
**minimum** [2] - 21:9, 55:21
**minute** [3] - 39:11, 39:20, 51:21
**minutes** [1] - 9:7
**Miramar** [11] - 16:14, 16:17, 27:6, 27:14, 28:25, 29:6, 40:11, 57:14, 57:21, 58:3, 58:6
**missed** [2] - 26:11, 26:13
**missing** [1] - 4:8
**misstatement** [1] - 14:17
**misstating** [1] - 85:11
**mistaken** [2] - 23:17,

23:19
**mode** [1] - 9:24
**moment** [7] - 19:12, 33:1, 42:4, 43:16, 44:5, 47:15, 51:24
**moments** [1] - 35:1
**Monday** [3] - 83:17, 83:18, 83:21
**money** [29] - 42:7, 43:3, 43:4, 43:6, 43:9, 43:10, 43:12, 43:13, 43:15, 43:19, 43:23, 44:2, 44:3, 44:5, 44:14, 44:22, 48:4, 48:6, 48:8, 48:16, 51:13, 54:8, 64:7, 64:9, 73:10, 79:7
**monitor** [1] - 10:6
**Montalvan** [1] - 59:18
**months** [5] - 35:21, 37:8, 38:20, 38:25, 42:25
**Morales** [16] - 4:2, 28:3, 28:8, 30:8, 30:11, 30:22, 31:1, 31:2, 36:13, 36:25, 39:6, 40:23, 42:11, 43:18, 44:10, 44:13
**MORALES** [1] - 1:7
**Morales'** [6] - 27:14, 28:9, 28:15, 28:17, 31:17, 39:22
**morning** [20] - 7:25, 8:1, 8:23, 10:13, 11:3, 11:4, 11:6, 33:25, 35:18, 62:23, 69:1, 69:3, 77:16, 77:20, 77:22, 78:10, 78:14, 78:18, 78:21, 88:4
**most** [9] - 19:25, 47:21, 48:8, 48:16, 48:19, 49:20, 56:1, 60:2, 86:10
**motion** [6] - 6:6, 21:12, 22:6, 24:25, 25:6, 25:14, 47:11, 60:21
**move** [6] - 7:4, 7:19, 33:4, 38:2, 50:3, 73:23
**moves** [4] - 11:13, 35:9, 37:21, 38:10
**moving** [2] - 37:10, 80:19
**MR** [109] - 4:11, 4:15, 4:23, 5:3, 5:10, 5:25, 6:10, 6:14, 6:19, 6:24, 7:3, 7:11, 7:13,

7:18, 7:21, 8:4, 8:9, 8:19, 8:21, 10:23, 11:2, 11:15, 11:18, 14:17, 14:21, 19:12, 19:14, 25:2, 25:5, 25:12, 25:22, 25:25, 26:11, 26:13, 26:16, 26:17, 31:20, 31:23, 31:24, 34:24, 35:12, 35:15, 37:23, 38:1, 38:12, 38:15, 39:13, 39:17, 42:4, 42:6, 47:15, 47:17, 49:5, 49:7, 50:3, 50:6, 50:14, 50:19, 50:24, 51:2, 51:10, 51:15, 51:19, 51:23, 52:2, 52:6, 52:9, 52:11, 52:19, 52:21, 52:23, 53:7, 53:12, 53:17, 53:20, 54:2, 54:5, 54:21, 56:17, 56:19, 57:7, 57:9, 58:18, 58:21, 58:23, 59:1, 61:10, 61:12, 61:15, 61:18, 61:25, 62:3, 73:25, 78:4, 79:14, 79:18, 79:20, 80:4, 80:6, 82:19, 83:7, 84:17, 86:14, 86:17, 86:21, 87:16, 87:24, 88:2, 88:5
**MS** [27] - 51:6, 62:11, 62:21, 71:16, 73:22, 74:3, 78:5, 78:7, 78:8, 79:16, 79:25, 80:11, 80:16, 80:25, 81:5, 81:8, 81:19, 81:23, 82:5, 82:10, 82:16, 83:1, 83:5, 83:9, 83:25, 84:7, 84:13

**N**

**Nacho** [12] - 11:20, 12:2, 12:12, 13:8, 13:17, 14:14, 14:24, 15:6, 15:17, 52:6, 52:19, 52:20
**Nacho's** [2] - 11:22, 15:19
**name** [16] - 11:22, 11:24, 12:14, 13:3, 13:10, 13:13, 15:6, 15:7, 25:20, 28:21, 40:22, 62:24, 63:1, 63:17, 74:11
**name-by-name** [1] - 15:7
**names** [2] - 23:19,

68:2
**narrow** [2] - 52:15, 53:2
**natural** [1] - 66:8
**nature** [2] - 20:6, 20:11
**near** [1] - 30:11
**necessary** [2] - 68:16, 83:16
**need** [4] - 6:8, 19:12, 48:2, 50:6
**nervous** [2] - 77:23, 78:3
**never** [13] - 11:24, 15:17, 16:1, 16:2, 24:21, 31:5, 36:25, 39:6, 40:8, 43:2, 44:12, 44:16, 79:10
**new** [5] - 7:21, 61:8, 61:20, 63:18
**news** [1] - 86:23
**next** [11] - 20:9, 62:10, 70:18, 72:21, 72:23, 73:1, 73:6, 73:12, 73:13, 73:15, 86:24
**nice** [1] - 13:2
**Nicole** [1] - 7:14
**night** [1] - 6:1
**nine** [1] - 45:11
**NO** [1] - 1:2
**normal** [1] - 6:4
**North** [2] - 1:24, 88:15
**Northeast** [1] - 1:17
**noted** [1] - 7:13
**notes** [3] - 33:6, 33:7, 39:20
**nothing** [3] - 25:18, 56:22, 62:14
**noticed** [1] - 9:6
**number** [3] - 33:20, 76:8, 76:17
**Number** [8] - 11:13, 35:7, 35:10, 35:22, 37:19, 38:8, 38:11, 45:7
**numbers** [1] - 8:7
**numerous** [1] - 34:25

