```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                             (MIAMI)
                      CASE NO. 1:17-CR-20701-MGC-5
 3

 4    UNITED STATES OF AMERICA          Miami, Florida

 5                                      December 19, 2018
              vs.                       Wednesday
 6

 7    LEONARDO MIGUEL GARCIA MORALES
                                        Scheduled for 9:00 a.m.
 8                                      Held 9:08 a.m. - 1:11 p.m.
      _____

 9

10                            JURY TRIAL
                               DAY 10
11                          PAGES 1 - 128

12           BEFORE THE HONORABLE DONALD L. GRAHAM
                  UNITED STATES DISTRICT JUDGE
13

14    APPEARANCES:

15    FOR THE GOVERNMENT:      IGNACIO JESUS VAZQUEZ, JR., AUSA
                               J. MACKENZIE DUANE, AUSA
16                             United States Attorney's Office
                               Miami Special Prosecutions Section
17                             99 Northeast 4th Street
                               Room 806
18                             Miami, Florida  33132

19    FOR THE DEFENDANT:       DERIC ZACCA, ESQ.
                               Deric Zacca, P.A.
20                             110 Southeast 6th Street
                               110 Tower - Suite 1700
21                             Fort Lauderdale, Florida  33301

22
      STENOGRAPHICALLY
23    REPORTED BY:             GLENDA M. POWERS, FPR, CRR, FPR
                               Official Federal Court Reporter
24                             United States District Court
                               400 North Miami Avenue
25                             Miami, Florida  33128
```

1                          I N D E X

2

                                                      PAGE

3
                      GOVERNMENT'S EVIDENCE

4
WITNESS

5

6  JORGE BELLO
       Direct Examination by Ms. Duane              4

7

8  DETECTIVE JORGE NUNEZ
       Direct Examination continued by Mr. Vazquez   15

9      Cross-Examination by Mr. Zacca                30
       Redirect Examination by Mr. Vazquez           32

10

11 GOVERNMENT RESTS                                  38

12

13                    DEFENDANT'S EVIDENCE

14

   LEONARDO GARCIA MORALES
15     Direct Examination by Mr. Zacca              60
       Cross-Examination by Mr. Vazquez              84

16     Redirect Examination by Mr. Zacca             81

17

18

19

20

21

22

23

24

25

```
 1                          E X H I B I T S

 2
        EXHIBIT                                      RECEIVED
 3                                                   IN EVIDENCE

 4
                         GOVERNMENT'S EXHIBITS
 5
        Exhibit 50                                       24
 6
        Exhibit 57                                       37
 7

 8

 9

10                       DEFENDANT'S EXHIBITS

11      Exhibit 19                                       61

12      Exhibit 20                                       61

13      Exhibit 21                                       61

14      Exhibit 28                                       75

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Call to the order of the Court:)

 2              (Defendant Leonardo Garcia Morales aided by

 3    Court-Certified Spanish Interpreters.)

 4              COURT SECURITY OFFICER:  All rise.

 5              THE COURT:  Good morning.  Are you ready to proceed?

 6              MR. ZACCA:  Yes, Your Honor.

 7              THE COURT:  Bring the jury in.

 8              COURT SECURITY OFFICER:  Yes, sir.

 9              (Jury entered courtroom at 9:08 a.m.)

10              THE COURT:  Be seated.  Ladies and gentlemen, good

11    morning.  We are now ready to continue with the trial.

12              MS. DUANE:  Yes, Your Honor.  The Government calls

13    Jorge Bello.

14              COURTROOM DEPUTY:  Raise your right hand.

15              Do you solemnly swear or affirm that the testimony

16    you're about to give will be the whole truth, so help you God?

17              THE WITNESS:  I do.

18              COURTROOM DEPUTY:  Thank you.  You may be seated.

19    Please state your name with the spelling for the record.

20              THE WITNESS:  My name is Jorge Bello.  That's

21    J-O-R-G-E, last name is B-E-L-L-O.

22              (JORGE BELLO, being sworn, testified as follows:)

23                        DIRECT EXAMINATION

24    BY MS. DUANE:

25    Q.  Mr. Bello, where do you work?
```

5

```
1   A.   I work for the Broward Sheriff's Office in the Crime Lab.

2   Q.   How long have you worked for the Broward Sheriff's Office?

3   A.   Almost two years.

4   Q.   What were you doing before you joined the Broward Sheriff's

5   Office?

6   A.   I was a criminalist for the Miami-Dade Police Department in

7   the Crime Lab.

8   Q.   What is your position in the Crime Lab?

9   A.   I'm the Crime Lab unit manager and the manager of the

10  firearms and tool mark unit.

11  Q.   Which unit is that?

12  A.   The firearm and tool mark unit.

13  Q.   As the manager for that lab of that particular unit, what

14  type of work do you do?

15  A.   I examine firearms-related evidence to determine whether or

16  not casings or projectiles came from a certain firearm.

17  Q.   And in your Crime Lab as the manager, what type of work do

18  you do?

19  A.   I supervise the unit.  I also maintain and update the

20  standard operating procedures and perform case work about

21  75, 80 percent of the time.

22  Q.   What sort of training have you received in connection with

23  this position?

24  A.   So my training was completed at Miami-Dade Police

25  Department.  It was a two-year training program, through which
```

1    I was tested by written tests, oral examinations.  I was also

2    given practical examinations and competency tests.

3         In addition to that in-house training, which I completed,

4    I also attended training outside of the laboratory, which

5    included attending factory tours and armorers' courses, as well

6    as attending several different educational conferences,

7    including conferences for the Association of Firearm and Tool

8    Mark Examiners, as well as the International Association For

9    Identification, and training in management as well.

10   Q.   If you can just explain in the simplest terms what you do

11   with firearms?

12   A.   Whenever a firearm comes in, essentially, I'm testing it

13   for operability, making sure the firearm actually works the way

14   it's intended to work.

15        And then after test-firing the firearm, I compare that

16   projectile or casing to question the unknown projectile or

17   casings to determine whether or not they came from the same

18   firearm.

19   Q.   Approximately, how many firearms have you analyzed during

20   your career?

21   A.   In the thousands.

22   Q.   What about projectiles?

23   A.   In the tens of thousands.

24   Q.   And just to be clear, what is a "projectile"?

25   A.   A "projectile" is the portion of a live ammunition which

```
 1    travels down the barrel toward an intended target.

 2    Q.   Have you testified as an expert before?

 3    A.   I have.

 4    Q.   And, approximately, how many times?

 5    A.   26.

 6              MS. DUANE:   Your Honor, at this time, the United States

 7    would tender this witness as an expert in firearm and tool mark

 8    identification.

 9              MR. ZACCA:   No objection.

10              THE COURT:   Very well.   And the instruction you

11    previously heard, ladies and gentlemen, you know that experts

12    are allowed to give opinions, but you decide the extent to

13    which you will rely upon the opinion.

14              You may proceed.

15    BY MS. DUANE:

16    Q.   So I'm handing you what's been admitted into evidence as

17    Government's Exhibit 13 and Government's Exhibit 11, and we're

18    going to be dealing with 13 first.

19         So, with regards to Government's Exhibit 13, do you

20    recognize that item?

21    A.   I do.

22    Q.   And how do you recognize it?

23    A.   My initials and badge number, as well as the date I

24    examined the evidence, and the sticker I placed on it are

25    present.
```

```
 1    Q.   And what is that item?

 2    A.   It's a spent projectile.

 3    Q.   And you can take it out of the packaging.

 4    A.   (Witness complied.)   It's a spent projectile.

 5    Q.   And would you mind turning on the overhead camera, if

 6    possible?   Thank you.

 7         And there should be, hopefully, a light -- yes -- that pops

 8    up on your desk.   Do you see that, if you look down.

 9         And if you put the projectile -- yes -- in front of that

10    red light you should be able to project what you're looking at

11    onto the jurors' screens.

12         It looks like the jurors' screens are off.   Would you mind?

13    Thank you.   Okay.   Everyone see it?

14         So walk me through what you did with this projectile.

15    A.   Whenever we receive a projectile in evidence the first

16    thing we will do is sanitize it, if necessary, and then,

17    essentially, there's a worksheet that's filled out with

18    information that we detail about the projectile.

19         Basic information we detail is the measurement of the base,

20    which is otherwise called the "caliber," the weight of the

21    projectile, the materials it's made of, and then the

22    trajectories from the firearm that it fired, so how many

23    different number of lands and grooves there are, the direction

24    in which they point, and the type of rifling that is present,

25    if any.
```

1   Q.   And what information does that give you -- or what does

2   that information tell you about?

3   A.   Well, it tells me the potential caliber of the firearm that

4   this projectile was loaded in, so the caliber, the cartridge,

5   and it will also tell me the potential firearm the projectile

6   may have been fired from.

7   Q.   So, in this case, what was the caliber of this firearm --

8   this projectile, rather?

9   A.   The projectile was a .40 caliber projectile.

10   Q.   And what does the rifling tell you?

11   A.   The rifling, there were six impressions on the projectile,

12   and they were polygonal in nature, and they twisted to the

13   right-hand side.

14   Q.   And again, what is "rifling"?

15   A.   "Rifling" is the actual -- by definition, the hole it

16   leaves inside the barrel of a firearm, the impressions of which

17   are left on the projectile when it travels through the barrel.

18   Q.   So I now want you to turn to what's been admitted into

19   evidence as Government's Exhibit 11.

20       Do you recognize that item?

21   A.   I do.

22   Q.   And how do you recognize it?

23   A.   Again, my initials and badge number are on here, as well as

24   the date that I examined it, and the stickers which describe

25   the evidence.

1    Q.   What did you do with that firearm -- if you could actually

2    put it under the desk -- yes, that would be great.  So walk me

3    through the examination that you did of this firearm.

4    A.   So, similar to projectiles, whenever we see a firearm

5    there's a worksheet that we have to detail information about.

6    Some of the basic information includes the make, model, serial

7    number of the firearm, as well as anything that you might see

8    that's out of the ordinary with the firearm.

9        We also detail that class characteristic information, so

10   the number of lands and grooves, and the direction in which

11   they twist, and the type of rifling that we follow.

12       And then we check the safeties of the firearm to make sure

13   that they're all present and functioning the way they intended

14   to function, and the ultimate test of function is to actually

15   test-fire the firearm.

16   Q.   So, this is a Glock; right?

17   A.   Yes.

18   Q.   I see that on the manufacturer information.

19   A.   Right there.

20   Q.   What caliber is this firearm?

21   A.   It's a .40 Smith & Wesson.

22   Q.   And a .40 caliber?

23   A.   Yes, that's correct.

24   Q.   And is that the same as the projectile?

25   A.   Yes, it is.

1   Q.   And so, in connection with the projectile, what conclusions

2   were you able to draw with regards to the projectile and this

3   particular firearm?

4   A.   The projectile could have been fired from the submitted

5   firearm.

6   Q.   And why aren't you able to tell the jurors with a hundred

7   percent certainty that this projectile came out of this

8   firearm?

9   A.   So polygonal rifling is notoriously difficult to identify.

10       What it's lacking is the individual characteristics within

11  those land impressions and within that rifling which we use to

12  make our identification.

13       So all of the class characteristics aligned with this

14  particular firearm, but the individual characteristics which

15  allow me to individualize it are not present.

16  Q.   If I could just break that down a little bit more.

17       So what is polygonal rifling?

18  A.   Polygonal rifling is -- the difference between conventional

19  and polygonal rifling is that conventional rifling has very

20  sharp edges to it, basically, 90 degrees, like half of a

21  square, if you will.

22       Polygonal rifling is more shaped like a semi-circle or half

23  a circle, so it's very curved edges, and that doesn't engage

24  the bullet as well, which that's why it doesn't transfer marks

25  over as well.

1    Q.   So am I correct that this particular gun -- is this a

2    feature that's unique to Glock firearms?

3    A.   No.  Typical polygonal rifling, so any firearm with

4    polygonal rifling could potentially be difficult to identify.

5    Q.   And what firearms are typical polygonal rifling?

6    A.   In .40 Smith & Wesson, there's a handful, the most common

7    being Glock, followed by Versa & Carr.

8    Q.   So those three firearms have polygonal rifling, so the

9    impact is that they don't leave identifying marks; is that a

10   plain English way of explaining it?

11   A.   Essentially, yes.

12   Q.   Okay.  So, ultimately, the conclusion is that this

13   projectile could have been fired from this firearm?

14   A.   Yes, that's correct.

15   Q.   And now, do most firearms leave rifling?

16   A.   Yes.

17   Q.   So is polygonal rifling, that doesn't leave marking, is

18   more in the minority?

19   A.   Yes, that's correct, there are fewer firearms with

20   polygonal rifling than there are with conventional rifling.

21   Q.   Now I want to hand you what's been admitted into evidence

22   as Government's Exhibit 9.

23        Now, with regards to Government's Exhibit 9, what kind of

24   firearm is Government's Exhibit 9?

25   A.   It looks like a Colt semiautomatic firearm.

1   Q.   And what caliber firearm is this?

2   A.   Can I unstrap the firearm just to verify the caliber?

3            MS. DUANE:  Would he be able to do that, Your Honor?

4            THE COURT:  Do you have to take the plastic off of --

5   the plastic tubing off?

6            THE WITNESS:  Just these, so I can actually turn the

7   firearm and see it.  I don't have to take off the safety.

8            THE COURT:  Alright, very well.

9            MS. DUANE:  He needs a scissors.  I have given you a

10  difficult task.

11           THE WITNESS:  That's okay.

12           The caliber is .38 Super Model.  It's actually written

13  on the barrel, right here.

14  BY MS. DUANE:

15  Q.   And what does that mean, a ".38 caliber"?

16  A.   A "38 caliber" is a specific caliber, essentially, it

17  measures 3.55 to 3.57 inches of the diameter of the base of the

18  bullet.

19  Q.   So before we were dealing with a .40 caliber.

20       This is a .38 caliber; right?

21  A.   Correct.

22  Q.   And can a .38 caliber, like this gun, can that hold

23  .40 caliber ammunition?

24  A.   No, it can't.

25  Q.   So could this firearm have fired the projectile that you

1    analyzed?

2    A.   No, it couldn't have.

3    Q.   Is there anything else in connection with the projectile

4    that you can tell us as to whether or not it came from this

5    gun?

6    A.   The rifling is typical of Colt.

7         It's also different than the rifling from Glock firearms.

8         So Colt firearms tend to have six lands and grooves as

9    well, but they twist to the left, and they are conventional in

10   nature.

11        As opposed to the Glock, which is polygonal, and twists to

12   the right, so the markings are completely different from the

13   projectile that came from this particular firearm.

14   Q.   So this projectile -- or this gun, rather, would have left

15   different markings?

16   A.   Correct.

17   Q.   So, in addition to not being able to fire a .40 caliber

18   bullet, it also would have left different markings than the

19   projectile that you have?

20   A.   Yes, that's correct.

21        MS. DUANE:   I have no further questions for this

22   witness.

23        MR. ZACCA:   No questions.

24        THE COURT:   May the witness be permanently excused?

25        MS. DUANE:   Yes, Your Honor.

```
 1              THE COURT:  You are excused.

 2              (Witness excused.)

 3              MR. VAZQUEZ:  United States calls Detective Jorge Nunez

 4    from North Miami Beach Police Department.

 5              COURTROOM DEPUTY:  Please raise your right hand.

 6              Do you solemnly swear or affirm that the testimony

 7    you're about to give will be the whole truth, so help you God?

 8              THE WITNESS:  Yes.

 9              COURTROOM DEPUTY:  Thank you.  You may be seated.

10              THE WITNESS:  Thank you.

11              COURTROOM DEPUTY:  Please state your name again with

12    the spelling for the record.

13              THE WITNESS:  Yes.  My name is Detective Jorge Nunez,

14    J-O-R-G-E, Nunez, N-U-N-E-Z.

15              (DETECTIVE JORGE NUNEZ, being sworn, testified as

16    follows:)

17                     DIRECT EXAMINATION

18    BY MR. VAZQUEZ:

19    Q.  Good morning, Detective Nunez.

20    A.  Good morning.

21    Q.  Detective Nunez, would you please let the members of the

22    jury know where you're employed and what assignment.

23    A.  I'm a detective with the City of North Miami Beach Police

24    Department.

25    Q.  How long have you held that capacity?
```

1    A.   Detective, 15 years, but with the department 20.

2    Q.   And what assignments have you held with the City of North

3    Miami Beach?

4    A.   The first five years, I was on road patrol, and then a

5    detective with the narcotics unit.

6    Q.   And when you say you're a detective in the narcotics unit,

7    what kind of cases do you participate in?

8    A.   Well, we do some vice crimes in narcotics cases, anywhere

9    from street level amounts, all the way to kilograms of cocaine,

10   and we also assist federal agencies with international cases.

11   Q.   Detective, in the course of your service as a narcotics

12   investigator, how is it that you conduct your cases, what are

13   the tools that you use to make your investigations go forward?

14   A.   The majority of the times we utilize a confidential

15   informant.  A "confidential informant" is a person that assists

16   us, gives us information, leads.  Sometimes we use an

17   undercover officer, but mostly we use informants.

18   Q.   And why is it that you use a confidential informant?

19   A.   Informants are usually -- what I like to say -- they're

20   kind of like our eyes and ears out on the street, and they're

21   also able to get into places where normally law enforcement

22   can't get into.

23   Q.   And why is that?

24   A.   Well, because they are into the -- they have knowledge of

25   the criminal world, so they know places to go, people to see,

```
 1    to talk, and they have the contact, so to speak.

 2    Q.   Now, Detective, you've been a narcotics investigate for

 3    15 years, are you able to walk into a drug conspiracy with the

 4    amount of service that you've had and how well you're known?

 5    A.   No.

 6    Q.   Now, Detective, with the use of confidential informants,

 7    can you tell the members of the jury how they're used and how

 8    they're managed by you as the lead investigator?

 9            THE COURT:  Are we talking about this case,

10    Mr. Vazquez?  If we're talking about this case, that's fine.

11    BY MR. VAZQUEZ:

12    Q.   Detective, I want to draw your attention to August 28th of

13    2013 and the days surrounding that event.

14         On that date, did you come to participate in an

15    investigation addressing individuals involving Osvaldo

16    Magdalena and Leonardo Miguel Morales?

17    A.   Yes.

18    Q.   And how is it that you came to participate in that

19    investigation?

20    A.   The confidential informant gave us a lead of --

21            MR. ZACCA:  Objection, to hearsay.

22            MR. VAZQUEZ:  This is offered for how the investigation

23    began, not so much for --

24            THE COURT:  Alright, I'm not receiving it for the truth

25    of the matter.  Let me hear -- and try to go directly to the
```

 1    point.

 2    BY MR. VAZQUEZ:

 3    Q.   Detective, if you can tell us how the events transpired to

 4    give the investigation direction.

 5    A.   Okay.  We got a -- like I said, we had a lead.  We

 6    instructed the confidential informant to make contact with who

 7    later was known to be Magdalena.  We set up --

 8    Q.   Let me backup.  So now we talked about this confidential

 9    informant.  With regard to this confidential informant, how is

10    it that he's managed, how is it, just generally, that you

11    exercised control and direction over him?

12    A.   Yes.  The way we normally work, any time -- the

13    confidential informants are instructed any time they make

14    contact with any individual talking about criminal activities,

15    that phone calls have to be recorded, any meets will have to be

16    conducted with us.  We supply them with audio and video

17    recording devices.

18    Q.   Now, in this case, did you utilize those tools?

19    A.   Yes, we did.

20    Q.   I want to show you, for example, what's been admitted as

21    Government's Exhibit 44.  Do you recognize it?

22    A.   Yes, I do.

23    Q.   And what is it?

24    A.   It is the undercover meet audio of a meet that took place

25    in the Arbys parking lot in North Miami Beach.

1    Q.   And what is this here?

2    A.   That is my initials with my badge number.

3    Q.   And for the record, I've circled on the screen on the right

4    side center of the CD the numbers 207 and the initials.

5         Now, Detective, when you are conducting this investigation

6    with these recordings, where are you?

7    A.   Normally, we're within the parking lot or visual distance,

8    maybe -- depending how crowded the parking lot can be, we're

9    not really on top of everyone, but we're close by enough where

10   I can visually see what's going on.

11        And also, we utilize a listening device, so not only am I

12   seeing what's going on when they get into a vehicle, I'm also

13   listening to it realtime.

14   Q.   Now, did you oversee the recording -- the operation for the

15   recording for what's been admitted into evidence as

16   Government's Exhibit 44?

17   A.   Yes.

18   Q.   Prior to use of this confidential informant on the day that

19   the recording was generated, what did you do with the

20   confidential informant?

21   A.   We met in a predetermined location.  We instructed him to

22   make a recorded phone call, to set up the meeting at the Arbys.

23   Q.   And did you participate in the meeting itself, were you

24   physically present when -- in the area when the meeting

25   occurred?

1    A.   Yes, I was physically present, obviously, not with the

2    target and confidential informant, but within visual sight.

3    Q.   Prior to the physical meeting happening, what, if anything,

4    did you do with this confidential informant to prepare him for

5    this meeting?

6    A.   We gave him -- like I said, we gave him a video and audio

7    recording device to record and video all the evidence in the

8    conversation.

9    Q.   Did you have a chance after that meeting to review the

10   contents of Government's Exhibit 44, the recordings?

11   A.   Yes, I did.

12   Q.   And through this investigation and this effort with the

13   Government's prosecution, did you have a chance to review

14   transcripts for Government's 44?

15   A.   Yes, I have.

16   Q.   Now, after the initial meeting that you talked about, what

17   was your next step with the confidential informant in this

18   investigation?

19   A.   Our next step -- typically, in this particular place, we

20   just waited -- I believe, it was the next day.  I instructed

21   the confidential informant to call Magdalena to see if they

22   were ready to do the transaction.

23   Q.   Now, Detective, before this case and before the date of

24   August 27th, 2013, and August 28th of 2013, had you had

25   Mr. Magdalena as a target of yours in any way?

1    A.   No.

2    Q.   Now, I want to draw your attention to the next date, August

3    28th, 2013.  I'm showing you what's been admitted into evidence

4    as Government's 45.  Do you recognize it?

5    A.   Yes.

6    Q.   And what is it?

7    A.   It's recorded phone calls.

8    Q.   And where are these recorded phone calls from?

9    A.   From the confidential informant talking to the targets --

10   or target.

11   Q.   Now, I want to show you what is on the right side of the

12   screen, what is it that I've just circled?

13   A.   You circled my initials with my badge number 207.

14   Q.   And as part of this investigation, did you have an

15   opportunity to review the recordings and any resulting

16   transcripts?

17   A.   Yes.

18   Q.   So on the date that these phone calls were happening, where

19   were you in relation to the confidential informant?

20   A.   That day, I was with him.

21   Q.   When you say you were "with him," where?

22   A.   We were in the parking lot while he was making the phone

23   calls.

24   Q.   And what were you doing as these phone calls were happening

25   with regard to furthering this investigation?

```
 1  A.   Well, obviously, listened to, and after it was recorded, I
 2  listened to the phone calls that we just generated, generally,
 3  just made plans for the next step.
 4  Q.   And when you say "the next step," what was that?
 5  A.   Well, once Magdalena told me that --
 6           MR. ZACCA:  Objection.  Objection.  Hearsay.
 7           THE COURT:  Rephrase your question, sir.
 8           THE WITNESS:  I'm sorry.
 9  BY MR. VAZQUEZ:
10  Q.   Did you review the recording?
11  A.   Yes.
12  Q.   And based on your review of the recording that's in
13  evidence, what did you do?
14  A.   We then went ahead and set up for the transaction.
15  Q.   Okay.  Where was that transaction?
16  A.   It took place in the parking lot of a Burger King in North
17  Miami Beach.
18  Q.   I'm showing you what's been admitted as Government's 47.
19  Do you recognize it?
20  A.   Yes, I do.
21  Q.   And what is it?
22  A.   It's the arrest audio.
23  Q.   And how do you know that?
24  A.   Because I reviewed it and, obviously, it says, "arrest
25  audio."
```

1  Q.   And what is this here?

2  A.   That is my initials with my badge number once again.

3  Q.   For the record, I've circled the right side of the disk for

4  Government's 47 over the initials and number 207.

5       Now, where did this operation happen on August 28th, 2013?

6  A.   It happened at a parking lot of Burger King in North Miami

7  Beach.

8  Q.   And why did this site get selected for the operation?

9  A.   Well, typically, in these cases, a lot of times what the

10 targets like to do -- believe it or not -- like to go in public

11 places, so we picked this particular place, the Burger King.

12      One of the reasons why, 'cause it has a big parking lot in

13 the back, so we know there wouldn't be a lot of pedestrians in

14 that area, and it also has a back wall separating it from

15 another building.

16      And normally, we like to pick public places with a wall,

17 'cause I instruct the confidential informant to park there, so

18 we can kind of lure the targets into the confidential

19 informant's car.

20      For a couple reasons.  One, there's a wall, so when we go

21 to make the arrest, it's easier for our SWAT guy -- our SWAT

22 officers to block in the vehicle because there's really nowhere

23 to go, and then we cut them off as we enter the parking lot.

24 Q.   And were you able to do that in this case?

25 A.   We were able to position the confidential informant where

```
 1    we liked, but unfortunately, when Magdalena arrived with the
 2    codefendants, they parked like, I'd say, about 40 yards away.
 3    Q.   I want to show you what's been marked for identification as
 4    Government's 50.  Do you recognize it?
 5    A.   Yes, I do.
 6    Q.   And what is it?
 7    A.   It's the real kilogram of cocaine that we used in the
 8    investigation.
 9    Q.   And where did the item marked for identification
10    Government's 50 come from?
11    A.   It comes from the North Miami Beach property room.
12    Q.   Did you secure the item?
13    A.   Yes, I did.
14          MR. VAZQUEZ:  At this time, I would move Government's
15    Exhibit 50 into evidence.
16          MR. ZACCA:  Judge, if I may just have a moment.
17          (Brief pause in the proceedings.)
18          MR. ZACCA:  No objection.
19          THE COURT:  Received as marked.
20          (Government's Exhibit 50 received into evidence.)
21    BY MR. VAZQUEZ:
22    Q.   Why did you pick this item, Government's 50 -- or what's
23    now been admitted as Government's 50 for this transaction?
24    A.   Because through the audio and video evidence, it was
25    suggested that they wanted to purchase a kilogram of cocaine.
```

```
1    Q.  Did you bring a sham to this deal?

2    A.  No, sir.

3    Q.  What is this?

4    A.  That is a real kilogram of cocaine.

5    Q.  Now, is this what the kilogram looked like at the time of

6    the transaction?

7    A.  No, it didn't.

8    Q.  What did it look like?

9    A.  Normally, kilograms of cocaine usually come in like a book

10   size, about this big, and it's usually wrapped in some type of

11   tape, and it looks like -- on the street they call it a brick

12   of cocaine, because it looks like a brick.

13   Q.  And we were addressing your set-up as this kilogram of

14   cocaine was going to be introduced.  Why were you set up with

15   the personnel that you had on this scene?

16   A.  We set up with the personnel because we usually use our

17   SWAT officers, 'cause -- apparently, this a drug deal, so it

18   has the potential to be a robbery --

19           MR. ZACCA:  Objection.  "Potential."

20           THE COURT:  Rephrase.

21   BY MR. VAZQUEZ:

22   Q.  Why did you physically position the officers where they

23   were for this drug deal?

24   A.  To make sure that it wasn't going to be a robbery or a

25   raid.
```

```
1    Q.   Okay.  And why were they staged as they were prior to the
2    transaction?
3    A.   They were staged in a position, number one, so not blocking
4    the parking lot so they're not spotted by the individuals or
5    the potential targets, and they're strategically placed so that
6    when they come in -- when they move in to make their arrest
7    they're there.  And also, some have the assignments to block
8    off entries and exits of the parking lot.
9    Q.   Based on the evidence that you had collected, which has
10   been admitted in the case, how many people were you looking at
11   potentially engaging during this drug transaction?
12   A.   Through the evidence, at least two.
13   Q.   And when you say "two," why do you say "two"?
14   A.   Because during the first week with the evidence and the
15   audio/video, Magdalena suggested that he was purchasing the
16   kilogram of cocaine for his Godfather or, in Spanish, Padrino.
17   Q.   I'm going to show you what's been admitted into evidence as
18   Government's Exhibit 52.  What do we see here?
19   A.   That is an image extracted from the surveillance video of
20   the confidential informant and Mr. Magdalena.
21   Q.   And when you talked to the members of the jury about your
22   staging, where does this image -- what does this image depict
23   relative to where the officers were staged?
24   A.   Behind the confidential informant, which is the person with
25   the blue shirt, his vehicle was parked against the wall.  You
```

1   don't see it 'cause it's black.

2      The surveillance vehicle was parked kind of far away and

3   it's zoomed in to where they were talking.

4   Q.  I'm going to show you the second image from

5   Government's 52.  What are we looking at here?

6   A.  That's the confidential informant, Magdalena, and another

7   co-defendant.

8   Q.  Now, Detective Nunez, this confidential informant, after he

9   participated in this matter, what happened to him?

10   A.  Unfortunately, long after this case, we no longer use him.

11   Q.  And why is that?

12   A.  Because I received information that he later got arrested

13   for transporting adults into the country.

14   Q.  While this case was going on, his activities with relation

15   to Magdalena and any of your narcotics operations, were they

16   recorded?

17   A.  Yes.

18   Q.  And did you review them?

19   A.  Yes, I did.

20   Q.  Now, as this transaction progressed, what occurred in the

21   case?

22   A.  When Magdalena first arrived, he was greeted by the

23   confidential informant.  They both went back to the vehicle

24   where Magdalena came from.

25   Q.  Were you able to get a visual recording of that location?

1    A.   No, we weren't.

2    Q.   And what happened after Magdalena departed?

3    A.   They later came back and -- back to the CI's vehicle, and

4    that's when they consummated the transaction.

5    Q.   And what happened after that transaction was completed?

6    A.   Everybody was placed under arrest, and then that's when I

7    became -- that's when I first made contact with the defendant

8    today.

9    Q.   Now, I want to show you what's been marked -- what's been

10   admitted as Government's 49.  What are we looking at here?

11   A.   That was the bag of money which they used to purchase the

12   cocaine.

13   Q.   And what happened to this money after the arrest?

14   A.   It gets impounded, and then it gets forfeiture.

15   Q.   Were you present when this money was taken into custody?

16   A.   Yes, I was.

17   Q.   I'm showing you what's been admitted into evidence as

18   Government's 48.  Do you recognize it?

19   A.   Yes, I do.

20   Q.   What is it?

21   A.   That is the real kilogram of cocaine that we used for that

22   investigation.

23   Q.   On what date?

24   A.   On August of 2013.

25   Q.   So what's depicted on Government's 48 is what became

1    Government's 50?

2    A.   Yes, sir.

3    Q.   Why is there a cutout of the kilogram on Government's 48?

4    A.   Prior to the case, we, as a unit, we like to open up what

5    we call a "window."  The reason we do that -- for two reasons:

6         One, is when the person's receiving the cocaine that he, in

7    fact, knows that it's cocaine.

8         Two, a lot of times if we don't do that, the person buying

9    the cocaine wants to see what's inside because, obviously, it's

10   taped up, so they don't know if it's cocaine, sugar, or

11   anything like that.

12        So, instead of having them introduce a sharp object, God

13   forbid, when we do the take-down the person has a sharp object

14   in his hand, it doesn't end well.  So, we like, you know, open

15   a window so everything is covered.

16   Q.   Now, you stated that there was an arrest that occurred

17   after the consummated drug transaction; is that correct?

18   A.   Yes, sir.

19   Q.   And during that event, what happened to you?

20        What did you see?

21   A.   Well, after everybody was placed into custody, that's when

22   I made contact with the defendant.

23   Q.   And where was the defendant?

24   A.   The defendant was still inside a gold mini van.

25   Q.   I'm going to show you what's been admitted as

```
 1   Government's 51.  What are we looking at here?

 2   A.   That is a picture of Magdalena in custody.

 3   Q.   Were you present when he was arrested?

 4   A.   Yes, I was.

 5   Q.   And I want to show you the next image from Government's 51.

 6   A.   That is a picture of the vehicle that Magdalena and the

 7   defendant and two other codefendants arrived in.

 8   Q.   And I want to show you the next image from Government's

 9   Exhibit 51.

10   A.   That is a picture of the defendant here today.

11        MR. VAZQUEZ:  Your Honor, I tender the witness.

12                      CROSS-EXAMINATION

13   BY MR. ZACCA:

14   Q.   Good morning, Detective Nunez.

15   A.   Good morning, sir.

16   Q.   Approximately, how many -- just to be clear, you're the

17   lead detective in this case; right?

18   A.   Yes, I was.

19   Q.   All the information about this case filters through you;

20   correct?

21   A.   Yes.

22   Q.   Alright.  So how many recordings were obtained in this

23   case?

24   A.   That would be the meet at the Arbys, the actual

25   transaction, and some phone calls.
```

1   Q.   Right.   And what I mean is audio recordings?

2   A.   Yes, sir.

3   Q.   Other than the surveillance van that was capturing the

4   images from far away, everything was audio and video recorded;

5   correct?

6   A.   Yes.

7   Q.   So, suffice it to say -- I'm just going through the exhibit

8   list here, one, two -- there are about seven audio recordings,

9   more or less?

