1        UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF FLORIDA
2                  (MIAMI)
         CASE NO. 1:17-CR-20701-MGC-5
3

4   UNITED STATES OF AMERICA        Miami, Florida

5                                   January 2, 2020
              vs.                   Wednesday
6

7   LEONARDO MIGUEL GARCIA MORALES
                                    Scheduled for 9:00 a.m.
8                                   Held 9:18 a.m. - 12:43 p.m.

9   _____

10                      **JURY TRIAL**
                        **DAY 12**
11                   **PAGES 1 - 128**

12       BEFORE THE HONORABLE DONALD L. GRAHAM
              UNITED STATES DISTRICT JUDGE
13

14  APPEARANCES:

15  FOR THE GOVERNMENT:      **IGNACIO JESUS VAZQUEZ, JR., AUSA**
                             **J. MACKENZIE DUANE, AUSA**
16                           United States Attorney's Office
                             Miami Special Prosecutions Section
17                           99 Northeast 4th Street
                             Room 806
18                           Miami, Florida  33132

19  FOR THE DEFENDANT:       **DERIC ZACCA, ESQ.**
                             Deric Zacca, P.A.
20                           110 Southeast 6th Street
                             110 Tower - Suite 1700
21                           Fort Lauderdale, Florida  33301

22
    STENOGRAPHICALLY
23  REPORTED BY:             GLENDA M. POWERS, FPR, CRR, FPR
                             Official Federal Court Reporter
24                           United States District Court
                             400 North Miami Avenue
25                           Miami, Florida  33128

1                                    I N D E X

2
                                                              PAGE
3

4    JURY CHARGE                                               6

5
     GOVERNMENT'S CLOSING ARGUMENT
6
         By Ms. Duane                                          29
7
     DEFENDANT'S CLOSING ARGUMENT
8
         By Mr. Zacca                                          66
9
     GOVERNMENT'S REBUTTAL CLOSING ARGUMENT
10
         By Mr. Vazquez                                        87
11

12   VERDICT FORM EXPLANATION

13       By The Court                                          100

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Call to the order of the Court:)

 2              (Defendant Leonardo Garcia Morales aided by

 3    Court-Certified Spanish Interpreters.)

 4              THE COURT:  Be seated.  Good morning, everyone.

 5              Happy New Year.

 6              MR. ZACCA:  Happy New Year.

 7              THE COURT:  We are ready to resume the trial.

 8              THE INTERPRETER:  Excuse me, Your Honor, your

 9    microphone, please.

10              THE COURT:  We are going to have to decide what the

11    jurors would like to do regarding the deliberations, whether

12    they stop at 1:00 or deliberate all day.

13              We have to ask them, being the first order we take up

14    this morning.

15              Are we ready to proceed?

16              MR. VAZQUEZ:  The United States is ready, Your Honor.

17              MR. ZACCA:  The defense is ready, Judge.

18              THE COURT:  Very well.

19              You gave me an indication of when you wanted me to give

20    you notice of time remaining, so I'm going to ask you to give

21    that information to me once again to make sure I'm clear.

22              So, Government, you have a total of 90 minutes.  I

23    think you asked for a note -- a notice, that is -- that after

24    55 minutes has elapsed, or five minutes remaining, if carried

25    out, you would have a total of 30 minutes thereafter; and the
```

```
1    defense has asked for a notice when you have completed 80

2    minutes, 10 minutes before the 90; and again, with rebuttal,

3    Government would like a notice of five minutes remaining,

4    assuming you've used the 60 minutes to begin with, you may have

5    more or less, as the case may be.

6              Any corrections or changes?

7              MR. VAZQUEZ:  Not on behalf of the United States, Your

8    Honor.

9              MR. ZACCA:  That's correct, Judge.

10             THE COURT:  Thank you.  Bring the jury in, please.

11             COURT SECURITY OFFICER:  Yes, sir.

12             THE COURT:  Do other judges allow reading of the

13   instructions first, before closing arguments, are other people

14   doing that also?

15             MR. VAZQUEZ:  Yes, after my last trial.

16             MR. ZACCA:  Yes, Judge Cohn does that, I think.

17             (Jury entered courtroom at 9:22 a.m.)

18             THE COURT:  Be seated, ladies and gentlemen.

19             Good morning.  Welcome back to the United States

20   District Court for the Southern District of Florida.

21             We are now ready to continue with the trial.

22             Happy New Year, everyone.  I am excited to be back here

23   with you.

24             We are going to follow a procedure of having the

25   instructions delivered first, followed by the closing
```

 1    arguments.

 2         You will recall that each party has a maximum of 90

 3    minutes.  Occasionally, I will give a party notice that they

 4    have a certain amount of time remaining, as they have

 5    requested.

 6         Traditionally, the instructions are given after the

 7    closing arguments, but some lawyers think it's best that you

 8    know what the law is before they tell you their view of the

 9    facts, and so that is the procedure we will follow in this

10    case.

11         I will ask that the instructions be passed out to you.

12    We have enough for you to share a copy with the person next to

13    you.  There may be an extra copy or two, so some may have a

14    single copy.  And I'll ask of you, follow along with me, that

15    is, read along with me as the instructions are presented.

16         Our experience is that if you read along as they are

17    presented, they are more understanding for the jurors.  Some of

18    the language is a little technical, so you really have to

19    concentrate on the law.

20         We know you're not lawyers, we try to make it as simple

21    as possible, but occasionally it can be a little difficult to

22    understand, so you have to listen carefully and give the

23    instructions your undivided attention.

24

25

JURY CHARGE

1
2       THE COURT:  Members of the jury, it's my duty to

3   instruct you on the rules of law that you must use in deciding

4   this case.  After I have completed these instructions, you will

5   go to the jury room and begin your discussions -- what we call

6   your "deliberations."

7       You must decide whether the Government has proved the

8   specific facts necessary to find the defendant guilty beyond a

9   reasonable doubt.

10       Your decision must be based only on the evidence

11   presented during the trial.  You must not be influenced in any

12   way by either sympathy for, or prejudice against, the defendant

13   or the Government.

14       You must follow the law as I explain it -- even if you

15   do not agree with the law -- and you must follow all of my

16   instructions as a whole.  You must not single out or disregard

17   any of the Court's instructions on the law.

18       The "indictment" or formal charge against a defendant

19   isn't evidence of guilt.  The law presumes every defendant is

20   innocent.  The defendant does not have to prove his innocence

21   or produce any evidence at all.  The Government must prove

22   guilt beyond a reasonable doubt.  If it fails to do so, you

23   must find the defendant not guilty.

24       The Government's burden of proof is heavy, but it

25   doesn't have to prove a defendant's guilt beyond all possible

1   doubt.  The Government's proof only has to exclude any

2   reasonable doubt concerning the defendant's guilt.

3          A "reasonable doubt" is a real doubt, based upon your

4   reason and common sense, after you've carefully and impartially

5   considered all the evidence in the case.

6          "Proof beyond a reasonable doubt" is proof so

7   convincing that you would be willing to rely and act on it

8   without hesitation in the most important of your own affairs.

9   If you are convinced that the defendant has been proved guilty

10  beyond a reasonable doubt, say so.

11         If you are not convinced, say so.

12         As I said before, you must consider only the evidence

13  that I have admitted in the case.  "Evidence" includes the

14  testimony of witnesses and the exhibits admitted.

15         You may recall, during the course of the trial there

16  was some discussion with the lawyers about whether an exhibit

17  was just marked for identification or actually received in

18  evidence.  Items actually received are admitted and may be

19  considered by you.

20         But anything the lawyers say is not evidence and isn't

21  binding on you.

22         You shouldn't assume from anything I've said that I

23  have any opinion about any factual issue in this case.  Except

24  for my instructions to you on the law, you should disregard

25  anything I may have said during the trial in arriving at your

1    own decisions about the facts.

2          Your own recollection and interpretation of the

3    evidence is what matters.

4          In considering the evidence, you may use reason and

5    common sense to make deductions and reach conclusions.  You

6    shouldn't be concerned about whether the evidence is direct or

7    circumstantial.

8          "Direct evidence" is the testimony of a person who

9    asserts that he or she has actual knowledge of a fact, such as

10   an eyewitness.

11         "Circumstantial evidence" is proof of a chain of facts

12   and circumstances that tend to prove or disprove a fact.

13   There's no legal difference in the weight you may give to

14   either direct or circumstantial evidence.

15         When I say you must consider all the evidence, I don't

16   mean that you must accept all the evidence as true or accurate.

17   You should decide whether you believe what each witness had to

18   say and how important that testimony was.  In making that

19   decision you may believe or disbelieve any witness in whole or

20   in part.  The number of witnesses testifying concerning a

21   particular point doesn't necessarily matter.

22         To decide whether you believe any witness, I suggest

23   that you ask yourself a few questions:

24         Did the witness impress you as one who was telling the

25   truth?

1        Did the witness have any particular reason not to tell

2  the truth?

3        Did the witness have a personal interest in the outcome

4  of the case?

5        Did the witness seem to have a good memory?

6        Did the witness have the opportunity and ability to

7  accurately observe the things he or she testified about?

8        Did the witness appear to understand the questions

9  clearly and answer them directly?

10        Did the witness' testimony differ from other testimony

11  or other evidence?

12        You should also ask yourself whether there was evidence

13  that a witness testified falsely about an important fact, and

14  ask whether there was evidence that at some other time a

15  witness said or did something, or didn't say or do something,

16  that was different from the testimony the witness gave during

17  this trial.

18        To decide whether you believe a witness, you may

19  consider the fact that the witness has been convicted of a

20  felony or a crime involving dishonesty or a false statement.

21        But keep in mind that a simple mistake doesn't mean a

22  witness wasn't telling the truth as he or she remembers it.

23  People naturally tend to forget some things or remember them

24  inaccurately.  So, if a witness misstated something, you must

25  decide whether it was because of an innocent lapse in memory or

1    an intentional deception.  The significance of your decision

2    may depend on whether the misstatement is about an unimportant

3    fact or about an unimportant detail.

4         When scientific, technical, or other specialized

5    knowledge might be helpful, a person who has special training

6    or experience in that field is allowed to state an opinion

7    about the matter.

8         You recall that I gave you some instructions on how to

9    consider expert testimony, and as you know, it doesn't

10   necessarily mean that you must accept the witness' opinion.  As

11   with any other witness' testimony, you must decide for yourself

12   whether to rely upon that opinion.

13        You must consider some witness' testimony with more

14   caution than others.

15        For example, paid informants, witnesses who have been

16   promised immunity from prosecution, or witnesses who hope to

17   gain more favorable treatment in their own cases may have a

18   reason to make a false statement in order to strike a good

19   bargain with the Government.

20        In this case the Government has made a plea agreement

21   with a codefendant in exchange for his testimony.  Such "plea

22   bargaining," as it's called, provides for the possibility of a

23   lesser sentence than the codefendant would normally face.  Plea

24   bargaining is lawful and proper, and the rules of this Court

25   expressly provide for it.

1           But a witness who hopes to gain more favorable

2    treatment may have a reason to make a false statement in order

3    to strike a good bargain with the Government.

4           So while a witness of that kind may be entirely

5    truthful when testifying, you should consider that testimony

6    with more caution than the testimony of other witnesses.

7           And the fact that a witness has pleaded guilty to an

8    offense isn't evidence of the guilt of any other person.

9           You have been permitted to take notes during the trial.

10   Most of you -- perhaps all of you -- have taken advantage of

11   that opportunity.  You must use your notes only as a memory aid

12   during your deliberations.

13          You must not give your notes priority over your

14   independent recollection of the evidence, and you must not

15   allow yourself to be unduly influenced by the notes of other

16   jurors.

17          I emphasize that notes are not entitled to any greater

18   weight than your memories or impressions about your testimony.

19          Now let's go back to page nine, with regard to the

20   "statement of defendant."

21          If the Government offers evidence that a defendant made

22   a statement or admission, you must consider that evidence with

23   caution and great care.

24          You must decide for yourself, one, whether the

25   defendant made the statement; and two, if so, how much weight

1      to give to it.  To make these decisions, you must consider all

2      the evidence about the statement -- including the circumstances

3      under which it was made.

4            "Introduction to the offense instructions."  These are

5      the offenses that are charged.

6            The indictment charges five separate crimes, called

7      "counts," against the defendant.  Each count has a number.

8      You'll be given a copy of the indictment to refer to during

9      your deliberations.

10           In summary, Count 1 charges the defendant with

11     knowingly conspiring to obstruct, delay, and affect commerce

12     and the movement of articles and commodities in commerce by

13     means of robbery.

14          Count 2 charges the defendant with knowingly and

15     willfully conspiring to possess with intent to distribute a

16     controlled substance.

17          Counts 3, 4, and 7 charge that the defendant committed

18     what are called "substantive offenses," specifically, in

19     Count 3, that the defendant attempted to knowingly and

20     unlawfully obstruct, delay, and affect commerce and the

21     movement of articles and commodities in commerce by means of

22     robbery; second, in Count 4, that the defendant used and

23     carried a firearm during and in relation to a crime of

24     violence; and three, in Count 7, that the defendant knowingly

25     and intentionally attempted to possess with intent to

```
 1    distribute a controlled substance.

 2           But first note that the defendant is not charged in

 3    Counts 1 or 2 with committing what we call a "substantive

 4    offense" -- the defendant in Counts 1 and 2 is charged with

 5    conspiring to commit those offenses, that is, agreeing to

 6    commit those offenses.

 7           I will give you specific instructions on the

 8    conspiracy.

 9           It is a separate federal crime for anyone to conspire

10    to acquire someone else's property by robbery and in doing so

11    to obstruct, delay, or affect interstate commerce.

12           Title 18 United States Code Section 1951(a), akes it a

13    crime to knowingly acquire someone else's property by robbery

14    and in doing so to obstruct, delay, or affect interstate

15    commerce.

16           A "conspiracy" is an agreement by two or more persons

17    to commit an unlawful act.  In other words, it is a kind of

18    partnership for criminal purposes.  Every member of the

19    conspiracy becomes the agent or partner of every other member.

20           The Government does not have to prove that all of the

21    people named in the indictment were members of the plan, or

22    that those who were members made any kind of formal agreement.

23    The heart of a conspiracy is the making of the unlawful plan

24    itself, so the Government does not have to prove that the

25    conspirators succeeded in carrying out the plan.
```

1          The defendant can be found guilty of this conspiracy

2     offense only if all the following facts are proved beyond a

3     reasonable doubt:

4          One:  Two or more people, not including a confidential

5     informant or any other agent or officer of the Government, in

6     some way agreed to try to accomplish a shared and unlawful plan

7     to commit robbery, as charged in the indictment;

8          Two:  The defendant knew the unlawful purpose of the

9     plan and willfully joined in it;

10         Three:  The object of the unlawful plan was to acquire

11    someone else's personal property against the victim's will, by

12    using actual or threatened force, or violence, or causing the

13    victim to fear harm, either immediately or in the future;

14         And four:  The defendant's actions obstructed, delayed,

15    or affected interstate commerce.

16         However, to find the defendant guilty, you must be

17    unanimous as to the object of the conspiracy.

18         In this case, there were two objects of this

19    conspiracy:

20         A gold courier robbery and/or marijuana robbery.

21         Also, you must specify one or more objects on the

22    verdict form.

23         And I will detail the verdict form a little later.

24         "Property" includes money, tangible things of value,

25    and intangible rights that are a source or element of income or

```
1    wealth.

2         "Fear" means a state of anxious concern, alarm, or

3    anticipation of harm.  It includes the fear of financial loss

4    as well as fear of physical violence.

5         "Interstate commerce" is the flow of business

6    activities between one state and anywhere outside that state.

7         The Government doesn't have to prove that the defendant

8    specifically intended to affect interstate commerce.  But it

9    must prove that the natural consequences of the acts described

10   in the indictment would be to somehow delay, interrupt, or

11   affect interstate commerce.

12        If you decide that there would be any effect at all on

13   interstate commerce, then that is enough to satisfy this

14   element.  The effect can be minimal.

15        A person who attempts to rob a drug dealer of his drugs

16   or drug proceeds necessarily affects or attempts to affect

17   interstate commerce.

18        A person may be a conspirator even without knowing all

19   of the details of the unlawful plan or the names and identities

20   of all the other alleged conspirators.

21        If a defendant played only a minor part in the plan but

22   had a general understanding of the unlawful purpose of the

23   plan -- and willfully joined in the plan on at least one

24   occasion -- that's sufficient for you to find the defendant

25   guilty.
```

1          But simply being present at the scene of an event or

2    merely associating with certain people and discussing common

3    goals and interests doesn't establish proof of a conspiracy.

4    Also, a person who doesn't know about a conspiracy but happens

5    to act in a way that advances some purpose of one doesn't

6    automatically become a conspirator.

7          In this case, regarding the alleged conspiracy in

8    Count 1, the indictment charges that the defendant conspired to

9    rob a gold courier and to rob a marijuana dealer.  In other

10   words, the defendant is charged with conspiring to commit two

11   separate substantive crimes.

12         The Government does not have to prove that the

13   defendant willfully conspired to commit both crimes.  It is

14   sufficient if the Government proves beyond a reasonable doubt

15   that the defendant willfully conspired to commit one of those

16   crimes.  But to return a verdict of guilty, you must all agree

17   on which of the two crimes the defendant conspired to commit,

18   or both.

19         So if you're deliberating as to one of the

20   conspiracies, all 12 deliberating jurors must agree that that

21   was the object of the conspiracy.  It could also mean that all

22   12 agree that the other object, that is, the marijuana aspect

23   of the case, the robbery involving the marijuana, you can also

24   agree, but all 12 must be unanimous.

25         All 12 can agree that both of the objects of a

1   conspiracy were proved beyond a reasonable doubt or you may

2   find that neither of the two objects were proved beyond a

3   reasonable doubt, but you have to have unanimity as to each of

4   the two objects.

5          Count 2:  It is a separate federal crime for anyone to

6   conspire to knowingly possess with intent to distribute a

7   controlled substance.

8          Cocaine and marijuana are "controlled substances."

9          Title 21 United States Code Section 841(a)(1) makes it

10  a crimes for anyone to knowingly possess cocaine or marijuana

11  with intent to distribute it.

12         A "conspiracy" is an agreement by two or more persons

13  to commit an unlawful act.  In other words, it is a kind of a

14  partnership for criminal purposes.  Every member of the

15  conspiracy becomes the agent or partner of every other member.

16         The Government does not have to prove that all of the

17  people named in the indictment were members of the plan, or

18  that those who were members made any kind of formal agreement.

19  The heart of a conspiracy is the making of the unlawful plan

20  itself, so the Government does not have to prove that the

21  conspirators succeeded in carrying out the plan.

22         The defendant can be found guilty of this conspiracy

23  offense only if all the following facts are proved beyond a

24  reasonable doubt:

25         One:  Two or more people not including the confidential

1   informant or any other agent or officer of the Government, in

2   some way agreed to try to accomplish a shared and unlawful plan

3   to possess a controlled substance;

4        Number two:  The defendant knew the unlawful purpose of

5   the plan and willfully joined in it;

6        Three:  The object of the unlawful plan was to possess

7   with the intent to distribute more than 500 grams of cocaine, a

8   detectable amount of cocaine, and/or a detectable amount of

9   marijuana.

10        To "intend to distribute" is a plan to deliver

11   possession of a controlled substance to someone else, even if

12   nothing of value is exchanged.

13        A person may be a conspirator without knowing all of

14   the details of the unlawful plan or the names and identities of

15   all the other alleged conspirators.

16        If the defendant played only a minor part in the plan

17   but had a general understanding of the unlawful purpose of the

18   plan -- and willfully joined in the plan on at least one

19   occasion -- that's sufficient for you to find the defendant

20   guilty.

21        But simply being present at the scene of an event, or

22   merely associated with certain people and discussing common

23   goals and interests doesn't establish proof of a conspiracy.

24   Also, a person who doesn't know about the conspiracy, but

25   happens to act in a way that advances some purpose of one

```
1      doesn't automatically become a conspirator.

2           The defendant is charged with conspiring to possess

3      with intent to distribute at least 500 grams of cocaine, a

4      detectable amount of cocaine, and a detectable amount of

5      marijuana.  You may find the defendant guilty of the crime even

6      if the amount of cocaine for which he should be held

7      responsible is less than 500 grams.

8           You may also find the defendant guilty of this crime

9      based solely on an attempt to possess with intent to distribute

10     marijuana.  So if you find the defendant guilty, you must also

11     unanimously agree on the weight of cocaine and/or marijuana the

12     defendant conspired to possess and specify the amount on the

13     verdict form.

14          As I said a moment ago, I'll go through the verdict

15     form with you and explain it in detail.

16          Count 3:  In some cases, it's a crime to attempt to

17     commit an offense -- even if the attempt fails.  In this case

18     the defendant is charged in Count 3 with attempting to commit a

19     Hobbs Act robbery.

20          The defendant can be found guilty of Hobbs Act robbery

21     only if all the following facts are proved beyond a reasonable

22     doubt:

23          One:  The defendant knowingly acquired someone else's

24     personal property;

25          Two:  The defendant took the property against the
```

1   victim's will, by using actual or threatened force, or

2   violence, or causing the victim to fear harm, either

3   immediately or in the future;

4          And three:  The defendant's actions obstructed,

5   delayed, or affected interstate commerce.

6          The defendant can be found guilty of an attempt to

7   commit that offense only if both of the following facts are

8   proved beyond a reasonable doubt:

9          First:  That the defendant knowingly intended to commit

10   the crime of Hobbs Act robbery;

11          And second:  The defendant's intent was strongly

12   corroborated by his taking a substantial step toward committing

13   the crime.

14          A "substantial step" is an important action leading up

15   to committing of an offense -- not just an inconsequential act.

16   It must be more than simply preparing.  It must be an act that

17   normally would result in committing the offense.

18          Count 4:  It's a separate federal crime to use or carry

19   a firearm during and in relation to a violent crime, or to

20   possess a firearm in furtherance of a violent crime.

21          The defendant can be found guilty of this crime only if

22   the following facts are proven beyond a reasonable doubt:

23          One:  That the defendant committed the violent crime

24   charged in Count 3 of the indictment;

25          Two:  And that during and in relation to that violent

1   crime, the defendant knowingly used or carried a firearm, as

2   charged in the indictment; or that the defendant knowingly

3   possessed a firearm in furtherance of that violent crime, as

4   charged in the indictment.

5        Thus, there are three ways by which the Government can

6   prove Count 4.  Specifically, you may find the defendant guilty

7   of Count 4 if you determine that he:

8        One:  Used a firearm during and in relation to the

9   violent crime charged in Count 3;

10       Or two:  Carried a firearm during and in relation to

11  that violent crime;

12       Or three:  Possessed a firearm in furtherance of that

13  violent crime.

14       However, to find the defendant guilty you must be

15  unanimous as to at least one of the three methods of committing

16  the offense, and you must specify one or more on the verdict

17  form.

18       A "firearm" is any weapon designed to or readily

19  convertible to expel a projectile by the action of an

20  explosive.  The term includes the frame or receiver of any such

21  weapon or any firearm muffler or silencer.

22       To "use" a firearm means more than mere possession and

23  more than proximity and accessibility to the firearm.  It

24  requires active employment of the firearm by brandishing or

25  displaying it in some fashion.

1       To "brandish" a firearm means to show all or part of

2   the firearm to another person, or otherwise make another person

3   aware of the firearm in order to intimidate that person.  The

4   firearm need not be directly visible to the other person.

5       To "carry" a firearm is to have a firearm on one's

6   person or to transport the firearm, such as in a vehicle, from

7   one place to another, while committing the violent crime.

8       To use or carry a firearm "in relation to" a crime

9   means that the firearm had some purpose or effect with respect

10  to the crime, and was not there by accident or coincidence.

11  The firearm must have facilitated, or had the potential of

12  facilitating, the crime.

13      To "possess" a firearm is to have direct physical

14  control of the firearm or to have the knowledge of the

15  firearm's presence and the ability and intent to later exercise

16  control over the firearm.

17      Possessing a firearm "in furtherance of" a crime means

18  that the firearm helped, promoted, or advanced the crime in

19  some way.

20      A defendant who aids and abets the crime of using or

21  carrying a firearm during and in relation to, or possessing a

22  firearm in furtherance of, a violent crime can be found guilty

23  even if the defendant did not personally use or carry or

24  possess the firearm.  But to be found guilty on this basis, the

25  defendant must have actively participated in the violent crime

1    with the advance knowledge that another participant would use

2    or carry a firearm during and in relation to, or possess a

3    firearm in furtherance of, the violent crime.

4         "Advance knowledge" means knowledge at a time when the

5    defendant chose to begin or continue the defendant's

6    participation in the violent crime.  The defendant chose to

7    continue the defendant's participation if the defendant learned

8    of the firearm and continued to participate.

9         But the defendant did not chose to continue to

10   participate if the defendant learned of the firearm too late

11   for the defendant to be reasonably able to walk away.

12        Brandishing:  If you find the defendant guilty of using

13   or carrying a firearm during or in relation to a crime of

14   violence, you must also determine if the defendant brandished a

15   firearm during and in relation to a crime of violence.

16        The defendant is guilty of aiding and abetting the

17   brandishing of a firearm if he had advance knowledge that

18   another participant in the crime would display or make the

19   presence of a firearm known for purposes of intimidation.

20        The defendant need not have had advance knowledge that

21   a participant would actually brandish the firearm.  This

22   requirement is satisfied if the defendant knew that a

23   participant intended to brandish a firearm to intimidate if the

24   need arose.

25        Count 7:  In some cases it's a crime to attempt to

1   commit an offense -- even if the attempt fails.  In this case,

2   the defendant is charged in Count 7 with attempting to possess

3   with intent to distribute a controlled substance.

4          The defendant can be found guilty of attempted

5   possession of a controlled substance with intent to distribute

6   only if all the following facts are proved beyond a reasonable

7   doubt:

8          One:  The defendant knowingly possessed cocaine and,

9          Two:  The defendant intended to distribute cocaine;

10         Three:  The weight of the cocaine the defendant

11  possessed was more than 500 grams.

12         The defendant can be found guilty of an attempt to

13  commit that offense only if both the following facts are proved

14  beyond a reasonable doubt:

15         First:  That the defendant knowingly intended to commit

16  the crime of possession with intent to distribute at least 500

17  grams of cocaine;

18         And second:  That the defendant's intent was strongly

19  corroborated by his taking a substantial step toward committing

20  the crime.

21         A "substantial step" is an important action leading up

22  to committing of an offense -- not just an inconsequential act.

23  It must be more than simply preparing.  It must be an act that

24  would normally result in committing the offense.

25         It's possible to prove a defendant guilty of a crime

 1   even without evidence that the defendant personally performed

 2   every act charged.

 3           Ordinarily, any act a person can do may be done by

 4   directing another person or "agent."  Or it may be done by

 5   acting with or under the direction of others.

 6           A defendant "aids and abets" a person if the defendant

 7   intentionally joins with the person to commit a crime.

 8           The defendant is criminally responsible for the acts of

 9   another person if the defendant aids and abets the other

10   person.  The defendant is also responsible if the defendant

11   willfully directs or authorizes the acts of an agent, employee,

12   or other associate.

13           But finding that a defendant is criminally responsible

14   for the acts of another person requires proof that the

15   defendant intentionally associated with or participated in the

16   crime -- not just proof that the defendant was simply present

17   at the scene of a crime or knew about it.

18           In other words, you must find beyond a reasonable doubt

19   that the defendant was a willful participant and not merely a

20   knowing spectator.

21           Theory of defense:  A theory of defense as to Count 3,

22   attempted Hobbs Act robbery, and Count 7, attempted possession

23   of a controlled substance with intent to distribute is that

24   simply being present at the scene an event does not establish

25   proof of an attempt to commit a crime.

1           Also, a person who does not intend to commit a crime,

2    but happens to act in a way that advances some purpose of a

3    crime is insufficient to prove an attempt to commit the crime.

4           The law recognizes several kinds of possession.  A

5    person may have actual possession, constructive possession,

6    sole possession, or joint possession.

7           "Actual possession" of a thing occurs if a person

8    knowingly has direct physical control of it.

9           "Constructive possession" of a thing occurs if a person

10   doesn't have actual possession of it, but has both the power

11   and the intention to take control over it later.

12          "Sole possession" of a thing occurs if a person is the

13   only one to possess it.

14          "Joint possession" of a thing occurs if two or more

15   people share possession of it.

16          The term "possession" includes actual, constructive,

17   sole, and joint possession.

18          You'll see that the indictment charges that a crime was

19   committed on or about a certain date.  The Government doesn't

20   have to prove that the crime occurred on an exact date.  The

21   Government only has to prove beyond a reasonable doubt that the

22   crime was committed on a date reasonably close to the date

23   alleged.

24          The word "knowingly" -- and I've used this term

25   throughout the instructions -- means that an act was done

1   voluntarily and intentionally and not because of a mistake or

2   by accident.

3         The word "willfully" means that the act was committed

4   voluntarily and purposely, with the intent to do something the

5   law forbids, that is, with the bad purpose to disobey or

6   disregard the law.  While a person must have acted with the

7   intent to do something the law forbids, before you can find

8   that the person acted "willfully," the person need not be aware

9   of the specific law or rule that his or her conduct may be

10  violating.

11        Each count of the indictment charges a separate crime.

12  You must consider each crime and the evidence relating to it,

13  separately.  If you find the defendant guilty or not guilty of

14  one crime, that must not affect your verdict for any other

15  crime.

16        I caution you that the defendant is on trial only for

17  the specific crimes charged in the indictment.  You're here to

18  determine from the evidence in this case whether the defendant

19  is guilty or not guilty of those specific crimes.

20        You must never consider punishment in any way to decide

21  whether the defendant is guilty.  If you find the defendant

22  guilty, the punishment is for the Judge alone to decide in

23  accordance with the Sentencing Guidelines.

24        Your verdict, whether guilty or not guilty, must be

25  unanimous -- in other words, you must all agree.  Your

1   deliberations are secret, and you will never have to explain

2   your verdict to anyone.

3          Each of you must decide the case for yourself, but only

4   after fully considering the evidence with the other jurors.  So

5   you must discuss the case with one another and try to reach an

6   agreement.  While you're discussing the case, don't hesitate to

7   re-examine your own opinion and change your mind if you become

8   convinced that you were wrong.  But don't give up your honest

9   beliefs just because others think differently or because you

10   simply want to get the case over with.

11          Remember that, in a very real way, you're judges --

12   judges of the facts.  Your only interest is to seek the truth

13   from the evidence in the case.

14          When the lawyers complete their closing arguments, I

15   will give you the instruction on the verdict form that's on

16   page 31, and I will also go through the verdict form with you,

17   so that you may have a clearer understanding.

18          So what I suggest at this time is for you all just to

19   stand, stretch, and take a breath of air, and then the

20   attorneys will be presenting their closing arguments.

21          So just stand up, stretch, sip your coffee a little.

22   After the Government presents their initial argument, we will

23   take a 15-minute break thereafter.

24          Alright, Government, are we ready to proceed?

25          MS. DUANE:  Yes, Your Honor, and if we could put the

1    prosecution PC up, so that the jurors are able to see.

2                    GOVERNMENT'S CLOSING ARGUMENT

3           MS. DUANE:  Good morning, and Happy New Year.

4           I want to start by thanking you all for serving as

5    jurors on this case.  I know it was a great service for you to

6    come here for three weeks.  We thank you for coming here each

7    day, patiently listening to the evidence and paying attention.

8              Now, we have picked each of you as jurors in this

9    case because you made a commitment to be fair and impartial in

10   assessing the evidence presented and because you made a

11   commitment to follow the law.

12             And the evidence that has been presented over these

13   three weeks in December is that the defendant, Leonardo Miguel

14   Garcia Morales, is guilty beyond a reasonable doubt as to the

15   crimes charged against him in the indictment.

16             Now, I'm going to take some time, and I'm going to go

17   through what those charges are.  I'm going to highlight some of

18   the points that are in the instructions that the judge just

19   went through with you, and I'm going to walk through the

20   evidence that's presented in this case that supports the only

21   reasonable conclusion, which is that the defendant is guilty.

22             Now, you heard three weeks of testimony.  I have an

23   hour, so I won't be able to go through all of the points that

24   were raised in this case.  And that's not to say the points

25   that I don't get to aren't important, that that evidence isn't

1    important, it's just that I don't have enough time to get

2    through it.

3           I also wanted to let you know that I am going to be

4    going through a PowerPoint.  You will not have the PowerPoint

5    back when you begin your deliberations, so to the extent that

6    you want to take notes, feel free, no pressure.

7           Now, I want to take you back to the beginning of this

8    case, to nearly a month ago when this case began, to remember

9    why we are here.  We are here because of the actions of the

10   defendant, because of the defendant's actions and the impact

11   the defendant's actions have had.

12          Particularly, we started with the impact, the impacts

13   of the defendant's actions on the Micheli family, the impact

14   that his actions on September 30th, 2012, had.

15          We're here not because the defendant went to the

16   Micheli residence -- not because the defendant peacefully sat

17   on a step waiting for his friend Frank to come to the door, so

18   that he could broker a marijuana purchase.

19          We are here because the defendant and his criminal

20   partners got together to commit a violent robbery on September

21   30th, 2012, a violent robbery using a firearm.

22          And I want to bring you back to that morning.

23          This is the 911 call that Elizabeth Micheli made on

24   September 30th, 2012, that she made when the defendant and his

25   criminal partners were outside of the house trying to come in.

```
 1              (Audiotape played for the Judge and Jury.)

 2         MS. DUANE:  Now, at the beginning of this case, I stood

 3    before you and I told you you would be hearing about three

 4    events, three events in this case that led to the defendant

 5    being charged with five crimes.

 6         The first event is the September 30th, 2012, attempted

 7    grow-house robbery.  We just heard the 911 call from that

 8    robbery.

 9         The second event is the October 12th, 2012, gold heist

10    in Coral Gables.

11         The third event is the August 28th, 2013, attempted

12    cocaine purchase where the defendant used his godson to try to

13    purchase a kilo of cocaine after he was paralyzed in the

14    attempted grow-house robbery.

15         Now, these three events have lead to five crimes being

16    charged.  First, the conspiracy to commit robberies; and

17    second, conspiracy to possess with intent to distribute

18    marijuana.  And I'm going to focus for a minute on those two

19    counts, those two crimes, and generally, the language of the

20    conspiracy.