**O**

**oath** [1] - 57:1
**object** [3] - 8:19, 25:2, 56:17
**objected** [1] - 85:12
**objection** [31] - 4:13, 8:21, 11:15, 14:17, 25:22, 35:12, 37:23, 38:12, 39:13, 50:6, 53:6, 53:8, 53:11, 53:17, 54:2, 57:7,

58:18, 58:23, 61:10, 61:15, 73:25, 78:4, 79:14, 79:18, 79:19, 81:14, 85:7, 85:10, 85:11, 85:24, 86:6
**objectionable** [1] - 85:5
**objections** [1] - 84:25
**obtained** [1] - 65:4
**obvious** [1] - 32:24
**obviously** [1] - 40:5
**occasion** [2] - 34:12, 34:17
**occasions** [1] - 59:9
**occur** [2] - 42:18, 42:19
**occurred** [4] - 17:14, 36:20, 42:17, 74:9
**occurring** [1] - 8:1
**October** [20] - 32:9, 32:17, 37:6, 37:7, 37:10, 42:17, 64:12, 69:21, 70:13, 71:1, 71:11, 74:9, 74:21, 75:1, 75:14, 77:10, 77:13, 79:9, 83:3
**OF** [2] - 1:1, 1:4
**offense** [1] - 12:21
**offenses** [1] - 54:15
**offered** [1] - 86:2
**offering** [3] - 56:15, 56:20, 56:23
**Office** [5] - 1:16, 20:4, 20:23, 46:9, 60:18
**office** [8] - 16:14, 16:17, 20:3, 20:4, 20:20, 20:22, 20:23, 68:15
**OFFICER** [5] - 10:10, 34:3, 34:6, 34:20, 83:22
**offices** [1] - 71:25
**Official** [1] - 1:23
**old** [1] - 7:20
**once** [8] - 57:13, 66:23, 66:25, 67:3, 67:5, 67:13, 67:21, 75:4
**one** [37] - 4:8, 6:11, 6:17, 7:4, 10:17, 10:21, 14:11, 32:17, 34:11, 34:15, 34:17, 40:21, 45:5, 48:25, 52:7, 59:5, 59:6, 63:18, 67:18, 68:3, 68:4, 68:6, 68:25, 69:1, 71:3, 72:24, 73:2, 73:8, 73:11, 77:23, 79:25, 81:4, 82:18, 84:24, 85:7,

85:12, 87:1
**ones** [1] - 7:20
**onset** [1] - 72:13
**Opa** [4] - 65:15, 65:18, 65:19, 66:3
**open** [6] - 6:20, 53:10, 61:20, 63:25, 82:22, 88:3
**opened** [1] - 74:13
**opening** [1] - 74:8
**operating** [1] - 81:2
**operation** [1] - 81:20
**opportunity** [1] - 45:21
**order** [3] - 4:1, 9:10, 9:18
**Ordoñez** [2] - 32:10, 33:15
**ore** [3] - 65:6, 75:5, 75:25
**organization** [2] - 53:16, 53:21
**organizer** [1] - 40:2
**Ortiz** [1] - 40:17
**ounces** [1] - 76:13
**ourselves** [1] - 22:21
**out-of-country** [1] - 4:12
**out-of-turn** [2] - 4:25, 5:1
**overruled** [9] - 14:18, 25:4, 25:23, 39:15, 53:6, 53:18, 54:3, 61:16, 85:10
**owe** [2] - 64:7

---

## P

**P.A** [1] - 1:19
**p.m** [5] - 1:8, 62:7, 62:9, 83:23, 88:6
**packaged** [1] - 71:9
**packages** [1] - 76:8
**packaging** [2] - 71:19, 73:14
**page** [14] - 7:15, 7:21, 7:22, 8:6, 8:7, 12:20, 13:13, 13:21, 19:18, 45:11, 55:18, 74:4
**PAGE** [1] - 2:2
**PAGES** [1] - 1:11
**pages** [2] - 7:19, 13:23
**papers** [1] - 32:18
**paperwork** [2] - 71:20, 71:22
**paragraph** [8] - 18:25, 19:1, 19:25, 46:5, 51:9, 55:18, 55:19
**part** [11] - 21:11, 23:8, 26:21, 51:22, 51:25,