10   A.   Yes, sir, those would be correct.

11   Q.   I may be off a number.

12   A.   Yes.

13   Q.   But that's more or less?

14   A.   Yes, sir.

15   Q.   In those recordings, how many times is Mr. Garcia Morales

16   recorded negotiating the price of cocaine?

17   A.   None.

18   Q.   How many times is he recorded talking about a transaction

19   involving cocaine?

20   A.   None, sir.

21   Q.   How many times is he recorded talking about the quantity of

22   cocaine?

23   A.   None.

24   Q.   How many times is he recorded talking about where to meet

25   to do the transaction for the cocaine?

1    A.   None.

2    Q.   How many times is he recorded saying the word "cocaine"?

3    A.   None.

4    Q.   How many times is he recorded talking about drugs?

5    A.   None.

6              MR. ZACCA:  No further questions.

7                        REDIRECT EXAMINATION

8    BY MR. VAZQUEZ:

9    Q.   Detective, while this investigation was going on, did you

10   review the recordings?

11   A.   Yes, I have.

12   Q.   How many times do you estimate that you heard the word

13   "padrino" before the arrest happened?

14   A.   Quite a few.

15   Q.   And how many times did you hear that padrino was disabled?

16   A.   The first meet at the Arbys and when they made a phone

17   call.

18   Q.   And at the Arbys incident -- I want to take you to the

19   transcript, I want to put it on the screen for you -- it's

20   admitted as Government's Exhibit 47A -- excuse me -- at the

21   Burger King, August 28th, 2013.  Did you review this portion of

22   the transcript at page three?

23   A.   Yes.

24   Q.   Where Magdalena addresses the presence of the padrino?

25   A.   Yes.

1   Q.   Did you review the transcript at page four, where the

2   defendant introduces the padrino?

3   A.   Yes.

4   Q.   Did you review the portion of the transcript where the

5   padrino signs off on the transaction?

6   A.   Yes.

7   Q.   While this investigation take-down was going on, did you

8   recover any records, paperwork, that had anything to do with

9   Mr. Magdalena transporting the defendant to any kind of medical

10  appointment?

11         MR. ZACCA:   Objection.   Beyond the scope.

12         THE COURT:   Sustained.

13  BY MR. VAZQUEZ:

14  Q.   When you reviewed this recording that the defense counsel

15  was asking you about, at any point in time did the padrino say

16  anything about having to go to a medical appointment?

17  A.   No.

18         MR. VAZQUEZ:   No further questions.

19         THE COURT:   May the witness be permanently excused?

20         MR. VAZQUEZ:   Yes, Judge.

21         THE COURT:   You're excused.

22         THE WITNESS:   Thank you, sir.

23         (Witness excused.)

24         MR. VAZQUEZ:   Your Honor, we just have a legal question

25  to raise sidebar before we rest our case.   If we may approach.

1      THE COURT:  Yes, sir.

2      (Sidebar discussion held as follows:)

3      MR. VAZQUEZ:  Your Honor, we previously had provided

4  some cases on our desire to have the summary exhibit admitted

5  under 1006, and we wanted to know if the Court was in a

6  position to do that.

7      THE COURT:  The cases?  May I see the exhibit?

8      MR. VAZQUEZ:  Yes, sir.

9      THE COURT:  Do you plan on using this during your

10  closing argument; is that correct?

11      MR. VAZQUEZ:  We will be using it in demonstrative

12  fashion, but we would like this to go back to the jury.

13      THE COURT:  Listen to the question I asked.  You will

14  be using this in your closing argument; correct?

15      MR. VAZQUEZ:  Yes.

16      THE COURT:  In addition to using this, what will you do

17  during the closing argument?

18      MR. VAZQUEZ:  We have placed and we intend to use a

19  powerpoint which builds on this for a demonstrative to our

20  argument, so we would add to it in the closing.

21      THE COURT:  And is there an objection?

22      MR. ZACCA:  Yes, Judge.

23      THE WITNESS:  What is the objection?

24      MR. ZACCA:  This document 57 going back to the jury --

25  they can use it as a demonstrative.  The agent testified this

```
 1   is --

 2           THE COURT:  What is the objection?

 3           MR. ZACCA:  Cumulative --

 4           THE COURT:  Cumulative?

 5           MR. ZACCA:  -- to the agent's testimony.

 6           THE COURT:  It is cumulative, if that's the term you

 7   want to use, but there's complicated scenes and various

 8   numbers, et cetera.  I don't see any reason to deny its

 9   introduction with, however, an instruction to the jury that

10   this is a summary, and as you consider it as such, the

11   underlying evidence is the evidence.

12           And if you're going to point out something that might

13   be inaccurate and it caused you to question that, then you're

14   willing to do that.  But you have numerous numbers and

15   documents and figures going on all over the place.

16           It might be helpful for the jury to have the summary of

17   that which is already in evidence in one location.

18           MR. ZACCA:  I can understand the Court's rationale.

19   I have a second objection.  It's by an agent -- hearsay -- I

20   don't believe the Government qualified him as an expert.

21   They brang him in to testify (inaudible).

22           I also have a secondary objection on the other side.

23           THE COURT:  Well, if you take a look at 1006, it seems

24   to me, with the limiting instruction, that it should be

25   allowed.  Otherwise, you know, we'll be here in the afternoon.
```

```
 1              I already allowed -- how many minutes do you all get?

 2              MR. VAZQUEZ:  90 minutes, Your Honor.

 3              THE COURT:  90 minutes, 120, numbers, and pull out

 4      pages, and trying to show the jury what number's here, the

 5      number there.  It seems to me that, in addition, it's a waste

 6      of time as well.

 7              And so I am going to receive 57 for identification as

 8      marked, with the limiting instruction, if you request it.

 9              MR. VAZQUEZ:  I am, Judge.

10              If we formally move it, we can rest our case.

11              THE COURT:  We will take a break, and then I will

12      entertain motions, and then we will get into the defendant's

13      case.  Alright.

14              (Sidebar concluded, proceedings continued in open

15      court:)

16              MR. VAZQUEZ:  Your Honor, the Government will formally

17      move to admit Government's 57 into evidence.

18              THE COURT:  Alright.  Moving 57, which was previously

19      marked for identification?

20              MR. VAZQUEZ:  Yes, Your Honor.

21              THE COURT:  Do you want to identify it, since we --

22              MR. VAZQUEZ:  Yes.  Your Honor, what was marked for

23      identification as Government Exhibit 57 and was

24      temporarily identified as a demonstrative exhibit, now I will

25      move it into evidence so I can present it to the jury so they
```

```
1    can see it.

2            THE COURT:  This is a summary of what?

3            MR. VAZQUEZ:  This is a summary of cellular phone

4    records, the call detail records, that was addressed by Special

5    Agent Scott Eicher with the FBI, addressing telephone accounts

6    from T-Mobile, AT & T -- those two companies.

7            THE COURT:  Very well.  I am going to receive 57 for

8    identification as marked.

9            (Government's Exhibit 57 received into evidence.)

10           THE COURT:  These items were presented to you during

11   the testimony of the officer, or agent, as you recall.

12           Let me give you a limiting instruction.  This is a

13   summary document.  The underlying documents of phone records,

14   et cetera, are in evidence as well.

15           Keep in mind, you're not required to accept the

16   information in the summary as true, and you should only rely on

17   the summary to the extent that you find it helpful.

18           It's just a way of sort of synthesizing all of the

19   numerous records into one summary document to make it easier

20   for you to understand, to the extent you want to use it to

21   understand the testimony that has been presented.

22           MR. VAZQUEZ:  Your Honor, if I may, just briefly

23   publish it to the jury?

24           THE COURT:  Yes, sir.

25           MR. VAZQUEZ:  Government's Exhibit 57.
```

```
 1              Your Honor, at this time, the United States rests its
 2    case.
 3              THE COURT:  Very well.  You may recall, ladies and
 4    gentlemen, that when the Government announces they are resting
 5    their case, that means they have presented all the testimony
 6    that they have in their case-in-chief.
 7              You also recall that there are some legal issues that I
 8    have to entertain at this time.  So I am going to excuse you.
 9    I am going to handle the legal issues.
10              It shouldn't take more than about 30 minutes.  I'm
11    going to listen to the arguments on the legal issues.  I will
12    give them a short break after we finish with the argument, and
13    then we will continue.
14              You are in recess at this time.  Thanks you.
15              COURT SECURITY OFFICER:  All rise.
16              (Jury exited courtroom at 10:02 a.m.)
17              THE COURT:  Be seated.
18              Are there any motions?
19              MR. ZACCA:  Yes, Judge.  The defense would be moving
20    for a judgment of acquittal on each count the defendant is
21    charged in the indictment under Rule 29, and I'll go through
22    the counts, Judge.  I just want to get my indictment in order.
23              I'll just start with Count 1, which is the conspiracy
24    to commit Hobbs Act robbery, and my argument will be twofold:
25              With regard to -- I'll start with the gold -- to the
```

1    gold robbery, and then I'll move to the second object, which is

2    the attempted marijuana robbery.

3         With regard to the gold, looking at the statute -- I

4    have it here -- I don't believe, looking at the plain language

5    of the statute, that this Court has jurisdiction over the

6    Bolivian company.  So the nexus, the interstate nexus here has

7    to be shown once the gold is here in the United States, in my

8    opinion, the defense's position.

9         THE COURT:  Wait now.

10        MR. ZACCA:  Yes, sir.

11        THE COURT:  The gold traveled from Bolivia to Florida

12   in foreign commerce, and as I recall the evidence, the

13   defendants were awaiting the arrival of the gold, and so there

14   the courier, after the gold entered the United States in the

15   possession of the courier, to the residence in Coral Gables;

16   would that be accurate?

17        MR. ZACCA:  Yes, Judge.  I don't dispute that

18   recitation of what the evidence was presented.

19        However, Judge, looking at -- and.

20        THE COURT:  And just one additional thing --

21        MR. ZACCA:  Yes, sir.

22        THE COURT:  While it was en route to a refinery in Opa

23   Locka; correct?

24        MR. ZACCA:  Yes, sir.

25        THE COURT:  And was at the residence in Coral Gables

 1    overnight.  The following morning when the courier attempted to

 2    transport the gold to Opa Locka, it was then intercepted and a

 3    robbery occurred?

 4          MR. ZACCA:  Yes, sir, I don't dispute those -- that's

 5    the evidence as presented by the Government.  However, looking

 6    at 18 USC 1591, threats by robbery or commerce, that's the

 7    Hobbs Act -- and it defines the term "commerce," and I'm

 8    looking at the term "commerce," as its plain meaning, and I

 9    Your Honor's looking at it right now as I'm speaking -- and I

10    can continue speaking?

11          THE COURT:  Alright.  I'm looking at 18 USC 1951.

12          MR. ZACCA:  Yes, Judge.  And if you look at (A)(b)

13    subsection three, it defines the term "commerce."  I mean, you

14    all can read it.  But I don't see "foreign commerce."

15          It discusses "interstate commerce," reading it.

16          And in this case, Judge, the Government did not present

17    evidence that -- yes, sir?

18          THE COURT:  Because it reads:

19          "The term "commerce" means commerce within the District

20    of Colombia, or any territory or possession of the

21    United States; all commerce between any point in a state,

22    territory, possession, or the District of Colombia, and any

23    point outside thereof."

24          So a point outside of Florida would be Bolivia?

25          MR. ZACCA:  No, you're right, that would be a point.

```
 1    If we are to read that language -- if the Court is to read that
 2    language as any point outside thereof, as including foreign
 3    commerce, in this case Bolivia, being outside of Florida, then
 4    my argument is shutdown.  I am not reading it that way.
 5    I guess, I am reading it more narrow than the Court just read
 6    it.
 7               THE COURT:  How are you not reading "outside thereof"?
 8               MR. ZACCA:  Judge, I did not read it as foreign
 9    commerce.  I go no further, Judge.  I go no further.  I just
10    wanted to point that out.
11               THE COURT:  Do you have a case --
12               MR. ZACCA:  No, Judge, I don't have a case to support
13    that argument.
14               THE COURT:  -- to cite "outside thereof"?
15          And further, all commerce points within the same state
16    to any place outside such state, all other commerce.
17          Does the U.S. have jurisdiction over foreign commerce?
18               MR. VAZQUEZ:  When it interacts with the United States,
19    yes.  And we have -- there are cases -- just -- I have my
20    Eleventh Circuit just to point out this case, and I believe if
21    the Court needs to engage this further, there are cases, for
22    example, this case addresses an extortion effort between Panama
23    and Florida, there's interstate commerce in that case.
24          That would be the United States versus De Parias,
25    that's D-E P-A-R-I-A-S, 805 F.2d, 1447, that's the Eleventh
```

1    Circuit, 1986 case.

2         THE COURT:  You know what, I really enjoy you all

3    giving me case cites, but when you give them to me, maybe I

4    should get a copy of it so I could read it, too.

5         MR. VAZQUEZ:  Yes, Your Honor.  I didn't know exactly

6    what he was going to argue, as far as interstate commerce not

7    existing in -- or enter foreign commerce.

8         I think that the -- it's plain, that the Bolivian

9    company crosses over, comes into Miami International Airport,

10   has intentions to do business with -- in Opa Locka, with

11   Republic Metals in Opa Locka, they get robbed of 2.8 million

12   dollars worth of gold, they are definitely interacting with the

13   United States at that point.

14        THE COURT:  Were there any invoices that showed the

15   interstate connection --

16        MR. VAZQUEZ:  Yes.

17        THE COURT:  -- and foreign commerce connection as well;

18   correct?

19        MR. VAZQUEZ:  Yes.  The business records were admitted

20   to show them dealing with the United States and how much their

21   gold would be valued in the United States.

22        THE COURT:  It appears to me, counsel, that there are

23   at least three instances in the statute itself which explains

24   the foreign commerce connection.

25        And so, for those reasons, and as you are aware, this

```
 1    stage of the proceeding the Court has to look at the evidence
 2    in the light most favorable to the Government.  It's a pretty
 3    high burden for the defense to meet.  That is Rule 29 in the
 4    Federal Rules of Criminal Procedure.
 5         So, for the particular argument that you have made,
 6    your relief is denied.
 7         MR. ZACCA:  Very well, Judge.  And I'll move on.  That
 8    alone saves Count 1 for the Government.  But I'll -- just for
 9    the record, I will speak to the marijuana objective.
10         Judge, I'm aware of the Taylor opinion, we've discussed
11    it before in pre-trial matters.  I just want to preserve my
12    objection.  I don't -- obviously, the case law's against me, in
13    that there's no evidence to show that, number one, there was
14    marijuana to be had in the first place; number two, how that
15    marijuana was cultivated, if it was cultivated for in state to
16    sell or personal for consumption.  There is no evidence on the
17    record as to what that marijuana was going to be used for.
18         Judge, I know the Taylor opinion is against me, that's
19    fine.  I'm just preserving the record, Judge.
20         THE COURT:  Alright.  Government?
21         MR. VAZQUEZ:  Your Honor, the witness testimony from
22    Alfredo Kindelan said that they were going to rob and
23    distribute that marijuana, that came in in this trial.  And
24    United States relies on Taylor.
25         The Court's instruction for the proposed jury
```

1    instruction reflects the controlling precedence in this case,

2    that when you intend to rob a drug dealer, such as a marijuana

3    dealer, that implicates -- as the Court has reflected in its

4    proposed jury instruction, necessarily affects interstate

5    commerce, we believe that this argument is not persuasive.

6            THE COURT:  Well, based on the Taylor case, it is

7    pretty clear that when the Court looks at the evidence in the

8    light most favorable to the Government, the relief sought is

9    denied.

10           MR. ZACCA:  Very well, Judge.  I'll move on to Count 2,

11   which is the conspiracy to possess or intent to distribute a

12   controlled substance.

13           Now, when you look at Count 2 of the indictment, Judge,

14   the codefendants listed do not include -- well, let's make it

15   even -- I'll make it even more general.  I don't see the name

16   "Osvaldo Magdalena Ruiz" anywhere in Count 2.

17           Now, I know that the Government, as their tradition is

18   in their conspiracy counts, they always include that with

19   "others known and unknown to the Grand Jury" language in their

20   conspiracy counts that's, I guess, to kind of hedge their bets.

21           But in this case there's no evidence that the cocaine

22   transaction with regard to Osvaldo Magdalena Ruiz has anything

23   to do with Count 2 of the indictment.

24           If anything, the Government alleged one conspiracy, and

25   the Government proved another conspiracy, if you want to call

1    it --

2              THE COURT:  I'm not following you.

3              MR. ZACCA:  Okay, Judge.

4              THE COURT:  What is the -- what were the two

5    conspiracies that you are arguing right now?

6              MR. ZACCA:  What I'm arguing, Judge, is that with

7    regard to Count 2, the language with regard to the conspiracy

8    to possess with intent to distribute 500 grams or more of

9    cocaine, the Government hasn't proved the conspiracy alleged in

10   the indictment, at most.

11             THE COURT:  And why is that?

12             MR. ZACCA:  Because their evidence relates to an event

13   that occurred in August of 2013 involving Mr. Garcia Morales

14   and Osvaldo Magdalena Ruiz.

15             There is no evidence tying that evidence -- that

16   conspiracy to acquire -- in this case, one kilogram of cocaine,

17   with the conspiracy alleged here.  There's nothing tying them

18   to -- as to Osvaldo Magdalena Ruiz to any of the listed

19   codefendants in Count 2.

20             In fact, there's no evidence in the record where the

21   Government said, Well, this was a conspiracy involving all

22   these conspirators.  If anything, Judge, what it seems to me,

23   is that the Government proved the conspiracy that falls outside

24   the contours of Count 2.

25             THE COURT:  So is your argument that the Government has

1    to prove all the conspirators?  In other words, they listed

2    ending date and intending date, and based on the evidence

3    there's one incident on a finite date, so it is a little

4    strange that you would be talking about September 30th, 2012,

5    through June 4th, 2014, when -- what was the date of this

6    incident?

7         MR. VAZQUEZ:  August 28th of 2013 is when this episode

8    happens.  Now, we were a little --

9         MR. ZACCA:  Wait, wait, can I finish my argument?

10        THE COURT:  That is a little odd, but they do name the

11   defendant, and I guess, at the last moment here, there were two

12   other persons involved, I don't know who they were.  The

13   witness testified there were two other defendants in the case.

14        MR. ZACCA:  Let me approach it this way, Judge, and

15   perhaps argue it this way, from a different perspective.

16        I don't see anywhere in the Government's evidence that

17   the Government proved a conspiracy involving the codefendants

18   listed in Count 2 involving 500 grams or more of cocaine,

19   involving these codefendants.

20        That conspiracy allegedly indicted has not been proven.

21        And I'm not talking about the marijuana objective,

22   because that marijuana language is in Count 2.

23        But with the language with regards to 500 grams of

24   cocaine has not been proven.

25        THE COURT:  Let me hear the Government's position.

1        MR. VAZQUEZ:  Your Honor, one, we do not agree that

2   every codefendant who is secretly participating in the

3   overarching conspiracy needs to be charged and identified in

4   the indictment; two, these defendants -- the charge of

5   uncharged defendants had ongoing relationship.  We have had a

6   targeted approach to this prosecution, so there are --

7        THE COURT:  Well, if you had a targeted approach, it

8   seems like you would have charged the conspiracy -- you know,

9   frankly, this indictment is a little strange.

10       MR. VAZQUEZ:  Well, there was a lot of things that were

11   happening in this indictment.

12       THE COURT:  The indictment charged with conspiracy and

13   possession with intent to distribute on or about a certain

14   date, so we're clear.

15       MR. VAZQUEZ:  Right.

16       THE COURT:  It's a little strange, as we had pointed

17   out before, but the fact of the matter is that the particulars

18   that were given, the defendant was on notice as to what

19   incident was involved and, therefore, could adamantly defend

20   against it.

21       So even though it's overbroad and the evidence doesn't

22   seem to comport with, in particular, with what is alleged here.

23   It is charged during that period, and there is a finite date

24   and there was evidence about what happened on that date, and

25   the defendant is listed in the count, and so the evidence in

```
 1    the light most favorable to the Government, that is, admittedly
 2    somewhat confusing.
 3         What were -- I'm not sure I understand what's behind
 4    authority to create a count this way.  Did the evidence change?
 5         MR. VAZQUEZ:  No.  We focused the trial presentation on
 6    this defendant.  This conspiracy, as there are other counts
 7    that we did not address as to other defendants, who are using
 8    their robbery proceeds to buy cocaine, so there's another
 9    episode that happens later on, where -- not relative to
10    Your Honor -- there is a fugitive at this point who was working
11    with Jean Lara to purchase cocaine.
12         Mr. Kindelan testified that the proceeds from the gold
13    heist were used and were given to Mr. Morales so that he could
14    buy cocaine.  And he uses his associate, Leonardo Morales to --
15    or excuse me -- Osvaldo Magdalena to buy that cocaine.
16         So everything -- there are multiple episodes in this
17    drug conspiracy that relate to their robbery activities.
18    That's why they're broader, but they encompass multiple events.
19         This drug transaction is an episode from the drug
20    conspiracy who is financed by a gold robbery.
21         THE COURT:  Well, I understand your position, and I
22    think as a matter of law it's sufficient.  It's just confusing
23    to the jury.  So maybe that enures to your benefit when you
24    argue about, Who are all these people this whole time period?
25         But I don't think it's sufficient for me to grant a
```

1    Rule 29 motion.

2         We addressed this issue in our pre-trial setting, and

3    as you will recall, I was concerned about the particulars, but

4    the Government announced the particulars that they were

5    including in this indictment, and so I determined that was

6    sufficient.

7         But, you know, Government, you can always supersede an

8    indictment, but that's for another day.

9         The motion is denied as to Count 2.

10   MR. ZACCA:  Very well, Judge.  I will move on to

11   Count 3, which is attempted Hobbs Act robbery.  Judge, I'm

12   going to rely upon the argument I made earlier.  Again, I know

13   current precedence is against me, in the Taylor opinion.

14        But again, the lack of evidence of the marijuana

15   affecting interstate commerce, the lack of evidence of how the

16   marijuana was going to be used, and distributed, and where, and

17   what quantity, those types of things, Judge, that lack of

18   evidence, similar to the argument I made for Count 1 of the

19   conspiracy, I move for a judgment of acquittal on Count 3.

20        THE COURT:  I have previously looked at the legal

21   issues, as you had correctly stated, and the Taylor case is

22   controlling.  The motion is denied.

23        MR. ZACCA:  With regard to Count 4, brandishing a

24   firearm in furtherance of a crime of violence, the defense

25   moves for a judgment of acquittal on the grounds that there was

1    insufficient evidence that the defendant carried, used,

2    possessed, or brandished a firearm in furtherance of a crime of

3    violence.

4           THE COURT:  What about the aiding and abetting theory?

5           MR. ZACCA:  Judge, admittedly, I'm not going to stand

6    here and tell you otherwise, Judge.  I'm just making my record,

7    Judge.

8           THE COURT:  Alright, I'm just trying to --

9           MR. ZACCA:  No, you're right.  And under the -- I'll

10   concede, under the language of the aiding and abetting statute

11   and the current state of the law, you know, that's another

12   theory the prosecution is adamant to travel on.

13          Nevertheless, Judge, I'm just going to make my

14   argument, under all theories, insufficient evidence lies.

15          THE COURT:  Very well.  And in the light most favorable

16   to the Government, your motion is denied.

17          MR. ZACCA:  I believe the next count is Count 7.

18          Judge, again, with regard to Count 7, the defense moves

19   for judgment of acquittal, in that there's insufficient

20   evidence that the defendant attempted to possess 500 grams or

21   more of cocaine.  Just a general argument, Judge, and that's

22   all I have to say about that.

23          THE COURT:  Alright.  Well, once again, the Court has

24   to look at the evidence in the light most favorable to the

25   Government.  That's not, of course, the trial standard.  The

```
 1   jury has to determine beyond a reasonable doubt whether the

 2   defendant has committed an offense.

 3          But at this stage, the Court has to focus in on the

 4   light most favorable to the Government, and most favorable to

 5   the Government, and based upon that standard, the motion is

 6   denied.

 7          Are there any other motions that I should entertain at

 8   this point?

 9          MR. ZACCA:  No, not under Rule 29.  But perhaps we

10   could take up some other legal matters that I anticipate coming

11   up rapidly.

12          Judge, I think this is my first time in front of you, I

13   don't know if Your Honor likes to colloquy the defendant.  My

14   understanding is Mr. Garcia Morales wants to testify, and I've

15   discussed it with him at length, and he wants to testify.

16          I don't know if you want to colloquy him about that

17   right to testify and the right not to testify.

18          THE COURT:  I don't typically colloquy persons when

19   they elect to testify.  But at your request, I will state to

20   Mr. Garcia Morales that you have the right to testify, it's

21   your final decision.

22          You can consult with your attorney.  Your attorney can

23   make recommendations, but ultimately it is you who makes that

24   decision.  Do you understand, sir?

25          DEFENDANT GARCIA MORALES:  Yes, perfectly well.
```

```
 1          THE COURT:  And if you decide to testify, that is
 2   perfectly fine, that is your constitutional right.
 3          MR. ZACCA:  Judge, there is a secondary objection that
 4   I anticipate coming up.
 5          Mr. Garcia Morales will testify, the Government will
 6   cross, and I suspect, if Mr. Vasquez is the good lawyer,
 7   Ms. Duane is a good lawyer, they're going to attempt to impeach
 8   Mr. Garcia Morales with the statements he gave to Detective
 9   Bertrand post-Miranda at the hospital.
10          Judge, the general law is this -- and I did some
11   research last night, I'm still putting it all together.
12          The general law is this, that the Government can use a
13   suppressed statement -- a statement obtained in violation of
14   Miranda -- for impeachment purpose, and only impeachment
15   purposes, to impeach a testifying defendant.
16          However, there has to be a finding that the statements
17   being used are voluntary, and that's the crux of the issue.
18          I moved to suppress -- and Judge Cooke suppressed --
19   those statements, based on, essentially, the voluntariness of
20   those statements, considering the mental state and the
21   medication that he was given.
22          THE COURT:  Was that the crux of the ruling, that it
23   was an involuntary statement?
24          MR. ZACCA:  Judge, I'm making that argument based on
25   the fact that -- first, you know, I did not attack the Miranda
```

 1   warnings themselves.  I did not attack that, you know,

 2   Detective Bertrand failed to make -- failed to ask a certain

 3   question or failed to follow what needs to be said and read in

 4   the Miranda warnings.

 5        My attack -- and I think the record's clear on that --

 6   is that at the time the interview -- the Miranda warnings were

 7   given and the statements were obtained, he was under heavy

 8   medication, Dilaudid -- and the record's complete with all

 9   the -- the amount of Dilaudid that was given to him.

10        Secondarily, Judge, I called an expert witness -- and

11   it was the battle of the experts at the suppression hearing --

12   with regard to the psychoactive effects of that medication at

13   the time his Miranda was given and at the time the statements

14   were obtained.  And that was the crux of my argument.

15        So I don't know how now the Government can come in and

16   try to impeach Mr. Garcia Morales with those statements under

17   the medical state he was in, with the medication that he was

18   given, when those statements were suppressed for these reasons.

19        So that's my argument, Judge.  And I know this issue is

20   going to come up.  I know Mr. Vazquez is eager to use those

21   statements, and that's why I brought up the issue.

22        MR. VAZQUEZ:  Your Honor, I think I can briefly address

23   this issue.  When I did a notice of clarification, that

24   prompted Judge Cooke to issue a subsequent order.

25        And the Government's position has been that what

1    Mr. Zacca traveled under was a lack of capacity to waive

2    Miranda itself.

3         There's the Fifth Amendment, which is what would be

4    implicated here, addresses -- and for impeachment purposes --

5    involuntary confession.  That is a product of police coercion.

6    That is a product of abuse.

7         That is not what Mr. Zacca moved under.

8         THE COURT:  It doesn't have anything to with medication

9    and et cetera.

10        MR. VAZQUEZ:  No.  It is a product -- Fifth Amendment

11   involuntary issues are addressed with, it is a predicate, it is

12   a necessary component of abuse, misconduct, coercive action by

13   the police.

14        Miranda addresses his capacity, his knowing and

15   voluntary ability to waive the right.  These are separate

16   concepts.

17        We also -- and I would say this now -- we withdrew the

18   statement, so that was a subsequent statement to Mr. Vargas,

19   where we made the decision not to use that, and that surprised

20   the Court.

21        If Mr. Morales gets up there and says something that is

22   false -- this is to the gold courier company -- we would seek

23   to introduce that statement for impeachment.

24        We would bring the investigator and introduce the

25   recording, which was years after this event, where he says much

```
 1   of the same thing, and we believe provides false testimony in
 2   two recorded statements.
 3            THE COURT:  Do you have a case that's on point as it
 4   relates to a medical scenario?
 5            MR. VAZQUEZ:  I can look at my filing and see if I
 6   can --
 7            THE COURT:  You mean something you've already filed?
 8            MR. VAZQUEZ:  Yes.
 9            THE COURT:  Would you kindly like to direct me to them?
10            MR. VAZQUEZ:  Yes.  I'm trying to locate them in the
11   docket where I filed my notice.
12            THE COURT:  I would point out that Judge Cooke stated
13   the following:
14            "So that even though he was not in opioid intoxication,
15   it was enough to impair his ability to knowingly and
16   voluntarily waive his rights.
17            "The sedative effects of the Dilaudid at the high end
18   of his dosage and the indicated timeline indicates to the Court
19   that the defendant was unable to make critical judgment
20   statements.
21            "Given that fact, I find that the Miranda waiver was
22   not knowingly and intelligently made, even though the defendant
23   spoke voluntarily under the circumstances.
24            "Therefore, I find defendant's statement made to the
25   officer during the date and time in question did not comport
```

1   with knowing and intelligent waiver of his Miranda warnings,

2   and the statements are hereby suppressed."

3        So it seems to me that it has previously been

4   determined that while the statement was voluntary, there was a

5   a violation of the Fifth Amendment right, which means if it was

6   voluntary, then the statement could be asked about on

7   cross-examination.

8        And then, I guess, the factual issue as to its

9   truthfulness, or it's being informed, would come up with regard

10  to the medication, and that's a question for the jury to

11  decide, if he gave a voluntary statement.

12       And that's the way I read the ruling, and I don't

13  recall -- I know there was a short order issued after trial

14  started, but I don't recall that or it having any impact only

15  the voluntariness issue.

16       Government, do you have a recollection of Judge Cooke's

17  subsequent order that somehow would affect the voluntary issue?

18       MR. VAZQUEZ:  No.  I recall her order simply being very

19  clear that the subsequent order in response to our engagement

20  of this issue that any statement to Detective Bertrand -- which

21  I think at one point was characterized the Miranda bargain  --

22  was suppressed, and that -- again, under her analysis which the

23  Court just read, he was not in a position to knowingly and

24  voluntarily waive Miranda.

25       There was no finding that Detective Bertrand engaged in

 1    type of coercive conduct against the defendant.

 2          THE COURT:  So what is it -- there's several statements

 3    out of there.  What would you intend to introduce?

 4          MR. VAZQUEZ:  The statements of Detective Bertrand at

 5    the hospital that was recorded and the statement to Guy Vargas

 6    and David Bolton that he initiated that was also recorded.

 7          THE COURT:  So two statements.

 8          MR. VAZQUEZ:  Yes, they are recorded and transcribed,

 9    transcripts.

10          THE COURT:  Alright.  And do you have a case on

11    voluntariness as it relates to a medical scenario, where maybe

12    someone is intoxicated with some type of drug, be it legal or

13    not?

14          MR. ZACCA:  Judge, I'm working on it.  I'm by myself,

15    so I'm working on it, Judge.  I'm doing the best I can on it.

16          And just so the record's clear, with regard to the

17    statements to Mr. Bolton, I'm not making the same argument, I

18    think the Government understands that, that stands alone.

19          And I don't have a legal -- well, I got to rethink that

20    because I know I did challenge it, but I didn't challenge it on

21    voluntariness.  I challenged it on another issue, analysis, and

22    it's different.