21         Now, the Judge just went through the instructions with

22    you, and those instructions will serve as a roadmap when you go

23    back to begin your deliberations, and I just want to highlight

24    some parts of those instructions that will help you as you go

25    back to deliberate.
```

1          Now, the defendant is charged in Count 1 with

2     conspiracy to commit robberies, and Count 2 with conspiracy to

3     possess with intent to distribute drugs.

4          The defendant is charged, along with Alfredo Kindelan

5     Hernandez, Jean Marrero Lara, and Raonel Valdez Valhuerdis --

6     and it's important that the defendant is charged with these

7     individuals -- with two conspiracies.

8          The defendant worked with these three individuals,

9     among others, to do different things, they worked to commit --

10    they had an agreement to commit robberies, and they had an

11    agreement to get drugs, to get drugs and to sell drugs.

12          Essentially, the overarching conspiracy was to get

13    money, and the means by which this group got money was by

14    robberies, robberies of the gold courier, and robberies of the

15    grow-house for drugs, and the end goal being to get drugs to

16    make more money.

17          Now, a "conspiracy" is an agreement by two or more

18    persons to commit an unlawful act.  It is a criminal

19    partnership, essentially, and it doesn't require any sort of

20    formal agreement.  Nobody writes down, "I'm going to conspire

21    to do X."  Their actions are what tell you what the conspiracy

22    consisted of.

23          The heart of the conspiracy is the making of the

24    unlawful plan, so it's the plan itself, it's not necessarily

25    the actions taken in furtherance of that plan.

1          It is the plan, the conspiracy, to do a certain act.

2          Count 1, which is the conspiracy to commit robberies,

3    is a multiple-object conspiracy.  And the Judge just went

4    through the instructions on what a multiple-object conspiracy

5    means, but I want to highlight a few things.

6          So, in this case, Count 1 deals with the conspiracy to

7    commit robbery, and there are two objects:

8          There is the gold courier robbery, which is one object,

9    and the marijuana grow-house robbery, which is the other

10   object.

11         The defendant is guilty of conspiracy to commit robbery

12   if you find unanimously either that he conspired to commit the

13   grow-house robbery or that he conspired to commit the gold

14   courier robbery, or if you find that he conspired to commit

15   both.

16         Respectfully, the position of the Government is that

17   the evidence here is overwhelming that the defendant was in the

18   conspiracy to commit both robberies.  And the facts that this

19   is a multiple-object conspiracy is reflected on the verdict

20   form.  The Judge will go through that after you've heard

21   closing arguments.

22         But in paragraph one, at the end of Count 1, the

23   conspiracy to commit robberies, and if you move down, you can

24   see that there is a place for you to allocate whether you find

25   the defendant guilty based on his conspiracy for the gold

1    robbery or for the marijuana robbery.

2         Count 2 is a conspiracy to possess with intent to

3    distribute drugs.  The defendant, as the Judge went through, is

4    charged with conspiring to possess with intent to distribute

5    at least 500 grams of cocaine, a detectable amount of cocaine,

6    and a detectable amount of marijuana.

7         You may find the defendant guilty of this crime, of

8    this conspiracy, if you find either that he conspired to

9    possess at least 500 grams of cocaine, if you find that he

10   conspired to possess any amount of cocaine, or if you find that

11   he conspired to possess marijuana.  And that's reflected in the

12   instructions, and it's also reflected in the verdict form.

13        Paragraph two deals with the conspiracy to possess with

14   intent to distribute drugs, specifically, cocaine, and it gives

15   you the opportunity to deliberate and come back to the

16   conclusion on how much cocaine you believe the defendant was

17   conspiring to possess with intent to distribute.

18        Here, you heard testimony that the defendant was

19   conspiring to possess a kilo of cocaine, that's a thousand

20   grams.

21        It also has a place for marijuana, again, the

22   conspiracy was to rob the marijuana grow-house to get drugs, to

23   get marijuana.

24        So now, I want to return to the remaining counts.

25        As the Judge instructed you, these are the substantive

 1    counts.  Count 3 is the attempted robbery in connection with

 2    the Miramar; Count 4 is using, carrying, or possessing a

 3    firearm in furtherance of that attempted robbery; and Count 7,

 4    which is the fifth charge against the defendant, is attempted

 5    possession of cocaine with the intent to distribute, and again,

 6    that's when he utilized his godson in order to get a kilo.

 7         Now, let's go through the September 2012 attempted

 8    marijuana grow-house robbery, in which we just listened to the

 9    911 call.  The plan here was to rob a marijuana grow-house.

10    How?  By using and brandishing a firearm.  The intended victim

11    of this crime was a man named Frank.

12         You heard testimony about Frank.  The defendant

13    admitted that he knew Frank, and Alfredo Kindelan Hernandez

14    told you that he knew Frank, Livan Ochill told you that the

15    defendant knew Frank.  He was the intended victim of this

16    crime, he is the one who the defendant believed was operating

17    this grow-house at this location.

18         The participants on the scene were the defendant, Jean

19    Marrero Lara, Alfredo Kindelan Hernandez, who you heard

20    testimony from during this trial, and Raonel Valdez Valhuerdis.

21         The defendant's role was to get the information about

22    the grow-house from Celia, and we'll go through the testimony

23    that you heard on that point.

24         He made the plan to rob the marijuana grow-house, he

25    drove to the location on the night of the robbery using his

1    white work van.

2          The defendant, as you heard testimony, had the firearm

3    in the glove compartment of that work van, along with the mask

4    that he wore that night.

5          The defendant went to the Michelis' door to commit the

6    robbery, and as he tried to break inside, he was shot and

7    paralyzed.

8          Now, in connection with this one event, the September

9    30th, 2012, attempted marijuana grow-house, these counts relate

10   to that one event.

11         Again, Count 1, conspiracy to commit robberies;

12   Count 2, conspiracy to possess with intent to distribute drugs;

13   Count 3, the attempted robbery itself; and Count 4, using,

14   carrying, or possessing a firearm in furtherance of the

15   attempted robbery.

16         So all four of these counts relate to this one event.

17         Now, in order to find the defendant guilty of Count 1,

18   there are certain elements that you must find have been proven

19   beyond a reasonable doubt.  The first element is that two or

20   more people -- not including a confidential informant or any

21   other agent or officer of the Government -- which is not an

22   issue in this count -- in some way agreed to try to accomplish

23   a shared and unlawful plan to commit a robbery.

24         Again, you'll hear that the evidence was that the

25   defendant was in a conspiracy with Jean Marrero Lara, with

1   Alfredo Kindelan Hernandez, with Raonel Valdez Valhuerdis, to

2   commit a robbery of a marijuana grow-house.

3           The defendant knew the unlawful purpose of the plan.

4   He was the one who got the information about the grow-house.

5           The third element is that the object of the unlawful

6   plan was to acquire someone else's personal property against

7   their will, using actual or threatened force.

8           The evidence was that the defendant attempted to rob

9   marijuana from that house.  How?  Using a firearm.

10          You heard the testimony of Julio Micheli.  He had a

11  firearm pointed at him as the defendant and Raonel Valhuerdis

12  attempted to enter his home, and so that element has been

13  proven.

14          And the fourth element, the final element, is that the

15  defendant's actions obstructed, delayed, or affected interstate

16  commerce.  And you've heard some of the instructions related to

17  the interstate commerce, and I'm going to go through them more

18  in connection with the gold heist.

19          But note, for purposes of Count 1, as it relates to the

20  attempted marijuana grow-house, there is specific instruction.

21  And that instruction is that a person who attempts to rob a

22  drug dealer of his drugs or drug proceeds, necessarily affects

23  or attempts to affect interstate commerce.

24          So here, the defendant's actions by attempting to rob a

25  marijuana grow-house affects interstate commerce, and so the

1    fourth element is proven beyond a reasonable doubt.

2         Count 2 has three elements.  The first is that two or

3    more people, not including a confidential informant or any

4    other agent or officer, in some way agreed to try and

5    accomplish a shared and unlawful plan to possess a controlled

6    substance.  So here, we're dealing with the unlawful plan to

7    possess the marijuana, the marijuana the defendant believed was

8    inside that house when he showed up with his mask and showed up

9    with a gun.

10        The second element is that the defendant knew the

11   unlawful purpose of the plan and willfully joined it.  Again,

12   he got the information about this grow-house.

13        And three, the object of the plan is to possess and

14   attempt to distribute more than 500 grams of cocaine, a

15   detectable amount of cocaine and/or a detectable amount of

16   marijuana.  And we will go through the cocaine element later

17   on.  For now, we're going to focus on the amount of marijuana

18   the defendant conspired to possess.

19        Count 3 charges the defendant with attempted robbery.

20   There are two elements of that offense, and it's important to

21   note that is an attempted robbery, an attempted crime.

22   Throughout the defendant's testimony, if you'll remember, he

23   continually asked my cocounsel "what marijuana, where's the

24   marijuana?"  This was an attempted crime.

25        Obviously, when he went to the Michelis' house, there

1  was no marijuana there, but that doesn't change the

2  circumstances under which he went there.  He went there to rob

3  a marijuana grow-house, he attempted to rob a marijuana

4  grow-house.

5      The first element of Count 3 is that the defendant

6  knowingly intended, again, to commit the crime of Hobbs Act

7  robbery, and we know that he did that from the evidence that we

8  have discussed.

9      The second is that the defendant's intent is strongly

10 corroborated by his taking a substantial step towards

11 committing the crime.

12     Now, a substantial step -- you received an instruction

13 on -- is an important action leading up to committing of the

14 offense, not just an inconsequential act, and it must be an act

15 that would normally result in committing the offense.

16     Here, the evidence was that the defendant drove to that

17 house, the defendant hopped that fence, the defendant went to

18 the Michelis' home, he went to the Michelis' home wearing a

19 mask and he knocked -- he didn't knock on that door -- he hid

20 outside, and as Mr. Micheli was opening that door, the

21 defendant and his criminal partners yelled, "this is a

22 robbery."

23     That is certainly a substantial step, and the defendant

24 himself admits that he was there on this night, that he went

25 there on this night.

         1          Count 4 charges the defendant with using or carrying or

         2   possessing a firearm in furtherance of the attempted robbery.

         3   Now, there are three elements -- there are two elements of this

         4   offense.

         5          First, that the defendant committed the violent crime

         6   charged in Count 3, so the defendant committed the attempted

         7   robbery that we just went through.

         8          The second element is that during and in relation to

         9   this violent crime the defendant knowingly used or carried a

        10   firearm as charged in the indictment.  So that's one way in

        11   which the defendant can be found guilty, if you find that he

        12   used or carried a firearm.

        13          Alternatively, if you find that the defendant knowingly

        14   possessed a firearm, he is guilty.

        15          And just to break that down a little bit further, the

        16   defendant is guilty of Count 4 if you find any of these three

        17   things, that the defendant carried the firearm, that he

        18   possessed the firearm, or that he used the firearm on September

        19   30th, 2012.

        20          And the evidence, ladies and gentlemen, if you will

        21   remember back to Mr. Kindelan's testimony, was that the

        22   defendant brought the firearm in his van to this robbery.  So

        23   the defendant possessed this firearm in furtherance of this

        24   attempted robbery, that is the evidence.

        25          The defendant also carried this firearm in furtherance

1   of this attempted robbery.  With regards to use and possession,

2   you'll receive a specific instruction about aiding and

3   abetting -- or you've received a specific instruction about

4   aiding and abetting, and it's in your packet, and I just want

5   to take a few seconds to go through it, because it can be a

6   little confusing.

7         But, essentially, what it provides for is a situation

8   where the defendant, like here, is not the one who pointed the

9   gun at Mr. Micheli, but he aided and abetted in the use and

10  possession of that gun by bringing the gun that night, by being

11  part of this robbery that was going to be done using violence,

12  using a firearm, and so the defendant is guilty, even though he

13  may not have held that firearm -- he may have not pointed that

14  firearm rather -- at Mr. Micheli in that doorway, and that

15  instruction -- this instruction reflects that.

16        To be found guilty on this basis, the defendant must

17  have actively participated in the violent crime with advance

18  knowledge.  "Advance knowledge" means knowledge at the time

19  that the defendant chose to begin or continue the defendant's

20  participation in the violent crime.  Again, the defendant

21  brought the firearm in his van to the robbery, he clearly aided

22  and abetted the use, possession, and carried the firearm in

23  furtherance of this robbery.

24        So those are the three ways in which the defendant is

25  guilty.  In addition, you will be asked to determine whether or

1    not the defendant aided and abetted in the brandishing of the

2    firearm, and as the Judge instructed you, the "brandishing" of

3    the firearm means to show the firearm.

4              For example, it means to point a firearm at a person.

5    And the evidence here is that the firearm was pointed at

6    Mr. Micheli, in his home, on September 30th, 2012.  Again, the

7    defendant aided and abetted in the brandishing of that firearm.

8              He had advanced knowledge that, if needed, that that

9    firearm would be used to intimidate who he thought would be

10   Frank, and so when you go to the verdict form, that is

11   reflected.

12             Paragraph four deals specifically with this count, and

13   it will ask you to decide whether the defendant used, carried,

14   possessed, or all three, the firearm that night.  It further

15   asks you to make a finding as to whether or not the defendant

16   aided or abetted the brandishing of that firearm.

17             So now I'm going to go through the testimony that you

18   heard related to September 30th, 2012, the testimony that

19   proves the defendant is guilty of all of the crimes charged in

20   connection with this incident.

21             You heard from Livan Ochill -- that's Livan Ochill --

22   he came and he told you why the defendant went to the Michelis'

23   residence that night.  He told you that the defendant received

24   information from a woman named Celia that a marijuana

25   grow-house was being operated there.  This is Celia.

1          Mr. Ochill also told you who the intended victim of

2   that crime was, he told you that the defendant intended to rob

3   a man named Frank -- a man named Frank who the defendant knew;

4   and again, the defendant admitted that he knew Frank.

5          But Mr. Ochill told you more.  He also testified that

6   since the defendant was paralyzed on September 30th, 2012, the

7   defendant has been successfully extorting Mr. Ochill for the

8   past six years.

9          Mr. Ochill has been made to pay the defendant $200 a

10  month:  $50 a month for the defendant's phone bill, you saw

11  those phone records, there was a woman who testified in

12  relation to those phone records, and $150 so the defendant can

13  maintain his lifestyle.

14         And why did Mr. Ochill do this?  He did this so the

15  defendant wouldn't implicate him in the robbery, wouldn't

16  implicate him, because Mr. Ochill was present, he was present

17  when Celia asked a question -- gave the information to the

18  defendant about the location of the grow-house.

19         You also heard from Elizabeth Micheli, we just heard

20  her 911 call.  You will have it back with you in evidence, you

21  will have the transcripts as well, and you should feel free to

22  listen to it as many times as you want, because there are

23  important things that are said during that 911 call.

24         "There's no power in our house," why was there no

25  power?  Alfredo Kindelan Hernandez told you because he turned

1    the power off.  "My dad shot, my dad shot," and finally, "my

2    dad shot because there was someone there with a weapon."

3    That's what Elizabeth Micheli says to the dispatcher that

4    night, "my dad shot because there was someone there with a

5    weapon."

6         Not just somebody peacefully sitting on the steps

7    waiting to talk to his friend, Frank, while he talked to his

8    friend, Peru, on the phone.  It was because the defendant and

9    his criminal partners' efforts to go inside that house using a

10   gun.

11        You also heard from Julio Micheli, Elizabeth's father,

12   and he told you as he approached the front door with his Glock,

13   he slowly unlocked that front door, and as he opened that front

14   door to see if anything was out there, anything he should be

15   concerned about for the safety of his family, he heard voices

16   from the other side, "this is a robbery."  He heard that yelled

17   on the other side of that door as hands emerged trying to pull

18   that door open.

19        He told you that the firearm appeared, and it was

20   pointed at him, and that as he pushed his wife into the office

21   to protect her, he fell backwards firing his Glock .40 caliber

22   firearm and striking the defendant.

23        You saw the firearm that he used to shoot the

24   defendant, right near him, paralyzing him, and you saw the

25   photographs and the shell casings that were recovered from the

1   home.  But not only did you hear from the victims in this case,

2   you heard from one of the defendant's criminal partners.

3          You heard from one of the people that the defendant

4   chose to associate with for these crimes.  You heard from

5   Alfredo Kindelan Hernandez.  He came here and he testified in

6   front of you, and he told you about the plan for the marijuana

7   grow-house robbery.  He told you that the defendant got the

8   information from Celia about the marijuana grow-house.  He also

9   told you -- the same as      Mr. Ochill -- that the defendant

10  was the one who knew about Frank, again, corroborating Mr.

11  Ochill's testimony.

12         He also told you about the execution of the marijuana

13  grow-house robbery, that the defendant drove his white van to

14  the location, that the defendant had the mask in his glove

15  compartment and the gun in his glove compartment of that van.

16         That the other participants in this event, including

17  the defendant, were Jean Marrero Lara, Raonel Valdez

18  Valhuerdis, and that they hopped the fence to get to the house,

19  which is in a gated community, near midnight on a Sunday.

20         Kindelan admitted he was the one that turned off the

21  power to the house and that the defendant and Valhuerdis

22  approached the front door.  He also told you that when they

23  heard gun shots, everyone fled, and the defendant was left

24  behind.

25         But what evidence corroborates Mr. Kindelan's

1    testimony?  You have the evidence presented by Mr. Ochill and

2    the evidence presented by Julio and Elizabeth Micheli.  We also

3    have the fingerprints of Jean Marrero Lara on Elizabeth

4    Micheli's BMW that was parked in the driveway on September

5    30th, 2012.  You've heard that testimony.

6          We also have the gun, the gun that was used -- that was

7    pointed at Mr. Micheli by Raonel Valdez Valhuerdis on that

8    night as he approached the front door, the gun that you heard

9    was found in a probation sweep years later, you heard from the

10   probation officer, after it was stolen by Mr. Kindelan's

11   nephew, the gun that was used by this criminal group to

12   intimidate Julio Micheli.

13         Mr. Hernandez also identified the contacts in the

14   defendant's phone, the contacts and who they were associated

15   with, because the contacts in the defendant's phone were all

16   nicknames, nicknames that have no meaning unless you knew the

17   defendant, unless you knew these people.

18         And so, Mr. Kindelan Hernandez told you that he is

19   Alfre, that Jean Marrero Lara is known as Mattatan, that Raonel

20   Valhuerdis is known as at Matapito, and that the defendant, he

21   was referred to as Miguelito.

22         You also heard the testimony of Special Agent Scott

23   Eicher, from the FBI.  He was the one that did the analysis on

24   the phone records, the phone records that were received in

25   connection with the defendant's phone, and the phone records

1    that were received in connection with the number for Alfre, the

2    number for Mattatan, the number for Matapito, and the number

3    for Celia.

4         Special Agent Eicher told you about the calls between

5    this criminal group, these conspirators, leading up to the

6    September 30th, 2012, robbery.

7         Leonardo Morales contacted Mattatan seven times,

8    Leonardo Morales contacted Alfre 17 times, Leonardo Morales

9    contacted Matapito 24 times.  Again, getting closer to the

10   robbery on 9/19, Leonardo Morales, 19 times with Mattatan,

11   three times with Alfre.

12        On 9/28, two days before this robbery was committed,

13   Leonardo Morales reaching out to Mattatan 19 times, 10 times

14   with Alfred, and three times with Matapito, and on the night of

15   this robbery, on September 30th, 2012, again, we see Leonardo

16   Morales and Mattatan 24 contacts; Leonardo Morales and Alfred,

17   five contacts; Leonardo Morales and Matapito, four contacts;

18   and Leonardo Morales and Celia, provider of the information,

19   two contacts.

20        Ladies and gentlemen, this does not look like the

21   defendant trying to give whatever religious advice he said he

22   was trying to give, this looks like a conspiracy, a conspiracy

23   to commit a marijuana grow-house robbery.

24        You also heard about the forensics of the gun on scene

25   that night.  You heard from Nicole Inhat, she came in to

1    testify and tell you about DNA.  I know it was awhile back, but

2    she told you that the DNA which was recovered from the walkway

3    would match the defendant, that shouldn't be surprising.

4         But she also told you that that DNA was consistent with

5    blood -- DNA consistent with blood -- and you will actually

6    have the swab back with you, so if you choose to look at it,

7    you could, but you can see that that swab is a red, crusty

8    swab, it's consistent with blood.

9         But she also told you that the DNA on the mask matched

10   the defendant, the DNA that was taken from the inside of that

11   mask.  And she told you that the DNA taken from inside of that

12   mask was not consistent with blood, instead, it was consistent

13   with touch DNA, the type of DNA that comes from your skin, that

14   comes from sweat, and it is left on something when, for

15   example, you are wearing it.

16        And that is what the evidence shows here, the evidence

17   shows that the defendant's DNA was on that mask because he wore

18   it that night.  And why was the defendant wearing that mask,

19   ladies and gentlemen?  Because he was the one who knew Frank,

20   he admitted that he knew Frank, and he wore a mask that night

21   so when he committed this robbery he wouldn't be found out.

22        You also heard from Detective Bertrand from the Miramar

23   Police Department, and he told you a lot.  He told you about

24   responding to the scene, processing of the scene, and he told

25   you that on that night, after this robbery -- or this attempted

1    robbery -- he went to the hospital.  He went to the hospital

2    where the defendant was located, and he was outside the

3    defendant's door when the defendant was speaking to his mother

4    and his wife.

5            And during that conversation Mr. Bertrand heard two

6    important statements:  He heard the defendant say, "we hit the

7    wrong house," "we hit the wrong house."  And he heard the

8    defendant say, "Celia gave me the wrong information."

9            Again, both of these statements corroborating

10   Mr. Ochill's testimony about the marijuana grow-house that

11   Celia told the defendant about, corroborating Alfredo Kindelan

12   Hernandez's testimony that they went to the house that night to

13   rob a marijuana grow-house.

14           So not only did Detective Bertrand tell you about those

15   two statements, those two statements that corroborate exactly

16   what happened on September 30th, 2012.

17           He also told you about the follow-up investigation that

18   was done of this robbery, the follow-up investigation that was

19   done in the surrounding area to identify who else was involved

20   in this crime, and you heard testimony that the victim's

21   residence was located inside a gated community in Miramar, that

22   the defendant's white van was parked outside of that gated

23   community, and so they jumped the fence in order to get into

24   that gated community, and that law enforcement was able to get

25   surveillance that showed the white van driving to and from the

1    robbery that night.

2          The defendant's white work van, again, corroborating

3    Mr. Ochill's testimony that when he was driving around with

4    Celia and the defendant, they were talking about this marijuana

5    grow-house, he was in the back of a white work van with

6    closed-up sides, Corroborating Mr. Kindelan's testimony about

7    where the mask -- where the gun -- was located.

8          He also told you about the retrieval of the defendant's

9    phone, and there was a report in connection with the

10   defendant's phone, it's in evidence, it's long, and I'm not

11   going to go through all of it.  But it did show the defendant's

12   outgoing and incoming calls from that day, and this is a subset

13   of those calls, and if you do go and look at those calls,

14   remember they are in Greenwich Meantime, and there is testimony

15   that that is four hours ahead.

16          I translated it here so that it's actually easier to

17   understand the time on that day.  You can see early on in that

18   date, the defendant is calling Mattatan, Alfred, Alfred,

19   Mattatan, and that continues throughout the day.  We saw a call

20   to Ochill, additional calls to Mattatan, to Alfred, to

21   Mattatan, and it continues onward.

22          And then we see a call with Celia, another call from

23   Celia, and here, ladies and gentlemen, is the one call that the

24   defendant had with Peru on that day.  That call happened 7:17

25   p.m.  Now, if you recall the defendant's testimony, it was that

1    he was peacefully sitting outside the Michelis' home, he was

2    talking to his buddy, Peru.

3          That is not reflected in the call logs.  The only call

4    with Peru lasted four seconds, and it was at 7:17 p.m.  And if

5    we keep going onward, closer to the time of the robbery, again,

6    you see the defendant reaching out to Mattatan, to Matapito,

7    to -- getting a call from Alfred, and so on, leading up to the

8    time of the robbery, which happened around midnight.

9          Again, ladies and gentlemen, this is a conspiracy, this

10   is what a conspiracy looks like, the constant contact, the

11   constant evolution of the plan.

12         You also heard from the defendant, in connection with

13   the September 30th, 2012, attempted marijuana grow-house

14   robbery, and the defendant told you that he was shot in the

15   back, that he was shot in the back while he was peacefully

16   sitting outside of the Micheli residence.

17         He was shot in the back while he was waiting for Frank

18   to answer the door so that he could broker a marijuana sale --

19   not a theft -- between himself and Frank, for Alfredo and Jean

20   Marrero Lara.  That was the defendant's testimony.

21         Ladies and gentlemen, you saw the shirt, you will have

22   the shirt back there if you want to look at it, and there is no

23   hole in the back of that shirt.

24         You also heard the testimony of Julio Micheli, you

25   heard testimony that a gun was pointed at him.

1          He didn't say he opened the door and there was some man

2    sitting on the steps and he fired.

3          He told you that there was a gun pointed at him, and

4    that he heard the phrase, "this is a robbery."  "This is a

5    robbery."

6          And, again, you heard Elizabeth Micheli on that 911

7    call, "my dad shot, my dad shot because there was someone there

8    with a weapon."

9          You also heard from the defense with Dr. Frankowitz.

10   The defendant called him, and what did he tell you?  He told

11   you that he removed the projectile from the defendant's back,

12   from the surface of the defendant's back.

13         It was not from a gunshot wound made in close

14   proximity, it was not made --  it was not made as a result of a

15   gunshot, in this case, for example, from the doorway to the

16   front step.  It's not consistent with that.

17         You heard Dr. Frankowitz testify, again, the projectile

18   was right at the surface, that there was no excoriation around

19   the wound.  That just means that there was no trauma around the

20   wound, which would be consistent with a gunshot wound made at

21   close range, a gunshot made at close range -- or an injury

22   rather, as a result of that.

23         Instead, the more likely scenario is that that bullet

24   migrated to that location from another spot.  So again, ladies

25   and gentlemen, we see the defendant is not shot by Mr. Micheli

1     in the back.

2          The defendant went to meet his criminal partners on

3     September 30th, 2012, with this gun, wearing this mask.  There

4     is only one conclusion for why the defendant went there, and

5     that is that he's guilty of conspiracy to possess -- or

6     conspiracy to commit robberies -- specifically, the marijuana

7     robbery; that he is guilty of conspiracy to possess with intent

8     to distribute marijuana, and again, we see that by his efforts

9     to get marijuana in connection with the grow-house robbery --

10    you can note that at the bottom there -- that he is guilty of

11    the attempted robbery; and that he is guilty of using the

12    firearm when he brought -- when aiding and abetting rather --

13    the use of the firearm, in carrying the firearm, and in

14    possessing the firearm on September 30th.

15         But furthermore, the defendant is guilty of aiding and

16    abetting in the brandishing of that firearm, for his efforts in

17    bringing the firearm, his efforts in this crime, the efforts

18    that he took with his criminal partners in this case.

19         Now, I want to move on from the September 30th, 2012,

20    robbery to the gold heist, the gold heist which happened nearly

21    two weeks later, on October 12th, 2012, and as a reminder, that

22    robbery took place in Coral Gables.

23         The victim of that robbery was Jorge Villegas, a

24    representative -- a courier -- working for the company Quari

25    Wasi, which is a Bolivian company.  The amount robbed was 2.3

1    million dollars in gold.

2          The participants on scene were Jean Marrero Lara,

3    Alfredo Kindelan Hernandez, Raonel Valdez Valhuerdis, among

4    others, and the defendant's role -- because at that time, on

5    October 12th, 2012, he was already paralyzed -- was in the

6    planning of that robbery.

7          You heard testimony of the planning for this gold heist

8    took weeks, weeks upon weeks of following the courier, of

9    surveillance on the courier to try to plan this robbery, to get

10   2.3 million dollars worth of gold.

11         And you also heard testimony that even though the

12   defendant was paralyzed, he could not physically participate in

13   this crime, for his effort in surveilling the courier, in

14   planning this robbery, he received a cut of approximately

15   $150,000.

16         In connection with this event, the defendant has been

17   charged in Count 1, which we have already gone over, with

18   conspiracy to commit robbery, specifically, the gold heist

19   robbery.  And we've gone through the elements that constitute a

20   violation of Count 1, of conspiracy to commit robberies.

21   Again, you see the unlawful plan, which was to rob the gold

22   courier, to rob the gold courier of his gold.

23         The defendant knew the unlawful purpose of the plan,

24   and we know because he partook in the surveillance of this gold

25   courier.  The object of the plan was to acquire someone else's

1    personal property against the victim's will.

2         Again, the evidence was that 2.3 million dollars worth

3    of gold was stolen from a courier in Coral Gables.  It was

4    stolen by force and by violence on October 12th, 2012.

5         And finally, the fourth element which we discussed in

6    connection with the marijuana grow-house is that the

7    defendant's actions obstructed or delayed or affected

8    interstate commerce.

9         I'm going to give you a further instruction on that.

10        Now, interstate commerce is the flow of business

11   activities between one state and anywhere outside of the state.

12   And this element is important in connection with the gold heist

13   because the evidence that came in through the testimony of Guy

14   Vargas -- which I will discuss shortly -- is that 2.3 million

15   dollars was brought from Bolivia to the United States, cleared

16   Customs, was brought to Coral Gables, and it was actually on

17   its way to Opa Locka at the time that it was stolen out of

18   commerce, it was stolen from the courier by the defendant's

19   criminal partners.

20        And so that element is now, this -- the action of the

21   defendant and his criminal partners affected interstate

22   commerce, and again, the witness who testified to that was Guy

23   Vargas, the representative of Quari Wasi who came here from

24   Bolivia to speak to you.

25        He told you that he operated a family business

1     exporting gold from Bolivia to the United States, and this

2     particular shipment was on its way from Coral Gables to

3     Republic Metals, Opa Locka when it was stolen.  And this gold

4     has never been discovered, it has never been recovered by the

5     company, Quari Wasi.

6          You also heard from Detective McKee, in connection with

7     the Coral Gables robbery.  He told you that he responded to

8     Jorge Villegas' house on October 12th, 2012, to hear about the

9     robbery, he learned what had happened.

10          He also told you that he had received evidence -- that

11     he had learned that Raonel Valhuerdis, one of the defendant's

12     coconspirators, had a GPS monitor that day, a GPS monitor that

13     not only put Valhuerdis at the grow-house robbery, but also put

14     him at the gold heist robbery -- Just another piece of evidence

15     corroborating what happened in this case.

16          You also heard from Alfredo Kindelan Hernandez, and he

17     told you about the plan for the gold heist.  He told you that

18     Miguelito, the defendant, is a smart guy, and that he would

19     tell other people what to do, planning this gold heist, prior

20     to becoming paralyzed.

21          He told you that the defendant was part of the

22     surveillance for this robbery, surveillance that took multiple

23     weeks.  The defendant was part of the planning before this

24     robbery.

25          He also told you about the execution of the gold heist,

1    that the defendant, in fact, chose his successor when he was

2    paralyzed and couldn't participate, that he chose the person

3    who would go with his criminal partners, his coconspirators, to

4    commit this robbery; and the defendant's successor, along with

5    Lara, along with Valhuerdis, and along with Kindelan, executed

6    the gold heist.

7         Kindelan told you that he served as the getaway driver

8    for this gold heist, and that the plan was to use violence to

9    take the gold by any means necessary.  He told you that he

10   could hear the victim's screams when the gold was taken.  He

11   also told you that the defendant received $150,000, again, for

12   his role in the planning, in the surveillance, for this gold

13   heist, but the defendant wanted more, and he asked Mr. Kindelan

14   for more.

15        But, importantly, what Mr. Kindelan also told you was

16   what the plan was, what the defendant's plan was with regards

17   to the money that he received in connection with the gold

18   heist, what he was going to do with his $150,000 that he had

19   just come across, and the defendant told Mr. Kindelan that he

20   was going to use that money, use that money to purchase

21   cocaine, kilos of cocaine, using his godson.  He told Mr.

22   Kindelan that, and Mr. Kindelan testified exactly that to you.

23        Ladies and gentlemen, you also heard from the

24   defendant, and he told you that he had previously admitted to

25   his participation in the gold heist.  He had admitted -- he