52:10, 53:15, 55:1, 67:19, 80:25
**participant** [1] - 51:14
**participated** [1] - 39:8
**participation** [2] - 39:22, 55:1
**particular** [2] - 72:7, 77:7
**parties** [2] - 4:9, 83:24
**pass** [1] - 15:13
**past** [4] - 15:24, 28:2, 28:16, 46:11
**pause** [6] - 6:23, 8:15, 19:13, 31:22, 42:5, 47:16
**Paz** [1] - 67:15
**pending** [1] - 4:18
**people** [5] - 59:15, 68:8, 68:10, 68:13, 86:21
**per** [1] - 76:19
**percent** [1] - 75:23
**perhaps** [1] - 9:19
**period** [4] - 13:11, 13:12, 81:10, 84:2
**permanently** [1] - 62:2
**permit** [2] - 64:21, 64:24
**person** [5] - 14:1, 34:16, 43:18, 73:4, 74:12
**phone** [1] - 78:16
**phonetic** [1] - 68:4
**photo** [1] - 27:8
**photograph** [3] - 27:9, 70:18, 70:24
**photographs** [2] - 27:10, 70:12
**physical** [1] - 33:11
**physically** [2] - 59:17, 59:20
**pick** [1] - 27:16
**picked** [3] - 28:3, 28:8, 28:14
**place** [3] - 66:13, 69:5, 72:14
**placed** [5] - 7:21, 70:8, 71:5, 73:9, 80:16
**plane** [4] - 67:13, 67:14, 67:18, 67:20
**planning** [1] - 57:20
**plant** [1] - 69:4
**play** [2] - 15:5, 16:25
**plea** [13] - 18:15, 18:16, 18:24, 19:1, 19:2, 19:20, 35:21, 37:3, 37:19, 45:4, 45:6, 46:17, 55:15
**pled** [15] - 12:1, 12:5, 14:14, 18:3, 18:7,

18:9, 18:12, 36:1, 36:11, 37:16, 40:20, 49:14, 49:20, 53:13
**plus** [1] - 68:10
**point** [14] - 27:12, 36:9, 36:10, 42:10, 52:7, 52:15, 53:2, 53:5, 68:17, 68:18, 85:24, 86:5, 86:11
**pointers** [1] - 84:21
**points** [1] - 82:6
**policy** [1] - 72:24
**popcorn** [3] - 66:9, 70:7, 70:15
**popcorn-like** [3] - 66:9, 70:7, 70:15
**popular** [1] - 26:5
**position** [1] - 50:12
**positions** [1] - 34:18
**possible** [1] - 82:17
**possibly** [1] - 86:8
**power** [1] - 21:1
**Powers** [1] - 88:13
**POWERS** [1] - 1:23, 88:14
**practical** [1] - 81:9
**precious** [1] - 63:14
**precisely** [3] - 6:9, 21:20, 22:7
**premise** [1] - 86:1
**preparation** [1] - 27:19
**preparations** [1] - 71:18
**prepare** [1] - 65:7
**prepared** [4] - 72:12, 72:19, 73:2, 74:7
**presence** [1] - 59:2
**present** [5] - 4:10, 4:16, 36:15, 57:12, 59:20
**presentation** [1] - 10:13
**presenting** [2] - 6:12, 6:15
**presents** [1] - 76:25
**preserve** [2] - 82:4, 82:5
**presiding** [1] - 4:6
**pretty** [1] - 20:10
**previously** [2] - 10:24, 85:4
**price** [3] - 76:9, 76:18, 76:21
**priced** [1] - 76:20
**Prieto** [14] - 22:19, 22:21, 22:22, 22:25, 23:6, 23:13, 23:20, 23:23, 24:20, 25:1, 25:8, 25:16, 26:24

**Prieto's** [1] - 25:14
**prison** [5] - 23:24, 24:10, 37:14, 55:23, 56:5
**prisoner** [1] - 26:3
**private** [1] - 66:21
**problem** [5] - 7:24, 8:2, 8:20, 9:1, 9:6
**Procedure** [1] - 21:14
**proceed** [1] - 66:25
**proceeding** [1] - 5:11
**proceedings** [8] - 6:23, 8:15, 19:13, 31:22, 42:5, 47:16, 88:6, 88:10
**process** [5] - 6:4, 6:25, 64:3, 64:8, 67:2
**processed** [1] - 69:4
**proffer** [5] - 5:13, 49:21, 49:24, 54:18, 54:23
**pronouncement** [1] - 28:21
**proper** [2] - 72:5, 85:24
**propose** [1] - 82:9
**proposition** [1] - 81:15
**prosecution** [3] - 21:6, 22:15, 53:14
**Prosecutions** [1] - 1:16
**prosecutors** [3] - 27:23, 35:2, 59:9
**protecting** [1] - 29:9
**provide** [4] - 6:3, 9:10, 84:3, 84:14
**provided** [1] - 21:15
**purchase** [2] - 44:19, 45:2
**purity** [10] - 73:17, 75:17, 75:19, 75:20, 75:21, 75:23, 76:1, 76:2, 76:13, 79:6
**purpose** [1] - 85:13
**purposes** [3] - 35:10, 37:18, 38:8
**pursuant** [3] - 21:14, 25:6, 50:4
**put** [7] - 5:25, 36:3, 36:10, 71:3, 71:18, 78:15

---

## Q

**quality** [1] - 21:5
**quantity** [2] - 73:9, 73:10
**Quari** [23] - 63:18,

63:24, 63:25, 64:2,
64:6, 64:16, 64:19,
65:8, 65:11, 65:12,
65:14, 66:4, 66:16,
67:7, 68:8, 68:15,
68:17, 74:13, 79:13,
79:17, 81:20, 83:2
**questioning** [5] - 32:1,
49:12, 56:10, 57:15,
60:13
**questions** [12] - 16:18,
20:2, 27:25, 36:18,
36:19, 49:5, 59:12,
59:14, 61:25, 82:20,
83:7, 85:12
**quick** [1] - 51:11
**quickly** [2] - 76:22,
79:21