23          With regard to Detective Bertrand's statement, Judge,

24    the statement of Detective Bertrand on the voluntariness of the

25    issue.  It goes to as I stated, I think Judge Cooke's order's

```
1    clear.  I'm not saying that, you know, he was tortured and

2    forced to give those statements at the hospital or that he was

3    under some kind of a --

4         THE COURT:  She said "even though the defendant spoke

5    voluntarily," that seems to resolve the issue.

6         MR. ZACCA:  Well, and I -- if I, respectfully, Judge, I

7    think the defendant -- I look at it a little differently.  I

8    think that if he -- if he doesn't have the -- the finding is

9    the drugs rendered his capacity to understand the process or --

10        THE COURT:  It seems to me that's a factual issue for

11   the jury.

12        MR. ZACCA:  Okay.

13        THE COURT:  Now, you would say he was under the effect

14   of the drugs, and what he said was inaccurate, and they would

15   say it was accurate.  Now, jury decide.  You want to have

16   credibility on the set of facts -- on the --

17        MR. ZACCA:  That's fine, Judge.  I respect Your Honor,

18   I know where you're going with this.  I just want to maintain

19   the record, maintain my objection.

20        THE COURT:  Alright.

21        MR. ZACCA:  And with regard to Bolton's statement, I

22   think the issue to that was there was discovery issued, as well

23   as -- well, a surreptitious recording of it, and that was --

24   that's another legal issue that I think is going to be

25   resurrected now with the development of the case.
```

```
1              We'll have to, perhaps, mitigate that as well.
2              THE COURT:  What's your position?  I mean, initially,
3    we were going to have a hearing, and then --
4              MR. VAZQUEZ:  Yes.  We withdrew it from our
5    case-in-chief, Your Honor, because in preparing for the hearing
6    I felt that there was sufficient contact between Bolton and law
7    enforcement, where we should have known about it and produce
8    this statement, and we didn't, so I did not want to -- I was
9    not going to proceed on an understanding that there was due
10   diligence.  So the Government collectively should have turned
11   this over, and we didn't.  That was our failure.
12             We have provided to Mr. Zacca, with time with the
13   translation, and now his client, I think, is going to get up on
14   the stand and say something that is contrary to what he said on
15   the --
16             THE COURT:  Why don't we just wait and see what he
17   says --
18             MR. VAZQUEZ:  Yes, sir.
19             THE COURT:  -- then we can figure out where we are;
20   okay?
21             MR. VAZQUEZ:  Yes, sir.
22             THE COURT:  Alright, let's take a -- let's say, 10 till
23   11, we will resume, and the defense can begin its case-in
24   -chief.  I know the defendant will be testifying.
25             Is there another witness that will be testifying?
```

1              MR. ZACCA:  No, Judge.  What I plan to do is introduce,

2      without Government objection, a medical record -- excerpts of a

3      medical record, and then I will publish it for the jury, and

4      then I will call Mr. Garcia Morales.

5              THE COURT:  So I don't know if you want to have a

6      practice run to get Mr. Garcia Morales in position before the

7      jury comes out.

8              MR. ZACCA:  Okay.

9              THE COURT:  We can take a break, and then you can get

10     him in position, and then --

11             MR. ZACCA:  Thank you, Your Honor.

12             COURT SECURITY OFFICER:  All rise.

13             (Recess taken from 10:40 a.m. to 11:04 a.m.)

14             (Jury entered courtroom at 11:04 a.m.)

15             THE COURT:  Ladies and gentlemen, I have entertained

16     all of their legal issues.

17             The Government has concluded its case-in-chief, and now

18     the defense has a right to present a case-in-chief, if they

19     elect to do so.

20             In fact, you have already heard one defense witness out

21     of turn, and now, the defense will continue with the

22     presentation of its case-in-chief.

23             MR. ZACCA:  Thank you, Judge.

24             At this time, the defense moves the following

25     exhibits -- the following documents marked for identification,

```
 1   Defense 19, Defense 20 and 21 into evidence.

 2          THE COURT:  I'm sorry, 19 --

 3          MR. ZACCA:  Yes, Judge, I'll repeat.  Marked for

 4   identification Defense 19, Defense 20 and Defense 21.

 5          THE COURT:  Any objection?

 6          MR. VAZQUEZ:  May I just briefly inquire?

 7          No objection as to 19, 20 or 21.

 8          THE COURT:  Received as marked.

 9          (Defendant's Exhibits 19, 20 and 21 received into

10   evidence.)

11          MR. ZACCA:  Judge, permission to publish.

12          THE COURT:  Yes, sir.

13          MR. ZACCA:  I will be publishing Defense 21, which is

14   the discharge summary from Memorial Hospital of Leonardo Garcia

15   Morales, and I will just leave it on the screen so it can be

16   read.

17          (Brief pause in the proceedings.)

18          MR. ZACCA:  I'm now going to go to page two of the

19   document so it can be read in its conclusion.

20          THE COURT:  Make sure everyone has read the first page.

21          MR. ZACCA:  We're good to go to page two?  Okay.

22          And, Judge, when I get indication from Your Honor and

23   with the jury, I will move on to publishing Exhibit 20.

24          THE COURT:  Is everyone finished the second page?

25   Alright.  You may.
```

```
 1              MR. ZACCA:  Yes, sir.

 2              This is Defendant's Exhibit 20.  It consists of several

 3      pages, but this is the only area at this time I choose to

 4      publish, the first page, although the entire document is in

 5      evidence.

 6              With that, Judge, the defense calls Leonardo Garcia

 7      Morales.

 8              COURTROOM DEPUTY:  Are you able to raise your right

 9      hand?  Do you solemnly swear or affirm that the testimony

10      you're about to give will be the whole truth, so help you God?

11              THE WITNESS:  I do.

12              COURTROOM DEPUTY:  Thank you, sir.

13              State your name, please, for the record.

14              THE WITNESS:  Leonardo Miguel Garcia Morales.

15              (LEONARDO GARCIA MORALES, being sworn, testified as

16      follows:)

17                        DIRECT EXAMINATION

18      BY MR. ZACCA:

19      Q.  Mr. Garcia Morales, how old are you?

20      A.  I'm 47.

21      Q.  Where were you born?

22      A.  In Cuba.

23      Q.  When did you come to the United States?

24      A.  2006.

25      Q.  Where do you currently live?
```

1  A.   At the Larkin Community Hospital.

2  Q.   Now, by way of background, do you have any children?

3  A.   Three.

4  Q.   How old are they?

5        MR. VAZQUEZ:  Objection as to relevance.

6        THE COURT:  Overruled.

7  BY MR. ZACCA:

8  Q.   You can you can tell the jury how old your children are.

9  A.   One is 14, one is 13, and the other one is eight.

10 Q.   Mr. Garcia Morales, a lot has been discussed about your

11 medical condition right now, and I want to talk about it so the

12 jury understands your medical condition.

13        MR. VAZQUEZ:  Objection as to relevance.

14        THE COURT:  Overruled.

15 BY MR. ZACCA:

16 Q.   Are you a quadriplegic?

17 A.   Yes.

18 Q.   What body parts can you currently move?

19 A.   I can move my arms a little bit, but not my hands or the

20 rest of my body.

21 Q.   Are you able to feed yourself?

22 A.   No.

23 Q.   Are you able to grab a drink and drink?

24 A.   No.

25 Q.   Can you put on clothes without assistance?

1    A.    No, I need assistance for everything.

2    Q.    Do you have a colostomy bag?

3    A.    Yes.

4    Q.    And that's for you to pass waste; correct?

5    A.    Yes.

6    Q.    Mr. Garcia Morales, do you have three felony convictions?

7    A.    Yes.

8    Q.    Were they in 2008?

9    A.    Yes.

10   Q.    Did you serve time for them?

11   A.    Yes.

12   Q.    How much time?

13   A.    About 200 days or so.

14   Q.    Mr. Garcia Morales, we're going to talk about all the

15   events that we've discussed the past couple of weeks in trial;

16   okay?

17   A.    Okay.

18   Q.    We're going to talk about the events in Miramar on

19   September 30th, 2012.

20   A.    Yes.

21   Q.    Government Exhibit 1 has already been entered into

22   evidence, Bate stamped 1759.

23         Were you at this home on September 30th, 2012?

24   A.    Yes.

25   Q.    Why were you there?

A.   Well, I was called by Celia Gonzalez, and she told me that

Frank lived there, and she wanted me to go see Frank and for me

to speak with Frank so that Jean and Alfredo would buy some

supposed marijuana that they had.

     She chooses me because she knows of my friendship with

Frank, that I was the person indicated to speak to Frank to see

if they could sell that marijuana.

     After I went there, Frank's house, after she had shown me

which house it was.  I went there, and I knocked at the door of

that home.  I sat down where that little step is, in order for

them to open the door.  I waited.

     And I want to clarify something that has not been said

here.  Outside there, all that area outside, there was light

out there.

     There's some pictures that have been shown that shows

shadows from the light that has not been indicated or pointed

out here.

     I never saw that there were no lights inside the house.

     I was there speaking on the phone, sitting right there on

the step, right in front of the house.  And I was talking on

the phone with Peru, who is Perucho, a friend of mine.

     You can see my last call in my phone if you have

investigated it so much.

     When I was sitting down, my back facing the door -- the

door that you see there -- that door was opened, the side that

```
 1   you see that is closed, that was the side that was open.
 2       And I got the first shot on my back.  The first shot that I
 3   got was on my back, and I got up immediately, and I said,
 4   Frank, it's me, Miguelito.
 5       And the only thing I saw inside the house was the darkness
 6   and the flash from the gun shooting, that would not stop
 7   shooting at me.
 8       And there's something that I'd like to set clear here.
 9       I have no ranker against that person that shot me.  Perhaps
10   I would have done the same thing, any of you who are here
11   present, perhaps would have done the same thing.
12       Anybody who feels threatened -- that he or his family's
13   threatened could have done the same thing, even though it could
14   be a mistake.
15       I never, ever did I threaten anybody in that home.
16       I never held a weapon in front of that home.  I never
17   planned -- not with Jean and not with Alfredo -- I never
18   planned for them to get close to the house, nor for Alfredo to
19   turn off the lights of that house.
20       They did that for something that I have in my mind that
21   happened there.
22           MR. VAZQUEZ:  Objection.  Calls for hearsay, in
23   narrative form.
24           THE COURT:  Overruling the objection as to the
25   narrative.  Why don't you give him first a question.
```

1   BY MR. ZACCA:

2   Q.   Mr. Garcia Morales, I want to go back and highlight a

3   couple things you mentioned.  You mentioned Celia.

4        Celia is a name that has come up in this case.

5        How do you know Celia?

6   A.   I would like to ask for permission to the Judge, to the

7   jury, to the prosecutor, and all those present in this

8   courtroom, there is no tomorrow for me, not only because of my

9   health, but also because of my freedom.

10       There are things that have been said here technically, and

11  I don't understand them very well.  I'm not a lawyer.

12           MR. VAZQUEZ:  Objection, as to nonresponsive answer,

13  Your Honor.

14           THE WITNESS:  That is why --

15           THE COURT:  One moment.  One moment.  I want to hear

16  the rest of it to see if it is responsive.

17           THE WITNESS:  What I would like to say is the

18  following:  There is no tomorrow for me.  As soon as I get out

19  of here and this is over, I don't know what's going to happen

20  to me because of my health, and again, I say because of my

21  freedom.

22           Here, you have heard at all times that I am a religious

23  person, and this is what I have gone through, lived through

24  since I got to the United States.

25           Aside or independent from other transactions or

1   businesses that I may have had, I am not a saint.  But I didn't

2   go to that house there to rob anybody.

3        I went to that house because Celia asked Ochill for my

4   phone number, and Ochill said that here.

5        You ask yourselves, why was I chosen?

6        MR. VAZQUEZ:  Objection.  Calls for hearsay.

7        THE WITNESS:  Ochill said --

8        THE COURT:  You want to try to have him direct his

9   answer to your specific question.

10       MR. ZACCA:  Sure.  Yes, I will.

11  BY MR. ZACCA:

12  Q.  Mr. Garcia Morales, if you could just follow along with

13  questions, and we'll cover your testimony.

14       The names that have been brought up in this case, some of

15  whom we met, I'd like the jury to understand how you know them.

16       Beginning with Celia, how long have you known Celia?

17  A.  20 years or so, approximately.

18  Q.  How do you know her?

19  A.  We all know each other from the same neighborhood in Cuba.

20  Q.  With regard to Livan, Livan Ochill, who we did meet in this

21  case, how do you know him?

22  A.  Ochill has been my friend for the last 25 years.

23  Q.  Alfredo Kindelan Hernandez, tell the jury how you know him.

24  A.  Alfredo Hernandez, I know him from working together at the

25  airport in Havana, Cuba, in terminal three.

```
 1        And at the same time, he was the husband of the aunt of

 2   Jean Marrero Lara, Consuelo Marrero Lara, and she was my

 3   girlfriend.

 4   Q.   The name Jean Marrero Lara has come up.

 5        How do you know him?

 6   A.   I know Jean Marrero Lara from Cuba.  I approached him after

 7   he was released from prison.  He was in prison for about 10

 8   years.  A group of us approached him, he was a type of

 9   individual who was somewhat controversial.

10        And he was boyfriend of a young neighbor of mine, and so my

11   brothers and our friends there, we just accepted him in with

12   us.  And ever since Cuba, he began to consult with me in what

13   my religious practices are, and that's how I know him.

14   Q.   Raonel Valhuerdis, how do you know him?

15   A.   I met him through Alfredo, here.

16   Q.   Now, you mentioned the reason why you went to that house.

17   Did you go there to a do a robbery?

18   A.   Not at all.  I went there because Celia Gonzalez called me,

19   chose me -- and I'd like to see if I am given permission for me

20   to say why I was placed there in that house?

21   Q.   Well, why did you go there?  Tell them, sure.

22   A.   Celia told me --

23             MR. VAZQUEZ:  Objection.  Calls for hearsay, Celia

24   said.

25             THE COURT:  Overruled.
```

A.   Celia told me that Frank was selling some marijuana, and that I was the person indicated to go and see and talk to Frank to see if he wanted to sell it to Jean and Alfredo.

At no time whatsoever during the time we were there, I did not make any plan, nor did I agree for Jean or Alfredo to arrive at the home.

I didn't even know whether it was true that Frank had any marijuana, or something like that.  I just needed to speak to Frank to see if that truly existed.

That is why I approached that house, and I knocked at the door and I called out, Frank.  And then when I received the surprise that's sitting down in that step in the front, I felt the pushing of the door, the pain on my back, the wound that I had on my back, and I got up and I said, Frank, it's me, Miguelito.

The door -- the side of the door which you see that it's open now, that was closed then.  I don't know if my lawyer can show another picture that you have there, was where you are able to see that that other door can be opened as well.

Q.   I'm showing you what was previously entered into evidence as Government's Exhibit 1A, Bate stamped 1765.

Is this the photograph that you were referring to as regards the door?

A.   Yes, you can see there that that other door can be opened as well.  And behind that door, once the door is opened, I only

1    see the reflection of a light and that was the gun that was

2    being shot at me.

3        And you can see the other little step where I was sitting

4    down, and my feet were toward that pathway that goes up to the

5    door.  I sat there just waiting to see if they were going to

6    get up and thinking that the person that was going to come to

7    that door was Frank.

8        I went to that house only to -- well, because Celia called

9    me and pointed out that house to me, telling me that Frank was

10   living there, and I never had any intention of getting to that

11   house and bother any family inside the home, much less Julio's

12   family, or any serious family, or any other additional person,

13   just what Celia told me who I would see there.

14       My presence at that home was to see Frank, and according to

15   Celia --

16           MR. VAZQUEZ:  Objection, calls for hearsay.

17   A.  -- he pointed that house --

18           THE COURT:  Hold on.  Some of the testimony was allowed

19   because it wasn't for the truth of the matter, and was asked

20   for hearsay.  So this time, the objection is sustained.

21           MR. VAZQUEZ:  I move to strike, Your Honor.

22           MR. ZACCA:  Okay.  So --

23           THE COURT:  Excuse me.

24           MR. ZACCA:  Yes, sir.

25           THE COURT:  When an objection is "sustained," that

1    means the jurors are not to consider it.

2    BY MR. ZACCA:

3    Q.   Okay.  So you have already told the jury that Frank was

4    looking to sell marijuana, and you have already told the jury

5    that Jean and Alfredo were looking to go buy; correct?

6    A.   Yes.

7    Q.   Did you go there with a firearm?

8    A.   At no time did I take a firearm.

9         And those are some of the things that have amazed me, that

10   surprised me here, that I mean, for the Government to come and

11   show a weapon, that a trained witness that they have comes in

12   with it, a firearm that does not have my fingerprints, that was

13   never in my hands, that never was there, that was never found

14   around me.

15        The witness, Julio, says that he saw a firearm with a white

16   hand --

17            MR. VAZQUEZ:  Objection, hearsay.

18            THE COURT:  Sustained.

19   BY MR. ZACCA:

20   Q.   The firearm that was shown, Government 9, it's the Colt

21   firearm; that's not your firearm; is it?

22   A.   That has a number, that must indicate whose name it is

23   under.

24            THE COURT:  Sir, so the question was:  Is that your

25   firearm?  And you want to respond to your lawyer directly

```
 1   answering his question and all the questions that he asks, try

 2   to respond directly to his question.

 3           So ask the question again.

 4           MR. ZACCA:  Okay.

 5   BY MR. ZACCA:

 6   Q.  Government 9, the Colt firearm that we have seen in this

 7   case, is that your firearm?

 8   A.  With your permission, Your Honor, I apologize to you, but I

 9   feel that --

10           THE COURT:  Well, just answer the question.

11           See, he's asking a question and then you just respond.

12           Is that your firearm?

13           THE WITNESS:  No, that weapon is not mine.

14   BY MR. ZACCA:

15   Q.  Did you bring a firearm that night?

16   A.  No.

17   Q.  Did you possess a firearm that night?

18   A.  No.

19   Q.  Have you seen photographs -- and we've actually seen a

20   mask.  Is that your mask?

21   A.  No.

22   Q.  Did you bring a mask?

23   A.  No.

24   Q.  Do you know how a mask got there?

25   A.  I don't know.
```

1    Q.   How many times were you shot?

2    A.   Some six or seven times.

3    Q.   Tell the jury the places in your body that were shot, as

4    far as you know.

5    A.   Here, in my neck, I still have a bullet there; on my back,

6    one here on the side; on my right arm here, I have a bullet;

7    here, in my groin, I have a bullet; and there is another bullet

8    that is here, by my leg, that I just found out that it is

9    there, because I did not know that that bullet was there, in my

10   leg; I also have a bullet -- and that I know of -- well, I do

11   not know because I cannot check myself on my own.

12   Q.   Were you taken to Memorial Hospital?

13   A.   I understand that I was taken.

14   Q.   Do you recall how long you were at Memorial Hospital?

15   A.   I believe that for the first time I was there for two

16   weeks.

17   Q.   Eventually, were you taken to the Broward County Jail?

18   A.   Yes, they had me there in a cell.

19   Q.   Now, yesterday we heard the testimony of Dr. Frankowitz.

20        Do you recall when he removed the bullet from your left

21   scapula?

22   A.   Yes.

23   Q.   I'm going to show you a set of photographs identified as

24   Defendant's Exhibit 28.  I'm going to hold out each photograph,

25   show them each to you and then ask you some questions.

 1        For the record, it's a set of five photographs.

 2        Do you recognize what is depicted in these photographs?

 3   A.   Yes.

 4   Q.   Is that a photograph of your back?

 5   A.   Yes.

 6   Q.   Is that a photograph of the left scapula area of your back?

 7   A.   Technically, I do not know how to say scapula or any of

 8   that, what I know it is the left side of my body.

 9        MR. ZACCA:  At this time, the defense moves Defense

10   Exhibit 28 into evidence.

11        MR. VAZQUEZ:  No objection.

12        THE COURT:  Received.

13        (Defendant's Exhibit 28 received into evidence.)

14        MR. ZACCA:  Okay.  Now I'm going to retrieve these

15   photographs, and I'm going to show them to the jury now.

16   BY MR. ZACCA:

17   Q.   Starting with the photograph that's marked five, is that

18   the area where the bullet is removed?

19   A.   Yes, I suppose it was -- it is.

20   Q.   Each of the photographs are just simply photographs of

21   different areas or angles of your back.

22        For the record, we're looking at number two.

23        There's number five.

24        You mentioned a bullet wound to the neck; is that what

25   rendered you a quadriplegic?

1   A.   Yes.

2   Q.   The Government presented testimony of Alfredo Kindelan with

3   regard to a robbery of a gold courier on October 12th, 2012.

4        Where were you on that date?

5   A.   At the Memorial Hospital, Broward.

6   Q.   Did you participate in the planning of that robbery?

7   A.   Not at any time.

8   Q.   Were you part of that robbery?

9   A.   No.

10  Q.   Did you participate in surveillance?

11  A.   No.

12  Q.   Surveillance of any gold couriers?

13  A.   No.

14  Q.   Did you have any discussions with Alfredo Kindelan about a

15  robbery of a gold courier?

16  A.   No.

17  Q.   Did you have any discussions with Alfredo Kindelan about

18  the robbery of gold -- of any gold?

19  A.   No.

20  Q.   Did you are participate in the planning of a gold robbery?

21  A.   No.

22  Q.   Did you ever organize the robbery of a gold courier?

23  A.   No.

24  Q.   Do you have anything to do with the robbery of the gold

25  courier on October 12th, 2012?

1  A.   No.

2  Q.   Now, Mr. Alfredo Kindelan Hernandez testified about money

3  that was given to you following this gold robbery.

4  A.   Not at any time was I given a cent.

5  Q.   Well, that was going to be my next question.

6       Did you receive any money from this gold robbery?

7  A.   Not at any time.

8  Q.   Did Jean Lara Marrero pay you in any way with regard to

9  this gold robbery?

10  A.   Not at any time.

11  Q.   We heard the testimony of Osvaldo Magdalena Ruiz.

12       Tell the jury how you know this man.

13  A.   I repeat, I practice the Ifa Yoruba religion.  I was

14  invited by friends of mine, my babalawos, my priests -- by a

15  priest by the name of Baneque for an initiation for this

16  religion.  This Baneque is the Godfather, the only true

17  Godfather that Magdalena has.

18       I am going to explain how this works.

19       Him -- I do not know him.  Being at Baneque's home, when

20  people are initiated, they have their Godfather.  They're the

21  ones that they go to for consultation.  This is the person that

22  sees them for religious matters.

23       And each one of the initiation ceremonies, a few babalawos

24  participates in them.  Many times it reaches the number of 16

25  babalawos.  Each one of these initiated individuals has the

1    opportunity to choose a person as a Yubona, that he called a

2    second Godfather, and that's not how it is.

3        A Yubona is an individual that helps you while you are

4    being initiated with your religious things, but only and

5    exclusively when you're being initiated.

6        When you finish with that initiation and you need something

7    of a religious nature, you go see your Godfather.  I am not his

8    Godfather, even though he continued calling me "Godfather."

9    Q.  And that was going to be -- you mentioned the name

10   "Baneque."  Is that his Godfather?

11   A.  Yes.

12   Q.  Let's talk about the events of that day.

13       THE WITNESS:  Could I get some water, please?

14       MR. ZACCA:  I'm sorry?

15       THE WITNESS:  Can I get some water, please?

16       MR. ZACCA:  Yes.

17   BY MR. ZACCA:

18   Q.  I'm going to show you a photograph from Government's

19   Exhibit 51.  It doesn't have a Bate stamp, but it's a

20   photograph of you, so it's identifiable.

21       That's a picture of you on August 28th, 2013.

22       That's you in a van; is that right?

23   A.  Yes.

24   Q.  Now, we've heard the testimony of Osvaldo Magdalena Ruiz

25   being arrested.

1        Why were you there at this location -- at the location of

2   the arrest of Mr. Ruiz?

3   A.   After I left from the hospital where I was, after having

4   left Memorial Broward, to continue with my care that continued

5   at Jackson Memorial, where I would go to for permanent checkups

6   every week, 3:00 sharp, was when my appointments were with

7   Ms. Patty, who was the nurse who specialized in individuals

8   like me.

9        There they check our urine and they do blood analysis, and

10  there they check us to see whether we can go on to Miami

11  Project.  That is the institution that does look for new

12  horizons for individuals like myself.

13       As you can see, I have a bracelet placed on my arm so that

14  I can keep my arm straight.  That day I had an appointment at

15  3:00 sharp.  That day I was seated on that chair that can be

16  seen there to go to the appointment I had at Jackson at 3:00 in

17  the afternoon.

18       And I was seated on that chair by Fidel and Umberto.

19  They were the ones that were taking care of me at my house with

20  Maritza.  Maritza is Fidel's wife.

21       And that van that is there, people appeared, that is how I

22  knew him.  Not at any time did I know that he was -- his name

23  was like that, but that was his name.

24       He came with that van to take me to the medical

25  appointment, because I cannot deny that he helped me quite a

1    bit after I had this problem.

2         He and his brothers, they built a ramp so that I could go

3    up and down my house with a chair.  He give me financial help.

4    He helped me with food.  He also helped me with medication as

5    well.

6         And I repeat, that day I was going to a medical

7    appointment, to Jackson, with Fidel and Umberto for a medical

8    appointment at Jackson.

9         Umberto is an individual with special issues.

10              MR. VAZQUEZ:  Your Honor, objection to relevance as to

11   Umberto's special needs.

12              THE COURT:  I'm sorry, I didn't hear you, sir.

13              MR. VAZQUEZ:  Objection to relevance as to Umberto's

14   specialized needs.

15              THE COURT:  Overruled.

16   BY MR. ZACCA:

17   Q.   You can continue.

18   A.   Umberto is a person who has special needs, and on that day

19   people used him so that he would get a bag that he had in

20   between the two seats in front and to take it to where he was

21   at.  As you can see here, I was listening to music.  And not at

22   any time was I paying attention to what was happening there at

23   that time.

24        If I was there to meet someone to do any deal, why didn't

25   this person approach this van?  When I was introduced to that

81

```
 1   individual, in the recording you can hear that I say
 2   tuku pareito (phonetic), which is my Ifa sign, and I said
 3   before, "tuku pareito" means "what is your name" in the Ifa
 4   language.  And that man does not answer to me at all,
 5   absolutely, and they left.  And that is everything that I
 6   talked to that man.
 7       I was shown another conversation that I had where it said
 8   that parieto, parieto (phonetic) standing up.
 9       Fidel had gotten out of the van to smoke.  He is standing
10   outside the van -- on this side here -- and he sat down on the
11   sidewalk to smoke.  What I was telling him was, stand up here,
12   stand up here.
13       I never smoked -- never in my life have I smoked
14   cigarettes, and they know that the cigarette smoking bothers
15   me; and he had gone there to smoke, and so that is why I told
16   him to smoke standing up here.
17       When people came to the van here, to introduce that person
18   to me, I told him now, come on, come on, because I was in a
19   hurry, it was already getting late for the appointment I was
20   going to.
21       I don't know what was happening there, nor aware what was
22   the people into, or that he was using me there to get prices
23   lowered, or any of that, nor would I have allowed so much time
24   for him because I had my appointment on 3:00 p.m. of that day.
25       You can see there that I'm listening to music, and the face
```

1    of being scared is because there is a man with a camera in

2    front of me and another one with a gun.

3         And I asked myself, What is he doing here?

4    Q.   Now, you mentioned that Ruiz and his brothers helped you.

5         Is one of the ways Mr. Ruiz helped you is by taking you to

6    your medical appointments?

7    A.   Ruiz never helped me get on that chair.

8         It was Umberto and Fidel that helped put me on that chair.

9         But I do have to say that once before he did take me to the

10   appointment just on his own, by himself.

11        That is when he mentions that it took them 30 minutes to

12   put me there, that him and my wife took me -- put me on another

13   van, on a black van that he used to come that occasion.  Yes,

14   he did take me to a medical appointment once before, right

15   there.

16   Q.   I'm going to show you Government Exhibit 49.

17        Mr. Garcia Morales, is that your money?

18   A.   No.

19   Q.   Did you give my money to Mr. Ruiz to buy cocaine?

20   A.   No.

21   Q.   Did you direct Mr. Ruiz in the purchase of cocaine?

22   A.   Never.

23   Q.   Did you have any involvement whatsoever with regard to the

24   purchase of cocaine?

25   A.   Never.

```
 1  Q.  At the time of the arrest, did you tell Mr. Ruiz anything?

 2  A.  There must be a recording somewhere where I am telling him,

 3  This is your affair -- in front of the police -- I told him,

 4  This is your thing.

 5  Q.  Meaning that you had nothing to do with this?

 6  A.  Not only me, but Fidel, also, he's a man of integrity, an

 7  elderly person, that was involved in a case.  He was sentenced

 8  and all that, but because of his people's fault because it was

 9  always his business.

10  Q.  Finally, with regard to Livan Ochill, there was --

11          THE COURT:  Excuse me, counsel --

12          MR. ZACCA:  Yes, sir?

13          THE COURT:  Let me stop you there.  Should we take a

14  short break at this time?  No?

15          Alright.  Continue, please.

16  BY MR. ZACCA:

17  Q.  With regard to Livan Ochill, we heard from him, I think it

18  was the first week of evidence in this case.

19      He testified that he paid for your cell phone for a number

20  of years; is that true?

21  A.  Yes.

22  Q.  Why did he pay for your cell phone bill?

23  A.  As I told you, Ochill and myself, we've been friends for

24  the past 25 years.  When I had the situation, he is among the

25  few friends of mine that visited me.  He came to my house and
```

1    he offered to me $200 that he was going to give to me as long

2    as he was able to, he told me that.  And he continued giving

3    that to me for six years, of which $50 of it were used to pay

4    for my phone.

5        And I would like to say that Ochill had nothing to do with

6    any of this problems that I've had.  He's one of the

7    individuals that I know he has never, ever been involved in any

8    criminal problems.

9        And if he was there with Celia that day, it was because he

10   and Celia were in a relationship.  It was -- the only reason

11   why he was there because we were socializing.

12       When Celia called me, he and Celia were there talking.

13   That was the only reason why Ochill was present there.  He had

14   nothing whatsoever to do with the conversation that I had with

15   Celia.

16           MR. ZACCA:  Thank you, Mr. Garcia Morales.

17           No further questions.

18                    CROSS-EXAMINATION

19   BY MR. VAZQUEZ:

20   Q.  Good afternoon, Mr. Garcia Morales.

21   A.  Good afternoon.

22   Q.  Mr. Morales, you spoke with the members of the jury about

23   the people who were involved in this robbery in Miramar,

24   Florida, in 2012; is that right?

25   A.  Yes.

1    Q.   You talked about Alfredo Kindelan, how he was there;

2    correct?

3    A.   Yes.

4    Q.   And you talked about Raonel Valhuerdis, how he was there;

5    correct?

6    A.   At no time have I mentioned Raonel, 'cause I never at any

7    time did I see Raonel there.

8    Q.   Raonel wasn't there; is that your testimony?

9         THE INTERPRETER:   For the Interpreter, could you repeat

10   your question, counsel.

11   BY MR. VAZQUEZ:

12   Q.   Raonel wasn't there?

13   A.   I never saw him.  Whether he was there or not, I don't

14   know, I didn't see him.

15   Q.   And so any GPS records showing that he was there, that's

16   unknown to you?

17   A.   Yes, for me, it's unknown.

18   Q.   And this is how you have remembered this event in Miramar

19   the entire time; correct?

20   A.   Yes.

21   Q.   Alfredo Kindelan, he was there; correct?

22   A.   I already answered that the first time that you asked me

23   the question, yes.

24   Q.   And that's always been how you understood what's happened,

25   'cause that's what you think is true?

1  A.   Not what do I think, but what happened.

2  Q.   So when you spoke with law enforcement after this incident,

3  why is it that you did not bring up Alfredo Kindelan to

4  Detective Hector Bertrand?

5        MR. ZACCA:  Objection, based on -- can we go sidebar

6  just for a moment, Judge?

7        THE COURT:  Yes, sir.

8        (Sidebar discussion held as follows:)

9        MR. ZACCA:  Judge, I guess, to make it easier -- I

10  don't want to keep interrupting -- if I could have a standing

11  objection to questions with regard to the statements given to

12  Detective Bertrand post-Miranda?

13        THE COURT:  Yes, because I have reviewed some

14  additional questions, and it's pretty clear that when you're

15  speaking of voluntariness, police misconduct, that is what the

16  Fifth Amendment is designed to protect.

17        Coercive action.  There have been some cases where the

18  police knew the defendant had some issues and kept them in a

19  room for several hours and asked questions over and over, and

20  the Court determined that that was not voluntary because it was

21  coercive action by state actors -- governmental actors.

22        And as Judge Cooke rules in this case, I do not find

23  any coercive Government action.  So to ask about prior

24  statements, these statements can be admissible, but not

25  violative of Fourth Amendment.

1          So, having said that, you may have a standing objection

2     to any questions that are asked by the Assistant U.S. Attorney

3     or statements that we've made after speaking.

4          At this time -- we are talking about Detective

5     Bertrand?

6          MR. VAZQUEZ:  Yes, Your Honor.  He addressed he had

7     nothing to do with the recorded statements that were

8     transcribed where he absolutely implicated himself, and I do

9     intend to cross-examine him on that for the purposes of

10    impeachment.

11         THE COURT:  Well, you're going to ask him if he made a

12    prior statement, I assume.

13         MR. VAZQUEZ:  But you never talked about the gold

14    courier robbery and you never mentioned being implicated.

15    Did you speak to Detective Bertrand?

16         THE COURT:  When he says "no," we go on from there.

17         MS. VAZQUEZ:  Alright, yes, very well.

18         (Sidebar discussion concluded, the following held in

19    open court:)

20    BY MR. VAZQUEZ:

21    Q.  So, Mr. Garcia Morales, why is it that you never brought up

22    Alfredo Kindelan to Detective Bertrand when he spoke to you

23    about the Miramar robbery?

24    A.  First of all, I'd like to know who Detective Bertrand is,

25    because there have been so many different agents, and I don't

1   know who I spoke to first, there's been so many.

2   Q.  Of course.  So, during the course of this trial, there was

3   a person who walked up here and introduced himself as Detective

4   Bertrand from the Miramar Police Department, a heavyset-shaped

5   male, and he investigated the Miramar robbery.

6        And I'm asking you if you ever met him and why didn't you

7   bring up Alfredo Kindelan to him?

8            THE COURT:  Let's take up one question at a time,

9   please.  First, have you met him, before the previous day?

10  BY MR. VAZQUEZ:

11  Q.  Yes.  Have you ever met the individual who introduced

12  himself as Detective Hector Bertrand to this jury?