```
 1    admitted that he had detailed his participation, that he had
 2    detailed his knowledge of the gold heist on a prior occasion to
 3    David Bolton.  But, but, he had only done that because David
 4    Bolton was going to pay him in order to make these admissions,
 5    in order for him to give a confession, essentially, the
 6    defendant, that he lied to the victims of the gold heist, to
 7    the Bolivians, for money.
 8          But you heard from David Bolton, he was the last
 9    witness that testified, and he told you that the only money
10    that was ever given to the defendant was $300, $300 that was
11    given to the defendant so that he could buy a bicycle for his
12    child.  That money was given by the Bolivians because they felt
13    bad for the child.
14          And David Bolton told you unequivocally that he never
15    paid the defendant to admit to the crime, or to provide any
16    information that the defendant had done that on.
17          So, ladies and gentlemen, in light of that evidence we
18    would ask that you go to the verdict form as to Count 1, which
19    will already be filled out as to the marijuana robbery, and
20    find the defendant guilty beyond a reasonable doubt as to the
21    gold courier object of this particular count of conspiracy.
22          And, ladies and gentlemen, I would then ask that you go
23    to Count 2.  Count 2, which is the conspiracy to possess with
24    intent to distribute marijuana and cocaine and, specifically,
25    to the count as it relates to cocaine.
```

1          And think about Alfredo Kindelan Hernandez's testimony,

2    his testimony about the defendant's intent with the money that

3    he received from the gold heist, from the robberies, was to

4    purchase kilos of cocaine, purchase kilos of cocaine to sell.

5          And then we see the defendant acting on that plan,

6    acting on that plan to use his godson to purchase cocaine

7    nearly a year later, on August 28th, 2014 {sic}.  And the

8    charges in connection with this event relate to Count 7,

9    attempted possession with intent to distribute cocaine.

10          And there are two elements of Count 7.

11          First, that the defendant knowingly intended to commit

12    the crime of possession with intent to distribute at least 500

13    grams of cocaine.

14          And second, that the defendant's attempt is strongly

15    corroborated by his taking a substantial step toward committing

16    the crime.  And, again, this particular count relates to the

17    defendant's use of his godson to purchase a kilo of cocaine,

18    his defendant -- the defendant's godson, Mr. Magdalena, he

19    testified for you.  He told you what happened on this

20    particular date.

21          He told you that he was trying to buy a kilo of cocaine

22    for his Godfather, the defendant, who is handicapped.  So we

23    know that the defendant knowingly intended to commit the crime,

24    that he wanted a kilo of cocaine, and that attempt is strongly

25    corroborated by the fact that the defendant went, he went to

1   the scene that day, he met with the confidential informant, who

2   he believed at that time was the seller of that cocaine, and

3   so, again, those two elements have been proven beyond a

4   reasonable doubt.

5        You'll also receive an instruction -- or you have

6   received an instruction -- relating to aiding and abetting,

7   with agency, in connection with that crime.  And this

8   instruction is important because it deals with what happened

9   here, which is, essentially, that the defendant used his godson

10  to accomplish this act.

11       He used his godson by having his godson go out into the

12  world to find this seller of cocaine, and then the defendant is

13  the one who was pulling the strings, that was working with him

14  to make it happen, and the law recognizes that that means --

15  that evidence absolves the defendant of liability.  In fact,

16  the defendant is guilty, because he aided and abetted in the

17  crime, because he used his godson, he directed his godson to go

18  about purchasing this kilo of cocaine.

19       And again, the evidence relating to August 28th, 2013,

20  was that the defendant was attempting to purchase a kilo of

21  cocaine in Miami.  The cost of that kilo is $28,000.  The

22  participants on the scene, Osvaldo Magdalena, the defendant,

23  among others, were in the van, and the defendant's role was

24  that he was the purchaser and he provided the money for this

25  purchase.

1      You heard from Osvaldo Magdalena, he came here and he

2   testified for you.  He testified under oath, and you heard the

3   questions asked of him.  He is not receiving any benefit from

4   his testimony, he came to tell you here what happened on that

5   day, what happened on that day he tried to buy a kilo of

6   cocaine for his padrino, or his Godfather.  He told you that

7   the defendant was his padrino, or his Godfather, and the

8   defendant told him that he had some money, and he wanted to

9   find cocaine to buy, and he knew Mr. Magdalena's background is

10  buying and selling drugs.

11      And so, Mr. Magdalena helped him out, and Mr. Magdalena

12  told you specifically, the defendant told him, You are my feet

13  and my hands, and I am the head.  This is the concept of

14  agency, the concept of aiding and abetting.  The defendant was

15  paralyzed at that point, and so he used his godson to

16  effectuate his plan.

17      Mr. Magdalena found a seller of a kilogram of cocaine

18  for his padrino.  Little did he know, this seller was a

19  confidential informant working for law enforcement.

20      Mr. Magdalena took the defendant that day, on August

21  28th, to this purchase.  He loaded him into his minivan and he

22  drove him to the purchase.  And then, Mr. Magdalena went one

23  step further, he brought this confidential informant, the

24  seller of cocaine, over to meet his padrino, his Godfather,

25  before this purchase was made, and the defendant provided

1    $28,000 to make the purchase.

2          Before long, law enforcement intervened and took back

3    the drugs, and took the money, and arrested everyone on the

4    scene.  But, importantly, you do not have to believe the

5    testimony of Mr. Magdalena.  You have the surveillance video

6    that corroborates what Mr. Magdalena told you, but you also

7    have the undercover recordings that were made of Mr. Magdalena

8    as he was attempting to purchase this cocaine, the undercover

9    recordings that were made by the confidential informant.

10          And I'm going to go over the recordings now, quickly.

11    You will have those recordings back with you, you can reference

12    those whenever you like, and you'll also have the transcripts.

13          But I just want to draw your attention to the number of

14    times during this undercover recording that Mr. Magdalena

15    references his padrino, that he references the defendant.  And

16    this is one of the first calls made on August 27th, 2013,

17    between Mr. Magdalena, and the confidential informant.

18          Again, you see Mr. Magdalena thinking that he's

19    speaking to someone that's really selling him cocaine,

20    referencing "my padrino," explaining "my padrino, he is

21    handicapped."  And going further, "I will bring him, too, I

22    will bring him this one."  And what is he referring to there?

23    He is referring to bringing a kilogram of cocaine to his

24    padrino.

25          Going further, "let me take it to padrino, he will

1   withdraw the money from the bank."  Again, the testimony was

2   that the defendant was the one providing the funds for this

3   transaction.  "I am going to be calling my padrino" -- this is

4   from the next day, the date of the actual purchase -- "To go

5   alone, by myself, with my padrino.  I'll go pick up my padrino,

6   Alright, right now."

7        Again, the continual references to "my padrino."  "I'm

8   already loading in my padrino."  "They're already loading my

9   padrino on the crane, already up to load him to the car."  To

10  load the defendant, who is handicapped, so he can come to the

11  purchase -- "I am loading my padrino in the van, just a

12  second."

13       And then at the meeting where the actual purchase was

14  made, again, the reference to "my padrino."  "First, I want you

15  to meet my padrino."  "Look, here is my padrino."

16       Why would Mr. Magdalena bring a drug dealer to meet his

17  padrino if his padrino, who is handicapped, is not involved in

18  this purchase?  "He is my padrino," and then we hear from the

19  defendant, padrino:  "I'm waiting on you, my friend."

20  "Padrino, go on, Alright."  And then we have the photograph of

21  the defendant from the scene that day, from the van where the

22  CI went to meet him before the purchase.

23       You saw the photographs of the money, the $28,000

24  provided by the defendant for this purchase, and you saw the

25  cocaine.  970 grams of cocaine, nearly a kilo of cocaine, well

1    over the 500 grams required for the count.

2           And that takes us, ladies and gentlemen, to the final

3    count, to Count 7, which is reflected in paragraph five.  The

4    defendant is guilty beyond a reasonable doubt of that count,

5    and he is guilty of that count for trying to possess with

6    intent to distribute cocaine weighing 500 grams or more, 970

7    grams in this case.

8           Ladies and gentlemen, those are the counts, those are

9    the charges against the defendant, and that is some of the

10   evidence -- not all of the evidence -- that has been presented

11   in connection with those counts.

12          And before I finish, I just wanted to quickly go over

13   the definition of "reasonable doubt," which seems to have

14   disappeared.  But the idea being that reasonable doubt is the

15   standard by which the Government must prove its case to you,

16   beyond a reasonable doubt, and beyond a reasonable doubt is not

17   beyond all shadow of doubt, it's beyond a reasonable doubt,

18   using your reason and your common sense.

19          And we want you to bring your reason and common sense

20   back into that jury room.  We want you to bring your reason and

21   common sense and your life experiences when you analyze the

22   evidence in this case.  We want you to use your common sense

23   when you consider the testimony of the defendant.

24          The defendant's testimony that he went to that house in

25   a gated community at nearly midnight and was sitting on the

1    steps talking to his friend, Peru, waiting to broker a drug

2    deal, when he was suddenly shot in the back.

3            We want you to use your common sense when you're

4    thinking about that testimony.  We want you to use your common

5    sense when you're thinking about the defendant's testimony that

6    he had previously admitted to the gold courier robbery, to his

7    part in the gold courier robbery, but he only did that because

8    he was being paid money.

9            And we want you to use your common sense when you think

10   about the defendant's testimony that he was on his way to a

11   doctor's appointment when Mr. Magdalena pulled over to do the

12   drug deal.  We want you to use your common sense when you're

13   reviewing the evidence that was presented in this case, and

14   after you've reviewed all of that evidence, the evidence that

15   came in through the various witnesses and the physical

16   evidence, the only conclusion is that the defendant is guilty

17   beyond a reasonable doubt of each of the crimes charged against

18   him in the indictment.  Thank you.

19           THE COURT:  Alright, thank you.  We will take a

20   15-minute recess at this point, everybody.

21           COURT SECURITY OFFICER:  All rise for the jury.

22           (Jury exited courtroom at 11:00 a.m.)

23           THE COURT:  We will be in recess.

24           Ms. Duane, you finished at exactly 10:59, so you have

25   35 minutes remaining.

1          MS. DUANE:  Thank you, Your Honor.

2          (Recess taken from 11:00 a.m. to 11:18 a.m.)

3          (Jury entered courtroom at 11:18 a.m.)

4          THE COURT:  Mr. Zacca.

5          MR. ZACCA:  Thank you, Judge.

6                    DEFENDANT'S CLOSING ARGUMENT

7          MR. ZACCA: Good morning, everybody.  Happy New Year.

8          First of all, I want to echo what my colleague opened

9    with, is thank you for coming.  It's been a long trial, you

10   have been here for the past month.  You've heard a lot of

11   witnesses, you've heard a lot of testimony.

12         Thank you for your service, it's so important.

13         And with that thank you, I want to emphasize something

14   that may not have been recognized up until this point.  You

15   know, in life we all make important decisions:

16         Where to work, what to do for work, should we get

17   married, who do I marry, where do I live?  These are important

18   decisions that we have to make throughout our life.

19          Well, today, you are going to make another important

20   decision in each of your lives, because today you hold the

21   power to decide whether to convict Leonardo Garcia Morales as

22   charged in the indictment.  That is an important decision,

23   because your decision, your individual decision, collectively,

24   will impact his life for the rest of his life.

25          Now, you -- you know, some would say that the U.S.

1    Government is the most powerful organization in the world --

2    some would argue -- and I would point out the resources

3    available to the U.S. Government.  They have two fine

4    prosecutors, they have an agent assigned at counsel's table,

5    they have agents in the back of the room providing support and

6    backup -- which is great -- however, in this building, in this

7    room, it has been said that the courtroom is the great leveler,

8    and you know, listen.

9         With certain witnesses I was more aggressive in my

10   questioning, more animated in my questioning, and I hope I

11   didn't offend any one of you, but my purpose is, is in order to

12   bring life into this room, I have to cross-examine.

13        It is the right to confront witnesses, and with the

14   power and resources of the U.S. Government, all I have is

15   myself and my client, so yes, there are certain witnesses that

16   the Government is going to call that I'm going to challenge,

17   that I'm going to cross-examine, to confront, because he has

18   the right to confront.

19        And this building, this room is the great leveler;

20   you are, because the Judge doesn't decide the conviction, the

21   Government doesn't decide the conviction.

22        You, the people, and all of you took an oath to be

23   fair and honest and apply the law, and that's what I'm asking

24   you to do.

25        Now, what is the law?  The law was discussed and read

1    to you.  I want to emphasize on certain points.  You know, as

2    was emphasized in jury selection, the defendant is presumed

3    innocent, there's a clean slate.  They -- the Government has to

4    prove him guilty beyond a reasonable doubt.

5          Now, "reasonable doubt," what exactly is that?

6          And I'm going to give you an example that you may or

7    may not consider when deciding for yourself the guilt or

8    innocence of Mr. Garcia Morales.

9          So what does the law say reasonable doubt is?

10   Reasonable doubt.  "Proof beyond a reasonable doubt" is proof

11   so convincing that you would be willing to rely and act on it

12   without hesitation in the most important of your own affairs.

13         Now, when I think about this, I -- I think of my

14   father, who I love dearly.  My father is someone who helps me

15   pick up the kids from school.  Maybe I'm away from the house

16   for a long time -- I have two dogs -- he comes to my house,

17   lets the dogs out and brings them back in -- so they can use

18   the bathroom.

19         You see, if my dad calls me and I'm in court, and

20   says, Deric, I took the dogs out, I picked up my kids from

21   school -- or I picked up the kids from school.

22         I can trust his word "without hesitation" because my

23   home, my dogs, my family, my kids are the most important things

24   of my life, but I can trust his word "without hesitation" in

25   the most important of my affairs.

 1          And that is what the law says.  The law says that

 2    they must prove this case beyond a reasonable doubt.  It's a

 3    high standard, and this illustrates it right here.

 4          The law tells you that when you're listening to the

 5    Government's witnesses, you have to be convinced by them to the

 6    point where you would rely on it without hesitation in the most

 7    important of your affairs, that's the standard.  That's the

 8    standard.

 9          So, understanding that, and understanding that each

10    offense is to be judged separately, so we have, basically,

11    three events, right?

12          In opening statement I talked about the three events,

13    and now we're here at the end of the case.  Three events, you

14    have to judge them separately.  And let's go through them.

15          Let's, first, talk about the attempted cocaine

16    purchase by Osvaldo Magdalena Ruiz, and I want to point this

17    out, you may recall from the cross-examination of Mr. Ruiz --

18    excuse me -- one of the things we learned about him during

19    cross-examination was his background.  And you may recall when

20    I was trying to scribble on the screen, when I was talking to

21    him and asking him questions, well, what we know about

22    Mr. Ruiz, he's a lifetime cocaine drug dealer.

23          These are the convictions that he admitted to, and

24    these are the ones that we know about, starting from 1998, up

25    until July 2013, a month before the event charged in this case.

1    And so this is somebody who clearly is in the business of

2    buying and selling cocaine.  Now, the Government says, Well, on

3    this particular day on August 13th, he was in a partnership

4    with Mr. Garcia Morales to purchase cocaine.

5         But things to keep in mind:  First of all, obvious

6    question, we all saw Mr. Ruiz, an admitted Latin King member,

7    aside from being a dealer, is he somebody whose testimony you

8    would rely upon in the most important of your affairs?  I

9    submit to you, probably not.  Reasonable people would be wary

10   of trusting somebody like that.

11        But at the end of the day, if you look at the case,

12   you have to believe him in order to convict him.  You'll have

13   the transcripts when you go back to the jury room.  There's

14   never a recording, a discussion, any objective evidence, aside

15   from Mr. Ruiz capturing Mr. Morales talking about cocaine,

16   talking about the price of cocaine, the amount of cocaine, when

17   to purchase it, how to purchase it, and what to do with it.

18   Nothing.

19        You're basing your conviction entirely on the word of

20   Mr. Ruiz.  And what struck me -- and I tried to illustrate it

21   during the cross, I don't know if it came out -- but what

22   struck me was, during the direct -- Mr. Vazquez, during his

23   direct testimony of Mr. Ruiz -- and I think it was right here

24   in the transcript, so let me just take this off, now that we've

25   reminded you of his background.

1              This is a -- again, you'll have this -- but in the

2     transcripts -- this was the day before, August 27th, when we

3     saw the video where Mr. Ruiz first meets with the confidential

4     informant.  Mr. Vazquez asks Mr. Ruiz, "why did you bring up

5     padrino?  Why did you bring him up?"

6              And on direct testimony -- not during cross -- he said

7     that he brought him up because he thought he could get a better

8     price, basically, used the fact that Mr. Morales was

9     handicapped, perhaps he can get a better price.  That was not

10    something that he admitted on cross, he admitted that on

11    direct.

12             That struck me, I guess he's trying to do whatever he's

13    always doing, as any buyer or seller of a product, you're

14    trying to get the best price, so you maximize the situation

15    and, quite frankly, that's somebody that -- only somebody

16    that's been in the business and doing it on their own,

17    independent of Garcia Morales, would think of.

18             This is not the first-time event for him.

19             Now, conveniently, he's serving prison time, and he

20    comes in and tells you that he wants nothing for his testimony,

21    that he's just doing it because all of a sudden, essentially,

22    he wants to be a good citizen.

23             Listen, the Government asked you to use common sense,

24    that doesn't make a lot of sense.  He is not a new person

25    deciding to do the right thing, because, rest assured -- rest

1   assured -- what's going through his mind is once this case is

2   over with, he will be knocking on the door of the Government

3   asking for something for his testimony.  Rest assured, once you

4   all leave here -- this is inevitable -- and that's going

5   through his mind.  So, you have, essentially, to rely on the

6   word of Mr. Ruiz with regard to the cocaine purchase.

7        We now have the second event in this case, which -- oh,

8   and -- and I remind you, I want to bring out one thing, and

9   you're going to see this a lot, it's in the conspiracy

10   instruction that was read to you:

11        Simply being at an event or merely associating with

12   certain people discussing common goals and interests doesn't

13   establish proof of a conspiracy.  Also, a person who doesn't

14   know about a conspiracy, but happens to act in a way that

15   advances some purpose of one, doesn't automatically become a

16   conspirator.

17        Being present at the scene, at the time of the arrest

18   of Mr. Ruiz, is not convincing, and you need more than this.

19   You need to believe that what Mr. Ruiz tells you, that, Yeah, I

20   was in a partnership with him to buy cocaine.

21        So, we've talked about Mr. Ruiz.

22        The second event is this gold robbery in Coral

23   Gables, and what does the Government rely upon in order to help

24   you decide whether to convict him, is the word of Mr. Alfredo

25   Kindelan Hernandez.

1        Now, listen, I don't think I pulled any punches here in

2   opening statement when I told you, you're going to meet in this

3   trial some of the most unpleasant people you'll ever meet in

4   your life.  I think I was on the mark there, and the evidence

5   proved it.

6        So let's talk about Mr. Kindelan Hernandez, some of

7   you would argue is a lot worse than Mr. Ruiz, a guy who

8   committed kidnappings to make money, Just think about that,

9   think about the guy you met today in the trial.

10       This is a guy who would get on a plane, go to a

11  foreign country -- Cancun, Mexico -- be part of a group that

12  would forcibly grab somebody, put them in a room, like you've

13  seen on TV, tie them up, and then threaten their families to

14  extort money out of them.  This is what this guy did.

15       And he also, you know, happened to be in the illegal

16  immigrant smuggling business by stealing boats and being part

17  of that.  You see, this is the guy that the Government asks you

18  to believe, and say, Yes, convict this man, convict this man of

19  gold robbery.

20       You know, not only does the law -- first of all,

21  that's not somebody who you would rely upon, I submit.  I

22  submit, that you wouldn't rely upon his testimony in the most

23  important of your affairs.  I submit, reasonable people would

24  reject that, because this is not a man that you would trust,

25  but let's go -- let's dig deeper.

 1          The law talks about people like him.  I'm going to

 2    show you where the law -- the Judge raised -- you may not have

 3    picked up on it originally -- but the law tells you, you have

 4    to be wary of people like this, and I will tell you how.

 5          We talked about his plea agreement, he has two plea

 6    agreements, it's in evidence, you will be able to take it back

 7    and read it.

 8          But this is a guy who, you know, did all these

 9    terrible things for money, but, you know, money is not the most

10    important thing to him, it's freedom; right?  To be with his

11    family.  What's a lie?  How easy is it to lie when you're

12    willing to kidnap people and extort their families?  You saw a

13    man that was serving 16 years in prison and hoping to get a

14    Rule 35.  Remember Rule 35?  We talked about that, how they

15    talk about that at FDC -- the Federal Detention Center --

16    that's the ticket out of -- that's the ticket out of jail,

17    Rule 35.

18          And rest assured, again, when you leave here today,

19    when your job is done -- deliberating -- there will be a

20    Rule 35 in this case, because he will be asking for one.  Now,

21    he tries to downplay it, he tries to downplay it, but in his

22    plea agreement, you can't escape the language.

23          It's right here, he wants his Rule 35.  We went over

24    this during his cross-examination.  You see, in his mind, while

25    he's testifying -- and I tried to illustrate this in

1    cross-examination, hopefully, I was effective enough in

2    pointing that out -- but while he's testifying, you see, it's

3    The Office, the U.S. Attorney's Office, that decides the value

4    of or how substantial his cooperation is, in their sole,

5    unreviewable judgment.

6           He knows his plea agreement, he knows he has to

7    impress them.  He knows, so that's an extra motivation in his

8    mind, not that the Government is doing anything wrong, it's

9    that -- I'm pointing out what's in his mind, Hey, I've got to

10   come through here and, quite frankly, it was a display in

11   itself when he tried to downplay the significance of his

12   agreement.  Of course he's looking for a sentence reduction, 16

13   years is a long time.

14          So what does the law say about somebody who's looking

15   for a Rule 35, a sentence reduction?  Well -- bear with me one

16   second -- page eight of your instructions talks about the

17   testimony of an accomplice, informer, or a witness with

18   immunity, or codefendant with a plea agreement.

19          This instruction applies to Mr. Ruiz and Mr. Kindelan

20   Hernandez.  And think about the force of this, that the law is

21   actually going out of its way to tell you, Hey, be careful

22   believing guys like them.

23          Why?  Well, what we know is, in this case, the

24   Government has made a plea agreement with a codefendant in

25   exchange for his testimony.

1              Such plea bargaining calls for, or provides for, the

2    possibility of a lesser sentence, but a witness who hopes to

3    gain more favorable treatment may have a reason to make a false

4    statement in order to strike a good bargain with the

5    Government.  So while a witness of that kind may be entirely

6    truthful when testifying, you should consider that testimony

7    with more caution than the testimony of other witnesses.

8              Think about what the law is telling you, saying, Hey,

9    listen, by the way, you know, these two guys, you got to really

10   be careful believing these guys, because they have everything

11   to gain by testifying for the Government.  And, listen, that's

12   common sense, that's normal.  That can be seen.

13             So again, there's no video, there's no audio, there's

14   nothing, nothing to support Mr. Garcia Morales' involvement in

15   the conspiracy of the gold robbery, other than the words of

16   Mr. Hernandez.

17             I want to point something else out that I think is --

18   I tried, again, to bring out in cross, and I'll try to

19   emphasize it again here -- is the timeline of Mr. Kindelan's

20   accusation against Garcia Morales because I think that's

21   important.  So what did he testify to?

22             He testified -- well, we know what happened; in 2014,

23   he went to Cancun, Mexico, and kidnapped a man named Alex Mesa.

24   On March 19th, 2015, he was arrested for the kidnapping of Alex

25   Mesa, and -- you may recall, I mean, we -- I don't know, he

1    wanted to quibble -- but he denied lying to the FBI agents

2    about his involvement with Alex Mesa, and then he admits that

3    he lied but tries to downplay it, but that's for you to decide,

4    but I think his dishonesty was in full display.

5            So, what happens.  He gets arrested on March 19th;

6    July 21st, just a few months later, he meets with the FBI

7    agents, he meets with the U.S. Attorney's Office.  He's asked

8    specifically about the gold robbery in Coral Gables.  He

9    identifies other participants, but he never mentioned Leonardo

10   Garcia Morales.

11           And if you recall, he's described Mr. Garcia Morales as

12   a leader, as a smart guy, as somebody who was telling other

13   people to do -- direction, give everybody direction -- how can

14   you forget the person who's the leader when asked about the

15   gold robbery?

16           It doesn't make any sense, he would be the first

17   person that he would tell the Government, Oh, he was involved,

18   yeah.  Back up.  If he was the so-called panel organizer, well,

19   he testifies, as we know, and just a few days later he pleads

20   guilty to the Alex Mesa kidnapping.

21           Two years later, he's indicted in this case, the gold

22   robbery, pleads guilty April 10th, 2018, and I want to -- I

23   think something that's worthwhile pointing out here -- we have

24   his second plea agreement, and in this plea agreement, he's

25   operating under the same language, he's hoping to get a

1    Rule 35.

2            There's no difference in the language.  He's looking

3    to get that Rule 35, and so he can get that Rule 35 language.

4    So he's now incentivized to help himself, and for the first

5    time, after signing two plea agreements, he identifies

6    Mr. Garcia Morales on April 2018.

7            This, right here, this timeline right here, shows you

8    enough to cause doubt, reasonable doubt, when you believe his

9    accusation because, at the end of the day, when he melts it

10   down, that's all the Government has, the bare word of

11   Mr. Kindelan Hernandez.

12           Now, in rebuttal, the Government called Mr. Bolton.

13   Now, I want to point something out here as well.  In many cases

14   you hear some evidence in the direct and then you hear other

15   points that weren't raised on cross.  Now, wait a minute, I

16   didn't know that.

17           Well, I submit to you David Bolton was one of those

18   moments.  David Bolton is an interesting character because we

19   all remember when Mr. Garcia Morales was testifying -- and you

20   may or may not have believed him, I don't know -- when he said

21   well, Why didn't you tell Mr. Vargas or Mr. Bolton you were

22   part of the robbery?

23           Well, I lied.

24           Well, why?

25           Well, I needed the money.  He doesn't -- he's lying at

1      this point, it doesn't make the any sense.

2             Well, lo and behold, the Government calls Mr. Bolton,

3      and guess what we find out?

4             Mr. Bolton, who has a financial interest -- many

5      financial interests -- in the case, he's on retainer, he gets

6      paid hourly -- that he was still owed money at the time he met

7      with Mr. Garcia Morales.

8             The one thing he didn't admit was that he gave

9      information to Mr. Garcia Morales to regurgitate at that

10     meeting, but he admitted everything else that Mr. Garcia

11     Morales said.  He got paid -- Mr. Vargas it was -- paid

12     Mr. Garcia Morales, in October of 2015, $300 so he could buy a,

13     I guess, a toy for his son, Mr. Garcia Morales' son.

14             What strikes me -- and what should give you pause --

15     in Mr. Bolton's testimony, is the fact that he records this

16     interview -- has ongoing discussions with law enforcement for

17     the past six years, because the robbery happened in 2012 -- and

18     he doesn't tell law enforcement until the middle of this trial;

19     because that's what happened, This tape came up in the middle

20     of this trial and it was handed to them and handed to me, and,

21     Oh, I just happen to have this tape.

22             Mr. Bolton, what are you talking about?  You're a

23     private investigator looking -- protecting interest of this

24     victim -- you don't think it's strange that you show up on

25     October of 2015 and Mr. Garcia says that he was involved in

1    this while charges are pending in state court, you don't think

2    that's strange?

3          No, I don't.

4          I mean, the fact that Mr. Garcia Morales admitted to

5    this stuff while he's charged in state court should give you

6    pause to whether to believe those statements.

7          He got paid $300 -- and, quite frankly -- I want to

8    point something else out.  The Government makes a big point of

9    Mr. Hernandez saying that the gold robbery -- he was paid

10   $150,000 after the gold robbery.  $300 is cheap compared to

11   $150,000.  It doesn't make any sense.

12         That right there undermines Mr. Hernandez's claim that

13   he was paid $150,000, because all of a sudden Mr. Garcia

14   Morales, desperate, financially destitute, in a hospital, is

15   willing to sell an incriminating story for $300.

16         It makes no sense, and guess who wins in this

17   transaction?  Mr. Bolton.  We find out in cross he's writing a

18   book.  He has a reporter that comes over and talks to him.

19         Is this so hard to believe that before that reporter

20   came, that he met with Mr. Garcia Morales the times that he

21   said he met him, like three or four -- four or five times --

22   and told him, Hey, listen, what do you think about this?  What

23   do you think about that?  Help me out here.

24         He has a movie production.  He wants to impress his

25   client, so his client pays him -- Mr. Vargas -- I don't think

81

```
 1    it's too hard to believe that Mr. Bolton is somebody who would

 2    manipulate the situation for his own financial interests.

 3            At the end of the day, the crux of the Government's

 4    case with regard to the gold robbery is the testimony of

 5    Mr. Hernandez, and the question you have to ask yourself is,

 6    are you going to rely upon his word and his accusation of the

 7    gold robbery without hesitation in the most important of your

 8    affairs?  I submit to you, reasonable people wouldn't.

 9            So that leads us to the third event.

10            And again, when you break it down, you have to decide

11    whether the Miramar event was a robbery or a transaction.

12    That's really what it comes down to.  I mean, he admitted --

13    Mr. Garcia Morales admitted to the purpose of going there, for

14    marijuana, so I don't think that's a dispute.

15            The question is, was it a transaction that went

16    terribly wrong for Mr. Morales, or was it an outright robbery?

17            Now, if you remember in opening I argued that the

18    evidence -- that the investigation wasn't as proper and

19    complete as it should have been to answer that question,

20    transaction versus robbery, because that's really what it boils

21    down to.  It's not complicated.

22            And, you know, I first want to point out the charge

23    of brandishing a firearm, that's Count 4, if I'm not mistaken,

24    of the indictment, and Mr. Kindelan Hernandez says that this is

25    the firearm that was used by Mr. -- that was used in the
```

1    robbery.  I believe he testified that Mr. Morales, I believe,

2    at one point handled it.

3         Well, we're here now, January 2nd, 2019, we are at

4    closing arguments, we're at the end of the case, we're about to

5    deliberate on the case.

6         Did you hear any evidence whatsoever of fingerprints

7    recovered from this firearm matching to Mr. Garcia Morales?

8         Did you hear any evidence of DNA linking this firearm

9    to Morales?  You heard none.

10        So the question in your mind is -- and you'll have to

11   decide -- is that enough to convict him of brandishing,

12   possessing, carrying, using a firearm?

13        That's a decision that you have to make.

14        I submit to you that it's insufficient because, again,

15   what do you have to base that on?  You have to base that on the

16   word of Kindelan Hernandez.

17        And certainly, if we're to believe Mr. Micheli and his

18   account, which was, I think, best described as fuzzy, he was

19   more focused on the gun he said, but the person he said held

20   the gun ran away.  I don't know if he said "chicken," but he

21   used some kind of a term.

22        So, obviously, we know Mr. Garcia Morales didn't run

23   away from the scene because we can see his statement, and the

24   evidence is clear, he was shot and was taken to the hospital

25   from the front of the house.  So I think the evidence is

83

1 lacking with regard to the firearm count.

2   Now, during cross-examination, I made -- I kept

3 repeating this line of cross -- so I can get it focused here --

4 and these are just random pictures of the scene of the crime --

5 I'm just going to flash in front -- so I can put two here --

6 and I'm not going to show all the photos, I mean, we saw them.

7   But one of the points I tried to emphasize on cross for

8 your consideration was the fact that the amount of blood -- it

9 was undisputed that there's blood in the driveway, even blood

10 in the street -- none of the witnesses that the Government

11 called could testify as to exactly what fire rescue did with

12 regard to handling the situation, handling the clothes, in

13 fact, we know they left scissors there in the chaos of

14 attending to Mr. Garcia Morales.

15   So the Government then -- so the point being, it's a

16 chaotic scene, and that's important because the Government

17 hangs its hat on arguing that, Hey, there was a mask recovered,

18 there's DNA of Mr. Morales in the mask, according to the DNA

19 expert, he's got to have the mask on.  Well, what do we know?

20   Number one, we don't know how the mask got deposited

21 right here, we heard no testimony of fire rescue, the

22 Government didn't call any of the fire rescue individuals.

23   We know there's blood right near the mask -- as can be

24 seen here -- and again, you can study these pictures, and I

25 encourage you to do so -- the mask, as it is seen with the

1    crime scene technician -- is from the bottom up.  You see?

2    Right here.

3            So if you recall from the cross-examination, we

4    talked about the concept of transference, where I did -- and I

5    did that whole example with the pen, I can grab Mr. Vazquez's

6    pen, touch it, get skin cells from his pen, then pick up this

7    pen over here and move it over here.

8            There is the potential for Mr. Vazquez's DNA to get on

9    this pen without Mr. Vazquez ever touching the pen, because

10   it's called "transference," it can happen, and that's the

11   point.  In the madness of the fire rescue attending to the

12   scene, we don't know what transference, if any, could have

13   taken place in moving stuff around.

14           Also, if you recall the testimony of Ms. Inhat -- she

15   was the DNA expert -- there was three DNAs in the mask.  One

16   was identified to Mr. Garcia Morales and two were other minor

17   contributors, so there's three different DNAs, we don't know

18   who those other two people are.

19           Could that have been fire rescue?  That would firmly

20   establish the transference potential, but the point is, it's

21   unclear.

22           Finally, I kept hitting on the shooting

23   reconstruction -- look, Detective Bertrand is a nice guy from

24   Miramar, he's a nice guy, a pleasant man, but, quite frankly,

25   he didn't even know the projectile that he said was recovered

1    from the hospital was actually recovered at the Broward County

2    Jail.

3            We all heard from Dr. Frankowitz, he's the one who

4    removed the bullet at the Broward County Jail a month after the

5    hospital from his back.  Now, the Government wants to argue

6    bullet vibration and what have you, but, you know, pictures of

7    his back don't lie.

8            I mean, there's a -- we see a bullet hole in his

9    back.  Just remind ourselves of these pictures.  Bullets

10   migrating don't cause bullet holes in the back.

11           Also, medical records that were introduced in the case

12   established that he was shot at least what, eight to nine

13   times.  Eight to nine times.

14           Now, admittedly, in this medical record, this discharge

15   summary from Memorial Hospital, doesn't mention the bullet

16   wound in the back, it mentions eight bullet wounds all over

17   various portions of his body, including two to the upper-right,

18   but we know for a fact there a bullet in his back, because we

19   heard Dr. Frankowitz testify, that just seven to 10 days later,

20   he took a bullet out of his back.

21           At the end of the day, the Government's evidence

22   relies heavily on the testimony -- and I encourage you to look

23   at all the photographs in this case, I think they're all

24   telling -- but, at the end of the day, the Government's case

25   relies heavily on the testimony of Mr. Hernandez and Mr. Ruiz.

```
 1              Those are the two individuals that -- and I'll say it

 2      again -- I think reasonable -- it's reasonable to doubt their

 3      case -- doubt their testimony.  They're characters that have

 4      something to gain for their testimony, and it's not to be

 5      trusted.

 6              So, with regard to the verdict form -- the Judge will

 7      review with you -- there's a place in the verdict form that

 8      addresses whether to convict Mr. Garcia Morales for the charge

 9      of attempting to purchase 500 grams or more of cocaine.  The

10      testimony of Mr. Ruiz is not enough, it's insufficient to prove

11      beyond a reasonable doubt.

12              It seems that the only reasonable verdict would be

13      one of not guilty, the Government has not met its burden.

14              With regard to the other sections in the verdict form,

15      and there's one in Count 1, which is -- it appears this way

16      because this is the way the Government charged it -- is a

17      conspiracy to possess with the intent to distribute 500 grams

18      or more of cocaine.

19              Again, the Government has not met its burden.

20              With respect to the gold robbery event in Coral Gables,

21      again, you have to be unanimous.  As the Judge instructed, you

22      have to unanimously decide that he is guilty of either the gold

23      robbery, the Coral Gables -- the Miramar event -- you can't be

24      six here, six there, it has to be unanimous.  You can be

25      unanimous on both, but you have to be unanimous on each
```

```
 1    objective.
 2           Again, I thank you for your time.  I hope my
 3    summation was helpful in your deliberations, and I hope my
 4    examinations of the Government witnesses were helpful in
 5    helping you decide the proper decision in this case.
 6           Thank you.
 7           GOVERNMENT'S REBUTTAL CLOSING ARGUMENT
 8           MR. VAZQUEZ:  Ladies and gentlemen, again, the
 9    Government thanks you for your time, I appreciate your
10    interest.
11           I have a set amount of time, and I want to talk to you
12    directly about this case and this defendant's actions.
13           There's an old saying, it may be familiar to some,
14    "tell me who your friends are and I will tell you who you are."
15    These friends, these band of brothers, these partners, they got
16    together for one purpose:  Money.
17           They came together for money, and they chose two ways
18    of getting it:  Robbery and drugs.
19           They came together through two conspiracies:
20    Count 1, conspiracy to commit Hobbs Act robbery, Robbery of the
21    gold courier, robbery of a drug dealer.
22           What were we going to do with that drugs that we
23    acquired from Frank, the person he knew, the person this
24    defendant could not face, so he put on a mask?  We were gonna
25    sell.
```

1        What were we going to do with the money from the gold

2   courier robbery?  We were going to get drugs.

3        What were we gonna do with the drugs?  We were going to

4   sell them, we were going to make money.

5        These defendants, these friends, banded together for

6   that purpose, and they acted on it.

7        At the beginning of this case the defense said

8   something to you in opening that I thought was a great point,

9   look for the objective evidence in the case.  We agree.

10       The Government, the United States, did not come here on

11  the word of Alfredo Kindelan, did not come here on the word of

12  Osvaldo Magdalena.

13       It came on records, recordings, common sense, evidence

14  that was presented to you over three weeks.

15       We're going to talk about that now.

16       These witnesses, while they have to get up on the

17  stand, they gave you the physical evidence, they give you the

18  records, they give you the context that you can decide.

19       Does this make sense?  Are they telling the truth?

20       How do these records play into the facts of what they

21  told me?

22       Mr. Zacca spent a lot of time talking about

23  Mr. Kindelan.  He told you in the beginning of this case, in

24  the opening, he was one of the worst people you will ever meet.

25       If Mr. Kindelan is so bad, why did he say so little

1    about the defendant?  If he's here hunting for a Rule 35,

2    willing to say anything under oath in front of a District Court

3    Justice, and a court reporter, why didn't he say, I saw him

4    hold the gun?

5         Come on, let's make it spicy, Mr. Kindelan, let's make

6    it real good.  He didn't do that.

7         He said, "I couldn't see."  He said he knew the source

8    of the gun, but he didn't say, "I saw him holding the gun."

9         In fact, he said he saw Raonel Valhuerdis come back

10   with the gun.  That tells that what he's saying can be relied

11   upon, because that fact alone -- and there's other facts I'm

12   going to talk about briefly now -- because they are

13   corroborating, they do not stand alone.

14        This case doesn't ask you to believe the word of one

15   witness, it will ask you to believe your ears, your eyes, to

16   use your common sense at the end of this case.

17        Think of Mr. Magdalena, the drug deal.  Defense counsel

18   told you Mr. Magdalena, he is a skilled drug dealer, he's got

19   convictions for drugs, that's why he brought him.  That's why

20   the defendant asked for him, because he knows where to go and

21   who to talk to.  Think of what Mr. Magdalena would do if he was

22   on his own, a skilled drug dealer looking to make money, who

23   has access to $28,000.

24        Is he going to say, You know what I'd like to do in

25   today's drug deal?  I'd like to pick up a quadriplegic, I'd

 1    like to take 30 minutes to pick him up, I'd like to move

 2    around, I'd like to be exposed for arrest and surveillance.

 3              That doesn't make any sense.

 4              Mr. Magdalena is not doing cocaine charity.  He is not

 5    an Uber driver for the disabled.  He doesn't have the money,

 6    that's the only reason to involve the defendant.  He has the

 7    keys to the Kingdom.  Without the money, there is no drugs.

 8              Otherwise, he cuts him out, it's basic common sense.

 9              Mr. Magdalena talks about the padrino, because the

10    padrino is the money.  Otherwise, the confidential informant

11    says, Let's do the deal now, let's do the deal now.

12              I can't do the deal now.

13              Why?

14              Because he has the money.

15              That isn't the word of Mr. Magdalena, that's common

16    sense.  Why is he going back to talk to this defendant if he

17    has nothing to do with the case?  It's making the deal longer,

18    he's exposed to law enforcement longer.

19              The recording that Ms. Duane presented for you has this

20    defendant signing off on the deal.  That was shown to you.

21              They are there because he has the money; and Magdalena

22    admitted, if I get a lower price, I may get a bigger cut from

23    who?  Him.  He has the money.

24              All of these crimes work together.

25              There is no money without the gold heist, so that's

```
 1   another fact that you could use to understand corroboration.

 2   The defendant got up there and testified, I have no money.

 3        The only reason that he had any money, that he could

 4   even be there is because he was involved in a 2.3 million

 5   dollar gold courier robbery.

 6        That is the only way that he has any money, that is

 7   the only way that Mr. Magdalena would be there spending any

 8   time with him, and that is the only reason why Mr. Magdalena

 9   would say, If I go a lower price, maybe my finder's fee will be

10   better.  That's why he said that.

11        It makes sense, common objective sense.

12        Mr. Magdalena does not have a deal with the

13   United States.  He is serving a state sentence.  He is under

14   oath.  He would be buying himself an incredible amount of

15   trouble if he got up here and lied.  He understands that.

16        He has already gone to jail with a crime he committed

17   with this defendant, and that is why he was here, because he

18   was brought here to testify, he had to answer, and he had to

19   raise his hand and take his oath and answer the questions, that

20   is why he is here.