**R**

**R.M.C** [1] - 75:10
**raise** [3] - 62:12,
82:17, 84:1
**raised** [2] - 49:13,
86:18
**range** [2] - 21:8, 57:21
**ransom** [3] - 12:21,
13:4, 13:14
**Raonel** [11] - 27:2,
29:23, 30:3, 30:11,
30:18, 30:25, 31:8,
32:25, 36:24, 58:14,
59:18
**rather** [5] - 8:8, 28:8,
68:15, 69:11
**re** [1] - 5:4
**re-call** [1] - 5:4
**reach** [2] - 66:19, 79:5
**reached** [4] - 66:23,
67:21, 75:4, 79:10
**read** [3] - 12:9, 51:8,
84:22
**reads** [1] - 20:2
**ready** [4] - 10:2, 10:13,
34:8, 71:20
**real** [2] - 11:22, 51:11
**really** [4] - 28:10, 85:9,
86:11, 87:2
**reason** [1] - 40:12
**rebut** [2] - 53:4, 53:5
**receive** [6] - 38:13,
60:7, 66:8, 69:7,
78:22, 79:11
**RECEIVED** [1] - 3:2
**received** [15] - 11:16,
11:17, 35:13, 35:14,
37:24, 37:25, 38:14,
43:15, 46:13, 66:4,
74:1, 74:2, 77:16,

77:18, 79:3
**recent** [5] - 50:12,
50:17, 51:4, 53:5,
60:17
**recently** [3] - 49:20,
51:16, 55:16
**Recess** [2] - 34:5, 62:7
**recess** [3] - 34:1,
83:14, 84:19
**recognize** [4] - 32:11,
49:16, 49:18, 72:11
**recommending** [2] -
21:17, 22:6
**record** [1] - 61:14
**recorded** [2] - 61:5,
61:23
**recover** [1] - 83:4
**red** [3] - 85:16, 85:20,
85:21
**redirect** [1] - 2:7
**REDIRECT** [1] - 49:6
**reduce** [2] - 22:13,
40:25
**reduced** [4] - 21:18,
22:7, 26:4, 60:25
**reduction** [3] - 26:2,
47:7, 61:22
**refer** [1] - 33:7
**reference** [3] - 27:12,
36:9, 36:10
**referencing** [1] - 36:4
**referring** [2] - 41:13,
70:15
**refining** [5] - 66:2,
66:3, 67:6, 67:7,
67:8
**refused** [1] - 43:6
**regard** [1] - 46:5
**regarding** [1] - 49:13
**registered** [2] - 64:19,
64:22
**Regulations** [1] - 5:14
**regulations** [1] - 66:13
**reject** [1] - 47:6
**related** [1] - 4:17
**relating** [1] - 14:5
**relation** [1] - 22:25
**relationship** [1] -
68:11
**relatives** [1] - 68:5
**relax** [1] - 10:1
**relaxing** [1] - 9:23
**relevance** [5] - 25:2,
79:14, 79:19, 79:20,
79:23
**reluctant** [1] - 87:11
**remaining** [2] - 72:17,
83:19
**remember** [22] -
11:20, 12:3, 16:6,

18:17, 31:25, 32:18,
36:16, 40:18, 46:9,
47:18, 47:22, 56:10,
57:15, 57:24, 58:1,
58:3, 60:13, 60:22,
69:22, 77:11, 83:18,
85:2
**remind** [1] - 22:21
**remove** [1] - 32:21
**removed** [4] - 31:10,
32:1, 80:8, 81:4
**removing** [1] - 80:23
**repeat** [2] - 54:20,
84:6
**report** [1] - 73:16
**REPORTED** [1] - 1:23
**REPORTER** [1] - 84:6
**reporter** [1] - 22:21
**Reporter** [1] - 1:23
**reports** [4] - 33:18,
41:14, 41:16, 73:16
**Republic** [14] - 65:19,
66:3, 69:14, 69:17,
74:12, 74:19, 75:8,
75:9, 75:11, 75:13,
78:24, 78:25, 79:4,
79:10
**requested** [1] - 73:13
**required** [3] - 22:17,
73:21, 76:7
**reserve** [1] - 82:23
**reserves** [2] - 20:3,
20:6
**resolved** [1] - 82:7
**response** [1] - 57:11
**responsible** [1] -
66:16
**rest** [3] - 13:23, 68:4,
75:25
**restate** [1] - 79:15
**restrict** [1] - 26:9
**result** [7] - 60:12,
61:8, 64:5, 80:20,
80:22, 81:19, 83:2
**resume** [2] - 10:13,
83:17
**resumes** [1] - 10:9,
34:7
**retire** [1] - 87:14
**review** [1] - 45:21
**reviewed** [7] - 19:4,
19:6, 19:15, 19:16,
41:20, 45:15, 45:19
**revisit** [1] - 18:22
**rise** [5] - 10:10, 34:3,
34:6, 34:20, 83:22
**rob** [1] - 59:4
**Robberies** [1] - 53:24
**robbery** [38] - 22:25,
23:9, 27:6, 28:4,