13           THE COURT:  Prior to this case.

14  Q.  Prior to this case.

15           THE COURT:  Him, specifically.

16  A.  And I repeat to you, I don't know who Detective Bertrand

17  is.  There have been so many detectives, I don't know who is

18  who.

19  Q.  Do you deny ever making a statement about the Miramar

20  robbery, where you failed to bring up the name Alfredo

21  Kindelan?

22           MR. ZACCA:  Objection.

23           THE COURT:  Sustained.  Counsel, be clear with your

24  questions.  What is it that you're asking?

25  BY MR. VAZQUEZ:

1    Q.   Mr. Garcia Morales, do you know that you were interviewed

2    at the Miramar Hospital after the shooting?

3            THE COURT:   Is the question, Were you interviewed?

4    BY MR. VAZQUEZ:

5    Q.   Were you interviewed, sir, after the Miramar robbery?

6    A.   Perhaps, many times.

7    Q.   So during those interviews, did you ever talk about Alfredo

8    Kindelan to the investigator?

9            THE COURT:   Come sidebar.

10           (Sidebar discussion held as follows:)

11           THE COURT:   Mr. Vazquez, can you please be specific.

12   Are you asking him about the interview while he was in the

13   hospital?

14           MR. VAZQUEZ:   Yes.

15           THE COURT:   Why don't you ask him that?  You're talking

16   about interviews.  There was lots of interviews to ask him

17   about, one that happened at the nursing facility.

18           We have to be specific with your questions so we know

19   what you're talking about.  You've got to ask a specific

20   question so you can get a specific answer.  Alright.

21           MR. VAZQUEZ:   Yes, sir.

22           (Sidebar concluded, proceedings continued in open

23   court:)

24   BY MR. VAZQUEZ:

25   Q.   Mr. Morales, I want to talk to you about the day after the

```
 1    Miramar robbery; on that day, were you interviewed?

 2    A.   I don't remember.

 3    Q.   While you were in the hospital, were you interviewed?

 4         MR. ZACCA:  Objection.  Asked and answered.

 5         THE COURT:  Overruled, because I'm not sure when.

 6    He's been in the hospital many times, so please be specific.

 7    BY MR. VAZQUEZ:

 8    Q.   Immediately after, in the day following the Miramar

 9    robbery, were you interviewed by the police?

10    A.   And I say once again, I don't remember.

11    Q.   And within the first two days after the Miramar robbery,

12    were you ever interviewed, even one time, in that hospital?

13    A.   What I remember while I was in the hospital was that I was

14    in very much pain, pain.  And I remember that I was thinking

15    that I was very close to death, very close to death, to dying.

16    Q.   Did you, in the days following the robbery, meet with any

17    Miramar detectives?

18    A.   I don't remember.

19         MR. ZACCA:  Objection.  Asked and answered.

20         THE COURT:  Overruled.

21    BY MR. VAZQUEZ:

22    Q.   Have you -- if I can grow on it, Your Honor -- ever spoken

23    with a Miramar detective about a robbery in Miramar, Florida?

24    A.   I've had -- this is the fourth lawyer that I've had, and I

25    seen this case, and before it was seen here, you know, it was
```

```
 1   seen at the state level.  Do you know how many people have gone

 2   through this case already?

 3   Q.   Yes.  I'm asking you, sir, if you recall ever speaking with

 4   a detective for the Miramar Police Department?

 5   A.   No.

 6   Q.   Who is "Alfred" in your telephone contacts, sir?

 7   A.   I know quite a few Alfredos and --

 8   Q.   How many -- I'm sorry, please finish your answer.

 9   A.   No, you continue.

10   Q.   How many "Alfreds" do you have in your cell phone?

11   A.   I would have to look at the full list in order to be able

12   to tell you.

13   Q.   And prior to the Miramar robbery, how many "Alfreds" were

14   you calling?

15   A.   I cannot say because I know quite a few Alfredos.

16   Q.   Were you calling Alfredo Kindelan?

17   A.   I don't remember.

18   Q.   Mr. Morales, isn't it a fact that you know who Frank is?

19   A.   Yes.

20   Q.   And that Alfredo Kindelan doesn't know Frank?

21   A.   Yes, he does know him.

22   Q.   Isn't it a fact that you were there, on this scene, to get

23   property from Frank?

24   A.   No.  To get property from Frank, no.

25   Q.   Isn't it a fact that you were there to take property
```

1    through scaring and threatening Frank?

2    A.  No.

3    Q.  Now -- and you have never said that?

4    A.  Never.

5    Q.  And isn't it a fact that this robbery -- this robbery was

6    planned with Celia giving the information to Jean; is that what

7    you believed happened?

8    A.  Celia and Jean are friends, I'd like you to know that.

9    And if you verified all of the telephone calls that have been

10   made there, Celia and Jean, they talk to each other.

11   Q.  Isn't it a fact that you represented that Celia gave the

12   information to Jean to do this robbery?

13        MR. ZACCA:  Objection to the form of the question.

14   It's vague.

15        THE COURT:  Overruled.

16   A.  Can you repeat that question?

17   Q.  Isn't it a fact that you have said that Celia gave this

18   information to this robbery through Jean?

19   A.  I don't remember having said that, no.

20   Q.  Mr. Morales, isn't it also a fact that you went to this

21   scene, and you had a van and you were going to pull marijuana

22   out of this house after the robbery was completed?

23   A.  The van that I had was the only means of transportation

24   that I had.  I would use that transportation, whether it was

25   going to visit a friend at his home, or to work, or I would

```
 1   take it wherever I needed to go because that was my only means

 2   of transportation.

 3   Q.  It was a white van; correct?

 4   A.  Yes.

 5   Q.  And you took it to this scene to take the marijuana home?

 6        THE INTERPRETER:  I'm sorry, counsel, can you repeat.

 7   BY MR. VAZQUEZ:

 8   Q.  And you took your white van to the Miramar scene to take

 9   the marijuana from the house?

10   A.  No.

11   Q.  You never intended to pull marijuana from that home and

12   load it into your van?

13   A.  What marijuana are you talking about?

14   Q.  From Frank's house, in Miramar?

15   A.  Where is that marijuana that you're talking about?

16   Q.  Isn't that why you were there?

17   A.  I was going to talk to Frank.

18   Q.  And you had no idea about marijuana when you arrived at the

19   scene?

20   A.  I needed to speak to Frank, and I repeat that.

21   Q.  And what were you going to talk to him about?

22   A.  About marijuana.

23   Q.  And then you were going to rob the house and load your van

24   with it?

25   A.  What marijuana are you talking about?  I was going to speak
```

1    about it with Frank, but where is the marijuana that you're

2    talking about?  I was just going to speak to Frank about it.

3        I knocked at the door.  They opened the door, and then they

4    began to shoot me.  I never got to talk to Frank.  Frank never

5    lived there.  So I was sent to a house to speak to Frank, where

6    Frank didn't exist and where there was no marijuana.

7        So what marijuana are you asking me about?

8    Q.  Well, then let me make sure that I understand.

9        Are you telling the jury that you went to this house just

10   to talk to Frank and not to take marijuana?

11   A.  Take what marijuana with me?  What marijuana are you

12   talking about?  There was no Frank, and there was no marijuana.

13       What marijuana are you talking about?

14   Q.  I understand.  Just so it's clear, you never had the

15   intention of pulling marijuana out of the house where Frank

16   lived?

17   A.  No.

18   Q.  Thank you.  Now, Jean, Jean Marrero Lara.  I want to talk

19   about him real quick.  Is it the case that you only met Joan by

20   face right before this robbery happened?

21   A.  I don't understand the question.

22   Q.  Let me try again, sir.

23       When did you first see Jean's face, in your life, when did

24   you first see him, face-to-face?

25   A.  In Cuba, I told you, after he was in jail.  I think that he

1    got 10 years.  I knew him since childhood.

2    Q.  So since Cuba, you have been speaking to Jean and talking

3    to Jean; is that right?

4    A.  Yes.

5    Q.  So it is not the case that the first time you met Jean was

6    on the day of the Miramar robbery; is that right?

7    A.  No.

8    Q.  And anyone who says that would be wrong?

9    A.  It is possible.

10   Q.  Now, you spoke to your defense counsel about what was left

11   on the scene at the Miramar robbery.

12       I want to talk to you about that real quick.

13       Your clothes were left on the scene; correct?

14   A.  They left them there, yes.

15   Q.  And your cellular phone was left on the scene; correct?

16   A.  Yes.

17   Q.  And those items were not next to you; correct?

18   A.  Those clothes were on my body.  They were left there by

19   those who left them there.

20   Q.  And along with the clothes that were left on the scene was

21   a mask that was next to where you were found; isn't that the

22   case?

23   A.  No, that mask is not next to me.  The mask is out there.

24   Q.  Out where?

25   A.  According to the pictures that I see.

1    Q.   I want to show you, Mr. Morales, what has been admitted

2    into evidence as Government's 1A, and I'm going to start with

3    what's been marked as Bates number 1765.

4         Mr. Garcia Morales, pointing to the front entranceway, is

5    this where you were laying after the shooting?

6    A.   Yes.

7    Q.   And the answer by the witness?

8    A.   Yes.

9    Q.   And this here that I've just circled on the center left of

10   the image, what is that?

11   A.   I suppose it is my tennis shoes.  My tennis shoes, yes.

12   Q.   And over here?

13   A.   My blood.

14   Q.   Alright.  And here, what is that, on the left side of the

15   screen -- on the right side of the screen?  Excuse me.

16   A.   I suppose, it's my clothes.

17   Q.   Now let's turn to Bates number 17.  What is this here?

18   A.   My clothes.

19   Q.   Is that your shirt?

20   A.   It is possible.

21   Q.   And here, what is that?

22   A.   That is what you suppose is the mask.

23   Q.   Now, you stated that you were peacefully sitting in the

24   front.  I'm showing you Government's 1, Bates number 1759 of

25   the residence; correct?

1    A.   Yes.

2    Q.   And you were peacefully sitting here after you were

3    knocking on the door?

4    A.   Yes.

5    Q.   And in your testimony to the jury -- if I can approach,

6    Your Honor, I'm trying to do a physical demonstration from the

7    witness stand; if that's okay, Your Honor?

8         This is the door.  You knock on the door peacefully; is

9    that right?

10   A.   Yes.

11   Q.   Okay.  It isn't especially loud?

12   A.   No.

13   Q.   Did you say "this is a robbery"?

14   A.   Not at any time.

15   Q.   Did you threaten anyone when you were knocking on the door?

16   A.   No.

17   Q.   And so you then turned around and sat down on the ground

18   peacefully.

19   A.   I was talking over my phone peacefully while I was sitting

20   down on the floor --

21   Q.   Peacefully, down on the floor.

22   A.   -- with Perucho.  It is reflected as my last call in the

23   phone, at the same time as I am sitting down there, as it is

24   shown in the GPS's that you have.

25   Q.   And this conversation is a peaceful conversation, there's

1   not any yelling?

2   A.   No.

3   Q.   So you were having a peaceful conversation with Perucho,

4   not causing a ruckus; is that right?

5   A.   Yes.

6   Q.   And your testimony is that scares Mr. Micheli to come out

7   and shoot you with a .40 caliber in the back?

8   A.   No, no, no, no.  What I think, that Mr. Micheli got nervous

9   was because Alfredo Kindelan turned the lights off from inside

10  of the house -- on the inside of the house.

11       From what has been said from here, what I thought was

12  Mr. Micheli had been paid to kill me.  I saw -- so far, that I

13  have seen all the proof, I leave him out of that.

14       When I learned that Alfredo Kindelan had shut off the

15  light, when I find that out, that is when I have full knowledge

16  that that man has nothing to do with that.

17       But I realized that between the two of them, they had a

18  plan to kill me, in between the two of them, as things

19  developed.  Because not at any time did they have to approach

20  that house.

21       But they had to have waited for me where the cars had been

22  parked, where my van wasn't -- to walk from the clubhouse to

23  where the door of the house is at, there's no need to go in

24  with a car, to wait until I finished my conversation with Frank

25  to then decide whether the transaction was going to be made or

1   not.  I don't know why I was taken there, to a house where

2   Frank did not live at.

3       Just you, yourself, think about this, I'm taken to a house

4   where I go, where Frank did not live, and where I knock on the

5   door.  As I am there in front of a door, and the lights are

6   shut off the house, what was the purpose of that for?

7       Because the mask that you mentioned, that is not full of

8   blood either.

9   Q.  Just your DNA.

10  A.  But what DNA?  DNA -- many people that came here, their DNA

11  is there.

12  Q.  So, Mr. Morales, just so I'm clear --

13  A.  They said that they had different DNAs.

14  Q.  -- is it your testimony that this was a plan to kill you or

15  that this was an accident?

16      I didn't quite understand what you said.

17  A.  When we talk about accident, we're talking -- I am

18  referring to Mr. Micheli; that before this trial I thought that

19  he had been programmed to do what they wanted to do to me.

20      You know this very well.  You have a progressive case

21  before this with Jean and Alfredo, they are killers.

22      Those people put me there so that I would be killed.

23      What was the intention of Celia when she tells me that

24  Frank lives there and me knocking on a door where Frank does

25  not live?

1       So what was the purpose of Alfredo shutting off the lights

2   while I was knocking at the door?  And outside, out there,

3   where there's light.  The only place where there isn't light is

4   inside the house.

5       Check your papers to see how many people have been framed

6   the same way.

7   Q.  So it's your testimony that the Alfredo and Jean --

8   A.  And Celia, too.

9   Q.  -- and Celia sent you to this home to be killed by someone

10  who you think accidentally shot you?

11  A.  Or for me to be arrested or something like that.

12  Q.  And it's your testimony that this plan to place you in

13  front of someone to accidentally kill you, that was planned

14  out?

15  A.  I suppose that it is.

16  Q.  And you were accidentally shot in the back?

17  A.  Accidentally, no.  That was fully planned.  Mr. Micheli

18  opened the door to shoot.

19      Because nobody broke a window, nobody broke his door.

20      He opened the door, and he says that he did with the full

21  intention to shoot and fully justifiable.

22      If this is done to me at my house, I'd possibly shoot, too,

23  to protect one's own family.

24  Q.  And so, Mr. Micheli was both not involved and was the tool

25  of Alfredo Kindelan and Jean Marrero Lara to have you killed?

1              MR. ZACCA:  Object to form.

2              THE COURT:  Overruled.

3              THE WITNESS:  Can you repeat the question?

4    BY MR. VAZQUEZ:

5    Q.  So Mr. Micheli was both uninvolved in this plan and also

6    was a tool that Jean Marrero Lara and Alfredo Kindelan used to

7    kill you?

8    A.  Well, according to what happened, yes.

9    Q.  So they just got lucky that they picked a person to shoot

10   you?

11   A.  That individual or anybody, but that they were lucky, yes,

12   they were lucky.

13   Q.  Not everyone has a gun.

14   A.  Go house by house, and then we'll see how many people have

15   guns.  Remember that in this country anybody can freely buy a

16   gun.

17   Q.  Now, I want to show you what's been admitted into evidence

18   as Government's Exhibit 33.  What is this?

19   A.  The pull-over that I was wearing.

20   Q.  I'm going to show you the back of this pull-over.

21        If you could have the interpreter point out where you were

22   shot in the back with Government's Exhibit 33.

23   A.  Up here, on my back.  Up here.  (Indicating.)

24   Q.  No, I'm looking for the hole.

25   A.  No, because -- not that, because the neck of the shirt was

```
 1   below.

 2   Q.  So your collar was here?  (Indicating.)

 3       And I'm pointing to my left scapula on my back, left side.

 4   A.  I didn't know whether it is precisely where you're pointing

 5   at.

 6   Q.  Well, your collar wasn't here.

 7   A.  Where the collar was exactly, I cannot tell you that now.

 8   Q.  Mr. Morales, you would agree that if you were shot with a

 9   bullet, it would have gone through the cloth; right?

10   A.  What I can tell you is that the specialist you brought over

11   said that it was a .40, the same one that was extracted from me

12   from here.

13   Q.  Yes.  And the doctor that you called said that a bullet

14   could have migrated from your neck to that area.

15   A.  Well, here, the bullet that I have of this neck is there.

16   That is the one that is constantly -- it effects my head, and

17   it is still there in the neck.

18   Q.  Mr. Morales --

19   A.  I can add.  I was never operated on there, because the

20   bullet cannot be extracted from there, according to my

21   neurologist, the neurosurgeon, that is.

22       They attempted to put an implant to me there that, until

23   very recently, to control my pain because I have chronic -- I

24   suffer from chronic pain in my hands.

25       And in the place where the bullet is, that is obstructing
```

 1    where they had to pass through the cable of the implant that

 2    had to go to my brain, because of that bullet that was

 3    obstructing, and the particles of the bullet, the implant to

 4    control the pain was not possible to place it in.

 5         And what neurologists have offered me is to continue with

 6    pills and to live with the pain, that is what I was told.

 7    Q.   Mr. Morales, in addition to this robbery in Miramar,

 8    Florida, in 2012, you also spoke many times with Jean and

 9    Alfredo about committing the gold courier robbery in Coral

10    Gables, Florida; isn't that correct?

11    A.   I am very much scared when you talk about the robbery in

12    Miramar.  What did I rob?

13    Q.   The attempted robbery in Miramar, Florida, of marijuana, in

14    2012, on the date September 30th.

15    A.   What was it that I attempted to rob in Miramar?

16    Q.   Mr. Morales, I'm going to ask you a different area of

17    questions because we talked a lot about Miramar; okay?

18    A.   Yes.  But you have not answered my question.

19    Q.   Well, Mr. Morales, if I may, I'm here to ask you questions

20    at this point.

21    A.   So my question will not be answered then, what I stole,

22    what I attempted to steal, that is not going to be answered

23    then?

24    Q.   I'm going to ask you a question now about Coral Gables.

25         Mr. Morales, isn't it a fact that you spoke with Jean

1   Marrero Lara and Alfredo Kindelan about conducting a robbery of

2   gold coming from Bolivia?

3   A.   Not ever.

4   Q.   You don't have any knowledge about a robbery of gold coming

5   from Bolivia?

6   A.   Yes, I do have knowledge.

7   Q.   And you have spoken about what you know about that gold

8   robbery with individuals like Mr. David Bolton; isn't that a

9   fact?

10   A.   He was the one that let me know about that robbery.  He was

11   the one that told me everything that had happened with that

12   situation, that is the private detective of David.

13   Q.   And you admitted to Mr. Bolton that you participated in the

14   planning for the commission of that robbery?

15   A.   I, just like your trained witnesses, that is how David

16   trained me.  When David went to see me, he still had not

17   received payment for his work regarding these people.

18       He had told me that these Bolivian individuals thought that

19   one of their own group had betrayed them, so he offered me

20   $500.  I had been admitted to the hospital, to Baptist Hospital

21   with a urinary tract infection when he went to see me.

22       So he had not yet been paid his money, because these people

23   were not believing their investigation -- his investigation.

24       So I repeat.  He offered me $500 for me to say that the

25   investigation that he had done was the real thing.  So, for

1    this, according to what he had told me, I should include myself

2    as if I knew everything, as if I knew everything that he told

3    me.

4       Me, because of the $500, you know, if you know, I don't

5    receive disability, I have three children.  I have not received

6    one cent or one dollar from this country and, of course,

7    because of money, given the situation I was in, I did offer

8    myself.

9       I lived using my hands, as babalawo, a priest that consults

10   with the Oracle, what is known as the chain, the Opelette,

11   which is the name in Yoruba of the chain -- of my not being

12   able to use my hands any longer, I thought that it was easy to

13   obtain this money.  This is why I got involved with David in

14   doing this story for those individuals he wanted me to give

15   this -- do this story for.

16   Q.  And you told --

17       THE COURT:  Let me stop you there because it is one

18   p.m., so remember that point, and we will start tomorrow

19   morning at nine a.m.

20       As you heard me say many times, do not discuss the case

21   or have anyone discuss it with you.

22       Have a good evening, ladies and gentlemen.

23       COURT SECURITY OFFICER:  All rise.

24       (Jury exited courtroom at 1:00 p.m.)

25       THE COURT:  Be seated, please, just for a moment.

1          I ruled sidebar on the coercive nature of the

2    statements that were -- and this was made by the Government

3    about the defendant.   There are two cases that the Court relies

4    on.   United States versus Daniel, 775 F.3d, 1001, and Colorado

5    versus Connelly, 107 Supreme Court 515.

6          There are many, many cases on the issue.   This is

7    simply a summary of the rationale as I discussed sidebar.

8          Now, I'm not sure where we are, Government.   Maybe you

9    can help me with what you anticipate so we can sort of judge

10   our schedule.

11         MR. VAZQUEZ:   Your Honor, I think that we will have

12   rebuttal witnesses to include, Hector Bertrand, David Bolton, I

13   think that we will have medical witnesses from the hospital to

14   address some of the testimony of the defendant.

15         THE COURT:   Could you be specific?   I know what you

16   mean with regard to the statements, but what is it that you're

17   going to elicit regarding the medical personnel?

18         MR. VAZQUEZ:   The number of bullets and placement of

19   bullets from the shooting episode, we believe, and we will

20   consult with the witnesses further --

21         THE COURT:   Is this something that is impeachment?

22         MR. VAZQUEZ:   Yes.

23         THE COURT:   Because if it is, then you need to be

24   prepared to tell me what the defendant said and what the

25   impeachment was -- would be.

1              MR. VAZQUEZ:  Yes.

2              THE COURT:  Because I remember him saying something

3    about being shot in the neck and, therefore, there was no hole

4    in the shirt because that shot was below or above the

5    collar-line.  So I'm not sure where you're going.

6              MR. VAZQUEZ:  May I approach?  I'm contemplating a

7    rebuttal case, and I don't want to divulge my strategy.

8              I can show you the record and --

9              THE COURT:  You can come sidebar.

10             (Sidebar discussion held as follows with The Court and

11   Government counsel:)

12             MR. VAZQUEZ:  This is, for an example, the medical

13   records which depict the gunshot wounds documented by Memorial,

14   there is no documented wound in the back, this has been

15   testified to.

16             THE COURT:  Oh, wait.  I don't know if that's rebuttal,

17   because based on his testimony he said he got shot in the neck,

18   and that's why.  So what rebuts "back," is the point?

19             MR. VAZQUEZ:  I believe he said "back," Your Honor, and

20   I also know the defense placed a picture in evidence that shows

21   a wound in this area.

22             THE COURT:  So wait now.  If he had a wound in that

23   area, and there's no hole in the shirt --

24             MR. ZACCA:  That's right.

25             THE COURT:  -- what's an expert going to say?

 1              MS. DUANE:  He wasn't shot in the back.

 2              MR. VAZQUEZ:  He wasn't shot in the back.  They're

 3    advancing a theory.

 4              THE COURT:  That's not what the other doctor said.

 5              The defense witness said it had to do with the distance

 6    between the shot and the person.

 7              MR. VAZQUEZ:  I think shot from the back here,

 8    traumatic impact on the back.

 9              THE COURT:  Yes, but he said that depends on the

10    distance from the gunshot to the person, so...

11              MR. VAZQUEZ:  They're showing a picture of his shoulder

12    blade, and there's nothing there.

13              THE COURT:  Let me say this:  Have you ever used a

14    sledgehammer on a piece of wood?  Let's try to move on.

15              MR. VAZQUEZ:  Yes, sir.

16              THE COURT:  What do you think as far as

17    cross-examination, and your rebuttal case, in trying to plan?

18              MS. DUANE:  We will have most of the day tomorrow for

19    the testimony.  The statements are long, Your Honor, so playing

20    those --

21              MR. VAZQUEZ:  These are recordings.

22              THE COURT:  How long are they?

23              MR. VAZQUEZ:  They're an hour.

24              (Sidebar concluded, proceedings continued in open

25    court:)

1          THE COURT:  Mr. Zacca, are we going to finish this case

2     before the holidays?  Giving closing arguments, et cetera, but

3     we will see where we are.

4          I need to have a brief in camera hearing with the

5     defendant and his counsel.  I'm going to ask the Government

6     representatives to step out for just a few minutes, and then

7     I'll be back with you.

8          (Government counsel exited courtroom at 1:06 p.m.)

9          THE COURT:  The Marshals have brought some matters to

10    my attention.  I need to have a chat with the defendant.

11         MR. ZACCA:  Okay.

12         THE COURT:  And so what I'll ask you all to do is go

13    outside of the courtroom just for a few minutes, and then I

14    will have you come back in, and I guess that's where we are.

15         MR. ZACCA:  Okay.

16         THE COURT:  We are going to have a brief in camera

17    hearing with defense and his counsel, so I'm going to ask the

18    Government and their representatives to step out for just a few

19    minutes and then I will be back in a few.

20         THE COURT:  Mr. Garcia Morales, it has come to my

21    attention that your behavior at the Larkin facility is totally

22    inappropriate.  I've received reports that you have spit on

23    people, that you are rude to people, you're nasty to people,

24    et cetera.

25         Now, if I have to have a hearing -- I'm just telling

1    you, sir, this is the report I've received.  If I have to have

2    a hearing to call in witnesses from Larkin to tell me about

3    your conduct, and I make a determination that you're not

4    behaving as you should, then there are going to be some serious

5    sanctions.

6          So you're going to have to decide if you want to

7    conduct yourself in a proper way or not, prove otherwise.  I'm

8    just going to leave it at that at this time.

9          But be mindful that there are people, in addition to

10   you, who have witnessed these items that I have mentioned, and

11   if I have to have a hearing and make certain findings, then

12   there could be adverse consequences.

13         So you need to keep that in mind when you go back to

14   Larkin from today forward.  Are we clear, sir?

15         DEFENDANT GARCIA MORALES:  May I say something?

16         THE COURT:  I don't want you to say anything at this

17   time, because if I have to have a hearing, then you can say

18   whatever you want to say at the hearing.  I'm just giving you

19   an alert.  This is not an adversarial hearing.  I'm just giving

20   you an alert, and you act accordingly.

21         You discuss these issues with your lawyer, and he can

22   tell you more about what possible sanctions could be, and we'll

23   go from that point.  If I need to have a hearing, I will.

24         If I get anymore reports, then I will have a hearing,

25   and then I'll have to make factual findings and decide what

111

1    course of action I should take.

2          Do you understand what I said, sir?

3          No, no, answer my question:

4          Do you understand what I have said?

5          DEFENDANT GARCIA MORALES:  Yes.

6          THE COURT:  That's as far as we're going today.  If we

7    have to go further, we will.

8          Mr. Zacca, you can speak to your client about this

9    issue.

10         MR. ZACCA:  Yes, sir.

11         THE COURT:  I think he understands exactly what I'm

12   referring to, and we'll go from there.

13         I might add, this is not the first time I've gotten

14   these reports.  There have been reports in other facilities, as

15   well, about the same kind of conduct.

16         So I'm warning you, sir, act accordingly.  You don't

17   want to do anything that jeopardizes your case, or yourself.

18         I'll leave it at that.

19         Anything further, Mr. Zacca?

20         MR. ZACCA:  Nothing from the defense, Judge.

21         THE COURT:  Thank you.  We are in recess.

22         COURT SECURITY OFFICER:  All rise.

23         (Proceedings adjourned at 1:11 p.m.)

24

25

1

2                    C E R T I F I C A T E

3

4          I hereby certify that the foregoing is an

5     accurate transcription of the proceedings in the

6     above-entitled matter.

7

8     January 24th, 2020 /s/Glenda M. Powers
                          GLENDA M. POWERS, RPR, CRR, FPR
9                         United States District Court
                          400 North Miami Avenue, 08S33
10                        Miami, Florida 33128

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

113

## $

**$200** [1] - 84:1
**$50** [1] - 84:3
**$500** [3] - 104:20, 104:24, 105:4

## /

**/s/Glenda** [1] - 112:7

## 0

**08S33** [1] - 112:9

## 1

**1** [6] - 1:11, 38:23, 43:8, 49:18, 64:21, 96:24
**10** [4] - 1:10, 59:22, 69:7, 95:1
**1001** [1] - 106:4
**1006** [2] - 34:5, 35:23
**107** [1] - 106:5
**10:02** [1] - 38:16
**10:40** [1] - 60:13
**11** [3] - 7:17, 9:19, 59:23
**110** [2] - 1:20, 1:20
**11:04** [2] - 60:13, 60:14
**120** [1] - 36:3
**128** [1] - 1:11
**12th** [2] - 76:3, 76:25
**13** [4] - 7:17, 7:18, 7:19, 63:9
**14** [1] - 63:9
**1447** [1] - 41:25
**15** [3] - 2:8, 16:1, 17:3
**1591** [1] - 40:6
**16** [1] - 77:24
**17** [1] - 96:17
**1700** [1] - 1:20
**1759** [2] - 64:22, 96:24
**1765** [2] - 70:21, 96:3
**18** [2] - 40:6, 40:11
**19** [7] - 1:5, 3:11, 61:1, 61:2, 61:4, 61:7, 61:9
**1951** [1] - 40:11
**1986** [1] - 42:1
**1:00** [1] - 105:24
**1:06** [1] - 109:8
**1:11** [2] - 1:8, 111:23
**1:17-CR-20701-MGC-5** [1] - 1:2
**1A** [2] - 70:21, 96:2

## 2

**2** [10] - 44:10, 44:13, 44:16, 44:23, 45:7, 45:19, 45:24, 46:18, 46:22, 49:9
**2.8** [1] - 42:11
**20** [9] - 3:12, 16:1, 61:1, 61:4, 61:7, 61:9, 61:23, 62:2, 68:17
**200** [1] - 64:13
**2006** [1] - 62:24
**2008** [1] - 64:8
**2012** [8] - 46:4, 64:19, 64:23, 76:3, 76:25, 84:24, 103:8, 103:14
**2013** [10] - 17:13, 20:24, 21:3, 23:5, 28:24, 32:21, 45:13, 46:7, 78:21
**2014** [1] - 46:5
**2018** [1] - 1:5
**2020** [1] - 112:7
**207** [3] - 19:4, 21:13, 23:4
**21** [6] - 3:13, 61:1, 61:4, 61:7, 61:9, 61:13
**24** [1] - 3:5
**24th** [1] - 112:7
**25** [2] - 68:22, 83:24
**26** [1] - 7:5
**27th** [1] - 20:24
**28** [4] - 3:14, 74:24, 75:10, 75:13
**28th** [7] - 17:12, 20:24, 21:3, 23:5, 32:21, 46:7, 78:21
**29** [4] - 38:21, 43:3, 49:1, 51:9

## 3

**3** [2] - 49:11, 49:19
**3.55** [1] - 13:17
**3.57** [1] - 13:17
**30** [3] - 2:9, 38:10, 82:11
**30th** [4] - 46:4, 64:19, 64:23, 103:14
**32** [1] - 2:9
**33** [2] - 101:18, 101:22
**33128** [2] - 1:25, 112:9
**33132** [1] - 1:18
**33301** [1] - 1:21
**37** [1] - 3:6
**38** [6] - 2:11, 13:12, 13:15, 13:16, 13:20, 13:22

## 3:00

**3:00** [4] - 79:6, 79:15, 79:16, 81:24

## 4

**4** [2] - 2:6, 49:23
**40** [10] - 9:9, 10:21, 10:22, 12:6, 13:19, 13:23, 14:17, 24:2, 98:7, 102:11
**400** [2] - 1:24, 112:9
**44** [4] - 18:21, 19:16, 20:10, 20:14
**45** [1] - 21:4
**47** [3] - 22:18, 23:4, 62:20
**47A** [1] - 32:20
**48** [3] - 28:18, 28:25, 29:3
**49** [2] - 28:10, 82:16
**4th** [2] - 1:17, 46:5

## 5

**50** [8] - 3:5, 24:4, 24:10, 24:15, 24:20, 24:22, 24:23, 29:1
**500** [4] - 45:8, 46:18, 46:23, 50:20
**51** [4] - 30:1, 30:5, 30:9, 78:19
**515** [1] - 106:5
**52** [2] - 26:18, 27:5
**57** [9] - 3:6, 34:24, 36:7, 36:17, 36:18, 36:23, 37:7, 37:9, 37:25

## 6

**60** [1] - 2:15
**61** [3] - 3:11, 3:12, 3:13
**6th** [1] - 1:20

## 7

**7** [2] - 50:17, 50:18
**75** [2] - 3:14, 5:21
**775** [1] - 106:4

## 8

**80** [1] - 5:21
**805** [1] - 41:25
**806** [1] - 1:17
**81** [1] - 2:16
**84** [1] - 2:15

## 9

**9** [5] - 12:22, 12:23, 12:24, 72:20, 73:6
**90** [3] - 11:20, 36:2, 36:3
**99** [1] - 1:17
**9:00** [1] - 1:7
**9:08** [2] - 1:8, 4:9

## A

**A)(b** [1] - 40:12
**a.m** [8] - 1:7, 1:8, 4:9, 38:16, 60:13, 60:14, 105:19
**abetting** [2] - 50:4, 50:10
**ability** [2] - 54:15, 55:15
**able** [8] - 8:10, 11:2, 11:6, 13:3, 14:17, 16:21, 17:3, 23:24, 23:25, 27:25, 62:8, 63:21, 63:23, 70:19, 84:2, 91:11, 105:12
**above-entitled** [1] - 112:5
**absolutely** [2] - 81:5, 87:8
**abuse** [2] - 54:6, 54:12
**accept** [1] - 37:15
**accepted** [1] - 69:11
**accident** [2] - 99:15, 99:17
**accidentally** [4] - 100:10, 100:13, 100:16, 100:17
**according** [5] - 71:14, 95:25, 101:8, 102:20, 105:1
**accordingly** [2] - 110:20, 111:16
**accounts** [1] - 37:5
**accurate** [3] - 39:16, 58:15, 112:4
**acquire** [1] - 45:16
**acquittal** [5] - 38:20, 49:19, 49:25, 50:19
**act** [2] - 110:20, 111:16
**Act** [3] - 38:24, 40:7, 49:11
**action** [5] - 54:12, 86:17, 86:21, 86:23, 111:1
**activities** [3] - 18:14, 27:14, 48:17
**actors** [2] - 86:21
**actual** [2] - 9:15, 30:24