21        That drug deal -- if you work backwards -- comes from

22   the gold heist; and Mr. Kindelan, who doesn't know Magdalena,

23   said he was going to use his godchildren to effectuate, to make

24   these drug deals happen, with the money that the

25   coconspirators, the criminal partners, gave him.
```

1          This defendant has come to you with statements only

2     when they cannot be denied.  He says, I was at Miramar because

3     he was physically left there.

4          He says, I did the gold courier robbery, I admitted to

5     the gold courier robbery, but only because I was paid, because

6     there was a recording.

7          He chooses the lies he will accept and the truths he

8     must be bound by.  But the facts show that he is objectively

9     linked to these crimes over and over again.

10          Not only is he on a recording authorizing a drug deal

11     with the money he got from Mr. Kindelan and his associates, you

12     see phone records that were presented in this case after the

13     robbery to Mr. Morales, calls from the codefendants from the

14     gold heist.

15          Why is that?  If they were going -- if they were going

16     to kill him after the Miramar robbery -- which is what he got

17     up there and said -- why are they calling him?

18          They're calling him because they have spent months

19     preparing to do the gold heist.  They're calling him so they

20     can bring in another associate.

21          Phone records show they were planning before the

22     robbery and after the robbery at Miramar, so that he could get

23     his share of the gold courier robbery.  That is an objective

24     fact.  He got up there -- the defendant got up there and said,

25     Oh, that's just whatever you want the phone records to say.

1          Those phone records were dumped from his phone and

2     placed in a binder, they are black and white, ink and paper.

3     Peru got on there right before the robbery, Peru is not

4     involved in the gold courier robbery.

5          It's this defendant and the criminals that he

6     associates with.

7          Objectively, he is linked by both the circumstance in

8     the drug object and by his own activity, which shows him in

9     contact with people like Raonel Valhuerdis, who is on the GPS

10     record staking out the Coral Gables victim, staking out and

11     preparing to do the Miramar robbery.

12          These objective facts don't happen in a vacuum, they

13     are linked together because he is committing conspirative

14     crimes, not because he is the victim of a series of unfortunate

15     events.

16          Now, Mr. Kindelan was challenged for his

17     understanding of conspiracy law by Mr. Zacca, where he said,

18     You didn't say that these individuals -- that Mr. Morales --

19     was one of the robbers.

20          Mr. Kindelan did not go to law school, he does not

21     understand the person who is doing the robbery and the person

22     who planned to do the robbery.  He explained who did the

23     robbery, physically did the robbery.  He is convicted, he is

24     indicted, he has the benefit of a lawyer.

25          He's asked later on, and asked to explain what was the

1    master plan, and that is how he learned about this defendant.

2    And this defendant is linked to them on multiple days during

3    surveillance, during the period of time they are constantly

4    calling each other.  They are linked together objectively by

5    phone records that show he was doing the gold courier robbery.

6          And how do you know that they're a team?

7    Fundamentally, basically, the Miramar robbery, it's the root of

8    the entire case and how you understand it.

9          The team comes together linked by objective facts, like

10   a fingerprint that Mr. Kindelan left, the fingerprint that Jean

11   Lara left, the GPS records that Raonel Valhuerdis left, that

12   same team that for months was working together through lots of

13   phone calls to do the gold courier robbery, got an opportunity,

14   and he was the person who got it.

15          The phone records that we showed that Celia was

16   contacting this defendant -- and not just Celia, she's not the

17   only source of information, a person with no plea agreement, a

18   person with no criminal exposure walked in here and said, I

19   have been extorted for years because this defendant had me

20   paying his phone records -- paying his bills -- under threat

21   that I would be implicated in a robbery, and that's Livan

22   Ochill.

23          And Livan Ochill came in here and told you that he was

24   there when Celia and this defendant went to go and do their

25   plan.  He was there when the Miramar robbery was first hatched

1    and staged.  He was hanging around.

2         The defendant got up there and said he's not involved

3    in anything, and this defendant who had every reason if he

4    wanted to implicate him, he could have, didn't say that.

5         But Mr. Ochill said, He has forced me to cover for him

6    and pay for him.  That is a witness without a bone to pick,

7    that is a witness without anything to gain, and to just come up

8    here, and say, He was there to get at Frank.

9         And now, what do we have at the Miramar robbery that

10   tells you, objectively, this was a robbery?

11        The defendant wore a terrifying mask to confront

12   someone he knew, and it had his DNA in it.

13        An expert witness came in here and said that was DNA

14   consistent with spit.  This wasn't a spitting contest in front

15   of the Micheli home.  This was a robbery that resulted in

16   gunfire where this defendant was shot.  They're not spraying

17   spit everywhere.  There was blood, and the DNA expert said this

18   DNA was not consistent with blood, it was consistent with

19   touch, with what you would get if you put a mask on your face.

20        And, again, Ms. Duane invited you, look at the swabs,

21   the swabs which are not crusty and red for this item, they are

22   swabs consistent with touch and spit, because he was wearing

23   the mask when he was going to try and rob the person who he

24   knew.

25        Think of the Michelis.  You heard the 9-1-1 call.

```
 1    The 9-1-1 call says, There's men outside of my house, they're

 2    lurking around; not, There's some guy peacefully sitting in

 3    front of my doorway, I think my dad's going to shoot him in the

 4    back and execute him.

 5         What the defendant said objectively makes no sense.

 6    There is no way, no how, with that 9-1-1 call that that series

 7    of events happened the way the defendant depicted.

 8              Mr. Micheli shot him because the team of robbers was

 9    going into his home and putting his wife and daughter in

10    danger; that same team of robbers who had been planning to do a

11    gold heist so they could get money, so they could get drugs, so

12    they could get more money, that is how this case comes

13    together.

14         It is fundamentally false and untrue that Julio Micheli

15    came out and shot this defendant in the back, and his own

16    witness told you that.

17         A bullet being removed from your back is going to

18    leave a mark.  That is not the same as being shot at close

19    range with a .40 caliber.  When this defendant was shot in the

20    front, it shattered his bones in his arm, which could have been

21    incredibly destructive.  It could have gone through his back,

22    it could have gone right through his heart.

23         It didn't happen that way, and that's why the medical

24    records are documented that way, because what he told you

25    happened was wrong, and he told you that he's comfortable
```

 1    lying.

 2            Of all the witnesses that have testified in this

 3    trial, this defendant is the one who has got up here and said,

 4    I lie.  I lie for money, I lie.

 5            Every other witness, witnesses who don't know each

 6    other, witnesses on plea agreements, witnesses who are private

 7    investigators, all from the different perspectives, they're all

 8    wrong?  No.

 9            He's lying, he lied before, and you can count on him to

10    continue to lie; and that's what happened, forensically,

11    objectively, what he told you was false.

12            When you come down to it, this is a case about

13    overwhelming facts, a series of crimes linked together by the

14    common pursuit of money, objectively, linked by recordings, by

15    presence, that has no other explanation.

16            By the way that the defendant describes himself and his

17    team -- when Hector Bertrand listened to what this defendant

18    said, they talked about hitting the wrong house, Celia gave us

19    the wrong information.

20            There were two words in there that let you know

21    everything that you need to know that this was a criminal

22    partnership, "us" and "we."

23            "We" hit the wrong house, she gave "us" the wrong

24    information.

25            The conspiracy was at work for months, to make money

1   through violence, through drug deals, and it had a big pickup.

2   But it didn't stop there, the conspiracy kept on, and there was

3   a Coral Gables robbery, but it didn't stop this defendant.  He

4   wanted to continue to make money, so he sold drugs with the

5   money that he got from his coconspirators.

6          Common sense tells you that this defendant would not

7   implicate himself in a 2.3 million dollar robbery for $300.

8   $300?  That doesn't make any sense.

9          He implicated them because he thought he would never

10  get caught, he would never be brought to justice, he could just

11  say what he needed to do and be offered something, and he was

12  wrong, because the wheels of justice turn slowly, but they

13  turn.  And when there was enough evidence and when the time was

14  right this defendant was charged.

15         And he wasn't going to extort his way out of justice.

16  He wasn't going to lie and manipulate his way out of

17  accountability.

18         These events are not accidents.  These three events are

19  a plan by a person who would not be stopped, not be stopped by

20  disability, not be stopped by the terms of his codefendants, he

21  wouldn't stop, and it is that common pursuit that shows you all

22  of these objective facts:

23         The phone records, the testimony, the location, it was

24  part of his plan, with his confederates, to do crimes for

25  money.

1          The defense asked you to believe that this defendant

2     was struck by lightning three times.

3          He got struck by lightning by Magdalena, who took a

4     break from being his Uber driver to do a drug deal.

5          He got struck by lightning when he was inadvertently

6     forced to lie for $300 about a gold courier robbery.

7          He got struck by lightning as he peacefully sat in

8     front of the Micheli home.  Those are lies, from a person who

9     under oath told you he lies often.

10          He wasn't struck by lightning, he was the lightning.

11     This defendant and his band of criminals got together to commit

12     a series of crimes against numerous people and violate the drug

13     laws to make money.  All of the evidence against them, all of

14     it shows that he is guilty of every crime charged, by his

15     actions.  This is a case that requires you to follow the

16     Court's instructions specifically, to put sympathy on the

17     shelf, to allow each of us to do our roles.

18          Members of the jury, His Honor told you, you are

19     judges of the facts.  Do that.  His Honor will apply the law.

20          Put any feelings of sympathy aside and think, was this

21     proven or not?  Layer after layer of witness testimony,

22     objective evidence, shows you that this defendant committed

23     these crimes and, as a result, he is guilty and must be held to

24     account.

25          We ask you to follow the law, continue to honor your

1    oath, and we trust that when you do that, you will come back

2    with a guilty verdict on each count of the indictment.

3         I thank you for your time.

4         THE COURT:  Thank you very much for your closing

5    arguments, counsel.

6         Ladies and gentlemen, I will now be turning to the

7    instruction on page 31, the explanation of the verdict form.

8         So either today, or tomorrow morning, when you get to

9    the jury room, you will choose one of your members to act as

10   your foreperson.  The foreperson will direct your deliberations

11   and will speak for you in open court.

12        A verdict form has been prepared for your

13   convenience -- I'm following up -- and I'm going to explain it

14   to you.  The verdict form, in paragraph one, makes reference to

15   Count 1, and it gives you, the jury, an opportunity to check

16   the block "not guilty" or "guilty."

17        And then there's a note, I believe, under one, that

18   states:  "If you find the defendant not guilty as to Count 1,

19   then proceed to Count 2 and disregard the information below."

20        If you find the defendant guilty of Count 1, then you

21   have some questions to answer and they are as follows:

22        "We, the jury, having found the defendant guilty of the

23   charge alleged in Count 1 further unanimously find with respect

24   to that count that the defendant knowingly conspired" -- and

25   then there are two choices -- "to commit the gold courier

1    robbery as charged," and two, "to commit the marijuana robbery

2    as charged."

3         As I explained to you earlier, you have to have been

4    unanimous as to each one, or both, of the objects of the

5    conspiracy.  Less than unanimity as to each one would not be a

6    verdict of guilty.  Am I being clear?

7         There are two objects in the conspiracy.  You have to

8    decide unanimously, was there a violation of the law as to the

9    gold courier robbery as charged and/or was there violation of

10   the law to commit the marijuana robbery as charged.

11        And then the verdict form will refer you to Count 2,

12   and a space to check either "guilty" or "not guilty."

13        And it further advises you if you find the defendant

14   not guilty as to Count 2, then proceed to paragraph three.

15   There would be no reason to answer anymore of the items with

16   respect to Count 2.

17        If you find the defendant guilty of Count 2, then there

18   are some additional questions, which read as follows:

19        "We, the jury, having found the defendant guilty of the

20   offense charged in Count 2, further unanimously find, with

21   respect to that count, that he conspired to possess with intent

22   to distribute the following controlled substances in the amount

23   shown."

24        It tells you to place an "X" in the appropriate box,

25   and the choices are:

1          One, "cocaine weighing 500 grams or more," two,

2    "cocaine weighing less than 500 grams," or three, "a detectable

3    amount of cocaine."  So you would check the appropriate box

4    where you were unanimous.

5          And item two refers to marijuana, and the choice there

6    is "a detectable amount of marijuana, as was charged in the

7    indictment."

8          Next, paragraph three refers you to Count 3 and a spot

9    to check "guilty" or "not guilty."

10          Four, "We, the jury, unanimously find as to Count 4 of

11    the indictment" -- and then an additional note -- "if you find

12    the defendant not guilty as to Count 4, then proceed to

13    paragraph five and disregard the remainder."

14          If you find the defendant guilty of Count 4, you have

15    some additional questions to answer:

16          "We, the jury, having found the defendant guilty of the

17    offense charged in Count 4, further unanimously find, with

18    respect to that count, that the firearm was":

19          And then, number one -- "used during and in relation to

20    the violent crime charged in Count 3," "carried during and in

21    relation to the violent crime charged in Count 3," or the third

22    option, "possessed in furtherance of the violent crime charged

23    in Count 3 of the indictment."  So you will check all of them

24    off, all that you unanimously find.

25          And then the second question is:

1    "We, the jury, having found the defendant guilty of

2    offense charged in Count 4, further unanimously find, with

3    respect to that count, that the firearm was brandished."

4         And I'll explain "brandish" -- the definition of that

5    term -- in the instruction phase.

6         And now, item five -- paragraph five, in the last

7    paragraph, states:

8         "We, the jury, unanimously find the defendant, as to

9    Count 7 of the indictment," "guilty" or "not guilty" -- with a

10   note -- "if you find the defendant not guilty as to Count 7,

11   then stop, don't answer the paragraph below."

12        "If you find the defendant guilty as to Count 7, then

13   you will answer the question:

14        "We, the jury, having found the defendant guilty of the

15   offense charged in Count 7 further unanimously find, with

16   respect to that count, that he attempted to possess with intent

17   to distribute the following controlled substance, or

18   substances, in the amounts shown," and then there's a block to

19   check "weighing 500 grams or more," or two, "weighing less than

20   500 grams."  So those are the two options.

21        And then the last line, "so say we all," a place for

22   the foreperson to sign the verdict form, and then a place to

23   affix the date that the verdict is returned.

24        So you can take the verdict form with you to the jury

25   room.  When you have all agreed on the verdict, then the

1    foreperson, as I explained, will date and sign it and will then

2    return it to the courtroom.

3          If you wish to communicate with me at any time, please

4    write down your question and give it to the court security

5    officer.  The court security officer will bring it to me, and I

6    will respond as promptly as possible, either in writing or by

7    bringing you into the courtroom and responding directly.

8          Now, if you send a question out, we can't respond

9    immediately.  It will be a reasonable period of time.  But if

10   you send a question out and then we have to contact the

11   lawyers, who have to be within 10 minutes of being in the

12   courtroom, we have to give them a copy of the question, they

13   then give me their opinions about what they think the answer

14   should be, I then make the final determination and then send a

15   note back into the jury room and you enter the courtroom to

16   respond to that question.  So we are prompt, but it's not that

17   easy.  In other words, you can't send a question out and then

18   in five minutes, where are they, what are they doing?  It's not

19   quite that fast.

20         Now, and any question that you may have -- and I'm not

21   suggesting that you should have questions -- does not include

22   in the question what your count on a particular verdict has

23   been with respect to the charges.

24         So don't say, We have a question with regard to Count 7

25   because we voted and we're now seven-five.  Never reveal any

1  numerical division, just simply ask the question and we will

2  respond.

3          Now, I use the hypothetical seven-five because that

4  totals 12, and there are 12 persons who deliberate in a federal

5  criminal trial.  Three of you serve as our alternate jurors.

6          On occasion, someone becomes ill or incapacitated, or

7  for whatever reason cannot serve, and then an alternate juror

8  would have to come in.

9          Those of you who are alternates, I am going to excuse

10 you today.  However, do not discuss the case until Ms. Foster

11 has contacted you and advised that we have a verdict, because

12 something could happen during deliberations.  We may have to

13 call you back to deliberate with the remaining jurors.

14         And in the event that happens -- and it doesn't happen

15 very often -- but the jurors have to start from the very

16 beginning and catch that person up with the status of the

17 deliberations.  So even though you are serving as an alternate,

18 do not discuss the case until we have advised you that the case

19 is over.

20         The following persons served as our alternate jurors:

21         Mr. Juan Aparicio, Ms. Arnedra Oni-Orisan, and

22 Ms. Maria Marquez, you served as our alternate jurors.

23         I want to thank you very, very much for your

24 participation in our trial.  As I stated, when I release the

25 jurors, you may depart the building.

1          Make sure the courtroom deputy has your phone contact,

2     I think we all have it, but let's verify in case we need to get

3     back in touch with you.

4          And, again, thank you very, very much for your service

5     in this important case.

6          I understand that the jurors desire to depart today at

7     the regularly-scheduled time of about 1:00, so I am going to

8     excuse you.

9          Those who are permanent jurors, you'll remain.  You

10    should select the foreperson.

11         We will be gathering the exhibits.

12         Given the time, you can decide, once you select the

13    foreperson, if you want to depart at that time, you may,

14    because it's going to take about 10 or 15 minutes to gather all

15    of the exhibits to make sure they were received.

16         They will be in the deliberation room tomorrow morning.

17         If there is any particular evidence that you want to

18    review, then let us know, and we will provide the equipment for

19    you to be able to review or listen or bring you into the

20    courtroom for that purpose.

21         When you are deliberating, if someone wants to use the

22    restroom facilities or take a break, do not continue

23    deliberating.  All 12 of you must be present to hear what

24    everyone has to say during the deliberations.  So, please, keep

25    that in mind.

```
1              Are there requests for additional instructions?

2              MR. VAZQUEZ:  Not on behalf of the United States

3    Your Honor.

4              MR. ZACCA:  Not from the defense, Judge.

5              THE COURT:  With the concurrence of the attorneys, the

6    jurors should return at 9:00 a.m. and may begin deliberating

7    without us intervening; is that agreeable?

8              MR. VAZQUEZ:  Yes, on behalf of the United States,

9    Your Honor.

10             MR. ZACCA:  Yes, Judge, on behalf of the defense.

11             THE COURT:  So if seven of you arrive at five minutes

12   until 9:00, and then the other five at 9:00 -- no one is going

13   to arrive after 9:00; correct? -- Do not discuss the case

14   unless all 12 persons are present, this is very important, so

15   please keep that in mind.

16             We're going to excuse you at this time.  You will go

17   into the jury deliberation room.  You may take the instructions

18   with you, leave your copy of the instructions in the

19   deliberation room when you depart this afternoon.

20             Once again, do not permit anyone to discuss the case

21   with you, don't call one another in the evening to talk about

22   the case.  All deliberations stay in the deliberation room.