29:6, 29:11, 33:4,
33:9, 36:20, 36:23,
37:1, 39:10, 40:11,
40:23, 42:8, 42:17,
57:15, 57:17, 57:20,
57:21, 58:3, 58:4,
58:6, 58:16, 59:17,
59:21, 72:14, 74:9,
79:1, 79:13, 79:17,
79:24, 80:20, 80:21,
80:22, 81:2, 81:19,
83:3
**robbing** [1] - 33:11
**role** [4] - 23:1, 29:2,
71:14, 71:17
**Ronaldo** [1] - 23:15
**Room** [1] - 1:17
**row** [1] - 32:10
**RPR** [1] - 88:14
**rule** [1] - 50:7
**Rule** [18] - 5:12, 21:14,
21:19, 21:20, 21:22,
21:24, 22:5, 22:8,
22:12, 24:22, 25:7,
25:14, 25:20, 26:21,
46:6, 46:24, 50:17,
51:1
**Rules** [1] - 21:14
**rules** [2] - 5:14, 6:7
**ruling** [2] - 6:14, 82:23
**run** [1] - 29:23
**rush** [1] - 9:20
**rushing** [2] - 9:22,
9:24

**S**

**save** [4] - 40:25,
48:19, 48:23, 49:2
**saw** [5] - 19:18, 29:23,
30:2, 44:12, 44:16
**scenario** [1] - 10:6
**schedule** [2] - 6:17,
10:15
**Scheduled** [1] - 1:7
**scheduled** [1] - 9:3
**screen** [1] - 76:15
**seal** [2] - 5:11, 5:21
**sealed** [1] - 70:9
**seated** [4] - 4:7, 10:12,
34:22, 62:17
**second** [8] - 20:10,
20:19, 22:22, 23:1,
29:11, 45:6, 72:18,
85:3
**SECRETARY** [1] -
8:12
**Section** [1] - 1:16
**security** [3] - 67:12,
67:19, 67:22

**SECURITY** [5] - 10:10,
34:3, 34:6, 34:20,
83:22
**see** [27] - 10:7, 10:20,
12:11, 13:2, 13:6,
13:10, 14:7, 14:11,
15:6, 15:9, 20:1,
24:7, 24:22, 29:13,
29:17, 33:2, 36:3,
44:7, 44:9, 46:16,
53:1, 55:13, 80:17,
85:18, 86:25, 87:5,
88:4
**seeing** [1] - 83:20
**seeking** [1] - 50:11
**seem** [1] - 50:23
**sees** [1] - 22:12
**sell** [1] - 65:7
**sent** [2] - 72:13, 75:18
**sentence** [26] - 20:9,
20:10, 20:12, 20:19,
21:2, 21:10, 21:18,
22:7, 22:13, 23:24,
26:2, 35:7, 37:5,
37:14, 38:9, 38:17,
38:22, 40:21, 41:1,
47:7, 55:10, 60:7,
60:9, 60:21, 60:24,
61:22
**sentenced** [11] - 22:4,
26:4, 37:6, 37:8,
38:4, 38:18, 38:20,
54:17, 55:16, 56:1
**sentences** [2] - 22:2,
22:5
**sentencing** [7] - 20:8,
21:8, 21:9, 21:12,
21:13, 21:25, 40:21
**separated** [1] - 7:5
**serve** [1] - 56:5
**server** [1] - 6:4
**serving** [6] - 22:1,
22:4, 23:23, 37:14,
38:22, 40:21
**sessions** [2] - 27:21,
27:23
**set** [2] - 27:9, 27:11
**seven** [5] - 7:22, 8:6,
8:7, 55:21, 87:11
**several** [4] - 27:18,
65:4, 67:19, 69:12
**shape** [4] - 66:9, 70:8,
70:15, 86:25
**sheet** [1] - 13:24
**shipment** [29] - 64:4,
64:5, 64:12, 64:14,
69:20, 69:22, 69:24,
69:25, 70:13, 70:25,
71:2, 71:12, 71:14,
71:17, 72:7, 73:4,

73:18, 74:22, 74:23, 74:25, 75:19, 76:6, 76:7, 76:9, 76:12, 76:18, 77:7, 79:9, 79:11
**shipments** [5] - 72:13, 74:8, 74:17, 79:3, 80:18
**shooting** [1] - 30:17
**shot** [3] - 31:1, 40:11, 86:17
**shots** [4] - 29:21, 29:23, 30:3, 33:1
**show** [7] - 15:1, 49:15, 52:16, 52:22, 81:9, 82:3, 82:14
**showing** [4] - 70:10, 71:5, 74:4, 75:15
**shows** [4] - 51:4, 74:7, 75:17, 80:8
**shutdown** [1] - 80:2
**sidebar** [4] - 5:8, 50:8, 79:21, 84:18
**Sidebar** [8] - 5:6, 6:20, 50:9, 53:10, 79:22, 82:22, 84:20, 88:3
**sign** [1] - 49:21
**signature** [2] - 45:9, 49:18
**signed** [3] - 5:13, 19:10, 19:18
**significance** [1] - 21:6
**similar** [2] - 13:11, 70:14
**simple** [5] - 14:22, 15:23, 28:6, 28:13, 49:1
**sister** [2] - 68:12, 68:13
**sister-in-law** [2] - 68:12, 68:13
**sit** [1] - 49:1
**sitting** [1] - 32:10
**six** [3] - 7:21, 13:21, 55:19
**skipping** [1] - 21:13
**sky** [3] - 85:14, 85:15, 85:20
**smelter** [1] - 65:15
**Smelter** [1] - 65:19
**smelting** [2] - 69:4, 69:5
**smuggling** [13] - 12:6, 12:13, 13:19, 14:15, 15:9, 15:13, 48:6, 48:13, 51:12, 51:20, 52:7, 52:8, 54:6
**so..** [1] - 86:22
**sole** [4] - 20:20, 20:22, 20:25, 46:8