**adamant** [1] - 50:12
**adamantly** [1] - 47:19
**add** [3] - 34:20, 102:19, 111:13
**addition** [6] - 6:3, 14:17, 34:16, 36:5, 103:7, 110:9
**additional** [3] - 39:20, 71:12, 86:14
**address** [3] - 48:7, 53:22, 106:14
**addressed** [4] - 37:4, 49:2, 54:11, 87:6
**addresses** [4] - 32:24, 41:22, 54:4, 54:14
**addressing** [3] - 17:15, 25:13, 37:5
**adjourned** [1] - 111:23
**admissible** [1] - 86:24
**admit** [1] - 36:17
**admitted** [20] - 7:16, 9:18, 12:21, 18:20, 19:15, 21:3, 22:18, 24:23, 26:10, 26:17, 28:10, 28:17, 29:25, 32:20, 34:4, 42:19, 96:1, 101:17, 104:13, 104:20
**admittedly** [2] - 48:1, 50:5
**adults** [1] - 27:13
**advancing** [1] - 108:3
**adversarial** [1] - 110:19
**adverse** [1] - 110:12
**affair** [1] - 83:3
**affect** [1] - 56:17
**affecting** [1] - 49:15
**affects** [1] - 44:4
**affirm** [3] - 4:15, 15:6, 62:9
**afternoon** [4] - 35:25, 79:17, 84:20, 84:21
**agencies** [1] - 16:10
**agent** [3] - 34:25, 35:19, 37:11
**Agent** [1] - 37:5
**agent's** [1] - 35:5
**agents** [1] - 87:25
**agree** [3] - 47:1, 70:5, 102:8
**ahead** [1] - 22:14
**aided** [1] - 4:2
**aiding** [2] - 50:4, 50:10
**airport** [1] - 68:25
**Airport** [1] - 42:9
**alert** [2] - 110:19, 110:20
**Alfred** [1] - 91:6

**Alfredo** [32] - 43:22, 65:3, 66:17, 66:18, 68:23, 68:24, 69:15, 70:3, 70:5, 72:5, 76:2, 76:14, 76:17, 77:2, 85:1, 85:21, 86:3, 87:22, 88:7, 88:20, 89:7, 91:16, 91:20, 98:9, 98:14, 99:21, 100:1, 100:7, 100:25, 101:6, 103:9, 104:1

**Alfredos** [2] - 91:7, 91:15

**Alfreds** [2] - 91:10, 91:13

**aligned** [1] - 11:13

**alleged** [4] - 44:24, 45:9, 45:17, 47:22

**allegedly** [1] - 46:20

**allow** [1] - 11:15

**allowed** [5] - 7:12, 35:25, 36:1, 71:18, 81:23

**almost** [1] - 5:3

**alone** [2] - 43:8, 57:18

**alright** [16] - 13:8, 17:24, 30:22, 36:13, 36:18, 40:11, 43:20, 50:8, 50:23, 57:10, 59:22, 61:25, 83:15, 87:17, 89:20, 96:14

**Alright** [1] - 58:20

**amazed** [1] - 72:9

**Amendment** [5] - 54:3, 54:10, 56:5, 86:16, 86:25

**AMERICA** [1] - 1:4

**ammunition** [2] - 6:25, 13:23

**amount** [2] - 17:4, 53:9

**amounts** [1] - 16:9

**analysis** [3] - 56:22, 57:21, 79:9

**analyzed** [2] - 6:19, 14:1

**angles** [1] - 75:21

**announced** [1] - 49:4

**announces** [1] - 38:4

**answer** [8] - 67:12, 68:9, 73:10, 81:4, 89:20, 91:8, 96:7, 111:3

**answered** [6] - 85:22, 90:4, 90:19, 103:18, 103:21, 103:22

**answering** [1] - 73:1

**anticipate** [3] - 51:10, 52:4, 106:9

**apologize** [1] - 73:8

**APPEARANCES** [1] - 1:14

**appeared** [1] - 79:21

**appointment** [11] - 33:10, 33:16, 79:14, 79:16, 79:25, 80:7, 80:8, 81:19, 81:24, 82:10, 82:14

**appointments** [2] - 79:6, 82:6

**approach** [8] - 33:25, 46:14, 47:6, 47:7, 80:25, 97:5, 98:19, 107:6

**approached** [3] - 69:6, 69:8, 70:10

**Arbys** [5] - 18:25, 19:22, 30:24, 32:16, 32:18

**area** [10] - 19:24, 23:14, 62:3, 65:13, 75:6, 75:18, 102:14, 103:16, 107:21, 107:23

**areas** [1] - 75:21

**argue** [3] - 42:6, 46:15, 48:24

**arguing** [2] - 45:5, 45:6

**argument** [20] - 34:10, 34:14, 34:17, 34:20, 38:12, 38:24, 41:4, 41:13, 43:5, 44:5, 45:25, 46:9, 49:12, 49:18, 50:14, 50:21, 52:24, 53:14, 53:19, 57:17

**arguments** [2] - 38:11, 109:2

**arm** [3] - 74:6, 79:13, 79:14

**armorers'** [1] - 6:5

**arms** [1] - 63:19

**arrest** [10] - 22:22, 22:24, 23:21, 26:6, 28:6, 28:13, 29:16, 32:13, 79:2, 83:1

**arrested** [4] - 27:12, 30:3, 78:25, 100:11

**arrival** [1] - 39:13

**arrive** [1] - 70:6

**arrived** [4] - 24:1, 27:22, 30:7, 93:18

**aside** [1] - 67:25

**assignment** [1] - 15:22

**assignments** [2] - 16:2, 26:7

**assist** [1] - 16:10

**assistance** [2] - 63:25, 64:1

**Assistant** [1] - 87:2

**assists** [1] - 16:15

**associate** [1] - 48:14

**Association** [2] - 6:7, 6:8

**assume** [1] - 87:12

**AT** [1] - 37:6

**attack** [3] - 52:25, 53:1, 53:5

**attempt** [1] - 52:7

**attempted** [8] - 39:2, 40:1, 49:11, 50:20, 102:22, 103:13, 103:15, 103:22

**attended** [1] - 6:4

**attending** [2] - 6:5, 6:6

**attention** [5] - 17:12, 21:2, 80:22, 109:10, 109:21

**Attorney** [1] - 87:2

**attorney** [2] - 51:22

**Attorney's** [1] - 1:16

**audio** [9] - 18:16, 18:24, 20:6, 22:22, 22:25, 24:24, 31:1, 31:4, 31:8

**audio/video** [1] - 26:15

**August** [10] - 17:12, 20:24, 21:2, 23:5, 28:24, 32:21, 45:13, 46:7, 78:21

**aunt** [1] - 69:1

**AUSA** [2] - 1:15, 1:15

**authority** [1] - 48:4

**Avenue** [1] - 1:24, 112:9

**awaiting** [1] - 39:13

**aware** [3] - 42:25, 43:10, 81:21

## B

**B-E-L-L-O** [1] - 4:21

**babalawo** [1] - 105:9

**babalawos** [3] - 77:14, 77:23, 77:25

**background** [1] - 63:2

**backup** [1] - 18:8

**badge** [5] - 7:23, 9:23, 19:2, 21:13, 23:2

**bag** [3] - 28:11, 64:2, 80:19

**Baneque** [3] - 77:15, 77:16, 78:10

**Baneque's** [1] - 77:19

**Baptist** [1] - 104:20

**bargain** [1] - 56:21

**barrel** [4] - 7:1, 9:16, 9:17, 13:13

**base** [2] - 8:19, 13:17

**based** [9] - 22:12, 26:9, 44:6, 46:2, 51:5, 52:19, 52:24, 86:5, 107:17

**basic** [2] - 8:19, 10:6

**Bate** [1] - 64:22, 70:21, 78:19

**Bates** [3] - 96:3, 96:17, 96:24

**battle** [1] - 53:11

**Beach** [7] - 15:4, 15:23, 16:3, 18:25, 22:17, 23:7, 24:11

**became** [2] - 28:7, 28:25

**BEFORE** [1] - 1:12

**began** [3] - 17:23, 69:12, 94:4

**begin** [1] - 59:23

**beginning** [1] - 68:16

**behaving** [1] - 110:4

**behavior** [1] - 109:21

**behind** [3] - 26:24, 48:3, 70:25

**Bello** [4] - 4:13, 4:20, 4:25

**BELLO** [2] - 2:6, 4:22

**below** [2] - 102:1, 107:4

**benefit** [1] - 48:23

**Bertrand** [16] - 52:9, 53:2, 56:20, 56:25, 57:4, 57:24, 86:4, 86:12, 87:5, 87:15, 87:22, 87:24, 88:4, 88:12, 88:16, 106:12

**Bertrand's** [1] - 57:23

**best** [1] - 57:15

**betrayed** [1] - 104:19

**bets** [1] - 44:20

**between** [8] - 11:18, 40:21, 41:22, 59:6, 80:20, 98:17, 98:18, 108:6

**beyond** [2] - 33:11, 51:1

**big** [2] - 23:12, 25:10

**bill** [1] - 83:22

**bit** [3] - 11:16, 63:19, 80:1

**black** [2] - 27:1, 82:13

**blade** [1] - 108:12

**block** [2] - 23:22, 26:7

**blocking** [1] - 26:3

**blood** [3] - 79:9, 96:13, 99:8

**blue** [1] - 26:25

**body** [5] - 63:18, 63:20, 74:3, 75:8, 95:18

**Bolivia** [5] - 39:11, 40:24, 41:3, 104:2, 104:5

**Bolivian** [3] - 39:6, 42:8, 104:18

**Bolton** [6] - 57:6, 57:17, 59:6, 104:8, 104:13, 106:12

**Bolton's** [1] - 58:21

**book** [1] - 25:9

**born** [1] - 62:21

**bother** [1] - 71:11

**bothers** [1] - 81:14

**boyfriend** [1] - 69:10

**bracelet** [1] - 79:13

**brain** [1] - 103:2

**brandished** [1] - 50:2

**brandishing** [1] - 49:23

**brang** [1] - 35:21

**break** [5] - 11:16, 36:11, 38:12, 60:9, 83:14

**brick** [2] - 25:11, 25:12

**brief** [3] - 61:17, 109:4, 109:16

**Brief** [1] - 24:17

**briefly** [3] - 37:22, 53:22, 61:6

**bring** [8] - 4:7, 25:1, 54:24, 73:15, 73:22, 86:3, 88:7, 88:20

**broader** [1] - 48:18

**broke** [2] - 100:19

**brothers** [3] - 69:11, 80:2, 82:4

**brought** [5] - 53:21, 68:14, 87:21, 102:10, 109:9

**Broward** [6] - 5:1, 5:2, 5:4, 74:17, 76:5, 79:4

**building** [1] - 23:15

**builds** [1] - 34:19

**built** [1] - 80:2

**bullet** [19] - 11:24, 13:18, 14:18, 74:5, 74:6, 74:7, 74:9, 74:10, 74:20, 75:18, 75:24, 102:9, 102:13, 102:15, 102:20, 102:25, 103:2, 103:3

**bullets** [2] - 106:18, 106:19

**burden** [1] - 43:3

**Burger** [4] - 22:16, 23:6, 23:11, 32:21
**business** [3] - 42:10, 42:19, 83:9
**businesses** [1] - 68:1
**buy** [7] - 48:8, 48:14, 48:15, 65:3, 72:5, 82:19, 101:15
**buying** [1] - 29:8
**BY** [37] - 1:23, 4:24, 7:15, 13:14, 15:18, 17:11, 18:2, 22:9, 24:21, 25:21, 30:13, 32:8, 33:13, 62:18, 63:7, 63:15, 67:1, 68:11, 72:2, 72:19, 73:5, 73:14, 75:16, 78:17, 80:16, 83:16, 84:19, 85:11, 87:20, 88:10, 88:25, 89:4, 89:24, 90:7, 90:21, 93:7, 101:4

**C**

**cable** [1] - 103:1
**caliber** [19] - 8:20, 9:3, 9:4, 9:7, 9:9, 10:20, 10:22, 13:1, 13:2, 13:12, 13:15, 13:16, 13:19, 13:20, 13:22, 13:23, 14:17, 98:7
**camera** [4] - 8:5, 82:1, 109:4, 109:16
**cannot** [5] - 74:11, 79:25, 91:15, 102:7, 102:20
**capacity** [4] - 15:25, 54:1, 54:14, 58:9
**capturing** [1] - 31:3
**car** [2] - 23:19, 98:24
**care** [2] - 79:4, 79:19
**career** [1] - 6:20
**Carr** [1] - 12:7
**carried** [1] - 50:1
**cars** [1] - 98:21
**cartridge** [1] - 9:4
**CASE** [1] - 1:2
**case** [65] - 5:20, 9:7, 17:9, 17:10, 18:18, 20:23, 23:24, 26:10, 27:10, 27:14, 27:21, 29:4, 30:17, 30:19, 30:23, 33:25, 36:10, 36:13, 38:2, 38:5, 38:6, 40:16, 41:3, 41:11, 41:12, 41:20, 41:22, 41:23, 42:1, 42:3, 43:12, 44:1, 44:6, 44:21, 45:16,

46:13, 49:21, 55:3, 57:10, 58:25, 59:5, 59:23, 60:17, 60:18, 60:22, 67:4, 68:14, 68:21, 73:7, 83:7, 83:18, 86:22, 88:13, 88:14, 90:25, 91:2, 94:19, 95:5, 95:22, 99:20, 105:20, 107:7, 108:17, 109:1, 111:17
**case-in** [1] - 59:23
**case-in-chief** [5] - 38:6, 59:5, 60:17, 60:18, 60:22
**cases** [12] - 16:7, 16:8, 16:10, 16:12, 23:9, 34:4, 34:7, 41:19, 41:21, 86:17, 106:3, 106:6
**casing** [1] - 6:16
**casings** [2] - 5:16, 6:17
**caused** [1] - 35:13
**causing** [1] - 98:4
**CD** [1] - 19:4
**celia** [1] - 69:22
**Celia** [26] - 65:1, 67:3, 67:4, 67:5, 68:3, 68:16, 69:18, 69:23, 70:1, 71:8, 71:13, 71:15, 84:9, 84:10, 84:12, 84:15, 92:6, 92:8, 92:10, 92:11, 92:17, 99:23, 100:8, 100:9
**cell** [4] - 74:18, 83:19, 83:22, 91:10
**cellular** [2] - 37:3, 95:15
**cent** [2] - 77:4, 105:6
**center** [2] - 19:4, 96:9
**ceremonies** [1] - 77:23
**certain** [4] - 5:16, 47:13, 53:2, 110:11
**certainty** [1] - 11:7
**Certified** [1] - 4:3
**certify** [1] - 112:3
**cetera** [5] - 35:8, 37:14, 54:9, 109:2, 109:24
**chain** [2] - 105:10, 105:11
**chair** [5] - 79:15, 79:18, 80:3, 82:7, 82:8
**challenge** [1] - 57:20
**challenged** [1] - 57:21
**chance** [2] - 20:9,

20:13
**change** [1] - 48:4
**characteristic** [1] - 10:9
**characteristics** [3] - 11:10, 11:13, 11:14
**characterized** [1] - 56:21
**charge** [1] - 47:4
**charged** [5] - 38:21, 47:3, 47:8, 47:12, 47:23
**chat** [1] - 109:10
**check** [5] - 10:12, 74:11, 79:9, 79:10, 100:5
**checkups** [1] - 79:5
**chief** [6] - 38:6, 59:5, 59:24, 60:17, 60:18, 60:22
**childhood** [1] - 95:1
**children** [3] - 63:2, 63:8, 105:5
**choose** [2] - 62:3, 78:1
**chooses** [1] - 65:5
**chose** [1] - 69:19
**chosen** [1] - 46:19
**chronic** [2] - 102:23, 102:24
**CI's** [1] - 28:3
**cigarette** [1] - 81:14
**cigarettes** [1] - 81:14
**circle** [2] - 11:22, 11:23
**circled** [5] - 19:3, 21:12, 21:13, 23:3, 96:9
**Circuit** [2] - 41:20, 42:1
**circumstances** [1] - 55:23
**cite** [1] - 41:14
**cites** [1] - 42:3
**City** [2] - 15:23, 16:2
**clarification** [1] - 53:23
**clarify** [1] - 65:12
**class** [2] - 10:9, 11:13
**clear** [14] - 6:24, 30:16, 44:7, 47:14, 53:5, 56:19, 57:16, 58:1, 66:8, 86:14, 88:23, 94:14, 99:12, 110:14
**client** [2] - 59:13, 111:8
**close** [4] - 19:9, 66:18, 90:15
**closed** [2] - 66:1,

70:17
**closing** [5] - 34:10, 34:14, 34:17, 34:20, 109:2
**cloth** [1] - 102:9
**clothes** [6] - 63:25, 95:13, 95:18, 95:20, 96:16, 96:18
**clubhouse** [1] - 98:22
**co** [1] - 27:7
**co-defendant** [1] - 27:7
**cocaine** [32] - 16:9, 24:7, 24:25, 25:4, 25:9, 25:12, 25:14, 26:16, 28:12, 28:21, 29:6, 29:7, 29:9, 29:10, 31:16, 31:19, 31:22, 31:25, 32:2, 44:21, 45:9, 45:16, 46:18, 46:24, 48:8, 48:11, 48:14, 48:15, 50:21, 82:19, 82:21, 82:24
**codefendant** [1] - 47:2
**codefendants** [6] - 24:2, 30:7, 44:14, 45:19, 46:17, 46:19
**coercion** [1] - 54:5
**coercive** [6] - 54:12, 57:1, 86:17, 86:21, 86:23, 106:1
**collar** [4] - 102:2, 102:6, 102:7, 107:5
**collar-line** [1] - 107:5
**collected** [1] - 26:9
**collectively** [1] - 59:10
**colloquy** [5] - 51:13, 51:16, 51:18
**Colombia** [2] - 40:20, 40:22
**Colorado** [1] - 106:4
**colostomy** [1] - 64:2
**Colt** [5] - 12:25, 14:6, 14:8, 72:20, 73:6
**coming** [4] - 51:10, 52:4, 104:2, 104:4
**commerce** [22] - 39:12, 40:6, 40:7, 40:8, 40:13, 40:14, 40:15, 40:19, 40:21, 41:3, 41:9, 41:15, 41:16, 41:17, 41:23, 42:6, 42:7, 42:17, 42:24, 44:5, 49:15
**commission** [1] - 104:14
**commit** [1] - 38:24
**committed** [1] - 51:2
**committing** [1] - 103:9

**common** [1] - 12:6
**Community** [1] - 63:1
**companies** [1] - 37:6
**company** [3] - 39:6, 42:9, 54:22
**compare** [1] - 6:15
**competency** [1] - 6:2
**complete** [1] - 53:8
**completed** [4] - 5:24, 6:3, 28:5, 92:22
**completely** [1] - 14:12
**complicated** [1] - 35:7
**complied** [1] - 8:4
**component** [1] - 54:12
**comport** [2] - 47:22, 55:25
**concede** [1] - 50:10
**concepts** [1] - 54:16
**concerned** [1] - 49:3
**concluded** [5] - 36:14, 60:17, 87:18, 89:22, 108:24
**conclusion** [2] - 12:12, 61:19
**conclusions** [1] - 11:1
**condition** [2] - 63:11, 63:12
**conduct** [5] - 16:12, 57:1, 110:3, 110:7, 111:15
**conducted** [1] - 18:16
**conducting** [2] - 19:5, 104:1
**conferences** [2] - 6:6, 6:7
**confession** [1] - 54:5
**confidential** [25] - 16:14, 16:15, 16:18, 17:6, 17:20, 18:6, 18:8, 18:9, 18:13, 19:18, 19:20, 20:2, 20:4, 20:17, 20:21, 21:9, 21:19, 23:17, 23:18, 23:25, 26:20, 26:24, 27:6, 27:8, 27:23
**confusing** [2] - 48:2, 48:22
**connection** [6] - 5:22, 11:1, 14:3, 42:15, 42:17, 42:24
**Connelly** [1] - 106:5
**consequences** [1] - 110:12
**consider** [2] - 35:10, 72:1
**considering** [1] - 52:20
**consists** [1] - 62:2
**conspiracies** [1] -

116

45:5
**conspiracy** [22] - 17:3, 38:23, 44:11, 44:18, 44:20, 44:24, 44:25, 45:7, 45:9, 45:16, 45:17, 45:21, 45:23, 46:17, 46:20, 47:3, 47:8, 47:12, 48:6, 48:17, 48:20, 49:19
**conspirators** [2] - 45:22, 46:1
**constantly** [1] - 102:16
**constitutional** [1] - 52:2
**Consuelo** [1] - 69:2
**consult** [3] - 51:22, 69:12, 106:20
**consultation** [1] - 77:21
**consults** [1] - 105:9
**consummated** [2] - 28:4, 29:17
**consumption** [1] - 43:16
**contact** [6] - 17:1, 18:6, 18:14, 28:7, 29:22, 59:6
**contacts** [1] - 91:6
**contemplating** [1] - 107:6
**contents** [1] - 20:10
**continue** [4] - 4:11, 38:13, 40:10, 60:21, 79:4, 80:17, 83:15, 91:9, 103:5
**continued** [7] - 2:8, 36:14, 78:8, 79:4, 84:2, 89:22, 108:24
**contours** [1] - 45:24
**contrary** [1] - 59:14
**control** [3] - 18:11, 102:23, 103:4
**controlled** [1] - 44:12
**controlling** [2] - 44:1, 49:22
**controversial** [1] - 69:9
**conventional** [4] - 11:18, 11:19, 12:20, 14:9
**conversation** [7] - 20:8, 81:7, 84:14, 97:25, 98:3, 98:24
**convictions** [1] - 64:6
**Cooke** [2] - 52:18, 53:24, 55:12, 86:22
**Cooke's** [2] - 56:16, 57:25
**copy** [1] - 42:4

**Coral** [4] - 39:15, 39:25, 103:9, 103:24
**correct** [27] - 10:23, 12:1, 12:14, 12:19, 13:21, 14:16, 14:20, 29:17, 30:20, 31:5, 31:10, 34:10, 34:14, 39:23, 42:18, 64:4, 72:5, 85:2, 85:5, 85:19, 85:21, 93:3, 95:13, 95:15, 95:17, 96:25, 103:10
**correctly** [1] - 49:21
**counsel** [11] - 33:14, 42:22, 83:11, 85:10, 88:23, 93:6, 95:10, 107:11, 109:5, 109:8, 109:17
**count** [4] - 38:20, 47:25, 48:4, 50:17
**Count** [18] - 38:23, 43:8, 44:10, 44:13, 44:16, 44:23, 45:7, 45:19, 45:24, 46:18, 46:22, 49:9, 49:11, 49:18, 49:19, 49:23, 50:17, 50:18
**country** [3] - 27:13, 101:15, 105:6
**counts** [4] - 38:22, 44:18, 44:20, 48:6
**County** [1] - 74:17
**couple** [3] - 23:20, 64:15, 67:3
**courier** [10] - 39:14, 39:15, 40:1, 54:22, 76:3, 76:15, 76:22, 76:25, 87:14, 103:9
**couriers** [1] - 76:12
**course** [6] - 16:11, 50:25, 88:2, 105:6, 111:1
**courses** [1] - 6:5
**COURT** [159] - 1:1, 4:4, 4:5, 4:7, 4:8, 4:10, 7:10, 13:4, 13:8, 14:24, 15:1, 17:9, 17:24, 22:7, 24:19, 25:20, 33:12, 33:19, 33:21, 34:1, 34:7, 34:9, 34:13, 34:16, 34:21, 35:2, 35:4, 35:6, 35:23, 36:3, 36:11, 36:18, 36:21, 37:2, 37:7, 37:10, 37:24, 38:3, 38:15, 38:17, 39:9, 39:11, 39:20, 39:22, 39:25, 40:11, 40:18, 41:7, 41:11, 41:14,

42:2, 42:14, 42:17, 42:22, 43:20, 44:6, 45:2, 45:4, 45:11, 45:25, 46:10, 46:25, 47:7, 47:12, 47:16, 48:21, 49:20, 50:4, 50:8, 50:15, 50:23, 51:18, 52:1, 52:22, 54:8, 55:3, 55:7, 55:9, 55:12, 57:2, 57:7, 57:10, 58:4, 58:10, 58:13, 58:20, 59:2, 59:16, 59:19, 59:22, 60:5, 60:9, 60:12, 60:15, 61:2, 61:5, 61:8, 61:12, 61:20, 61:24, 63:6, 63:14, 66:24, 67:15, 68:8, 69:25, 71:18, 71:23, 71:25, 72:18, 72:24, 73:10, 75:12, 80:12, 80:15, 83:11, 83:13, 86:7, 86:13, 87:11, 87:16, 88:8, 88:13, 88:15, 88:23, 89:3, 89:9, 89:11, 89:15, 90:5, 90:20, 92:15, 101:2, 105:17, 105:23, 105:25, 106:15, 106:21, 106:23, 107:2, 107:9, 107:16, 107:22, 107:25, 108:4, 108:9, 108:13, 108:16, 108:22, 109:1, 109:9, 109:12, 109:16, 109:20, 110:16, 111:6, 111:11, 111:21, 111:22
**court** [4] - 36:15, 87:19, 89:23, 108:25
**Court** [22] - 1:23, 1:24, 4:1, 4:3, 34:5, 39:5, 41:1, 41:5, 41:21, 43:1, 44:3, 44:7, 50:23, 51:3, 54:20, 55:18, 56:23, 86:20, 106:3, 106:5, 107:10, 112:8
**Court's** [2] - 35:18, 43:25
**Court-Certified** [1] - 4:3
**courtroom** [7] - 4:9, 38:16, 60:14, 67:8, 105:24, 109:8, 109:13
**COURTROOM** [7] -

4:14, 4:18, 15:5, 15:9, 15:11, 62:8, 62:12
**cover** [1] - 68:13
**covered** [1] - 29:15
**create** [1] - 48:4
**credibility** [1] - 58:16
**Crime** [5] - 5:1, 5:7, 5:8, 5:9, 5:17
**crime** [2] - 49:24, 50:2
**crimes** [1] - 16:8
**Criminal** [1] - 43:4
**criminal** [3] - 16:25, 18:14, 84:8
**criminalist** [1] - 5:6
**critical** [1] - 55:19
**Cross** [2] - 2:9, 2:15
**CROSS** [2] - 30:12, 84:18
**cross** [4] - 52:6, 56:7, 87:9, 108:17
**cross-examination** [2] - 56:7, 108:17
**Cross-Examination** [2] - 2:9, 2:15
**CROSS-EXAMINATION** [2] - 30:12, 84:18
**cross-examine** [1] - 87:9
**crosses** [1] - 42:9
**crowded** [1] - 19:8
**CRR** [2] - 1:23, 112:8
**crux** [3] - 52:17, 52:22, 53:14
**Cuba** [7] - 62:22, 68:19, 68:25, 69:6, 69:12, 94:25, 95:2
**cultivated** [2] - 43:15
**cumulative** [3] - 35:3, 35:4, 35:6
**current** [2] - 49:13, 50:11
**curved** [1] - 11:23
**custody** [3] - 28:15, 29:21, 30:2
**cut** [1] - 23:23
**cutout** [1] - 29:3

**D**

**Dade** [2] - 5:6, 5:24
**Daniel** [1] - 106:4
**darkness** [1] - 66:5
**date** [17] - 7:23, 9:24, 17:14, 20:23, 21:2, 21:18, 28:23, 46:2, 46:3, 46:5, 47:14, 47:23, 47:24, 55:25, 76:4, 103:14

**David** [7] - 57:6, 104:8, 104:12, 104:15, 104:16, 105:13, 106:12
**DAY** [1] - 1:10
**days** [4] - 17:13, 64:13, 90:11, 90:16
**De** [1] - 41:24
**DE** [1] - 41:25
**deal** [4] - 25:1, 25:17, 25:23, 80:24
**dealer** [2] - 44:2, 44:3
**dealing** [3] - 7:18, 13:19, 42:20
**death** [2] - 90:15
**december** [1] - 1:5
**decide** [7] - 7:12, 52:1, 56:11, 58:15, 98:25, 110:6, 110:25
**decision** [3] - 51:21, 51:24, 54:19
**defend** [1] - 47:19
**DEFENDANT** [1] - 1:19, 51:25, 110:15, 111:5
**defendant** [31] - 27:7, 28:7, 29:22, 29:23, 29:24, 30:7, 30:10, 33:2, 33:9, 38:20, 46:11, 47:18, 47:25, 48:6, 50:1, 50:20, 51:2, 51:13, 52:15, 55:19, 55:22, 57:1, 58:4, 58:7, 59:24, 86:18, 106:3, 106:14, 106:24, 109:5, 109:10
**Defendant** [1] - 4:2
**Defendant's** [2] - 62:2, 74:24
**defendant's** [4] - 36:12, 55:24, 61:9, 75:13
**DEFENDANT'S** [2] - 2:13, 3:10
**defendants** [5] - 39:13, 46:13, 47:4, 47:5, 48:7
**Defense** [7] - 61:1, 61:4, 61:13, 75:9
**defense** [17] - 33:14, 38:19, 43:3, 49:24, 50:18, 59:23, 60:18, 60:20, 60:21, 60:24, 62:6, 75:9, 95:10, 107:20, 108:5, 109:17, 111:20
**defense's** [1] - 39:8
**defines** [2] - 40:7, 40:13

**definitely** [1] - 42:12
**definition** [1] - 9:15
**degrees** [1] - 11:20
**demonstration** [1] - 97:6
**demonstrative** [4] - 34:11, 34:19, 34:25, 36:24
**denied** [6] - 43:6, 44:9, 49:9, 49:22, 50:16, 51:6
**deny** [3] - 35:8, 79:25, 88:19
**departed** [1] - 28:2
**Department** [6] - 5:6, 5:25, 15:4, 15:24, 88:4, 91:4
**department** [1] - 16:1
**depict** [2] - 26:22, 107:13
**depicted** [2] - 28:25, 75:2
**DEPUTY** [7] - 4:14, 4:18, 15:5, 15:9, 15:11, 62:8, 62:12
**DERIC** [1] - 1:19
**Deric** [1] - 1:19
**describe** [1] - 9:24
**designed** [1] - 86:16
**desire** [1] - 34:4
**desk** [2] - 8:8, 10:2
**detail** [5] - 8:18, 8:19, 10:5, 10:9, 37:4
**Detective** [25] - 15:3, 15:13, 15:19, 17:2, 17:6, 19:5, 20:23, 27:8, 30:14, 52:8, 53:2, 56:20, 56:25, 57:4, 57:23, 57:24, 86:4, 86:12, 87:4, 87:15, 87:22, 87:24, 88:3, 88:12, 88:16
**DETECTIVE** [2] - 2:8, 15:15
**detective** [13] - 15:21, 15:23, 16:1, 16:5, 16:6, 16:11, 17:12, 18:3, 30:17, 32:9, 90:23, 91:4, 104:12
**detectives** [2] - 88:17, 90:17
**determination** [1] - 110:3
**determine** [3] - 5:15, 6:17, 51:1
**determined** [3] - 49:5, 56:4, 86:20
**developed** [1] - 98:19
**development** [1] - 58:25

**device** [2] - 19:11, 20:7
**devices** [1] - 18:17
**diameter** [1] - 13:17
**difference** [1] - 11:18
**different** [12] - 6:6, 8:23, 14:7, 14:12, 14:15, 14:18, 46:15, 57:22, 75:21, 87:25, 99:13, 103:16
**differently** [1] - 58:7
**difficult** [3] - 11:9, 12:4, 13:10
**Dilaudid** [3] - 53:8, 53:9, 55:17
**diligence** [1] - 59:10
**direct** [4] - 2:6, 55:9, 68:8, 82:21
**DIRECT** [3] - 4:23, 15:17, 62:17
**Direct** [2] - 2:8, 2:15
**direction** [4] - 8:23, 10:10, 18:4, 18:11
**directly** [3] - 17:25, 72:25, 73:2
**disability** [1] - 105:5
**disabled** [1] - 32:15
**discharge** [1] - 61:14
**discovery** [1] - 58:22
**discuss** [3] - 105:20, 105:21, 110:21
**discussed** [5] - 43:10, 51:15, 63:10, 64:15, 106:7
**discusses** [1] - 40:15
**discussion** [5] - 34:2, 86:8, 87:18, 89:10, 107:10
**discussions** [2] - 76:14, 76:17
**disk** [1] - 23:3
**dispute** [2] - 39:17, 40:4
**distance** [3] - 19:7, 108:5, 108:10
**distribute** [4] - 43:23, 44:11, 45:8, 47:13
**distributed** [1] - 49:16
**DISTRICT** [3] - 1:1, 1:1, 1:12
**District** [4] - 1:24, 40:19, 40:22, 112:8
**divulge** [1] - 107:7
**DNA** [4] - 99:9, 99:10
**DNAs** [1] - 99:13
**docket** [1] - 55:11
**doctor** [2] - 102:13, 108:4
**document** [5] - 34:24, 37:13, 37:19, 61:19,