23             Thank you very, very much, ladies and gentlemen.

24             You are excused.

25             COURTROOM DEPUTY:  All rise for the jury.
```

1          (Jury exited courtroom at 12:40 p.m. and agreed to

2    commence deliberations at 9:00 a.m. on Thursday, January 3,

3    2019.)

4          THE COURT:  Be seated, please.

5          I would like the attorneys to confer and agree on the

6    exhibits that have been received in evidence.  Please be

7    careful, only those exhibits received will go into the jury

8    deliberation room.

9          If you all have some disagreement or different opinions

10   about what has been received, you can check with the court

11   reporter, who maintains a log.

12         If that doesn't resolve the issue, I, too, maintain a

13   log, so let me know, I can come out and get those issues

14   resolved after argument.

15         There is a form for you to sign which acknowledges that

16   you have reviewed the exhibits and only those exhibits actually

17   received have been submitted for the jury deliberations.

18         Are there any questions or comments or issues that we

19   can discuss at this time?

20         MR. VAZQUEZ:  Not on behalf of the United States, Your

21   Honor.

22         MR. ZACCA:  Not from the defense, Judge.

23         THE COURT:  I'm handing you the acknowledgment

24   concerning the trial exhibits, so once you have reviewed

25   them -- I suggest that you put the exhibits on the table in

1    front, or in front of the bench, so that you can go back and

2    check and make sure that what has been received will go to the

3    deliberation room.

4         With respect to recording equipment, does the

5    Government have a clean computer that the jury can use for that

6    purpose, in the event they request it?

7         MR. VAZQUEZ:  Yes, sir.

8         THE COURT:  So we will keep that computer in the

9    courtroom.  When, and if, they request it, then you can send it

10   back.  I believe the transcripts were received as substantive

11   evidence, so make sure that the copies that go in are proper

12   copies, without any additional annotations, etc.

13        Thank you all very much.  We are in recess.

14        MR. VAZQUEZ:  Thank you, Your Honor.

15        MR. ZACCA:  Thank you, Judge.  Have a good day.

16        COURTROOM DEPUTY:  All rise.

17        THE COURT:  I think tomorrow morning everyone can be

18   ready with a 10-minute notice starting at 10:00.  So, at 10:00,

19   if we contact you, you've got to be close enough that you can

20   get to the courtroom within 10 minutes, so that we can respond

21   to any questions as promptly as possible.

22        MR. ZACCA:  Judge, my office will be right there.

23        THE COURT:  Let the courtroom deputy know where you

24   are, where you can be reached, etc.

25        MR. ZACCA:  Thank you, Judge.

1          MR. VAZQUEZ:  Thank you, Your Honor.

2          (Proceedings adjourned at 12:43 p.m.)

3

4                    C E R T I F I C A T E

5

6       I hereby certify that the foregoing is an

7    accurate transcription of the proceedings in the

8    above-entitled matter.

9

10   January 24th, 2020 /s/Glenda M. Powers
                         GLENDA M. POWERS, RPR, CRR, FPR
11                       United States District Court
                         400 North Miami Avenue, 08S33
12                       Miami, Florida 33128

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$150** [1] - 43:12
**$150,000** [6] - 54:15, 57:11, 57:18, 80:10, 80:11, 80:13
**$200** [1] - 43:9
**$28,000** [4] - 60:21, 62:1, 63:23, 89:23
**$300** [9] - 58:10, 79:12, 80:7, 80:10, 80:15, 98:7, 98:8, 99:6
**$50** [1] - 43:10

## /

**/s/Glenda** [1] - 110:9

## 0

**08S33** [1] - 110:11

## 1

**1** [21] - 1:11, 12:10, 13:3, 13:4, 16:8, 32:1, 33:2, 33:6, 33:22, 36:11, 36:17, 37:19, 54:17, 54:20, 58:18, 86:15, 87:20, 100:15, 100:18, 100:20, 100:23
**10** [6] - 4:2, 47:13, 85:19, 104:11, 106:14, 109:20
**10-minute** [1] - 109:18
**100** [1] - 2:13
**10:00** [2] - 109:18
**10:59** [1] - 65:24
**10th** [1] - 77:22
**110** [2] - 1:20, 1:20
**11:00** [2] - 65:22, 66:2
**11:18** [2] - 66:2, 66:3
**12** [9] - 1:10, 16:20, 16:22, 16:24, 16:25, 105:4, 106:23, 107:14
**128** [1] - 1:11
**12:40** [1] - 108:1
**12:43** [2] - 1:8, 110:2
**12th** [5] - 31:9, 53:21, 54:5, 55:4, 56:8
**13th** [1] - 70:3
**15** [1] - 106:14
**15-minute** [2] - 28:23, 65:20
**16** [2] - 74:13, 75:12
**17** [1] - 47:8
**1700** [1] - 1:20

**18** [1] - 13:12
**19** [2] - 47:10, 47:13
**1951(a** [1] - 13:12
**1998** [1] - 69:24
**19th** [2] - 76:24, 77:5
**1:00** [2] - 3:12, 106:7
**1:17-CR-20701-MGC-5** [1] - 1:2

## 2

**2** [17] - 1:5, 12:14, 13:3, 13:4, 17:5, 32:2, 34:2, 36:12, 38:2, 58:23, 100:19, 101:11, 101:14, 101:16, 101:17, 101:20
**2.3** [6] - 53:25, 54:10, 55:2, 55:14, 91:4, 98:7
**2012** [23] - 30:14, 30:21, 30:24, 31:6, 31:9, 35:7, 36:9, 40:19, 42:6, 42:18, 43:6, 46:5, 47:6, 47:15, 49:16, 51:13, 53:3, 53:19, 53:21, 54:5, 55:4, 56:8, 79:17
**2013** [4] - 31:11, 60:19, 62:16, 69:25
**2014** [2] - 59:7, 76:22
**2015** [3] - 76:24, 79:12, 79:25
**2018** [2] - 77:22, 78:6
**2019** [2] - 82:3, 108:3
**2020** [2] - 1:5, 110:9
**21** [1] - 17:9
**21st** [1] - 77:6
**24** [2] - 47:9, 47:16
**24th** [1] - 110:9
**27th** [2] - 62:16, 71:2
**28th** [4] - 31:11, 59:7, 60:19, 61:21
**29** [1] - 2:6
**2nd** [1] - 82:3

## 3

**3** [17] - 12:17, 12:19, 19:16, 19:18, 20:24, 21:9, 25:21, 35:1, 36:13, 38:19, 39:5, 40:6, 102:8, 102:20, 102:21, 102:23, 108:2
**30** [2] - 3:25, 90:1
**30th** [7] - 30:14, 30:21, 30:24, 31:6,

36:9, 40:19, 42:6, 42:18, 43:6, 46:5, 47:6, 47:15, 49:16, 51:13, 53:3, 53:14, 53:19
**31** [2] - 28:16, 100:7
**33128** [2] - 1:25, 110:11
**33132** [1] - 1:18
**33301** [1] - 1:21
**35** [11] - 65:25, 74:14, 74:17, 74:20, 74:23, 75:15, 78:1, 78:3, 89:1

## 4

**4** [15] - 12:17, 12:22, 20:18, 21:6, 21:7, 35:2, 36:13, 40:1, 40:16, 81:23, 102:10, 102:12, 102:14, 102:17, 103:2
**40** [2] - 44:21, 96:19
**400** [2] - 1:24, 110:11
**4th** [1] - 1:17

## 5

**500** [17] - 18:7, 19:3, 19:7, 24:11, 24:16, 34:5, 34:9, 38:14, 59:12, 64:1, 64:6, 86:9, 86:17, 102:1, 102:2, 103:19, 103:20
**55** [1] - 3:24

## 6

**6** [1] - 2:4
**60** [1] - 4:4
**66** [1] - 2:8
**6th** [1] - 1:20

## 7

**7** [14] - 12:17, 12:24, 23:25, 24:2, 25:22, 35:3, 59:8, 59:10, 64:3, 103:9, 103:10, 103:12, 103:15, 104:24
**7:17** [2] - 50:24, 51:4

## 8

**80** [1] - 4:1
**806** [1] - 1:17
**841(a)(1** [1] - 17:9

**87** [1] - 2:10

## 9

**9-1-1** [3] - 95:25, 96:1, 96:6
**9/19** [1] - 47:10
**9/28** [1] - 47:12
**90** [3] - 3:22, 4:2, 5:2
**911** [6] - 30:23, 31:7, 35:9, 43:20, 43:23, 52:6
**970** [2] - 63:25, 64:6
**99** [1] - 1:17
**9:00** [6] - 1:7, 107:6, 107:12, 107:13, 108:2
**9:18** [1] - 1:8
**9:22** [1] - 4:17

## A

**a.m** [9] - 1:7, 1:8, 4:17, 65:22, 66:2, 66:3, 107:6, 108:2
**abets** [3] - 22:20, 25:6, 25:9
**abetted** [6] - 41:9, 41:22, 42:1, 42:7, 42:16, 60:16
**abetting** [7] - 23:16, 41:3, 41:4, 53:12, 53:16, 60:6, 61:14
**ability** [2] - 9:6, 22:15
**able** [6] - 23:11, 29:1, 29:23, 49:24, 74:6, 106:19
**above-entitled** [1] - 110:7
**absolves** [1] - 60:15
**accept** [3] - 8:16, 10:10, 92:7
**access** [1] - 89:23
**accessibility** [1] - 21:23
**accident** [2] - 22:10, 27:2
**accidents** [1] - 98:18
**accomplice** [1] - 75:17
**accomplish** [5] - 14:6, 18:2, 36:22, 38:5, 60:10
**accordance** [1] - 27:23
**according** [1] - 83:18
**account** [2] - 82:18, 99:24
**accountability** [1] - 98:17

**accurate** [2] - 8:16, 110:6
**accurately** [1] - 9:7
**accusation** [3] - 76:20, 78:9, 81:6
**acknowledges** [1] - 108:15
**acknowledgment** [1] - 108:23
**acquire** [5] - 13:10, 13:13, 14:10, 37:6, 54:25
**acquired** [2] - 19:23, 87:23
**act** [22] - 7:7, 13:17, 16:5, 17:13, 18:25, 20:15, 20:16, 24:22, 24:23, 25:2, 25:3, 26:2, 26:25, 27:3, 32:18, 33:1, 39:14, 60:10, 68:11, 72:14, 100:9
**Act** [6] - 19:19, 19:20, 20:10, 25:22, 39:6, 87:20
**acted** [3] - 27:6, 27:8, 88:6
**acting** [3] - 25:5, 59:5, 59:6
**action** [5] - 20:14, 21:19, 24:21, 39:13, 55:20
**actions** [14] - 14:14, 20:4, 30:9, 30:10, 30:11, 30:13, 30:14, 32:21, 32:25, 37:15, 37:24, 55:7, 87:12, 99:15
**active** [1] - 21:24
**actively** [2] - 22:25, 41:17
**activities** [2] - 15:6, 55:11
**activity** [1] - 93:8
**acts** [4] - 15:9, 25:8, 25:11, 25:14, 58:20
**actual** [10] - 8:9, 14:12, 20:1, 26:5, 26:7, 26:10, 26:16, 37:7, 63:4, 63:13
**addition** [1] - 41:25
**additional** [6] - 50:20, 101:18, 102:11, 102:15, 107:1, 109:12
**addresses** [1] - 86:8
**adjourned** [1] - 110:2
**admission** [1] - 11:22
**admissions** [1] - 58:4
**admit** [2] - 58:15, 79:8

**admits** [2] - 39:24, 77:2
**admitted** [21] - 7:13, 7:14, 7:18, 35:13, 43:4, 45:20, 48:20, 57:24, 57:25, 58:1, 65:6, 69:23, 70:6, 71:10, 79:10, 80:4, 81:12, 81:13, 90:22, 92:4
**admittedly** [1] - 85:14
**advance** [6] - 23:1, 23:4, 23:17, 23:20, 41:17, 41:18
**advanced** [2] - 22:18, 42:8
**advances** [4] - 16:5, 18:25, 26:2, 72:15
**advantage** [1] - 11:10
**advice** [1] - 47:21
**advised** [2] - 105:11, 105:18
**advises** [1] - 101:13
**affairs** [7] - 7:8, 68:12, 68:25, 69:7, 70:8, 73:23, 81:8
**affect** [9] - 12:11, 12:20, 13:11, 13:14, 15:8, 15:11, 15:16, 27:14, 37:23
**affected** [5] - 14:15, 20:5, 37:15, 55:7, 55:21
**affects** [3] - 15:16, 37:22, 37:25
**affix** [1] - 103:23
**afternoon** [1] - 107:19
**agency** [2] - 60:7, 61:14
**agent** [9] - 13:19, 14:5, 17:15, 18:1, 25:4, 25:11, 36:21, 38:4, 67:4
**Agent** [2] - 46:22, 47:4
**agents** [3] - 67:5, 77:1, 77:7
**aggressive** [1] - 67:9
**ago** [2] - 19:14, 30:8
**agree** [10] - 6:15, 16:16, 16:20, 16:22, 16:24, 16:25, 19:11, 27:25, 88:9, 108:5
**agreeable** [1] - 107:7
**agreed** [4] - 14:6, 18:2, 36:22, 38:4, 103:25, 108:1
**agreeing** [1] - 13:5
**agreement** [19] - 10:20, 13:16, 13:22, 17:12, 17:18, 28:6,

32:10, 32:11, 32:17, 32:20, 74:5, 74:22, 75:6, 75:12, 75:18, 75:24, 77:24, 94:17
**agreements** [3] - 74:6, 78:5, 97:6
**ahead** [1] - 50:15
**aid** [1] - 11:11
**aided** [7] - 3:2, 41:9, 41:21, 42:1, 42:7, 42:16, 60:16
**aiding** [7] - 23:16, 41:2, 41:4, 53:12, 53:15, 60:6, 61:14
**aids** [3] - 22:20, 25:6, 25:9
**air** [1] - 28:19
**akes** [1] - 13:12
**alarm** [1] - 15:2
**Alex** [4] - 76:23, 76:24, 77:2, 77:20
**Alfre** [4] - 46:19, 47:1, 47:8, 47:11
**Alfred** [6] - 47:14, 47:16, 50:18, 50:20, 51:7
**Alfredo** [13] - 32:4, 35:13, 35:19, 37:1, 43:25, 45:5, 49:11, 51:19, 54:3, 56:16, 59:1, 72:24, 88:11
**alleged** [5] - 15:20, 16:7, 18:15, 26:23, 100:23
**allocate** [1] - 33:24
**allow** [4] - 4:12, 11:15, 99:17
**allowed** [1] - 10:6
**alone** [4] - 27:22, 63:5, 89:11, 89:13
**Alright** [4] - 28:24, 63:6, 63:20, 65:19
**alternate** [5] - 105:5, 105:7, 105:17, 105:20, 105:22
**alternates** [1] - 105:9
**alternatively** [1] - 40:13
**AMERICA** [1] - 1:4
**amount** [21] - 5:4, 18:8, 19:4, 19:6, 19:12, 34:5, 34:6, 34:10, 38:15, 38:17, 53:25, 70:16, 83:8, 87:11, 91:14, 101:22, 102:3, 102:6
**amounts** [1] - 103:18
**analysis** [1] - 46:23
**analyze** [1] - 64:21
**animated** [1] - 67:10

**annotations** [1] - 109:12
**answer** [11] - 9:9, 51:18, 81:19, 91:18, 91:19, 100:21, 101:15, 102:15, 103:11, 103:13, 104:13
**anticipation** [1] - 15:3
**anxious** [1] - 15:2
**Aparicio** [1] - 105:21
**appear** [1] - 9:8
**APPEARANCES** [1] - 1:14
**appeared** [1] - 44:19
**applies** [1] - 75:19
**apply** [2] - 67:23, 99:19
**appointment** [1] - 65:11
**appreciate** [1] - 87:9
**approached** [3] - 44:12, 45:22, 46:8
**appropriate** [2] - 101:24, 102:3
**April** [2] - 77:22, 78:6
**area** [1] - 49:19
**argue** [3] - 67:2, 73:7, 85:5
**argued** [1] - 81:17
**arguing** [1] - 83:17
**argument** [2] - 28:22, 108:14
**ARGUMENT** [6] - 2:5, 2:7, 2:9, 29:2, 66:6, 87:7
**arguments** [8] - 4:13, 5:1, 5:7, 28:14, 28:20, 33:21, 82:4, 100:5
**arm** [1] - 96:20
**Arnedra** [1] - 105:21
**arose** [1] - 23:24
**arrest** [2] - 72:17, 90:2
**arrested** [3] - 62:3, 76:24, 77:5
**arrive** [2] - 107:11, 107:13
**arriving** [1] - 7:25
**articles** [2] - 12:12, 12:21
**aside** [3] - 70:7, 70:14, 99:20
**aspect** [1] - 16:22
**asserts** [1] - 8:9
**assessing** [1] - 29:10
**assigned** [1] - 67:4
**associate** [3] - 25:12, 45:4, 92:20
**associated** [3] -

18:22, 25:15, 46:14
**associates** [2] - 92:11, 93:6
**associating** [2] - 16:2, 72:11
**assume** [1] - 7:22
**assuming** [1] - 4:4
**assured** [4] - 71:25, 72:1, 72:3, 74:18
**attempt** [12] - 19:9, 19:16, 19:17, 20:6, 23:25, 24:1, 24:12, 25:25, 26:3, 38:14, 59:14, 59:24
**attempted** [33] - 12:19, 12:25, 24:4, 25:22, 31:6, 31:11, 31:14, 35:1, 35:3, 35:4, 35:7, 36:9, 36:13, 36:15, 37:8, 37:12, 37:20, 38:19, 38:21, 38:24, 39:3, 40:2, 40:6, 40:24, 41:1, 48:25, 51:13, 53:11, 59:9, 69:15, 103:16
**attempting** [6] - 19:18, 24:2, 37:24, 60:20, 62:8, 86:9
**attempts** [4] - 15:15, 15:16, 37:21, 37:23
**attending** [2] - 83:14, 84:11
**attention** [3] - 5:23, 29:7, 62:13
**Attorney's** [3] - 1:16, 75:3, 77:7
**attorneys** [3] - 28:20, 107:5, 108:5
**audio** [1] - 76:13
**Audiotape** [1] - 31:1
**August** [3] - 31:11, 59:7, 60:19, 61:20, 62:16, 70:3, 71:2
**AUSA** [2] - 1:15, 1:15
**authorizes** [1] - 25:11
**authorizing** [1] - 92:10
**automatically** [3] - 16:6, 19:1, 72:15
**available** [1] - 67:3
**Avenue** [2] - 1:24, 110:11
**aware** [2] - 22:3, 27:8
**awhile** [1] - 48:1

**B**

**background** [3] - 61:9, 69:19, 70:25
**backup** [1] - 67:6

**backwards** [2] - 44:21, 91:21
**bad** [3] - 27:5, 58:13, 88:25
**band** [2] - 87:15, 99:11
**banded** [1] - 88:5
**bank** [1] - 63:1
**bare** [1] - 78:10
**bargain** [3] - 10:19, 11:3, 76:4
**bargaining** [3] - 10:22, 10:24, 76:1
**base** [2] - 82:15
**based** [4] - 6:10, 7:3, 19:9, 33:25
**basic** [1] - 90:8
**basing** [1] - 70:19
**basis** [2] - 22:24, 41:16
**bathroom** [1] - 68:18
**bear** [1] - 75:15
**become** [6] - 16:6, 19:1, 28:7, 72:15
**becomes** [3] - 13:19, 17:15, 105:6
**becoming** [1] - 56:20
**BEFORE** [1] - 1:12
**began** [1] - 30:8
**begin** [7] - 4:4, 6:5, 23:5, 30:5, 31:23, 41:19, 107:6
**beginning** [5] - 30:7, 31:2, 88:7, 88:23, 105:16
**behalf** [5] - 4:7, 107:2, 107:8, 107:10, 108:20
**behind** [1] - 45:24
**behold** [1] - 79:2
**beliefs** [1] - 28:9
**below** [2] - 100:19, 103:11
**bench** [1] - 109:1
**benefit** [2] - 61:3, 93:24
**Bertrand** [5] - 48:22, 49:5, 49:14, 84:23, 97:17
**best** [3] - 5:7, 71:14, 82:18
**better** [3] - 71:7, 71:9, 91:10
**between** [5] - 15:6, 47:4, 51:19, 55:11, 62:17
**beyond** [32] - 6:8, 6:22, 6:25, 7:6, 7:10, 14:2, 16:14, 17:1, 17:2, 17:23, 19:21,

20:8, 20:22, 24:6, 24:14, 25:18, 26:21, 29:14, 36:19, 38:1, 58:20, 60:3, 64:4, 64:16, 64:17, 65:17, 68:4, 68:10, 69:2, 86:11

**bicycle** [1] - 58:11
**big** [2] - 80:8, 98:1
**bigger** [1] - 90:22
**bill** [1] - 43:10
**bills** [1] - 94:20
**binder** [1] - 93:2
**binding** [1] - 7:21
**bit** [1] - 40:15
**black** [1] - 93:2
**block** [2] - 100:16, 103:18
**blood** [10] - 48:5, 48:8, 48:12, 83:8, 83:9, 83:23, 95:17, 95:18
**BMW** [1] - 46:4
**boats** [1] - 73:16
**body** [1] - 85:17
**boils** [1] - 81:20
**Bolivia** [3] - 55:15, 55:24, 56:1
**Bolivian** [1] - 53:25
**Bolivians** [2] - 58:7, 58:12
**bolton** [1] - 79:22
**Bolton** [12] - 58:3, 58:4, 58:8, 58:14, 78:12, 78:17, 78:18, 78:21, 79:2, 79:4, 80:17, 81:1
**Bolton's** [1] - 79:15
**bone** [1] - 95:6
**bones** [1] - 96:20
**book** [1] - 80:18
**bottom** [2] - 53:10, 84:1
**bound** [1] - 92:8
**box** [2] - 101:24, 102:3
**brandish** [4] - 22:1, 23:21, 23:23, 103:4
**brandished** [2] - 23:14, 103:3
**brandishing** [11] - 21:24, 23:12, 23:17, 35:10, 42:1, 42:2, 42:7, 42:16, 53:16, 81:23, 82:11
**break** [6] - 28:23, 36:6, 40:15, 81:10, 99:4, 106:22
**breath** [1] - 28:19
**briefly** [1] - 89:12
**bring** [15] - 4:10, 30:22, 62:21, 62:22,

63:16, 64:19, 64:20, 67:12, 71:4, 71:5, 72:8, 76:18, 92:20, 104:5, 106:19
**bringing** [4] - 41:10, 53:17, 62:23, 104:7
**brings** [1] - 68:17
**broker** [3] - 30:18, 51:18, 65:1
**brothers** [1] - 87:15
**brought** [10] - 40:22, 41:21, 53:12, 55:15, 55:16, 61:23, 71:7, 89:19, 91:18, 98:10
**Broward** [2] - 85:1, 85:4
**buddy** [1] - 51:2
**building** [3] - 67:6, 67:19, 105:25
**bullet** [10] - 52:23, 85:4, 85:6, 85:8, 85:10, 85:15, 85:16, 85:18, 85:20, 96:17
**bullets** [1] - 85:9
**burden** [3] - 6:24, 86:13, 86:19
**business** [6] - 15:5, 55:10, 55:25, 70:1, 71:16, 73:16
**buy** [6] - 58:11, 59:21, 61:5, 61:9, 72:20, 79:12
**buyer** [1] - 71:13
**buying** [3] - 61:10, 70:2, 91:14
**BY** [1] - 1:23

## C

**caliber** [2] - 44:21, 96:19
**Cancun** [2] - 73:11, 76:23
**cannot** [2] - 92:2, 105:7
**capturing** [1] - 70:15
**car** [1] - 63:9
**care** [1] - 11:23
**careful** [3] - 75:21, 76:10, 108:7
**carefully** [2] - 5:22, 7:4
**carried** [11] - 3:24, 12:23, 21:1, 21:10, 40:9, 40:12, 40:17, 40:25, 41:22, 42:13, 102:20
**carry** [5] - 20:18, 22:5, 22:8, 22:23, 23:2
**carrying** [9] - 13:25,

17:21, 22:21, 23:13, 35:2, 36:14, 40:1, 53:13, 82:12
**CASE** [1] - 1:2
**case** [74] - 4:5, 5:10, 6:4, 7:5, 7:13, 7:23, 9:4, 10:20, 14:18, 16:7, 16:23, 19:17, 24:1, 27:18, 28:3, 28:5, 28:6, 28:10, 28:13, 29:5, 29:9, 29:20, 29:24, 30:8, 31:2, 31:4, 33:6, 45:1, 52:15, 53:18, 56:15, 64:7, 64:15, 64:22, 65:13, 69:2, 69:13, 69:25, 70:11, 72:1, 72:7, 74:20, 75:23, 77:21, 79:5, 81:4, 82:4, 82:5, 85:11, 85:23, 85:24, 86:3, 87:5, 87:12, 88:7, 88:9, 88:23, 89:14, 89:16, 90:17, 92:12, 94:8, 96:12, 97:12, 99:15, 105:10, 105:18, 106:2, 106:5, 107:13, 107:20, 107:22
**cases** [4] - 10:17, 19:16, 23:25, 78:13
**casings** [1] - 44:25
**catch** [1] - 105:16
**caught** [1] - 98:10
**causing** [2] - 14:12, 20:2
**caution** [5] - 10:14, 11:6, 11:23, 27:16, 76:7
**Celia** [16] - 35:22, 42:24, 42:25, 43:17, 45:8, 47:3, 47:18, 49:8, 49:11, 50:4, 50:22, 50:23, 94:15, 94:16, 94:24, 97:18
**cells** [1] - 84:6
**Center** [1] - 74:15
**certain** [10] - 5:4, 16:2, 18:22, 26:19, 33:1, 36:18, 67:9, 67:15, 68:1, 72:12
**certainly** [2] - 39:23, 82:17
**Certified** [1] - 3:3
**certify** [1] - 110:5
**chain** [1] - 8:11
**challenge** [1] - 67:16
**challenged** [1] - 93:16
**change** [2] - 28:7,

39:1
**changes** [1] - 4:6
**chaos** [1] - 83:13
**chaotic** [1] - 83:16
**character** [1] - 78:18
**characters** [1] - 86:3
**charge** [6] - 6:18, 12:17, 35:4, 81:22, 86:8, 100:23
**CHARGE** [2] - 2:4, 6:1
**charged** [44] - 12:5, 13:2, 13:4, 14:7, 16:10, 19:2, 19:18, 20:24, 21:2, 21:4, 21:9, 24:2, 25:2, 27:17, 29:15, 31:5, 31:16, 32:1, 32:4, 32:6, 34:4, 40:6, 40:10, 42:19, 54:17, 65:17, 66:22, 69:25, 80:5, 86:16, 98:14, 99:14, 101:1, 101:2, 101:9, 101:10, 101:20, 102:6, 102:17, 102:20, 102:21, 102:22, 103:2, 103:15
**charges** [13] - 12:6, 12:10, 12:14, 16:8, 26:18, 27:11, 29:17, 38:19, 40:1, 59:8, 64:9, 80:1, 104:23
**charity** [1] - 90:4
**cheap** [1] - 80:10
**check** [8] - 100:15, 101:12, 102:3, 102:9, 102:23, 103:19, 108:10, 109:2
**chicken** [1] - 82:20
**child** [2] - 58:12, 58:13
**choice** [1] - 102:5
**choices** [2] - 100:25, 101:25
**choose** [2] - 48:6, 100:9
**chooses** [1] - 92:7
**chose** [8] - 23:5, 23:6, 23:9, 41:19, 45:4, 57:1, 57:2, 87:17
**CI** [1] - 63:22
**circumstance** [1] - 93:7
**circumstances** [3] - 8:12, 12:2, 39:2
**circumstantial** [3] - 8:7, 8:11, 8:14
**citizen** [1] - 71:22
**claim** [1] - 80:12
**clean** [2] - 68:3, 109:5

**clear** [3] - 3:21, 82:24, 101:6
**cleared** [1] - 55:15
**clearer** [1] - 28:17
**clearly** [3] - 9:9, 41:21, 70:1
**client** [3] - 67:15, 80:25
**close** [6] - 26:22, 52:13, 52:21, 96:18, 109:19
**closed** [1] - 50:6
**closed-up** [1] - 50:6
**closer** [2] - 47:9, 51:5
**closing** [8] - 4:13, 4:25, 5:7, 28:14, 28:20, 33:21, 82:4, 100:4
**CLOSING** [6] - 2:5, 2:7, 2:9, 29:2, 66:6, 87:7
**clothes** [1] - 83:12
**cocaine** [67] - 17:8, 17:10, 18:7, 18:8, 19:3, 19:4, 19:6, 19:11, 24:8, 24:9, 24:10, 24:17, 31:12, 31:13, 34:5, 34:9, 34:10, 34:14, 34:16, 34:19, 35:5, 38:14, 38:15, 38:16, 57:21, 58:24, 58:25, 59:4, 59:6, 59:9, 59:13, 59:17, 59:21, 59:24, 60:2, 60:12, 60:18, 60:21, 61:6, 61:9, 61:17, 61:24, 62:8, 62:19, 62:23, 63:25, 64:6, 69:15, 69:22, 70:2, 70:4, 70:15, 70:16, 72:6, 72:20, 86:9, 86:18, 90:4, 102:1, 102:2, 102:3
**coconspirators** [4] - 56:12, 57:3, 91:25, 98:5
**cocounsel** [1] - 38:23
**Code** [2] - 13:12, 17:9
**codefendant** [4] - 10:21, 10:23, 75:18, 75:24
**codefendants** [2] - 92:13, 98:20
**coffee** [1] - 28:21
**Cohn** [1] - 4:16
**coincidence** [1] - 22:10
**colleague** [1] - 66:8
**collectively** [1] - 66:23
**comfortable** [1] -

96:25
**coming** [2] - 29:6, 66:9
**commence** [1] - 108:2
**comments** [1] - 108:18
**commerce** [21] - 12:11, 12:12, 12:20, 12:21, 13:11, 13:15, 14:15, 15:5, 15:8, 15:11, 15:13, 15:17, 20:5, 37:16, 37:17, 37:23, 37:25, 55:8, 55:10, 55:18, 55:22
**commit** [51] - 13:5, 13:6, 13:17, 14:7, 16:10, 16:13, 16:15, 16:17, 17:13, 19:17, 19:18, 20:7, 20:9, 24:1, 24:13, 24:15, 25:7, 25:25, 26:1, 26:3, 30:20, 31:16, 32:2, 32:9, 32:10, 32:18, 33:2, 33:7, 33:11, 33:12, 33:13, 33:14, 33:18, 33:23, 36:5, 36:11, 36:23, 37:2, 39:6, 47:23, 53:6, 54:18, 54:20, 57:4, 59:11, 59:23, 87:20, 99:11, 100:25, 101:1, 101:10
**commitment** [2] - 29:9, 29:11
**committed** [12] - 12:17, 20:23, 26:19, 26:22, 27:3, 40:5, 40:6, 47:12, 48:21, 73:8, 91:16, 99:22
**committing** [14] - 13:3, 20:12, 20:15, 20:17, 21:15, 22:7, 24:19, 24:22, 24:24, 39:11, 39:13, 39:15, 59:15, 93:13
**commodities** [2] - 12:12, 12:21
**common** [23] - 7:4, 8:5, 16:2, 18:22, 64:18, 64:19, 64:21, 64:22, 65:3, 65:4, 65:9, 65:12, 71:23, 72:12, 76:12, 88:13, 89:16, 90:8, 90:15, 91:11, 97:14, 98:6, 98:21
**communicate** [1] - 104:3
**community** [5] -

45:19, 49:21, 49:23, 49:24, 64:25
**company** [3] - 53:24, 53:25, 56:5
**compared** [1] - 80:10
**compartment** [3] - 36:3, 45:15
**complete** [2] - 28:14, 81:19
**completed** [2] - 4:1, 6:4
**complicated** [1] - 81:21
**computer** [2] - 109:5, 109:8
**concentrate** [1] - 5:19
**concept** [3] - 61:13, 61:14, 84:4
**concern** [1] - 15:2
**concerned** [2] - 8:6, 44:15
**concerning** [3] - 7:2, 8:20, 108:24
**conclusion** [4] - 29:21, 34:16, 53:4, 65:16
**conclusions** [1] - 8:5
**concurrence** [1] - 107:5
**conduct** [1] - 27:9
**confederates** [1] - 98:24
**confer** [1] - 108:5
**confession** [1] - 58:5
**confidential** [11] - 14:4, 17:25, 36:20, 38:3, 60:1, 61:19, 61:23, 62:9, 62:17, 71:3, 90:10
**confront** [4] - 67:13, 67:17, 67:18, 95:11
**confusing** [1] - 41:6
**connection** [17] - 35:1, 36:8, 37:18, 42:20, 46:25, 47:1, 50:9, 51:12, 53:9, 54:16, 55:6, 55:12, 56:6, 57:17, 59:8, 60:7, 64:11
**consequences** [1] - 15:9
**consider** [13] - 7:12, 8:15, 9:19, 10:9, 10:13, 11:5, 11:22, 12:1, 27:12, 27:20, 64:23, 68:7, 76:6
**consideration** [1] - 83:8
**considered** [2] - 7:5, 7:19

**considering** [2] - 8:4, 28:4
**consisted** [1] - 32:22
**consistent** [11] - 48:4, 48:5, 48:8, 48:12, 52:16, 52:20, 95:14, 95:18, 95:22
**conspiracies** [3] - 16:20, 32:7, 87:19
**conspiracy** [66] - 13:8, 13:16, 13:19, 13:23, 14:1, 14:17, 14:19, 16:3, 16:4, 16:7, 16:21, 17:1, 17:12, 17:15, 17:19, 17:22, 18:23, 18:24, 31:16, 31:17, 31:20, 32:2, 32:12, 32:17, 32:21, 32:23, 33:1, 33:2, 33:3, 33:4, 33:6, 33:11, 33:18, 33:19, 33:23, 33:25, 34:2, 34:8, 34:13, 34:22, 36:11, 36:12, 36:25, 47:22, 51:9, 51:10, 53:5, 53:6, 53:7, 54:18, 54:20, 58:21, 58:23, 72:9, 72:13, 72:14, 76:15, 86:17, 87:20, 93:17, 97:25, 98:2, 101:5, 101:7
**conspirative** [1] - 93:13
**conspirator** [5] - 15:18, 16:6, 18:13, 19:1, 72:16
**conspirators** [5] - 13:25, 15:20, 17:21, 18:15, 47:5
**conspire** [3] - 13:9, 17:6, 32:20
**conspired** [14] - 16:8, 16:13, 16:15, 16:17, 19:12, 33:12, 33:13, 33:14, 34:8, 34:10, 34:11, 38:18, 100:24, 101:21
**conspiring** [8] - 12:11, 12:15, 13:5, 16:10, 19:2, 34:4, 34:17, 34:19
**constant** [2] - 51:10, 51:11
**constantly** [1] - 94:3
**constitute** [1] - 54:19
**constructive** [3] - 26:5, 26:9, 26:16
**contact** [5] - 51:10, 93:9, 104:10, 106:1, 109:19

**contacted** [4] - 47:7, 47:8, 47:9, 105:11
**contacting** [1] - 94:16
**contacts** [7] - 46:13, 46:14, 46:15, 47:16, 47:17, 47:19
**contest** [1] - 95:14
**context** [1] - 88:18
**continual** [1] - 63:7
**continually** [1] - 38:23
**continue** [9] - 4:21, 23:5, 23:7, 23:9, 41:19, 97:10, 98:4, 99:25, 106:22
**continued** [1] - 23:8
**continues** [2] - 50:19, 50:21
**contributors** [1] - 84:17
**control** [4] - 22:14, 22:16, 26:8, 26:11
**controlled** [12] - 12:16, 13:1, 17:7, 17:8, 18:3, 18:11, 24:3, 24:5, 25:23, 38:5, 101:22, 103:17
**convenience** [1] - 100:13
**conveniently** [1] - 71:19
**conversation** [1] - 49:5
**convertible** [1] - 21:19
**convict** [7] - 66:21, 70:12, 72:24, 73:18, 82:11, 86:8
**convicted** [2] - 9:19, 93:23
**conviction** [3] - 67:20, 67:21, 70:19
**convictions** [2] - 69:23, 89:19
**convinced** [4] - 7:9, 7:11, 28:8, 69:5
**convincing** [3] - 7:7, 68:11, 72:18
**cooperation** [1] - 75:4
**copies** [2] - 109:11, 109:12
**copy** [6] - 5:12, 5:13, 5:14, 12:8, 104:12, 107:18
**Coral** [12] - 31:10, 53:22, 55:3, 55:16, 56:2, 56:7, 72:22, 77:8, 86:20, 86:23, 93:10, 98:3
**correct** [2] - 4:9, 107:13
**corrections** [1] - 4:6

**corroborate** [1] - 49:15
**corroborated** [5] - 20:12, 24:19, 39:10, 59:15, 59:25
**corroborates** [2] - 45:25, 62:6
**Corroborating** [1] - 50:6
**corroborating** [6] - 45:10, 49:9, 49:11, 50:2, 56:15, 89:13
**corroboration** [1] - 91:1
**cost** [1] - 60:21
**counsel** [2] - 89:17, 100:5
**counsel's** [1] - 67:4
**count** [20] - 12:7, 27:11, 36:22, 42:12, 58:21, 58:25, 59:16, 64:1, 64:3, 64:4, 64:5, 83:1, 97:9, 100:2, 100:24, 101:21, 102:18, 103:3, 103:16, 104:22
**Count** [74] - 12:10, 12:14, 12:19, 12:22, 12:24, 16:8, 17:5, 19:16, 19:18, 20:18, 20:24, 21:6, 21:7, 21:9, 23:25, 24:2, 25:21, 25:22, 32:1, 32:2, 33:2, 33:6, 33:22, 34:2, 35:1, 35:2, 35:3, 36:11, 36:12, 36:13, 36:17, 37:19, 38:2, 38:19, 39:5, 40:1, 40:6, 40:16, 54:17, 54:20, 58:18, 58:23, 59:8, 59:10, 64:3, 81:23, 86:15, 87:20, 100:15, 100:18, 100:19, 100:20, 100:23, 101:11, 101:14, 101:16, 101:17, 101:20, 102:8, 102:10, 102:12, 102:14, 102:17, 102:20, 102:23, 103:2, 103:9, 103:10, 103:12, 103:15, 104:24
**country** [1] - 73:11
**Counts** [2] - 13:3, 13:4
**counts** [9] - 12:7, 12:17, 31:19, 34:24,

35:1, 36:9, 36:16, 64:8, 64:11