**solemnly** [1] - 62:13
**someone** [5] - 7:12, 7:24, 39:23, 40:5, 59:4
**somewhere** [1] - 29:18
**soon** [1] - 6:21
**sorry** [6] - 24:18, 26:13, 53:9, 63:20, 65:17, 74:10
**sound** [1] - 86:2
**sounded** [1] - 77:21
**sounds** [1] - 81:3
**Southeast** [1] - 1:20
**SOUTHERN** [1] - 1:1
**Southern** [1] - 4:5
**Spanish** [1] - 4:3
**SPEAKER** [1] - 85:25
**speaking** [1] - 17:3
**special** [2] - 5:14, 6:7
**Special** [5] - 1:16, 32:11, 36:12, 40:16, 40:17
**specific** [5] - 5:17, 27:9, 51:18, 52:4, 59:14
**specifically** [1] - 51:7
**speculation** [1] - 61:15
**spell** [1] - 62:24
**Spielvogel** [3] - 32:11, 33:15, 40:16
**spoken** [1] - 33:19
**stage** [1] - 87:17
**stamped** [7] - 27:9, 70:19, 74:6, 75:15, 76:4, 76:10, 76:23
**stand** [4] - 5:2, 10:9, 34:7, 84:2
**standardize** [2] - 65:6, 65:13
**stands** [1] - 81:15
**start** [3] - 8:24, 9:24, 87:12
**started** [4] - 56:15, 56:20, 56:23, 78:16
**starting** [2] - 34:9, 51:8
**state** [4] - 31:3, 62:24, 66:8, 85:4
**statement** [9] - 4:17, 4:20, 43:4, 50:5, 50:10, 50:11, 50:19, 51:3, 51:4
**statements** [1] - 27:7
**STATES** [3] - 1:1, 1:4, 1:12
**States** [5] - 1:16, 1:24, 4:4, 24:25, 25:7, 36:14, 56:12,

63:10, 65:15, 65:16, 65:21, 66:12, 66:17, 66:19, 66:24, 67:12, 67:15, 67:21, 67:24, 69:21, 75:2, 75:4, 75:18, 77:2, 77:3, 80:18, 84:4, 84:7, 88:14
**station** [1] - 81:10
**statute** [1] - 34:14
**statutory** [1] - 55:22
**staying** [1] - 24:5
**stealing** [1] - 80:23
**STENOGRAPHICAL LY** [1] - 1:22
**step** [2] - 81:4, 83:11
**steps** [2] - 5:17, 34:2
**stepson** [6] - 28:19, 28:20, 28:24, 29:9, 30:14
**still** [3] - 4:8, 4:18, 64:2
**stolen** [2] - 64:4, 64:5
**stop** [2] - 20:9, 20:21
**stops** [1] - 67:16
**straight** [1] - 17:6
**straightforward** [3] - 17:6, 17:7, 17:16
**Street** [1] - 1:17, 1:20
**street** [5] - 24:2, 24:5, 24:7, 24:12, 24:13
**string** [1] - 84:13
**stuff** [1] - 33:5
**subject** [2] - 83:10, 83:12
**subpoenaing** [1] - 5:14
**subsequent** [2] - 21:13, 21:24
**subsequently** [1] - 65:7
**substances** [1] - 51:14
**substantial** [1] - 21:15
**suggest** [3] - 8:17, 10:16, 85:2
**suggestion** [1] - 82:4
**Suite** [1] - 1:20
**summarize** [2] - 12:10, 20:1, 65:12
**summary** [1] - 13:24
**supplementary** [1] - 13:23
**supposed** [1] - 75:12
**supposedly** [1] - 30:22
**sustain** [2] - 81:14, 82:2
**sustained** [8] - 53:7, 53:8, 53:11, 56:18,

57:8, 58:19, 61:11, 78:6
**swear** [1] - 62:13
**switched** [1] - 8:13
**swore** [1] - 22:9
**sworn** [1] - 10:24

## T

**tape** [3] - 6:15, 70:9
**tea** [1] - 10:1
**temporarily** [1] - 83:9
**temporary** [2] - 4:21, 4:22
**tender** [1] - 83:5
**term** [2] - 38:20, 55:21
**terms** [1] - 25:11
**terrible** [1] - 48:17
**test** [2] - 85:13, 85:18
**testified** [15] - 12:10, 22:19, 23:1, 27:6, 27:13, 30:1, 30:2, 33:5, 39:5, 41:4, 42:10, 42:17, 43:2, 43:5, 62:18
**testify** [7] - 5:23, 10:25, 41:24, 42:2, 43:11, 63:10, 82:8
**testifying** [5] - 5:4, 22:8, 33:6, 46:11, 53:15
**testimony** [20] - 11:6, 15:14, 15:16, 18:18, 22:9, 22:14, 27:19, 28:19, 29:7, 30:9, 31:3, 46:12, 46:18, 46:21, 46:23, 47:2, 47:3, 50:21, 62:13, 82:11
**THE** [132] - 1:12, 1:15, 1:19, 4:7, 4:14, 4:21, 4:25, 5:5, 5:8, 5:11, 6:6, 6:11, 6:18, 6:21, 7:2, 7:6, 7:7, 7:8, 7:12, 7:15, 7:19, 7:23, 8:5, 8:11, 8:17, 8:23, 9:4, 9:5, 9:6, 9:8, 9:9, 9:10, 9:12, 9:13, 9:14, 9:15, 9:17, 9:18, 10:3, 10:4, 10:6, 10:12, 11:16, 14:18, 14:19, 25:4, 25:10, 25:23, 25:24, 26:9, 26:14, 33:25, 34:8, 34:22, 35:13, 37:24, 38:13, 39:15, 39:16, 50:8, 50:10, 50:17, 50:22, 51:1, 51:3, 51:8, 51:12, 51:18, 51:21,