62:4
**documented** [2] - 107:13, 107:14
**documents** [2] - 35:15, 37:13, 60:25
**dollar** [1] - 105:6
**dollars** [1] - 42:12
**DONALD** [1] - 1:12
**done** [5] - 66:10, 66:11, 66:13, 100:22, 104:25
**door** [30] - 65:9, 65:11, 65:24, 65:25, 70:11, 70:13, 70:16, 70:19, 70:23, 70:24, 70:25, 71:5, 71:7, 94:3, 97:3, 97:8, 97:15, 98:23, 99:5, 99:24, 100:2, 100:18, 100:19, 100:20
**dosage** [1] - 55:18
**doubt** [1] - 51:1
**down** [15] - 7:1, 8:8, 11:16, 29:13, 33:7, 65:10, 65:24, 70:12, 71:4, 80:3, 81:10, 97:17, 97:20, 97:21, 97:23
**Dr** [1] - 74:19
**draw** [3] - 11:2, 17:12, 21:2
**drink** [2] - 63:23
**drug** [10] - 17:3, 25:17, 25:23, 26:11, 29:17, 44:2, 48:17, 48:19, 57:12
**drugs** [3] - 32:4, 58:9, 58:14
**Duane** [2] - 2:6, 52:7
**DUANE** [12] - 1:15, 4:12, 4:24, 7:6, 7:15, 13:3, 13:9, 13:14, 14:21, 14:25, 108:1, 108:18
**due** [1] - 59:9
**during** [12] - 6:19, 26:11, 26:14, 29:19, 34:9, 34:17, 37:10, 47:23, 55:25, 70:4, 88:2, 89:7
**dying** [1] - 90:15

**E**

**eager** [1] - 53:20
**ears** [1] - 16:20
**easier** [3] - 23:21, 37:19, 86:9
**easy** [1] - 105:12
**edges** [1] - 11:20,

11:23
**educational** [1] - 6:6
**effect** [1] - 58:13
**effects** [3] - 53:12, 55:17, 102:16
**effort** [2] - 20:12, 41:22
**Eicher** [1] - 37:5
**eight** [1] - 63:9
**either** [1] - 99:8
**elderly** [1] - 83:7
**elect** [2] - 51:19, 60:19
**Eleventh** [2] - 41:20, 41:25
**elicit** [1] - 106:17
**employed** [1] - 15:22
**en** [1] - 39:22
**encompass** [1] - 48:18
**end** [2] - 29:14, 55:17
**ending** [1] - 46:2
**enforcement** [3] - 16:21, 59:7, 86:2
**engage** [1] - 11:23, 41:21
**engaged** [1] - 56:25
**engagement** [1] - 56:19
**engaging** [1] - 26:11
**English** [1] - 12:10
**enjoy** [1] - 42:2
**enter** [2] - 23:23, 42:7
**entered** [5] - 4:9, 39:14, 60:14, 64:21, 70:20
**entertain** [3] - 36:12, 38:8, 51:7
**entertained** [1] - 60:15
**entire** [2] - 62:4, 85:19
**entitled** [1] - 112:5
**entranceway** [1] - 96:4
**entries** [1] - 26:8
**enures** [1] - 48:23
**episode** [4] - 46:7, 48:9, 48:19, 106:19
**episodes** [1] - 48:16
**especially** [1] - 97:11
**ESQ** [1] - 1:19
**essentially** [5] - 6:12, 8:17, 12:11, 13:16, 52:19
**estimate** [1] - 32:12
**et** [5] - 35:8, 37:14, 54:9, 109:2, 109:24
**evening** [1] - 105:22
**event** [5] - 17:13, 29:19, 45:12, 54:25, 85:18

**events** [5] - 18:3, 48:18, 64:15, 64:18, 78:12
**eventually** [1] - 74:17
**evidence** [63] - 5:15, 7:16, 7:24, 8:15, 9:19, 9:25, 12:21, 19:15, 20:7, 21:3, 22:13, 24:15, 24:20, 24:24, 26:9, 26:12, 26:14, 26:17, 28:17, 35:11, 35:17, 36:17, 36:25, 37:9, 37:14, 39:12, 39:18, 40:5, 40:17, 43:1, 43:13, 43:16, 44:7, 44:21, 45:12, 45:15, 45:20, 46:2, 46:16, 47:21, 47:24, 47:25, 48:4, 49:14, 49:15, 49:18, 50:1, 50:14, 50:20, 50:24, 61:1, 61:10, 62:5, 64:22, 70:20, 75:10, 75:13, 83:18, 96:2, 101:17, 107:20
**EVIDENCE** [3] - 2:3, 2:13, 3:3
**exactly** [2] - 42:5, 102:7, 111:11
**examination** [3] - 10:3, 56:7, 108:17
**EXAMINATION** [6] - 4:23, 15:17, 30:12, 32:7, 62:17, 84:18
**Examination** [7] - 2:6, 2:8, 2:9, 2:9, 2:15, 2:15, 2:16
**examinations** [2] - 6:1, 6:2
**examine** [2] - 5:15, 87:9
**examined** [2] - 7:24, 9:24
**Examiners** [1] - 6:8
**example** [3] - 18:20, 41:22, 107:12
**excerpts** [1] - 60:2
**exclusively** [1] - 78:5
**excuse** [6] - 32:20, 38:8, 48:15, 71:23, 83:11, 96:15
**excused** [6] - 14:24, 15:1, 15:2, 33:19, 33:21, 33:23
**exercised** [1] - 18:11
**Exhibit** [34] - 3:5, 3:6, 3:11, 3:13, 3:14, 7:17, 7:19, 9:19, 12:22, 12:23, 12:24, 18:21, 19:16, 20:10,

24:15, 24:20, 26:18, 30:9, 32:20, 36:23, 37:9, 37:25, 61:23, 62:2, 64:21, 70:21, 74:24, 75:10, 75:13, 78:19, 82:16, 101:18, 101:22

**EXHIBIT** [1] - 3:2

**exhibit** [5] - 3:12, 31:7, 34:4, 34:7, 36:24

**Exhibits** [1] - 61:9

**EXHIBITS** [2] - 3:4, 3:10

**exhibits** [1] - 60:25

**exist** [1] - 94:6

**existed** [1] - 70:9

**existing** [1] - 42:7

**exited** [3] - 38:16, 105:24, 109:8

**exits** [1] - 26:8

**expert** [5] - 7:2, 7:7, 35:20, 53:10, 107:25

**experts** [2] - 7:11, 53:11

**explain** [2] - 6:10, 77:18

**explaining** [1] - 12:10

**explains** [1] - 42:23

**extent** [3] - 7:12, 37:17, 37:20

**extortion** [1] - 41:22

**extracted** [3] - 26:19, 102:11, 102:20

**eyes** [1] - 16:20

---

## F

**F.2d** [1] - 41:25

**F.3d** [1] - 106:4

**face** [5] - 81:25, 94:20, 94:23, 94:24

**face-to-face** [1] - 94:24

**facilities** [1] - 111:14

**facility** [2] - 89:17, 109:21

**facing** [1] - 65:24

**fact** [15] - 29:7, 45:20, 47:17, 52:25, 55:21, 60:20, 91:18, 91:22, 91:25, 92:5, 92:11, 92:17, 92:20, 103:25, 104:9

**factory** [1] - 6:5

**facts** [1] - 58:16

**factual** [2] - 56:8, 58:10, 110:25

**failed** [4] - 53:2, 53:3, 88:20

**failure** [1] - 59:11

**falls** [1] - 45:23

**false** [2] - 54:22, 55:1

**family** [4] - 71:11, 71:12, 100:23

**family's** [1] - 66:12

**far** [7] - 27:2, 31:4, 42:6, 74:4, 98:12, 108:16, 111:6

**fashion** [1] - 34:12

**fault** [1] - 83:8

**favorable** [7] - 43:2, 44:8, 48:1, 50:15, 50:24, 51:4

**FBI** [1] - 37:5

**feature** [1] - 12:2

**federal** [1] - 16:10

**Federal** [2] - 1:23, 43:4

**feed** [1] - 63:21

**feet** [1] - 71:4

**felony** [1] - 64:6

**felt** [2] - 59:6, 70:12

**few** [9] - 32:14, 77:23, 83:25, 91:7, 91:15, 109:6, 109:13, 109:18, 109:19

**fewer** [1] - 12:19

**Fidel** [5] - 79:18, 80:7, 81:9, 82:8, 83:6

**Fidel's** [1] - 79:20

**Fifth** [4] - 54:3, 54:10, 56:5, 86:16

**figure** [1] - 59:19

**figures** [1] - 35:15

**filed** [2] - 55:7, 55:11

**filing** [1] - 55:5

**filled** [1] - 8:17

**filters** [1] - 30:19

**final** [1] - 51:21

**finally** [1] - 83:10

**financed** [1] - 48:20

**financial** [1] - 80:3

**findings** [2] - 110:11, 110:25

**fine** [4] - 17:10, 43:19, 52:2, 58:17

**fingerprints** [1] - 72:12

**finish** [5] - 38:12, 46:9, 78:6, 91:8, 109:1

**finished** [2] - 61:24, 98:24

**finite** [2] - 46:3, 47:23

**fire** [2] - 10:15, 14:17

**firearm** [48] - 5:12, 5:16, 6:12, 6:13, 6:15, 6:18, 7:7, 8:22, 9:3, 9:5, 9:7, 9:16,

10:1, 10:3, 10:4, 10:7, 10:8, 10:12, 10:15, 10:20, 11:3, 11:5, 11:8, 11:14, 12:3, 12:13, 12:24, 12:25, 13:1, 13:2, 13:7, 13:25, 14:13, 49:24, 50:2, 72:7, 72:8, 72:12, 72:15, 72:20, 72:21, 72:25, 73:6, 73:7, 73:12, 73:15, 73:17

**Firearm** [1] - 6:7

**firearms** [11] - 5:10, 5:15, 6:11, 6:19, 12:2, 12:5, 12:8, 12:15, 12:19, 14:7, 14:8

**firearms-related** [1] - 5:15

**fired** [5] - 8:22, 9:6, 11:4, 12:13, 13:25

**firing** [1] - 6:15

**first** [26] - 7:18, 8:15, 16:4, 26:14, 27:22, 28:7, 32:16, 43:14, 51:12, 52:25, 61:20, 62:4, 66:2, 66:25, 74:15, 83:18, 85:22, 87:24, 88:1, 88:9, 90:11, 94:23, 94:24, 95:5, 111:13

**five** [4] - 16:4, 75:1, 75:17, 75:23

**flash** [1] - 66:6

**floor** [2] - 97:20, 97:21

**FLORIDA** [1] - 1:1

**Florida** [14] - 1:4, 1:18, 1:21, 1:25, 39:11, 40:24, 41:3, 41:23, 84:24, 90:23, 103:8, 103:10, 103:13, 112:9

**focus** [1] - 51:3

**focused** [1] - 48:5

**follow** [3] - 10:11, 53:3, 68:12

**followed** [1] - 12:7

**following** [10] - 40:1, 45:2, 55:13, 60:24, 60:25, 67:18, 77:3, 87:18, 90:8, 90:16

**follows** [7] - 4:22, 15:16, 34:2, 62:16, 86:8, 89:10, 107:10

**food** [1] - 80:4

**FOR** [2] - 1:15, 1:19

**forbid** [1] - 29:13

**forced** [1] - 58:2

**foregoing** [1] - 112:3

**foreign** [8] - 39:12, 40:14, 41:2, 41:8, 41:17, 42:7, 42:17, 42:24

**forfeiture** [1] - 28:14

**form** [2] - 66:23, 92:13, 101:1

**formally** [2] - 36:10, 36:16

**Fort** [1] - 1:21

**forward** [2] - 16:13, 110:14

**four** [1] - 33:1

**Fourth** [1] - 86:25

**fourth** [1] - 90:24

**FPR** [3] - 1:23, 112:8

**framed** [1] - 100:5

**Frank** [37] - 65:2, 65:3, 65:6, 66:4, 70:1, 70:2, 70:7, 70:9, 70:11, 70:14, 71:7, 71:9, 71:14, 72:3, 91:18, 91:20, 91:23, 91:24, 92:1, 93:17, 93:20, 94:1, 94:2, 94:4, 94:5, 94:6, 94:10, 94:12, 94:15, 98:24, 99:2, 99:4, 99:24

**Frank's** [2] - 65:8, 93:14

**frankly** [1] - 47:9

**Frankowitz** [1] - 74:19

**freedom** [2] - 67:9, 67:21

**freely** [1] - 101:15

**friend** [3] - 65:21, 68:22, 92:25

**friends** [5] - 69:11, 77:14, 83:23, 83:25, 92:8

**friendship** [1] - 65:5

**front** [12] - 8:9, 51:12, 65:20, 66:16, 70:12, 80:20, 82:2, 83:3, 96:4, 96:24, 99:5, 100:13

**fugitive** [1] - 48:10

**full** [4] - 91:11, 98:15, 99:7, 100:20

**fully** [2] - 100:17, 100:21

**function** [2] - 10:14

**functioning** [1] - 10:13

**furtherance** [2] - 49:24, 50:2

**furthering** [1] - 21:25

---

## G

**Gables** [4] - 39:15, 39:25, 103:10, 103:24

**GARCIA** [6] - 1:7, 2:14, 51:25, 62:15, 110:15, 111:5

**Garcia** [4] - 4:2, 31:15, 45:13, 51:14, 51:20, 52:5, 52:8, 53:16, 60:4, 60:6, 61:14, 62:6, 62:14, 62:19, 63:10, 64:6, 64:14, 67:2, 68:12, 82:17, 84:16, 84:20, 87:21, 89:1, 96:4, 109:20

**general** [4] - 44:15, 50:21, 52:10, 52:12

**generally** [2] - 18:10, 22:2

**generated** [2] - 19:19, 22:2

**gentlemen** [5] - 4:10, 7:11, 38:4, 60:15, 105:22

**girlfriend** [1] - 69:3

**given** [15] - 6:2, 13:9, 47:18, 48:13, 52:21, 53:7, 53:9, 53:13, 53:18, 55:21, 69:19, 77:3, 77:4, 86:11, 105:7

**GLENDA** [2] - 1:23, 112:8

**Glock** [5] - 10:16, 12:2, 12:7, 14:7, 14:11

**God** [4] - 4:16, 15:7, 29:12, 62:10

**Godfather** [9] - 26:16, 77:16, 77:17, 77:20, 78:2, 78:7, 78:8, 78:10

**gold** [30] - 29:24, 38:25, 39:1, 39:3, 39:7, 39:11, 39:13, 39:14, 40:2, 42:12, 42:21, 48:12, 48:20, 54:22, 76:3, 76:12, 76:15, 76:18, 76:20, 76:22, 76:24, 77:3, 77:6, 77:9, 87:13, 103:9, 104:2, 104:4, 104:7

**Gonzalez** [2] - 65:1, 69:18

**Government** [47] - 4:12, 35:20, 36:16,

36:23, 38:4, 40:5,
40:16, 43:2, 43:8,
43:20, 44:8, 44:17,
44:24, 44:25, 45:9,
45:21, 45:23, 45:25,
46:17, 48:1, 49:4,
49:7, 50:16, 50:25,
51:4, 51:5, 52:5,
52:12, 53:15, 56:16,
57:18, 59:10, 60:2,
60:17, 64:21, 72:10,
72:20, 73:6, 76:2,
82:16, 86:23, 106:2,
106:8, 107:11,
109:5, 109:8, 109:18
**GOVERNMENT** [2] -
1:15, 2:11
**Government's** [43] -
7:17, 7:19, 9:19,
12:22, 12:23, 12:24,
18:21, 19:16, 20:10,
20:13, 20:14, 21:4,
22:18, 23:4, 24:4,
24:10, 24:14, 24:20,
24:22, 24:23, 26:18,
27:5, 28:10, 28:18,
28:25, 29:1, 29:3,
30:1, 30:5, 30:8,
32:20, 36:17, 37:25,
46:16, 46:25, 53:25,
70:21, 78:18, 96:2,
96:24, 101:18,
101:22
**GOVERNMENT'S** [2] -
2:3, 3:4
**government's** [1] -
37:9
**governmental** [1] -
86:21
**GPS** [1] - 85:15
**GPS's** [1] - 97:24
**grab** [1] - 63:23
**GRAHAM** [1] - 1:12
**grams** [4] - 45:8,
46:18, 46:23, 50:20
**Grand** [1] - 44:19
**grant** [1] - 48:25
**great** [1] - 10:2
**greeted** [1] - 27:22
**groin** [1] - 74:7
**grooves** [3] - 8:23,
10:10, 14:8
**ground** [1] - 97:17
**grounds** [1] - 49:25
**group** [2] - 69:8,
104:19
**grow** [1] - 90:22
**guess** [6] - 41:5,
44:20, 46:11, 56:8,
86:9, 109:14

## H

**gun** [9] - 12:1, 13:22,
14:5, 14:14, 66:6,
71:1, 82:2, 101:13,
101:16
**guns** [1] - 101:15
**gunshot** [2] - 107:13,
108:10
**guy** [1] - 23:21
**Guy** [1] - 57:5

## H

**half** [2] - 11:20, 11:22
**hand** [7] - 4:14, 9:13,
12:21, 15:5, 29:14,
62:9, 72:16
**handful** [1] - 12:6
**handing** [1] - 7:16
**handle** [1] - 38:9
**hands** [5] - 63:19,
72:13, 102:24,
105:9, 105:12
**Havana** [1] - 68:25
**head** [1] - 102:16
**health** [2] - 67:9,
67:20
**hear** [6] - 17:25,
32:15, 46:25, 67:15,
80:12, 81:1
**heard** [9] - 7:11,
32:12, 60:20, 67:22,
74:19, 77:11, 78:24,
83:17, 105:20
**hearing** [13] - 53:11,
59:3, 59:5, 109:4,
109:17, 109:25,
110:2, 110:11,
110:17, 110:18,
110:19, 110:23,
110:24
**hearsay** [9] - 17:21,
22:6, 35:19, 66:22,
68:6, 69:23, 71:16,
71:20, 72:17
**heavy** [1] - 53:7
**heavyset** [1] - 88:4
**heavyset-shaped** [1] -
88:4
**Hector** [3] - 86:4,
88:12, 106:12
**hedge** [1] - 44:20
**heist** [1] - 48:13
**held** [8] - 15:25, 16:2,
34:2, 66:16, 86:8,
87:18, 89:10, 107:10
**Held** [1] - 1:8
**help** [5] - 4:16, 15:7,
62:10, 80:3, 106:9
**helped** [7] - 79:25,
80:4, 82:4, 82:5,

82:7, 82:8
**helpful** [2] - 35:16,
37:17
**helps** [1] - 78:3
**hereby** [2] - 56:2,
112:3
**Hernandez** [3] - 68:23,
68:24, 77:2
**high** [2] - 43:3, 55:17
**highlight** [1] - 67:2
**himself** [4] - 82:10,
87:8, 88:3, 88:12
**Hobbs** [3] - 38:24,
40:7, 49:11
**hold** [3] - 13:22,
71:18, 74:24
**hole** [4] - 9:15, 101:24,
107:3, 107:23
**holidays** [1] - 109:2
**home** [12] - 64:23,
65:10, 66:15, 66:16,
70:6, 71:11, 71:14,
77:19, 92:25, 93:5,
93:11, 100:9
**Honor** [35] - 4:6, 4:12,
7:6, 13:3, 14:25,
30:11, 33:24, 34:3,
36:2, 36:16, 36:20,
36:22, 37:22, 38:1,
42:5, 43:21, 47:1,
48:10, 51:13, 53:22,
58:17, 59:5, 60:11,
61:22, 67:13, 71:21,
73:8, 80:10, 87:6,
90:22, 97:6, 97:7,
106:11, 107:19,
108:19
**Honor's** [1] - 40:9
**HONORABLE** [1] -
1:12
**hopefully** [1] - 8:7
**horizons** [1] - 79:12
**hospital** [11] - 52:9,
57:5, 58:2, 79:3,
89:13, 90:3, 90:6,
90:12, 90:13,
104:20, 106:13
**Hospital** [7] - 61:14,
63:1, 74:12, 74:14,
76:5, 89:2, 104:20
**hour** [1] - 108:23
**hours** [1] - 86:19
**house** [38] - 6:3, 65:8,
65:9, 65:18, 65:20,
66:5, 66:18, 66:19,
68:2, 68:3, 69:16,
69:20, 70:10, 71:8,
71:9, 71:11, 71:17,
79:19, 80:3, 83:25,
92:22, 93:9, 93:14,

93:23, 94:5, 94:9,
94:15, 98:10, 98:20,
98:23, 99:1, 99:3,
99:6, 100:4, 100:22,
101:14
**hundred** [1] - 11:6
**hurry** [1] - 81:19
**husband** [1] - 69:1

## I

**idea** [1] - 93:18
**identifiable** [1] - 78:20
**Identification** [1] - 6:9
**identification** [10] -
7:8, 11:12, 24:3,
24:9, 36:7, 36:19,
36:23, 37:8, 60:25,
61:4
**identified** [3] - 36:24,
47:3, 74:23
**identify** [3] - 11:9,
12:4, 36:21
**identifying** [1] - 12:9
**Ifa** [3] - 77:13, 81:2,
81:3
**IGNACIO** [1] - 1:15
**image** [7] - 26:19,
26:22, 27:4, 30:5,
30:8, 96:10
**images** [1] - 31:4
**immediately** [2] -
66:3, 90:8
**impact** [2] - 12:9,
56:14, 108:8
**impair** [1] - 55:15
**impeach** [3] - 52:7,
52:15, 53:16
**impeachment** [7] -
52:14, 54:4, 54:23,
87:10, 106:21,
106:25
**implant** [3] - 102:22,
103:1, 103:3
**implicated** [3] - 54:4,
87:8, 87:14
**implicates** [1] - 44:3
**impounded** [1] - 28:14
**impressions** [3] -
9:11, 9:16, 11:11
**IN** [1] - 3:3
**in-house** [1] - 6:3
**inaccurate** [2] - 35:13,
58:14
**inappropriate** [1] -
109:22
**inaudible** [1] - 35:21
**inches** [1] - 13:17
**incident** [5] - 32:18,
46:3, 46:6, 47:19,

86:2
**include** [4] - 44:14,
44:18, 105:1, 106:12
**included** [1] - 6:5
**includes** [1] - 10:6
**including** [3] - 6:7,
41:2, 49:5
**independent** [1] -
67:25
**indicate** [1] - 72:22
**indicated** [4] - 55:18,
65:6, 65:16, 70:2
**indicates** [1] - 55:18
**indicating** [2] -
101:23, 102:2
**indication** [1] - 61:22
**indicted** [1] - 46:20
**indictment** [11] -
38:21, 38:22, 44:13,
44:23, 45:10, 47:4,
47:9, 47:11, 47:12,
49:5, 49:8
**individual** [9] - 11:10,
11:14, 18:14, 69:9,
78:3, 80:9, 81:1,
88:11, 101:11
**individualize** [1] -
11:15
**individuals** [9] -
17:15, 26:4, 77:25,
79:7, 79:12, 84:7,
104:8, 104:18,
105:14
**infection** [1] - 104:21
**informant** [22] - 16:15,
16:18, 17:20, 18:6,
18:9, 19:18, 19:20,
20:2, 20:4, 20:17,
20:21, 21:9, 21:19,
23:17, 23:25, 26:20,
26:24, 27:6, 27:8,
27:23
**informant's** [1] - 23:19
**informants** [4] -
16:17, 16:19, 17:6,
18:13
**information** [15] -
8:18, 8:19, 9:1, 9:2,
10:5, 10:6, 10:9,
10:18, 16:16, 27:12,
30:19, 37:16, 92:6,
92:12, 92:18
**informed** [1] - 56:9
**initial** [1] - 20:16
**initials** [7] - 7:23, 9:23,
19:2, 19:14, 21:13,
23:2, 23:4
**initiated** [5] - 57:6,
77:20, 77:25, 78:4,
78:5

**initiation** [3] - 77:15, 77:23, 78:6
**inquire** [1] - 61:6
**inside** [9] - 9:16, 29:9, 29:24, 65:18, 66:5, 71:11, 98:9, 98:10, 100:4
**instances** [1] - 42:23
**instead** [1] - 29:12
**institution** [1] - 79:11
**instruct** [1] - 23:17
**instructed** [4] - 18:6, 18:13, 19:21, 20:20
**instruction** [8] - 7:10, 35:9, 35:24, 36:8, 37:12, 43:25, 44:1, 44:4
**insufficient** [3] - 50:1, 50:14, 50:19
**integrity** [1] - 83:6
**intelligent** [1] - 56:1
**intelligently** [1] - 55:22
**intend** [4] - 34:18, 44:2, 57:3, 87:9
**intended** [4] - 6:14, 7:1, 10:13, 93:11
**intending** [1] - 55:22
**intent** [3] - 44:11, 45:8, 47:13
**intention** [4] - 71:10, 94:15, 99:23, 100:21
**intentions** [1] - 42:10
**interacting** [1] - 42:12
**interacts** [1] - 41:18
**intercepted** [1] - 40:2
**International** [2] - 6:8, 42:9
**international** [1] - 16:10
**INTERPRETER** [2] - 85:9, 93:6
**interpreter** [1] - 101:21
**Interpreter** [1] - 85:9
**Interpreters** [1] - 4:3
**interrupting** [1] - 86:10
**interstate** [7] - 39:6, 40:15, 41:23, 42:6, 42:15, 44:4, 49:15
**interview** [2] - 53:6, 89:12
**interviewed** [7] - 89:1, 89:3, 89:5, 90:1, 90:3, 90:9, 90:12
**interviews** [3] - 89:7, 89:16
**intoxicated** [1] - 57:12
**intoxication** [1] -

55:14
**introduce** [6] - 29:12, 54:23, 54:24, 57:3, 60:1, 81:17
**introduced** [4] - 25:14, 80:25, 88:3, 88:11
**introduces** [1] - 33:2
**introduction** [1] - 35:9
**investigate** [1] - 17:2
**investigated** [2] - 65:23, 88:5
**investigation** [16] - 17:15, 17:19, 17:22, 18:4, 19:5, 20:12, 20:18, 21:14, 21:25, 24:8, 28:22, 32:9, 33:7, 104:23, 104:25
**investigations** [1] - 16:13
**investigator** [4] - 16:12, 17:8, 54:24, 89:8
**invited** [1] - 77:14
**invoices** [1] - 42:14
**involuntary** [1] - 52:23, 54:5, 54:11
**involved** [7] - 46:12, 47:19, 83:7, 84:7, 84:23, 100:24, 105:13
**involvement** [1] - 82:23
**involving** [7] - 17:15, 31:19, 45:13, 45:21, 46:17, 46:18, 46:19
**issue** [18] - 49:2, 52:17, 53:19, 53:21, 53:23, 53:24, 56:8, 56:15, 56:17, 56:20, 57:21, 57:25, 58:5, 58:10, 58:22, 58:24, 106:6, 111:9
**issued** [2] - 56:13, 58:22
**issues** [9] - 38:7, 38:9, 38:11, 49:21, 54:11, 60:16, 80:9, 86:18, 110:21
**item** [6] - 7:20, 8:1, 9:20, 24:9, 24:12, 24:22
**items** [3] - 37:10, 95:17, 110:10
**itself** [3] - 19:23, 42:23, 54:2

---

**J**

**Jackson** [4] - 79:5,

79:16, 80:7, 80:8
**jail** [1] - 94:25
**Jail** [1] - 74:17
**January** [1] - 112:7
**Jean** [26] - 48:11, 65:3, 66:17, 69:2, 69:4, 69:6, 70:3, 70:5, 72:5, 77:8, 92:6, 92:8, 92:10, 92:12, 92:18, 94:18, 95:2, 95:3, 95:5, 99:21, 100:7, 100:25, 101:6, 103:8, 103:25
**Jean's** [1] - 94:23
**jeopardizes** [1] - 111:17
**JESUS** [1] - 1:15
**Joan** [1] - 94:19
**joined** [1] - 5:4
**Jorge** [4] - 4:13, 4:20, 15:3, 15:13
**JORGE** [6] - 2:6, 2:8, 4:21, 4:22, 15:14, 15:15
**JR** [1] - 1:15
**Judge** [52] - 24:16, 33:20, 34:22, 36:9, 38:19, 38:22, 39:17, 39:19, 40:12, 40:16, 41:8, 41:9, 41:12, 43:7, 43:19, 44:10, 44:13, 45:3, 45:6, 45:22, 46:14, 49:10, 49:11, 49:17, 50:5, 50:6, 50:7, 50:13, 50:21, 51:12, 52:3, 52:18, 53:10, 53:19, 53:24, 55:12, 56:16, 57:15, 57:23, 57:25, 58:6, 58:17, 60:1, 60:23, 61:3, 61:22, 62:6, 67:6, 86:6, 86:9, 86:22, 111:20
**JUDGE** [1] - 1:12
**judge** [8] - 43:10, 43:18, 50:18, 52:10, 52:24, 57:14, 61:11, 106:9
**judgment** [5] - 38:20, 49:19, 49:25, 50:19, 55:19
**Julio** [1] - 72:15
**Julio's** [1] - 71:11
**June** [1] - 46:5
**jurisdiction** [2] - 39:5, 41:17
**jurors** [2] - 11:6, 72:1
**jurors'** [2] - 8:11, 8:12
**Jury** [1] - 44:19,

105:24
**JURY** [1] - 1:10
**jury** [38] - 4:7, 4:9, 15:22, 17:7, 26:21, 34:12, 34:24, 35:9, 35:16, 36:4, 36:25, 37:23, 38:16, 43:25, 44:4, 48:23, 51:1, 56:10, 58:11, 58:15, 60:3, 60:7, 60:14, 61:23, 63:8, 63:12, 67:7, 68:15, 68:23, 72:3, 72:4, 74:3, 75:15, 77:12, 84:22, 88:12, 94:9, 97:5
**justifiable** [1] - 100:21

---

**K**

**keep** [4] - 37:15, 79:14, 86:10, 110:13
**kept** [1] - 86:18
**kill** [5] - 98:12, 98:18, 99:14, 100:13, 101:7
**killed** [3] - 99:22, 100:9, 100:25
**killers** [1] - 99:21
**kilogram** [9] - 24:7, 24:25, 25:4, 25:5, 25:13, 26:16, 28:21, 29:3, 45:16
**kilograms** [2] - 16:9, 25:9
**kind** [9] - 12:23, 16:7, 16:20, 23:18, 27:2, 33:9, 44:20, 58:3, 111:15
**Kindelan** [21] - 43:22, 48:12, 68:23, 76:2, 76:14, 76:17, 77:2, 85:1, 85:21, 86:3, 87:22, 88:7, 88:21, 89:8, 91:16, 91:20, 98:9, 98:14, 100:25, 101:6, 104:1
**kindly** [1] - 55:9
**King** [4] - 22:16, 23:6, 23:11, 32:21
**knock** [2] - 97:8, 99:4
**knocked** [3] - 65:9, 70:10, 94:3
**knocking** [1] - 97:3, 97:15, 99:24, 100:2
**knowing** [2] - 54:14, 56:1
**knowingly** [3] - 55:15, 55:22, 56:23
**knowledge** [4] - 16:24, 94:15, 104:4, 104:6

known [6] - 17:4, 18:7, 44:19, 59:7, 68:16, 105:10
**knows** [2] - 29:7, 65:5

---

**L**

**Lab** [5] - 5:1, 5:7, 5:8, 5:9, 5:17
**lab** [1] - 5:13
**laboratory** [1] - 6:4
**lack** [4] - 49:14, 49:15, 49:17, 54:1
**lacking** [1] - 11:10
**ladies** [5] - 4:10, 7:11, 38:3, 60:15, 105:22
**land** [1] - 11:11
**lands** [3] - 8:23, 10:10, 14:8
**language** [9] - 39:4, 41:1, 41:2, 44:19, 45:7, 46:22, 46:23, 50:10, 81:4
**Lara** [10] - 48:11, 69:2, 69:4, 69:6, 77:8, 94:18, 100:25, 101:6, 104:1
**Larkin** [4] - 63:1, 109:21, 110:2, 110:14
**last** [6] - 4:21, 46:11, 52:11, 65:22, 68:22, 97:22
**late** [1] - 81:19
**Lauderdale** [1] - 1:21
**law** [7] - 16:21, 48:22, 50:11, 52:10, 52:12, 59:6, 86:2
**law's** [1] - 43:12
**lawyer** [7] - 52:6, 52:7, 67:11, 70:17, 72:25, 90:24, 110:21
**laying** [1] - 96:5
**lead** [4] - 17:8, 17:20, 18:5, 30:17
**leads** [1] - 16:16
**learned** [1] - 98:14
**least** [2] - 26:12, 42:23
**leave** [7] - 12:9, 12:15, 12:17, 61:15, 98:13, 110:8, 111:18
**leaves** [1] - 9:16
**left** [21] - 9:17, 14:9, 14:14, 14:18, 74:20, 75:6, 75:8, 79:3, 79:4, 81:5, 95:10, 95:13, 95:14, 95:15, 95:18, 95:19, 95:20, 96:9, 96:14, 102:3
**leg** [2] - 74:8, 74:10