**County** [2] - 85:1, 85:4
**courier** [29] - 14:20, 16:9, 32:14, 33:8, 33:14, 53:24, 54:8, 54:9, 54:13, 54:22, 54:25, 55:3, 55:18, 58:21, 65:6, 65:7, 87:21, 88:2, 91:5, 92:4, 92:5, 92:23, 93:4, 94:5, 94:13, 99:6, 100:25, 101:9
**course** [2] - 7:15, 75:12
**Court** [9] - 1:23, 1:24, 2:13, 3:1, 3:3, 4:20, 10:24, 89:2, 110:10
**court** [8] - 68:19, 80:1, 80:5, 89:3, 100:11, 104:4, 104:5, 108:10
**COURT** [22] - 1:1, 3:4, 3:7, 3:10, 3:18, 4:10, 4:11, 4:12, 4:18, 6:2, 65:19, 65:21, 65:23, 66:4, 100:4, 107:5, 107:11, 108:4, 108:23, 109:8, 109:17, 109:23
**Court's** [2] - 6:17, 99:16
**Court-Certified** [1] - 3:3
**COURTROOM** [2] - 107:25, 109:16
**courtroom** [14] - 4:17, 65:22, 66:3, 67:7, 104:2, 104:7, 104:12, 104:15, 106:1, 106:20, 108:1, 109:9, 109:20, 109:23
**cover** [1] - 95:5
**crane** [1] - 63:9
**crime** [80] - 9:20, 12:23, 13:9, 13:13, 17:5, 19:5, 19:8, 19:16, 20:10, 20:13, 20:18, 20:19, 20:20, 20:21, 20:23, 21:1, 21:3, 21:9, 21:11, 21:13, 22:7, 22:8, 22:10, 22:12, 22:17, 22:18, 22:20, 22:22, 22:25, 23:3, 23:6, 23:13, 23:15, 23:18, 23:25, 24:16, 24:20, 24:25, 25:7, 25:16, 25:17, 25:25, 26:1, 26:3, 26:18, 26:20,

26:22, 27:11, 27:12, 27:14, 27:15, 34:7, 35:11, 35:16, 38:21, 38:24, 39:6, 39:11, 40:5, 40:9, 41:17, 41:20, 43:2, 49:20, 53:17, 54:13, 58:15, 59:12, 59:16, 59:23, 60:7, 60:17, 83:4, 84:1, 91:16, 99:14, 102:20, 102:21, 102:22
**crimes** [22] - 12:6, 16:11, 16:13, 16:16, 16:17, 17:10, 27:17, 27:19, 29:15, 31:5, 31:15, 31:19, 42:19, 45:4, 65:17, 90:24, 92:9, 93:14, 97:13, 98:24, 99:12, 99:23
**criminal** [19] - 13:18, 17:14, 30:19, 30:25, 32:18, 39:21, 44:9, 45:2, 46:11, 47:5, 53:2, 53:18, 55:19, 55:21, 57:3, 91:25, 94:18, 97:21, 105:5
**criminally** [2] - 25:8, 25:13
**criminals** [2] - 93:5, 99:11
**cross** [16] - 67:12, 67:17, 69:17, 69:19, 70:21, 71:6, 71:10, 74:24, 75:1, 76:18, 78:15, 80:17, 83:2, 83:3, 83:7, 84:3
**cross-examination** [6] - 69:17, 69:19, 74:24, 75:1, 83:2, 84:3
**cross-examine** [2] - 67:12, 67:17
**CRR** [2] - 1:23, 110:10
**crusty** [2] - 48:7, 95:21
**crux** [1] - 81:3
**Customs** [1] - 55:16
**cut** [2] - 54:14, 90:22
**cuts** [1] - 90:8

**D**

**dad** [7] - 44:1, 44:2, 44:4, 52:7, 68:19
**dad's** [1] - 96:3
**danger** [1] - 96:10
**date** [9] - 26:19, 26:20, 26:22, 50:18, 59:20, 63:4, 103:23, 104:1

**daughter** [1] - 96:9
**David** [6] - 58:3, 58:8, 58:14, 78:17, 78:18
**DAY** [1] - 1:10
**days** [4] - 47:12, 77:19, 85:19, 94:2
**deal** [13] - 65:2, 65:12, 89:17, 89:25, 90:11, 90:12, 90:17, 90:20, 91:12, 91:21, 92:10, 99:4
**dealer** [9] - 15:15, 16:9, 37:22, 63:16, 69:22, 70:7, 87:21, 89:18, 89:22
**dealing** [1] - 38:6
**deals** [6] - 33:6, 34:13, 42:12, 60:8, 91:24, 98:1
**dearly** [1] - 68:14
**December** [1] - 29:13
**deception** [1] - 10:1
**decide** [25] - 3:10, 6:7, 8:17, 8:22, 9:18, 9:25, 10:11, 11:24, 15:12, 27:20, 27:22, 28:3, 42:13, 66:21, 67:20, 67:21, 72:24, 77:3, 81:10, 82:11, 86:22, 87:5, 88:18, 101:8, 106:12
**decides** [1] - 75:3
**deciding** [3] - 6:3, 68:7, 71:25
**decision** [9] - 6:10, 8:19, 10:1, 66:20, 66:22, 66:23, 82:13, 87:5
**decisions** [4] - 8:1, 12:1, 66:15, 66:18
**deductions** [1] - 8:5
**deeper** [1] - 73:25
**defendant** [292] - 6:8, 6:12, 6:18, 6:19, 6:20, 6:23, 7:9, 11:20, 11:21, 11:25, 12:7, 12:10, 12:14, 12:17, 12:19, 12:22, 12:24, 13:2, 13:4, 14:1, 14:8, 14:16, 15:7, 15:21, 15:24, 16:8, 16:10, 16:13, 16:15, 16:17, 17:22, 18:4, 18:16, 18:19, 19:2, 19:5, 19:8, 19:10, 19:12, 19:18, 19:20, 19:23, 19:25, 20:6, 20:9, 20:21, 20:23, 21:1, 21:2, 21:6, 21:14, 22:20,

22:23, 22:25, 23:5, 23:6, 23:7, 23:9, 23:10, 23:11, 23:12, 23:14, 23:16, 23:20, 23:22, 24:2, 24:4, 24:8, 24:9, 24:10, 24:12, 24:15, 24:25, 25:1, 25:6, 25:8, 25:9, 25:10, 25:13, 25:15, 25:16, 25:19, 27:13, 27:16, 27:18, 27:21, 29:13, 29:21, 30:10, 30:15, 30:16, 30:19, 30:24, 31:4, 31:12, 32:1, 32:4, 32:6, 32:8, 33:11, 33:17, 33:25, 34:3, 34:7, 34:16, 34:18, 35:4, 35:12, 35:15, 35:16, 35:18, 36:2, 36:5, 36:17, 36:25, 37:3, 37:8, 37:11, 38:7, 38:10, 38:18, 38:19, 39:5, 39:16, 39:17, 39:21, 39:23, 40:1, 40:5, 40:6, 40:9, 40:11, 40:13, 40:16, 40:17, 40:22, 40:23, 40:25, 41:8, 41:12, 41:16, 41:19, 41:20, 41:24, 42:1, 42:7, 42:13, 42:15, 42:19, 42:22, 42:23, 43:2, 43:3, 43:4, 43:6, 43:7, 43:9, 43:12, 43:15, 43:18, 44:8, 44:22, 44:24, 45:3, 45:7, 45:9, 45:13, 45:14, 45:17, 45:21, 45:23, 46:17, 46:20, 47:21, 48:3, 48:10, 48:18, 49:2, 49:3, 49:6, 49:8, 49:11, 50:4, 50:18, 50:24, 51:6, 51:12, 51:14, 52:10, 52:25, 53:2, 53:4, 53:15, 54:12, 54:16, 54:23, 55:21, 56:18, 56:21, 56:23, 57:1, 57:11, 57:13, 57:19, 57:24, 58:6, 58:10, 58:11, 58:15, 58:16, 58:20, 59:5, 59:11, 59:18, 59:22, 59:23, 59:25, 60:9, 60:12, 60:15, 60:16, 60:20, 60:22, 61:7, 61:8, 61:12, 61:14, 61:20, 61:25, 62:15, 63:2, 63:10, 63:19, 63:21, 63:24,

64:4, 64:9, 64:23, 65:16, 68:2, 87:24, 89:1, 89:20, 90:6, 90:16, 90:20, 91:2, 91:17, 92:1, 92:24, 93:5, 94:1, 94:2, 94:16, 94:19, 94:24, 95:2, 95:3, 95:11, 95:16, 96:5, 96:7, 96:15, 96:19, 97:3, 97:16, 97:17, 98:3, 98:6, 98:14, 99:1, 99:11, 99:22, 100:18, 100:20, 100:22, 100:24, 101:13, 101:17, 101:19, 102:12, 102:14, 102:16, 103:1, 103:8, 103:10, 103:12, 103:14
**DEFENDANT** [1] - 1:19
**Defendant** [1] - 3:2
**defendant's** [48] - 6:25, 7:2, 14:14, 20:4, 20:11, 23:5, 23:7, 24:18, 30:10, 30:11, 30:13, 35:21, 37:15, 37:24, 38:22, 39:9, 41:19, 43:10, 45:2, 46:14, 46:15, 46:25, 48:17, 49:3, 49:22, 50:2, 50:8, 50:10, 50:11, 50:25, 51:20, 52:11, 52:12, 54:4, 55:7, 55:18, 56:11, 57:4, 57:16, 59:2, 59:14, 59:17, 59:18, 60:23, 64:24, 65:5, 65:10, 87:12
**DEFENDANT'S** [2] - 2:7, 66:6
**defendants** [1] - 88:5
**defense** [11] - 3:17, 4:1, 25:21, 52:9, 88:7, 89:17, 99:1, 107:4, 107:10, 108:22
**definition** [2] - 64:13, 103:4
**delay** [5] - 12:11, 12:20, 13:11, 13:14, 15:10
**delayed** [4] - 14:14, 20:5, 37:15, 55:7
**deliberate** [6] - 3:12, 31:25, 34:15, 82:5, 105:4, 105:13
**deliberating** [6] -

16:19, 16:20, 74:19, 106:21, 106:23, 107:6

**deliberation** [6] - 106:16, 107:17, 107:19, 107:22, 108:8, 109:3

**deliberations** [15] - 3:11, 6:6, 11:12, 12:9, 28:1, 30:5, 31:23, 87:3, 100:10, 105:12, 105:17, 106:24, 107:22, 108:2, 108:17

**deliver** [1] - 18:10

**delivered** [1] - 4:25

**denied** [2] - 77:1, 92:2

**depart** [4] - 105:25, 106:6, 106:13, 107:19

**Department** [1] - 48:23

**depicted** [1] - 96:7

**deposited** [1] - 83:20

**deputy** [2] - 106:1, 109:23

**DEPUTY** [2] - 107:25, 109:16

**DERIC** [1] - 1:19

**Deric** [2] - 1:19, 68:20

**described** [3] - 15:9, 77:11, 82:18

**describes** [1] - 97:16

**designed** [1] - 21:18

**desire** [1] - 106:6

**desperate** [1] - 80:14

**destitute** [1] - 80:14

**destructive** [1] - 96:21

**detail** [3] - 10:3, 14:23, 19:15

**detailed** [2] - 58:1, 58:2

**details** [2] - 15:19, 18:14

**detectable** [10] - 18:8, 19:4, 34:5, 34:6, 38:15, 102:2, 102:6

**Detective** [4] - 48:22, 49:14, 56:6, 84:23

**Detention** [1] - 74:15

**determination** [1] - 104:14

**determine** [4] - 21:7, 23:14, 27:18, 41:25

**differ** [1] - 9:10

**difference** [2] - 8:13, 78:2

**different** [5] - 9:16, 32:9, 84:17, 97:7, 108:9

**differently** [1] - 28:9

**difficult** [1] - 5:21

**dig** [1] - 73:25

**direct** [11] - 8:6, 8:8, 8:14, 22:13, 26:8, 70:22, 70:23, 71:6, 71:11, 78:14, 100:10

**directed** [1] - 60:17

**directing** [1] - 25:4

**direction** [3] - 25:5, 77:13

**directly** [4] - 9:9, 22:4, 87:12, 104:7

**directs** [1] - 25:11

**disability** [1] - 98:20

**disabled** [1] - 90:5

**disagreement** [1] - 108:9

**disappeared** [1] - 64:14

**disbelieve** [1] - 8:19

**discharge** [1] - 85:14

**discovered** [1] - 56:4

**discuss** [7] - 28:5, 55:14, 105:10, 105:18, 107:13, 107:20, 108:19

**discussed** [2] - 39:8, 55:5, 67:25

**discussing** [4] - 16:2, 18:22, 28:6, 72:12

**discussion** [2] - 7:16, 70:14

**discussions** [2] - 6:5, 79:16

**dishonesty** [2] - 9:20, 77:4

**disobey** [1] - 27:5

**dispatcher** [1] - 44:3

**display** [3] - 23:18, 75:10, 77:4

**displaying** [1] - 21:25

**disprove** [1] - 8:12

**dispute** [1] - 81:14

**disregard** [5] - 6:16, 7:24, 27:6, 100:19, 102:13

**distribute** [30] - 12:15, 13:1, 17:6, 17:11, 18:7, 18:10, 19:3, 19:9, 24:3, 24:5, 24:9, 24:16, 25:23, 31:17, 32:3, 34:3, 34:4, 34:14, 34:17, 35:5, 36:12, 38:14, 53:8, 58:24, 59:9, 59:12, 64:6, 86:17, 101:22, 103:17

**District** [5] - 1:24, 4:20, 89:2, 110:10

**DISTRICT** [3] - 1:1, 1:1, 1:12

**division** [1] - 105:1

**DNA** [19] - 48:1, 48:2, 48:4, 48:5, 48:9, 48:10, 48:11, 48:13, 48:17, 82:8, 83:18, 84:8, 84:15, 95:12, 95:13, 95:17, 95:18

**DNAs** [2] - 84:15, 84:17

**doctor's** [1] - 65:11

**documented** [1] - 96:24

**dogs** [4] - 68:16, 68:17, 68:20, 68:23

**dollar** [1] - 91:5, 98:7

**dollars** [4] - 54:1, 54:10, 55:2, 55:15

**DONALD** [1] - 1:12

**done** [9] - 25:3, 25:4, 26:25, 41:11, 49:18, 49:19, 58:3, 58:16, 74:19

**door** [15] - 30:17, 36:5, 39:19, 39:20, 44:12, 44:13, 44:14, 44:17, 44:18, 45:22, 46:8, 49:3, 51:18, 52:1, 72:2

**doorway** [3] - 41:14, 52:15, 96:3

**doubt** [44] - 6:9, 6:22, 7:1, 7:2, 7:3, 7:6, 7:10, 14:3, 16:14, 17:1, 17:3, 17:24, 19:22, 20:8, 20:22, 24:7, 24:14, 25:18, 26:21, 29:14, 36:19, 38:1, 58:20, 60:4, 64:4, 64:13, 64:14, 64:16, 64:17, 65:17, 68:4, 68:5, 68:9, 68:10, 69:2, 78:8, 86:2, 86:3, 86:11

**down** [9] - 32:20, 33:23, 40:15, 78:10, 81:10, 81:12, 81:21, 97:12, 104:4

**downplay** [4] - 74:21, 75:11, 77:3

**Dr** [4] - 52:9, 52:17, 85:3, 85:19

**draw** [1] - 62:13

**driver** [3] - 57:7, 90:5, 99:4

**driveway** [1] - 46:4, 83:9

**driving** [2] - 49:25, 50:3

**drove** [4] - 35:25, 39:16, 45:13, 61:22

**drug** [20] - 15:15, 15:16, 37:22, 63:16, 65:1, 65:12, 69:22, 87:21, 89:17, 89:18, 89:22, 89:25, 91:21, 91:24, 92:10, 93:8, 98:1, 99:4, 99:12

**drugs** [22] - 15:15, 32:3, 32:11, 32:15, 34:3, 34:14, 34:22, 36:12, 37:22, 61:10, 62:3, 87:18, 87:22, 88:2, 88:3, 89:19, 90:7, 96:11, 98:4

**Duane** [2] - 2:6, 65:24, 90:19, 95:20

**DUANE** [5] - 1:15, 28:25, 29:3, 31:2, 66:1

**dumped** [1] - 93:1

**during** [34] - 6:11, 7:15, 7:25, 9:16, 11:9, 11:12, 12:8, 12:23, 20:19, 20:25, 21:8, 21:10, 22:21, 23:2, 23:13, 23:15, 35:20, 40:8, 43:23, 49:5, 62:14, 69:18, 70:21, 70:22, 71:6, 74:24, 83:2, 94:2, 94:3, 102:19, 102:20, 105:12, 106:24

**duty** [1] - 6:2

# E

**early** [1] - 50:17

**ears** [1] - 89:15

**easier** [1] - 50:16

**easy** [2] - 74:11, 104:17

**echo** [1] - 66:8

**effect** [3] - 15:12, 15:14, 22:9

**effective** [1] - 75:1

**effectuate** [2] - 61:16, 91:23

**effort** [1] - 54:13

**efforts** [5] - 44:9, 53:8, 53:16, 53:17

**Eicher** [2] - 46:23, 47:4

**eight** [4] - 75:16, 85:12, 85:13, 85:16

**either** [10] - 6:12, 8:14, 14:13, 20:2, 33:12, 34:8, 86:22, 100:8,

101:12, 104:6

**elapsed** [1] - 3:24

**element** [15] - 14:25, 15:14, 36:19, 37:5, 37:12, 37:14, 38:1, 38:10, 38:16, 39:5, 40:8, 55:5, 55:12, 55:20

**elements** [8] - 36:18, 38:2, 38:20, 40:3, 54:19, 59:10, 60:3

**Elizabeth** [6] - 30:23, 43:19, 44:3, 46:2, 46:3, 52:6

**Elizabeth's** [1] - 44:11

**emerged** [1] - 44:17

**emphasize** [5] - 11:17, 66:13, 68:1, 76:19, 83:7

**emphasized** [1] - 68:2

**employee** [1] - 25:11

**employment** [1] - 21:24

**encourage** [2] - 83:25, 85:22

**end** [10] - 32:15, 33:22, 69:13, 70:11, 78:9, 81:3, 82:4, 85:21, 85:24, 89:16

**enforcement** [6] - 49:24, 61:19, 62:2, 79:16, 79:18, 90:18

**enter** [2] - 37:12, 104:15

**entered** [2] - 4:17, 66:3

**entire** [1] - 94:8

**entirely** [3] - 11:4, 70:19, 76:5

**entitled** [2] - 11:17, 110:7

**equipment** [2] - 106:18, 109:4

**escape** [1] - 74:22

**ESQ** [1] - 1:19

**essentially** [7] - 32:12, 32:19, 41:7, 58:5, 60:9, 71:21, 72:5

**establish** [5] - 16:3, 18:23, 25:24, 72:13, 84:20

**established** [1] - 85:12

**etc** [2] - 109:12, 109:24

**evening** [1] - 107:21

**event** [23] - 16:1, 18:21, 25:24, 31:6, 31:9, 31:11, 36:8, 36:10, 36:16, 45:16,

54:16, 59:8, 69:25, 71:18, 72:7, 72:11, 72:22, 81:9, 81:11, 86:20, 86:23, 105:14, 109:6

**events** [10] - 31:4, 31:15, 69:11, 69:12, 69:13, 93:15, 96:7, 98:18

**everywhere** [1] - 95:17

**evidence** [82] - 6:10, 6:19, 6:21, 7:5, 7:12, 7:13, 7:18, 7:20, 8:3, 8:4, 8:6, 8:8, 8:11, 8:14, 8:15, 8:16, 9:11, 9:12, 9:14, 11:8, 11:14, 11:21, 11:22, 12:2, 25:1, 27:12, 27:18, 28:4, 28:13, 29:7, 29:10, 29:12, 29:20, 29:25, 33:17, 36:24, 37:8, 39:7, 39:16, 40:20, 40:24, 42:5, 43:20, 45:25, 46:1, 46:2, 48:16, 50:10, 55:2, 55:13, 56:10, 56:14, 58:17, 60:15, 60:19, 64:10, 64:22, 65:13, 65:14, 65:16, 70:14, 73:4, 74:6, 78:14, 81:18, 82:6, 82:8, 82:24, 82:25, 85:21, 88:9, 88:13, 88:17, 98:13, 99:13, 99:22, 106:17, 108:6, 109:11

**evolution** [1] - 51:11

**exact** [1] - 26:20

**exactly** [5] - 49:15, 57:22, 65:24, 68:5, 83:11

**examination** [6] - 69:17, 69:19, 74:24, 75:1, 83:2, 84:3

**examinations** [1] - 87:4

**examine** [3] - 28:7, 67:12, 67:17

**example** [6] - 10:15, 42:4, 48:15, 52:15, 68:6, 84:5

**except** [1] - 7:23

**exchange** [2] - 10:21, 75:25

**exchanged** [1] - 18:12

**excited** [1] - 4:22

**exclude** [1] - 7:1

**excoriation** [1] - 52:18

**excuse** [5] - 3:8, 69:18, 105:9, 106:8, 107:16

**excused** [1] - 107:24

**execute** [1] - 96:4

**executed** [1] - 57:5

**execution** [2] - 45:12, 56:25

**exercise** [1] - 22:15

**exhibit** [1] - 7:16

**exhibits** [9] - 7:14, 106:11, 106:15, 108:6, 108:7, 108:16, 108:24, 108:25

**exited** [2] - 65:22, 108:1

**expel** [1] - 21:19

**experience** [2] - 5:16, 10:6

**experiences** [1] - 64:21

**expert** [5] - 10:9, 83:19, 84:15, 95:13, 95:17

**explain** [6] - 6:14, 19:15, 28:1, 93:25, 100:13, 103:4

**explained** [3] - 93:22, 101:3, 104:1

**explaining** [1] - 62:20

**EXPLANATION** [1] - 2:12

**explanation** [2] - 97:15, 100:7

**explosive** [1] - 21:20

**exporting** [1] - 56:1

**exposed** [2] - 90:2, 90:18

**exposure** [1] - 94:18

**expressly** [1] - 10:25

**extent** [1] - 30:5

**extort** [3] - 73:14, 74:12, 98:15

**extorted** [1] - 94:19

**extorting** [1] - 43:7

**extra** [2] - 5:13, 75:7

**eyes** [1] - 89:15

**eyewitness** [1] - 8:10

**F**

**face** [3] - 10:23, 87:24, 95:19

**facilitated** [1] - 22:11

**facilitating** [1] - 22:12

**facilities** [1] - 106:22

**fact** [19] - 8:9, 8:12, 9:13, 9:19, 10:3, 11:7, 57:1, 59:25,

60:15, 71:8, 79:15, 80:4, 83:8, 83:13, 85:18, 89:9, 89:11, 91:1, 92:24

**facts** [21] - 5:9, 6:8, 8:1, 8:11, 14:2, 17:23, 19:21, 20:7, 20:22, 24:6, 24:13, 28:12, 33:18, 88:20, 89:11, 92:8, 93:12, 94:9, 97:13, 98:22, 99:19

**factual** [1] - 7:23

**fails** [3] - 6:22, 19:17, 24:1

**fair** [1] - 29:9, 67:23

**false** [6] - 9:20, 10:18, 11:2, 76:3, 96:14, 97:11

**falsely** [1] - 9:13

**familiar** [1] - 87:13

**families** [2] - 73:13, 74:12

**family** [5] - 30:13, 44:15, 55:25, 68:23, 74:11

**fashion** [1] - 21:25

**fast** [1] - 104:19

**father** [3] - 44:11, 68:14

**favorable** [3] - 10:17, 11:1, 76:3

**FBI** [3] - 46:23, 77:1, 77:6

**FDC** [1] - 74:15

**fear** [5] - 14:13, 15:2, 15:3, 15:4, 20:2

**Federal** [2] - 1:23, 74:15

**federal** [4] - 13:9, 17:5, 20:18, 105:4

**fee** [1] - 91:9

**feelings** [1] - 99:20

**feet** [1] - 61:12

**fell** [1] - 44:21

**felony** [1] - 9:20

**felt** [1] - 58:12

**fence** [3] - 39:17, 45:18, 49:23

**few** [5] - 8:23, 33:5, 41:5, 77:6, 77:19

**field** [1] - 10:6

**fifth** [1] - 35:4

**filled** [1] - 58:19

**final** [3] - 37:14, 64:2, 104:14

**finally** [3] - 44:1, 55:5, 84:22

**financial** [4] - 15:3, 79:4, 79:5, 81:2

**financially** [1] - 80:14

**finder's** [1] - 91:9

**fine** [1] - 67:3

**fingerprint** [2] - 94:10

**fingerprints** [2] - 46:3, 82:6

**finish** [1] - 64:12

**finished** [1] - 65:24

**fire** [5] - 83:11, 83:21, 83:22, 84:11, 84:19

**firearm** [89] - 12:23, 20:19, 20:20, 21:1, 21:3, 21:8, 21:10, 21:12, 21:18, 21:21, 21:22, 21:23, 21:24, 22:1, 22:2, 22:3, 22:4, 22:5, 22:6, 22:8, 22:9, 22:11, 22:13, 22:14, 22:16, 22:17, 22:18, 22:21, 22:22, 22:24, 23:2, 23:3, 23:8, 23:10, 23:13, 23:15, 23:17, 23:19, 23:21, 23:23, 30:21, 35:3, 35:10, 36:2, 36:14, 37:9, 37:11, 40:2, 40:10, 40:12, 40:14, 40:17, 40:18, 40:22, 40:23, 40:25, 41:12, 41:13, 41:14, 41:21, 41:22, 42:2, 42:3, 42:4, 42:5, 42:7, 42:9, 42:14, 42:16, 44:19, 44:22, 44:23, 53:12, 53:13, 53:14, 53:16, 53:17, 81:23, 81:25, 82:7, 82:8, 82:12, 83:1, 102:18, 103:3

**firearm's** [1] - 22:15

**fired** [1] - 52:2

**firing** [1] - 44:21

**firmly** [1] - 84:19

**first** [25] - 3:13, 4:13, 4:25, 13:2, 20:9, 24:15, 31:6, 31:16, 36:19, 38:2, 39:5, 40:5, 59:11, 62:16, 63:14, 66:8, 69:15, 70:5, 71:3, 71:18, 73:20, 77:16, 78:4, 81:22, 94:25

**first-time** [1] - 71:18

**five** [16] - 3:24, 4:3, 12:6, 31:5, 31:15, 47:17, 64:3, 80:21, 102:13, 103:6, 104:18, 104:25, 105:3, 107:11, 107:12

**flash** [1] - 83:5

**fled** [1] - 45:23

**FLORIDA** [1] - 1:1

**Florida** [6] - 1:4, 1:18, 1:21, 1:25, 4:20, 110:11

**flow** [2] - 15:5, 55:10

**focus** [2] - 31:18, 38:17

**focused** [2] - 82:19, 83:3

**follow** [10] - 4:24, 5:9, 5:14, 6:14, 6:15, 29:11, 49:17, 49:18, 99:15, 99:25

**follow-up** [2] - 49:17, 49:18

**followed** [1] - 4:25

**following** [12] - 14:2, 17:23, 19:21, 20:7, 20:22, 24:6, 24:13, 54:8, 100:13, 101:22, 103:17, 105:20

**follows** [2] - 100:21, 101:18

**FOR** [2] - 1:15, 1:19

**forbids** [2] - 27:5, 27:7

**force** [5] - 14:12, 20:1, 37:7, 55:4, 75:20

**forced** [2] - 95:5, 99:6

**forcibly** [1] - 73:12

**foregoing** [1] - 110:5

**foreign** [1] - 73:11

**forensically** [1] - 97:10

**forensics** [1] - 47:24

**foreperson** [6] - 100:10, 103:22, 104:1, 106:10, 106:13

**forget** [2] - 9:23, 77:14

**form** [21] - 14:22, 14:23, 19:13, 19:15, 21:17, 28:15, 28:16, 33:20, 34:12, 42:10, 58:18, 86:6, 86:7, 86:14, 100:7, 100:12, 100:14, 101:11, 103:22, 103:24, 108:15

**FORM** [1] - 2:12

**formal** [4] - 6:18, 13:22, 17:18, 32:20

**Fort** [1] - 1:21

**Foster** [1] - 105:10

**four** [9] - 14:14, 36:16, 42:12, 47:17, 50:15, 51:4, 80:21, 102:10

**fourth** [3] - 37:14,

38:1, 55:5
**FPR** [3] - 1:23, 110:10
**frame** [1] - 21:20
**Frank** [18] - 30:17, 35:11, 35:12, 35:13, 35:14, 35:15, 42:10, 43:3, 43:4, 44:7, 45:10, 48:19, 48:20, 51:17, 51:19, 87:23, 95:8
**frankly** [4] - 71:15, 75:10, 80:7, 84:24
**Frankowitz** [4] - 52:9, 52:17, 85:3, 85:19
**free** [2] - 30:6, 43:21
**freedom** [1] - 74:10
**friend** [5] - 30:17, 44:7, 44:8, 63:19, 65:1
**friends** [3] - 87:14, 87:15, 88:5
**front** [16] - 44:12, 44:13, 45:6, 45:22, 46:8, 52:16, 82:25, 83:5, 89:2, 95:14, 96:3, 96:20, 99:8, 109:1
**full** [1] - 77:4
**fully** [1] - 28:4
**fundamentally** [2] - 94:7, 96:14
**funds** [1] - 63:2
**furtherance** [14] - 20:20, 21:3, 21:12, 22:17, 22:22, 23:3, 32:25, 35:3, 36:14, 40:2, 40:23, 40:25, 41:23, 102:22
**furthermore** [1] - 53:15
**future** [2] - 14:13, 20:3
**fuzzy** [1] - 82:18

### G

**Gables** [12] - 31:10, 53:22, 55:3, 55:16, 56:2, 56:7, 72:23, 77:8, 86:20, 86:23, 93:10, 98:3
**gain** [6] - 10:17, 11:1, 76:3, 76:11, 86:4, 95:7
**GARCIA** [1] - 1:7
**Garcia** [27] - 3:2, 29:14, 66:21, 68:8, 70:4, 71:17, 76:14, 76:20, 77:10, 77:11, 78:6, 78:19, 79:7, 79:9, 79:10, 79:12,

79:13, 79:25, 80:4, 80:13, 80:20, 81:13, 82:7, 82:22, 83:14, 84:16, 86:8
**gated** [2] - 45:19, 49:21, 49:22, 49:24, 64:25
**gather** [1] - 106:14
**gathering** [1] - 106:11
**general** [2] - 15:22, 18:17
**generally** [1] - 31:19
**gentlemen** [14] - 4:18, 40:20, 47:20, 48:19, 50:23, 51:9, 51:21, 52:25, 57:23, 58:17, 58:22, 64:2, 64:8, 87:8, 100:6, 107:23
**getaway** [1] - 57:7
**given** [6] - 5:6, 12:8, 58:10, 58:11, 58:12, 106:12
**GLENDA** [2] - 1:23, 110:10
**Glock** [2] - 44:12, 44:21
**glove** [3] - 36:3, 45:14, 45:15
**goal** [1] - 32:15
**goals** [3] - 16:3, 18:23, 72:12
**godchildren** [1] - 91:23
**Godfather** [4] - 59:22, 61:6, 61:7, 61:24
**godson** [12] - 31:12, 35:6, 57:21, 59:6, 59:17, 59:18, 60:9, 60:11, 60:17, 61:15
**gold** [68] - 14:20, 16:9, 31:9, 32:14, 33:8, 33:13, 33:25, 37:18, 53:20, 54:1, 54:7, 54:10, 54:18, 54:21, 54:22, 54:24, 55:3, 55:12, 56:1, 56:3, 56:14, 56:17, 56:19, 56:25, 57:6, 57:8, 57:9, 57:10, 57:12, 57:17, 57:25, 58:2, 58:6, 58:21, 59:3, 65:6, 65:7, 72:22, 73:19, 76:15, 77:8, 77:15, 77:21, 80:9, 80:10, 81:4, 81:7, 86:20, 86:22, 87:21, 88:1, 90:25, 91:5, 91:22, 92:4, 92:5, 92:14, 92:19, 92:23, 93:4, 94:5, 94:13,

96:11, 99:6, 100:25, 101:9
**gonna** [2] - 87:24, 88:3
**GOVERNMENT** [1] - 1:15
**Government** [58] - 3:22, 4:3, 6:7, 6:13, 6:21, 10:19, 10:20, 11:3, 11:21, 13:20, 13:24, 14:5, 15:7, 16:12, 16:14, 17:16, 17:20, 18:1, 21:5, 26:19, 26:21, 28:22, 28:24, 33:16, 36:21, 64:15, 67:1, 67:3, 67:14, 67:16, 67:21, 68:3, 70:2, 71:23, 72:2, 72:23, 73:17, 75:8, 75:24, 76:5, 76:11, 77:17, 78:10, 78:12, 79:2, 80:8, 83:10, 83:15, 83:16, 83:22, 85:5, 86:13, 86:16, 86:19, 87:4, 87:9, 88:10, 109:5
**Government's** [6] - 6:24, 7:1, 69:5, 81:3, 85:21, 85:24
**GOVERNMENT'S** [4] - 2:5, 2:9, 29:2, 87:7
**GPS** [4] - 56:12, 93:9, 94:11
**grab** [2] - 73:12, 84:5
**GRAHAM** [1] - 1:12
**grams** [20] - 18:7, 19:3, 19:7, 24:11, 24:17, 34:5, 34:9, 34:20, 38:14, 59:13, 63:25, 64:1, 64:6, 64:7, 86:9, 86:17, 102:1, 102:2, 103:19, 103:20
**great** [6] - 11:23, 29:5, 67:6, 67:7, 67:19, 88:8
**greater** [1] - 11:17
**Greenwich** [1] - 50:14
**group** [4] - 32:13, 46:11, 47:5, 73:11
**grow** [32] - 31:7, 31:14, 32:15, 33:9, 33:13, 34:22, 35:8, 35:9, 35:17, 35:22, 35:24, 36:9, 37:2, 37:4, 37:20, 37:25, 38:12, 39:3, 39:4, 42:25, 43:18, 45:7, 45:8, 45:13, 47:23, 49:10, 49:13, 50:5,

51:13, 53:9, 55:6, 56:13
**grow-house** [32] - 31:7, 31:14, 32:15, 33:9, 33:13, 34:22, 35:8, 35:9, 35:17, 35:22, 35:24, 36:9, 37:2, 37:4, 37:20, 37:25, 38:12, 39:3, 39:4, 42:25, 43:18, 45:7, 45:8, 45:13, 47:23, 49:10, 49:13, 50:5, 51:13, 53:9, 55:6, 56:13
**guess** [4] - 71:12, 79:3, 79:13, 80:16
**Guidelines** [1] - 27:23
**guilt** [6] - 6:19, 6:22, 6:25, 7:2, 11:8, 68:7
**guilty** [86] - 6:8, 6:23, 7:9, 11:7, 14:1, 14:16, 15:25, 16:16, 17:22, 18:20, 19:5, 19:8, 19:10, 19:20, 20:6, 20:21, 21:6, 21:14, 22:22, 22:24, 23:12, 23:16, 24:4, 24:12, 24:25, 27:13, 27:19, 27:21, 27:22, 27:24, 29:14, 29:21, 33:11, 33:25, 34:7, 36:17, 40:11, 40:14, 40:16, 41:12, 41:16, 41:25, 42:19, 53:5, 53:7, 53:10, 53:11, 53:15, 58:20, 60:16, 64:4, 64:5, 65:16, 68:4, 77:20, 77:22, 86:13, 86:22, 99:14, 99:23, 100:2, 100:16, 100:18, 100:20, 100:22, 101:6, 101:12, 101:14, 101:17, 101:19, 102:9, 102:12, 102:14, 102:16, 103:1, 103:9, 103:10, 103:12, 103:14
**gun** [22] - 38:9, 41:9, 41:10, 44:10, 45:15, 45:23, 46:6, 46:8, 46:11, 47:24, 50:7, 51:25, 52:3, 53:3, 82:19, 82:20, 89:4, 89:8, 89:10
**gunfire** [1] - 95:16
**gunshot** [4] - 52:13, 52:15, 52:20, 52:21
**guy** [11] - 56:18, 73:7,

73:9, 73:10, 73:14, 73:17, 74:8, 77:12, 84:23, 84:24, 96:2
**Guy** [2] - 55:13, 55:22
**guys** [3] - 75:22, 76:9, 76:10

### H

**hand** [1] - 91:19
**handed** [2] - 79:20
**handicapped** [5] - 59:22, 62:21, 63:10, 63:17, 71:9
**handing** [1] - 108:23
**handled** [1] - 82:2
**handling** [2] - 83:12
**hands** [2] - 44:17, 61:13
**hanging** [1] - 95:1
**hangs** [1] - 83:17
**Happy** [5] - 3:5, 3:6, 4:22, 29:3, 66:7
**hard** [2] - 80:19, 81:1
**harm** [3] - 14:13, 15:3, 20:2
**hat** [1] - 83:17
**hatched** [1] - 94:25
**head** [1] - 61:13
**hear** [10] - 36:24, 45:1, 56:8, 57:10, 63:18, 78:14, 82:6, 82:8, 106:23
**heard** [54] - 29:22, 31:7, 33:20, 34:18, 35:12, 35:19, 35:23, 36:2, 37:10, 37:16, 42:18, 42:21, 43:19, 44:11, 44:15, 44:16, 45:2, 45:3, 45:4, 45:23, 46:5, 46:8, 46:9, 46:22, 47:24, 47:25, 48:22, 49:5, 49:6, 49:7, 49:20, 51:12, 51:24, 51:25, 52:4, 52:6, 52:9, 52:17, 54:7, 54:11, 56:6, 56:16, 57:23, 58:8, 61:1, 61:2, 66:10, 66:11, 82:9, 83:21, 85:3, 85:19, 95:25
**hearing** [1] - 31:3
**heart** [4] - 13:23, 17:19, 32:23, 96:22
**heavily** [2] - 85:22, 85:25
**heavy** [1] - 6:24
**Hector** [1] - 97:17
**heist** [24] - 31:9,

37:18, 53:20, 54:7, 54:18, 55:12, 56:14, 56:17, 56:19, 56:25, 57:6, 57:8, 57:13, 57:18, 57:25, 58:2, 58:6, 59:3, 90:25, 91:22, 92:14, 92:19, 96:11
**held** [4] - 19:6, 41:13, 82:19, 99:23
**Held** [1] - 1:8
**help** [4] - 31:24, 72:23, 78:4, 80:23
**helped** [2] - 22:18, 61:11
**helpful** [3] - 10:5, 87:3, 87:4
**helping** [1] - 87:5
**helps** [1] - 68:14
**hereby** [1] - 110:5
**Hernandez** [20] - 32:5, 35:13, 35:19, 37:1, 43:25, 45:5, 46:13, 46:18, 54:3, 56:16, 72:25, 73:6, 75:20, 76:16, 78:11, 80:9, 81:5, 81:24, 82:16, 85:25
**Hernandez's** [3] - 49:12, 59:1, 80:12
**hesitate** [1] - 28:6
**hesitation** [6] - 7:8, 68:12, 68:22, 68:24, 69:6, 81:7
**hid** [1] - 39:19
**high** [1] - 69:3
**highlight** [3] - 29:17, 31:23, 33:5
**himself** [6] - 39:24, 51:19, 78:4, 91:14, 97:16, 98:7
**hit** [3] - 49:6, 49:7, 97:23
**hitting** [1] - 84:22, 97:18
**Hobbs** [6] - 19:19, 19:20, 20:10, 25:22, 39:6, 87:20
**hold** [2] - 66:20, 89:4
**holding** [1] - 89:8
**hole** [2] - 51:23, 85:8
**holes** [1] - 85:10
**home** [10] - 37:12, 39:18, 42:6, 45:1, 51:1, 68:23, 95:15, 96:9, 99:8
**honest** [2] - 28:8, 67:23
**honor** [1] - 99:25
**Honor** [12] - 3:8, 3:16,

4:8, 28:25, 66:1, 99:18, 99:19, 107:3, 107:9, 108:21, 109:14, 110:1