51:24, 52:4, 52:7, 52:10, 52:12, 52:20, 52:22, 52:25, 53:8, 53:11, 53:18, 53:19, 54:3, 54:4, 54:19, 56:18, 57:8, 58:19, 58:24, 61:11, 61:16, 61:17, 62:2, 62:4, 62:8, 62:10, 62:16, 71:15, 74:1, 78:6, 79:15, 79:19, 79:21, 79:23, 80:3, 80:5, 80:7, 80:13, 80:21, 81:3, 81:7, 81:12, 81:22, 82:1, 82:7, 82:14, 82:21, 82:23, 83:8, 83:10, 83:13, 83:24, 84:9, 84:16, 84:18, 84:21, 86:4, 86:15, 86:20, 86:23, 87:22, 88:1, 88:4
**thereof** [1] - 20:8
**they've** [1] - 86:22
**thinking** [1] - 56:9
**third** [6] - 57:4, 72:24, 73:2, 73:8, 73:16
**thoughts** [1] - 10:18
**three** [2] - 13:24, 15:18
**THROUGH** [2] - 2:8, 62:21
**timeline** [3] - 35:5, 38:2, 39:1
**today** [8] - 15:14, 15:16, 18:13, 18:18, 22:8, 22:14, 27:19, 46:23
**together** [1] - 67:1
**tomorrow** [3] - 83:15, 83:17, 88:4
**took** [4] - 30:11, 72:14, 74:11, 75:5
**top** [3] - 81:5
**topic** [2] - 26:5, 32:20
**total** [4] - 38:20, 64:7, 76:18, 76:21
**towards** [1] - 26:14
**Tower** [1] - 1:20
**traffic** [1] - 7:25
**trafficking** [3] - 51:12, 52:17, 54:1
**transcription** [1] - 88:10
**transfer** [2] - 79:7, 79:8
**translated** [3] - 19:8, 19:15, 45:13
**transportation** [2] - 66:16, 68:22
**transporting** [1] - 73:5

**travel** [1] - 66:11
**traveling** [1] - 67:11
**Tree** [2] - 63:19, 63:22
**TRIAL** [1] - 1:10
**trial** [1] - 9:3
**true** [5] - 12:11, 14:15,
18:2, 18:20, 18:21
**truth** [12] - 16:1, 16:2,
22:10, 22:16, 47:1,
47:5, 48:24, 62:14
**truthful** [1] - 15:20
**try** [4] - 9:20, 10:20,
78:6, 78:11
**trying** [11] - 10:17,
28:11, 39:11, 46:22,
48:22, 49:4, 51:5,
85:8, 85:25, 86:15,
86:25
**Tuesday** [1] - 1:5
**turn** [4] - 4:25, 5:1,
55:18, 66:9
**turning** [2] - 70:18,
70:23
**twice** [1] - 56:14
**two** [13] - 6:2, 6:17,
22:1, 22:4, 40:20,
46:11, 49:14, 55:18,
61:2, 67:25, 68:13,
68:25, 70:25
**type** [1] - 81:11
**typically** [4] - 9:15,
65:25, 69:14, 79:3

## U

**U.S** [5] - 20:4, 20:23,
25:6, 46:9, 60:18
**ultimate** [1] - 60:24
**uncle** [1] - 23:18
**unclear** [1] - 30:5
**under** [8] - 5:11, 5:21,
21:8, 31:2, 52:21,
57:1, 64:3, 79:2
**understood** [2] -
45:17, 52:16
**UNIDENTIFIED** [1] -
85:25
**unit** [1] - 76:9
**UNITED** [3] - 1:1, 1:4,
1:12
**United** [29] - 1:16,
1:24, 4:4, 24:25,
25:7, 36:14, 56:12,
63:10, 65:15, 65:16,
65:21, 66:12, 66:17,
66:19, 66:24, 67:11,
67:15, 67:21, 67:24,
69:21, 75:2, 75:4,
75:18, 77:2, 77:3,
80:18, 84:4, 84:7,

88:14
**unlawfully** [1] - 13:14
**unreviewable** [4] -
20:20, 20:22, 20:25,
46:8
**up** [17] - 6:25, 7:7,
11:5, 18:13, 24:19,
27:16, 28:3, 28:8,
28:14, 32:20, 51:16,
55:22, 61:20, 85:5,
86:8, 86:24, 87:4
**usual** [1] - 4:8
**utterance** [3] - 78:5,
86:6, 86:11