**legal** [10] - 33:24,
38:7, 38:9, 38:11,
49:20, 51:10, 57:12,
57:19, 58:24, 60:16
**length** [1] - 51:15
**Leonardo** [6] - 4:2,
17:16, 48:14, 61:14,
62:6, 62:14
**LEONARDO** [3] - 1:7,
2:14, 62:15
**less** [3] - 31:9, 31:13,
71:11
**level** [2] - 16:9, 91:1
**lies** [1] - 50:14
**life** [2] - 81:13, 94:23
**light** [14] - 8:7, 8:10,
43:2, 44:8, 48:1,
50:15, 50:24, 51:4,
65:13, 65:16, 71:1,
98:15, 100:3
**lights** [5] - 65:18,
66:19, 98:9, 99:5,
100:1
**limiting** [3] - 35:24,
36:8, 37:12
**line** [1] - 107:5
**list** [2] - 31:8, 91:11
**listed** [5] - 44:14,
45:18, 46:1, 46:18,
47:25
**listen** [2] - 34:13,
38:11
**listened** [2] - 22:1,
22:2
**listening** [4] - 19:11,
19:13, 80:21, 81:25
**Livan** [4] - 68:20,
83:10, 83:17
**live** [6] - 6:25, 62:25,
99:2, 99:4, 99:25,
103:6
**lived** [5] - 65:2, 67:23,
94:5, 94:16, 105:9
**lives** [1] - 99:24
**living** [1] - 71:10
**load** [2] - 93:12, 93:23
**loaded** [1] - 9:4
**locate** [1] - 55:10
**location** [5] - 19:21,
27:25, 35:17, 79:1
**Locka** [4] - 39:23,
40:2, 42:10, 42:11
**look** [11] - 8:8, 25:8,
35:23, 40:12, 43:1,
44:13, 50:24, 55:5,
58:7, 79:11, 91:11
**looked** [2] - 25:5,
49:20
**looking** [16] - 8:10,
26:10, 27:5, 28:10,

30:1, 39:3, 39:4,
39:19, 40:5, 40:8,
40:9, 40:11, 72:4,
72:5, 75:22, 101:24
**looks** [5] - 8:12, 12:25,
25:11, 25:12, 44:7
**loud** [1] - 97:11
**lowered** [1] - 81:23
**lucky** [1] - 101:9,
101:11, 101:12
**lure** [1] - 23:18

**M**

**MACKENZIE** [1] - 1:15
**Magdalena** [25] -
17:16, 18:7, 20:21,
20:25, 22:5, 24:1,
26:15, 26:20, 27:6,
27:15, 27:22, 27:24,
28:2, 30:2, 30:6,
32:24, 33:9, 44:16,
44:22, 45:14, 45:18,
48:15, 77:11, 77:17,
78:24
**maintain** [3] - 5:19,
58:18, 58:19
**majority** [1] - 16:14
**male** [1] - 88:5
**man** [6] - 77:12, 81:4,
81:6, 82:1, 83:6,
98:16
**managed** [2] - 17:8,
18:10
**management** [1] - 6:9
**manager** [4] - 5:9,
5:13, 5:17
**manufacturer** [1] -
10:18
**marijuana** [35] - 39:2,
43:9, 43:14, 43:15,
43:17, 43:23, 44:2,
46:21, 46:22, 49:14,
49:16, 65:4, 65:7,
70:1, 70:8, 72:4,
92:21, 93:5, 93:9,
93:11, 93:13, 93:15,
93:18, 93:22, 93:25,
94:1, 94:6, 94:7,
94:10, 94:11, 94:12,
94:13, 94:15, 103:13
**Maritza** [2] - 79:20
**Mark** [1] - 6:8
**mark** [3] - 5:10, 5:12,
7:7
**marked** [13] - 24:3,
24:9, 24:19, 28:9,
36:8, 36:19, 36:22,
37:8, 60:25, 61:3,
61:8, 75:17, 96:3

**marking** [1] - 12:17
**markings** [3] - 14:12,
14:15, 14:18
**marks** [2] - 11:24, 12:9
**Marrero** [9] - 69:2,
69:4, 69:6, 77:8,
94:18, 100:25,
101:6, 104:1
**Marshals** [1] - 109:9
**mask** [9] - 73:20,
73:22, 73:24, 95:21,
95:23, 96:22, 99:7
**materials** [1] - 8:21
**matter** [6] - 17:25,
27:9, 47:17, 48:22,
71:19, 112:5
**matters** [4] - 43:11,
51:10, 77:22, 109:9
**mean** [7] - 13:15, 31:1,
40:13, 55:7, 59:2,
72:10, 106:16
**meaning** [2] - 40:8,
83:5
**means** [7] - 38:5,
40:19, 56:5, 72:1,
81:3, 92:23, 93:1
**measurement** [1] -
8:19
**measures** [1] - 13:17
**medical** [17] - 33:9,
33:16, 53:17, 55:4,
57:11, 60:2, 60:3,
63:11, 63:12, 79:24,
80:6, 80:7, 82:6,
82:14, 106:13,
106:17, 107:12
**medication** [7] -
52:21, 53:8, 53:12,
53:17, 54:8, 56:10,
80:4
**meet** [9] - 18:24,
30:24, 31:24, 32:16,
43:3, 68:20, 80:24,
90:16
**meeting** [7] - 19:22,
19:23, 19:24, 20:3,
20:5, 20:9, 20:16
**meets** [1] - 18:15
**members** [4] - 15:21,
17:7, 26:21, 84:22
**Memorial** [7] - 61:14,
74:12, 74:14, 76:5,
79:4, 79:5, 107:13
**mental** [1] - 52:20
**mentioned** [10] - 67:3,
69:16, 75:24, 78:9,
82:4, 85:6, 87:14,
99:7, 110:10
**mentions** [1] - 82:11
**met** [8] - 19:21, 68:15,

69:15, 88:6, 88:9,
88:11, 94:19, 95:5
**Metals** [1] - 42:11
**MIAMI** [1] - 1:2
**Miami** [18] - 1:4, 1:16,
1:18, 1:24, 1:25, 5:6,
5:24, 15:4, 15:23,
16:3, 18:25, 22:17,
23:6, 24:11, 42:9,
79:10, 112:9, 112:9
**Miami-Dade** [2] - 5:6,
5:24
**Micheli** [7] - 98:6,
98:8, 98:12, 99:18,
100:17, 100:24,
101:5
**might** [4] - 10:7,
35:12, 35:16, 111:13
**migrated** [1] - 102:14
**Miguel** [2] - 17:16,
62:14
**MIGUEL** [1] - 1:7
**Miguelito** [2] - 66:4,
70:15
**million** [1] - 42:11
**mind** [5] - 8:5, 8:12,
37:15, 66:20, 110:13
**mindful** [1] - 110:9
**mine** [5] - 65:21,
69:10, 73:13, 77:14,
83:25
**mini** [1] - 29:24
**minority** [1] - 12:18
**minutes** [8] - 36:1,
36:2, 36:3, 38:10,
82:11, 109:6,
109:13, 109:19
**Miramar** [26] - 64:18,
84:23, 85:18, 87:23,
88:4, 88:5, 88:19,
89:2, 89:5, 90:1,
90:8, 90:11, 90:17,
90:23, 91:4, 91:13,
93:8, 93:14, 95:6,
95:11, 103:7,
103:12, 103:13,
103:15, 103:17
**Miranda** [13] - 52:9,
52:14, 52:25, 53:4,
53:6, 53:13, 54:2,
54:14, 55:21, 56:1,
56:21, 56:24, 86:12
**misconduct** [2] -
54:12, 86:15
**mistake** [1] - 66:14
**mitigate** [1] - 59:1
**Mobile** [1] - 37:6
**model** [1] - 10:6
**Model** [1] - 13:12
**moment** [6] - 24:16,

46:11, 67:15, 86:6,
105:25
**money** [10] - 28:11,
28:13, 28:15, 77:2,
77:6, 82:17, 82:19,
104:22, 105:7,
105:13
**MORALES** [6] - 1:7,
2:14, 51:25, 62:15,
110:15, 111:5
**Morales** [4] - 4:2,
17:16, 31:15, 45:13,
48:13, 48:14, 51:14,
51:20, 52:5, 52:8,
53:16, 54:21, 60:4,
60:6, 61:15, 62:7,
62:14, 62:19, 63:10,
64:6, 64:14, 67:2,
68:12, 82:17, 84:16,
84:20, 84:22, 87:21,
89:1, 89:25, 91:18,
92:20, 96:1, 96:4,
99:12, 102:8,
102:18, 103:7,
103:16, 103:19,
103:25, 109:20
**morning** [8] - 4:5,
4:11, 15:19, 15:20,
30:14, 30:15, 40:1,
105:19
**most** [11] - 12:6,
12:15, 43:2, 44:8,
45:10, 48:1, 50:15,
50:24, 51:4, 108:18
**mostly** [1] - 16:17
**motion** [5] - 49:1,
49:9, 49:22, 50:16,
51:5
**motions** [3] - 36:12,
38:18, 51:7
**move** [15] - 24:14,
26:6, 36:10, 36:17,
36:25, 39:1, 43:7,
44:10, 49:10, 49:19,
61:23, 63:18, 63:19,
71:21, 108:14
**moved** [2] - 52:18,
54:7
**moves** [4] - 49:25,
50:18, 60:24, 75:9
**moving** [2] - 36:18,
38:19
**MR** [181] - 4:6, 7:9,
14:23, 15:3, 15:18,
17:11, 17:21, 17:22,
18:2, 22:6, 22:9,
24:14, 24:16, 24:18,
24:21, 25:19, 25:21,
30:11, 30:13, 32:6,
32:8, 33:11, 33:13,

33:18, 33:20, 33:24, 34:3, 34:8, 34:11, 34:15, 34:18, 34:22, 34:24, 35:3, 35:5, 35:18, 36:2, 36:9, 36:16, 36:20, 36:22, 37:3, 37:22, 37:25, 38:19, 39:10, 39:17, 39:21, 39:24, 40:4, 40:12, 40:25, 41:8, 41:12, 41:18, 42:5, 42:16, 42:19, 43:7, 43:21, 44:10, 45:3, 45:6, 45:12, 46:7, 46:9, 46:14, 47:1, 47:10, 47:15, 48:5, 49:10, 49:23, 50:5, 50:9, 50:17, 51:9, 52:3, 52:24, 53:22, 54:10, 55:5, 55:8, 55:10, 56:18, 57:4, 57:8, 57:14, 58:6, 58:12, 58:17, 58:21, 59:4, 59:18, 59:21, 60:1, 60:8, 60:11, 60:23, 61:3, 61:6, 61:11, 61:13, 61:18, 61:21, 62:1, 62:18, 63:5, 63:7, 63:13, 63:15, 66:22, 67:1, 67:12, 68:6, 68:10, 68:11, 69:23, 71:16, 71:21, 71:22, 71:24, 72:2, 72:17, 72:19, 73:4, 73:5, 73:14, 75:9, 75:11, 75:14, 75:16, 78:14, 78:16, 78:17, 80:10, 80:13, 80:16, 83:12, 83:16, 84:16, 84:19, 85:11, 86:5, 86:9, 87:6, 87:13, 87:20, 88:10, 88:22, 88:25, 89:4, 89:14, 89:21, 89:24, 90:4, 90:7, 90:19, 90:21, 92:13, 93:7, 101:1, 101:4, 106:11, 106:18, 106:22, 107:1, 107:6, 107:12, 107:19, 107:24, 108:2, 108:7, 108:11, 108:15, 108:21, 108:23, 109:11, 109:15, 111:10, 111:20
**MS** [12] - 4:12, 4:24, 7:6, 7:15, 13:3, 13:9, 13:14, 14:21, 14:25, 87:17, 108:1, 108:18
**multiple** [2] - 48:16,

48:18
**music** [2] - 80:21, 81:25
**must** [2] - 72:22, 83:2

**N**

**N-U-N-E-Z** [1] - 15:14
**name** [18] - 4:19, 4:20, 4:21, 15:11, 15:13, 44:15, 46:10, 62:13, 67:4, 69:4, 72:22, 77:15, 78:9, 79:22, 79:23, 81:3, 88:20, 105:11
**names** [1] - 68:14
**narcotics** [6] - 16:5, 16:6, 16:8, 16:11, 17:2, 27:15
**narrative** [2] - 66:23, 66:25
**narrow** [1] - 41:5
**nasty** [1] - 109:23
**nature** [4] - 9:12, 14:10, 78:7, 106:1
**necessarily** [1] - 44:4
**necessary** [2] - 8:16, 54:12
**neck** [8] - 74:5, 75:24, 101:25, 102:14, 102:15, 102:17, 107:3, 107:17
**need** [8] - 64:1, 78:6, 98:23, 106:23, 109:4, 109:10, 110:13, 110:23
**needed** [3] - 70:8, 93:1, 93:20
**needs** [7] - 13:9, 41:21, 47:3, 53:3, 80:11, 80:14, 80:18
**negotiating** [1] - 31:16
**neighbor** [1] - 69:10
**neighborhood** [1] - 68:19
**nervous** [1] - 98:8
**neurologist** [1] - 102:21
**neurologists** [1] - 103:5
**neurosurgeon** [1] - 102:21
**never** [27] - 65:18, 66:15, 66:16, 66:17, 71:10, 72:13, 81:13, 82:7, 82:22, 82:25, 84:7, 85:6, 85:13, 87:13, 87:14, 87:21, 92:3, 92:4, 93:11, 94:4, 94:14, 102:19

**nevertheless** [1] - 50:13
**new** [1] - 79:11
**next** [13] - 20:17, 20:19, 20:20, 21:2, 22:3, 22:4, 30:5, 30:8, 50:17, 77:5, 95:17, 95:21, 95:23
**nexus** [2] - 39:6
**night** [3] - 52:11, 73:15, 73:17
**nine** [1] - 105:19
**NO** [1] - 1:2
**nobody** [2] - 100:19
**none** [6] - 31:17, 31:20, 31:23, 32:1, 32:3, 32:5
**nonresponsive** [1] - 67:12
**normally** [5] - 16:21, 18:12, 19:7, 23:16, 25:9
**North** [9] - 1:24, 15:4, 15:23, 16:2, 18:25, 22:16, 23:6, 24:11, 112:9
**Northeast** [1] - 1:17
**nothing** [8] - 45:17, 83:5, 84:5, 84:14, 87:7, 98:16, 108:12, 111:20
**notice** [3] - 47:18, 53:23, 55:11
**notoriously** [1] - 11:9
**nowhere** [1] - 23:22
**number** [24] - 7:23, 8:23, 9:23, 10:7, 10:10, 19:2, 21:13, 23:2, 23:4, 26:3, 31:11, 36:5, 43:13, 43:14, 68:4, 72:22, 75:22, 75:23, 77:24, 83:19, 96:3, 96:17, 96:24, 106:18
**number's** [1] - 36:4
**numbers** [4] - 19:4, 35:8, 35:14, 36:3
**numerous** [2] - 35:14, 37:19
**Nunez** [7] - 15:3, 15:13, 15:14, 15:19, 15:21, 27:8, 30:14
**NUNEZ** [2] - 2:8, 15:15
**nurse** [1] - 79:7
**nursing** [1] - 89:17

**O**

**object** [4] - 29:12, 29:13, 39:1, 101:1

**Objection** [1] - 71:16
**objection** [38] - 7:9, 17:21, 22:6, 24:18, 25:19, 33:11, 34:21, 34:23, 35:2, 35:19, 35:22, 43:12, 52:3, 58:19, 60:2, 61:5, 61:7, 63:5, 63:13, 66:22, 66:24, 67:12, 68:6, 69:23, 71:20, 71:25, 72:17, 75:11, 80:10, 80:13, 86:5, 86:11, 87:1, 88:22, 90:4, 90:19, 92:13
**objective** [2] - 43:9, 46:21
**obstructing** [2] - 102:25, 103:3
**obtain** [1] - 105:13
**obtained** [4] - 30:22, 52:13, 53:7, 53:14
**obviously** [5] - 20:1, 22:1, 22:24, 29:9, 43:12
**occasion** [1] - 82:13
**occurred** [5] - 19:25, 27:20, 29:16, 40:3, 45:13
**Ochill** [10] - 68:3, 68:4, 68:7, 68:20, 68:22, 83:10, 83:17, 83:23, 84:5, 84:13
**October** [2] - 76:3, 76:25
**odd** [1] - 46:10
**OF** [2] - 1:1, 1:4
**offense** [1] - 51:2
**offer** [1] - 105:7
**offered** [5] - 17:22, 84:1, 103:5, 104:19, 104:24
**Office** [4] - 1:16, 5:1, 5:2, 5:5
**OFFICER** [6] - 4:4, 4:8, 38:15, 60:12, 105:23, 111:22
**officer** [3] - 16:17, 37:11, 55:25
**officers** [4] - 23:22, 25:17, 25:22, 26:23
**Official** [1] - 1:23
**old** [3] - 62:19, 63:4, 63:8
**once** [8] - 22:5, 23:2, 39:7, 50:23, 70:25, 82:9, 82:14, 90:10
**one** [37] - 23:12, 23:20, 26:3, 29:6, 31:8, 35:17, 37:19, 39:20, 43:13, 44:24,

45:16, 46:3, 47:1, 56:21, 60:20, 63:9, 67:15, 74:6, 77:23, 77:25, 82:2, 82:5, 84:6, 88:8, 89:17, 90:12, 102:11, 102:16, 104:10, 104:11, 104:19, 105:6, 105:17
**one's** [1] - 100:23
**ones** [2] - 77:21, 79:19
**ongoing** [1] - 47:5
**Opa** [4] - 39:22, 40:2, 42:10, 42:11
**Opelette** [1] - 105:10
**open** [9] - 29:4, 29:14, 36:14, 65:11, 66:1, 70:17, 87:19, 89:22, 108:24
**opened** [7] - 65:25, 70:19, 70:24, 70:25, 94:3, 100:18, 100:20
**operability** [1] - 6:13
**operated** [1] - 102:19
**operating** [1] - 5:20
**operation** [3] - 19:14, 23:5, 23:8
**operations** [1] - 27:15
**opinion** [5] - 7:13, 39:8, 43:10, 43:18, 49:13
**opinions** [1] - 7:12
**opioid** [1] - 55:14
**opportunity** [2] - 21:15, 78:1
**opposed** [1] - 14:11
**Oracle** [1] - 105:10
**oral** [1] - 6:7
**order** [9] - 4:1, 38:22, 53:24, 56:13, 56:17, 56:18, 56:19, 65:10, 91:11
**order's** [1] - 57:25
**ordinary** [1] - 10:8
**organize** [1] - 76:22
**Osvaldo** [8] - 17:15, 44:16, 44:22, 45:14, 45:18, 48:15, 77:11, 78:24
**otherwise** [4] - 8:20, 35:25, 50:6, 110:7
**outside** [14] - 6:4, 40:23, 40:24, 41:2, 41:3, 41:7, 41:14, 41:16, 45:23, 65:13, 81:10, 100:2, 109:13
**overarching** [1] - 47:3
**overbroad** [1] - 47:21
**overhead** [1] - 8:5
**overnight** [1] - 40:1

**overruled** [8] - 63:6, 63:14, 69:25, 80:15, 90:5, 90:20, 92:15, 101:2
**overruling** [1] - 66:24
**oversee** [1] - 19:14
**own** [4] - 74:11, 82:10, 100:23, 104:19

## P

**P.A** [1] - 1:19
**p.m** [6] - 1:8, 81:24, 105:18, 105:24, 109:8, 111:23
**packaging** [1] - 8:3
**Padrino** [1] - 26:16
**padrino** [6] - 32:13, 32:15, 32:24, 33:2, 33:5, 33:15
**PAGE** [1] - 2:2
**page** [7] - 32:22, 33:1, 61:18, 61:20, 61:21, 61:24, 62:4
**pages** [2] - 36:4, 62:3
**PAGES** [1] - 1:11
**paid** [3] - 83:19, 98:12, 104:22
**pain** [7] - 70:13, 90:14, 102:23, 102:24, 103:4, 103:6
**Panama** [1] - 41:22
**papers** [1] - 100:5
**paperwork** [1] - 33:8
**pareito** [2] - 81:2, 81:3
**Parias** [1] - 41:24
**PARIAS** [1] - 41:25
**parieto** [2] - 81:8
**park** [1] - 23:17
**parked** [4] - 24:2, 26:25, 27:2, 98:22
**parking** [10] - 18:25, 19:7, 19:8, 21:22, 22:16, 23:6, 23:12, 23:23, 26:4, 26:8
**part** [2] - 21:14, 76:8
**participate** [7] - 16:7, 17:14, 17:18, 19:23, 76:6, 76:10, 76:20
**participated** [2] - 27:9, 104:13
**participates** [1] - 77:24
**participating** [1] - 47:2
**particles** [1] - 103:3
**particular** [9] - 5:13, 11:3, 11:14, 12:1, 14:13, 20:19, 23:11, 43:5, 47:22

**particulars** [3] - 47:17, 49:3, 49:4
**parts** [1] - 63:18
**pass** [2] - 64:4, 103:1
**past** [2] - 64:15, 83:24
**pathway** [1] - 71:4
**patrol** [1] - 16:4
**Patty** [1] - 79:7
**pause** [2] - 24:17, 61:17
**pay** [3] - 77:8, 83:22, 84:3
**paying** [1] - 80:22
**payment** [1] - 104:17
**peaceful** [2] - 97:25, 98:3
**peacefully** [6] - 96:23, 97:2, 97:8, 97:18, 97:19, 97:21
**pedestrians** [1] - 23:14
**people** [20] - 16:25, 26:10, 48:24, 77:20, 79:21, 80:19, 81:17, 81:22, 84:23, 91:1, 99:10, 99:22, 100:5, 101:14, 104:17, 104:22, 109:23, 110:9
**people's** [1] - 83:8
**percent** [2] - 5:21, 11:7
**perfectly** [2] - 51:25, 52:2
**perform** [1] - 5:20
**perhaps** [6] - 46:15, 51:9, 59:1, 66:9, 66:11, 89:6
**period** [2] - 47:23, 48:24
**permanent** [1] - 79:5
**permanently** [2] - 14:24, 33:19
**permission** [4] - 61:11, 67:6, 69:19, 73:8
**person** [20] - 16:15, 26:24, 29:8, 29:13, 65:6, 66:9, 67:23, 70:2, 71:6, 71:12, 77:21, 78:1, 80:18, 80:25, 81:17, 83:7, 88:3, 101:9, 108:6, 108:10
**person's** [1] - 29:6
**personal** [1] - 43:16
**personnel** [3] - 25:15, 25:16, 106:17
**persons** [2] - 46:12, 51:18

**perspective** [1] - 46:15
**persuasive** [1] - 44:5
**Peru** [1] - 65:21
**Perucho** [3] - 65:21, 97:22, 98:3
**phone** [23] - 18:15, 19:22, 21:7, 21:8, 21:18, 21:22, 21:24, 22:2, 30:25, 32:16, 37:3, 37:13, 65:19, 65:21, 65:22, 68:4, 83:19, 83:22, 84:4, 91:10, 95:15, 97:19, 97:23
**phonetic** [2] - 81:2, 81:8
**photograph** [7] - 70:22, 74:24, 75:4, 75:6, 75:17, 78:18, 78:20
**photographs** [7] - 73:19, 74:23, 75:1, 75:2, 75:15, 75:20
**physical** [2] - 20:3, 97:6
**physically** [3] - 19:24, 20:1, 25:22
**pick** [2] - 23:16, 24:22
**picked** [2] - 23:11, 101:9
**picture** [7] - 30:2, 30:6, 30:10, 70:18, 78:21, 107:20, 108:11
**pictures** [2] - 65:15, 95:25
**piece** [1] - 108:14
**pills** [1] - 103:6
**place** [11] - 18:24, 20:19, 22:16, 23:11, 35:15, 41:16, 43:14, 100:3, 100:12, 102:25, 103:4
**placed** [8] - 7:24, 26:5, 28:6, 29:21, 34:18, 69:20, 79:13, 107:20
**placement** [1] - 106:18
**places** [5] - 16:21, 16:25, 23:11, 23:16, 74:3
**plain** [4] - 12:10, 39:4, 40:8, 42:8
**plan** [8] - 34:9, 60:1, 70:5, 98:18, 99:14, 100:12, 101:5, 108:17
**planned** [5] - 66:17, 66:18, 92:6, 100:13,

100:17
**planning** [3] - 76:6, 76:20, 104:14
**plans** [1] - 22:3
**plastic** [2] - 13:4, 13:5
**playing** [1] - 108:19
**point** [22] - 8:24, 18:1, 33:15, 35:12, 40:21, 40:23, 40:24, 40:25, 41:2, 41:10, 41:20, 42:13, 48:10, 51:8, 55:3, 55:12, 56:21, 101:21, 103:20, 105:18, 107:18, 110:23
**pointed** [4] - 47:16, 65:16, 71:9, 71:17
**pointing** [3] - 96:4, 102:3, 102:4
**points** [1] - 41:15
**Police** [5] - 5:6, 5:24, 15:4, 15:23, 88:4, 91:4
**police** [6] - 54:5, 54:13, 83:3, 86:15, 86:18, 90:9
**Polygonal** [2] - 11:18, 11:22
**polygonal** [11] - 9:12, 11:9, 11:17, 11:19, 12:3, 12:4, 12:5, 12:8, 12:17, 12:20, 14:11
**pops** [1] - 8:7
**portion** [3] - 6:25, 32:21, 33:4
**position** [14] - 5:8, 5:23, 23:25, 25:22, 26:3, 34:6, 39:8, 46:25, 48:21, 53:25, 56:23, 59:2, 60:6, 60:10
**possess** [4] - 44:11, 45:8, 50:20, 73:17
**possessed** [1] - 50:2
**possession** [4] - 39:15, 40:20, 40:22, 47:13
**possible** [5] - 8:6, 95:9, 96:20, 103:4, 110:22
**possibly** [1] - 100:22
**post** [2] - 52:9, 86:12
**post-Miranda** [2] - 52:9, 86:12
**potential** [5] - 9:3, 9:5, 25:18, 25:19, 26:5
**potentially** [2] - 12:4, 26:11
**powerpoint** [1] - 34:19

**Powers** [1] - 112:7
**POWERS** [2] - 1:23, 112:8
**practical** [1] - 6:2
**practice** [2] - 60:6, 77:13
**practices** [1] - 69:13
**pre** [2] - 43:11, 49:2
**pre-trial** [2] - 43:11, 49:2
**precedence** [2] - 44:1, 49:13
**precisely** [1] - 102:4
**predetermined** [1] - 19:21
**predicate** [1] - 54:11
**prepare** [1] - 20:4
**prepared** [1] - 106:24
**preparing** [1] - 59:5
**presence** [2] - 32:24, 71:14
**present** [14] - 7:25, 8:24, 10:13, 11:15, 19:24, 20:1, 28:15, 30:3, 36:25, 40:16, 60:18, 66:11, 67:7, 84:13
**presentation** [2] - 48:5, 60:22
**presented** [6] - 37:10, 37:21, 38:5, 39:18, 40:5, 76:2
**preserve** [1] - 43:11
**preserving** [1] - 43:19
**pretty** [3] - 43:2, 44:7, 86:14
**previous** [1] - 88:9
**previously** [6] - 7:11, 34:3, 36:18, 49:20, 56:3, 70:20
**price** [1] - 31:16
**prices** [1] - 81:22
**priest** [2] - 77:15, 105:9
**priests** [1] - 77:14
**prison** [2] - 69:7
**private** [1] - 104:12
**problem** [1] - 80:1
**problems** [2] - 84:6, 84:8
**Procedure** [1] - 43:4
**procedures** [1] - 5:20
**proceed** [3] - 4:5, 7:14, 59:9
**proceeding** [1] - 43:1
**proceedings** [7] - 24:17, 36:14, 61:17, 89:22, 108:24, 111:23, 112:4
**proceeds** [2] - 48:8,

48:12
**process** [1] - 58:9
**produce** [1] - 59:7
**product** [3] - 54:5, 54:6, 54:10
**program** [1] - 5:25
**programmed** [1] - 99:19
**progressed** [1] - 27:20
**progressive** [1] - 99:20
**project** [1] - 8:10
**Project** [1] - 79:11
**projectile** [29] - 6:16, 6:24, 6:25, 8:2, 8:4, 8:9, 8:14, 8:15, 8:18, 8:21, 9:4, 9:5, 9:8, 9:9, 9:11, 9:17, 10:24, 11:1, 11:2, 11:4, 11:7, 12:13, 13:25, 14:3, 14:13, 14:14, 14:19
**projectiles** [3] - 5:16, 6:22, 10:4
**prompted** [1] - 53:24
**proof** [1] - 98:13
**proper** [1] - 110:7
**property** [4] - 24:11, 91:23, 91:24, 91:25
**proposed** [2] - 43:25, 44:4
**prosecution** [3] - 20:13, 47:6, 50:12
**Prosecutions** [1] - 1:16
**prosecutor** [1] - 67:7
**protect** [2] - 86:16, 100:23
**prove** [2] - 46:1, 110:7
**proved** [4] - 44:25, 45:9, 45:23, 46:17
**proven** [2] - 46:20, 46:24
**provided** [2] - 34:3, 59:12
**provides** [1] - 55:1
**psychoactive** [1] - 53:12
**public** [2] - 23:10, 23:16
**publish** [4] - 37:23, 60:3, 61:11, 62:4
**publishing** [2] - 61:13, 61:23
**pull** [5] - 36:3, 92:21, 93:11, 101:19, 101:20
**pull-over** [2] - 101:19, 101:20
**pulling** [1] - 94:15

**purchase** [5] - 24:25, 28:11, 48:11, 82:21, 82:24
**purchasing** [1] - 26:15
**purpose** [3] - 52:14, 99:6, 100:1
**purposes** [3] - 52:15, 54:4, 87:9
**pushing** [1] - 70:13
**put** [9] - 8:9, 10:2, 32:19, 63:25, 82:8, 82:12, 99:22, 102:22
**putting** [1] - 52:11

## Q

**quadriplegic** [2] - 63:16, 75:25
**qualified** [1] - 35:20
**quantity** [2] - 31:21, 49:17
**questions** [16] - 14:21, 14:23, 32:6, 33:18, 68:13, 73:1, 74:25, 84:17, 86:11, 86:14, 86:19, 87:2, 88:24, 89:18, 103:17, 103:19
**quick** [2] - 94:19, 95:12
**quite** [5] - 32:14, 79:25, 91:7, 91:15, 99:16

## R

**raid** [1] - 25:25
**raise** [4] - 4:14, 15:5, 33:25, 62:8
**ramp** [1] - 80:2
**ranker** [1] - 66:9
**Raonel** [6] - 69:14, 85:4, 85:6, 85:7, 85:8, 85:12
**rapidly** [1] - 51:11
**rather** [2] - 9:8, 14:14
**rationale** [2] - 35:18, 106:7
**reaches** [1] - 77:24
**read** [12] - 40:14, 41:1, 41:5, 41:8, 42:4, 53:3, 56:12, 56:23, 61:16, 61:19, 61:20
**reading** [4] - 40:15, 41:4, 41:5, 41:7
**reads** [1] - 40:18
**ready** [3] - 4:5, 4:11, 20:22
**real** [6] - 24:7, 25:4, 28:21, 94:19, 95:12,

104:25
**realized** [1] - 98:17
**really** [3] - 19:9, 23:22, 42:2
**realtime** [1] - 19:13
**reason** [5] - 29:5, 35:8, 69:16, 84:10, 84:13
**reasonable** [1] - 51:1
**reasons** [5] - 23:12, 23:20, 29:5, 42:25, 53:18
**rebuts** [1] - 107:18
**rebuttal** [4] - 106:12, 107:7, 107:16, 108:17
**receive** [5] - 8:15, 36:7, 37:7, 77:6, 105:5
**received** [14] - 5:22, 24:19, 24:20, 27:12, 37:9, 61:8, 61:9, 70:11, 75:12, 75:13, 104:17, 105:5, 109:22, 110:1
**RECEIVED** [1] - 3:2
**receiving** [2] - 17:24, 29:6
**recently** [1] - 102:23
**recess** [3] - 38:14, 60:13, 111:21
**recitation** [1] - 39:18
**recognize** [10] - 7:20, 7:22, 9:20, 9:22, 18:21, 21:4, 22:19, 24:4, 28:18, 75:2
**recollection** [1] - 56:16
**recommendations** [1] - 51:23
**record** [17] - 4:19, 15:12, 19:3, 20:7, 23:3, 43:9, 43:17, 43:19, 45:20, 50:6, 58:19, 60:2, 60:3, 62:13, 75:1, 75:22, 107:8
**record's** [3] - 53:5, 53:8, 57:16
**recorded** [18] - 18:15, 19:22, 21:7, 21:8, 22:1, 27:16, 31:4, 31:16, 31:18, 31:21, 31:24, 32:2, 32:4, 55:2, 57:5, 57:6, 57:8, 87:7
**recording** [13] - 18:17, 19:14, 19:15, 19:19, 20:7, 22:10, 22:12, 27:25, 33:14, 54:25,