**HONORABLE** [1] - 1:12
**hope** [4] - 10:16, 67:10, 87:2, 87:3
**hopefully** [1] - 75:1
**hopes** [2] - 11:1, 76:2
**hoping** [2] - 74:13, 77:25
**hopped** [2] - 39:17, 45:18
**Hospital** [1] - 85:15
**hospital** [6] - 49:1, 80:14, 82:24, 85:1, 85:5
**hour** [1] - 29:23
**hourly** [1] - 79:6
**hours** [1] - 50:15
**house** [52] - 30:25, 31:7, 31:14, 32:15, 33:9, 33:13, 34:22, 35:8, 35:9, 35:17, 35:22, 35:24, 36:9, 37:2, 37:4, 37:9, 37:20, 37:25, 38:8, 38:12, 38:25, 39:3, 39:4, 39:17, 42:25, 43:18, 43:24, 44:9, 45:7, 45:8, 45:13, 45:18, 45:21, 47:23, 49:7, 49:10, 49:12, 49:13, 50:5, 51:13, 53:9, 55:6, 56:8, 56:13, 64:24, 68:15, 68:16, 82:25, 96:1, 97:18, 97:23
**hunting** [1] - 89:1
**hypothetical** [1] - 105:3

**I**

**idea** [1] - 64:14
**identification** [1] - 7:17
**identified** [2] - 46:13, 84:16
**identifies** [2] - 77:9, 78:5
**identify** [1] - 49:19
**identities** [2] - 15:19, 18:14
**IGNACIO** [1] - 1:15
**ill** [1] - 105:6
**illegal** [1] - 73:15
**illustrate** [2] - 70:20, 74:25

**illustrates** [1] - 69:3
**immediately** [3] - 14:13, 20:3, 104:9
**immigrant** [1] - 73:16
**immunity** [2] - 10:16, 75:18
**impact** [4] - 30:10, 30:12, 30:13, 66:24
**impacts** [1] - 30:12
**impartial** [1] - 29:9
**impartially** [1] - 7:4
**implicate** [4] - 43:15, 43:16, 95:4, 98:7
**implicated** [2] - 94:21, 98:9
**important** [31] - 7:8, 8:18, 9:13, 20:14, 24:21, 29:25, 30:1, 32:6, 38:20, 39:13, 43:23, 49:6, 55:12, 60:8, 66:12, 66:15, 66:17, 66:19, 66:22, 68:12, 68:23, 68:25, 69:7, 70:8, 73:23, 74:10, 76:21, 81:7, 83:16, 106:5, 107:14
**importantly** [2] - 57:15, 62:4
**impress** [3] - 8:24, 75:7, 80:24
**impressions** [1] - 11:18
**inaccurately** [1] - 9:24
**inadvertently** [1] - 99:5
**incapacitated** [1] - 105:6
**incentivized** [1] - 78:4
**incident** [1] - 42:20
**include** [1] - 104:21
**includes** [5] - 7:13, 14:24, 15:3, 21:20, 26:16
**including** [7] - 12:2, 14:4, 17:25, 36:20, 38:3, 45:16, 85:17
**income** [1] - 14:25
**incoming** [1] - 50:12
**inconsequential** [3] - 20:15, 24:22, 39:14
**incredible** [1] - 91:14
**incredibly** [1] - 96:21
**incriminating** [1] - 80:15
**independent** [2] - 11:14, 71:17
**indication** [1] - 3:19
**indicted** [2] - 77:21, 93:24
**indictment** [24] - 6:18,

12:6, 12:8, 13:21, 14:7, 15:10, 16:8, 17:17, 20:24, 21:2, 21:4, 26:18, 27:11, 27:17, 29:15, 40:10, 65:18, 66:22, 81:24, 100:2, 102:7, 102:11, 102:23, 103:9
**individual** [1] - 66:23
**individuals** [5] - 32:7, 32:8, 83:22, 86:1, 93:18
**inevitable** [1] - 72:4
**influenced** [2] - 6:11, 11:15
**informant** [11] - 14:5, 18:1, 36:20, 38:3, 60:1, 61:19, 61:23, 62:9, 62:17, 71:4, 90:10
**informants** [1] - 10:15
**information** [15] - 3:21, 35:21, 37:4, 38:12, 42:24, 43:17, 45:8, 47:18, 49:8, 58:16, 79:9, 94:17, 97:19, 97:24, 100:19
**informer** [1] - 75:17
**Inhat** [2] - 47:25, 84:14
**initial** [1] - 28:22
**injury** [1] - 52:21
**ink** [1] - 93:2
**innocence** [2] - 6:20, 68:8
**innocent** [3] - 6:20, 9:25, 68:3
**inside** [5] - 36:6, 38:8, 44:9, 48:10, 48:11, 49:21
**instead** [2] - 48:12, 52:23
**instruct** [1] - 6:3
**instructed** [3] - 34:25, 42:2, 86:21
**instruction** [16] - 28:15, 37:20, 37:21, 39:12, 41:2, 41:3, 41:15, 55:9, 60:5, 60:6, 60:8, 72:10, 75:19, 100:7, 103:5
**instructions** [26] - 4:13, 4:25, 5:6, 5:11, 5:15, 5:23, 6:4, 6:16, 6:17, 7:24, 10:8, 12:4, 13:7, 26:25, 29:18, 31:21, 31:22, 31:24, 33:4, 34:12, 37:16, 75:16, 99:16,

107:1, 107:17, 107:18
**insufficient** [3] - 26:3, 82:14, 86:10
**intangible** [1] - 14:25
**intend** [2] - 18:10, 26:1
**intended** [12] - 15:8, 20:9, 23:23, 24:9, 24:15, 35:10, 35:15, 39:6, 43:1, 43:2, 59:11, 59:23
**intent** [34] - 12:15, 12:25, 17:6, 17:11, 18:7, 19:3, 19:9, 20:11, 22:15, 24:3, 24:5, 24:16, 24:18, 25:23, 27:4, 27:7, 31:17, 32:3, 34:2, 34:4, 34:14, 34:17, 35:5, 36:12, 39:9, 53:7, 58:24, 59:2, 59:9, 59:12, 64:6, 86:17, 101:21, 103:16
**intention** [1] - 26:11
**intentional** [1] - 10:1
**intentionally** [4] - 12:25, 25:7, 25:15, 27:1
**interest** [5] - 9:3, 28:12, 79:4, 79:23, 87:10
**interesting** [1] - 78:18
**interests** [5] - 16:3, 18:23, 72:12, 79:5, 81:2
**interpretation** [1] - 8:2
**INTERPRETER** [1] - 3:8
**Interpreters** [1] - 3:3
**interrupt** [1] - 15:10
**interstate** [16] - 13:11, 13:14, 14:15, 15:5, 15:8, 15:11, 15:13, 15:17, 20:5, 37:15, 37:17, 37:23, 37:25, 55:8, 55:10, 55:21
**intervened** [1] - 62:2
**intervening** [1] - 107:7
**interview** [1] - 79:16
**intimidate** [4] - 22:3, 23:23, 42:9, 46:12
**intimidation** [1] - 23:19
**introduced** [1] - 85:11
**introduction** [1] - 12:4
**investigation** [3] - 49:17, 49:18, 81:18
**investigator** [1] -

79:23
**investigators** [1] - 97:7
**invited** [1] - 95:20
**involve** [1] - 90:6
**involved** [7] - 49:19, 63:17, 77:17, 79:25, 91:4, 93:4, 95:2
**involvement** [2] - 76:14, 77:2
**involving** [2] - 9:20, 16:23
**issue** [3] - 7:23, 36:22, 108:12
**issues** [2] - 108:13, 108:18
**item** [3] - 95:21, 102:5, 103:6
**items** [2] - 7:18, 101:15
**itself** [5] - 13:24, 17:20, 32:24, 36:13, 75:11

## J

**Jail** [2] - 85:2, 85:4
**jail** [2] - 74:16, 91:16
**January** [4] - 1:5, 82:3, 108:2, 110:9
**Jean** [9] - 32:5, 35:18, 36:25, 45:17, 46:3, 46:19, 51:19, 54:2, 94:10
**JESUS** [1] - 1:15
**job** [1] - 74:19
**joined** [5] - 14:9, 15:23, 18:5, 18:18, 38:11
**joins** [1] - 25:7
**joint** [3] - 26:6, 26:14, 26:17
**Jorge** [2] - 53:23, 56:8
**JR** [1] - 1:15
**Juan** [1] - 105:21
**judge** [3] - 29:18, 69:14, 109:22
**Judge** [21] - 3:17, 4:9, 4:16, 27:22, 31:1, 31:21, 33:3, 33:20, 34:3, 34:25, 42:2, 66:5, 67:20, 74:2, 86:6, 86:21, 107:4, 107:10, 108:22, 109:15, 109:25
**JUDGE** [1] - 1:12
**judged** [1] - 69:10
**judges** [4] - 4:12, 28:11, 28:12, 99:19
**judgment** [1] - 75:5

**Julio** [6] - 37:10, 44:11, 46:2, 46:12, 51:24, 96:14
**July** [2] - 69:25, 77:6
**jumped** [1] - 49:23
**juror** [1] - 105:7
**jurors** [17] - 3:11, 5:17, 11:16, 16:20, 28:4, 29:1, 29:5, 29:8, 105:5, 105:13, 105:15, 105:20, 105:22, 105:25, 106:6, 106:9, 107:6
**JURY** [3] - 1:10, 2:4, 6:1
**Jury** [2] - 31:1, 65:22
**jury** [27] - 4:10, 4:17, 6:2, 6:5, 64:20, 65:21, 66:3, 68:2, 70:13, 99:18, 100:9, 100:15, 100:22, 101:19, 102:10, 102:16, 103:1, 103:8, 103:14, 103:24, 104:15, 107:17, 107:25, 108:1, 108:7, 108:17, 109:5
**Justice** [1] - 89:3
**justice** [3] - 98:10, 98:12, 98:15

## K

**keep** [6] - 9:21, 51:5, 70:5, 106:24, 107:15, 109:8
**kept** [3] - 83:2, 84:22, 98:2
**keys** [1] - 90:7
**kidnap** [1] - 74:12
**kidnapped** [1] - 76:23
**kidnapping** [2] - 76:24, 77:20
**kidnappings** [1] - 73:8
**kids** [4] - 68:15, 68:20, 68:21, 68:23
**kill** [1] - 92:16
**kilo** [11] - 31:13, 34:19, 35:6, 59:17, 59:21, 59:24, 60:18, 60:20, 60:21, 61:5, 63:25
**kilogram** [2] - 61:17, 62:23
**kilos** [3] - 57:21, 59:4
**kind** [7] - 11:4, 13:17, 13:22, 17:13, 17:18, 76:5, 82:21
**Kindelan** [33] - 32:4,

35:13, 35:19, 37:1, 43:25, 45:5, 45:20, 46:18, 49:11, 54:3, 56:16, 57:5, 57:7, 57:15, 57:19, 57:22, 59:1, 72:25, 73:6, 75:19, 78:11, 81:24, 82:16, 88:11, 88:23, 88:25, 89:5, 91:22, 92:11, 93:16, 93:20, 94:10
**kindelan** [1] - 57:13
**Kindelan's** [5] - 40:21, 45:25, 46:10, 50:6, 76:19
**kinds** [1] - 26:4
**King** [1] - 70:6
**Kingdom** [1] - 90:7
**knock** [1] - 39:19
**knocked** [1] - 39:19
**knocking** [1] - 72:2
**knowing** [3] - 15:18, 18:13, 25:20
**knowingly** [21] - 12:11, 12:14, 12:19, 12:24, 13:13, 17:6, 17:10, 19:23, 20:9, 21:1, 21:2, 24:8, 24:15, 26:8, 26:24, 39:6, 40:9, 40:13, 59:11, 59:23, 100:24
**knowledge** [13] - 8:9, 10:5, 22:14, 23:1, 23:4, 23:17, 23:20, 41:18, 42:8, 58:2
**known** [3] - 23:19, 46:19, 46:20
**knows** [4] - 75:6, 75:7, 89:20

## L

**lacking** [1] - 83:1
**ladies** [16] - 4:18, 40:20, 47:20, 48:19, 50:23, 51:9, 51:21, 52:24, 57:23, 58:17, 58:22, 64:2, 64:8, 87:8, 100:6, 107:23
**language** [6] - 5:18, 31:19, 74:22, 77:25, 78:2, 78:3
**lapse** [1] - 9:25
**Lara** [10] - 32:5, 35:19, 36:25, 45:17, 46:3, 46:19, 51:20, 54:2, 57:5, 94:11
**last** [4] - 4:15, 58:8, 103:6, 103:21
**lasted** [1] - 51:4

**late** [1] - 23:10
**Latin** [1] - 70:6
**Lauderdale** [1] - 1:21
**law** [41] - 5:8, 5:19, 6:3, 6:14, 6:15, 6:17, 6:19, 7:24, 26:4, 27:5, 27:6, 27:7, 27:9, 29:11, 49:24, 60:14, 61:19, 62:2, 67:23, 67:25, 68:9, 69:1, 69:4, 73:20, 74:1, 74:2, 74:3, 75:14, 75:20, 76:8, 79:16, 79:18, 90:18, 93:17, 93:20, 99:19, 99:25, 101:8, 101:10
**lawful** [1] - 10:24
**laws** [1] - 99:13
**lawyer** [1] - 93:24
**lawyers** [6] - 5:7, 5:20, 7:16, 7:20, 28:14, 104:11
**layer** [2] - 99:21
**lead** [1] - 31:15
**leader** [2] - 77:12, 77:14
**leading** [5] - 20:14, 24:21, 39:13, 47:5, 51:7
**leads** [1] - 81:9
**learned** [6] - 23:7, 23:10, 56:9, 56:11, 69:18, 94:1
**least** [9] - 15:23, 18:18, 19:3, 21:15, 24:16, 34:5, 34:9, 59:12, 85:12
**leave** [4] - 72:4, 74:18, 96:18, 107:18
**led** [1] - 31:4
**left** [7] - 45:23, 48:14, 83:13, 92:3, 94:10, 94:11
**legal** [1] - 8:13
**LEONARDO** [1] - 1:7
**Leonardo** [13] - 3:2, 29:13, 47:7, 47:8, 47:10, 47:13, 47:15, 47:16, 47:17, 47:18, 66:21, 77:9
**less** [5] - 4:5, 19:7, 101:5, 102:2, 103:19
**lesser** [2] - 10:23, 76:2
**leveler** [2] - 67:7, 67:19
**liability** [1] - 60:15
**lie** [9] - 74:11, 85:7, 97:4, 97:10, 98:16, 99:6
**lied** [5] - 58:6, 77:3,

78:23, 91:15, 97:9
**lies** [3] - 92:7, 99:8, 99:9
**life** [8] - 64:21, 66:15, 66:18, 66:24, 67:12, 68:24, 73:4
**lifestyle** [1] - 43:13
**lifetime** [1] - 69:22
**light** [1] - 58:17
**lightning** [6] - 99:2, 99:3, 99:5, 99:7, 99:10
**likely** [1] - 52:23
**line** [2] - 83:3, 103:21
**linked** [8] - 92:9, 93:7, 93:13, 94:2, 94:4, 94:9, 97:13, 97:14
**linking** [1] - 82:8
**listen** [9] - 5:22, 43:22, 67:8, 71:23, 73:1, 76:9, 76:11, 80:22, 106:19
**listened** [2] - 35:8, 97:17
**listening** [2] - 29:7, 69:4
**Livan** [5] - 35:14, 42:21, 94:21, 94:23
**live** [1] - 66:17
**lives** [1] - 66:20
**lo** [1] - 79:2
**load** [2] - 63:9, 63:10
**loaded** [1] - 61:21
**loading** [2] - 63:8, 63:11
**located** [3] - 49:2, 49:21, 50:7
**location** [6] - 35:17, 35:25, 43:18, 45:14, 52:24, 98:23
**Locka** [2] - 55:17, 56:3
**log** [2] - 108:11, 108:13
**logs** [1] - 51:3
**look** [10] - 47:20, 48:6, 50:13, 51:22, 63:15, 70:11, 84:23, 85:22, 88:9, 95:20
**looking** [5] - 75:12, 75:14, 78:2, 79:23, 89:22
**looks** [2] - 47:22, 51:10
**loss** [1] - 15:3
**love** [1] - 68:14
**lower** [2] - 90:22, 91:9
**lurking** [1] - 96:2
**lying** [4] - 77:1, 78:25, 97:1, 97:9

## M

**MACKENZIE** [1] - 1:15
**madness** [1] - 84:11
**Magdalena** [29] -
59:18, 60:22, 61:1,
61:11, 61:20, 61:22,
62:5, 62:6, 62:7,
62:14, 62:17, 62:18,
63:16, 65:11, 69:16,
88:12, 89:17, 89:18,
89:21, 90:4, 90:9,
90:15, 90:21, 91:7,
91:8, 91:12, 91:22,
99:3
**magdalena** [1] - 61:17
**Magdalena's** [1] - 61:9
**maintain** [2] - 43:13,
108:12
**maintains** [1] - 108:11
**man** [10] - 35:11, 43:3,
52:1, 73:18, 73:24,
74:13, 76:23, 84:24
**manipulate** [2] - 81:2,
98:16
**March** [2] - 76:24, 77:5
**Maria** [1] - 105:22
**marijuana** [57] - 14:20,
16:9, 16:22, 16:23,
17:8, 17:10, 18:9,
19:5, 19:10, 19:11,
30:18, 31:18, 33:9,
34:1, 34:6, 34:11,
34:21, 34:22, 34:23,
35:8, 35:9, 35:24,
36:9, 37:2, 37:9,
37:20, 37:25, 38:7,
38:16, 38:17, 38:23,
38:24, 39:1, 39:3,
42:24, 45:6, 45:8,
45:12, 47:23, 49:10,
49:13, 50:4, 51:13,
51:18, 53:6, 53:8,
53:9, 55:6, 58:19,
58:24, 81:14, 101:1,
101:10, 102:5, 102:6
**mark** [2] - 73:4, 96:18
**marked** [1] - 7:17
**Marquez** [1] - 105:22
**Marrero** [8] - 32:5,
35:19, 36:25, 45:17,
46:3, 46:19, 51:20,
54:2
**married** [1] - 66:17
**marry** [1] - 66:17
**mask** [23] - 36:3, 38:8,
39:19, 45:14, 48:9,
48:11, 48:12, 48:17,
48:18, 48:20, 50:7,
53:3, 83:17, 83:18,

83:19, 83:20, 83:23,
83:25, 84:15, 87:24,
95:11, 95:19, 95:23
**master** [1] - 94:1
**Matapito** [6] - 46:20,
47:2, 47:9, 47:14,
47:17, 51:6
**match** [1] - 48:3
**matched** [1] - 48:9
**matching** [1] - 82:7
**Mattatan** [11] - 46:19,
47:2, 47:7, 47:10,
47:13, 47:16, 50:18,
50:19, 50:20, 50:21,
51:6
**matter** [3] - 8:21, 10:7,
110:7
**matters** [1] - 8:3
**maximize** [1] - 71:14
**maximum** [1] - 5:2
**McKee** [1] - 56:6
**mean** [9] - 8:16, 9:21,
10:10, 16:21, 76:25,
80:4, 81:12, 83:6,
85:8
**meaning** [1] - 46:16
**means** [18] - 12:13,
12:21, 15:2, 21:22,
22:1, 22:9, 22:17,
23:4, 26:25, 27:3,
32:13, 33:5, 41:18,
42:3, 42:4, 52:19,
57:9, 60:14
**Meantime** [1] - 50:14
**medical** [3] - 85:11,
85:14, 96:23
**meet** [8] - 53:2, 61:24,
63:15, 63:16, 63:22,
73:2, 73:3, 88:24
**meeting** [2] - 63:13,
79:10
**meets** [3] - 71:3, 77:6,
77:7
**melts** [1] - 78:9
**member** [5] - 13:18,
13:19, 17:14, 17:15,
70:6
**members** [7] - 6:2,
13:21, 13:22, 17:17,
17:18, 99:18, 100:9
**Memorial** [1] - 85:15
**memories** [1] - 11:18
**memory** [3] - 9:5,
9:25, 11:11
**men** [1] - 96:1
**mention** [1] - 85:15
**mentioned** [1] - 77:9
**mentions** [1] - 85:16
**mere** [1] - 21:22
**merely** [4] - 16:2,

18:22, 25:19, 72:11
**Mesa** [4] - 76:23,
76:25, 77:2, 77:20
**met** [7] - 60:1, 73:9,
79:6, 80:20, 80:21,
86:13, 86:19
**Metals** [1] - 56:3
**methods** [1] - 21:15
**Mexico** [2] - 73:11,
76:23
**MIAMI** [1] - 1:2
**Miami** [8] - 1:4, 1:16,
1:18, 1:24, 1:25,
60:21, 110:11,
110:11
**Micheli** [23] - 30:13,
30:16, 30:23, 37:10,
39:20, 41:9, 41:14,
42:6, 43:19, 44:3,
44:11, 46:2, 46:7,
46:12, 51:16, 51:24,
52:6, 52:25, 82:17,
95:15, 96:8, 96:14,
99:8
**Micheli's** [1] - 46:4
**Michelis** [1] - 95:25
**Michelis'** [6] - 36:5,
38:25, 39:18, 42:22,
51:1
**microphone** [1] - 3:9
**middle** [2] - 79:18,
79:19
**midnight** [3] - 45:19,
51:8, 64:25
**might** [1] - 10:5
**migrated** [1] - 52:24
**migrating** [1] - 85:10
**Miguel** [1] - 29:13
**MIGUEL** [1] - 1:7
**Miguelito** [2] - 46:21,
56:18
**million** [6] - 54:1,
54:10, 55:2, 55:14,
91:4, 98:7
**mind** [11] - 9:21, 28:7,
70:5, 72:1, 72:5,
74:24, 75:8, 75:9,
82:10, 106:25,
107:15
**minimal** [1] - 15:14
**minivan** [1] - 61:21
**minor** [3] - 15:21,
18:16, 84:16
**minute** [2] - 31:18,
78:15
**minutes** [16] - 3:22,
3:24, 3:25, 4:2, 4:3,
4:4, 5:3, 65:25, 90:1,
104:11, 104:18,
106:14, 107:11,

109:20
**Miramar** [13] - 35:2,
48:22, 49:21, 81:11,
84:24, 86:23, 92:2,
92:16, 92:22, 93:11,
94:7, 94:25, 95:9
**misstated** [1] - 9:24
**misstatement** [1] -
10:2
**mistake** [2] - 9:21,
27:1
**mistaken** [1] - 81:23
**moment** [1] - 19:14
**moments** [1] - 78:18
**money** [49] - 14:24,
32:13, 32:16, 57:17,
57:20, 58:7, 58:9,
58:12, 59:2, 60:24,
61:8, 62:3, 63:1,
63:23, 65:8, 73:8,
73:14, 74:9, 78:25,
79:6, 87:16, 87:17,
88:1, 88:4, 89:22,
90:5, 90:7, 90:10,
90:14, 90:21, 90:23,
90:25, 91:2, 91:3,
91:6, 91:24, 92:11,
96:11, 96:12, 97:4,
97:14, 97:25, 98:4,
98:5, 98:25, 99:13
**monitor** [2] - 56:12
**month** [6] - 30:8,
43:10, 66:10, 69:25,
85:4
**months** [4] - 77:6,
92:18, 94:12, 97:25
**Morales** [41] - 3:2,
29:14, 47:7, 47:8,
47:10, 47:13, 47:16,
47:17, 47:18, 66:21,
68:8, 70:4, 70:15,
71:8, 71:17, 76:20,
77:10, 77:11, 78:6,
78:19, 79:7, 79:9,
79:11, 79:12, 80:4,
80:14, 80:20, 81:13,
81:16, 82:1, 82:7,
82:9, 82:22, 83:14,
83:18, 84:16, 86:8,
92:13, 93:18
**MORALES** [1] - 1:7
**Morales'** [2] - 76:14,
79:13
**morning** [9] - 3:4,
3:14, 4:19, 29:3,
30:22, 66:7, 100:8,
106:16, 109:17
**most** [12] - 7:8, 11:10,
67:1, 68:12, 68:23,
68:25, 69:6, 70:8,

73:3, 73:22, 74:9,
81:7
**mother** [1] - 49:3
**motivation** [1] - 75:7
**move** [4] - 33:23,
53:19, 84:7, 90:1
**movement** [2] - 12:12,
12:21
**movie** [1] - 80:24
**moving** [1] - 84:13
**MR** [22] - 3:6, 3:16,
3:17, 4:7, 4:9, 4:15,
4:16, 66:5, 66:7,
87:8, 107:2, 107:4,
107:8, 107:10,
108:20, 108:22,
109:7, 109:14,
109:15, 109:22,
109:25, 110:1
**MS** [4] - 28:25, 29:3,
31:2, 66:1
**muffler** [1] - 21:21
**multiple** [5] - 33:3,
33:4, 33:19, 56:22,
94:2
**multiple-object** [3] -
33:3, 33:4, 33:19
**must** [55] - 6:3, 6:7,
6:10, 6:11, 6:14,
6:15, 6:16, 6:21,
6:23, 7:12, 8:15,
8:16, 9:24, 10:10,
10:11, 10:13, 11:11,
11:13, 11:14, 11:22,
11:24, 12:1, 14:16,
14:21, 15:9, 16:16,
16:20, 16:24, 19:10,
20:16, 21:14, 21:16,
22:11, 22:25, 23:14,
24:23, 25:18, 27:6,
27:12, 27:14, 27:20,
27:24, 27:25, 28:3,
28:5, 36:18, 39:14,
41:16, 64:15, 69:2,
92:8, 99:23, 106:23

## N

**named** [7] - 13:21,
17:17, 35:11, 42:24,
43:3, 76:23
**names** [2] - 15:19,
18:14
**natural** [1] - 15:9
**naturally** [1] - 9:23
**near** [3] - 44:24,
45:19, 83:23
**nearly** [5] - 30:8,
53:20, 59:7, 63:25,
64:25

**necessarily** [5] - 8:21, 10:10, 15:16, 32:24, 37:22
**necessary** [2] - 6:8, 57:9
**need** [8] - 22:4, 23:20, 23:24, 27:8, 72:18, 72:19, 97:21, 106:2
**needed** [3] - 42:8, 78:25, 98:11
**nephew** [1] - 46:11
**never** [10] - 27:20, 28:1, 56:4, 58:14, 70:14, 77:9, 98:9, 98:10, 104:25
**new** [1] - 71:24
**New** [5] - 3:5, 3:6, 4:22, 29:3, 66:7
**next** [3] - 5:12, 63:4, 102:8
**nice** [2] - 84:23, 84:24
**nicknames** [2] - 46:16
**Nicole** [1] - 47:25
**night** [16] - 35:25, 36:4, 39:24, 39:25, 41:10, 42:14, 42:23, 44:4, 46:8, 47:14, 47:25, 48:18, 48:20, 48:25, 49:12, 50:1
**nine** [3] - 11:19, 85:12, 85:13
**NO** [1] - 1:2
**nobody** [1] - 32:20
**none** [2] - 82:9, 83:10
**normal** [1] - 76:12
**normally** [4] - 10:23, 20:17, 24:24, 39:15
**North** [2] - 1:24, 110:11
**Northeast** [1] - 1:17
**note** [9] - 3:23, 13:2, 37:19, 38:21, 53:10, 100:17, 102:11, 103:10, 104:15
**notes** [6] - 11:9, 11:11, 11:13, 11:15, 11:17, 30:6
**nothing** [6] - 18:12, 70:18, 71:20, 76:14, 90:17
**notice** [6] - 3:20, 3:23, 4:1, 4:3, 5:3, 109:18
**number** [10] - 8:20, 12:7, 18:4, 47:1, 47:2, 62:13, 83:20, 102:19
**numerical** [1] - 105:1
**numerous** [1] - 99:12

**O**

**oath** [7] - 61:2, 67:22, 89:2, 91:14, 91:19, 99:9, 100:1
**object** [15] - 14:10, 14:17, 16:21, 16:22, 18:6, 33:3, 33:4, 33:8, 33:10, 33:19, 37:5, 38:13, 54:25, 58:21, 93:8
**objective** [9] - 70:14, 87:1, 88:9, 91:11, 92:23, 93:12, 94:9, 98:22, 99:22
**objectively** [7] - 92:8, 93:7, 94:4, 95:10, 96:5, 97:11, 97:14
**objects** [8] - 14:18, 14:21, 16:25, 17:2, 17:4, 33:7, 101:4, 101:7
**observe** [1] - 9:7
**obstruct** [4] - 12:11, 12:20, 13:11, 13:14
**obstructed** [4] - 14:14, 20:4, 37:15, 55:7
**obvious** [1] - 70:5
**obviously** [2] - 38:25, 82:22
**occasion** [4] - 15:24, 18:19, 58:2, 105:6
**occasionally** [2] - 5:3, 5:21
**occurred** [1] - 26:20
**occurs** [4] - 26:7, 26:9, 26:12, 26:14
**Ochill** [15] - 35:14, 42:21, 43:1, 43:5, 43:7, 43:9, 43:14, 43:16, 45:9, 46:1, 50:20, 94:22, 94:23, 95:5
**Ochill's** [3] - 45:11, 49:10, 50:3
**October** [7] - 31:9, 53:21, 54:5, 55:4, 56:8, 79:12, 79:25
**OF** [2] - 1:1, 1:4
**offend** [1] - 67:11
**offense** [23] - 11:8, 12:4, 13:4, 14:2, 17:23, 19:17, 20:7, 20:15, 20:17, 21:16, 24:1, 24:13, 24:22, 24:24, 38:20, 39:14, 39:15, 40:4, 69:10, 101:20, 102:17, 103:2, 103:15

**offenses** [4] - 12:5, 12:18, 13:5, 13:6
**offered** [1] - 98:11
**offers** [1] - 11:21
**Office** [4] - 1:16, 75:3, 77:7
**office** [2] - 44:20, 109:22
**officer** [7] - 14:5, 18:1, 36:21, 38:4, 46:10, 104:5
**OFFICER** [2] - 4:11, 65:21
**Official** [1] - 1:23
**often** [2] - 99:9, 105:15
**old** [1] - 87:13
**once** [6] - 3:21, 72:1, 72:3, 106:12, 107:20, 108:24
**one** [75] - 8:24, 11:24, 14:4, 14:21, 15:6, 15:23, 16:5, 16:15, 16:19, 17:25, 18:18, 18:25, 19:23, 20:23, 21:8, 21:15, 21:16, 22:7, 24:8, 26:13, 27:14, 28:5, 33:8, 33:22, 35:16, 36:8, 36:10, 36:16, 37:4, 40:10, 41:8, 45:2, 45:3, 45:10, 45:20, 46:23, 48:19, 50:23, 53:4, 55:11, 56:11, 60:13, 61:22, 62:16, 62:22, 63:2, 67:11, 69:18, 72:8, 72:15, 74:20, 75:15, 78:17, 79:8, 82:2, 83:7, 83:20, 84:15, 85:3, 86:13, 86:15, 87:16, 88:24, 89:14, 93:19, 97:3, 100:9, 100:14, 100:17, 101:4, 101:5, 102:1, 102:19, 107:12, 107:21
**one's** [1] - 22:5
**ones** [1] - 69:24
**ongoing** [1] - 79:16
**Oni** [1] - 105:21
**Oni-Orisan** [1] - 105:21
**onward** [2] - 50:21, 51:5
**Opa** [2] - 55:17, 56:3
**open** [2] - 44:18, 100:11
**opened** [3] - 44:13, 52:1, 66:8

**opening** [6] - 39:20, 69:12, 73:2, 81:17, 88:8, 88:24
**operated** [2] - 42:25, 55:25
**operating** [2] - 35:16, 77:25
**opinion** [5] - 7:23, 10:6, 10:10, 10:12, 28:7
**opinions** [2] - 104:13, 108:9
**opportunity** [5] - 9:6, 11:11, 34:15, 94:13, 100:15
**option** [1] - 102:22
**options** [1] - 103:20
**order** [14] - 3:1, 3:13, 10:18, 11:2, 22:3, 35:6, 36:17, 49:23, 58:4, 58:5, 67:11, 70:12, 72:23, 76:4
**ordinarily** [1] - 25:3
**organization** [1] - 67:1
**organizer** [1] - 77:18
**originally** [1] - 74:3
**Orisan** [1] - 105:21
**Osvaldo** [4] - 60:22, 61:1, 69:16, 88:12
**otherwise** [3] - 22:2, 90:8, 90:10
**ourselves** [1] - 85:9
**outcome** [1] - 9:3
**outgoing** [1] - 50:12
**outright** [1] - 81:16
**outside** [5] - 15:6, 30:25, 39:20, 49:2, 49:22, 51:1, 51:16, 55:11, 96:1
**overarching** [1] - 32:12
**overwhelming** [2] - 33:17, 97:13
**owed** [1] - 79:6
**own** [11] - 7:8, 8:1, 8:2, 10:17, 28:7, 68:12, 71:16, 81:2, 89:22, 93:8, 96:15

**P**

**P.A** [1] - 1:19
**p.m** [5] - 1:8, 50:25, 51:4, 108:1, 110:2
**packet** [1] - 41:4
**padrino** [27] - 61:6, 61:7, 61:18, 61:24, 62:15, 62:20, 62:24, 62:25, 63:3, 63:5, 63:7, 63:8, 63:9,

63:11, 63:14, 63:15, 63:17, 63:18, 63:19, 63:20, 71:5, 90:9, 90:10
**PAGE** [1] - 2:2
**page** [4] - 11:19, 28:16, 75:16, 100:7
**PAGES** [1] - 1:11
**paid** [10] - 10:15, 58:15, 65:8, 79:6, 79:11, 80:7, 80:9, 80:13, 92:5
**panel** [1] - 77:18
**paper** [1] - 93:2
**paragraph** [11] - 33:22, 34:13, 42:12, 64:3, 100:14, 101:14, 102:8, 102:13, 103:6, 103:7, 103:11
**paralyzed** [8] - 31:13, 36:7, 43:6, 54:5, 54:12, 56:20, 57:2, 61:15
**paralyzing** [1] - 44:24
**parked** [2] - 46:4, 49:22
**part** [12] - 8:20, 15:21, 18:16, 22:1, 41:11, 56:21, 56:23, 65:7, 73:11, 73:16, 78:22, 98:24
**participant** [5] - 23:1, 23:18, 23:21, 23:23, 25:19
**participants** [5] - 35:18, 45:16, 54:2, 60:22, 77:9
**participate** [4] - 23:8, 23:10, 54:12, 57:2
**participated** [3] - 22:25, 25:15, 41:17
**participation** [6] - 23:6, 23:7, 41:20, 57:25, 58:1, 105:24
**particular** [9] - 8:21, 9:1, 56:2, 58:21, 59:16, 59:20, 70:3, 104:22, 106:17
**particularly** [1] - 30:12
**partner** [2] - 13:19, 17:15
**partners** [11] - 30:20, 30:25, 39:21, 45:2, 53:2, 53:18, 55:19, 55:21, 57:3, 87:15, 91:25
**partners'** [1] - 44:9
**partnership** [6] - 13:18, 17:14, 32:19,

70:3, 72:20, 97:22
**partook** [1] - 54:24
**parts** [1] - 31:24
**party** [2] - 5:2, 5:3
**passed** [1] - 5:11
**past** [3] - 43:8, 66:10, 79:17
**patiently** [1] - 29:7
**pause** [2] - 79:14, 80:6
**pay** [3] - 43:9, 58:4, 95:6
**paying** [1] - 29:7, 94:20
**pays** [1] - 80:25
**PC** [1] - 29:1
**peacefully** [6] - 30:16, 44:6, 51:1, 51:15, 96:2, 99:7
**pen** [6] - 84:5, 84:6, 84:7, 84:9
**pending** [1] - 80:1
**people** [28] - 4:13, 9:23, 13:21, 14:4, 16:2, 17:17, 17:25, 18:22, 26:15, 36:20, 38:3, 45:3, 46:17, 56:19, 67:22, 70:9, 72:12, 73:3, 73:23, 74:1, 74:4, 74:12, 77:13, 81:8, 84:18, 88:24, 93:9, 99:12
**performed** [1] - 25:1
**perhaps** [2] - 11:10, 71:9
**period** [2] - 94:3, 104:9
**permanent** [1] - 106:9
**permit** [1] - 107:20
**permitted** [1] - 11:9
**person** [48] - 5:12, 8:8, 10:5, 11:8, 15:15, 15:18, 16:4, 18:13, 18:24, 22:2, 22:3, 22:4, 22:6, 25:3, 25:4, 25:6, 25:7, 25:9, 25:10, 25:14, 26:1, 26:5, 26:7, 26:9, 26:12, 27:6, 27:8, 37:21, 42:4, 57:2, 71:24, 72:13, 77:14, 77:17, 82:19, 87:23, 93:21, 94:14, 94:17, 94:18, 95:23, 98:19, 99:8, 105:16
**personal** [5] - 9:3, 14:11, 19:24, 37:6, 55:1
**personally** [2] - 22:23, 25:1
**persons** [6] - 13:16,

17:12, 32:18, 105:4, 105:20, 107:14
**perspectives** [1] - 97:7
**Peru** [7] - 44:8, 50:24, 51:2, 51:4, 65:1, 93:3
**phase** [1] - 103:5
**phone** [23] - 43:10, 43:11, 43:12, 44:8, 46:14, 46:15, 46:24, 46:25, 50:9, 50:10, 92:12, 92:21, 92:25, 93:1, 94:5, 94:13, 94:15, 94:20, 98:23, 106:1
**photograph** [1] - 63:20
**photographs** [3] - 44:25, 63:23, 85:23
**photos** [1] - 83:6
**phrase** [1] - 52:4
**physical** [5] - 15:4, 22:13, 26:8, 65:15, 88:17
**physically** [3] - 54:12, 92:3, 93:23
**pick** [6] - 63:5, 68:15, 84:6, 89:25, 90:1, 95:6
**picked** [4] - 29:8, 68:20, 68:21, 74:3
**pickup** [1] - 98:1
**pictures** [4] - 83:4, 83:24, 85:6, 85:9
**piece** [1] - 56:14
**place** [9] - 22:7, 33:24, 34:21, 53:22, 84:13, 86:7, 101:24, 103:21, 103:22
**placed** [1] - 93:2
**plan** [51] - 13:21, 13:23, 13:25, 14:6, 14:9, 14:10, 15:19, 15:21, 15:23, 17:17, 17:19, 17:21, 18:2, 18:5, 18:6, 18:10, 18:14, 18:16, 18:18, 32:24, 32:25, 33:1, 35:9, 35:24, 36:23, 37:3, 37:6, 38:5, 38:6, 38:11, 38:13, 45:6, 51:11, 54:9, 54:21, 54:23, 54:25, 56:17, 57:8, 57:16, 59:5, 59:6, 61:16, 94:1, 94:25, 98:19, 98:24
**plane** [1] - 73:10
**planned** [1] - 93:22

**planning** [8] - 54:6, 54:7, 54:14, 56:19, 56:23, 57:12, 92:21, 96:10
**play** [1] - 88:20
**played** [3] - 15:21, 18:16, 31:1
**plea** [15] - 10:20, 10:21, 10:23, 74:5, 74:22, 75:6, 75:18, 75:24, 76:1, 77:24, 78:5, 94:17, 97:6
**pleaded** [1] - 11:7
**pleads** [2] - 77:19, 77:22
**pleasant** [1] - 84:24
**point** [20] - 8:21, 35:23, 42:4, 61:15, 65:20, 66:14, 67:2, 69:6, 69:16, 76:17, 78:13, 79:1, 80:8, 81:22, 82:2, 83:15, 84:11, 84:20, 88:8
**pointed** [8] - 37:11, 41:8, 41:13, 42:5, 44:20, 46:7, 51:25, 52:3
**pointing** [2] - 75:2, 75:9, 77:23
**points** [6] - 29:18, 29:23, 29:24, 68:1, 78:15, 83:7
**Police** [1] - 48:23
**portions** [1] - 85:17
**position** [1] - 33:16
**possess** [37] - 12:15, 12:25, 17:6, 17:10, 18:3, 18:6, 19:2, 19:9, 19:12, 20:20, 22:13, 22:24, 23:2, 24:2, 26:13, 31:17, 32:3, 34:2, 34:4, 34:9, 34:10, 34:11, 34:13, 34:17, 34:19, 36:12, 38:5, 38:7, 38:13, 38:18, 53:5, 53:7, 58:23, 64:5, 86:17, 101:21, 103:16
**possessed** [9] - 21:3, 21:12, 24:8, 24:11, 40:14, 40:18, 40:23, 42:14, 102:22
**possessing** [7] - 22:17, 22:21, 35:2, 36:14, 40:2, 53:14, 82:12
**possession** [24] - 18:11, 21:22, 24:5, 24:16, 25:22, 26:4,

26:5, 26:6, 26:7, 26:9, 26:10, 26:12, 26:14, 26:15, 26:16, 26:17, 35:5, 41:1, 41:10, 41:22, 59:9, 59:12