## V

**Valhuerdis** [3] - 27:2,
32:25, 59:18
**value** [10] - 20:15,
64:14, 71:11, 74:22,
76:1, 76:2, 76:19,
80:9, 80:11, 80:22
**van** [4] - 30:6, 30:8,
30:20, 30:22
**VARGAS** [3] - 2:8,
62:18, 63:2
**Vargas** [8] - 62:11,
62:22, 63:1, 63:4,
63:13, 64:11, 83:2,
84:2
**various** [1] - 27:7
**VAZQUEZ** [57] - 1:15,
4:11, 4:15, 4:23, 5:3,
6:24, 7:3, 7:11, 7:13,
7:18, 7:21, 8:4, 8:9,
8:19, 11:15, 14:17,
25:2, 25:22, 35:12,
37:23, 38:12, 39:13,
49:7, 50:3, 50:14,
50:19, 50:24, 51:2,
51:10, 51:15, 51:19,
51:23, 52:2, 52:6,
52:9, 52:11, 52:19,
52:21, 52:23, 53:12,
53:20, 54:5, 54:21,
56:19, 57:9, 58:21,
59:1, 61:12, 61:18,
61:25, 62:3, 86:14,
86:17, 86:21, 87:16,
87:24, 88:2
**Vazquez** [6] - 2:7, 6:1,
32:4, 40:17, 84:1,
85:1
**Vazquez's** [1] - 31:25
**veracity** [1] - 50:20
**versus** [4] - 25:1, 25:7,
84:5, 84:7
**via** [1] - 66:24
**victims** [1] - 79:1

**view** [3] - 8:5, 52:2,
52:12
**Villegas** [16] - 68:3,
68:19, 68:20, 69:6,
69:9, 72:8, 75:3,
75:6, 75:7, 77:17,
77:21, 78:2, 78:9,
78:10, 78:13, 78:18
**Villegas'** [2] - 69:8,
69:14
**violence** [1] - 54:9
**visit** [1] - 42:11
**visited** [2] - 43:16,
43:20
**vs** [1] - 1:5

## W

**wait** [5] - 39:11, 39:20,
51:21, 51:24, 87:3
**wake** [1] - 24:19
**wake-up** [1] - 24:19
**walk** [1] - 24:8
**warrant** [1] - 21:7
**Wasi** [21] - 63:18,
63:24, 63:25, 64:2,
64:6, 64:16, 64:19,
65:8, 65:9, 65:11,
65:12, 65:14, 66:4,
66:16, 67:7, 68:8,
68:15, 68:17, 74:13,
81:20, 83:2
**Wasi's** [2] - 79:13,
79:17
**weapons** [1] - 67:18
**wear** [1] - 59:4
**wearing** [1] - 57:24
**week** [4] - 83:14,
83:20, 86:24, 87:12
**weekend** [1] - 83:20
**West** [2] - 24:15,
24:16
**white** [4] - 30:6, 30:8,
30:20, 30:22
**Whoa** [1] - 80:5
**whoa** [2] - 80:5
**whole** [4] - 23:9,
51:16, 62:14, 63:8
**wife** [2] - 68:12, 68:13
**willfully** [4] - 34:11,
34:13, 34:16
**willing** [4] - 48:12,
48:13, 48:21
**willingness** [1] - 56:9
**withdrawn** [1] - 67:3
**Witness** [3] - 34:2,
62:6, 83:12
**witness** [26] - 4:12,
4:16, 4:19, 5:1, 5:20,
7:1, 7:2, 8:5, 10:9,

25:3, 34:7, 51:15,
61:25, 62:2, 62:10,
76:16, 82:17, 83:6,
83:8, 83:10, 84:11,
85:3, 85:14, 85:18,
86:4, 86:7
**WITNESS** [8] - 2:4,
14:19, 25:24, 39:16,
53:19, 54:4, 61:17,
62:16
**witness'** [2] - 50:21,
85:13
**witnesses** [5] - 5:12,
6:2, 86:20
**word** [3] - 14:12,
25:13, 65:17
**words** [3] - 7:2, 9:25,
81:17
**works** [3] - 10:20,
64:17, 65:2
**worried** [2] - 46:23,
46:25
**worth** [2] - 86:6, 86:12
**write** [1] - 40:14
**wrote** [1] - 33:6

## Y

**year** [1] - 42:21
**years** [7] - 14:20,
38:24, 38:25, 55:6,
55:11, 55:22, 63:16
**Yellow** [1] - 63:19
**yellow** [1] - 63:22
**yesterday** [22] - 6:2,
11:5, 11:19, 12:1,
12:10, 14:13, 18:14,
19:18, 22:19, 27:6,
27:11, 28:18, 28:24,
29:13, 30:1, 39:20,
39:25, 42:7, 42:10,
43:5, 43:11, 47:18

## Z

**ZACCA** [54] - 1:19,
5:10, 5:25, 6:10,
6:14, 6:19, 8:21,
10:23, 11:2, 11:18,
14:21, 19:12, 19:14,
25:5, 25:12, 25:25,
26:11, 26:13, 26:16,
26:17, 31:20, 31:23,
31:24, 34:24, 35:15,
38:1, 38:15, 39:17,
42:4, 42:6, 47:15,
47:17, 49:5, 50:6,
53:7, 53:17, 54:2,
56:17, 57:7, 58:18,
58:23, 61:10, 61:15,

73:25, 78:4, 79:14,
79:18, 79:20, 80:4,
80:6, 82:19, 83:7,
84:17, 88:5
**Zacca** [7] - 1:19, 2:6,
5:6, 5:8, 5:12, 10:22,
56:8
**zero** [2] - 18:25, 45:8
**ziplock** [1] - 70:8, 71:6
**zoom** [3] - 12:17, 13:2,
13:5