58:23, 81:1, 83:2
**recordings** [9] - 19:6, 20:10, 21:15, 30:22, 31:1, 31:8, 31:15, 32:10, 108:21
**records** [8] - 33:8, 37:4, 37:13, 37:19, 42:19, 85:15, 107:13
**recover** [1] - 33:8
**red** [1] - 8:10
**Redirect** [2] - 2:9, 2:16
**REDIRECT** [1] - 32:7
**referring** [3] - 70:22, 99:18, 111:12
**refinery** [1] - 39:22
**reflected** [2] - 44:3, 97:22
**reflection** [1] - 71:1
**reflects** [1] - 44:1
**regard** [22] - 18:9, 21:25, 38:25, 39:3, 44:22, 45:7, 49:23, 50:18, 53:12, 56:9, 57:16, 57:23, 58:21, 68:20, 76:3, 77:8, 82:23, 83:10, 83:17, 86:11, 106:16
**regarding** [2] - 104:17, 106:17
**regards** [5] - 7:19, 11:2, 12:23, 46:23, 70:23
**relate** [1] - 48:17
**related** [1] - 5:15
**relates** [3] - 45:12, 55:4, 57:11
**relation** [2] - 21:19, 27:14
**relationship** [2] - 47:5, 84:10
**relative** [2] - 26:23, 48:9
**released** [1] - 69:7
**relevance** [4] - 63:5, 63:13, 80:10, 80:13
**relief** [2] - 43:6, 44:8
**relies** [2] - 43:24, 106:3
**religion** [2] - 77:13, 77:16
**religious** [5] - 67:22, 69:13, 77:22, 78:4, 78:7
**rely** [3] - 7:13, 37:16, 49:12
**remember** [10] - 90:2, 90:10, 90:13, 90:14, 90:18, 91:17, 92:19, 101:15, 105:18, 107:2

**remembered** [1] - 85:18
**removed** [2] - 74:20, 75:18
**rendered** [2] - 58:9, 75:25
**repeat** [10] - 61:3, 77:13, 80:6, 85:9, 88:16, 92:16, 93:6, 93:20, 101:3, 104:24
**rephrase** [2] - 22:7, 25:20
**report** [1] - 110:1
**REPORTED** [1] - 1:23
**Reporter** [1] - 1:23
**reports** [4] - 109:22, 110:24, 111:14
**representatives** [2] - 109:6, 109:18
**represented** [1] - 92:11
**Republic** [1] - 42:11
**request** [2] - 36:8, 51:19
**required** [1] - 37:15
**research** [1] - 52:11
**residence** [3] - 39:15, 39:25, 96:25
**resolve** [1] - 58:5
**respect** [1] - 58:17
**respectfully** [1] - 58:6
**respond** [3] - 72:25, 73:2, 73:11
**response** [1] - 56:19
**responsive** [1] - 67:16
**rest** [4] - 33:25, 36:10, 63:20, 67:16
**resting** [1] - 38:4
**RESTS** [1] - 2:11
**rests** [1] - 38:1
**resulting** [1] - 21:15
**resume** [1] - 59:23
**resurrected** [1] - 58:25
**rethink** [1] - 57:19
**retrieve** [1] - 75:14
**review** [10] - 20:9, 20:13, 21:15, 22:10, 22:12, 27:18, 32:10, 32:21, 33:1, 33:4
**reviewed** [3] - 22:24, 33:14, 86:13
**rifling** [23] - 8:24, 9:10, 9:11, 9:14, 9:15, 10:11, 11:9, 11:11, 11:17, 11:18, 11:19, 11:22, 12:3, 12:4, 12:5, 12:8, 12:15, 12:17, 12:20, 14:6, 14:7

**right-hand** [1] - 9:13
**rights** [1] - 55:16
**rise** [5] - 4:4, 38:15, 60:12, 105:23, 111:22
**road** [1] - 16:4
**rob** [6] - 43:22, 44:2, 68:2, 93:23, 103:12, 103:15
**robbed** [1] - 42:11
**robbery** [53] - 25:18, 25:24, 38:24, 39:1, 39:2, 40:3, 40:6, 48:8, 48:17, 48:20, 49:11, 69:17, 76:3, 76:6, 76:8, 76:15, 76:18, 76:20, 76:22, 76:24, 77:3, 77:6, 77:9, 84:23, 87:14, 87:23, 88:5, 88:20, 89:5, 90:1, 90:9, 90:11, 90:16, 90:23, 91:13, 92:5, 92:12, 92:18, 92:22, 94:20, 95:6, 95:11, 97:13, 103:7, 103:9, 103:11, 103:13, 104:1, 104:4, 104:8, 104:10, 104:14
**room** [2] - 24:11, 86:19
**Room** [1] - 1:17
**route** [1] - 39:22
**RPR** [1] - 112:8
**ruckus** [1] - 98:4
**rude** [1] - 109:23
**Ruiz** [13] - 44:16, 44:22, 45:14, 45:18, 77:11, 78:24, 79:2, 82:4, 82:5, 82:7, 82:19, 82:21, 83:1
**Rule** [4] - 38:21, 43:3, 49:1, 51:9
**ruled** [1] - 106:1
**rules** [1] - 86:22
**Rules** [1] - 43:4
**ruling** [2] - 52:22, 56:12
**run** [1] - 60:6

# S

**safeties** [1] - 10:12
**safety** [1] - 13:7
**saint** [1] - 68:1
**sanctions** [2] - 110:5, 110:22
**sanitize** [1] - 8:16
**sat** [4] - 65:10, 71:5, 81:10, 97:17

**saves** [1] - 43:8
**saw** [5] - 65:18, 66:5, 72:15, 85:13, 98:12
**scapula** [1] - 74:21, 75:6, 75:7, 102:3
**scared** [2] - 82:1, 103:11
**scares** [1] - 98:6
**scaring** [1] - 92:1
**scenario** [2] - 55:4, 57:11
**scene** [10] - 25:15, 91:22, 92:21, 93:5, 93:8, 93:19, 95:11, 95:13, 95:15, 95:20
**scenes** [1] - 35:7
**schedule** [1] - 106:10
**Scheduled** [1] - 1:7
**scissors** [1] - 13:9
**scope** [1] - 33:11
**Scott** [1] - 37:5
**screen** [6] - 19:3, 21:12, 32:19, 61:15, 96:15
**screens** [2] - 8:11, 8:12
**seated** [7] - 4:10, 4:18, 15:9, 38:17, 79:15, 79:18, 105:25
**seats** [1] - 80:20
**second** [5] - 27:4, 35:19, 39:1, 61:24, 78:2
**secondarily** [1] - 53:10
**secondary** [2] - 35:22, 52:3
**secretly** [1] - 47:2
**Section** [1] - 1:16
**secure** [1] - 24:12
**SECURITY** [6] - 4:4, 4:8, 38:15, 60:12, 105:23, 111:22
**sedative** [1] - 55:17
**see** [55] - 8:8, 8:13, 10:4, 10:7, 10:18, 13:7, 16:25, 19:10, 20:21, 26:18, 27:1, 29:9, 29:20, 34:7, 35:8, 37:1, 40:14, 44:15, 46:16, 55:5, 59:16, 65:2, 65:6, 65:22, 65:25, 66:1, 67:16, 69:19, 70:2, 70:3, 70:9, 70:16, 70:19, 70:24, 71:1, 71:3, 71:5, 71:13, 71:14, 73:11, 78:7, 79:10, 79:13, 80:21, 81:25, 85:7, 85:14,

94:23, 94:24, 95:25, 100:5, 101:14, 104:16, 104:21, 109:3
**seeing** [1] - 19:12
**seek** [1] - 54:22
**seem** [1] - 47:22
**sees** [1] - 77:22
**selected** [1] - 23:8
**sell** [4] - 43:16, 65:7, 70:3, 72:4
**selling** [1] - 70:1
**semi** [1] - 11:22
**semi-circle** [1] - 11:22
**semiautomatic** [1] - 12:25
**sent** [2] - 94:5, 100:9
**sentenced** [1] - 83:7
**separate** [1] - 54:15
**separating** [1] - 23:14
**September** [4] - 46:4, 64:19, 64:23, 103:14
**serial** [1] - 10:6
**serious** [2] - 71:12, 110:4
**serve** [1] - 64:10
**service** [2] - 16:11, 17:4
**set** [10] - 18:7, 19:22, 22:14, 25:13, 25:14, 25:16, 58:16, 66:8, 74:23, 75:1
**set-up** [1] - 25:13
**setting** [1] - 49:2
**seven** [2] - 31:8, 74:2
**several** [4] - 6:6, 57:2, 62:2, 86:19
**shadows** [1] - 65:16
**sham** [1] - 25:1
**shaped** [2] - 11:22, 88:4
**sharp** [5] - 11:20, 29:12, 29:13, 79:6, 79:15
**Sheriff's** [3] - 5:1, 5:2, 5:4
**shirt** [5] - 26:25, 96:19, 101:25, 107:4, 107:23
**shoes** [2] - 96:11
**shoot** [6] - 94:4, 98:7, 100:18, 100:21, 100:22, 101:9
**shooting** [5] - 66:6, 66:7, 89:2, 96:5, 106:19
**short** [3] - 38:12, 56:13, 83:14
**shot** [17] - 66:2, 66:9, 71:2, 74:1, 74:3,

100:10, 100:16, 101:22, 102:8, 107:3, 107:4, 107:17, 108:1, 108:2, 108:6, 108:7
**shoulder** [1] - 108:11
**show** [23] - 18:20, 21:11, 24:3, 26:17, 27:4, 28:9, 29:25, 30:5, 30:8, 36:4, 42:20, 43:13, 70:18, 72:11, 74:23, 74:25, 75:15, 78:18, 82:16, 96:1, 101:17, 101:20, 107:8
**showed** [1] - 42:14
**showing** [7] - 21:3, 22:18, 28:17, 70:20, 85:15, 96:24, 108:11
**shown** [6] - 39:7, 65:8, 65:15, 72:20, 81:7, 97:24
**shows** [2] - 65:15, 107:20
**shut** [2] - 98:14, 99:6
**shutdown** [1] - 41:4
**shutting** [1] - 100:1
**side** [14] - 9:13, 19:4, 21:11, 23:3, 35:22, 65:25, 66:1, 70:16, 74:6, 75:8, 81:10, 96:14, 96:15, 102:3
**sidebar** [6] - 33:25, 86:5, 89:9, 106:1, 106:7, 107:9
**Sidebar** [8] - 34:2, 36:14, 86:8, 87:18, 89:10, 89:22, 107:10, 108:24
**sidewalk** [1] - 81:11
**sight** [1] - 20:2
**sign** [1] - 81:2
**signs** [1] - 33:5
**similar** [2] - 10:4, 49:18
**simplest** [1] - 6:10
**simply** [3] - 56:18, 75:20, 106:7
**site** [1] - 23:8
**sitting** [8] - 65:19, 65:24, 70:12, 71:3, 96:23, 97:2, 97:19, 97:23
**situation** [3] - 83:24, 104:12, 105:7
**six** [4] - 9:11, 14:8, 74:2, 84:3
**size** [1] - 25:10
**sledgehammer** [1] - 108:14

**Smith** [2] - 10:21, 12:6
**smoke** [4] - 81:9, 81:11, 81:15, 81:16
**smoked** [2] - 81:13
**smoking** [1] - 81:14
**so..** [1] - 108:10
**socializing** [1] - 84:11
**solemnly** [3] - 4:15, 15:6, 62:9
**someone** [4] - 57:12, 80:24, 100:9, 100:13
**sometimes** [1] - 16:16
**somewhat** [2] - 48:2, 69:9
**somewhere** [1] - 83:2
**soon** [1] - 67:18
**sorry** [6] - 22:8, 61:2, 78:14, 80:12, 91:8, 93:6
**sort** [3] - 5:22, 37:18, 106:9
**sought** [1] - 44:8
**Southeast** [1] - 1:20
**SOUTHERN** [1] - 1:1
**Spanish** [2] - 4:3, 26:16
**speaking** [7] - 40:9, 40:10, 65:19, 86:15, 87:3, 91:3, 95:2
**special** [3] - 80:9, 80:11, 80:18
**Special** [2] - 1:16, 37:4
**specialist** [1] - 102:10
**specialized** [2] - 79:7, 80:14
**specific** [8] - 13:16, 68:9, 89:11, 89:18, 89:19, 89:20, 90:6, 106:15
**specifically** [1] - 88:15
**spelling** [2] - 4:19, 15:12
**spent** [2] - 8:2, 8:4
**spit** [1] - 109:22
**spoken** [2] - 90:22, 104:7
**spotted** [1] - 26:4
**square** [1] - 11:21
**stage** [2] - 43:1, 51:3
**staged** [3] - 26:1, 26:3, 26:23
**staging** [1] - 26:22
**stamp** [1] - 78:19
**stamped** [2] - 64:22, 70:21
**stand** [5] - 50:5, 59:14, 81:11, 81:12, 97:7
**standard** [3] - 5:20,

50:25, 51:5
**standing** [5] - 81:8, 81:9, 81:16, 86:10, 87:1
**stands** [1] - 57:18
**start** [4] - 38:23, 38:25, 96:2, 105:18
**started** [1] - 56:14
**starting** [1] - 75:17
**state** [13] - 4:19, 15:11, 40:21, 41:15, 41:16, 43:15, 50:11, 51:19, 52:20, 53:17, 62:13, 86:21, 91:1
**statement** [18] - 52:13, 52:23, 54:18, 54:23, 55:24, 56:4, 56:6, 56:11, 56:20, 57:5, 57:23, 57:24, 58:21, 59:8, 87:12, 88:19
**statements** [25] - 52:8, 52:16, 52:19, 52:20, 53:7, 53:13, 53:16, 53:18, 53:21, 55:2, 55:20, 56:2, 57:2, 57:4, 57:7, 57:17, 58:2, 86:11, 86:24, 87:3, 87:7, 106:2, 106:16, 108:19
**STATES** [3] - 1:1, 1:4, 1:12
**States** [18] - 1:16, 1:24, 7:6, 15:3, 38:1, 39:7, 39:14, 40:21, 41:18, 41:24, 42:13, 42:20, 42:21, 43:24, 62:23, 67:24, 106:4, 112:8
**statute** [4] - 39:3, 39:5, 42:23, 50:10
**steal** [1] - 103:22
**STENOGRAPHICALLY** [1] - 1:22
**step** [10] - 20:17, 20:19, 22:3, 22:4, 65:10, 65:20, 70:12, 71:3, 109:6, 109:18
**sticker** [1] - 7:24
**stickers** [1] - 9:24
**still** [5] - 29:24, 52:11, 74:5, 102:17, 104:16
**stole** [1] - 103:21
**stop** [3] - 66:6, 83:13, 105:17
**story** [2] - 105:14, 105:15
**straight** [1] - 79:14
**strange** [3] - 46:4, 47:9, 47:16
**strategically** [1] - 26:5

**strategy** [1] - 107:7
**Street** [2] - 1:17, 1:20
**street** [3] - 16:9, 16:20, 25:11
**strike** [1] - 71:21
**submitted** [1] - 11:4
**subsection** [1] - 40:13
**subsequent** [4] - 53:24, 54:18, 56:17, 56:19
**substance** [1] - 44:12
**suffer** [1] - 102:24
**suffice** [1] - 31:7
**sufficient** [4] - 48:22, 48:25, 49:6, 59:6
**sugar** [1] - 29:10
**suggested** [2] - 24:25, 26:15
**Suite** [1] - 1:20
**summary** [11] - 34:4, 35:10, 35:16, 37:2, 37:3, 37:13, 37:16, 37:17, 37:19, 61:14, 106:7
**Super** [1] - 13:12
**superseded** [1] - 49:7
**supervise** [1] - 5:19
**supply** [1] - 18:16
**support** [1] - 41:12
**suppose** [5] - 75:19, 96:11, 96:16, 96:22, 100:15
**supposed** [1] - 65:4
**suppress** [1] - 52:18
**suppressed** [5] - 52:13, 52:18, 53:18, 56:2, 56:22
**suppression** [1] - 53:11
**Supreme** [1] - 106:5
**surprise** [1] - 70:12
**surprised** [2] - 54:19, 72:10
**surreptitious** [1] - 58:23
**surrounding** [1] - 17:13
**surveillance** [5] - 26:19, 27:2, 31:3, 76:10, 76:12
**suspect** [1] - 52:6
**sustained** [5] - 33:12, 71:20, 71:25, 72:18, 88:23
**SWAT** [3] - 23:21, 25:17
**swear** [3] - 4:15, 15:6, 62:9
**sworn** [3] - 4:22, 15:15, 62:15

**synthesizing** [1] - 37:18

### T

**T-Mobile** [1] - 37:6
**take-down** [2] - 29:13, 33:7
**tape** [1] - 25:11
**taped** [1] - 29:10
**target** [4] - 7:1, 20:2, 20:25, 21:10
**targeted** [2] - 47:6, 47:7
**targets** [4] - 21:9, 23:10, 23:18, 26:5
**task** [1] - 13:10
**Taylor** [6] - 43:10, 43:18, 43:24, 44:6, 49:13, 49:21
**technically** [2] - 67:10, 75:7
**telephone** [3] - 37:5, 91:6, 92:9
**temporarily** [1] - 36:24
**tend** [1] - 14:8
**tender** [2] - 7:7, 30:11
**tennis** [2] - 96:11
**tens** [1] - 6:23
**term** [5] - 35:6, 40:7, 40:8, 40:13, 40:19
**terminal** [1] - 68:25
**terms** [1] - 6:10
**territory** [2] - 40:20, 40:22
**test** [3] - 6:15, 10:14, 10:15
**test-fire** [1] - 10:15
**test-firing** [1] - 6:15
**tested** [1] - 6:1
**testified** [10] - 4:22, 7:2, 15:15, 34:25, 46:13, 48:12, 62:15, 77:2, 83:19, 107:15
**testify** [9] - 35:21, 51:14, 51:15, 51:17, 51:19, 51:20, 52:1, 52:5
**testifying** [3] - 52:15, 59:24, 59:25
**testimony** [24] - 4:15, 15:6, 35:5, 37:11, 37:21, 38:5, 43:21, 55:1, 62:9, 68:13, 71:18, 74:19, 76:2, 77:11, 78:24, 85:8, 97:5, 98:6, 99:14, 100:7, 100:12, 106:14, 107:17, 108:19

**testing** [1] - 6:12
**tests** [2] - 6:1, 6:2
**THE** [176] - 1:12, 1:15, 1:19, 4:5, 4:7, 4:10, 4:17, 4:20, 7:10, 13:4, 13:6, 13:8, 13:11, 14:24, 15:1, 15:8, 15:10, 15:13, 17:9, 17:24, 22:7, 22:8, 24:19, 25:20, 33:12, 33:19, 33:21, 33:22, 34:1, 34:7, 34:9, 34:13, 34:16, 34:21, 34:23, 35:2, 35:4, 35:6, 35:23, 36:3, 36:11, 36:18, 36:21, 37:2, 37:7, 37:10, 37:24, 38:3, 38:17, 39:9, 39:11, 39:20, 39:22, 39:25, 40:11, 40:18, 41:7, 41:11, 41:14, 42:2, 42:14, 42:17, 42:22, 43:20, 44:6, 45:2, 45:4, 45:11, 45:25, 46:10, 46:25, 47:7, 47:12, 47:16, 48:21, 49:20, 50:4, 50:8, 50:15, 50:23, 51:18, 52:1, 52:22, 54:8, 55:3, 55:7, 55:9, 55:12, 57:2, 57:7, 57:10, 58:4, 58:10, 58:13, 58:20, 59:2, 59:16, 59:19, 59:22, 60:5, 60:9, 60:15, 61:2, 61:5, 61:8, 61:12, 61:20, 61:24, 62:11, 62:14, 63:6, 63:14, 66:24, 67:14, 67:15, 67:17, 68:7, 68:8, 69:25, 71:18, 71:23, 71:25, 72:18, 72:24, 73:10, 73:13, 75:12, 78:13, 78:15, 80:12, 80:15, 83:11, 83:13, 85:9, 86:7, 86:13, 87:11, 87:16, 88:8, 88:13, 88:15, 88:23, 89:3, 89:9, 89:11, 89:15, 90:5, 90:20, 92:15, 93:6, 101:2, 101:3, 105:17, 105:25, 106:15, 106:21, 106:23, 107:2, 107:9, 107:16, 107:22, 107:25, 108:4, 108:9, 108:13, 108:16, 108:22, 109:1,

109:9, 109:12, 109:16, 109:20, 110:16, 111:6, 111:11, 111:21
**themselves** [1] - 53:1
**theories** [1] - 50:14
**theory** [3] - 50:4, 50:12, 108:3
**therefore** [3] - 47:19, 55:24, 107:3
**thereof** [4] - 40:23, 41:2, 41:7, 41:14
**thinking** [2] - 71:6, 90:14
**thousands** [2] - 6:21, 6:23
**threaten** [2] - 66:15, 97:15
**threatened** [2] - 66:12, 66:13
**threatening** [1] - 92:1
**threats** [1] - 40:6
**three** [8] - 12:8, 32:22, 40:13, 42:23, 63:3, 64:6, 68:25, 105:5
**timeline** [1] - 55:18
**today** [4] - 28:8, 30:10, 110:14, 111:6
**together** [2] - 52:11, 68:24
**tomorrow** [4] - 67:8, 67:18, 105:18, 108:18
**took** [6] - 18:24, 22:16, 82:11, 82:12, 93:5, 93:8
**Tool** [1] - 6:7
**tool** [5] - 5:10, 5:12, 7:7, 100:24, 101:6
**tools** [2] - 16:13, 18:18
**top** [1] - 19:9
**tortured** [1] - 58:1
**totally** [1] - 109:21
**tours** [1] - 6:5
**toward** [2] - 7:1, 71:4
**Tower** [1] - 1:20
**tract** [1] - 104:21
**tradition** [1] - 44:17
**trained** [3] - 72:11, 104:15, 104:16
**training** [6] - 5:22, 5:24, 5:25, 6:3, 6:4, 6:9
**trajectories** [1] - 8:22
**transaction** [18] - 20:22, 22:14, 22:15, 24:23, 25:6, 26:2, 26:11, 27:20, 28:4, 28:5, 29:17, 30:25,

31:18, 31:25, 33:5, 44:22, 48:19, 98:25
**transactions** [1] - 67:25
**transcribed** [2] - 57:8, 87:8
**transcript** [4] - 32:19, 32:22, 33:1, 33:4
**transcription** [1] - 112:4
**transcripts** [3] - 20:14, 21:16, 57:9
**transfer** [1] - 11:24
**translation** [1] - 59:13
**transpired** [1] - 18:3
**transport** [1] - 40:2
**transportation** [3] - 92:23, 92:24, 93:2
**transporting** [2] - 27:13, 33:9
**traumatic** [1] - 108:8
**travel** [1] - 50:12
**traveled** [2] - 39:11, 54:1
**travels** [2] - 7:1, 9:17
**TRIAL** [1] - 1:10
**trial** [10] - 4:11, 43:11, 43:23, 48:5, 49:2, 50:25, 56:13, 64:15, 88:2, 99:18
**true** [5] - 37:16, 70:7, 77:16, 83:20, 85:25
**truly** [1] - 70:9
**truth** [5] - 4:16, 15:7, 17:24, 62:10, 71:19
**truthfulness** [1] - 56:9
**try** [6] - 17:25, 53:16, 68:8, 73:1, 94:22, 108:14
**trying** [5] - 36:4, 50:8, 55:10, 97:6, 108:17
**tubing** [1] - 13:5
**tuku** [2] - 81:2, 81:3
**turn** [5] - 9:18, 13:6, 60:21, 66:19, 96:17
**turned** [3] - 59:10, 97:17, 98:9
**turning** [1] - 8:5
**twist** [2] - 10:11, 14:9
**twisted** [1] - 9:12
**twists** [1] - 14:11
**two** [26] - 5:3, 5:25, 26:12, 26:13, 29:5, 29:8, 30:7, 31:8, 37:6, 43:14, 45:4, 46:11, 46:13, 47:4, 55:2, 57:7, 61:18, 61:21, 74:15, 75:22, 80:20, 90:11, 98:17, 98:18, 106:3

**two-year** [1] - 5:25
**twofold** [1] - 38:24
**tying** [2] - 45:15, 45:17
**type** [8] - 5:14, 5:17, 8:24, 10:11, 25:10, 57:11, 57:12, 69:8
**types** [1] - 49:17
**typical** [3] - 12:3, 12:5, 14:6
**typically** [3] - 20:19, 23:9, 51:18

**U**

**U.S** [2] - 41:17, 87:2
**ultimate** [1] - 10:14
**ultimately** [2] - 12:12, 51:23
**Umberto** [5] - 79:18, 80:7, 80:9, 80:18, 82:8
**Umberto's** [2] - 80:11, 80:13
**unable** [1] - 55:19
**uncharged** [1] - 47:5
**under** [17] - 10:2, 28:6, 34:5, 38:21, 50:9, 50:10, 50:14, 51:9, 53:7, 53:16, 54:1, 54:7, 55:23, 56:22, 58:3, 58:13, 72:23
**undercover** [2] - 16:17, 18:24
**underlying** [2] - 35:11, 37:13
**understood** [1] - 85:24
**unfortunately** [2] - 24:1, 27:10
**uninvolved** [1] - 101:5
**unique** [1] - 12:2
**unit** [9] - 5:9, 5:10, 5:11, 5:12, 5:13, 5:19, 16:5, 16:6, 29:4
**UNITED** [3] - 1:1, 1:4, 1:12
**United** [18] - 1:16, 1:24, 7:6, 15:3, 38:1, 39:7, 39:14, 40:21, 41:18, 41:24, 42:13, 42:20, 42:21, 43:24, 62:23, 67:24, 106:4, 112:8
**unknown** [4] - 6:16, 44:19, 85:16, 85:17
**unstrap** [1] - 13:2
**up** [37] - 8:8, 18:7, 19:22, 22:14, 25:13, 25:14, 25:16, 29:4,

29:10, 51:10, 51:11, 52:4, 53:20, 53:21, 54:21, 56:9, 59:13, 66:3, 67:4, 68:14, 69:4, 70:14, 71:4, 71:6, 80:3, 81:8, 81:11, 81:12, 81:16, 86:3, 87:21, 88:3, 88:7, 88:8, 88:20, 101:23
**update** [1] - 5:19
**urinary** [1] - 104:21
**urine** [1] - 79:9
**USC** [2] - 40:6, 40:11
**uses** [1] - 48:14
**utilize** [3] - 16:14, 18:18, 19:11

**V**

**vague** [1] - 92:14
**Valhuerdis** [2] - 69:14, 85:4
**valued** [1] - 42:21
**van** [18] - 29:24, 31:3, 78:22, 79:21, 79:24, 80:25, 81:9, 81:10, 81:17, 82:13, 92:21, 92:23, 93:3, 93:8, 93:12, 93:23, 98:22
**Vargas** [2] - 54:18, 57:5
**various** [1] - 35:7
**Vasquez** [1] - 52:6
**VAZQUEZ** [92] - 1:15, 15:3, 15:18, 17:11, 17:22, 18:2, 22:9, 24:14, 24:21, 25:21, 30:11, 32:8, 33:13, 33:18, 33:20, 33:24, 34:3, 34:8, 34:11, 34:15, 34:18, 36:2, 36:9, 36:16, 36:20, 36:22, 37:3, 37:22, 37:25, 41:18, 42:5, 42:16, 42:19, 43:21, 46:7, 47:1, 47:10, 47:15, 48:5, 53:22, 54:10, 55:5, 55:8, 55:10, 56:18, 57:4, 57:8, 59:4, 59:18, 59:21, 61:6, 63:5, 63:13, 66:22, 67:12, 68:6, 69:23, 71:16, 71:21, 72:17, 75:11, 80:10, 80:13, 84:19, 85:11, 87:6, 87:13, 87:17, 87:20, 88:10, 88:25, 89:4, 89:14, 89:21, 89:24, 90:7,

90:21, 93:7, 101:4, 106:11, 106:18, 106:22, 107:1, 107:6, 107:12, 107:19, 108:2, 108:7, 108:11, 108:15, 108:21, 108:23
**Vazquez** [6] - 2:8, 2:9, 2:15, 17:10, 53:20, 89:11
**vehicle** [7] - 19:12, 23:22, 26:25, 27:2, 27:23, 28:3, 30:6
**verified** [1] - 92:9
**verify** [1] - 13:2
**Versa** [1] - 12:7
**versus** [3] - 41:24, 106:4, 106:5
**vice** [1] - 16:8
**video** [6] - 18:16, 20:6, 20:7, 24:24, 26:19, 31:4
**violation** [2] - 52:13, 56:5
**violative** [1] - 86:25
**violence** [2] - 49:24, 50:3
**visit** [1] - 92:25
**visited** [1] - 83:25
**visual** [3] - 19:7, 20:2, 27:25
**visually** [1] - 19:10
**voluntarily** [4] - 55:16, 55:23, 56:24, 58:5
**voluntariness** [6] - 52:19, 56:15, 57:11, 57:21, 57:24, 86:15
**voluntary** [7] - 52:17, 54:15, 56:4, 56:6, 56:16, 56:17, 86:20
**vs** [1] - 1:5

**W**

**wait** [7] - 39:9, 46:9, 59:16, 98:24, 107:16, 107:22
**waited** [3] - 20:20, 65:11, 98:17
**waiting** [1] - 71:5
**waive** [4] - 54:1, 54:15, 55:16, 56:24
**waiver** [2] - 55:21, 56:1
**walk** [4] - 8:14, 10:2, 17:3, 98:22
**walked** [1] - 88:3
**wall** [4] - 23:14, 23:16, 23:20, 26:25

**wants** [3] - 29:9, 51:14, 51:15
**warning** [1] - 111:16
**warnings** [4] - 53:1, 53:4, 53:6, 56:1
**waste** [2] - 36:5, 64:4
**water** [2] - 78:13, 78:15
**ways** [1] - 82:5
**weapon** [3] - 66:16, 72:11, 73:13
**wearing** [1] - 101:19
**Wednesday** [1] - 1:5
**week** [3] - 26:14, 79:6, 83:18
**weeks** [2] - 64:15, 74:16
**weight** [1] - 8:20
**Wesson** [2] - 10:21, 12:6
**whatsoever** [3] - 70:4, 82:23, 84:14
**white** [3] - 72:15, 93:3, 93:8
**whole** [4] - 4:16, 15:7, 48:24, 62:10
**wife** [2] - 79:20, 82:12
**willing** [1] - 35:14
**window** [3] - 29:5, 29:15, 100:19
**withdrew** [2] - 54:17, 59:4
**witness** [15] - 7:7, 14:22, 14:24, 30:11, 33:19, 43:21, 46:13, 53:10, 59:25, 60:20, 72:11, 72:15, 96:7, 97:7, 108:5
**Witness** [3] - 8:4, 15:2, 33:23
**WITNESS** [20] - 2:4, 4:17, 4:20, 13:6, 13:11, 15:8, 15:10, 15:13, 22:8, 33:22, 34:23, 62:11, 62:14, 67:14, 67:17, 68:7, 73:13, 78:13, 78:15, 101:3
**witnessed** [1] - 110:10
**witnesses** [5] - 104:15, 106:12, 106:13, 106:20, 110:2
**wood** [1] - 108:14
**word** [2] - 32:2, 32:12
**words** [1] - 46:1
**works** [2] - 6:13, 77:18
**worksheet** [2] - 8:17, 10:5
**world** [1] - 16:25

**worth** [1] - 42:12
**wound** [5] - 70:13,
75:24, 107:14,
107:21, 107:22
**wounds** [1] - 107:13
**wrapped** [1] - 25:10
**written** [2] - 6:1, 13:12

# Y

**yards** [1] - 24:2
**year** [1] - 5:25
**years** [12] - 5:3, 16:1,
16:4, 17:3, 54:25,
68:17, 68:22, 69:8,
83:20, 83:24, 84:3,
95:1
**yelling** [1] - 98:1
**yesterday** [1] - 74:19
**Yoruba** [2] - 77:13,
105:11
**young** [1] - 69:10
**yourself** [4] - 63:21,
99:3, 110:7, 111:17
**yourselves** [1] - 68:5
**Yubona** [2] - 78:1,
78:3

# Z

**ZACCA** [92] - 1:19,
4:6, 7:9, 14:23,
17:21, 22:6, 24:16,
24:18, 25:19, 30:13,
32:6, 33:11, 34:22,
34:24, 35:3, 35:5,
35:18, 38:19, 39:10,
39:17, 39:21, 39:24,
40:4, 40:12, 40:25,
41:8, 41:12, 43:7,
44:10, 45:3, 45:6,
45:12, 46:9, 46:14,
49:10, 49:23, 50:5,
50:9, 50:17, 51:9,
52:3, 52:24, 57:14,
58:6, 58:12, 58:17,
58:21, 60:1, 60:8,
60:11, 60:23, 61:3,
61:11, 61:13, 61:18,
61:21, 62:1, 62:18,
63:7, 63:15, 67:1,
68:10, 68:11, 71:22,
71:24, 72:2, 72:19,
73:4, 73:5, 73:14,
75:9, 75:14, 75:16,
78:14, 78:16, 78:17,
80:16, 83:12, 83:16,
84:16, 86:5, 86:9,
88:22, 90:4, 90:19,
92:13, 101:1,

107:24, 109:11,
109:15, 111:10,
111:20
**Zacca** [10] - 1:19, 2:9,
2:15, 2:16, 54:1,
54:7, 59:12, 109:1,
111:8, 111:19
**zoomed** [1] - 27:3