**possibility** [2] - 10:22, 76:2
**possible** [5] - 5:21, 6:25, 24:25, 104:6, 109:21
**potential** [3] - 22:11, 84:8, 84:20
**power** [7] - 26:10, 43:24, 43:25, 44:1, 45:21, 66:21, 67:14
**powerful** [1] - 67:1
**PowerPoint** [2] - 30:4
**Powers** [1] - 110:9
**POWERS** [2] - 1:23, 110:10
**prejudice** [1] - 6:12
**prepared** [1] - 100:12
**preparing** [4] - 20:16, 24:23, 92:19, 93:11
**presence** [3] - 22:15, 23:19, 97:15
**present** [9] - 16:1, 18:21, 25:16, 25:24, 43:16, 72:17, 106:23, 107:14
**presented** [13] - 5:15, 5:17, 6:11, 29:10, 29:12, 29:20, 46:1, 46:2, 64:10, 65:13, 88:14, 90:19, 92:12
**presenting** [1] - 28:20
**presents** [1] - 28:22
**pressure** [1] - 30:6
**presumed** [1] - 68:2
**presumes** [1] - 6:19
**previously** [2] - 57:24, 65:6
**price** [6] - 70:16, 71:8, 71:9, 71:14, 90:22, 91:9
**priority** [1] - 11:13
**prison** [2] - 71:19, 74:13
**private** [2] - 79:23, 97:6
**probation** [2] - 46:9, 46:10
**procedure** [2] - 4:24, 5:9
**proceed** [5] - 3:15, 28:24, 100:19, 101:14, 102:12
**proceedings** [2] - 110:2, 110:6

**proceeds** [2] - 15:16, 37:22
**processing** [1] - 48:24
**produce** [1] - 6:21
**product** [1] - 71:13
**production** [1] - 80:24
**projectile** [4] - 21:19, 52:11, 52:17, 84:25
**promised** [1] - 10:16
**promoted** [1] - 22:18
**prompt** [1] - 104:16
**promptly** [2] - 104:6, 109:21
**proof** [11] - 6:24, 7:1, 7:6, 8:11, 16:3, 18:23, 25:14, 25:16, 25:25, 68:10, 72:13
**Proof** [2] - 7:6, 68:10
**proper** [4] - 10:24, 81:18, 87:5, 109:11
**property** [8] - 13:10, 13:13, 14:11, 14:24, 19:24, 19:25, 37:6, 55:1
**prosecution** [2] - 10:16, 29:1
**Prosecutions** [1] - 1:16
**prosecutors** [1] - 67:4
**protect** [1] - 44:21
**protecting** [1] - 79:23
**prove** [20] - 6:20, 6:21, 6:25, 8:12, 13:20, 13:24, 15:7, 15:9, 16:12, 17:16, 17:20, 21:6, 24:25, 26:3, 26:20, 26:21, 64:15, 68:4, 69:2, 86:10
**proved** [11] - 6:7, 7:9, 14:2, 17:1, 17:2, 17:23, 19:21, 20:8, 24:6, 24:13, 73:5
**proven** [6] - 20:22, 36:18, 37:13, 38:1, 60:3, 99:21
**proves** [2] - 16:14, 42:19
**provide** [3] - 10:25, 58:15, 106:18
**provided** [3] - 60:24, 61:25, 63:24
**provider** [1] - 47:18
**provides** [2] - 10:22, 41:7, 76:1
**providing** [2] - 63:2, 67:5
**proximity** [2] - 21:23, 52:14
**pull** [1] - 44:17
**pulled** [2] - 65:11,

73:1
**pulling** [1] - 60:13
**punches** [1] - 73:1
**punishment** [2] - 27:20, 27:22
**purchase** [27] - 30:18, 31:12, 31:13, 57:20, 59:4, 59:6, 59:17, 60:20, 60:25, 61:21, 61:22, 61:25, 62:1, 62:8, 63:4, 63:11, 63:13, 63:18, 63:22, 63:24, 69:16, 70:4, 70:17, 72:6, 86:9
**purchaser** [1] - 60:24
**purchasing** [1] - 60:18
**purpose** [19] - 14:8, 15:22, 16:5, 18:4, 18:17, 18:25, 22:9, 26:2, 27:5, 37:3, 38:11, 54:23, 67:11, 72:15, 81:13, 87:16, 88:6, 106:20, 109:6
**purposely** [1] - 27:4
**purposes** [4] - 13:18, 17:14, 23:19, 37:19
**pursuit** [2] - 97:14, 98:21
**pushed** [1] - 44:20
**put** [10] - 28:25, 56:13, 73:12, 83:5, 87:24, 95:19, 99:16, 99:20, 108:25
**putting** [1] - 96:9

## Q

**quadriplegic** [1] - 89:25
**Quari** [3] - 53:24, 55:23, 56:5
**questioning** [2] - 67:10
**questions** [11] - 8:23, 9:8, 61:3, 69:21, 91:19, 100:21, 101:18, 102:15, 104:21, 108:18, 109:21
**quibble** [1] - 77:1
**quickly** [2] - 62:10, 64:12
**quite** [5] - 71:15, 75:10, 80:7, 84:24, 104:19

## R

**raise** [1] - 91:19
**raised** [3] - 29:24,

74:2, 78:15
**ran** [1] - 82:20
**random** [1] - 83:4
**range** [3] - 52:21, 96:19
**Raonel** [12] - 32:5, 35:20, 37:1, 37:11, 45:17, 46:7, 46:19, 54:3, 56:11, 89:9, 93:9, 94:11
**rather** [3] - 41:14, 52:22, 53:12
**re** [1] - 28:7
**re-examine** [1] - 28:7
**reach** [2] - 8:5, 28:5
**reached** [1] - 109:24
**reaching** [2] - 47:13, 51:6
**read** [6] - 5:15, 5:16, 67:25, 72:10, 74:7, 101:18
**readily** [1] - 21:18
**reading** [1] - 4:12
**ready** [7] - 3:7, 3:15, 3:16, 3:17, 4:21, 28:24, 109:18
**real** [3] - 7:3, 28:11, 89:6
**really** [5] - 5:18, 62:19, 76:9, 81:12, 81:20
**reason** [15] - 7:4, 8:4, 9:1, 10:18, 11:2, 64:18, 64:19, 64:20, 76:3, 90:6, 91:3, 91:8, 95:3, 101:15, 105:7
**Reasonable** [1] - 68:10
**reasonable** [45] - 6:9, 6:22, 7:2, 7:3, 7:6, 7:10, 14:3, 16:14, 17:1, 17:3, 17:24, 19:21, 20:8, 20:22, 24:6, 24:14, 25:18, 26:21, 29:14, 29:21, 36:19, 38:1, 58:20, 60:4, 64:4, 64:13, 64:14, 64:16, 64:17, 65:17, 68:4, 68:5, 68:9, 68:10, 69:2, 70:9, 73:23, 78:8, 81:8, 86:2, 86:11, 86:12, 104:9
**reasonably** [2] - 23:11, 26:22
**REBUTTAL** [2] - 2:9, 87:7
**rebuttal** [2] - 4:2, 78:12
**receive** [2] - 41:2, 60:5

**received** [20] - 7:17, 7:18, 39:12, 41:3, 42:23, 46:24, 47:1, 54:14, 56:10, 57:11, 57:17, 59:3, 60:6, 106:15, 108:6, 108:7, 108:10, 108:17, 109:2, 109:10
**receiver** [1] - 21:20
**receiving** [1] - 61:3
**recess** [4] - 65:20, 65:23, 66:2, 109:13
**recognized** [1] - 66:14
**recognizes** [2] - 26:4, 60:14
**recollection** [2] - 8:2, 11:14
**reconstruction** [1] - 84:23
**record** [2] - 85:14, 93:10
**recording** [6] - 62:14, 70:14, 90:19, 92:6, 92:10, 109:4
**recordings** [6] - 62:7, 62:9, 62:10, 62:11, 88:13, 97:14
**records** [20] - 43:11, 43:12, 46:24, 46:25, 79:15, 85:11, 88:13, 88:18, 88:20, 92:12, 92:21, 92:25, 93:1, 94:5, 94:11, 94:15, 94:20, 96:24, 98:23
**recovered** [7] - 44:25, 48:2, 56:4, 82:7, 83:17, 84:25, 85:1
**red** [2] - 48:7, 95:21
**reduction** [2] - 75:12, 75:15
**refer** [2] - 12:8, 101:11
**reference** [3] - 62:11, 63:14, 100:14
**references** [2] - 62:15, 63:7
**referencing** [1] - 62:20
**referred** [1] - 46:21
**referring** [2] - 62:22, 62:23
**refers** [2] - 102:5, 102:8
**reflected** [6] - 33:19, 34:11, 34:12, 42:11, 51:3, 64:3
**reflects** [1] - 41:15
**regard** [8] - 11:19, 72:6, 81:4, 83:1, 83:12, 86:6, 86:14, 104:24

**regarding** [2] - 3:11, 16:7
**regards** [2] - 41:1, 57:16
**regularly** [1] - 106:7
**regularly-scheduled** [1] - 106:7
**regurgitate** [1] - 79:9
**reject** [1] - 73:24
**relate** [3] - 36:9, 36:16, 59:8
**related** [2] - 37:16, 42:18
**relates** [3] - 37:19, 58:25, 59:16
**relating** [3] - 27:12, 60:6, 60:19
**relation** [14] - 12:23, 20:19, 20:25, 21:8, 21:10, 22:8, 22:21, 23:2, 23:13, 23:15, 40:8, 43:12, 102:19, 102:21
**release** [1] - 105:24
**relied** [1] - 89:10
**relies** [2] - 85:22, 85:25
**religious** [1] - 47:21
**rely** [10] - 7:7, 10:12, 68:11, 69:6, 70:8, 72:5, 72:23, 73:21, 73:22, 81:6
**remain** [1] - 106:9
**remainder** [1] - 102:13
**remaining** [7] - 3:20, 3:24, 4:3, 5:4, 34:24, 65:25, 105:13
**remember** [9] - 9:23, 28:11, 30:8, 38:22, 40:21, 50:14, 74:14, 78:19, 81:17
**remembers** [1] - 9:22
**remind** [2] - 72:8, 85:9
**reminded** [1] - 70:25
**reminder** [1] - 53:21
**removed** [3] - 52:11, 85:4, 96:17
**repeating** [1] - 83:3
**report** [1] - 50:9
**REPORTED** [1] - 1:23
**reporter** [4] - 80:18, 80:19, 89:3, 108:11
**Reporter** [1] - 1:23
**representative** [2] - 53:24, 55:23
**Republic** [1] - 56:3
**request** [2] - 109:6, 109:9
**requested** [1] - 5:5
**requests** [1] - 107:1

**require** [1] - 32:19
**required** [1] - 64:1
**requirement** [1] - 23:22
**requires** [3] - 21:24, 25:14, 99:15
**rescue** [5] - 83:11, 83:21, 83:22, 84:11, 84:19
**residence** [4] - 30:16, 42:23, 49:21, 51:16
**resolve** [1] - 108:12
**resolved** [1] - 108:14
**resources** [2] - 67:2, 67:14
**respect** [10] - 22:9, 86:20, 100:23, 101:16, 101:21, 102:18, 103:3, 103:16, 104:23, 109:4
**respectfully** [1] - 33:16
**respond** [5] - 104:6, 104:8, 104:16, 105:2, 109:20
**responded** [1] - 56:7
**responding** [2] - 48:24, 104:7
**responsible** [4] - 19:7, 25:8, 25:10, 25:13
**rest** [5] - 66:24, 71:25, 72:3, 74:18
**restroom** [1] - 106:22
**result** [6] - 20:17, 24:24, 39:15, 52:14, 52:22, 99:23
**resulted** [1] - 95:15
**resume** [1] - 3:7
**retainer** [1] - 79:5
**retrieval** [1] - 50:8
**return** [4] - 16:16, 34:24, 104:2, 107:6
**returned** [1] - 103:23
**reveal** [1] - 104:25
**review** [3] - 86:7, 106:18, 106:19
**reviewed** [3] - 65:14, 108:16, 108:24
**reviewing** [1] - 65:13
**rights** [1] - 14:25
**rise** [3] - 65:21, 107:25, 109:16
**roadmap** [1] - 31:22
**rob** [16] - 15:15, 16:9, 34:22, 35:9, 35:24, 37:8, 37:21, 37:24, 39:2, 39:3, 43:2, 49:13, 54:21, 54:22, 95:23

**robbed** [1] - 53:25
**robberies** [13] - 31:16, 32:2, 32:10, 32:14, 33:2, 33:18, 33:23, 36:11, 53:6, 54:20, 59:3
**robbers** [3] - 93:19, 96:8, 96:10
**Robbery** [1] - 87:20
**robbery** [138] - 12:13, 12:22, 13:10, 13:13, 14:7, 14:20, 16:23, 19:19, 19:20, 20:10, 25:22, 30:20, 30:21, 31:7, 31:8, 31:14, 33:7, 33:8, 33:9, 33:11, 33:13, 33:14, 34:1, 35:1, 35:3, 35:8, 35:25, 36:6, 36:13, 36:15, 36:23, 37:2, 38:19, 38:21, 39:7, 39:22, 40:2, 40:7, 40:22, 40:24, 41:1, 41:11, 41:21, 41:23, 43:15, 44:16, 45:7, 45:13, 47:6, 47:10, 47:12, 47:15, 47:23, 48:21, 48:25, 49:1, 49:18, 50:1, 51:5, 51:8, 51:14, 52:4, 52:5, 53:7, 53:9, 53:11, 53:20, 53:22, 53:23, 54:6, 54:9, 54:14, 54:18, 54:19, 56:7, 56:9, 56:13, 56:14, 56:22, 56:24, 57:4, 58:19, 65:6, 65:7, 72:22, 73:19, 76:15, 77:8, 77:15, 77:22, 78:22, 79:17, 80:9, 80:10, 81:4, 81:7, 81:11, 81:16, 81:20, 82:1, 86:20, 86:23, 87:18, 87:20, 87:21, 88:2, 91:5, 92:4, 92:5, 92:13, 92:16, 92:22, 92:23, 93:3, 93:4, 93:11, 93:21, 93:22, 93:23, 94:5, 94:7, 94:13, 94:21, 94:25, 95:9, 95:10, 95:15, 98:3, 98:7, 99:6, 101:1, 101:9, 101:10
**role** [4] - 35:21, 54:4, 57:12, 60:23
**roles** [1] - 99:17
**Room** [1] - 1:17
**room** [17] - 6:5, 64:20, 67:5, 67:7, 67:12,

67:19, 70:13, 73:12, 100:9, 103:25, 104:15, 106:16, 107:17, 107:19, 107:22, 108:8, 109:3
**root** [1] - 94:7
**RPR** [1] - 110:10
**Ruiz** [16] - 69:16, 69:17, 69:22, 70:6, 70:15, 70:20, 70:23, 71:3, 71:4, 72:6, 72:19, 72:21, 73:7, 75:19, 85:25, 86:10
**ruiz** [1] - 72:18
**Rule** [10] - 74:14, 74:17, 74:20, 74:23, 75:15, 78:1, 78:3, 89:1
**rule** [1] - 27:9
**rules** [2] - 6:3, 10:24
**run** [1] - 82:22

---

**S**

**safety** [1] - 44:15
**sale** [1] - 51:18
**sat** [2] - 30:16, 99:7
**satisfied** [1] - 23:22
**satisfy** [1] - 15:13
**saw** [14] - 43:10, 44:23, 44:24, 50:19, 51:21, 63:23, 63:24, 70:6, 71:3, 74:12, 83:6, 89:3, 89:8, 89:9
**scenario** [1] - 52:23
**scene** [19] - 16:1, 18:21, 25:17, 25:24, 35:18, 47:24, 48:24, 54:2, 60:1, 60:22, 62:4, 63:21, 72:17, 82:23, 83:4, 83:16, 84:1, 84:12
**scheduled** [1] - 106:7
**Scheduled** [1] - 1:7
**school** [4] - 68:15, 68:21, 93:20
**scientific** [1] - 10:4
**scissors** [1] - 83:13
**Scott** [1] - 46:22
**screams** [1] - 57:10
**screen** [1] - 69:20
**scribble** [1] - 69:20
**seated** [3] - 3:4, 4:18, 108:4
**second** [15] - 12:22, 20:11, 24:18, 31:9, 31:17, 38:10, 39:9, 40:8, 59:14, 63:12, 72:7, 72:22, 75:16,

77:24, 102:25
**seconds** [2] - 41:5, 51:4
**secret** [1] - 28:1
**Section** [3] - 1:16, 13:12, 17:9
**sections** [1] - 86:14
**SECURITY** [2] - 4:11, 65:21
**security** [2] - 104:4, 104:5
**see** [24] - 26:18, 29:1, 33:24, 44:14, 47:15, 48:7, 50:17, 50:22, 51:6, 52:25, 53:8, 54:21, 59:5, 62:18, 68:19, 72:9, 73:17, 74:24, 75:2, 82:23, 84:1, 85:8, 89:7, 92:12
**seek** [1] - 28:12
**seem** [1] - 9:5
**select** [2] - 106:10, 106:12
**selection** [1] - 68:2
**sell** [5] - 32:11, 59:4, 80:15, 87:25, 88:4
**seller** [6] - 60:2, 60:12, 61:17, 61:18, 61:24, 71:13
**selling** [3] - 61:10, 62:19, 70:2
**send** [5] - 104:8, 104:10, 104:14, 104:17, 109:9
**sense** [28] - 7:4, 8:5, 64:18, 64:19, 64:21, 64:22, 65:3, 65:5, 65:9, 65:12, 71:23, 71:24, 76:12, 77:16, 79:1, 80:11, 80:16, 88:13, 88:19, 89:16, 90:3, 90:8, 90:16, 91:11, 96:5, 98:6, 98:8
**sentence** [5] - 10:23, 75:12, 75:15, 76:2, 91:13
**Sentencing** [1] - 27:23
**separate** [6] - 12:6, 13:9, 16:11, 17:5, 20:18, 27:11
**separately** [3] - 27:13, 69:10, 69:14
**September** [18] - 30:14, 30:20, 30:24, 31:6, 35:7, 36:8, 40:18, 42:6, 42:18, 43:6, 46:4, 47:6, 47:15, 49:16, 51:13,

53:3, 53:14, 53:19
**series** [4] - 93:14, 96:6, 97:13, 99:12
**serve** [3] - 31:22, 105:5, 105:7
**served** [3] - 57:7, 105:20, 105:22
**service** [3] - 29:5, 66:12, 106:4
**serving** [5] - 29:4, 71:19, 74:13, 91:13, 105:17
**set** [1] - 87:11
**seven** [5] - 47:7, 85:19, 104:25, 105:3, 107:11
**seven-five** [2] - 104:25, 105:3
**several** [1] - 26:4
**shadow** [1] - 64:17
**share** [3] - 5:12, 26:15, 92:23
**shared** [4] - 14:6, 18:2, 36:23, 38:5
**shattered** [1] - 96:20
**shelf** [1] - 99:17
**shell** [1] - 44:25
**shipment** [1] - 56:2
**shirt** [3] - 51:21, 51:22, 51:23
**shoot** [2] - 44:23, 96:3
**shooting** [1] - 84:22
**shortly** [1] - 55:14
**shot** [19] - 36:6, 44:1, 44:2, 44:4, 51:14, 51:15, 51:17, 52:7, 52:25, 65:2, 82:24, 85:12, 95:16, 96:8, 96:15, 96:18, 96:19
**shots** [1] - 45:23
**show** [9] - 22:1, 42:3, 50:11, 74:2, 79:24, 83:6, 92:8, 92:21, 94:5
**showed** [4] - 38:8, 49:25, 94:15
**shown** [3] - 90:20, 101:23, 103:18
**shows** [7] - 48:16, 48:17, 78:7, 93:8, 98:21, 99:14, 99:22
**sic]** [1] - 59:7
**side** [2] - 44:16, 44:17
**sides** [1] - 50:6
**sign** [3] - 103:22, 104:1, 108:15
**significance** [2] - 10:1, 75:11
**signing** [2] - 78:5, 90:20

**silencer** [1] - 21:21
**simple** [2] - 5:20, 9:21
**simply** [9] - 16:1, 18:21, 20:16, 24:23, 25:16, 25:24, 28:10, 72:11, 105:1
**single** [2] - 5:14, 6:16
**sip** [1] - 28:21
**sitting** [6] - 44:6, 51:1, 51:16, 52:2, 64:25, 96:2
**situation** [4] - 41:7, 71:14, 81:2, 83:12
**six** [4] - 43:8, 79:17, 86:24
**skilled** [2] - 89:18, 89:22
**skin** [2] - 48:13, 84:6
**slate** [1] - 68:3
**slowly** [2] - 44:13, 98:12
**smart** [2] - 56:18, 77:12
**smuggling** [1] - 73:16
**so-called** [1] - 77:18
**sold** [1] - 98:4
**sole** [4] - 26:6, 26:12, 26:17, 75:4
**solely** [1] - 19:9
**someone** [15] - 13:10, 13:13, 14:11, 18:11, 19:23, 37:6, 44:2, 44:4, 52:7, 54:25, 62:19, 68:14, 95:12, 105:6, 106:21
**son** [2] - 79:13
**sort** [1] - 32:19
**source** [3] - 14:25, 89:7, 94:17
**Southeast** [1] - 1:20
**Southern** [1] - 4:20
**SOUTHERN** [1] - 1:1
**space** [1] - 101:12
**Spanish** [1] - 3:3
**speaking** [2] - 49:3, 62:19
**special** [2] - 10:5, 47:4
**Special** [2] - 1:16, 46:22
**specialized** [1] - 10:4
**specific** [6] - 6:8, 13:7, 27:9, 27:17, 27:19, 37:20, 41:2, 41:3
**specifically** [11] - 12:18, 15:8, 21:6, 34:14, 42:12, 53:6, 54:18, 58:24, 61:12, 77:8, 99:16
**specify** [3] - 14:21, 19:12, 21:16

**spectator** [1] - 25:20
**spending** [1] - 91:7
**spent** [2] - 88:22, 92:18
**spicy** [1] - 89:5
**spit** [3] - 95:14, 95:17, 95:22
**spitting** [1] - 95:14
**spot** [2] - 52:24, 102:8
**spraying** [1] - 95:16
**staged** [1] - 95:1
**staking** [2] - 93:10
**stand** [4] - 28:19, 28:21, 88:17, 89:13
**standard** [4] - 64:15, 69:3, 69:7, 69:8
**start** [2] - 29:4, 105:15
**started** [1] - 30:12
**starting** [2] - 69:24, 109:18
**state** [9] - 10:6, 15:2, 15:6, 55:11, 80:1, 80:5, 91:13
**statement** [11] - 9:20, 10:18, 11:2, 11:20, 11:22, 11:25, 12:2, 69:12, 73:2, 76:4, 82:23
**statements** [6] - 49:6, 49:9, 49:15, 80:6, 92:1
**states** [2] - 100:18, 103:7
**STATES** [3] - 1:1, 1:4, 1:12
**States** [15] - 1:16, 1:24, 3:16, 4:7, 4:19, 13:12, 17:9, 55:15, 56:1, 88:10, 91:13, 107:2, 107:8, 108:20, 110:10
**status** [1] - 105:16
**stay** [1] - 107:22
**stealing** [1] - 73:16
**STENOGRAPHICAL LY** [1] - 1:22
**step** [11] - 20:12, 20:14, 24:19, 24:21, 30:17, 39:10, 39:12, 39:23, 52:16, 59:15, 61:23
**steps** [3] - 44:6, 52:2, 65:1
**still** [1] - 79:6
**stolen** [6] - 46:10, 55:3, 55:4, 55:17, 55:18, 56:3
**stood** [1] - 31:2
**stop** [5] - 3:12, 98:2, 98:3, 98:21, 103:11

**stopped** [3] - 98:19, 98:20
**story** [1] - 80:15
**strange** [2] - 79:24, 80:2
**street** [1] - 83:10
**Street** [2] - 1:17, 1:20
**stretch** [2] - 28:19, 28:21
**strike** [3] - 10:18, 11:3, 76:4
**strikes** [1] - 79:14
**striking** [1] - 44:22
**strings** [1] - 60:13
**strongly** [5] - 20:11, 24:18, 39:9, 59:14, 59:24
**struck** [8] - 70:20, 70:22, 71:12, 99:2, 99:3, 99:5, 99:7, 99:10
**study** [1] - 83:24
**stuff** [2] - 80:5, 84:13
**submit** [7] - 70:9, 73:21, 73:22, 73:23, 78:17, 81:8, 82:14
**submitted** [1] - 108:17
**subset** [1] - 50:12
**substance** [10] - 12:16, 13:1, 17:7, 18:3, 18:11, 24:3, 24:5, 25:23, 38:6, 103:17
**substances** [3] - 17:8, 101:22, 103:18
**substantial** [9] - 20:12, 20:14, 24:19, 24:21, 39:10, 39:12, 39:23, 59:15, 75:4
**substantive** [5] - 12:18, 13:3, 16:11, 34:25, 109:10
**succeeded** [2] - 13:25, 17:21
**successfully** [1] - 43:7
**successor** [2] - 57:1, 57:4
**sudden** [2] - 71:21, 80:13
**suddenly** [1] - 65:2
**sufficient** [5] - 15:24, 16:14, 18:19
**suggest** [3] - 8:22, 28:18, 108:25
**suggesting** [1] - 104:21
**Suite** [1] - 1:20
**summary** [2] - 12:10, 85:15
**summation** [1] - 87:3

**Sunday** [1] - 45:19
**support** [2] - 67:5, 76:14
**supports** [1] - 29:20
**surface** [2] - 52:12, 52:18
**surprising** [1] - 48:3
**surrounding** [1] - 49:19
**surveillance** [9] - 49:25, 54:9, 54:24, 56:22, 57:12, 62:5, 90:2, 94:3
**surveilling** [1] - 54:13
**swab** [3] - 48:6, 48:7, 48:8
**swabs** [3] - 95:20, 95:21, 95:22
**sweat** [1] - 48:14
**sweep** [1] - 46:9
**sympathy** [3] - 6:12, 99:16, 99:20

**T**

**table** [2] - 67:4, 108:25
**talks** [4] - 74:1, 75:16, 80:18, 90:9
**tangible** [1] - 14:24
**tape** [2] - 79:19, 79:21
**team** [6] - 94:6, 94:9, 94:12, 96:8, 96:10, 97:17
**technical** [2] - 5:18, 10:4
**technician** [1] - 84:1
**tend** [2] - 8:12, 9:23
**term** [5] - 21:20, 26:16, 26:24, 82:21, 103:5
**terms** [1] - 98:20
**terrible** [1] - 74:9
**terribly** [1] - 81:16
**terrifying** [1] - 95:11
**testified** [15] - 9:7, 9:13, 43:5, 43:11, 45:5, 55:22, 57:22, 58:9, 59:19, 61:2, 76:22, 82:1, 91:2, 97:2
**testifies** [1] - 77:19
**testify** [6] - 48:1, 52:17, 76:21, 83:11, 85:19, 91:18
**testifying** [7] - 8:20, 11:5, 74:25, 75:2, 76:6, 76:11, 78:19
**testimony** [73] - 7:14, 8:8, 8:18, 9:10, 9:16, 10:9, 10:11, 10:13,

10:21, 11:5, 11:6, 11:18, 19:22, 34:18, 35:12, 35:20, 35:22, 36:2, 37:10, 38:22, 40:21, 42:17, 42:18, 45:11, 46:1, 46:5, 46:22, 49:10, 49:12, 49:20, 50:3, 50:6, 50:14, 50:25, 51:20, 51:24, 51:25, 54:7, 54:11, 55:13, 59:1, 59:2, 61:4, 62:5, 63:1, 64:23, 64:24, 65:4, 65:5, 65:10, 66:11, 70:7, 70:23, 71:6, 71:20, 72:3, 73:22, 75:17, 75:25, 76:6, 76:7, 79:15, 81:4, 83:21, 84:14, 85:22, 85:25, 86:3, 86:4, 86:10, 98:23, 99:21
**thanking** [1] - 29:4
**THE** [23] - 1:12, 1:15, 1:19, 3:4, 3:7, 3:8, 3:10, 3:18, 4:10, 4:12, 4:18, 6:2, 65:19, 65:23, 66:4, 100:4, 107:5, 107:11, 108:4, 108:23, 109:8, 109:17, 109:23
**theft** [1] - 51:19
**Theory** [1] - 25:21
**theory** [1] - 25:21
**thereafter** [2] - 3:25, 28:23
**thinking** [3] - 62:18, 65:4, 65:5
**third** [4] - 31:11, 37:5, 81:9, 102:21
**thousand** [1] - 34:19
**threat** [1] - 94:20
**threaten** [1] - 73:13
**threatened** [3] - 14:12, 20:1, 37:7
**three** [36] - 12:24, 14:10, 18:6, 20:4, 21:5, 21:12, 21:15, 24:10, 29:6, 29:13, 29:22, 31:3, 31:4, 31:15, 32:8, 38:2, 38:13, 40:3, 40:16, 41:24, 42:14, 47:11, 47:14, 69:11, 69:12, 69:13, 80:21, 84:15, 84:17, 88:14, 98:18, 99:2, 101:14, 102:2, 102:8, 105:5
**throughout** [4] -

26:25, 38:22, 50:13, 66:18
**Thursday** [1] - 108:2
**ticket** [2] - 74:16
**tie** [1] - 73:13
**timeline** [2] - 76:19, 78:7
**Title** [2] - 13:12, 17:9
**today** [7] - 66:19, 66:20, 73:9, 74:18, 100:8, 105:10, 106:6
**today's** [1] - 89:25
**together** [13] - 30:20, 87:16, 87:17, 87:19, 88:5, 90:24, 93:13, 94:4, 94:9, 94:12, 96:13, 97:13, 99:11
**tomorrow** [2] - 100:8, 106:16, 109:17
**took** [12] - 19:25, 53:18, 53:22, 54:8, 56:22, 61:20, 62:2, 62:3, 67:22, 68:20, 85:20, 99:3
**total** [2] - 3:22, 3:25
**totals** [1] - 105:4
**touch** [5] - 48:13, 84:6, 95:19, 95:22, 106:3
**touching** [1] - 84:9
**toward** [3] - 20:12, 24:19, 59:15
**towards** [1] - 39:10
**Tower** [1] - 1:20
**toy** [1] - 79:13
**traditionally** [1] - 5:6
**training** [1] - 10:5
**transaction** [5] - 63:3, 80:17, 81:11, 81:15, 81:20
**transcript** [1] - 70:24
**transcription** [1] - 110:6
**transcripts** [5] - 43:21, 62:12, 70:13, 71:2, 109:10
**transference** [4] - 84:4, 84:10, 84:12, 84:20
**translated** [1] - 50:16
**transport** [1] - 22:6
**trauma** [1] - 52:19
**treatment** [3] - 10:17, 11:2, 76:3
**TRIAL** [1] - 1:10
**trial** [19] - 3:7, 4:15, 4:21, 6:11, 7:15, 7:25, 9:17, 11:9, 27:16, 35:20, 66:9, 73:3, 73:9, 79:18,

79:20, 97:3, 105:5,
105:24, 108:24
**tried** [7] - 36:6, 61:5,
70:20, 74:25, 75:11,
76:18, 83:7
**tries** [3] - 74:21, 77:3
**trouble** [1] - 91:15
**true** [1] - 8:16
**trust** [4] - 68:22,
68:24, 73:24, 100:1
**trusted** [1] - 86:5
**trusting** [1] - 70:10
**truth** [5] - 8:25, 9:2,
9:22, 28:12, 88:19
**truthful** [2] - 11:5,
76:6
**truths** [1] - 92:7
**try** [10] - 5:20, 14:6,
18:2, 28:5, 31:12,
36:22, 38:4, 54:9,
76:18, 95:23
**trying** [9] - 30:25,
44:17, 47:21, 47:22,
59:21, 64:5, 69:20,
71:12, 71:14
**turn** [2] - 98:12, 98:13
**turned** [2] - 43:25,
45:20
**turning** [1] - 100:6
**TV** [1] - 73:13
**two** [57] - 5:13, 11:25,
13:16, 14:4, 14:8,
14:18, 16:10, 16:17,
17:2, 17:4, 17:12,
17:25, 18:4, 19:25,
20:25, 21:10, 24:9,
26:14, 31:18, 31:19,
32:7, 32:17, 33:7,
34:13, 36:19, 38:2,
38:20, 40:3, 47:12,
47:19, 49:5, 49:15,
53:21, 59:10, 60:3,
67:3, 68:16, 74:5,
76:9, 77:21, 78:5,
83:5, 84:16, 84:18,
85:17, 86:1, 87:17,
87:19, 97:20,
100:25, 101:1,
101:7, 102:1, 102:5,
103:19, 103:20
**type** [1] - 48:13

## U

**U.S** [5] - 66:25, 67:3,
67:14, 75:3, 77:7
**Uber** [2] - 90:5, 99:4
**unanimity** [2] - 17:3,
101:5
**unanimous** [10] -

14:17, 16:24, 21:15,
27:25, 86:21, 86:24,
86:25, 101:4, 102:4
**unanimously** [12] -
19:11, 33:12, 86:22,
100:23, 101:8,
101:20, 102:10,
102:17, 102:24,
103:2, 103:8, 103:15
**unclear** [1] - 84:21
**under** [10] - 12:3, 25:5,
39:2, 61:2, 77:25,
89:2, 91:13, 94:20,
99:9, 100:17
**undercover** [3] - 62:7,
62:8, 62:14
**undermines** [1] -
80:12
**undisputed** [1] - 83:9
**undivided** [1] - 5:23
**unduly** [1] - 11:15
**unequivocally** [1] -
58:14
**unfortunate** [1] -
93:14
**unimportant** [2] -
10:2, 10:3
**UNITED** [3] - 1:1, 1:4,
1:12
**United** [15] - 1:16,
1:24, 3:16, 4:7, 4:19,
13:12, 17:9, 55:15,
56:1, 88:10, 91:13,
107:2, 107:8,
108:20, 110:10
**unlawful** [24] - 13:17,
13:23, 14:6, 14:8,
14:10, 15:19, 15:22,
17:13, 17:19, 18:2,
18:4, 18:6, 18:14,
18:17, 32:18, 32:24,
36:23, 37:3, 37:5,
38:5, 38:6, 38:11,
54:21, 54:23
**unlawfully** [1] - 12:20
**unless** [3] - 46:16,
46:17, 107:14
**unlocked** [1] - 44:13
**unpleasant** [1] - 73:3
**unreviewable** [1] -
75:5
**untrue** [1] - 96:14
**up** [44] - 3:13, 20:14,
24:21, 28:8, 28:21,
29:1, 38:8, 39:13,
47:5, 49:17, 49:18,
50:6, 51:7, 63:5,
63:9, 66:14, 68:15,
68:20, 68:21, 69:24,
71:4, 71:5, 71:7,

73:13, 74:3, 77:18,
79:19, 79:24, 84:1,
84:6, 88:16, 89:25,
90:1, 91:2, 91:15,
92:17, 92:24, 95:2,
95:7, 97:3, 100:13,
105:16
**upper** [1] - 85:17
**upper-right** [1] - 85:17
**utilized** [1] - 35:6

## V

**vacuum** [1] - 93:12
**Valdez** [6] - 32:5,
35:20, 37:1, 45:17,
46:7, 54:3
**Valhuerdis** [15] - 32:5,
35:20, 37:1, 37:11,
45:18, 45:21, 46:7,
46:20, 54:3, 56:11,
56:13, 57:5, 89:9,
93:9, 94:11
**value** [3] - 14:24,
18:12, 75:3
**van** [13] - 36:1, 36:3,
40:22, 41:21, 45:13,
45:15, 49:22, 49:25,
50:2, 50:5, 60:23,
63:11, 63:21
**Vargas** [5] - 55:14,
55:23, 78:21, 79:11,
80:25
**various** [2] - 65:15,
85:17
**Vazquez** [4] - 2:10,
70:22, 71:4, 84:9
**VAZQUEZ** [11] - 1:15,
3:16, 4:7, 4:15, 87:8,
107:2, 107:8,
108:20, 109:7,
109:14, 110:1
**Vazquez's** [2] - 84:5,
84:8
**vehicle** [1] - 22:6
**verdict** [31] - 14:22,
14:23, 16:16, 19:13,
19:14, 21:16, 27:14,
27:24, 28:2, 28:15,
28:16, 33:19, 34:12,
42:10, 58:18, 86:6,
86:7, 86:12, 86:14,
100:2, 100:7,
100:12, 100:14,
101:6, 101:11,
103:22, 103:23,
103:24, 103:25,
104:22, 105:11
**VERDICT** [1] - 2:12
**verify** [1] - 106:2

**versus** [1] - 81:20
**vibration** [1] - 85:6
**victim** [9] - 14:13,
20:2, 35:10, 35:15,
43:1, 53:23, 79:24,
93:10, 93:14
**victim's** [5] - 14:11,
20:1, 49:20, 55:1,
57:10
**victims** [2] - 45:1, 58:6
**video** [3] - 62:5, 71:3,
76:13
**view** [1] - 5:8
**Villegas** [1] - 53:23
**Villegas'** [1] - 56:8
**violate** [1] - 99:12
**violating** [1] - 27:10
**violation** [3] - 54:20,
101:8, 101:9
**violence** [10] - 12:24,
14:12, 15:4, 20:2,
23:14, 23:15, 41:11,
55:4, 57:8, 98:1
**violent** [22] - 20:19,
20:20, 20:23, 20:25,
21:3, 21:9, 21:11,
21:13, 22:7, 22:22,
22:25, 23:3, 23:6,
30:20, 30:21, 40:5,
40:9, 41:17, 41:20,
102:20, 102:21,
102:22
**visible** [1] - 22:4
**voices** [1] - 44:15
**voluntarily** [2] - 27:1,
27:4
**voted** [1] - 104:25
**vs** [1] - 1:5

## W

**wait** [1] - 78:15
**waiting** [5] - 30:17,
44:7, 51:17, 63:19,
65:1
**walk** [2] - 23:11, 29:19
**walked** [1] - 94:18
**walkway** [1] - 48:2
**wants** [6] - 71:20,
71:22, 74:23, 80:24,
85:5, 106:21
**wary** [2] - 70:9, 74:4
**Wasi** [3] - 53:25,
55:23, 56:5
**ways** [1] - 21:5, 41:24,
87:17
**wealth** [1] - 15:1
**weapon** [5] - 21:18,
21:21, 44:2, 44:5,
52:8

**wearing** [5] - 39:18,
48:15, 48:18, 53:3,
95:22
**Wednesday** [1] - 1:5
**weeks** [9] - 29:6,
29:13, 29:22, 53:21,
54:8, 56:23, 88:14
**weighing** [1] - 64:6,
102:1, 102:2, 103:19
**weight** [5] - 8:13,
11:18, 11:25, 19:11,
24:10
**welcome** [1] - 4:19
**whatsoever** [2] - 82:6
**wheels** [1] - 98:12
**white** [7] - 36:1, 45:13,
49:22, 49:25, 50:2,
50:5, 93:2
**whole** [3] - 6:16, 8:19,
84:5
**wife** [3] - 44:20, 49:4,
96:9
**willful** [1] - 25:19
**willfully** [11] - 12:15,
14:9, 15:23, 16:13,
16:15, 18:5, 18:18,
25:11, 27:3, 27:8,
38:11
**willing** [5] - 7:7, 68:11,
74:12, 80:15, 89:2
**wins** [1] - 80:16
**wish** [1] - 104:3
**withdraw** [1] - 63:1
**witness** [31] - 8:17,
8:19, 8:22, 8:24, 9:1,
9:3, 9:5, 9:6, 9:8,
9:13, 9:15, 9:16,
9:18, 9:19, 9:22,
9:24, 11:1, 11:4,
11:7, 55:22, 58:9,
75:17, 76:2, 76:5,
89:15, 95:6, 95:7,
95:13, 96:16, 97:5,
99:21
**witness'** [4] - 9:10,
10:10, 10:11, 10:13
**witnesses** [19] - 7:14,
8:20, 10:15, 10:16,
11:6, 65:15, 66:11,
67:9, 67:13, 67:15,
69:5, 76:7, 83:10,
87:4, 88:16, 97:2,
97:5, 97:6
**woman** [2] - 42:24,
43:11
**word** [14] - 26:24,
27:3, 68:22, 68:24,
70:19, 72:6, 72:24,
78:10, 81:6, 82:16,
88:11, 89:14, 90:15

**words** [8] - 13:17, 16:10, 17:13, 25:18, 27:25, 76:15, 97:20, 104:17
**wore** [4] - 36:4, 48:17, 48:20, 95:11
**world** [2] - 60:12, 67:1
**worse** [1] - 73:7
**worst** [1] - 88:24
**worth** [2] - 54:10, 55:2
**worthwhile** [1] - 77:23
**wound** [5] - 52:13, 52:19, 52:20, 85:16
**wounds** [1] - 85:16
**write** [1] - 104:4
**writes** [1] - 32:20
**writing** [2] - 80:17, 104:6

## Y

**Year** [5] - 3:5, 3:6, 4:22, 29:3, 66:7
**year** [1] - 59:7
**years** [7] - 43:8, 46:9, 74:13, 75:13, 77:21, 79:17, 94:19
**yelled** [2] - 39:21, 44:16
**yourself** [8] - 8:23, 9:12, 10:11, 11:15, 11:24, 28:3, 68:7, 81:5

## Z

**ZACCA** [13] - 1:19, 3:6, 3:17, 4:9, 4:16, 66:5, 66:7, 107:4, 107:10, 108:22, 109:15, 109:22, 109:25
**Zacca** [5] - 1:19, 2:8, 66:4, 88:22, 93:17