```
1                   UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
2                             (MIAMI)
                    CASE NO. 1:17-CR-20701-MGC-5
3

4    UNITED STATES OF AMERICA          Miami, Florida

5                                      December 17, 2018
               vs.                     Monday
6

7    LEONARDO MIGUEL GARCIA MORALES
                                       Scheduled for 9:00 a.m.
8                                      Held 9:03 a.m. - 1:05 p.m.
     _____

9

10                            JURY TRIAL
                               DAY 8
11                          PAGES 1 - 133

12            BEFORE THE HONORABLE DONALD L. GRAHAM
                  UNITED STATES DISTRICT JUDGE
13

14   APPEARANCES:

15   FOR THE GOVERNMENT:     IGNACIO JESUS VAZQUEZ, JR., AUSA
                             J. MACKENZIE DUANE, AUSA
16                           United States Attorney's Office
                             Miami Special Prosecutions Section
17                           99 Northeast 4th Street
                             Room 806
18                           Miami, Florida  33132

19   FOR THE DEFENDANT:      DERIC ZACCA, ESQ.
                             Deric Zacca, P.A.
20                           110 Southeast 6th Street
                             110 Tower - Suite 1700
21                           Fort Lauderdale, Florida  33301

22
     STENOGRAPHICALLY
23   REPORTED BY:            GLENDA M. POWERS, FPR, CRR, FPR
                             Official Federal Court Reporter
24                           United States District Court
                             400 North Miami Avenue
25                           Miami, Florida  33128
```

```
1                         I N D E X

2
                                                    PAGE
3
                     GOVERNMENT'S EVIDENCE
4
    WITNESS
5

6   DETECTIVE HECTOR BERTRAND
        Direct Examination Mr. Vazquez               5
7       Cross-Examination by Mr. Zacca              37
        Redirect Examination by Mr. Vazquez         67
8
    FBI AGENT SCOTT EICHER
9       Direct Examination by Mr. Vazquez           79
        Cross-Examination by Mr. Zacca              94
10      Redirect Examination by Mr. Vazquez        100

11
    OSVALDO MAGDALENA
12      Direct Examination by Mr. Vazquez          108

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        E X H I B I T S

 2
       EXHIBIT                                    RECEIVED
 3                                                IN EVIDENCE

 4
                         GOVERNMENT'S EXHIBITS
 5

 6     Exhibit 4                                      15

 7     Exhibit 5                                      16

 8     Exhibit 6                                      16

 9     Exhibit 38                                     27

10     Exhibit 39                                     25

11     Exhibit 40                                     27

12     Exhibit 41                                     26

13     Exhibit 42                                     28

14     Exhibit 13                                     35

15     Exhibit 44                                    108

16     Exhibit 44A                                   108

17

18

19

20

21

22

23

24

25
```

1           (Call to the order of the Court:)

2           (Defendant Leonardo Garcia Morales aided by

3      Court-Certified Spanish Interpreters.)

4           COURTROOM DEPUTY:  United States District Court,

5      Southern District of Florida; the Honorable Donald L. Graham

6      presiding.

7           THE COURT:  Good morning.  We are ready to proceed.

8      Bring the jury in, please.

9           COURT SECURITY OFFICER:  Remain standing for the jury,

10     please.

11          (Jury entered courtroom at 9:05 a.m.)

12          THE COURT:  Be seated, please.

13          Good morning, ladies and gentlemen.  Welcome back.

14     Thank you all for being here and ready to proceed.  We will do

15     just that at this time.

16          Please call your next witness.

17          MR. VAZQUEZ:  Yes, Your Honor.  At this time, the

18     United States calls Detective Hector Bertrand from the Miramar

19     Police Department.

20          COURTROOM DEPUTY:  Raise your right hand, sir.

21          Do you solemnly swear or affirm the testimony that

22     you're about to give will be the truth, so help you God?

23          THE WITNESS:  I do.

24          COURTROOM DEPUTY:  Thank you.  You may be seated.

25          (DETECTIVE HECTOR BERTRAND, being sworn, testified as

5

```
 1   follows:)
 2                     DIRECT EXAMINATION
 3   BY MR. VAZQUEZ:
 4   Q.   Good morning, sir.
 5   A.   Good morning.
 6   Q.   If you would please introduce yourself to the members of
 7   the trial jury.
 8   A.   Detective Hector Bertrand with the Miramar Police
 9   Department.
10   Q.   And, Detective Bertrand, how long have you been with the
11   Miramar Police Department?
12   A.   I've been with Miramar since October of 1992.
13   Q.   What assignments have you held with the Miramar Police
14   Department?
15   A.   I'm sorry?
16   Q.   What assignments have you held with the Miramar Police
17   Department?
18   A.   I started in road patrol, like all officers; and then I
19   went into detective bureau, where I been there for 24 years.
20   I was assigned to juvenile and sex crimes for a couple years;
21   then I went to undercover narcotics, I did that for 10 years;
22   and then I've been -- the last 12, I've been in the homicide
23   unit.
24   Q.   And in the homicide unit, what kind of cases do you
25   investigate beyond just homicides?
```

6

```
1    A.   We investigate crimes against person and sometimes that
2    includes robberies, home invasions.
3    Q.   And in your capacity as a detective, do you serve as a lead
4    detective?
5    A.   Yes, sir.
6    Q.   What is -- for the members of the jury, if you could
7    explain what a "lead detective" is versus any other kind.
8    A.   Well, in our department we have, basically, rotations,
9    two-week rotations.  We have about six detectives, and
10   depending on when your rotation is, you're up for two weeks at
11   a time, and then the next detective, and so on.  That's how
12   they space it so that we don't get bogged down with a lot of
13   cases.
14   Q.   And when you inherit a case or are assigned a case as a
15   lead detective, what is it that you do as compared to what
16   everyone else might do on that same investigation?
17   A.   Well, it's our responsibility to oversee the investigation,
18   direct certain people to do things, whether it be crime scene
19   or other detectives that assist in the investigation.
20   Q.   Now, Detective, I want to draw your attention to the date
21   of September 30th of 2012.
22        On that date, were you working in your current assignment?
23   A.   I was -- yes, I was, but I was off at the time of the
24   incident.
25   Q.   With regard to September 30th, 2012, and the immediate
```

```
 1    hours thereafter, did you have occasion to become familiar with
 2    a person known as Leonardo Garcia Morales and work a case
 3    related to that person?
 4    A.  Yes, sir.  That was the next day, just past midnight, about
 5    1:00 was when I arrived at the scene.
 6    Q.  And when you say "the scene," where is it that you went?
 7    A.  It's a development out by I-75, south of Miramar Parkway.
 8    The address is 5234 Southwest 149th Avenue, I think, in the
 9    City of Miramar.
10    Q.  Detective, I'm showing you what's been admitted in evidence
11    as Government's 1.  Do you recognize it?
12    A.  Yes, sir, that's the front of the residence where the
13    incident occurred.
14    Q.  And when you arrived to this call, what did you -- how did
15    you go about getting to the call, physically, explain to the
16    jurors how you got there.
17    A.  Like I explained before, I was off.  So I received a phone
18    call, and I was asked to respond in reference to a home
19    invasion, and I responded directly to the residence.
20    Q.  Getting to the residence, how do you enter the grounds?
21    A.  It's a gated community, so you have to go through a guard
22    gate.  There's a -- like most gated communities, there's an
23    entrance for homeowners, and then there's an entrance for
24    visitors.
25    Q.  And when you arrived at the residence depicted on
```

1    Exhibit 1, what did you find?

2    A.   There was a lot of police activity.  The street had been

3    roped off.  There were officers around the area.  I met with

4    one officer, Michael Aranda, when I arrived, he briefed me.

5         And after that, I took a walk up to the front of the house,

6    but not -- I didn't go inside 'cause it's still a scene that's

7    being worked on.

8         And so I made some observations at the front of the house,

9    and then I started walking around the house, just to see what I

10   could see or notice or get a lay of the land.

11   Q.   And when you say the scene was being worked on, what does

12   that mean?

13   A.   There was crime scene personnel there, Crime Scene

14   Investigator Ashley Clay, she was already on scene.  I believe

15   at the time she was taking photographs and things like that.

16   Q.   And did you meet with Ashley Clay?

17   A.   Eventually.  Not -- I probably said hi to her when I got

18   there, I saw her.  I first walked around the scene, made some

19   observations, like I said, and then eventually I met with her a

20   couple times during the night -- or morning.

21   Q.   When you walked the scene and when you met with Ashley

22   Clay, what were you looking for?

23   A.   Anything unusual.  I had already been briefed, so I had

24   some information.  So, like I said, I -- kind of looking for

25   things that I might want to get processed, things to mention to

1    her about processing.

2         Again, I actually -- in the picture, I don't know if you

3    guys see the picture -- but there's a bay window, so I walked

4    around that side of the house first, went around.  There's some

5    sliding glass doors in the back.  I made a mental note to have

6    her -- to ask her to process that.

7         I also went towards the other side of the house, and that's

8    where I found a -- there was a breaker panel, which is what

9    turns the electricity on and off for the inside of the house.

10   I saw that -- there's like a little locking thing on the

11   bottom, I saw that it was on "open."

12        So I didn't want to touch it, so I used my flashlight, and

13   with the flashlight I kind of moved it to see if I could open

14   it.  The front panel fell onto some bushes, and then that's

15   when I noticed the breaker box, that the switches were on "off"

16   for the house, meaning no electricity inside the house.

17        Then I walk to the front, and I think that's -- at that

18   time is, I believe, when I met with Ashley Clay and I told her

19   that -- specifically, I remember telling her that I wanted the

20   sliding glass doors processed, and I also asked her to process

21   the switches and the door panel for the breaker box.

22        And eventually, I also -- I don't know if it was then or

23   later, but I also met with her and asked her to process --

24   there was a black BMW in the driveway of the residence, and I

25   asked her to process the car, specifically, there was a --

1    looked like a print or a palm print, or something like that, on

2    the hood of the car.

3    Q.   Detective, while you were conducting this investigation,

4    did you come across other pieces of evidence, such as spent

5    casings, cellular phone, clothing?

6    A.   Initially, when I got to the residence, I stated that I

7    walked up to the front door, but I didn't go inside.  Out by

8    the front door, on, I guess, the porch, there was some

9    clothing.

10        There was also another item that was face down.  I didn't

11   know what it was at the time, but I later learned that it was a

12   Halloween, like a skull Halloween mask.

13        I believe there was some medical stuff, and there was also

14   a phone that was found with the clothing that was given to me

15   prior to leaving the scene.

16   Q.   I'm going to show you what's been admitted into evidence as

17   Government's 15.  What is Government's 15?

18   A.   That is the phone that was found at the scene with the

19   clothing, and that was given to me by Ashley Clay at the scene.

20   I later learned that it belonged to Leonardo Morales.

21   Q.   And what did you do with this phone?

22   A.   I -- prior to leaving the scene, I gave it to Detective

23   Zeller, he does our forensics on phones, meaning he downloads

24   the contents of the phone so that we can examine them later,

25   and that's what I did prior to leaving.

1    Q.   And you also talked about the clothing and other items that

2    were recovered on the scene.   What happened with those items?

3    A.   Those items were taken into evidence by Ashley Clay.

4    Q.   Did you have a chance to look at the crime scene before all

5    the evidence was taken?

6    A.   What happens is when we get to a crime scene, we don't want

7    to go inside because you can contaminate the crime scene, you

8    can either introduce things, items, to the crime scene, or you

9    can take out items inadvertently that stick to your shoes, or

10   anything like that.

11        So our job is, basically, we get there, there's crime scene

12   personnel that's there, it's their responsibility to collect

13   the evidence.

14        So, eventually, I did go inside, but I saw photos of what

15   was inside, and things like that, but by the time I go inside,

16   pretty much all the stuff is collected, I kind of go inside

17   just to, again, get the lay of the land for my knowledge of how

18   the house is inside and things like that.

19   Q.   And from your walk-through of the crime scene and your

20   later review of photographs that were taken, I want to ask you

21   specifically about any casings or bullet-related evidence that

22   was found.   What kind of evidence did you see on the scene?

23   A.   I'm sorry.   There was -- I know that there was a Glock 22

24   that was collected, which is the homeowner's gun, which is also

25   my service gun that I use for work.   It's a .40 caliber.

1        There was eight live rounds that were collected from the

2    gun.  And when I mean "live rounds," I mean rounds that weren't

3    fired, intact rounds.

4        And then there was three casings that were recovered from

5    inside the house, and all the casings and the live rounds match

6    the same brand, which, I believe, was a .40 caliber Winchester.

7    Q.   So I'm going to show you what's been admitted into evidence

8    as Government's 2, and I'm going to turn to Bates number 1802.

9    And when you say "casings were found," what is it that we're

10   looking at here?

11   A.   That's a spent casing, which means it's already been fired

12   and ejected from the gun.

13   Q.   And from your review of the crime scene and the crime scene

14   photos, as a lead detective, did you see any casings or gunshot

15   evidence that was consistent with any other caliber of firearm

16   being shot in this robbery?

17   A.   No.  Everything was consistent with the gun used by the

18   homeowner.

19   Q.   Now, you talked to the members of the jury how you walked

20   through the scene, you spoke to Ms. Clay.

21       After you had done all that, what was the next thing that

22   you did in this investigation?

23   A.   Well, once everything was collected from the scene, I did

24   do a walk-through of the residence.  At one point, I did a

25   walk-through with the homeowner, Julio, and I also had him

1   reenact what happened, and I videotaped that.

2   Q.   And did you eventually leave the crime scene?

3   A.   Yes, I did, and I responded back to the police department.

4   Q.   And what did you do at the police department?

5   A.   I did some paperwork, a probable cause affidavit.

6   Q.   Detective, did there come a point in time when you went to

7   the hospital?

8   A.   I did.

9   Q.   And when you went to the hospital, was there an occasion

10   when you saw the defendant with anyone?

11   A.   Yes.  Prior to going to the hospital, I met with the family

12   at the police department, and specifically defendant's wife and

13   mother, and they followed us to the hospital and they met with

14   the defendant.

15   Q.   Were you within earshot when the defendant and his family

16   members were talking?

17   A.   Yes, I was.  I stood by the door or right outside the open

18   door and kind of monitored just to make sure that nothing

19   happened.

20   Q.   During the time where you were present when the defendant

21   was speaking with family members, what did you hear?

22   A.   He had advised his mother and wife that they hit the wrong

23   house, and he also blamed a lady by the name of Celia for

24   giving him the wrong information.

25   Q.   Now, in addition to reviewing crime scene evidence and your

1    visit to the hospital, did you also secure any evidence from

2    any kind of security system that was at the community.

3    A.   A couple days later, I responded to the clubhouse at the

4    development, and I was able to obtain the DVR recorder for the

5    surveillance of the complex for a specific area in question,

6    which was -- it was the inside of the gym and right outside the

7    gym.

8         That camera that was pointed outside the gym specifically

9    aimed, I believe, west, and it captured a portion of a school,

10   Coral-something Elementary -- I can't remember the name of it.

11   It covered that area and you could see, it's kind of at that

12   point that it covered is what parents use -- it's a little

13   rotunda at the end -- it's what parents use to drive, pick up

14   their kids and then leave.  So at nighttime nobody uses it,

15   there's no reason for anybody to be there.

16   Q.   And I want to approach with what's been marked as

17   Government's 4 for identification.  Do you recognize the item?

18   A.   Yes.

19   Q.   What is this item?

20   A.   This is the surveillance DVR for the clubhouse, the

21   Reserves at Huntingdon.

22   Q.   And did you collect this item in the course of your

23   investigation?

24   A.   I'm sorry?

25   Q.   Did you collect this item in the course of your

```
 1   investigation?
 2   A.  Yes, sir.  Yes, sir.
 3        MR. VAZQUEZ:  Your Honor, at this time, I would move
 4   Government's 4 into evidence.
 5        MR. ZACCA:  No objection.
 6        THE COURT:  Received Government's Exhibit 4.
 7        (Government's Exhibit 4 received into evidence.)
 8   BY MR. VAZQUEZ:
 9   Q.  What did you do -- or what was done with Government's
10   Exhibit Number 4 into evidence?
11   A.  Eventually, that afternoon, I reviewed the video of the
12   incident before and after the incident.
13   Q.  I'm going to show you what's been marked as Government's
14   Exhibit 5 and 6 for identification.
15        Can you let me know what Exhibit 5 is?
16   A.  This is a recording, the DVD, the content of the video.
17   Q.  And what's been marked for identification as
18   Government's 6?
19   A.  These are all 6?
20   Q.  Yes.
21   A.  Okay.  This is a Google map of the location showing the
22   rotunda and the house where it happened, and the clubhouse.
23        And then these, the next, are pictures specifically showing
24   a white van and a dark-colored SUV driving into the rotunda and
25   leaving, that was captured on the video.
```

1          MR. VAZQUEZ:  Your Honor, at this time, I move

2    Government's Exhibit 5 and 6 in evidence.

3          MR. ZACCA:  No objection.

4          THE COURT:  Received.

5          (Government's Exhibits 5 and 6 received into evidence.)

6    BY MR. VAZQUEZ:

7    Q.   Detective, I'm going to show you Government's 6, which is

8    Bates number 36.  What are we looking at here?

9    A.   That's an aerial map taken from Google, which reflects the

10   development and the clubhouse and the school.  The school is on

11   the north side -- actually, if you lower it a little bit --

12   Q.   And, Detective, if you can, you can use your finger on the

13   screen to point anything that you -- so this, right here,

14   you're pointing the center top?

15   A.   That's the school there.  This is the clubhouse.

16        And then this is the house, the homeowner's house there, I

17   believe.

18        Well, actually, I believe that's the corner house.

19   Q.   Okay.  And I'm showing you Bates number 37 from

20   Government's 6, what are we looking at here?

21   A.   It's a white-panel van that's entering the school property,

22   the rotunda.

23   Q.   For the record, I'm going to circle the top center.

24        What have I circled there, Detective?

25   A.   It's the white-panel van.  And that was significant because

```
 1    we had information of a white van that was seen entering or
 2    leaving prior to the incident and people jumping over the fence
 3    from inside the --
 4              MR. ZACCA:  Objection to hearsay.
 5              THE COURT:  Sustained.
 6    BY MR. VAZQUEZ:
 7    Q.   Okay.  And I'm showing you --
 8              THE COURT:  Don't tell us what others told you, just
 9    based on your personal direct knowledge.
10              THE WITNESS:  Okay, sir.
11    MR. VAZQUEZ:
12    Q.   And I'm showing you Bates number 38 from Government's 6 in
13    evidence, and what is this?
14    A.   The white-panel van.
15    Q.   And I'm showing you Bates 39 from Government's 6, what are
16    we looking at here?
17    A.   That's a dark SUV that's leaving the rotunda.
18    Q.   And another shot for Government's 34.
19    A.   A close-up of that vehicle.
20    Q.   Now, we previously spoke about the cellular phone.
21         Did there come a point in time where you continued your
22    investigation with regard to the cellular phone?
23    A.   Yes, sir.
24    Q.   And how did you go about doing that?
25    A.   A couple things regarding the phone.  We did a
```

1    search warrant for the phone.  We also wrote some subpoenas for

2    phone numbers contained in the phone.

3    Q.   And when you say you conducted a search warrant on the

4    phone, from that search warrant, what did you find?

5    A.   It's basically a download of the phone, everything that's

6    in the phone, which include calls received, calls made.  They

7    have times, numbers, it's also -- like your directory on your

8    phone would be contained in there, text messages.

9    Q.   Okay.

10   A.   Information about the phone, and so on.

11   Q.   I want to show you what's been admitted as Government's

12   16A, and what are we looking at here, Detective?

13   A.   That's the portion that shows information about the phone

14   itself.

15   Q.   Okay.

16   A.   The type of phone, model, I believe, serial numbers, and

17   also the phone number for that particular phone, which is over

18   here, the 407 number.

19   Q.   Now, based on the information that you received on this

20   telephone number, what did you do?

21   A.   We wrote some subpoenas for additional phone numbers that

22   were calls being placed around the time of the incident.

23   Q.   Detective, I want to show you what's been marked for

24   identification as Government's 41.  Do you recognize it?

25   A.   Yes, sir.

1    Q.   And what is it?

2    A.   This is a phone number for a person we later learned was

3    Jean --

4            MR. ZACCA:  Objection.

5            THE COURT:  Sustained.

6    BY MR. VAZQUEZ:

7    Q.   What is that item?  Not what you might have heard from

8    somebody else.

9    A.   It's the contents of a phone number, a particular phone

10   number ending in 6304.

11   Q.   I'm showing you what's been marked for identification as

12   Government's Exhibit 42.  What is that?

13   A.   This is going to be the contents of a phone number ending

14   in 6717.

15   Q.   Are these the phone records from that?

16   A.   Yes, sir.

17   Q.   And I'm showing you what's been marked for identification

18   as Government's 38.

19   A.   Again, these are the phone records for a telephone ending

20   in 0441.

21   Q.   And I'm showing you what's been marked for identification

22   as Government's Exhibit 39.

23   A.   These are the phone records for telephone ending in 3946.

24    -- or 40 -- I'm sorry.  40.

25   Q.   I'm showing you what's been marked for identification as

```
1    Government's 40.

2    A.   Phone records for phone number ending in 3387.

3              MR. VAZQUEZ:  Your Honor, at this time, I would move

4    into evidence Government's Exhibit 38 for identification, 39

5    for identification, 40 for identification, 41 for

6    identification, 42 for identification.

7              MR. ZACCA:  Objection, relevance.

8              THE COURT:  Sustained.

9              MR. ZACCA:  Not properly authenticated.

10             MR. VAZQUEZ:  Excuse me?

11             THE COURT:  They're not properly authenticated.

12             MR. VAZQUEZ:  I believe we have an objection as to

13   relevance, not -- we have a stipulation as to authenticity.

14             MR. ZACCA:  Well, we can go sidebar.

15             THE COURT:  Come sidebar.

16             (Sidebar discussion held as follows:)

17             THE COURT:  We have some documents -- I'm not sure the

18   basis for his knowledge of a phone number, but that's the

19   evidence, you've got some documents and some phone numbers, so

20   how is that relevant at this time?

21             MR. VAZQUEZ:  That --

22             MR. ZACCA:  I would have continued when I said the

23   objection as to --

24             THE COURT:  Where did they come from?  They haven't

25   been authenticated.  Where were they?
```

```
 1          MR. ZACCA:  He testified he got them from subpoena by

 2   the phone company.

 3          THE COURT:  Okay.  But he's not the custodian of the

 4   records of the phone company.

 5          MR. VAZQUEZ:  I was told we had a stipulation.

 6          THE COURT:  They're not from the phone company, they're

 7   not properly authenticated.  If you have an agreement on

 8   authentication, then you have to let me know and I can act

 9   accordingly.

10          MR. ZACCA:  Judge, for the record, that's correct.

11   I am not asking him to bring in the phone company custodian

12   from the phone company.  They're just records belonging to a

13   number found on a phone.

14          THE COURT:  Well, wait a minute.  I don't know anything

15   about the phone.  So what's the evidence in the record so far

16   on these numbers?

17          MR. VAZQUEZ:  Those numbers are on the phone that has

18   been admitted into evidence.

19          THE COURT:  How do we know that?

20          MR. VAZQUEZ:  I believe he said that.

21          THE COURT:  He can tell you that --

22          MR. VAZQUEZ:  Yes.  Yes.

23          THE COURT:  -- that you have some phone that you have

24   already identified as having been retrieved -- I guess, is it

25   one phone --
```

```
1           MR. VAZQUEZ:  One phone, yes.

2           THE COURT:  -- that he tied to the defendant, so he

3   went through the phone and picked out some numbers; right.

4           MR. VAZQUEZ:  Yes.

5           THE COURT:  So you got to tell us that.

6           MR. VAZQUEZ:  Yes.

7           THE COURT:  If he tells us that, then I guess you're

8   going to tie those numbers to the name he told you earlier.

9           MR. VAZQUEZ:  Yes.

10          THE COURT:  That would be fine.  In other words, I

11  found a phone from the defendant, he gets a search warrant, he

12  goes into the phone, there's some numbers in the phone, the

13  numbers are 1, 2, 3, 4, also in the phone next to Jimmy Jones'

14  name is 2386, next to X's name is 4578.

15          MR. VAZQUEZ:  Yes, sir.

16          THE COURT:  He can't -- he can just say Jimmy Jones.

17  He can't say Jimmy Jones is that guy.  He's just tying up

18  numbers on a phone that was received, searched -- or retrieved

19  from the defendant.

20          MR. ZACCA:  And I understand, Judge, I understand your

21  point.  My objection is that they need something more to make

22  sure that Jimmy Jones is relevant to this case.

23          THE COURT:  Well, I guess that's coming.

24          MR. VAZQUEZ:  Your Honor --

25          THE COURT:  I mean, right now, the defendant has
```

1    possession of a phone, okay, in the phone there's some

2    information.  Now it's his job to make that information come

3    alive, otherwise, you would be saying during closing, what does

4    that prove?

5          So, right now, there's a link, the defendant, phone,

6    some numbers.  Now he's got to go further than that to make

7    that come alive.

8          MR. ZACCA:  Fine, Judge, I'm just going to maintain my

9    objection.  Very well.

10          THE COURT:  That's fine.  That's fine.  I assume

11   you're -- I assume someone is coming to tell us about Jimmy

12   Jones; right?

13          MR. VAZQUEZ:  The Government received that testimony

14   from a cooperating witness, name is Matatan.  These names link

15   up to that nickname that has already been presented.

16          THE COURT:  Alright.

17          (Sidebar concluded, following held in open court:)

18          THE COURT:  Please continue with your foundation.

19   BY MR. VAZQUEZ:

20   Q.  Detective, I want to turn to Government's 16A at page 13,

21   and I want to draw your attention to contact 116.

22       Do you see that?

23   A.  Yes, sir.

24   Q.  And contact 116, what is the telephone number?

25   A.  The contact name is Alfre, and the phone number's

```
 1   XXX-XXX-3940.

 2   Q.   And is that one of the telephone numbers that you've

 3   secured records for through subpoena that's been marked for

 4   identification as Government's Exhibit 39?

 5   A.   Yes, sir.

 6          MR. VAZQUEZ:  At this time, I would move Government's

 7   Exhibit 39 into evidence.

 8          MR. ZACCA:  Still maintain any objection, Judge.

 9          THE COURT:  Have you had him explain what this really

10   is, from a practical standpoint, because I'm not sure I've

11   heard that.

12          MR. VAZQUEZ:  Okay.

13   BY MR. VAZQUEZ:

14   Q.   Detective, this part of the phone, the report that's in

15   evidence, what is this that we're looking at?

16   A.   That's the directory on the phone.

17   Q.   Is that like a contact list?

18   A.   Yes, sir.

19   Q.   And this telephone number that you talked to us about you

20   securing a subpoena for, the telephone number, this telephone

21   number is in the contacts for the phone that was recovered on

22   the scene?

23   A.   Yes, sir.

24          MR. VAZQUEZ:  I would renew my -- I would move to admit

25   Government's 39 into evidence at this time.
```

```
 1          THE COURT:  39 for identification is received, over

 2   objection.

 3          (Government's Exhibit 39 received into evidence.)

 4   BY MR. VAZQUEZ:

 5   Q.  Staying on that point, I want to turn to contact 113.

 6      What is the telephone number for contact 113?

 7   A.  305-904-6304.

 8   Q.  And the telephone number for contact 113 in the contacts of

 9   this cellular phone, is this another one of the phone record

10   accounts that you secured pursuant to subpoena?

11   A.  Yes, sir.

12          MR. VAZQUEZ:  At this time, I would move

13   Government's 41 for identification into evidence.

14          MR. ZACCA:  Same objection, Judge.

15          THE COURT:  And so you subpoenaed this particular

16   document because it matched a name and number in the phone that

17   you retrieved; is that correct?

18          THE WITNESS:  Yes, and it was of people that were in

19   contact with the defendant.

20          THE COURT:  Well, no --

21          MR. ZACCA:  Objection.

22          THE COURT:  -- no, no, that's not what I'm asking.

23          THE WITNESS:  I'm sorry.

24          THE COURT:  I'm just simply asking, you subpoenaed from

25   the phone company information about a particular telephone
```

```
 1    number that was in a phone that you retrieved; correct?

 2              THE WITNESS:  Yes, sir.

 3              THE COURT:  The exact number?

 4              THE WITNESS:  Yes, sir.

 5              THE COURT:  Alright.  Received as marked.

 6              (Government's Exhibit 41 received into evidence.)

 7    BY MR. VAZQUEZ:

 8    Q.  I'm going to turn now to contact 169 from the telephone

 9    recovered at the crime scene at page 18 of the Government's

10    exhibit.

11         What is the telephone number associated with contact 169

12    for the telephone?

13    A.  XXX-XXX-3387.

14    Q.  And what is the name attributed to it on the cellular

15    phone?

16    A.  Matojito.

17    Q.  And did you issue or have participated for the issue of a

18    subpoena for the collection of the phone records of the

19    Matojito telephone number?

20    A.  Yes, sir.

21              MR. VAZQUEZ:  At this time, I would move to admit

22    what's been marked for identification as Government's 40 into

23    evidence.

24              MR. ZACCA:  Same objection, Judge.

25              THE COURT:  Received as marked.
```

1              (Government's Exhibit 40 received into evidence.)

2    BY MR. VAZQUEZ:

3    Q.   I want to turn now to contact 221, which is on page 23 of

4    Government's 16A.

5         What is the name and telephone number associated with

6    contact 221 with the cell phone recovered from the Miramar

7    robbery scene?

8    A.   Celia, XXX-XXX-0441.

9    Q.   And did you secure the telephone records for this telephone

10   number that was found in the phone out at the Miramar crime

11   scene?

12   A.   Yes, sir.

13              MR. VAZQUEZ:   At this time, I move to admit what was

14   marked for identification as Government's 38.

15              MR. ZACCA:   Same objection, Judge.

16              THE COURT:   Received over objection.

17              (Government's Exhibit 38 received into evidence.)

18   BY MR. VAZQUEZ:

19   Q.   I want to turn to the first page of the exhibit and turn

20   your attention to the telephone number.

21        Did you secure the telephone records for the telephone

22   number 1-407-456-6717?

23   A.   Yes, sir.

24   Q.   And did you secure those records from the telephone

25   company?

```
 1    A.   Yes, sir.

 2             MR. VAZQUEZ:  At this time, I would move to admit

 3    Government's 42 into evidence.

 4             THE COURT:  Received over objection.

 5             (Government's Exhibit 42 received into evidence.)

 6    BY MR. VAZQUEZ:

 7    Q.   Now, Detective, I want to turn to some examples from

 8    Government Exhibit 16A, and I want to start out on -- above the

 9    green line.  What do we see happening above the green line?

10             MR. ZACCA:  If I could just have a page number, Judge,

11    on the record.

12             MR. VAZQUEZ:  43.

13             MR. ZACCA:  Thank you.

14             THE WITNESS:  It's an incoming call from the phone

15    number ending in 0441 assigned to Celia, so it's basically

16    Celia calling the defendant.

17    BY MR. VAZQUEZ:

18    Q.   And above the Celia account, what was the preceding call?

19    A.   Matatan.  It's also another receiving call ending in 6304.

20    Q.   Skipping over the call at 35, entry 34, what is that call

21    from?

22    A.   Again, from a person named Matatan and the phone number

23    ending 6304.

24    Q.   And when we look at these dates here, what is --

25             THE COURT:  Excuse me, counsel.
```

1          You're referring to 16?

2          MR. VAZQUEZ:  16A, yes, sir.

3          THE COURT:  16A is received, you said 16.

4          MR. VAZQUEZ:  16A, Your Honor, I apologize.

5   BY MR. VAZQUEZ:

6   Q.  What is the date and time that we're looking at in this

7   column here?

8   A.  It's the day of the incident, the day, the month, and the

9   year.

10  Q.  I want to now turn to page 42, and go to line 25, and can

11  you tell us who the caller is and what date this call happened.

12  A.  Matatan and 9-30-12, which is the day of the incident.

13         THE COURT:  Let's be precise.  He can't tell you who

14  the caller is, but he can tell you what the numbers are;

15  correct?

16         MR. VAZQUEZ:  Yes, and the contact associated with that

17  telephone number.

18         THE COURT:  That doesn't mean it's the caller.  I just

19  want to be clear for the jury.

20         MR. VAZQUEZ:  Yes.

21  BY MR. VAZQUEZ:

22  Q.  What is the contact that's associated with that telephone

23  number?

24  A.  Matatan, and it's phone number ending in 6304.

25  Q.  Now I want to go back to page 43, the outgoing calls, and

```
 1    I'll start at the top of 44, and entry seven, what is the
 2    telephone number and what is the associated contact for entry
 3    seven?
 4    A.   Ochill, and it's 305 -- or ending in 3674.
 5    Q.   And what is the date and time, approximate time?
 6    A.   9-30-12.
 7    Q.   I want to drop down to entry 10, can you tell us the
 8    telephone number associated with the outgoing call and who and
 9    what contact is associated with that telephone number?
10    A.   Elaine --
11    Q.   10, sir.
12    A.   I'm sorry, 10?
13    Q.   10.
14    A.   Matatan.
15    Q.   And what is the time?
16    A.   It's -- the date is 9-30-12, and it's number 3064, ending
17    in 6304.
18    Q.   Detective, if you could read us down from 10, reading down
19    the contacts that are registering with the phone calls that are
20    coming in and give us the date.
21    A.   All of them?
22    Q.   Yes.
23    A.   From --
24    Q.   After that.
25    A.   -- 11?
```

1    Q.   Yes.

2    A.   A Matatan -- all these phone calls are from 9-30-2012.

3    Matatan, Alfre, Alfre, Matatan, Ochill, Sarahi, Matatan,

4    Matatan, Matatan, Alfre, Leo, mi esposa, my wife, another Leo,

5    Sarahi Anotar.

6    Q.   Okay.  Now, turning to page 45, and at entry 28, you can

7    continue giving us the contact associated with the incoming

8    calls, and what time do we have here, date and time?

9    A.   The date, again, all these are 9-30-12, Anotar, Anotar,

10   Anotar, Matojito, Matatan, Celia, Peru, and then, now it's the

11   next day, which is October 1st, 2012.

12   Q.   And these calls are in GMT time?

13   A.   Yes, sir.

14   Q.   So they are adjusted?  They have to be adjusted; right?

15        MR. ZACCA:  Objection to leading.

16        THE COURT:  Sustained.

17   BY MR. VAZQUEZ:

18   Q.   What does GMT time, sir?

19   A.   I believe it's Greenwich meantime.  It's like four or five

20   hours difference.

21   Q.   Now, these telephone calls, I want to draw your attention

22   to outgoing call 33.

23        What is the contact associated with outgoing call 33?

24   A.   Celia.

25   Q.   And what is the registered time?

1   A.   The time?

2   Q.   The registered date and time.

3   A.   Date is 9-30-12 and GMT time is 2301, which is 11:01 p.m.

4   Q.   Okay.  Now, in addition to going through the contacts, did

5   you also have the occasion to look through images that were

6   collected on this phone?

7   A.   Yes.  I want to show you Government's 16A, at page 189,

8   what are we looking at here?

9   A.   That's the defendant, Leonardo Morales.

10  Q.   And do you see the defendant in court today?

11  A.   Yes, sir.

12  Q.   And would you be able to identify him by an article of

13  clothing?

14  A.   He's -- I can see a white and something dark underneath.

15       MR. VAZQUEZ:   Let the record reflect the witness has

16  identified the defendant.

17  BY MR. VAZQUEZ:

18  Q.   And I want to turn to page 191.  What do we see here?

19  A.   Some kind of employment -- employee information thing.

20  It looks like a tax-type form.

21  Q.   And what is shown on it, who is it associated with?

22  A.   Leonardo Morales.

23  Q.   I'm showing you page 203 of 16A, what are we looking at

24  here?

25  A.   Pictures of the defendant.

1    Q.   And 205?

2    A.   Another picture of the defendant.

3    Q.   And picture 215?

4    A.   A guy showing off his muscles.  I can't -- I can't...

5    Q.   Now, Detective, in the course of this investigation after

6    the review of the phone, did you also have the occasion to

7    attempt to collect property involving a projectile?

8    A.   Yes, sir.

9    Q.   And where did you collect that projectile from?

10   A.   At the Broward Jail.

11   Q.   And that projectile, did you have the opportunity to look

12   at that projectile and the casings that were recovered in this

13   case?

14   A.   I did.  It was sent to the lab.  I put it in evidence and

15   eventually, it was sent to the lab.

16   Q.   From your review of the recovered projectile, the casings

17   that were recovered from the crime scene, is any of that

18   firearm evidence in any way connected with anything other than

19   a .40 caliber firearm?

20        MR. ZACCA:  Objection, with regard to hearsay with

21   regard to the projectile.

22        THE COURT:  Rephrase your question so it elicits direct

23   knowledge.

24

25

1   BY MR. VAZQUEZ:

2   Q.   Based on what you know.

3            THE COURT:   Know from where?

4   Q.   Personal knowledge.  From your inspection of looking at the

5   casings with your own eyes, looking at the guns recovered in

6   this case, is there any evidence of the projectile or any other

7   firearm evidence being associated with anything other than a

8   .40 caliber firearm?

9   A.   It appeared, based on my experience, consistent with a

10  .40 caliber.

11  Q.   Now, I want to show you what's been admitted into evidence

12  as Government's 11.  What is this?

13  A.   That's a Glock 22, that's the victim's gun.

14  Q.   And you said this is your service gun; correct?

15  A.   Yes, sir.

16  Q.   And this is the gun you use?

17  A.   Yes, sir.

18  Q.   And what kind of caliber is this gun?

19  A.   It's a .40 caliber.

20  Q.   I want to show you what's been admitted into evidence as

21  Government's Exhibit 9.  What is Government's 9?

22  A.   That's a 1911-type pistol.  I believe that's a .38 caliber.

23  Q.   From your personal investigation at the crime scene,

24  reviewing photographs personally, did you find any evidence

25  that this weapon was discharged in association with your

1   September 30th, 2012, robbery?

2   A.   No, sir.

3   Q.   I'm showing you what's been marked for identification as

4   Government's Exhibit 13.   Do you recognize it?

5   A.   Yes, sir.

6   Q.   And what is it?

7   A.   It's the projectile that was recovered that I picked up at

8   the jail.

9   Q.   And what brought you to collect this at the Broward Jail?

10  A.   I received a call from a deputy that he had a projectile.

11       MR. ZACCA:   Objection to hearsay.

12       THE COURT:   It's not being received for the truth of

13  the matter, but to explain why he went there.

14       So he received the call, and then he did what?

15  BY MR. VAZQUEZ:

16  Q.   And what did you do after you received that call, sir?

17  A.   I went to the jail to pick it up.

18  Q.   And when we were talking earlier about projectiles and

19  casings, is this the projectile that you were referring to?

20  A.   Yes, sir.

21       MR. VAZQUEZ:   Your Honor, at is this time, I would move

22  to admit Government's Exhibit 13 into evidence.

23       MR. ZACCA:   No objection.

24       THE COURT:   Received.

25       (Government's Exhibit 13 received in evidence.)

1

2    BY MR. VAZQUEZ:

3    Q.   Detective, when you said a "jail," what jail did you pick

4    this up at?

5    A.   I believe it was the North Broward Jail in Pompano.

6    Q.   And is that a facility run by the Broward Sheriff's Office?

7    A.   Yes, sir.

8    Q.   Now, Detective, in the course of this investigation, beyond

9    just the Miramar incident, did you speak with a Detective Jim

10   McKee in this case from the Coral Gables Police Department?

11   A.   I don't remember the name, but I believe I did, I spoke to

12   somebody from Gables.

13   Q.   And did you have occasion to review GPS records in your

14   investigation?

15   A.   Yes, sir.

16   Q.   Did it address a subject named Raonel Valhuerdis?

17   A.   Yes, sir.

18   Q.   Detective, did you find relevance in your review of those

19   records concerning Raonel Valhuerdis?

20   A.   There was.

21   Q.   How was that?

22   A.   The records show that before the incident in Miramar, the

23   home invasion, that, I guess, his ankle monitor was pinging off

24   the 149th Avenue.

25   Q.   And, Detective, when you say "149th," what is the

1    significance of that location?

2    A.   That's where the victim lives, 149th Avenue.

3    Q.   What victim?

4    A.   Julio Micheli, the home invasion.

5    Q.   Was that the robbery investigation?

6    A.   Yes, sir.

7          MR. VAZQUEZ:   I tender the witness, Your Honor.

8                    CROSS-EXAMINATION

9    BY MR. ZACCA:

10   Q.   Good morning.

11   A.   Good morning, sir.

12   Q.   I want to start off in the beginning of your involvement

13   of this case; okay?

14   A.   Yes, sir.

15   Q.   I think you mentioned you were off duty; correct?

16   A.   At the time, yes, sir.

17   Q.   And you got a phone call and you responded to the address

18   of the picture we saw; correct?

19   A.   Yes, sir.

20   Q.   And I wrote down some notes as you were testifying.

21        You testified that when you arrived at the scene, there

22   were a lot of officers already on the scene; correct?

23   A.   Yes, sir.

24   Q.   In fact, I believe you said Crime Scene Technician Clay was

25   already on the scene?

1    A.   Yes, sir.

2    Q.   So what time did you arrive on the scene?

3    A.   I arrived right after one a.m. on October 1st.

4    Q.   Okay.  Now, when you arrived at the scene, Mr. Garcia

5    Morales, he was no longer there; correct?

6    A.   That's correct, sir.

7    Q.   He had already been transported out by fire rescue;

8    correct?

9    A.   Yes, sir.

10   Q.   In fact, he was actually airlifted to the hospital;

11   correct?

12   A.   That's correct, sir.

13   Q.   Because his injuries were very severe; correct?

14   A.   Yes, sir.

15   Q.   So was there any fire rescue personnel left when you

16   arrived or they had all gone?

17   A.   They were all gone.

18   Q.   Detective Bertrand, I'm going to show you photograph that's

19   been entered into evidence as Government's Exhibit 1A, Bate

20   stamped 1765.

21        Now, when you arrived at the scene, you don't know how

22   these clothes that you see here got to the location that we're

23   seeing them at in this picture; do you?

24   A.   Other than what I was told.

25   Q.   Other than what you were told, okay.

1        So -- and let me just clarify because I think I complicated

2    that question.  Let me make it more simple.

3        We're seeing clothes here.  We see clothes here.

4        Other than what you were told, you did not physically see

5    how those clothes got there; correct?

6    A.   No, sir.

7    Q.   No, sir, you don't know; right?

8    A.   That's correct.

9    Q.   And you don't know how fire rescue treated the scene --

10   strike that.

11       You don't know how fire rescue handled the items that we're

12   looking at in this picture prior to your arrival; do you?

13   A.   No, sir, I wasn't there.

14   Q.   Okay.  In fact, earlier testimony -- I see what appears to

15   be scissors; correct?

16   A.   That's correct, sir.

17   Q.   That scissors left behind by fire rescue?

18   A.   Yes, sir.

19   Q.   That scissors that were not part of the case, other than

20   being left behind by fire rescue; correct?

21   A.   Yes, sir.

22   Q.   And you would agree that there was a lot of blood on the

23   scene; correct?

24   A.   I've seen bloodier, but yes, there was blood on the scene,

25   yes.

1   Q.   Okay.  Well, I mean, the pictures are clear, I mean,

2   there's blood here; correct?

3   A.   Well, you said "a lot."

4        "A lot" can mean different things to different people.

5   I've seen bloodier scenes.

6   Q.   Sure.

7   A.   Yeah, there was blood.

8   Q.   And, Detective, you mentioned that you've been a 24-year

9   detective, I'm sure you've come across a lot of crime scenes;

10  correct?

11  A.   Yes, sir.

12  Q.   But there's no dispute here that there's blood on the

13  scene; correct?

14  A.   Yes.

15  Q.   And not a little bit of blood, not drops of blood, lots of

16  blood?

17  A.   Yes, sir.

18  Q.   Okay.  In fact, we can go through the pictures, but you

19  don't dispute the fact that there was also blood found on the

20  walkway leading up to the house; correct?

21  A.   Yes, sir.

22  Q.   I mean, you've seen all these photographs; right?

23  A.   Yes, sir.

24  Q.   There was like a basketball hoop in the front of the house,

25  there was blood around that area, too; correct?

1  A.   I don't remember specifically, but I remember there was a

2  trail of blood out to the street, yes.

3  Q.   And that's what -- it was a trail of blood going out into

4  the street?

5  A.   Yes.

6  Q.   In fact, there was a trail of blood on the street; correct?

7  A.   Yes, sir.

8  Q.   I mean, you know that according to hospital records, he was

9  shot seven times; correct?

10 A.   I'm sorry?

11 Q.   He was shot seven times, Mr. Garcia Morales.

12 A.   No, I don't --

13 Q.   No?

14 A.   -- believe that, no, sir.  The hospital has different --

15 from what the police does.  Hospital's not looking at how many

16 times someone was shot.  They're looking at, I guess,

17 imperfections or holes, so that doesn't always equate to how

18 many times a person was shot.

19 Q.   Alright, then let's break it down to its basic form here.

20      You don't dispute the fact that the hospital documented

21 seven gunshot wounds on his body; do you dispute that?

22 A.   No, I don't dispute that.  I don't have the medical

23 records, but I wouldn't dispute what the hospital put.

24 Q.   Alright.  In your investigation, you had the opportunity to

25 take a statement from Julio Micheli; correct?

1   A.   Yes, sir.

2   Q.   Julio Micheli is the homeowner of this home; correct?

3   A.   Yes, sir.

4   Q.   And when you took his statement, he -- isn't it true, he

5   couldn't tell you where Mr. Garcia Morales was standing at the

6   moment he fired the gun shots?

7          MR. VAZQUEZ:  Objection.  Calls for hearsay.

8          THE COURT:  Re-state the question, please.

9          MR. ZACCA:  Sure.

10  BY MR. ZACCA:

11  Q.   Based on your investigation, you can't tell this jury the

12  precise location where Mr. Garcia Morales was standing at the

13  moment he was shot; could you?

14  A.   I'd say by the front door.

15  Q.   By the front door, inside the house, outside the house, you

16  can't determine with precise -- with precision; can you?

17  A.   I wasn't there, but I would say at the front door.

18  Q.   But you weren't there, and you're relying on by the front

19  door.  But at this point, you can't say -- well, let me ask you

20  this.  Do you know what a shooting reconstruction is?

21  A.   Yes, sir.

22  Q.   You're a detective of 24 years, of course, you would know

23  that; right?

24  A.   Yes, sir.

25  Q.   Have you engaged in that exercise before?

1   A.   We've -- I've done some in classes that I attended.

2   Q.   I'm sorry, you've done classes?

3   A.   Practical tests, yes.

4   Q.   Now, in -- as a detective, it's your job to identify

5   evidence, collect evidence and put it together and preserve it;

6   correct?

7   A.   Yes, sir.

8   Q.   And there's various pieces of evidence that you try to look

9   for; correct?

10   A.   Yes, sir.

11   Q.   In fact, I think you said that when you got to the scene

12   you kind of surveyed the area and asked Crime Scene Technician

13   Clay to process certain areas; correct?

14   A.   Yes, sir.

15   Q.   You gave her some direction; right?

16   A.   Yes, sir.

17   Q.   Now, I think, as you just alluded to, you went to school --

18   not school -- classes, some sort of training on shooting

19   reconstruction; correct?

20   A.   I went to a class, yes, sir.

21   Q.   And the importance of shooting reconstruction is basically

22   to determine -- to try to determine the pathway of bullets;

23   correct?

24   A.   That's correct, sir.

25   Q.   Okay.   To determine the trajectory of bullets; correct?

1    A.   Yes, sir.

2    Q.   And to determine how close the person who was shot was from

3    the person who was doing the shooting; correct?

4    A.   Yes, sir.

5    Q.   Through shooting reconstruction we can determine if

6    certain -- or try to determine if certain gun shot wounds were

7    defensive wounds as opposed to offensive wounds; correct?

8    A.   I don't know that you can tell whether it's an offensive

9    gunshot or defensive gunshot wound.  A wound is a wound.

10   Q.   Well, if somebody got shot in the back, would you consider

11   that an offensive or defensive wound?

12   A.   People when they're getting shot at don't usually stand

13   still, people move around, it's just human nature, so...

14   Q.   Isn't it all the more reason to do a shooting

15   reconstruction, to try to answer these questions?

16   A.   In this case, the defendant was not killed.  That's an

17   important thing.  There are certain things that we can do when

18   a person passes, that the medical examiner does, that we can't

19   do to a person that's alive.

20        There's trajectory rods that on a decedent's body are

21   placed that can help with that.  Obviously, someone that's

22   alive, we can't use those techniques and put trajectory rods

23   into them.

24        They can also examine the wounds, unlike the hospital,

25   which just looks at holes.  The hospital's not interested in

1    knowing if it's an entry wound or an exit wound.  They just

2    count them as wounds.

3        But in my experience, I've had subjects that have been

4    shot.  Bullets don't always just go in and stay in.  They go

5    in, they go out, sometimes they go back in, and sometimes they

6    go back out.

7        So, depending on the positioning of the body, what the

8    person's doing at the time, a bullet can -- or items that --

9    parts of the body that bullet strikes determine all those

10   things.

11   Q.  Alright.

12   A.  But with a person that's alive, we can't do that.

13   Q.  Well, you can certainly -- well, as a detective, isn't it

14   important for you to know the locations of the gunshot wounds

15   on Mr. Garcia Morales?

16   A.  Yes, sir.

17   Q.  Did you identify the gun shot wounds on Mr. Garcia Morales

18   when you went to the hospital -- that you told this jury --

19   that you went to the hospital, I think, the next day, October

20   1st?

21   A.  Yes, sir.

22   Q.  Did you identify the gun shot wounds on Mr. Garcia Morales'

23   body?

24   A.  He was bandaged up when I got there.  There was some photos

25   that were taken by the crime scene person, I believe, were to

```
 1    his arm, I believe, neck, inner thigh, and by his stomach
 2    somewhere.
 3    Q.   Is that it?  Are those all the locations you discovered
 4    when you did your investigation?
 5    A.   The best as I recall, yes, sir.
 6    Q.   Okay.  In fact, he was shot in the back; correct?
 7    A.   I don't recall a shot to the back.
 8    Q.   You don't recall.  What's been introduced as evidence as
 9    Government's 13, that's the projectile that you talked about in
10    direct examination?
11    A.   Yes, sir.
12    Q.   You went to the Broward County Jail to recover this;
13    correct?
14    A.   Yes, sir.
15    Q.   You testified that you went to the Broward County jail to
16    get this projectile?
17    A.   Yes, sir.
18    Q.   This projectile was recovered from the back of Mr. Garcia
19    Morales; was it not?
20              MR. VAZQUEZ:  Objection.  Calls for hearsay.
21              THE COURT:  Rephrase.
22    BY MR. ZACCA:
23    Q.   In your investigation -- well, strike that.
24         When you got this projectile in the Broward County Jail --
25    A.   Well -- I'm sorry, go ahead.
```

1   Q.   Okay.  When you went to the Broward County Jail and you

2   recovered this projectile, how did the Broward County Jail get

3   this, if you know?

4   A.   They got it from the hospital.

5   Q.   They got it from the hospital?

6   A.   Yes, sir.

7   Q.   Who told you they got it from the hospital?

8        MR. VAZQUEZ:  Objection.  Calls for hearsay.

9        THE COURT:  Sustained.

10  BY MR. ZACCA:

11  Q.   Who got it from the hospital in the Broward County Jail?

12  A.   The deputy that gave it to me.

13  Q.   He went to the hospital?  What's his name?

14  A.   Yakey Ballis.  It's a weird name.

15  Q.   Yakey Ballis?

16  A.   Yes, sir.

17  Q.   And where did he get it from?

18  A.   From the hospital.

19  Q.   He went to the hospital and got it from the hospital?

20  A.   He was one of the deputies that was assigned to taking care

21  of him or guarding him while at the hospital.

22  Q.   And the hospital only recovered one projectile; is that

23  your testimony?

24  A.   That day, yes, sir.

25  Q.   Well, are there any other projectiles?

A. No.
Q. Are you sure?
A. I believe so, yes, sir.
Q. Okay. And in your investigation, did you ever identify a gunshot wound to the left scapula of the back?
A. I don't remember seeing any bullet entries to the back. Now, could it have been to the back -- bullets, you know, go in, it's possible that it was removed from the back, 'cause the bullet travels while inside the body.
I don't remember a bullet entering the back of his body.
Q. Well, did you do any investigation to verify that?
A. I've seen crime scene photos. I didn't see any bullet holes to the back, that I recall.
Q. The clothes that were found on the scene here, right here, one of them included a long-sleeved shirt; correct?
A. Yes, sir.
Q. There were two holes to the back sleeve of that shirt; correct? Let me see if I can find the photograph.
Well, first of all, do you recall?
A. Yes, sir, I remember seeing the shirt.
Q. And the two holes in the back sleeve of the shirt, the right sleeve?
A. If I recall, the shirt was cut by rescue.
Q. Let me see if I can show you some evidence here, some photographs, Exhibit 3A, Bate stamped 1857.

```
 1        You see the marks here, two and one; correct?
 2   A.   Yes, sir.
 3   Q.   We're looking at the back of the shirt; correct?
 4   A.   Can you put the shirt down?
 5   Q.   Yeah, sure.
 6   A.   Can you lower the picture down?
 7   Q.   If you don't know, you don't know.
 8        But I'm asking you, is that the back sleeve of the shirt
 9   that we're looking at?
10   A.   It's possible.  I don't remember -- I mean, I can't see the
11   label inside, but it's possible it could be the back.
12   Q.   Well, you certainly -- you're the lead detective; right?
13   A.   Yes, sir.
14   Q.   All the information filters through you; correct?
15   A.   Yes, sir.
16   Q.   So, certainly, if Crime Scene Technician Clay took some
17   photographs and made some determinations that information would
18   have filtered to you; correct?
19   A.   Yes, sir.
20   Q.   Okay.  Gunshot residue, otherwise known as GSR, you know
21   what that is, sir?
22   A.   Yes, sir.
23   Q.   And GSR is another tool in the toolbox of tools to collect
24   evidence; correct?
25   A.   That is correct, yes, sir.
```

1    Q.   To use a figure of speech.

2    A.   Yes, sir.

3    Q.   And GSR is the residue that is created when a gun is fired;

4    right?

5    A.   Yes, sir.

6    Q.   It's emitted from the firearm; right?

7    A.   Yes, sir.

8    Q.   It's like, when you fire a firearm, a cloud -- it's like a

9    puff of residue forms; correct?

10   A.   That's correct, sir.

11   Q.   And it can fall on the hand of the shooter; correct?

12   A.   Yes, sir.

13   Q.   And depending on how close the person who was shot, that

14   residue can land on the clothes, or on the person, of the

15   person being shot; correct?

16   A.   That's correct.

17   Q.   You went to the hospital on October 1st; correct?

18   A.   Yes, sir.

19   Q.   Did you direct anyone to collect gunshot residue on the

20   person of Leonardo Garcia Morales?

21   A.   No, sir.

22   Q.   Did you direct anyone to do a gunshot residue collection on

23   the clothes of Garcia Morales?

24   A.   No, sir.

25           THE COURT:  Let's take our morning break, ladies and

```
 1    gentlemen.  We will be in recess for about 15 minutes.

 2              (Jury exited courtroom at 10:30 a.m.)

 3              (Witness steps down.)

 4              (Recess taken from 10:30 a.m. to 10:49 a.m.)

 5              (Jury entered courtroom at 10:49 a.m.)

 6              (Witness resumes stand.)

 7              THE COURT:  Be seated, ladies and gentlemen.

 8              Yes, sir.

 9    BY MR. ZACCA:

10    Q.  Okay.  Detective Bertrand, when we last left off before we

11    took our break we were talking about shooting reconstruction,

12    we were talking about GSR, I think you've already established

13    for this jury that the GSR was nothing; correct?

14    A.  Yes, sir.

15    Q.  I want to go back on one thing you said.  You said you took

16    a class in shooting reconstruction; is that right?

17    A.  It was like crime scene reconstruction, yes, sir.

18    Q.  How long ago was that class?

19    A.  I couldn't tell you.  I think maybe three, four years ago.

20    Q.  How long was that class?

21    A.  I believe it was a week-long class.

22    Q.  I'm sorry?

23    A.  Week-long.

24    Q.  Week-long class.

25              Now, if you wanted to do a shooting reconstruction --
```

1    A.    No.

2    Q.    -- would you do it or would somebody else do it?

3    A.    Someone else would do it.

4    Q.    Who would that person be?

5    A.    Crime scene.

6    Q.    Would that be Crime Scene Technician Clay?

7    A.    Yes, sir.

8    Q.    Now, I want to talk about the topic of photo line-ups;

9    okay?

10   A.    Yes, sir.

11   Q.    You know what a photo line-up is, obviously; right?

12   A.    Yes, sir.

13   Q.    It is one of the tools that you use as a detective in a

14   case; correct?

15   A.    Yes, sir.

16   Q.    Alright.  So let's explain to the jury what a photo line-up

17   is; alright?

18   A.    Yes, sir.

19   Q.    A photo line-up is when you want to identify somebody, you

20   want a victim or a witness to identify somebody, you get

21   photographs of the person that you think is the person that you

22   want to identify; correct?

23   A.    Yes, sir.

24   Q.    And you get similar-looking photographs of that person and

25   put it in a six-person photograph line-up or an array; correct?

1    A.    That's correct.

2    Q.    And the purpose of it is you show the witness and you ask

3    the witness, Hey, do you see the person that did this; correct?

4    A.    Yes, sir.

5    Q.    That's how it works; right?

6    A.    Yes, sir.

7    Q.    Now, in this case -- in this case -- did you create a photo

8    line-up of Mr. Garcia Morales and show it to Mr. Micheli and

9    say, Mr. Micheli, what did you see Leonardo Garcia Morales

10   doing?

11   A.    No, I did not do a photo line-up.

12   Q.    You didn't do a photo line-up; right?

13   A.    Correct.  There is a reason why.

14   Q.    Okay.  Why didn't you do one?

15   A.    Just like there's a reason why there's no GSR.

16   Q.    You can explain.

17   A.    Okay.  GSR, commonly, we use for -- someone leaves the

18   scene, they say they weren't involved, we will do a GSR to see

19   if they fired a gun or came into contact with a gun or

20   something like that.  That's not the case in this incident.

21         Photo line-up is someone that left the scene, that we're

22   trying to see if they were on the scene, the victim can

23   identify the suspect.

24         In this case, there's no question that he was there.

25   He was at the front door, okay.  Based on the information we

54

1    obtained and the way the victim described the incident, there's

2    no reason to not believe.

3         The person was shot, he was there on scene at the front

4    door.  The GSR's not going to help me determine that, that

5    he -- I mean, the fact that he's there on the scene and shot,

6    we know that he was there.

7    Q.   Detective Bertrand, there was no dispute that he was shot

8    and he was there.  That's not the issue in this case.

9         The issue is what was his state of mind at that moment;

10   correct?  Would you agree with that?

11   A.   Okay, I --

12        MR. VAZQUEZ:  Objection.  Calls for a legal conclusion,

13   Your Honor.

14        THE COURT:  Sustained.

15   BY MR. ZACCA:

16   Q.   Mr. Bertrand -- Detective Bertrand, GSR could tell us where

17   he was in relation to the shooter, correct, how close he was to

18   the shooter; correct?

19   A.   Not necessarily, sir, no.

20   Q.   Well, if there's GSR on his clothing, that would suggest

21   that he was right up next to Mr. Micheli as he was getting

22   shot; wouldn't you agree with that?

23   A.   Mr. Micheli was also shooting from laying on his back.

24   There's different elements.  It's not like me standing up,

25   shooting straight.  Mr. Micheli was shooting upward.  There

1    were other people at the door.

2         I don't think GSR's going to tell me what distance the

3    person was from the door.  The bottom line is, he was at the

4    door.

5    Q.   Well, again --

6    A.   I don't think an inch here or there, or a foot, is going to

7    make a difference.

8    Q.   You weren't there at the shooting, obviously; correct?

9    A.   Yes, sir.

10   Q.   And you're relying on what Mr. Micheli is telling you;

11   correct?

12   A.   And the evidence at the scene.

13   Q.   And the evidence at the scene, but --

14   A.   His clothing was at the front door.

15   Q.   But this thing about shooting falling back, that's

16   depending upon believing Mr. Micheli; correct?

17   A.   Locations of -- I'm sorry, believing, yes.  Locations of

18   the casings is also consistent with what he's telling me.

19   Q.   But that's the point.  You did not do a shooting

20   reconstruction, you don't know the trajectory of the bullets,

21   you're relying your investigation on what Mr. Micheli told you;

22   correct?

23   A.   And evidence on the scene.  And like I explained before,

24   there's certain stuff that we cannot do because the defendant

25   is -- Leonardo is alive, and there's certain things that we

```
 1   can't do that would normally be done where someone is deceased.

 2   Q.   It's a fact, Mr. Micheli described this as a very fast

 3   isn't; correct?

 4   A.   Yes, sir.

 5   Q.   He couldn't tell you precisely where Mr. Garcia Morales was

 6   relative to the other individuals in this case; correct?

 7            MR. VAZQUEZ:  Objection.  Calls for hearsay.

 8            THE COURT:  I'll allow the question.

 9            Do you know the answer to the question?

10            THE WITNESS:  Well, Your Honor, it's -- it's common

11   sense, he would be at the front.

12            THE COURT:  I think that's the point, you don't really

13   know?

14            THE WITNESS:  I wasn't there, but no one else was shot,

15   so...

16   BY MR. ZACCA:

17   Q.   Well, was he the only one there --

18   A.   No.

19   Q.   -- is that your investigation, that he was --

20   A.   No.

21   Q.   -- the only one there at the front door?

22   A.   No, sir.

23            THE COURT:  There's a lot of things in this

24   investigation.  It's what he knows.

25            MR. ZACCA:  Very well, Your Honor.
```

THE COURT: There's a lot of things in the investigation.

BY MR. ZACCA:

Q. Do you know that Mr. Garcia Morales was the only one there, do you know that for a fact?

A. No, there was other people there.

Q. Okay. And my question was, you don't know where he was in relation to the other people; do you? You don't know?

A. I know he wasn't behind someone because -- or else that person would have been the one shot.

Q. Detective Bertrand, were you there?

A. No.

Q. Okay.

A. But bullets don't go around one person and -- so he couldn't have been behind someone when Mr. Micheli fired. He had to be at the front.

Q. Isn't it a fact that Mr. Micheli told you that all he saw was a gun, that's the only thing he saw?

MR. VAZQUEZ: Objection. Calls for hearsay.

MR. ZACCA: No, Judge.

THE COURT: Sustained.

BY MR. ZACCA:

Q. Now, you talked about your visit at the hospital and about an occasion where you overheard a statement from Mr. Garcia Morales to his mother; correct?

1    A.   Yes, sir.

2    Q.   And somebody else; correct?  -- somebody else was there;

3    right?

4    A.   His mother and his wife.

5    Q.   Now, that statement you heard, what time of the day was it?

6    A.   It was the afternoon.  I believe it had just turned dark or

7    it was -- I don't remember exact, but I think it was like six

8    or six-something.

9    Q.   You wrote a report in this case; right?

10   A.   Yes, sir.

11   Q.   Did you write it in your report?

12   A.   Yes, sir.  Can I refer to it?

13   Q.   Yes, please.  And then once your recollection is refreshed,

14   you can answer the question as to what time you heard this

15   statement.

16        THE COURT:  Did you get to mark it, so he don't have

17   to...

18        MR. ZACCA:  Very well, Judge, you're right.

19   BY MR. ZACCA:

20   Q.   May I ask what you're looking at?

21        What are you referring to?

22   A.   My report.

23        MR. ZACCA:  Judge, for purposes of this

24   cross-examination, the defense had marked this for

25   identification purposes, his report -- I'm just trying to find

1    my exhibit list, Judge -- Exhibit 25 for identification

2    purposes, Detective Bertrand's report.

3    BY MR. ZACCA:

4    Q.   And just so we're specific -- I don't know how many reports

5    you wrote -- what's the date of the report?

6    A.   The report that I wrote started -- I don't have a date like

7    when it was authored.  It's a running report, so...

8    Q.   Okay.  Is it the only report that you drafted in this case?

9    A.   Yes, sir.

10   Q.   Okay.  So it's one single report.  Alright.

11        Have you had an opportunity to look at the report?

12   A.   Yes, sir.

13   Q.   Is your recollection refreshed?

14   A.   Yes, sir.

15   Q.   What time did you hear that statement?

16   A.   There were two different statements at the beginning and at

17   the end, but initially, when he met with his family, it was

18   19:20 hours, which is 7:20 p.m.

19   Q.   The statement you testified to, is that the time you heard

20   it, at 19:20?

21   A.   That's when they met for the first time.  I can't -- I

22   wasn't sitting there with a watch the precise moment that it

23   was given.

24   Q.   So 19:20 -- that's what, 7:20 --

25   A.   7:20 p.m.

1  Q.  -- p.m.  Alright.  So this is 7:20 p.m., October 1st, 2012;

2  right?

3  A.  Yes, sir.

4  Q.  Now, based on what you know, the shooting happened on

5  September 30th, 2012; correct?

6  A.  Yes, sir.

7  Q.  Just before midnight?

8  A.  Yes, sir.

9  Q.  Right.  So over 12 hours had passed; correct?

10  A.  Yes, sir.

11  Q.  Alright.  And he was air-lifted to the hospital; correct?

12  A.  Yes, sir.

13  Q.  And he was already being treated at the hospital; correct?

14  A.  Yes, sir.

15  Q.  He was at the hospital sometime between 12 a.m. and 1 a.m.

16  on October 1st, 2012; correct?

17  A.  Yes, sir.

18  Q.  Now, you would agree that the gunshot wounds he suffered

19  were serious; correct?

20  A.  Yes, sir.

21  Q.  We can all see he's a quadriplegic; correct?

22  A.  Yes, sir.

23  Q.  You can imagine that the medical treatment necessary to

24  treat that condition was heightened; correct?

25          MR. VAZQUEZ:  Objection.  Calls for expert testimony.

61

```
 1            THE COURT:  Was heightened?
 2            MR. ZACCA:  I'll rephrase the question, Judge.
 3   BY MR. ZACCA:
 4   Q.  This is not a small cut; right?
 5   A.  No, sir.
 6   Q.  This is a medical situation; correct?
 7   A.  Yes, sir.
 8   Q.  A serious medical situation; correct?
 9   A.  Yes, sir.
10   Q.  As part of your investigation, did you familiarize yourself
11   with the medicine that he was given at the hospital when he got
12   there?
13   A.  No.
14   Q.  Did you familiarize yourself with the pain killers, if any,
15   he was given at the hospital?
16   A.  No.
17   Q.  Did you familiarize yourself with how much medication he
18   was given at the hospital when he was taken there?
19   A.  No, but I did speak to him.
20   Q.  Okay.  Let's answer the question.
21        The question is, did you familiarize yourself with how much
22   medication he received when he was at the hospital?
23   A.  No, sir.
24   Q.  Do you know what Dilaudid is?
25   A.  It's a narcotic.
```

```
 1   Q.   Is it a heavy narcotic?

 2   A.   It's a pain killer, I believe, yes.

 3   Q.   Do you know if he was given Dilaudid at the hospital prior

 4   to hearing this statement?

 5   A.   No, sir.

 6   Q.   Do you know how much, if any, Dilaudid he was given prior

 7   to hearing the statement?

 8   A.   No, sir.

 9   Q.   Do you know what morphine sulfate is?

10   A.   It's a narcotic.

11   Q.   Do you know if he was given morphine sulfate prior to the

12   statement that you say you heard?

13   A.   No, sir.

14   Q.   Do you know how much morphine sulfate he was given prior to

15   the statement that you heard?

16   A.   No, sir.

17   Q.   Are you familiar with the psychoactive effects of Dilaudid?

18   A.   No, sir.

19   Q.   Are you familiar with the psychoactive effects of morphine

20   sulfate?

21   A.   No, sir.

22   Q.   And I'll use a simpler term.

23        When I say "psychoactive," how it affects the mind.

24   A.   No, sir.

25   Q.   Do you know who Dr. Markowitz is?
```

1    A.   No.

2    Q.   Have you met Dr. Markowitz?

3    A.   Nope.

4    Q.   Have you heard the name Dr. Markowitz in connection with

5    this case?

6    A.   Not that I can recall right now, no.

7    Q.   We were looking at some photographs during your direct

8    testimony specifically referencing Government's Exhibit 6,

9    Bate stamp 38.  We were looking at this image of a white van.

10        Do we have a license plate to that white van?

11   A.   No, sir.

12   Q.   Again, that image that we're looking at I think you

13   testified came from a surveillance camera at a clubhouse; is

14   that right?

15   A.   Yes, sir.

16   Q.   There were other vehicles captured in that surveillance

17   video; correct?  You don't recall, you don't recall.

18   A.   I believe that there was only two vehicles before the

19   incident, and that was the white van and a dark SUV; outside of

20   that, there were no other vehicles in that rotunda.

21   Q.   And how long a window are we talking about?

22   A.   A little bit over an hour window.

23   Q.   Now, we were looking at some contacts on a phone earlier.

24   I'm referencing Government 16A.  Let's go -- I'm taking notes

25   here.  We were looking at page 13 of Government's 16A, again,

1    so the jury understands and follows along.

2        This is information extracting, what's called a Cellebrite

3    report; right?

4    A.   That's correct, sir.

5    Q.   And so the jury understands, a Cellebrite report is a

6    report that's generated when you extract data from a phone;

7    correct?

8    A.   Yes, sir.

9    Q.   Now, you were asked about the contact -- let's go through

10   each one.  One, contact 116, Alfre.

11       Were you present when that contact was put in that phone?

12   A.   No, sir.

13   Q.   Were you present when that name "Alfre" associated with

14   that number was put in that phone?

15   A.   No, sir.

16   Q.   I think you were also asked to look at number 113.  Were

17   you present when that number was physically put in the phone?

18   A.   No, sir.

19   Q.   Were you present when that name "Matatan" was put in the

20   phone?

21   A.   No, sir.  I can only testify that that's what was on the

22   phone when we downloaded it.

23   Q.   Right.  In other words, the point is, there's limitations

24   as to what this tells us; correct?

25   A.   Yes.

1    Q.   And I see a lot of different one-word names.  I I see

2    Manolo here, I see Compa, I see Ferna -- there's a lot of these

3    type of one-word names; correct?

4    A.   Yes, sir.

5    Q.   It's like nicknames; right?  But you don't know -- you

6    don't know, right --

7    A.   Yes, sir.

8    Q.   -- because you weren't there when the name was put in the

9    phone; correct?

10   A.   Yes, sir.

11   Q.   I think we looked at page 18.  You were again asked to look

12   at this name here, Matojito, in between, Herm, Rox, Yorlan,

13   some other names here.  Again, were you present when that

14   number was put in the phone?

15   A.   No, sir.

16   Q.   Were you present when the word "Matojito" was put in the

17   phone?

18   A.   No, sir.

19   Q.   Were you present when the word "Matojito" was associated

20   with that number?

21   A.   No, sir.

22   Q.   Did you ever determine how many contacts were on this

23   phone?

24   A.   I'd have to look, there's a bunch.

25   Q.   Alright.  I'm looking at page 30 of the same exhibit, it

1    looks like number 300.  Does that sound about right?

2    A.  Yes, sir.

3    Q.  300 contacts; correct?

4    A.  Yes, sir.

5    Q.  I think we also looked at some incoming calls and outgoing

6    calls, and I think the first you were shown was page 43.  I

7    want to look at that for a second.

8         I'm going to start off here on page 42.

9         Now, reference was made to the name "Matatan" -- you were

10   asked about that, but you would agree that there are other

11   phone calls on September 30th; correct?

12   A.  Yes, sir.

13   Q.  One to Peru, Dairon, Sarahi -- I'll spell it for the court

14   reporter -- S-A-R-A-H-I -- I don't know how else to say it --

15   Anotar, San Juan.  There were other phone calls being made on

16   September 30th; correct?

17   A.  Yes, sir.

18   Q.  Going to page 33, again, other calls are being made;

19   correct?

20   A.  Yes, sir.

21   Q.  To Anotar, Abelo Kely; correct?

22   A.  Yes, sir.

23   Q.  We were also looking at 44, again, on September 30th, 2012,

24   other calls are being made, correct, Leojardin, Miesposita --

25   I can't even pronounce the next one -- Oggunda maybe --

1   Leojardin, Sarahi, Anotar; correct?

2   A.   Yes, sir.

3   Q.   Again, this goes on, page 45, Peru, Erika; correct?

4   A.   Yes, sir.

5   Q.   Other people are being spoken to; correct?  It would appear

6   so?

7   A.   Yes, sir.

8           MR. ZACCA:  If I can just have a moment, Judge.

9           (Brief pause in the proceedings.)

10          MR. ZACCA:  I have no further questions.

11                      DIRECT EXAMINATION

12  BY MR. VAZQUEZ:

13  Q.   Detective, I want to take you back to 16A and your review

14  of the contacts that were registered in that exhibit; okay?

15  A.   Yes, sir.

16  Q.   When you look at, for example, page 41 of 16A, and the date

17  of September 30th, which we start on page 42 of the exhibit,

18  how many of the contacts are repeatedly calling the Morales

19  phone?

20  A.   Only a few.  There's -- and that was one of the things that

21  brought my attention to these particular numbers.

22          THE COURT:  Just respond to his question, please.

23  BY MR. VAZQUEZ:

24  Q.   So drawing your attention to entry 23, for example, from

25  your review of the phone and the contacts associated with

```
1    telephone numbers, did you find any repeated calls from Manolo?

2    A.   From Manolo?

3    Q.   Yeah, anything similar to the pattern between entry 23 and

4    entry 25, back-to-back-to-back calls?

5    A.   They were all from Matatan.

6    Q.   And how many Matatans did you find in 16A?

7    A.   In that page?

8    Q.   In the contacts, sir.

9    A.   One person.

10   Q.   How many Matojitos did you find in 16A?

11   A.   In the contacts, one person.

12   Q.   How many Alfres did you find?

13   A.   One person.

14   Q.   How many Celias did you find?

15   A.   One, person.

16   Q.   How many Elchis (phonetic) did you find?

17   A.   One person.

18   Q.   On the subject of Alfre, during the course of this

19   investigation, did a person with the nickname Alfre -- or where

20   Alfre is a component of their full name -- become a subject of

21   yours?

22        MR. ZACCA:  Objection.  Calls for hearsay and is beyond

23   the scope of my cross-examination.

24        THE COURT:  Rephrase the question, sir.

25
```

```
1    BY MR. VAZQUEZ:

2    Q.   In the course of this investigation, did anyone whose name

3    contained the word "Alfre" become a subject of your

4    investigation?

5             MR. ZACCA:  Objection.

6             THE COURT:  Sustained.

7    BY MR. VAZQUEZ:

8    Q.   In the course of this investigation, did you --

9             THE COURT:  In the course of investigation lots of

10   things happen, lots of people said things.  It could be

11   hearsay.  He needs direct knowledge about things.

12   BY MR. VAZQUEZ:

13   Q.   Based on your personal knowledge, did you receive

14   returns -- not saying what it was -- returns from your request

15   for latent examination?

16   A.   Yes.

17   Q.   From your personal investigation of this case, did you

18   inquire as to the registry from your review of databases of

19   anyone who had a white van associated with this case?

20            MR. ZACCA:  Objection.  Hearsay.

21            THE COURT:  Rephrase.  Sustained.

22   BY MR. VAZQUEZ:

23   Q.   Did you look at the DHSMV records, personally?

24   A.   Yes.

25   Q.   Did you identify anyone associated with this case that had
```

1    a white van?

2         MR. ZACCA:  Objection.

3         THE COURT:  Come sidebar, please.

4         Do you have some documents on this?

5         (Sidebar discussion held as follows:)

6         THE COURT:  I'm not understanding the question.

7    It sounds like you're asking about some custodian of records.

8         What is it that you're trying to get to?

9         MR. VAZQUEZ:  I believe that his review of database

10   records is not hearsay, because it's not a -- he looked at a

11   computer.

12        THE COURT:  No, no, but what's the underlying document?

13   Is the underlying document in evidence?

14        MR. VAZQUEZ:  No, Your Honor.

15        THE COURT:  See, that's what makes it hearsay, you see,

16   because you didn't have a custodian of records come in with the

17   underlying document, that document is not here, so you can't

18   ask him what's on the document; alright?

19        MR. VAZQUEZ:  Yes, Your Honor.

20        (Sidebar concluded, following held in open court:)

21        THE COURT:  Do we need to take a break?

22        COURT SECURITY OFFICER:  All rise, please.

23        (Jury exited courtroom at 11:24 a.m.)

24        THE COURT:  You may step down, sir.

25        (Witness steps down.)

```
 1              THE COURT:  Government, what is your intent, status

 2     conference, what is your intent with regard to the forfeiture

 3     allegations in the indictment?

 4              MR. VAZQUEZ:  I believe there's not an agreement for

 5     firearm.

 6              MR. ZACCA:  We're not contesting possession of the

 7     firearm, Judge.

 8              THE COURT:  So there would be no need to have a

 9     forfeiture hearing with respect to the firearm that was seized

10     at the scene of the home; is that correct?

11              MR. VAZQUEZ:  And the subsequently recovered

12     .38 caliber, which we've introduced into evidence.

13              THE COURT:  Alright.  So, Mr. Morales, what that means

14     is the Government is seeking forfeiture of two firearms and

15     ammunition.

16              MR. VAZQUEZ:  There's one firearm.

17              THE COURT:  One firearm.

18              MR. VAZQUEZ:  And the other relates to the victim's

19     property, so we have one gun that we believe is used in this

20     crime.

21              THE COURT:  What is it you're seeking to forfeit, this

22     one firearm, some bullets?

23              MR. VAZQUEZ:  Ammunition, a magazine.

24              THE COURT:  A magazine?

25              MR. VAZQUEZ:  Yes.
```

```
 1              THE COURT:  Can you identify it with anymore

 2    particularity?

 3              MR. VAZQUEZ:  I believe it is Government Exhibit 11, it

 4    is a .38 caliber firearm.

 5              THE COURT:  Alright, a .38 caliber firearm.

 6              Mr. Morales, the Government is seeking to forfeit the

 7    .38 caliber firearm, magazine and bullets.

 8              Your attorney has announced that you are not

 9    challenging that firearm, in other words, asserting that it

10    should be returned to you, therefore, there would be no hearing

11    necessary after the verdict is issued for the Government to

12    introduce evidence or you to introduce evidence seeking to

13    establish that it belongs to you.

14              Do you understand that, sir?

15              DEFENDANT GARCIA MORALES:  What I don't understand is

16    what weapon is going to be returned to me?  I don't have any.

17              THE COURT:  They're seeking to forfeit, that is, to

18    prevent anyone else from owning it.  If your position is you

19    are not the owner, then it means you're not challenging their

20    right to take the firearm; understood?

21              DEFENDANT GARCIA MORALES:  Yes.

22              THE COURT:  And you agree, they should take the firearm

23    because you are not claiming any ownership in the firearm,

24    bullets, and magazine; understood?

25              DEFENDANT GARCIA MORALES:  Yes.
```

```
 1            THE COURT:  Any questions about that?

 2            DEFENDANT GARCIA MORALES:  No.

 3            THE COURT:  Thank you.  We are in recess.

 4            COURT SECURITY OFFICER:  All rise.

 5            (Recess taken from 11:27 a.m. to 11:36 a.m.)

 6            COURT SECURITY OFFICER:  All rise.

 7            COURTROOM DEPUTY:  Court is back in session.

 8            THE COURT:  There is one issue on the forfeiture count,

 9   I think it refers to funds or money.

10            MR. VAZQUEZ:  This defendant, I don't believe there's

11   any funds.

12            THE COURT:  So you're not seeking any forfeiture --

13            MR. VAZQUEZ:  No.

14            THE COURT:  -- of money?

15            MR. VAZQUEZ:  No.

16            THE COURT:  That resolves the issue.

17            (Witness resumes stand.)

18            (Jury entered courtroom at 11:36 a.m.)

19   BY MR. VAZQUEZ:

20   Q.  Detective, when you were speaking with defense counsel a

21   matter was brought to your attention about wounds and gun

22   shots, how many did the defendant sustain.

23   A.  Yes, sir.

24   Q.  Do you recall that line of questioning?

25   A.  Yes, sir.
```

1    Q.   For the purposes of criminal investigation and your service

2    as a detective, what's the difference between a gunshot, a

3    wound, per se, and a wound that someone may have on their body?

4    A.   As a police officer, or as detective, I deal a lot with the

5    medical examiner and I also deal with the hospital.

6         The medical examiner, when they're examining a body,

7    they're looking for entry wounds, exit wounds, re-entry wounds.

8         Doctors at a hospital are just looking at -- and I don't

9    even think they call them bullet wounds.  They call them

10   abnormalities.

11        And it's totally different, they're just looking to repair

12   and make the person survive versus at the medical examiner,

13   they're examining more as evidence.

14        The hospital is not looking at evidence.  They're looking

15   at saving a person's life and putting them back together.

16   That's not their job, to seek evidence on the person.

17   Q.   And talking about gun shots, is every wound a entry gunshot

18   wound?

19             MR. ZACCA:  Object to the form of the question.

20             THE COURT:  Do you understand the question?

21             THE WITNESS:  Yes, sir.

22             THE COURT:  Overruled.

23             THE WITNESS:  An entry wound would be one that when the

24   bullet actually breaks the skin into the body.  There could

25   also be where it kind of is superficial, where it just skips

 1   along the skin and grazes a person, but that wouldn't be an

 2   entry wound.

 3   BY MR. VAZQUEZ:

 4   Q.   What about an exit wound?

 5   A.   Usually, they're different elements to how the wound looks

 6   and stuff like that.  But again, it's a lot easier to tell on

 7   someone that's passed away versus someone at the hospital where

 8   medical personnel is stuffing bandages and things like that

 9   into the wound to make it stop bleeding.

10      So, therefore, the wound sometimes is expanded by those

11   bandages and things that are forced into the wound, so it

12   doesn't have the same shape, so -- and again, I'm not a medical

13   examiner, so it would have to be something where a medical

14   examiner would look at the wound and be able to tell, but

15   again, it's not going to be in the same, original state.

16   Q.   And what is a "ricochet"?

17   A.   Well, a "ricochet" could be a bullet wound that hit -- I

18   mean, a bullet that hits a wall and bounces off a wall and

19   could travel different distances, or it hits something else.

20      It's kind of like, you know, getting a stone and you skip

21   it on the water, kind of like something similar to that.

22   Q.   Now, you were asked about photo line-ups.

23   A.   Yes, sir.

24   Q.   Do you recall that?

25   A.   Yes, sir.

1    Q.   How many times have you put a masked person in a photo

2    line-up?

3    A.   I've never done that, sir.

4    Q.   Never put someone wearing a Halloween mask in a photo

5    line-up?

6    A.   No, sir.

7    Q.   And you were also asked about shooting reconstructions and

8    brought up trajectory rods and things of that nature.

9         Do you recall that line of questioning?

10   A.   Yes, sir.

11   Q.   When a shooting reconstruction is conducted on a homicide

12   case or any kind of assault case, do you ever work with the

13   crime scene investigator who's conducting that?

14   A.   We do.

15   Q.   And where the case results in a death, do you work with the

16   medical examiner for that?

17   A.   Yes, sir.

18   Q.   How do trajectory rods get used in such a case?

19   A.   They have to be inserted into the body and -- basically,

20   what the medical examiner does, he tries to follow the path of

21   the bullet.

22        However, sometimes that doesn't work because, like I

23   explained earlier, bullets don't always travel in a straight

24   line, depending on what they hit in the body, they can bounce

25   around.  Certain calibers are famous for that, like a small

```
1    .22, it's like a pinball inside the body, I've seen it just go

2    many directions.

3        So we use them, but it can't -- sometimes it's not -- we

4    can't use it, it doesn't help because of the way it bounces.

5    It's basically a rod that he put in and you try to follow it.

6    Q.  When you have these occasions to use the trajectory rods,

7    do you use clothing to see if it's consistent?

8    A.  Usually, it's without clothing, because clothing is

9    something that moves on the body, so usually it's --

10   Q.  Do you look at the clothing?

11   A.  Yes, we do.

12   Q.  To see if there's any kind of hole there from a gunshot?

13   A.  Yes, we do.

14   Q.  I want to show you what's been admitted into evidence as

15   Government's Exhibit 33.

16   A.  I need XL gloves.

17   Q.  I will hand you --

18   A.  I need larger gloves, I apologize, Your Honor.

19           THE COURT:  It seems like we've seen this somewhere

20   before.

21   BY MR. VAZQUEZ:

22   Q.  Alright.  I'm going to show you Government's 33, okay.

23       Do you recognize Government's 33?

24   A.  Yes, sir.  This is the shirt that was collected on scene.

25   Q.  You were asked about gunshot wounds to the back; correct?
```

1    A.   Yes, sir.

2    Q.   What are we looking at now?

3         What area of the shirt is this?

4    A.   That's the tag there, and this is the back of the shirt.

5    Q.   Okay.  And what's that, is that the back of the shirt?

6    A.   Yes, sir.

7    Q.   Show me the hole on the back of the shirt.

8    A.   I see no hole on the back of the shirt.

9    Q.   Now, if you had a trajectory rod, would that trajectory rod

10   go through this hole if there was a gunshot to the back?

11   A.   You would have to force it, but -- and break the fabric of

12   it, 'cause there's no hole to go through.

13   Q.   Are there bullets that can get into a person but not go

14   through a shirt?

15   A.   No.

16             MR. VAZQUEZ:  One moment, Your Honor.

17             (Brief pause in the proceedings.)

18             MR. VAZQUEZ:  No further questions, Your Honor.

19             THE COURT:  May the witness be permanently excused?

20             THE WITNESS:  Thank you, Your Honor.

21             MR. VAZQUEZ:  On behalf of the Government, yes.

22             MR. ZACCA:  On behalf of the defense, yes.

23             THE COURT:  You may be excused.

24             THE WITNESS:  Thank you, Your Honor.

25             (Witness excused.)

1        MR. VAZQUEZ:  Your Honor, at this time, the United

2   States calls Scott Eicher as its next witness.

3        COURTROOM DEPUTY:  Raise your right hand.  Do you

4   solemnly swear the testimony you're about to give in this case

5   is the truth and nothing but the truth, so help you God?

6        THE WITNESS:  I do.

7        (FBI AGENT SCOTT EICHER, testified as follows:)

8                      DIRECT EXAMINATION

9   BY MR. VAZQUEZ:

10  Q.  Good morning, sir.

11  A.  Good morning.

12  Q.  If you would kindly introduce yourself to the members of

13  the trial jury.

14  A.  I would be glad to.

15      My first name is Scott.  My last name is Eicher, it's

16  E-I-C-H-E-R.  I'm an FBI agent.

17  Q.  And do you have any particular service area with the FBI

18  that you currently operate?

19  A.  Yes.  I'm part of the FBI's Cellular Analysis Survey Team,

20  so the short version of that is CAST, C-A-S-T.  I work with FBI

21  agents and task force members who are trained in the analysis

22  of phone records.

23  Q.  And how long have you been serving in that capacity?

24  A.  For about 10 years.

25  Q.  Where do you work out of?

```
 1    A.   I live and work out of Denver, but I travel the
 2    United States for different cases.
 3    Q.   Agent Eicher, in the course of your service with the FBI,
 4    were you asked to review records as part of this investigation?
 5    A.   Yes, I was.
 6    Q.   I want to show you what's been admitted into evidence as
 7    Government's Exhibit 38, 39, 40, and 41, along with 42.
 8         Do you recognize this item?
 9    A.   I do.  These are a group of compact disks that I reviewed
10    and initialed.
11    Q.   And I'm going to show you the remaining.
12         I'm showing you 39.  What is this?
13    A.   Another disk that I have reviewed and initialed.
14    Q.   And Government's 40, in evidence?
15    A.   The same thing, another disk that I've reviewed and
16    initialed.
17    Q.   I'm showing you Government's 41.
18    A.   The same, I reviewed that disk and initialed it.
19    Q.   And showing you Government's 42.
20    A.   The same.
21    Q.   In addition to these -- well, what are these items, if you
22    can explain -- describe them to the members of the jury.
23    A.   I would be glad to.
24         They are electronic versions of cell phone records
25    regarding this case of several different individuals, so I
```

1    reviewed those records and did an analysis of those records.

2    Q.   Now, in addition to the cellular phone records, have you

3    had an opportunity to examine other records from this

4    investigation?

5    A.   Yes.

6    Q.   And what is that?

7    A.   A download of a phone.

8    Q.   Now, I want to show you what was marked for identification

9    as Government's 57.  Do you recognize it?

10   A.   Yes, sir, I do, it's a report I did for this case.

11   Q.   And what is what's been marked for identification as

12   Government's Exhibit 57, as far as its content?

13   A.   It's a powerpoint presentation, but, basically, it's a

14   report that shows the calls between several different phone

15   numbers during a period of time.

16   Q.   Does Government 57 summarize voluminous material from the

17   item of cell phone records that are in evidence?

18   A.   Yes, the records themselves are hundreds of thousands of

19   lines of data and this kind of summarizes the calls between the

20   different phone numbers.

21        MR. VAZQUEZ:  Your Honor, at this time, I would like to

22   move Government's 57 into evidence under Rule 1006.

23        MR. ZACCA:  Judge, same objection as before on

24   relevance.

25        THE COURT:  Come sidebar.

1          MR. ZACCA:  Yes.

2          (Sidebar discussion held as follows:)

3          THE COURT:  Alright.  What is your objection?

4          MR. ZACCA:  So, Judge, it's a carry-over from the

5    objection before, where he's going to say that -- he's going to

6    associate a number associated to Bob Jones, in this case, it's

7    Alfre.

8          THE COURT:  Let me make sure I'm clear.

9          MR. ZACCA:  Yes, sir.

10         THE COURT:  So we're just talking about numbers, we're

11   not talking about Alfre; is that right?

12         MR. VAZQUEZ:  No.

13         THE COURT:  He's going to show what?  He's going to

14   show --

15         MR. VAZQUEZ:  He's going to show -- and we talked about

16   this before -- there's a phone number account Alfre connected

17   with this telephone number.

18         THE COURT:  Is that already in evidence?

19         MR. VAZQUEZ:  Yes.

20         THE COURT:  The phone, the person who has the account

21   came in through the other officer; right?

22         MR. VAZQUEZ:  Mr. -- a cell phone is in evidence

23   through the binder.  He has associated the nicknames that are

24   on the contact list and linked to the particular phone numbers.

25         THE COURT:  And how about the phone records?

```
 1              MR. VAZQUEZ:  The phone records are in evidence, and
 2    he's reviewed them, and we're offering him to talk about them
 3    now.
 4              THE COURT:  So what certainly will he say now, that
 5    phone A called phone B on a certain date?
 6              MR. VAZQUEZ:  Yes.
 7              THE COURT:  So it's really a summary -- you have those
 8    things in evidence?
 9              MR. VAZQUEZ:  Yes.
10              THE COURT:  What's this thing he has?
11              MR. VAZQUEZ:  To bring it to light individually, it's
12    raw data.
13              THE COURT:  Are we going to have a big movie production
14    or is it raw numbers?  I haven't seen it.
15              MR. VAZQUEZ:  He's created --
16              THE COURT:  Is this it?
17              MR. VAZQUEZ:  Yes.
18              THE COURT:  Alright.
19              MR. VAZQUEZ:  And we --
20              THE COURT:  Okay, this really has sort of a depiction
21    of the documents we already have in evidence?
22              MR. VAZQUEZ:  Yes.
23              THE COURT:  So what is your objection?
24              MR. ZACCA:  First of all, the same objection as before,
25    relevance.  They haven't established that the name "Alfre" --
```

1          THE COURT:  What is it that you --

2          MR. ZACCA:  -- that these names actually belonged to

3    Alfredo Kindelan.

4          THE COURT:  So what's the tie between the name?

5          We had some people who testified who said they had a

6    phone number; right?

7          MR. ZACCA:  We had Mr. Kindelan self-identify his own

8    nickname as "Alfre."

9          THE COURT:  Right.

10          MR. ZACCA:  And he identified all the nicknames,

11    Matatan, Celia, Ochill, all those people gave their names.

12    They were put on the record through his testimony, we

13    downloaded the phone and we identified the names with the

14    telephone numbers that are those calls.

15          THE COURT:  Other than that, what is the tie?

16          MR. VAZQUEZ:  That is the tie, the nicknames that have

17    been identified to as witnesses.

18          THE COURT:  What is it that you're going to prove?

19          MR. VAZQUEZ:  It shows them calling each other leading

20    up to the crimes.

21          THE COURT:  Are these the names the coconspirator said

22    are involved in the crime?

23          MR. VAZQUEZ:  Yes, Alfre, Matatan.

24          THE COURT:  Sounds like the amount of weight.  It's the

25    same hypothetical I said earlier, if Alfre means anything, he's

1    going to say it means the guy who was in the crime, and that's

2    up for the jury to decide.

3           MR. ZACCA:  That may very well be the case.

4           I have a secondary objection, I already advised

5    Mr. Vazquez.  He can testify to this report, I guess it can be

6    used as a demonstrative aid, but to actually be admitted into

7    evidence --

8           THE COURT:  First of all, it hasn't been admitted.

9    I assume it was a demonstrative exhibit.

10          MR. VAZQUEZ:  I'm trying to admit it under 1006 as a

11   summary of voluminous records.

12          THE COURT:  But his testimony is the summary.  There's

13   a big debate on that question, by the way, but his testimony is

14   the summary.

15          MR. VAZQUEZ:  It is.

16          THE COURT:  And this is the demonstrative aid that's

17   used for the summary.  That doesn't mean that the summary comes

18   into evidence.

19          MR. VAZQUEZ:  I was offering it under 1006, which I

20   think allows us to create a summary so that it can go back with

21   the jury, because they're going to have these reams and reams

22   of phone records.

23          THE COURT:  But you told them in your testimony, I

24   think -- I've been around awhile -- I think there's a debate on

25   that very issue, so I'm not going to receive it at this time,

1    and you can do the testimony.

2          And if you can bring me a case to fill me in on that

3    issue, I will take a look at it and see if I can receive it

4    into evidence.

5          MR. VAZQUEZ:  Yes, sir.

6          THE COURT:  I will receive it as a demonstrative

7    exhibit at this time.  I will determine whether it's an actual

8    exhibit later.

9          MR. VAZQUEZ:  Thank you, Judge.

10         MR. ZACCA:  Thank you.

11         (Sidebar concluded, following held in open court:)

12         THE COURT:  So, ladies and gentlemen, at this time, I

13   am going to admit this exhibit as a demonstrative exhibit.

14   It's a summary of -- I think the evidence will show, it's up to

15   the Government to establish that -- it's a summary of many

16   documents that are already in evidence.

17         So I'm going to receive this so that they can

18   demonstrate -- at this time, it's not in evidence, I will

19   consider that a little later -- but it is being received as a

20   demonstrative exhibit to aid you in trying to cull out

21   information in voluminous documents already received in the

22   record.

23   BY MR. VAZQUEZ:

24   Q.  Agent, I'm showing you what's been admitted as a

25   demonstrative, Government's 57.

1      What is this first page that we're looking at here?

2   A.   It's a list of the phone numbers that I did the analysis

3   on, to include the phone number, the name of the individual

4   that's associated with the phone number, and the date and time

5   of the records, time frame that the records included.

6   Q.   Okay.  And these names here, Alfre, Matatan, Matojito,

7   Celia, what is that?

8   A.   Those are monikers that were found in the phone that was

9   downloaded that I looked at.

10   Q.   I want to turn to page two of 57.

11      What is it that we're looking at here?

12   A.   So what I did is an analysis of who -- which phone number

13   was calling which phone number back and forth and how many

14   times they talked per day.

15      So, as you can see at the top there, it says, "calls

16   between accounts on September 4th, 2012."

17      And you can see, there's five boxes on the screen and in

18   each box is a name.  So those names are associated with those

19   phone numbers that we looked at previously.

20      The lines and the arrows in between the boxes indicate how

21   many times they talked that day.  And when I say "talked," it

22   could be a text message, it could be a voice call, it could be

23   an attempted call between those phone numbers.

24      So those are the totals for that whole day.

25   Q.   And just so that we clearly understand what you mean, one

1  person -- what happens when someone attempts to call one

2  individual and that call doesn't register to the targeted

3  telephone number?

4  A.   Yes.  For an example, if the prosecutor attempts to call me

5  and he hangs up before the call actually goes through, that

6  call would show up on his records but would not show up on mine

7  because it never got to my phone.

8      So that would be an example of one of those calls.

9  Q.   Okay.  So --

10         THE COURT:  So what happens if there's a call and

11  someone doesn't answer it?

12         THE WITNESS:  Your Honor, we still see a log in both

13  phones that the phone call occurred, because it actually rang

14  the recipient's phone.

15  BY MR. VAZQUEZ:

16  Q.   And so, when we look at, for example, the number 34,

17  between the name identified, associated with the telephone

18  number for Leonardo Morales and the Matatan-associated account,

19  would that include text messaging?

20  A.   It does.

21  Q.   Would that include dropped calls?

22  A.   It does.

23  Q.   Does this breakdown the number the pathways, like how many

24  times Matatan called the Leonardo Morales account and vice

25  versa?

1    A.   No.   That's the total amount of time that they attempted or

2    talked to each other during that day.

3    Q.   And that applies for the Matojito account?

4    A.   Correct.

5    Q.   The Alfre account?

6    A.   Correct.

7    Q.   And this telephone number of XXX-XXX-9385?

8    A.   Correct.

9    Q.   Agent, how is it that you went about picking these dates?

10   A.   These dates were provided to me by the investigators and

11   prosecution themselves as important dates related to a crime

12   that occurred later on, on the 30th.

13   Q.   And so what do we see here on September 7th, 2012?

14   A.   We see the amount of calls between those same individual

15   accounts on September 7th and the amount of times that they

16   communicated between each other during that day.

17   Q.   September 10th?

18   A.   September 10th has the same information, same accounts, and

19   the number of times they talked to each other.

20   Q.   Now, September 11th?

21   A.   Same thing, again, for September 11th, the amount of times

22   and the same individuals.

23   Q.   September 12th?

24   A.   Same thing, the same individuals, same phone numbers, and

25   the amount of times.

```
 1    Q.   September 14th?

 2    A.   Same thing, same individuals and the amount of times they

 3    talked to each other during that day.

 4    Q.   And again, you're referring to contact between the parties;

 5    is that correct?

 6    A.   Yes, sir, contact between the individuals' phones.

 7    Q.   And even attempted contacts?

 8    A.   And attempted, correct.

 9    Q.   September 20th?

10    A.   Yes.  Same thing, the amount of times of contacts between

11    the phones.

12    Q.   September 28th?

13    A.   Again, the same amount of contacts between the phones.

14    Q.   What do we have here, on September 30th, 2012?

15    A.   On September 30th, we also see an additional -- an account

16    associated with the name Celia and the amount of times

17    Mr. Morales' phone contacted that one and the other phones that

18    we've been looking at through the previous pages.

19    Q.   Your review for the September 30th date and these

20    associated and reviewed accounts, did you find any other

21    account communicating with Celia on September 30th, 2012?

22    A.   Yes.

23    Q.   For this date?

24    A.   No, not on this date.  I'm sorry.

25    Q.   Now, when you conducted your analysis, do you adjust for
```

1    the relative times that the records are kept in?

2    A.   Yes.  The different phone numbers' accounts, some come in

3    different time zones, some of these were AT&T phones, which

4    come in Greenwich Meantime, so I have to adjust for some of the

5    calls there.  One of the accounts came in Pacific daylight

6    time, so I adjusted that back in time to East Coast time, and

7    the others are in local time.

8    Q.   And when you make the adjustment for Greenwich Meantime,

9    what does that do to your analysis?

10   A.   It just changes the amount of hours, so it adjusts four

11   hours from the Greenwich Meantime to this meantime.

12   Q.   For this date that you were analyzing?

13   A.   Right.

14   Q.   On page 12, what is it that we're looking at here?

15   A.   So we're looking at the records for the account associated

16   with Celia, and I was asked to look at specific times when that

17   phone contacted any of the other numbers.

18        So what we see here in the first paragraph is Celia's phone

19   ending in 4 -- or excuse me -- 0441 had one call with

20   individuals associated with the name "Matatan"; and then two

21   calls on -- excuse me -- that was on September 23rd; and then

22   two calls with the phone associated with Leonardo Morales,

23   those occurred on September 30th.  We saw those earlier.

24        And then looking at Mr. Leonardo Morales' call records with

25   the phone ending in 6717, we saw that there was a total of six

1    calls between Celia.  One occurred on September -- excuse me --

2    July 31st; three occurred on September 29th; and then two

3    occurred on September 30th.

4        And then in the last paragraph, we're looking at a phone

5    associated with Matatan ending in 6304, and we see that there

6    were two calls with Celia, one occurred on August 17th, 2012,

7    and the other one occurred on September 23rd, 2012.

8    Q.  So, based on the records that you reviewed, two accounts

9    were interacting with the Celia phone?

10   A.  That's correct.

11   Q.  Now, jumping to October 30th of 2012, what do we see here?

12   A.  We see, again, the same individuals and accounts and phone

13   numbers and the amount of times that they talked to each other

14   during -- on this day.

15   Q.  Now, following the date of September 30th, 2012, did you

16   review the records to see if the phone number associated with

17   Leonardo Morales was making any outgoing calls?

18   A.  I did.  And the phone records indicate there was no

19   outgoing calls from Leonardo Morales' phone after September

20   30th.

21   Q.  So when we see this "2" here and "2" here between telephone

22   number ending in 9385 and the Matatan account, those are calls

23   to the Morales account?

24   A.  That's correct.

25   Q.  And going to October 4th, 2012, what do we see here?

1    A.   The same thing, the calls going to Leonardo Morales' phone

2    and then a couple other contacts between other individuals'

3    accounts.

4    Q.   Is the telephone activity decreasing after September 30th,

5    2012?

6    A.   Yes.  You can see from the maps that we saw before --

7    slides -- there was a lot of calls between these individuals

8    prior to September 30th and that significantly dropped after

9    September 30th.

10   Q.   Looking at October 5th, 2012, what do we have here?

11   A.   No calls noted between those four individuals.

12   Q.   And these are the accounts that you had; correct?

13   A.   That's correct, these are the records I had for these

14   specific phone numbers.

15   Q.   We're going to October 8th, 2012.

16   A.   You just see those three calls between those two phone

17   numbers that are noted on the slide.

18   Q.   October 9th, 2012.

19   A.   Again, a large reduction in calls between the individuals

20   and just those 13 calls between those two numbers.

21   Q.   October 10th, 2012.

22   A.   No logged calls between any of the individuals on that

23   date.

24   Q.   And October 11th, 2012.

25   A.   Just the 19 noted calls between those two individuals on

1    that date.

2    Q.   And October 12th, 2012.

3    A.   Same thing, just those noted calls between those two

4    individuals on that date.

5    Q.   Now, Agent, when you review these records, do you know who

6    is actually making the phone calls?

7    A.   No, sir.  I'm just looking at numbers and counting the

8    amount of calls in between the two accounts.

9    Q.   So your testimony doesn't address who the operator is of

10   the phone?

11   A.   That's correct.

12   Q.   However, your analysis does incorporate -- does it address

13   what's found in the recovered cellular phone?

14   A.   Yes, in the fact that I've reviewed that analysis or

15   downloaded that file, which matched some of these monikers

16   we're looking at.

17           MR. VAZQUEZ:  I tender the witness, Your Honor.

18                       CROSS-EXAMINATION

19   BY MR. ZACCA:

20   Q.   Good afternoon.

21   A.   Good afternoon, sir.

22   Q.   Now, you haven't spoken to any witnesses in this case;

23   correct?

24   A.   No, sir.

25   Q.   Your role was to review the phone records that were given

1  to you?

2  A.  Correct.

3  Q.  Okay.  And when I look at the first sheet here, in

4  Government's Exhibit 57, what you did was look at the phone

5  data, extract it from a phone associated with Leonardo Garcia

6  Morales; is that correct?

7  A.  Yes, sir.

8  Q.  And there was a contact -- there were several contacts, one

9  listed as Alfre, one listed as Matatan, one listed as Matojito,

10  and one listed as Celia; correct?

11  A.  Correct.

12  Q.  And you received phone records from those phone numbers;

13  correct?

14  A.  Yes, sir.

15  Q.  Associated with the name.

16      I'm going to state the obvious here, you have a cell phone;

17  correct?

18  A.  I do.

19  Q.  And you pay a monthly bill, I imagine, for your cell phone;

20  right?

21  A.  The Government pays for mine.

22  Q.  The Government -- well, that's a good thing.

23      May I ask a personal question?  Are you married?

24  A.  I am.

25  Q.  Okay.  Does the Government also pay your wife's cell phone?

```
 1   A.   I wish, but no.

 2   Q.   No, okay.  So your wife receives a cell phone bill;

 3   correct?

 4   A.   Yes, sir.

 5   Q.   And it comes from the service provider -- I don't know what

 6   it is, but let's just say it's AT&T; correct?

 7   A.   Okay.

 8   Q.   Alright.  AT&T sends a bill every month; correct?

 9   A.   Yes, sir.

10   Q.   And when you get that bill, I imagine it has your wife's

11   name on it; right?

12   A.   Yes.

13   Q.   And it has your home address; correct?

14   A.   Yes, sir.

15   Q.   I mean, it has to get there; right?

16   A.   Yes, sir.

17   Q.   It has all of what's called "subscriber information";

18   correct?

19   A.   Yes, sir.

20   Q.   And "subscriber information" is the term that the cell

21   phone companies use to describe who has the account; correct?

22   A.   That's correct.

23   Q.   Alright.  Now, when you looked for -- strike that.

24        When you looked at the phone records associated with this

25   particular number, I see "T-Mobile" in parenthesis; is that
```

1    right?

2    A.   Yes, sir.

3    Q.   So is that the service provider for that phone number?

4    A.   Yes.

5    Q.   So when you looked at those records, what did the

6    subscriber information say?

7    A.   I was not provided any subscriber information for any of

8    these calls.

9    Q.   Well, I'm going to go one-by-one and we will talk about

10   that.

11   A.   Alright.

12   Q.   Were you provided the subscriber information for AT&T?

13   A.   No.

14   Q.   Were you provided the subscriber information for this

15   number associated with T-Mobile?

16   A.   No.

17   Q.   And the 0441 information?

18   A.   No, sir.

19   Q.   And who gave you these records?

20   A.   The prosecution.

21   Q.   And the prosecution didn't give the subscriber information?

22   A.   No, sir.  It was not relevant to what I was doing, because

23   I'm just counting calls between phones.

24   Q.   Well, it's certainly good to know if the account name

25   associated with that number is a person involved in this case;

```
 1   wouldn't you agree?

 2   A.   Well, I assume if they give me phone numbers that they want

 3   me to analyze, it's important to the case.  It doesn't matter

 4   to me who's using or subscribed to that phone, and often, the

 5   subscriber information is not correct anyway.

 6   Q.   Okay.  But in this case you weren't given the account name

 7   associated with each number; correct?

 8   A.   Correct.

 9   Q.   Okay.  Were you present when that phone number was entered

10   on the phone associated with 6717?

11   A.   What do you mean by "entered"?

12   Q.   The number 6717 is associated with Leonardo Garcia Morales?

13   A.   Yes, sir.

14   Q.   Right?

15   A.   Yes, sir.

16   Q.   Now, this name "Alfre" and this phone number appears as a

17   contact in the number 6717; correct?

18   A.   Correct, in the download of that phone, we did see that

19   contact information.

20   Q.   But you weren't present when the name "Alfre" was put into

21   that phone, were you, as a contact?

22   A.   No.  It would have been the user putting that name in his

23   phone.

24   Q.   Forgive me, it's an obvious question.

25   A.   Yes, sir.
```

1       I just want to follow you, and yes -- no, I was not

2   present.

3   Q.   Okay.  So what you're doing is analyzing associations

4   between phone numbers; correct?

5   A.   Yes, sir.

6   Q.   You have no personal knowledge as to the name "Alfre," who

7   it belongs to?

8   A.   That's correct.

9   Q.   You have no personal knowledge as to the name "Matatan,"

10  who it belongs to?

11  A.   That's correct.

12  Q.   Same question for "Matojito."

13  A.   That is correct.

14  Q.   Same question for "Celia."

15  A.   Yes, sir.

16  Q.   Now, we looked at several charts of -- or displays of phone

17  calls here -- and I'm just picking out a page random here --

18  page four, you don't know what was discussed?

19  A.   No, sir.

20  Q.   In fact, you don't know the identity of the person

21  specifically making the phone call associated with 9385;

22  correct?

23  A.   Correct.

24  Q.   You have no personal knowledge as to who's actually

25  operating the phone on this date on the number associated with

```
 1    the name "Matatan"?
 2    A.   That's correct.
 3    Q.   You have no personal knowledge as to the person operating
 4    the phone associated with the name "Alfre"?
 5    A.   That is correct, that's the same for all those.
 6    Q.   It's the same answer for all?
 7    A.   That's correct.
 8    Q.   And for each of these pages, it's the same answer; correct?
 9    A.   That is correct.  I'm just analyzing the amount of contacts
10    between the phone numbers.
11         MR. ZACCA:  Can I have a moment, Judge?
12         (Brief pause in the proceedings.)
13    BY MR. ZACCA:
14    Q.   Did you ask for this subscriber information in this case?
15    A.   I did not.
16         MR. ZACCA:  No further questions.
17                    REDIRECT EXAMINATION
18    BY MR. VAZQUEZ:
19    Q.   Agent, do phone companies allow you to register under names
20    like "Mickey Mouse"?
21         MR. ZACCA:  Objection.
22         THE COURT:  Do you want to come and tell me some
23    relevance to that question, I will hear it.
24         Otherwise, I will sustain the objection.
25    BY MR. VAZQUEZ:
```

```
1    Q.   Defense counsel asked you about phone records and the names

2    that could be put on it.

3    A.   Yes, sir.

4    Q.   From your experience, are the names that are in the records

5    always accurate?

6              MR. ZACCA:   Objection.

7              THE COURT:   Are you going to ask him about this case?

8              MR. VAZQUEZ:   I'm trying to address the records that he

9    asked about, the phone records.

10             THE COURT:   Come sidebar.

11             (Sidebar discussion held as follows:)

12             THE COURT:   I'm not exactly sure where you're going,

13   but you're going to have to come closer than Mickey Mouse.

14             So what is it that you're trying to do?

15             MR. VAZQUEZ:   I'm trying to address the fact that

16   people can register the phone number.

17             THE COURT:   Yes, he said that.

18             MR. VAZQUEZ:   I just want to make sure it's clear.

19             THE COURT:   So you're asking him about his experience,

20   which it doesn't really matter, he's told you that sometimes

21   phone records don't match.

22             MR. VAZQUEZ:   Right.

23             THE COURT:   They don't necessarily -- I guess the real

24   question is, a phone record and a number doesn't necessarily

25   have to match; isn't that the question?
```

1          MR. VAZQUEZ:  Correct, the name doesn't have to be

2    accurate when a customer --

3          MR. ZACCA:  Judge, he has to lay a foundation.

4          Did he work for AT&T?  And does he work for T-Mobile?

5    He doesn't know their practice.

6          THE COURT:  That's a good point, he's not an expert, so

7    why is his opinion relevant?

8          MR. VAZQUEZ:  I think I can qualify his opinion.

9          THE COURT:  He hasn't been listed as an expert.  So his

10   opinion on that doesn't matter, alright.  Let's move on.

11         (Sidebar concluded, following held in open court:)

12         THE COURT:  Sustained.

13   BY MR. VAZQUEZ:

14   Q.  Agent, you were asked about your knowledge of the records

15   that you reviewed and what might have been going on.

16         Do you recall that line of questioning?

17   A.  I do.

18   Q.  Based on your personal knowledge of these records, do you

19   know if these four and five accounts were in communication with

20   each other repeatedly over a period of time?

21   A.  Yes, they were, obviously, with all the -- the number of

22   calls between each one of those phones, they had a large

23   communication on those days.

24         MR. VAZQUEZ:  No further questions for the witness,

25   Your Honor.

```
 1              THE COURT:  May the witness be permanently excused?

 2              MR. VAZQUEZ:  Yes, on behalf of the United States.

 3              MR. ZACCA:  Yes, on behalf of the defense.

 4         (Witness excused.)

 5              MR. VAZQUEZ:  Your Honor, our next witness is

 6    Magdalena.  I understand the Marshals need to retrieve him.

 7    I have given them notice.

 8              THE COURT:  About how long would it take to get him?

 9              THE MARSHALL:  He's right here.

10              THE COURT:  He's right here.

11         (Brief pause in the proceedings.)

12              COURTROOM DEPUTY:  Raise your right hand, please.

13         Do you solemnly swear the testimony you're about to

14    give is the truth, the whole truth, and nothing but the truth,

15    so help you God?

16              THE WITNESS:  Yes.

17              COURTROOM DEPUTY:  Thank you.  You may be seated.

18         (OSVALDO MAGDALENA, through Spanish Interpreter,

19    testified as follows:)

20                        DIRECT EXAMINATION

21    BY MR. VAZQUEZ:

22    Q.  Good morning, sir.

23    A.  Good morning.

24    Q.  Would you please introduce yourself to the members of the

25    jury, telling them your name.
```

```
 1   A.   My name is Osvaldo Magdalena.

 2   Q.   Mr. Magdalena, where is it that you live right now?

 3   A.   Here, downtown, at FDC Miami.

 4   Q.   Mr. Magdalena, how is it that you came to live in FDC

 5   Miami?

 6   A.   Because they went to get me at the prison where I was at.

 7   Q.   And why were you at a prison?

 8   A.   For buying one kilo of cocaine.

 9   Q.   What were you sentenced to for that kilo of cocaine?

10   A.   Seven years, and three years probation.

11   Q.   Now, I want to draw your attention to that arrest that led

12   you to that conviction; okay?

13   A.   Yeah.

14   Q.   How did you become involved in that incident that led you

15   to attempt to purchase cocaine?

16   A.   When I found out that my Godfather, he got -- he was shot,

17   I went to visit him at his house.  So we got to talk there.  He

18   was separating from his wife.  His mother was -- had left, so

19   he was there by himself.

20        So that day, he did make this comment to me.

21        But the following day he came and said he had some money

22   and asked me whether I could get cocaine for him, to buy, I

23   don't know.

24   Q.   Now, you said your Padrino, your Godfather, if you saw that

25   person in court, would you be able to identify him?
```

1    A.   Yes.   Look at him, he's over there.   (Pointing.)

2    Q.   And could you please identify him by an article of

3    clothing?

4    A.   He has a white jacket.

5         MR. VAZQUEZ:   Let the record reflect the witness has

6    identified the defendant.

7    BY MR. VAZQUEZ:

8    Q.   Mr. Magdalena, can you tell the members of the jury how is

9    it that you were asked to purchase cocaine for the defendant?

10   A.   Well, he asked me whether I could get cocaine for him, and

11   yes.   Well, I went there and he asked me whether I could get

12   cocaine, to buy it, so the following day -- well, I told him I

13   had some contacts -- so I went searching for it.

14        And the next day I came and I said that it was ready, and

15   for him to have the money with him, that I was going to come

16   for the money the following day.

17        And when I got there the following day there was a man

18   there taking care of him, the woman had already left.

19        The lady and the man and the son were taking care of him.

20   I told him to give me the money --

21        MR. ZACCA:   Objection to the narrative form of this

22   answer.

23        THE COURT:   Overruled.

24   A.   -- to go look for the kilo of cocaine.

25        So he tells me, well, no, I want to be there when you do

 1   the transaction, because I want to meet the man that is going

 2   to sell you that.

 3         So I said to him, Listen, Godfather, you are handicapped

 4   now, so how can I get you on the car to take you there?

 5         And he tells me, no, I have to get there.

 6         So then he tells me, Look, at this time, you are my feet

 7   and my hands, and I am the head.

 8         So I told him, okay, I'll get you on the car and we'll --

 9   and you'll go with us.

10         So he tells me, look, the ones that are taking care of me,

11   they are also going to go, the son and Fidel, they are going as

12   well.

13         So I said, Okay, it's okay, let's go there then.

14   Q.  Mr. Magdalena, going back to how this conversation about

15   cocaine started, how did the defendant know to ask you about

16   cocaine?

17         MR. ZACCA:  Objection, calls for speculation and the

18   state of mind of my client.

19         THE COURT:  Overruled.

20   A.  Because he knew that the real way that I would be that I

21   bought cocaine and I sold, I know that.

22   BY MR. VAZQUEZ:

23   Q.  Mr. Magdalena, before testifying today, have you been

24   convicted of a felony?

25   A.  Yes.

```
 1    Q.   And prior to this event where you bought cocaine, had you

 2    been convicted of purchasing cocaine -- selling cocaine?

 3    A.   Yes, but I never gone to prison.

 4    Q.   How many times have you been convicted of a felony?

 5    A.   Three times.

 6    Q.   Now, when you received this request from the defendant,

 7    what did you go about doing to make this cocaine deal happen?

 8    A.   Nothing.  I was there trying to get some money for me, I do

 9    his business and make some money, I am an intermediary.

10    Q.   What does that mean, money for you, why were you doing this

11    for the defendant?

12    A.   I was -- well, nothing, I was buying one kilo of cocaine

13    and he was going to give me $1,000.

14    Q.   And before this cocaine deal was talked about, what is your

15    relationship to the defendant?

16    A.   He is my Godfather because of my religion.

17    Q.   Now, when you received this request, can you explain to the

18    members of the jury how it is that you attempted to get cocaine

19    for your Godfather?

20    A.   Well, call the people that were selling it.

21    Q.   And did you have success making contact with someone who

22    might want to sell you cocaine?

23    A.   Yes.

24    Q.   Did you later learn that this involved a confidential

25    informant?
```

1    A.   No, it wasn't until I got there with my Godfather and the

2    two men, then is when I realized what it was.

3    Q.   When you were arrested?

4    A.   Yes.

5    Q.   Prior to your arrest, did you think that this was going to

6    be a real cocaine deal?

7    A.   Yes.

8    Q.   I want to show you what's been marked for identification as

9    Government's 44 and 44A.  Do you recognize them?

10   A.   Yes, they have my signature, the signature and the

11   evidence -- the C.D. and the evidence.

12   Q.   And what are these items, Government's 44 and 44A?

13   A.   That is about the conversations -- my arrest and such.

14   Q.   Have you reviewed the C.D.s involving the undercover

15   recording of you, audio and video evidence-wise?

16   A.   Yes.

17   Q.   And is Government's 44 and 44A the recording and transcript

18   for one of those recordings?

19   A.   Yes.

20        MR. VAZQUEZ:  Your Honor, at this time, I would move to

21   admit Government's Exhibit 44 and 44A into evidence.

22        MR. ZACCA:  No objection.

23        THE COURT:  Received as marked.

24        (Government's Exhibits 44 and 44A received into

25   evidence.)

1           MR. VAZQUEZ:  And I would ask for permission to publish

2    the accompanying transcript.

3           THE COURT:  Yes, sir.

4           Approximately, how long is the tape?

5           MR. VAZQUEZ:  The tapes are 14 minutes, but there's

6    multiple.

7           THE COURT:  I'm not sure I understand.  The first one

8    is 14?  Alright.

9           MR. VAZQUEZ:  There's multiple.  Yes, sir.

10          THE COURT:  So let's do the first one.

11          MR. VAZQUEZ:  Yes, sir.

12          (Transcripts being handed to jury members.)

13          MR. VAZQUEZ:  Everyone have a transcript?

14          THE JURY:  (Collectively.)  Yes.

15   BY MR. VAZQUEZ:

16   Q.  Mr. Magdalena, what are we looking at now on the screen?

17   A.  The man that was -- the man that I got to buy the one kilo

18   cocaine.

19   Q.  I'm going to advance the recording to the

20   one-minute-34-second mark.

21          THE COURT:  Is there a volume issue?

22          Is there a volume issue?

23          MR. VAZQUEZ:  Yes, Your Honor, I will try and use a

24   different recording.  It picks up, it's easier to hear as the

25   recording advances.

1          (Video tape, in Spanish, being played for the judge and

2     jury.)

3          (Video tape paused.)

4     BY MR. VAZQUEZ:

5     Q.   Mr. Magdalena, what do you hear on the recording right now?

6     A.   Nothing, he was just telling me that he had been waiting

7     for me for an hour, and that was what he was saying.

8          (Video tape resumed.)

9     BY MR. VAZQUEZ:

10    Q.   Mr. Magdalena, I want to turn to page three of 21.  What

11    does that phrase -- that you just heard now -- what does that

12    mean?

13    A.   He was telling me that what I was looking for, to buy for

14    my Godfather, that that was good, that it was pure, pure, pure.

15         (Video tape paused.)

16    Q.   "Pure," what does that mean in the context of what you were

17    doing?

18    A.   That at that time, it was the best it was, everything,

19    everything, everything that it was.

20    Q.   And you're talking about cocaine in this conversation?

21    A.   Yes, yes.

22         (Video tape resumed.)

23         MR. VAZQUEZ:  Page four.

24         (Video tape paused.)

25    BY MR. VAZQUEZ:

1   Q.   Mr. Magdalena, you reference "grease" in this, why are you

2   referencing "grease"?

3   A.   That it is 100 percent cocaine that I'm looking for.

4   Q.   And how -- why is the word "grease" being brought up in

5   this conversation?

6   A.   Because when that is grease, it means it's a hundred

7   percent.

8              (Video tape paused.)

9   BY MR. VAZQUEZ:

10  Q.   What is the price that you were talking about here?

11  A.   He had it in 29, but he was giving it to me for 28 --

12  $28,000.

13  Q.   And what are you buying for $28,000?

14  A.   One kilo of cocaine.

15  Q.   One kilogram?

16  A.   Yeah.

17  Q.   How did you know to ask for a kilogram versus three ounces?

18  A.   Because the kilo comes in a square, something big.  It's a

19  square.

20  Q.   Did you talk with the defendant about buying a kilogram?

21             MR. ZACCA:  Objection to leading.

22             THE COURT:  Sustained.

23  BY MR. VAZQUEZ:

24  Q.   Mr. Morales, why are you asking for a kilogram?

25  A.   Because my Godfather sent me to buy one kilo of cocaine.

```
 1                    (Video tape paused.)

 2                    MR. VAZQUEZ:  Page six.

 3                    (Video tape resumed.)

 4   BY MR. VAZQUEZ:

 5   Q.   Mr. Garcia Morales, this exchange that you're having now

 6   about a Colombian, what is that about?

 7   A.   No, it was not me that was talking.  It was the man that I

 8   was talking to, he was talking about his nephew in Colombia.

 9                    MR. VAZQUEZ:  Turn back to page seven of the

10   transcript, it is, just for purpose of the record, this is the

11   second entry for the Osvaldo portion of the transcript.

12                    (Video clip resumed.)

13   BY MR. VAZQUEZ:

14   Q.   Mr. Garcia Morales, what just happened right now, when

15   you're talking about lips?

16   A.   Well, he's telling me about talking -- lowering the price

17   for me, but I have to make some money, I have to gain

18   something.

19   Q.   And did you take a sample of this cocaine?

20   A.   Yes.

21   Q.   And why did you do that?

22   A.   To take it to my Godfather.

23                    (Video tape resumed.)

24                    MR. VAZQUEZ:  We're on page nine of the transcript, at

25   the first entry for the C.I.
```

1    BY MR. VAZQUEZ:

2    Q.   Mr. Garcia Morales, you used the Spanish word "invalido"?

3         What were you trying to communicate there?

4    A.   That means when you're paralyzed, when you cannot move or

5    anything.

6    Q.   Why were you telling this person posing as a drug seller

7    that you're Padrino was paralyzed?

8    A.   Oh, well, I was doing this because of -- with Godfather --

9    I did not understand that part.

10   Q.   Why did you feel the need to tell the drug seller that you

11   were working with a paralyzed Godfather?

12   A.   To see whether he could give me a better price, to see if I

13   could find me a little more money for me.

14            (Video tape resumed.)

15            (Video tape paused.)

16   BY MR. VAZQUEZ:

17   Q.   Mr. Morales -- excuse me -- Mr. Magdalena, what are you

18   telling this confidential informant now with regard to your

19   Padrino?

20   A.   For me to take the sample to my Godfather so that he could

21   see it, and then that he would get the money from the bank or

22   wherever he will have it.

23   Q.   Did you have the money available to you to do this

24   transaction on your own?

25   A.   No.

1    Q.   Mr. Magdalena, what happened after you completed this

2    meeting with the confidential informant?

3    A.   I went to my Godfather to tell him to have the money ready

4    to go buy the kilo of cocaine.

5    Q.   What did you do with the sample?

6    A.   I showed it to my Godfather, and he saw it, and he said,

7    Okay.   He trusted me.

8    Q.   What did you do -- what happened to the grease, did you

9    look at this cocaine for grease?

10   A.   Yes, that piece they gave me, I tried to, and it was fine.

11   And I told my Godfather that it was fine, everything was okay,

12   in that respect.

13        MR. VAZQUEZ:   Your Honor, that's all I have for this

14   recording.   I could move on to the next recording.

15        THE COURT:   Alright, thank you very much.

16        Ladies and gentlemen, we will resume -- at this time,

17   we will resume tomorrow morning at nine am.   Please remember

18   not to discuss the case in any way.   Have a good day.

19        COURT SECURITY OFFICER:   All rise.

20        (Jury exited courtroom at 1:00 p.m.)

21        THE COURT:   Alright, you're excused.

22        (Witness steps down.)

23        THE COURT:   Are there any other issues that I need to

24   address?

25        MR. VAZQUEZ:   Yes, a minor one, with the permission of

1      the Court.  I will let Mr. --

2             MR. ZACCA:  One of the witness I intended on calling

3      was Dr. Frankowitz.  He planned on coming today.  He's a

4      retired 80-year-old doctor, and he takes care of his ailing

5      wife, and he can only be away from his wife for a certain

6      period of time.

7             I'm going to make arrangements for him to be here

8      tomorrow.  I already spoke to Mr. Vazquez.  In the event that

9      the Government is not able to rest tomorrow, I would like to

10     call him --

11            THE COURT:  Do you agree to take a witness out of turn?

12            MR. ZACCA:  Yes, sir.

13            THE COURT:  Alright.

14            MR. VAZQUEZ:  Your Honor, with the understanding that

15     this is defense case, so that then opens our ability to have a

16     rebuttal case, because he's putting his defense case forward

17     now for his witness.

18            THE COURT:  Rebuttal to what?  Rebuttal to this

19     witness?

20            MR. VAZQUEZ:  Yes, sir.

21            THE COURT:  It doesn't open up rebuttal for the world.

22            MR. VAZQUEZ:  No, no, no.

23            THE COURT:  You get a chance to cross-examine the

24     witness.  If you want to rebut what the witness would say, he

25     can tell you ahead of time.

1          Anything further?

2          MR. ZACCA:  Not from the defense.

3          MR. VAZQUEZ:  Not from the United States.

4          THE COURT:  Counsel, in case you don't, are you

5     contemplating resting tomorrow?

6          MR. VAZQUEZ:  I think we might get there.  I have to

7     finish this witness that has several more recordings.

8          And I have the chemist.  We don't have a stipulation

9     that the cocaine that was recovered is cocaine, so we have to

10    call that person.  And then I have --

11         THE COURT:  What about the chemist as an expert --

12         MR. VAZQUEZ:  Yes.

13         THE COURT:  -- do you need to qualify him as well?

14         MR. VAZQUEZ:  Yes.

15         THE COURT:  Alright.

16         MR. VAZQUEZ:  And the lead investigator for the North

17    Miami Beach case, and possibly a doctor, a witness.

18         That's the rest of our case-in-chief.

19         MR. ZACCA:  What doctor?

20         MR. VAZQUEZ:  Kiffin.

21         MR. ZACCA:  Who's that?

22         MR. VAZQUEZ:  One of the doctors on the list.

23         THE COURT:  Alright.  Let me have the defendant come

24    sidebar, and you're all excused.

25              (Sidebar discussion held with defense counsel and

1    The Court as follows:)

2         THE COURT:  I'm having this session sidebar just so

3    that I can inquire as to whether you intend to call the

4    defendant and any other witnesses, other than the doctor that

5    is considered at this time.

6         MR. ZACCA:  Dr. Frankowitz.  We also have a detective

7    from Coral Gables, I have a conference call later this

8    afternoon later scheduled with him.

9         Judge, I met with my client many hours.  Now I'm

10   meeting him again this afternoon to pin him down, as far as

11   whether he wants to testify.  We've been going back and forth

12   on it; and today, this afternoon, I hope to answer that

13   question.

14        THE COURT:  Do you have any indication one way or the

15   other, or are you right in the middle?

16        MR. ZACCA:  Judge, it depends on the day.  One day he

17   is and one day he isn't.

18        THE COURT:  Alright.  As soon as you find out, you can

19   come sidebar, just for planning purposes.

20        MR. ZACCA:  Absolutely, Judge.  Thank you.

21        (Sidebar concluded.)

22        COURT SECURITY OFFICER:  All rise.

23        (Proceedings adjourned at 1:05 p.m.)

24

25

1

2                      C E R T I F I C A T E

3

        I hereby certify that the foregoing is an
4

    accurate transcription of the proceedings in the
5

    above-entitled matter.
6

7

    January 29th, 2020 /s/Glenda M. Powers
8                              GLENDA M. POWERS, RPR, CRR, FPR
                               United States District Court
9                              400 North Miami Avenue, 08S33
                               Miami, Florida 33128
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

119

## $

**$1,000** [1] - 107:13
**$28,000** [2] - 111:12, 111:13

## /

**/s/Glenda** [1] - 118:7

## 0

**0441** [4] - 19:20, 28:15, 91:19, 97:17
**08S33** [1] - 118:9

## 1

**1** [5] - 1:11, 7:11, 8:1, 22:13, 60:15
**1-407-456-6717** [1] - 27:22
**10** [7] - 5:21, 30:7, 30:11, 30:12, 30:13, 30:18, 79:24
**100** [2] - 2:10, 111:3
**1006** [3] - 81:22, 85:10, 85:19
**108** [3] - 2:12, 3:15, 3:16
**10:30** [2] - 51:2, 51:4
**10:49** [2] - 51:4, 51:5
**10th** [3] - 89:17, 89:18, 93:21
**11** [3] - 30:25, 34:12, 72:3
**110** [2] - 1:20, 1:20
**113** [4] - 25:5, 25:6, 25:8, 64:16
**116** [3] - 23:21, 23:24, 64:10
**11:01** [1] - 32:3
**11:24** [1] - 70:23
**11:27** [1] - 73:5
**11:36** [2] - 73:5, 73:18
**11th** [3] - 89:20, 89:21, 93:24
**12** [4] - 5:22, 60:9, 60:15, 91:14
**12th** [2] - 89:23, 94:2
**13** [8] - 3:14, 23:20, 35:4, 35:22, 35:25, 46:9, 63:25, 93:20
**133** [1] - 1:11
**14** [2] - 109:5, 109:8
**149th** [4] - 7:8, 36:24, 36:25, 37:2
**14th** [1] - 90:1
**15** [4] - 3:6, 10:17, 51:1

**16** [4] - 3:7, 3:8, 29:1, 29:3
**169** [2] - 26:8, 26:11
**16A** [15] - 18:12, 23:20, 27:4, 28:8, 29:2, 29:3, 29:4, 32:7, 32:23, 63:24, 63:25, 67:13, 67:16, 68:6, 68:10
**17** [1] - 1:5
**1700** [1] - 1:20
**1765** [1] - 38:20
**17th** [1] - 92:6
**18** [2] - 26:9, 65:11
**1802** [1] - 12:8
**1857** [1] - 48:25
**189** [1] - 32:7
**19** [1] - 93:25
**191** [1] - 32:18
**1911-type** [1] - 34:22
**1992** [1] - 5:12
**19:20** [3] - 59:18, 59:20, 59:24
**1:00** [2] - 7:5, 114:20
**1:05** [2] - 1:8, 117:23
**1:17-CR-20701-MGC-5** [1] - 1:2
**1A** [1] - 38:19
**1st** [6] - 31:11, 38:3, 45:20, 50:17, 60:1, 60:16

## 2

**2** [4] - 12:8, 22:13, 92:21
**2012** [24] - 6:21, 6:25, 31:11, 35:1, 60:1, 60:5, 60:16, 66:23, 87:16, 89:13, 90:14, 90:21, 92:6, 92:7, 92:11, 92:15, 92:25, 93:5, 93:10, 93:15, 93:18, 93:21, 93:24, 94:2
**2018** [1] - 1:5
**2020** [1] - 118:7
**203** [1] - 32:23
**205** [1] - 33:1
**20th** [1] - 90:9
**21** [1] - 110:10
**215** [1] - 33:3
**22** [3] - 11:23, 34:13, 77:1
**221** [2] - 27:3, 27:6
**23** [3] - 27:3, 67:24, 68:3
**2301** [1] - 32:3
**2386** [1] - 22:14
**23rd** [2] - 91:21, 92:7

**24** [2] - 5:19, 42:22
**24-year** [1] - 40:8
**25** [4] - 3:10, 29:10, 59:1, 68:4
**26** [1] - 3:12
**27** [2] - 3:9, 3:11
**28** [3] - 3:13, 31:6, 111:11
**28th** [1] - 90:12
**29** [1] - 111:11
**29th** [2] - 92:2, 118:7

## 3

**3** [1] - 22:13
**30** [1] - 65:25
**300** [2] - 66:1, 66:3
**305** [1] - 30:4
**305-904-6304** [1] - 25:7
**3064** [1] - 30:16
**30th** [21] - 6:21, 6:25, 35:1, 60:5, 66:11, 66:16, 66:23, 67:17, 89:12, 90:14, 90:15, 90:19, 90:21, 91:23, 92:3, 92:11, 92:15, 92:20, 93:4, 93:8, 93:9
**31st** [1] - 92:2
**33** [6] - 31:22, 31:23, 66:18, 77:15, 77:22, 77:23
**33128** [2] - 1:25, 118:9
**33132** [1] - 1:18
**33301** [1] - 30:4
**34** [3] - 17:18, 28:20, 88:16
**35** [2] - 3:14, 28:20
**36** [1] - 16:8
**3674** [1] - 30:4
**37** [2] - 2:7, 16:19
**38** [13] - 3:9, 17:12, 19:18, 20:4, 27:14, 27:17, 34:22, 63:9, 71:12, 72:4, 72:5, 72:7, 80:7
**39** [11] - 3:10, 17:15, 19:22, 20:4, 24:4, 24:7, 24:25, 25:1, 25:3, 80:7, 80:12
**3946** [1] - 19:23
**3A** [1] - 48:25

## 4

**4** [8] - 3:6, 14:17, 15:4, 15:6, 15:7, 15:10, 22:13, 91:19

**40** [15] - 3:11, 11:25, 12:6, 19:24, 20:1, 20:5, 26:22, 27:1, 33:19, 34:8, 34:10, 34:19, 80:7, 80:14
**400** [2] - 1:24, 118:9
**407** [1] - 18:18
**41** [8] - 3:12, 18:24, 20:5, 25:13, 26:6, 67:16, 80:7, 80:17
**42** [10] - 3:13, 19:12, 20:6, 28:3, 28:5, 29:10, 66:8, 67:17, 80:7, 80:19
**43** [3] - 28:12, 29:25, 66:6
**44** [8] - 3:15, 30:1, 66:23, 108:9, 108:12, 108:17, 108:21, 108:24
**44A** [6] - 3:16, 108:9, 108:12, 108:17, 108:21, 108:24
**45** [2] - 31:6, 67:3
**4578** [1] - 22:14
**4th** [3] - 1:17, 87:16, 92:25

## 5

**5** [6] - 2:6, 3:7, 15:14, 15:15, 16:2, 16:5
**5234** [1] - 7:8
**57** [7] - 81:9, 81:12, 81:16, 81:22, 86:25, 87:10, 95:4
**5th** [1] - 93:10

## 6

**6** [11] - 3:8, 15:14, 15:18, 15:19, 16:2, 16:5, 16:7, 16:20, 17:12, 17:15, 63:8
**6304** [1] - 19:10, 28:19, 28:23, 29:24, 30:17, 92:5
**67** [1] - 2:7
**6717** [5] - 19:14, 91:25, 98:10, 98:12, 98:17
**6th** [1] - 1:20

## 7

**79** [1] - 2:9
**7:20** [4] - 59:18, 59:24, 59:25, 60:1
**7th** [2] - 89:13, 89:15

## 8

**8** [1] - 1:10
**80-year-old** [1] - 115:4
**806** [1] - 1:17
**8th** [1] - 93:15

## 9

**9** [2] - 34:21
**9-30-12** [5] - 29:12, 30:6, 30:16, 31:9, 32:3
**9-30-2012** [1] - 31:2
**9385** [2] - 92:22, 99:21
**94** [1] - 2:9
**99** [1] - 1:17
**9:00** [1] - 1:7
**9:03** [1] - 1:8
**9:05** [1] - 4:11
**9th** [1] - 93:18

## A

**a.m** [14] - 1:7, 1:8, 4:11, 38:3, 51:2, 51:4, 51:5, 60:15, 70:23, 73:5, 73:18
**Abelo** [1] - 66:21
**ability** [1] - 115:15
**able** [5] - 14:4, 32:12, 75:14, 104:25, 115:9
**abnormalities** [1] - 74:10
**above-entitled** [1] - 118:5
**absolutely** [1] - 117:20
**accompanying** [1] - 109:2
**according** [1] - 41:8
**accordingly** [1] - 21:9
**account** [15] - 28:18, 82:16, 82:20, 88:18, 88:24, 89:3, 89:5, 90:15, 90:21, 91:15, 92:22, 92:23, 96:21, 97:24, 98:6
**accounts** [13] - 25:10, 87:16, 89:15, 89:18, 90:20, 91:2, 91:5, 92:8, 92:12, 93:3, 93:12, 94:8, 102:19
**accurate** [3] - 101:5, 102:2, 118:4
**act** [1] - 21:8
**activity** [2] - 8:2, 93:4
**actual** [1] - 86:7
**addition** [4] - 13:25, 32:4, 80:21, 81:2

**additional** [2] - 18:21, 90:15
**address** [9] - 7:8, 36:16, 37:17, 94:9, 94:12, 96:13, 101:8, 101:15, 114:24
**adjourned** [1] - 117:23
**adjust** [2] - 90:25, 91:4
**adjusted** [3] - 31:14, 91:6
**adjustment** [1] - 91:8
**adjusts** [1] - 91:10
**admit** [8] - 24:24, 26:21, 27:13, 28:2, 35:22, 85:10, 86:13, 108:21
**admitted** [12] - 7:10, 10:16, 12:7, 18:11, 21:18, 34:11, 34:20, 77:14, 80:6, 85:6, 85:8, 86:24
**advance** [1] - 109:19
**advances** [1] - 109:25
**advised** [2] - 13:22, 85:4
**aerial** [1] - 16:9
**affects** [1] - 62:23
**affidavit** [1] - 13:5
**affirm** [1] - 4:21
**afternoon** [7] - 15:11, 58:6, 94:20, 94:21, 117:8, 117:10, 117:12
**Agent** [1] - 94:5
**agent** [6] - 79:16, 80:3, 86:24, 89:9, 100:19, 102:14
**AGENT** [2] - 2:8, 79:7
**agents** [1] - 79:21
**ago** [2] - 51:18, 51:19
**agree** [8] - 39:22, 54:10, 54:22, 60:18, 66:10, 72:22, 98:1, 115:11
**agreement** [2] - 21:7, 71:4
**ahead** [2] - 46:25, 115:25
**aid** [3] - 85:6, 85:16, 86:20
**aided** [1] - 4:2
**ailing** [1] - 115:4
**aimed** [1] - 14:9
**air** [1] - 60:11
**air-lifted** [1] - 60:11
**airlifted** [1] - 38:10
**Alfre** [24] - 23:25, 31:3, 31:4, 64:10, 64:13, 68:18, 68:19,

68:20, 69:3, 82:7, 82:11, 82:16, 83:25, 84:8, 84:23, 84:25, 87:6, 89:5, 95:9, 98:16, 98:20, 99:6, 100:4
**Alfredo** [1] - 84:3
**Alfres** [1] - 68:12
**alive** [6] - 23:3, 23:7, 44:19, 44:22, 45:12, 55:25
**allegations** [1] - 71:3
**allow** [2] - 56:8, 100:19
**allows** [1] - 85:20
**alluded** [1] - 43:17
**alright** [27] - 23:16, 26:5, 41:19, 41:24, 45:11, 52:16, 52:17, 59:10, 60:11, 65:25, 70:18, 71:13, 72:5, 77:22, 82:3, 83:18, 96:8, 96:23, 97:11, 102:10, 109:8, 114:15, 114:21, 115:13, 116:15, 116:23, 117:18
**Alright** [1] - 60:1
**AMERICA** [1] - 1:4
**ammunition** [2] - 71:15, 71:23
**amount** [14] - 84:24, 89:1, 89:14, 89:15, 89:21, 89:25, 90:2, 90:10, 90:13, 90:16, 91:10, 92:13, 94:8, 100:9
**Analysis** [1] - 79:19
**analysis** [8] - 79:21, 81:1, 87:2, 87:12, 90:25, 91:9, 94:12, 94:14
**analyze** [1] - 98:3
**analyzing** [3] - 91:12, 99:3, 100:9
**ankle** [1] - 36:23
**announced** [1] - 72:8
**Anotar** [7] - 31:5, 31:9, 31:10, 66:15, 66:21, 67:1
**answer** [9] - 44:15, 56:9, 58:14, 61:20, 88:11, 100:6, 100:8, 105:22, 117:12
**anyway** [1] - 98:5
**apologize** [2] - 29:4, 77:18
**appear** [1] - 67:5
**APPEARANCES** [1] - 1:14

**appeared** [1] - 34:9
**applies** [1] - 89:3
**approach** [1] - 14:16
**approximate** [1] - 30:5
**Aranda** [1] - 8:4
**area** [7] - 8:3, 14:5, 14:11, 40:25, 43:12, 78:3, 79:17
**areas** [1] - 43:13
**arm** [1] - 46:1
**arrangements** [1] - 115:7
**array** [1] - 52:25
**arrest** [2] - 104:11, 108:5, 108:13
**arrested** [1] - 108:3
**arrival** [1] - 39:12
**arrive** [1] - 38:2
**arrived** [9] - 7:5, 7:14, 7:25, 8:4, 37:21, 38:3, 38:4, 38:16, 38:21
**arrows** [1] - 87:20
**article** [2] - 32:12, 105:2
**Ashley** [6] - 8:14, 8:16, 8:21, 9:18, 10:19, 11:3
**assault** [1] - 76:12
**asserting** [1] - 72:9
**assigned** [4] - 5:20, 6:14, 28:15, 47:20
**assignment** [1] - 6:22
**assignments** [2] - 5:13, 5:16
**assist** [1] - 6:19
**associate** [1] - 82:6
**associated** [40] - 26:11, 27:5, 29:16, 29:22, 30:2, 30:8, 30:9, 31:7, 31:23, 32:21, 34:7, 64:13, 65:19, 67:25, 69:19, 69:25, 82:6, 82:23, 87:4, 87:18, 88:17, 88:18, 90:16, 90:20, 91:15, 91:20, 91:22, 92:5, 92:16, 94:5, 95:15, 96:24, 97:15, 97:25, 98:7, 98:10, 98:12, 99:21, 99:25, 100:4
**association** [1] - 34:25
**associations** [1] - 99:3
**assume** [4] - 23:10, 23:11, 85:9, 98:2
**AT&T** [5] - 91:3, 96:6, 96:8, 97:12, 102:4

**attempt** [2] - 33:7, 104:15
**attempted** [5] - 87:23, 89:1, 90:7, 90:8, 107:18
**attempts** [2] - 88:1, 88:4
**attended** [1] - 43:1
**attention** [8] - 6:20, 23:21, 27:20, 31:21, 67:21, 67:24, 73:21, 104:11
**attorney** [1] - 72:8
**Attorney's** [1] - 1:16
**attributed** [1] - 26:14
**audio** [1] - 108:15
**August** [1] - 92:6
**AUSA** [2] - 1:15, 1:15
**authenticated** [4] - 20:9, 20:11, 20:25, 21:7
**authentication** [1] - 21:8
**authenticity** [1] - 20:13
**authored** [1] - 59:7
**available** [1] - 113:23
**Avenue** [5] - 1:24, 7:8, 36:24, 37:2, 118:9
**awhile** [1] - 85:24

## B

**back-to-back-to-back** [1] - 68:4
**Ballis** [2] - 47:14, 47:15
**bandaged** [1] - 45:24
**bandages** [2] - 75:8, 75:11
**bank** [1] - 113:21
**based** [10] - 17:9, 18:19, 34:2, 34:9, 42:11, 53:25, 60:4, 69:13, 92:8, 102:18
**basic** [1] - 41:19
**basis** [1] - 20:18
**basketball** [1] - 40:24
**Bate** [3] - 38:19, 48:25, 63:9
**Bates** [5] - 12:8, 16:8, 16:19, 17:12, 17:15
**bay** [1] - 9:3
**Beach** [1] - 116:17
**become** [4] - 7:1, 68:20, 69:3, 104:14
**BEFORE** [1] - 1:12
**beginning** [2] - 37:12, 59:16
**behalf** [4] - 78:21,

78:22, 103:2, 103:3
**behind** [4] - 39:17, 39:20, 57:9, 57:15
**belonged** [2] - 10:20, 84:2
**belonging** [1] - 21:12
**belongs** [3] - 72:13, 99:7, 99:10
**BERTRAND** [2] - 2:6, 4:25
**Bertrand** [9] - 4:18, 5:8, 5:10, 38:18, 51:10, 54:7, 54:16, 57:11
**Bertrand's** [1] - 59:2
**best** [2] - 46:5, 110:18
**better** [1] - 113:12
**between** [33] - 60:15, 65:12, 68:3, 74:2, 81:14, 81:19, 84:4, 87:16, 87:20, 87:23, 88:17, 89:14, 89:16, 90:4, 90:6, 90:10, 90:13, 92:1, 92:21, 93:2, 93:7, 93:11, 93:16, 93:19, 93:20, 93:22, 93:25, 94:3, 94:8, 97:23, 99:4, 100:10, 102:22
**beyond** [3] - 5:25, 36:8, 68:22
**big** [3] - 83:13, 85:13, 111:18
**bill** [4] - 95:19, 96:2, 96:8, 96:10
**binder** [1] - 82:23
**bit** [3] - 16:11, 40:15, 63:22
**black** [1] - 9:24
**blamed** [1] - 13:23
**bleeding** [1] - 75:9
**blood** [13] - 39:22, 39:24, 40:2, 40:7, 40:12, 40:15, 40:16, 40:19, 40:25, 41:2, 41:3, 41:6
**bloodier** [1] - 39:24, 40:5
**BMW** [1] - 9:24
**Bob** [1] - 82:6
**body** [14] - 41:21, 44:20, 45:7, 45:9, 45:23, 48:9, 48:10, 74:3, 74:6, 74:24, 76:19, 76:24, 77:1, 77:6
**bogged** [1] - 6:12
**bottom** [2] - 9:11, 55:3
**bought** [2] - 106:21, 107:1

**bounce** [1] - 76:24
**bounces** [2] - 75:18, 77:4
**box** [3] - 9:15, 9:21, 87:18
**boxes** [2] - 87:17, 87:20
**brand** [1] - 12:6
**break** [5] - 41:19, 50:25, 51:11, 70:21, 78:11
**breakdown** [1] - 88:23
**breaker** [3] - 9:8, 9:15, 9:21
**breaks** [1] - 74:24
**Brief** [4] - 67:9, 78:17, 100:12, 103:11
**briefed** [2] - 8:4, 8:23
**bring** [4] - 4:8, 21:11, 83:11, 86:2
**brought** [5] - 35:9, 67:21, 73:21, 76:8, 111:4
**Broward** [10] - 33:10, 35:9, 36:5, 36:6, 46:12, 46:15, 46:24, 47:1, 47:2, 47:11
**bullet** [12] - 11:21, 45:8, 45:9, 48:6, 48:9, 48:10, 48:12, 74:9, 74:24, 75:17, 75:18, 76:21
**bullet-related** [1] - 11:21
**bullets** [11] - 43:22, 43:25, 45:4, 48:7, 55:20, 57:14, 71:22, 72:7, 72:24, 76:23, 78:13
**bunch** [1] - 65:24
**bureau** [1] - 5:19
**bushes** [1] - 9:14
**business** [1] - 107:9
**buy** [6] - 104:22, 105:12, 109:17, 110:13, 111:25, 114:4
**buying** [4] - 104:8, 107:12, 111:13, 111:20
**BY** [63] - 1:23, 5:3, 15:8, 16:6, 17:6, 19:6, 23:19, 24:13, 25:4, 26:7, 27:2, 27:18, 28:6, 28:17, 29:5, 29:21, 31:17, 32:17, 34:1, 35:15, 36:2, 37:9, 42:10, 46:22, 47:10, 51:9, 54:15, 56:16, 57:3,
57:22, 58:19, 59:3, 61:3, 67:12, 67:23, 69:1, 69:7, 69:12, 69:22, 73:19, 75:3, 77:21, 79:9, 86:23, 88:15, 94:19, 100:13, 100:18, 100:25, 102:13, 103:21, 105:7, 106:22, 109:15, 110:4, 110:9, 110:25, 111:9, 111:23, 112:4, 112:13, 113:1, 113:16

**C**

**C-A-S-T** [1] - 79:20
**C.D** [1] - 108:11
**C.D.s** [1] - 108:14
**C.I** [1] - 112:25
**caliber** [13] - 11:25, 12:6, 12:15, 33:19, 34:8, 34:10, 34:18, 34:19, 34:22, 71:12, 72:4, 72:5, 72:7
**calibers** [1] - 76:25
**caller** [3] - 29:11, 29:14, 29:18
**camera** [2] - 14:8, 63:13
**can't..** [1] - 33:4
**cannot** [2] - 55:24, 113:4
**capacity** [2] - 6:3, 79:23
**captured** [3] - 14:9, 15:25, 63:16
**car** [4] - 9:25, 10:2, 106:4, 106:8
**care** [5] - 47:20, 105:18, 105:19, 106:10, 115:4
**carry** [1] - 82:4
**carry-over** [1] - 82:4
**case** [46] - 6:14, 7:2, 22:22, 33:13, 34:6, 36:10, 37:13, 39:19, 44:16, 52:14, 53:7, 53:20, 53:24, 54:8, 56:6, 58:9, 59:8, 63:5, 69:17, 69:19, 69:25, 76:12, 76:15, 76:18, 79:4, 80:25, 81:10, 82:6, 85:3, 86:2, 94:22, 97:25, 98:3, 98:6, 100:14, 101:7, 114:18, 115:15, 115:16,
116:4, 116:17, 116:18
**CASE** [1] - 1:2
**case-in-chief** [1] - 116:18
**cases** [3] - 5:24, 6:13, 80:2
**casing** [1] - 12:11
**casings** [11] - 10:5, 11:21, 12:4, 12:5, 12:9, 12:14, 33:12, 33:16, 34:5, 35:19, 55:18
**CAST** [1] - 79:20
**Celia** [17] - 13:23, 27:8, 28:15, 28:16, 28:18, 31:10, 31:24, 84:11, 87:7, 90:16, 90:21, 91:16, 92:1, 92:6, 92:9, 95:10, 99:14
**Celia's** [1] - 91:18
**Celias** [1] - 68:14
**cell** [9] - 27:6, 80:24, 81:17, 82:22, 95:16, 95:19, 95:25, 96:2, 96:20
**Cellebrite** [2] - 64:2, 64:5
**cellular** [7] - 10:5, 17:20, 17:22, 25:9, 26:14, 81:2, 94:13
**Cellular** [1] - 79:19
**center** [2] - 16:14, 16:23
**certain** [10] - 6:18, 43:13, 44:6, 44:17, 55:24, 55:25, 76:25, 83:5, 115:5
**certainly** [5] - 45:13, 49:12, 49:16, 83:4, 97:24
**Certified** [1] - 4:3
**certify** [1] - 118:3
**challenging** [2] - 72:9, 72:19
**chance** [2] - 11:4, 115:23
**changes** [1] - 91:10
**charts** [1] - 99:16
**chemist** [2] - 116:8, 116:11
**chief** [1] - 116:18
**circle** [1] - 16:23
**circled** [1] - 16:24
**City** [1] - 7:9
**claiming** [1] - 72:23
**clarify** [1] - 39:1
**class** [6] - 43:20, 51:16, 51:18, 51:20,
51:21, 51:24
**classes** [3] - 43:1, 43:2, 43:18
**Clay** [11] - 8:14, 8:16, 8:22, 9:18, 10:19, 11:3, 12:20, 37:24, 43:13, 49:16, 52:6
**clear** [4] - 29:19, 40:1, 82:8, 101:18
**clearly** [1] - 87:25
**client** [2] - 106:18, 117:9
**clip** [1] - 112:12
**close** [4] - 17:19, 44:2, 50:13, 54:17
**close-up** [1] - 17:19
**closer** [1] - 101:13
**closing** [1] - 23:3
**clothes** [7] - 38:22, 39:3, 39:5, 48:14, 50:14, 50:23
**clothing** [13] - 10:5, 10:9, 10:14, 10:19, 11:1, 32:13, 54:20, 55:14, 77:7, 77:8, 77:10, 105:3
**cloud** [1] - 50:8
**clubhouse** [6] - 14:3, 14:20, 15:22, 16:10, 16:15, 63:13
**Coast** [1] - 91:6
**cocaine** [30] - 104:8, 104:9, 104:15, 104:22, 105:9, 105:10, 105:12, 105:24, 106:15, 106:16, 106:21, 107:1, 107:2, 107:7, 107:12, 107:14, 107:18, 107:22, 108:6, 109:18, 110:20, 111:3, 111:14, 111:25, 112:19, 114:4, 114:9, 116:9
**coconspirator** [1] - 84:21
**collect** [9] - 11:12, 14:22, 14:25, 33:7, 33:9, 35:9, 43:5, 49:23, 50:19
**collected** [6] - 11:16, 11:24, 12:1, 12:23, 32:6, 77:24
**collection** [2] - 26:18, 50:22
**collectively** [1] - 109:14
**Colombia** [1] - 112:8
**Colombian** [1] - 112:6
51:21, 51:24
**colored** [1] - 15:24
**column** [1] - 29:7
**coming** [4] - 22:23, 23:11, 30:20, 115:3
**comment** [1] - 104:20
**common** [1] - 56:10
**commonly** [1] - 53:17
**communicate** [1] - 113:3
**communicated** [1] - 89:16
**communicating** [1] - 90:21
**communication** [2] - 102:19, 102:23
**communities** [1] - 7:22
**community** [2] - 7:21, 14:2
**Compa** [1] - 65:2
**compact** [1] - 80:9
**companies** [2] - 96:21, 100:19
**company** [7] - 21:2, 21:4, 21:6, 21:11, 21:12, 25:25, 27:25
**compared** [1] - 6:15
**completed** [1] - 114:1
**complex** [1] - 14:5
**complicated** [1] - 39:1
**component** [1] - 68:20
**computer** [1] - 70:11
**concerning** [1] - 36:19
**concluded** [5] - 23:17, 70:20, 86:11, 102:11, 117:21
**conclusion** [1] - 54:12
**condition** [1] - 60:24
**conducted** [3] - 18:3, 76:11, 90:25
**conducting** [2] - 10:3, 76:13
**conference** [2] - 71:2, 117:7
**confidential** [3] - 107:24, 113:18, 114:2
**connected** [2] - 33:18, 82:16
**connection** [1] - 63:4
**consider** [2] - 44:10, 86:19
**considered** [1] - 117:5
**consistent** [5] - 12:15, 12:17, 34:9, 55:18, 77:7
**contact** [30] - 23:21, 23:24, 23:25, 24:17, 25:5, 25:6, 25:8, 25:19, 26:8, 26:11,

27:3, 27:6, 29:16, 29:22, 30:2, 30:9, 31:7, 31:23, 53:19, 64:9, 64:10, 64:11, 82:24, 90:4, 90:6, 95:8, 98:17, 98:19, 98:21, 107:21
**contacted** [2] - 90:17, 91:17
**contacts** [19] - 24:21, 25:8, 30:19, 32:4, 63:23, 65:22, 66:3, 67:14, 67:18, 67:25, 68:8, 68:11, 90:7, 90:10, 90:13, 93:2, 95:8, 100:9, 105:13
**contained** [3] - 18:2, 18:8, 69:3
**contaminate** [1] - 11:7
**contemplating** [1] - 116:5
**content** [2] - 15:16, 81:12
**contents** [3] - 10:24, 19:9, 19:13
**contesting** [1] - 71:6
**context** [1] - 110:16
**continue** [2] - 23:18, 31:7
**continued** [2] - 17:21, 20:22
**conversation** [3] - 106:14, 110:20, 111:5
**conversations** [1] - 108:13
**convicted** [3] - 106:24, 107:2, 107:4
**conviction** [1] - 104:12
**cooperating** [1] - 23:14
**Coral** [3] - 14:10, 36:10, 117:7
**Coral-something** [1] - 14:10
**corner** [1] - 16:18
**correct** [140] - 21:10, 25:17, 26:1, 29:15, 34:14, 37:15, 37:18, 37:22, 38:5, 38:6, 38:8, 38:11, 38:12, 38:13, 39:5, 39:8, 39:15, 39:16, 39:20, 39:23, 40:2, 40:10, 40:13, 40:20, 40:25, 41:6, 41:9, 41:25, 42:2, 43:6, 43:9, 43:13, 43:19, 43:23, 43:24, 43:25, 44:3,

44:7, 46:6, 46:13, 48:15, 48:18, 49:1, 49:3, 49:14, 49:18, 49:24, 49:25, 50:9, 50:10, 50:11, 50:15, 50:16, 50:17, 51:13, 52:14, 52:22, 52:25, 53:1, 53:3, 53:13, 54:10, 54:17, 54:18, 55:8, 55:11, 55:16, 55:22, 56:3, 56:6, 57:25, 58:2, 60:5, 60:9, 60:11, 60:13, 60:16, 60:19, 60:21, 60:24, 61:6, 61:8, 63:17, 64:4, 64:7, 64:24, 65:3, 65:9, 66:3, 66:11, 66:16, 66:19, 66:21, 66:24, 67:1, 67:3, 67:5, 71:10, 77:25, 89:4, 89:6, 89:8, 90:5, 90:8, 92:10, 92:24, 93:12, 93:13, 94:11, 94:23, 95:2, 95:6, 95:10, 95:11, 95:13, 95:17, 96:3, 96:6, 96:8, 96:13, 96:18, 96:21, 96:22, 98:5, 98:7, 98:8, 98:17, 98:18, 99:4, 99:8, 99:11, 99:13, 99:22, 99:23, 100:2, 100:5, 100:7, 100:8, 100:9, 102:1
**counsel** [5] - 28:25, 73:20, 101:1, 116:4, 116:25
**count** [2] - 45:2, 73:8
**counting** [2] - 94:7, 97:23
**County** [6] - 46:12, 46:15, 46:24, 47:1, 47:2, 47:11
**couple** [5] - 5:20, 8:20, 14:3, 17:25, 93:2
**course** [10] - 14:22, 14:25, 33:5, 36:8, 42:22, 68:18, 69:2, 69:8, 69:9, 80:3
**COURT** [167] - 1:1, 4:7, 4:9, 4:12, 15:6, 16:4, 17:5, 17:8, 19:5, 20:8, 20:11, 20:15, 20:17, 20:24, 21:3, 21:6, 21:14, 21:19, 21:21, 21:23, 22:2, 22:5, 22:7, 22:10, 22:16, 22:23,

22:25, 23:10, 23:16, 23:18, 24:9, 25:1, 25:15, 25:20, 25:22, 25:24, 26:3, 26:5, 26:25, 27:16, 28:4, 28:25, 29:3, 29:13, 29:18, 31:16, 33:22, 34:3, 35:12, 35:24, 42:8, 46:21, 47:9, 50:25, 51:7, 54:14, 56:8, 56:12, 56:23, 57:1, 57:21, 58:16, 61:1, 67:22, 68:24, 69:6, 69:9, 69:21, 70:3, 70:6, 70:12, 70:15, 70:21, 70:22, 70:24, 71:1, 71:8, 71:13, 71:17, 71:21, 71:24, 72:1, 72:5, 72:17, 72:22, 73:1, 73:3, 73:4, 73:6, 73:8, 73:12, 73:14, 73:16, 74:20, 74:22, 77:19, 78:19, 78:23, 81:25, 82:3, 82:8, 82:10, 82:13, 82:18, 82:20, 82:25, 83:4, 83:7, 83:10, 83:13, 83:16, 83:18, 83:20, 83:23, 84:1, 84:4, 84:9, 84:15, 84:18, 84:21, 84:24, 85:8, 85:12, 85:16, 85:23, 86:6, 86:12, 88:10, 100:22, 101:7, 101:10, 101:12, 101:17, 101:19, 101:23, 102:6, 102:9, 102:12, 103:1, 103:8, 103:10, 105:23, 106:19, 108:23, 109:3, 109:7, 109:10, 109:21, 111:22, 114:15, 114:19, 114:21, 114:23, 115:11, 115:13, 115:18, 115:21, 115:23, 116:4, 116:11, 116:13, 116:15, 116:23, 117:2, 117:14, 117:18, 117:22
**court** [8] - 23:17, 32:10, 66:13, 70:20, 73:7, 86:11, 102:11, 104:25
**Court** [8] - 1:23, 1:24, 4:1, 4:3, 4:4, 115:1, 117:1, 118:8

**Court-Certified** [1] - 4:3
**COURTROOM** [7] - 4:4, 4:20, 4:24, 73:7, 79:3, 103:12, 103:17
**courtroom** [6] - 4:11, 51:2, 51:5, 70:23, 73:18, 114:20
**covered** [2] - 14:11, 14:12
**create** [2] - 53:7, 85:20
**created** [2] - 50:3, 83:15
**crime** [26] - 6:18, 8:13, 11:4, 11:6, 11:7, 11:8, 11:11, 11:19, 12:13, 13:2, 13:25, 26:9, 27:10, 33:17, 34:23, 40:9, 45:25, 48:12, 51:17, 52:5, 71:20, 76:13, 84:22, 85:1, 89:11
**Crime** [5] - 8:13, 37:24, 43:12, 49:16, 52:6
**crimes** [3] - 5:20, 6:1, 84:20
**criminal** [1] - 74:1
**CROSS** [2] - 37:8, 94:18
**cross** [4] - 2:7, 58:24, 68:23, 115:23
**Cross** [1] - 2:9
**CROSS-EXAMINATION** [2] - 37:8, 94:18
**cross-examination** [3] - 2:7, 58:24, 68:23
**Cross-Examination** [1] - 2:9
**cross-examine** [1] - 115:23
**CRR** [2] - 1:23, 118:8
**cull** [1] - 86:20
**current** [1] - 6:22
**custodian** [4] - 21:3, 21:11, 70:7, 70:16
**customer** [1] - 102:2
**cut** [2] - 48:23, 61:4

**D**

**Dairon** [1] - 66:13
**dark** [5] - 15:24, 17:17, 32:14, 58:6, 63:19
**dark-colored** [1] - 15:24
**data** [4] - 64:6, 81:19, 83:12, 95:5

**database** [1] - 70:9
**databases** [1] - 69:18
**date** [25] - 6:20, 6:22, 29:6, 29:11, 30:5, 30:16, 30:20, 31:8, 31:9, 32:2, 32:3, 59:5, 59:6, 67:16, 83:5, 87:4, 90:19, 90:23, 90:24, 91:12, 92:15, 93:23, 94:1, 94:4, 99:25
**dates** [4] - 28:24, 89:9, 89:10, 89:11
**DAY** [1] - 1:10
**daylight** [1] - 91:5
**days** [2] - 14:3, 102:23
**deal** [5] - 74:4, 74:5, 107:7, 107:14, 108:6
**death** [1] - 76:15
**debate** [2] - 85:13, 85:24
**deceased** [1] - 56:1
**decedent's** [1] - 44:20
**december** [1] - 1:5
**decide** [1] - 85:2
**decreasing** [1] - 93:4
**DEFENDANT** [5] - 1:19, 72:15, 72:21, 72:25, 73:2
**defendant** [29] - 13:10, 13:14, 13:15, 13:20, 22:2, 22:11, 22:19, 22:25, 23:5, 25:19, 28:16, 32:9, 32:10, 32:16, 32:25, 33:2, 44:16, 55:24, 73:10, 73:22, 105:6, 105:9, 106:15, 107:6, 107:11, 107:15, 111:20, 116:23, 117:4
**Defendant** [1] - 4:2
**defendant's** [1] - 13:12
**defense** [9] - 58:24, 73:20, 78:22, 101:1, 103:3, 115:15, 115:16, 116:2, 116:25
**defensive** [3] - 44:7, 44:9, 44:11
**demonstrate** [1] - 86:18
**demonstrative** [7] - 85:6, 85:9, 85:16, 86:6, 86:13, 86:20, 86:25
**Denver** [1] - 80:1
**Department** [6] - 4:19, 5:9, 5:11, 5:14, 5:17,

36:10
**department** [4] - 6:8, 13:3, 13:4, 13:12
**depicted** [1] - 7:25
**depiction** [1] - 83:20
**deputies** [1] - 47:20
**deputy** [2] - 35:10, 47:12
**DEPUTY** [7] - 4:4, 4:20, 4:24, 73:7, 79:3, 103:12, 103:17
**DERIC** [1] - 1:19
**Deric** [1] - 1:19
**describe** [2] - 80:22, 96:21
**described** [2] - 54:1, 56:2
**detective** [29] - 5:8, 5:19, 6:3, 6:4, 6:7, 6:11, 6:15, 7:10, 10:3, 12:14, 13:6, 16:7, 23:20, 24:14, 30:18, 36:3, 36:18, 38:18, 40:9, 42:22, 43:4, 45:13, 49:12, 52:13, 67:13, 73:20, 74:2, 74:4, 117:6
**Detective** [19] - 4:18, 5:10, 6:20, 10:22, 16:12, 16:24, 18:12, 18:23, 28:7, 33:5, 36:8, 36:9, 36:25, 40:8, 51:10, 54:7, 54:16, 57:11, 59:2
**DETECTIVE** [2] - 2:6, 4:25
**detectives** [2] - 6:9, 6:19
**determinations** [1] - 49:17
**determine** [11] - 42:16, 43:22, 43:25, 44:2, 44:5, 44:6, 45:9, 54:4, 65:22, 86:7
**development** [3] - 7:7, 14:4, 16:10
**DHSMV** [1] - 69:23
**difference** [3] - 31:20, 55:7, 74:2
**different** [16] - 40:4, 41:14, 54:24, 59:16, 65:1, 74:11, 75:5, 75:19, 80:2, 80:25, 81:14, 81:20, 91:2, 91:3, 109:24
**Dilaudid** [4] - 61:24, 62:3, 62:6, 62:17
**DIRECT** [4] - 5:2, 67:11, 79:8, 103:20

**direct** [9] - 2:6, 6:18, 17:9, 33:22, 46:10, 50:19, 50:22, 63:7, 69:11
**Direct** [2] - 2:9, 2:12
**direction** [1] - 43:15
**directions** [1] - 77:2
**directly** [1] - 7:19
**directory** [2] - 18:7, 24:16
**discharged** [1] - 34:25
**discovered** [1] - 46:3
**discuss** [1] - 114:18
**discussed** [1] - 99:18
**discussion** [5] - 20:16, 70:5, 82:2, 101:11, 116:25
**disk** [3] - 80:13, 80:15, 80:18
**disks** [1] - 80:9
**displays** [1] - 99:16
**dispute** [7] - 40:12, 40:19, 41:20, 41:21, 41:22, 41:23, 54:7
**distance** [1] - 55:2
**distances** [1] - 75:19
**District** [4] - 1:24, 4:4, 4:5, 118:8
**DISTRICT** [3] - 1:1, 1:1, 1:12
**doctor** [4] - 115:4, 116:17, 116:19, 117:4
**doctors** [2] - 74:8, 116:22
**document** [6] - 25:16, 70:12, 70:13, 70:17, 70:18
**documented** [1] - 41:20
**documents** [6] - 20:17, 20:19, 70:4, 83:21, 86:16, 86:21
**DONALD** [1] - 1:12
**Donald** [1] - 4:5
**done** [6] - 12:21, 15:9, 43:1, 43:2, 56:1, 76:3
**door** [16] - 9:21, 10:7, 10:8, 13:17, 13:18, 42:14, 42:15, 42:17, 42:19, 53:25, 54:4, 55:1, 55:3, 55:4, 55:14, 56:21
**doors** [2] - 9:5, 9:20
**down** [14] - 6:12, 10:10, 30:7, 30:18, 37:20, 41:19, 49:4, 49:6, 51:3, 70:24, 70:25, 114:22,

117:10
**download** [3] - 18:5, 81:7, 98:18
**downloaded** [4] - 64:22, 84:13, 87:9, 94:15
**downloads** [1] - 10:23
**downtown** [1] - 104:3
**Dr** [5] - 62:25, 63:2, 63:4, 115:3, 117:6
**drafted** [1] - 59:8
**draw** [4] - 6:20, 23:21, 31:21, 104:11
**drawing** [1] - 67:24
**drive** [1] - 14:13
**driveway** [1] - 9:24
**driving** [1] - 15:24
**drop** [1] - 30:7
**dropped** [2] - 88:21, 93:8
**drops** [1] - 40:15
**drug** [2] - 113:6, 113:10
**DUANE** [1] - 1:15
**during** [10] - 8:20, 13:20, 23:3, 63:7, 68:18, 81:15, 89:2, 89:16, 90:3, 92:14
**duty** - 37:15
**DVD** [1] - 15:16
**DVR** [2] - 14:4, 14:20

## E

**E-I-C-H-E-R** [1] - 79:16
**earshot** [1] - 13:15
**easier** [2] - 75:6, 109:24
**East** [1] - 91:6
**effects** [2] - 62:17, 62:19
**EICHER** [2] - 2:8, 79:7
**Eicher** [3] - 79:2, 79:15, 80:3
**eight** [1] - 12:1
**either** [1] - 11:8
**ejected** [1] - 12:12
**Elaine** [1] - 30:10
**Elchis** [1] - 68:16
**electricity** [2] - 9:9, 9:16
**electronic** [1] - 80:24
**Elementary** [1] - 14:10
**elements** [2] - 54:24, 75:5
**elicits** [1] - 33:22
**emitted** [1] - 50:6
**employee** [1] - 32:19
**employment** [1] -

32:19
**end** [2] - 14:13, 59:17
**ending** [15] - 19:10, 19:13, 19:19, 19:23, 20:2, 28:15, 28:19, 28:23, 29:24, 30:4, 30:16, 91:19, 91:25, 92:5, 92:22
**engaged** [1] - 42:25
**enter** [1] - 7:20
**entered** [6] - 4:11, 38:19, 51:5, 73:18, 98:9, 98:11
**entering** [1] - 16:21, 17:1, 48:10
**entitled** [1] - 118:5
**entrance** [2] - 7:23
**entries** [1] - 48:6
**entry** [16] - 28:20, 30:1, 30:2, 30:7, 31:6, 45:1, 67:24, 68:3, 68:4, 74:7, 74:17, 74:23, 75:2, 112:11, 112:25
**equate** [1] - 41:17
**Erika** [1] - 67:3
**esposa** [1] - 31:4
**ESQ** [1] - 1:19
**establish** [2] - 72:13, 86:15
**established** [2] - 51:12, 83:25
**event** [2] - 107:1, 115:8
**eventually** [7] - 8:17, 8:19, 9:22, 11:14, 13:2, 15:11, 33:15
**evidence** [80] - 7:10, 10:4, 10:16, 11:3, 11:5, 11:13, 11:21, 11:22, 12:7, 12:15, 13:25, 14:1, 15:4, 15:7, 15:10, 16:2, 16:5, 17:13, 20:4, 20:19, 21:15, 21:18, 24:7, 24:15, 24:25, 25:3, 25:13, 26:6, 26:23, 27:1, 27:17, 28:3, 28:5, 33:14, 33:18, 34:6, 34:7, 34:11, 34:20, 34:24, 35:22, 35:25, 38:19, 43:5, 43:8, 46:8, 48:24, 49:24, 55:12, 55:13, 55:23, 70:13, 71:12, 72:12, 74:13, 74:14, 74:16, 77:14, 80:6, 80:14, 81:17, 81:22, 82:18, 82:22, 83:1, 83:8, 83:21,

85:7, 85:18, 86:4, 86:14, 86:16, 86:18, 108:11, 108:15, 108:21, 108:25
**EVIDENCE** [2] - 2:3, 3:3
**evidence-wise** [1] - 108:15
**exact** [2] - 26:3, 58:7
**exactly** [1] - 101:12
**EXAMINATION** [7] - 5:2, 37:8, 67:11, 79:8, 94:18, 100:17, 103:20
**Examination** [7] - 2:6, 2:7, 2:7, 2:9, 2:9, 2:10, 2:12
**examination** [4] - 46:10, 58:24, 68:23, 69:15
**examine** [4] - 10:24, 44:24, 81:3, 115:23
**examiner** [8] - 44:18, 74:5, 74:6, 74:12, 75:13, 75:14, 76:16, 76:20
**examining** [2] - 74:6, 74:13
**example** [5] - 67:16, 67:24, 88:4, 88:8, 88:16
**examples** [1] - 28:7
**exchange** [1] - 112:5
**excuse** [6] - 20:10, 28:25, 91:19, 91:21, 92:1, 113:17
**excused** [7] - 78:19, 78:23, 78:25, 103:1, 103:4, 114:21, 116:24
**exercise** [1] - 42:25
**exhibit** [12] - 26:10, 27:19, 59:1, 65:25, 67:14, 67:17, 85:9, 86:7, 86:8, 86:13, 86:20
**EXHIBIT** [1] - 3:2
**Exhibit** [43] - 3:6, 3:7, 3:8, 3:9, 3:10, 3:11, 3:12, 3:13, 3:14, 3:15, 3:16, 8:1, 15:6, 15:7, 15:10, 15:14, 15:15, 16:2, 19:12, 19:22, 20:4, 24:4, 24:7, 25:3, 26:6, 27:1, 27:17, 28:5, 28:8, 34:21, 35:4, 35:22, 35:25, 38:19, 48:25, 59:1, 63:8, 72:3, 77:15, 80:7,

81:12, 95:4, 108:21
**Exhibits** [2] - 16:5, 108:24
**EXHIBITS** [1] - 3:4
**exit** [3] - 45:1, 74:7, 75:4
**exited** [1] - 51:2, 70:23, 114:20
**expanded** [1] - 75:10
**experience** [4] - 34:9, 45:3, 101:4, 101:19
**expert** [4] - 60:25, 102:6, 102:9, 116:11
**explain** [8] - 6:7, 7:15, 24:9, 35:13, 52:16, 53:16, 80:22, 107:17
**explained** [3] - 7:17, 55:23, 76:23
**extract** [2] - 64:6, 95:5
**extracting** [1] - 64:2
**eyes** [1] - 34:5

**F**

**fabric** [1] - 78:11
**face** [1] - 10:10
**facility** [1] - 36:6
**fact** [16] - 37:24, 38:10, 39:14, 40:18, 40:19, 41:6, 41:20, 43:11, 46:6, 54:5, 56:2, 57:5, 57:17, 94:14, 99:20, 101:15
**fall** [1] - 50:11
**falling** [1] - 55:15
**familiar** [3] - 7:1, 62:17, 62:19
**familiarize** [4] - 61:10, 61:14, 61:17, 61:21
**family** [4] - 13:11, 13:15, 13:21, 59:17
**famous** [1] - 76:25
**far** [3] - 21:15, 81:12, 117:10
**fast** [1] - 56:2
**FBI** [6] - 2:8, 79:7, 79:16, 79:17, 79:20, 80:3
**FBI's** [1] - 79:19
**FDC** [2] - 104:3, 104:4
**Federal** [1] - 1:23
**feet** [1] - 106:6
**fell** [1] - 9:14
**felony** [2] - 106:24, 107:4
**fence** [1] - 17:2
**Ferna** [1] - 65:2
**few** [1] - 67:20
**Fidel** [1] - 106:11
**figure** [1] - 50:1

**file** [1] - 94:15
**fill** [1] - 86:2
**filtered** [1] - 49:18
**filters** [1] - 49:14
**fine** [6] - 22:10, 23:8, 23:10, 114:10, 114:11
**finger** [1] - 16:12
**finish** [1] - 116:7
**fire** [7] - 38:7, 38:15, 39:9, 39:11, 39:17, 39:20, 50:8
**firearm** [20] - 12:15, 33:18, 33:19, 34:7, 34:8, 50:6, 50:8, 71:5, 71:7, 71:9, 71:16, 71:17, 71:22, 72:4, 72:5, 72:7, 72:9, 72:20, 72:22, 72:23
**firearms** [1] - 71:14
**fired** [6] - 12:3, 12:11, 42:6, 50:3, 53:19, 57:15
**first** [15] - 8:18, 9:4, 27:19, 48:19, 59:21, 66:6, 79:15, 83:24, 85:8, 87:1, 91:18, 95:3, 109:7, 109:10, 112:25
**five** [3] - 31:19, 87:17, 102:19
**flashlight** [2] - 9:12, 9:13
**FLORIDA** [1] - 1:1
**Florida** [6] - 1:4, 1:18, 1:21, 1:25, 4:5, 118:9
**follow** [3] - 76:20, 77:5, 99:1
**followed** [1] - 13:13
**following** [9] - 23:17, 70:20, 86:11, 92:15, 102:11, 104:21, 105:12, 105:16, 105:17
**follows** [9] - 5:1, 20:16, 64:1, 70:5, 79:7, 82:2, 101:11, 103:19, 117:1
**foot** [1] - 55:6
**FOR** [2] - 1:15, 1:19
**force** [2] - 78:11, 79:21
**forced** [1] - 75:11
**foregoing** [1] - 118:3
**forensics** [1] - 10:23
**forfeit** [3] - 71:21, 72:6, 72:17
**forfeiture** [5] - 71:2,

71:9, 71:14, 73:8, 73:12
**forgive** [1] - 98:24
**form** [4] - 32:20, 41:19, 74:19, 105:21
**forms** [1] - 50:9
**Fort** [1] - 1:21
**forth** [2] - 87:13, 117:11
**forward** [1] - 115:16
**foundation** [2] - 23:18, 102:3
**four** [7] - 31:19, 51:19, 91:10, 93:11, 99:18, 102:19, 110:23
**FPR** [3] - 1:23, 118:8
**frame** [1] - 87:5
**Frankowitz** [2] - 115:3, 117:6
**front** [18] - 7:12, 8:5, 8:8, 9:14, 9:17, 10:7, 10:8, 40:24, 42:14, 42:15, 42:17, 42:18, 53:25, 54:3, 55:14, 56:11, 56:21, 57:16
**full** [1] - 68:20
**funds** [2] - 73:9, 73:11

**G**

**Gables** [3] - 36:10, 36:12, 117:7
**gain** [1] - 112:17
**Garcia** [21] - 4:2, 7:2, 38:4, 41:11, 42:5, 42:12, 45:15, 45:22, 46:18, 50:20, 50:23, 53:8, 53:9, 56:5, 57:4, 57:24, 95:5, 98:12, 112:5, 112:14, 113:2
**garcia** [1] - 45:17
**GARCIA** [5] - 1:7, 72:15, 72:21, 72:25, 73:2
**gate** [1] - 7:22
**gated** [2] - 7:21, 7:22
**generated** [1] - 64:6
**gentlemen** [5] - 4:13, 51:1, 51:7, 86:12, 114:16
**given** [13] - 10:14, 10:19, 59:23, 61:11, 61:15, 61:18, 62:3, 62:6, 62:11, 62:14, 94:25, 98:6, 103:7
**glad** [2] - 79:14, 80:23
**glass** [2] - 9:5, 9:20
**GLENDA** [2] - 1:23, 118:8

**Glock** [2] - 11:23, 34:13
**gloves** [2] - 77:16, 77:18
**GMT** [3] - 31:12, 31:18, 32:3
**God** [3] - 4:22, 79:5, 103:15
**Godfather** [15] - 104:16, 104:24, 106:3, 107:16, 107:19, 108:1, 110:14, 111:25, 112:22, 113:8, 113:11, 113:20, 114:3, 114:6, 114:11
**Google** [2] - 15:21, 16:9
**GOVERNMENT** [1] - 1:15
**Government** [14] - 23:13, 28:8, 63:24, 71:14, 72:3, 72:6, 72:11, 78:21, 81:16, 86:15, 95:21, 95:22, 95:25, 115:9
**government** [1] - 71:1
**Government's** [68] - 7:11, 10:17, 12:8, 14:17, 15:4, 15:6, 15:7, 15:9, 15:13, 15:18, 16:2, 16:5, 16:7, 16:20, 17:12, 17:15, 17:18, 18:11, 18:24, 19:12, 19:18, 19:22, 20:1, 20:4, 23:20, 24:4, 24:6, 24:25, 25:3, 25:13, 26:6, 26:9, 26:22, 27:1, 27:4, 27:14, 27:17, 28:3, 28:5, 32:7, 34:12, 34:21, 35:4, 35:22, 35:25, 38:19, 46:9, 63:8, 63:25, 77:15, 77:22, 77:23, 80:7, 80:14, 80:17, 80:19, 81:9, 81:12, 81:22, 86:25, 95:4, 108:9, 108:12, 108:17, 108:21, 108:24
**GOVERNMENT'S** [2] - 2:3, 3:4
**GPS** [1] - 36:13
**Graham** [1] - 4:5
**GRAHAM** [1] - 1:12
**grazes** [1] - 75:1
**grease** [6] - 111:1, 111:2, 111:4, 111:6, 114:8, 114:9

**green** [2] - 28:9
**Greenwich** [4] - 31:19, 91:4, 91:8, 91:11
**grounds** [1] - 7:20
**group** [1] - 80:9
**GSR** [10] - 49:20, 49:23, 50:3, 51:12, 51:13, 53:15, 53:17, 53:18, 54:16, 54:20
**GSR's** [2] - 54:4, 55:2
**guard** [1] - 7:21
**guarding** [1] - 47:21
**guess** [8] - 10:8, 21:24, 22:7, 22:23, 36:23, 41:16, 85:5, 101:23
**gun** [20] - 11:24, 11:25, 12:12, 12:12, 12:17, 34:13, 34:14, 34:16, 34:18, 42:6, 44:6, 45:17, 45:22, 50:3, 53:19, 57:18, 71:19, 73:21, 74:17
**guns** [1] - 34:5
**gunshot** [15] - 12:14, 41:21, 44:9, 45:14, 48:5, 49:20, 50:19, 50:22, 60:18, 74:2, 74:17, 77:12, 77:25, 78:10
**guy** [3] - 22:17, 33:4, 85:1
**guys** [1] - 9:3
**gym** [3] - 14:6, 14:7, 14:8

**H**

**Halloween** [3] - 10:12, 76:4
**hand** [5] - 4:20, 50:11, 77:17, 79:3, 103:12
**handed** [1] - 109:12
**handicapped** [1] - 106:3
**handled** [1] - 39:11
**hands** [1] - 106:7
**hangs** [1] - 88:5
**head** [1] - 106:7
**hear** [5] - 13:21, 59:15, 100:23, 109:24, 110:5
**heard** [9] - 19:7, 24:11, 58:5, 58:14, 59:19, 62:12, 62:15, 63:4, 110:11
**hearing** [4] - 62:4, 62:7, 71:9, 72:10
**hearsay** [13] - 17:4, 33:20, 35:11, 42:7,

46:20, 47:8, 56:7, 57:19, 68:22, 69:11, 69:20, 70:10, 70:15

**heavy** [1] - 62:1

**HECTOR** [2] - 2:6, 4:25

**Hector** [2] - 4:18, 5:8

**heightened** [2] - 60:24, 61:1

**Held** [1] - 1:8

**held** [11] - 5:13, 5:16, 20:16, 23:17, 70:5, 70:20, 82:2, 86:11, 101:11, 102:11, 116:25

**help** [6] - 4:22, 44:21, 54:4, 77:4, 79:5, 103:15

**hereby** [1] - 118:3

**Herm** [1] - 65:12

**hi** [1] - 8:17

**himself** [1] - 104:19

**hit** [3] - 13:22, 75:17, 76:24

**hits** [2] - 75:18, 75:19

**hole** [5] - 77:12, 78:7, 78:8, 78:10, 78:12

**holes** [5] - 41:17, 44:25, 48:13, 48:17, 48:21

**home** [7] - 6:2, 7:18, 36:23, 37:4, 42:2, 71:10, 96:13

**homeowner** [3] - 12:18, 12:25, 42:2

**homeowner's** [2] - 11:24, 16:16

**homeowners** [1] - 7:23

**homicide** [3] - 5:22, 5:24, 76:11

**homicides** [1] - 5:25

**Honor** [28] - 4:17, 15:3, 16:1, 20:3, 22:24, 29:4, 35:21, 37:7, 54:13, 56:10, 56:25, 70:14, 70:19, 77:18, 78:16, 78:18, 78:20, 78:24, 79:1, 81:21, 88:12, 94:17, 102:25, 103:5, 108:20, 109:23, 114:13, 115:14

**HONORABLE** [1] - 1:12

**Honorable** [1] - 4:5

**hood** [1] - 10:2

**hoop** [1] - 40:24

**hope** [1] - 117:12

**hospital** [37] - 13:7,

13:9, 13:11, 13:13, 14:1, 38:10, 41:8, 41:14, 41:20, 41:23, 44:24, 45:18, 45:19, 47:4, 47:5, 47:7, 47:11, 47:13, 47:18, 47:19, 47:21, 47:22, 50:17, 57:23, 60:11, 60:13, 60:15, 61:11, 61:15, 61:18, 61:22, 62:3, 74:5, 74:8, 74:14, 75:7

**hospital's** [2] - 41:15, 44:25

**hour** [2] - 63:22, 110:7

**hours** [7] - 7:1, 31:20, 59:18, 60:9, 91:10, 91:11, 117:9

**house** [20] - 8:5, 8:8, 8:9, 9:4, 9:7, 9:9, 9:16, 11:18, 12:5, 13:23, 15:22, 16:16, 16:18, 40:20, 40:24, 42:15, 104:17

**human** [1] - 44:13

**hundred** [1] - 111:6

**hundreds** [1] - 81:18

**Huntingdon** [1] - 14:21

**hypothetical** [1] - 84:25

**I**

**I-75** [1] - 7:7

**identification** [24] - 14:17, 15:14, 15:17, 18:24, 19:11, 19:17, 19:21, 19:25, 20:4, 20:5, 20:6, 24:4, 25:1, 25:13, 26:22, 27:14, 35:3, 58:25, 59:1, 81:8, 81:11, 108:8

**identified** [7] - 21:24, 32:16, 84:10, 84:13, 84:17, 88:17, 105:6

**identify** [14] - 32:12, 43:4, 45:17, 45:22, 48:4, 52:19, 52:20, 52:22, 53:23, 69:25, 72:1, 84:7, 104:25, 105:2

**identity** [1] - 99:20

**IGNACIO** [1] - 1:15

**image** [2] - 63:9, 63:12

**images** [1] - 32:5

**imagine** [3] - 60:23, 95:19, 96:10

**immediate** [1] - 6:25

**imperfections** [1] - 41:17

**importance** [1] - 43:21

**important** [4] - 44:17, 45:14, 89:11, 98:3

**IN** [1] - 3:3

**inadvertently** [1] - 11:9

**inch** [1] - 55:6

**incident** [14] - 6:24, 7:13, 15:12, 17:2, 18:22, 29:8, 29:12, 36:9, 36:22, 53:20, 54:1, 63:19, 104:14

**include** [4] - 18:6, 87:3, 88:19, 88:21

**included** [2] - 48:15, 87:5

**includes** [1] - 6:2

**incoming** [3] - 28:14, 31:7, 66:5

**incorporate** [1] - 94:12

**indicate** [2] - 87:20, 92:18

**indication** [1] - 117:14

**indictment** [1] - 71:3

**individual** [3] - 87:3, 88:2, 89:14

**individually** [1] - 83:11

**individuals** [13] - 56:6, 80:25, 89:22, 89:24, 90:2, 91:20, 92:12, 93:7, 93:11, 93:19, 93:22, 93:25, 94:4

**individuals'** [2] - 90:6, 93:2

**informant** [3] - 107:25, 113:18, 114:2

**information** [27] - 8:24, 13:24, 17:1, 18:10, 18:13, 18:19, 23:2, 25:25, 32:19, 49:14, 49:17, 53:25, 64:2, 86:21, 89:18, 96:17, 96:20, 97:6, 97:7, 97:12, 97:14, 97:17, 97:21, 98:5, 98:19, 100:14

**inherit** [1] - 6:14

**initialed** [4] - 80:10, 80:13, 80:16, 80:18

**injuries** [1] - 38:13

**inner** [1] - 46:1

**inquire** [2] - 69:18, 117:3

**inserted** [1] - 76:19

**inside** [17] - 8:6, 9:9,

9:16, 10:7, 11:7, 11:14, 11:15, 11:16, 11:18, 12:5, 14:6, 17:3, 42:15, 48:9, 49:11, 77:1

**inspection** [1] - 34:4

**intact** [1] - 12:3

**intend** [1] - 117:3

**intended** [1] - 115:2

**intent** [2] - 71:1, 71:2

**interacting** [1] - 92:9

**interested** [1] - 44:25

**intermediary** [1] - 107:9

**Interpreter** [1] - 103:18

**Interpreters** [1] - 4:3

**introduce** [6] - 5:6, 11:8, 72:12, 79:12, 103:24

**introduced** [2] - 46:8, 71:12

**invalido** [1] - 113:2

**invasion** [3] - 7:19, 36:23, 37:4

**invasions** [1] - 6:2

**investigate** [2] - 5:25, 6:1

**investigation** [33] - 6:16, 6:17, 6:19, 10:3, 12:22, 14:23, 15:1, 17:22, 33:5, 34:23, 36:8, 36:14, 37:5, 41:24, 42:11, 46:4, 46:23, 48:4, 48:11, 55:21, 56:19, 56:24, 57:2, 61:10, 68:19, 69:2, 69:4, 69:8, 69:9, 69:17, 74:1, 80:4, 81:4

**investigator** [2] - 76:13, 116:16

**Investigator** [1] - 8:14

**investigators** [1] - 89:10

**involved** [5] - 53:18, 84:22, 97:25, 104:14, 107:24

**involvement** [1] - 37:12

**involving** [2] - 33:7, 108:14

**issue** [10] - 26:17, 54:8, 54:9, 73:8, 73:16, 85:25, 86:3, 109:21, 109:22

**issued** [1] - 72:11

**issues** [1] - 114:23

**item** [8] - 10:10, 14:17, 14:19, 14:22, 14:25,

19:7, 80:8, 81:17

**items** [9] - 11:1, 11:2, 11:3, 11:8, 11:9, 39:11, 45:8, 80:21, 108:12

**itself** [1] - 18:14

**J**

**jacket** [1] - 105:4

**Jail** [8] - 33:10, 35:9, 36:5, 46:12, 46:24, 47:1, 47:2, 47:11

**jail** [5] - 35:8, 35:17, 36:3, 46:15

**January** [1] - 118:7

**Jean** [1] - 19:3

**JESUS** [1] - 1:15

**Jim** [1] - 36:9

**Jimmy** [5] - 22:13, 22:16, 22:17, 22:22, 23:11

**job** [4] - 11:11, 23:2, 43:4, 74:16

**Jones** [5] - 22:16, 22:17, 22:22, 23:12, 82:6

**Jones'** [1] - 22:13

**JR** [1] - 1:15

**Juan** [1] - 66:15

**judge** [7] - 21:10, 58:23, 81:23, 102:3, 110:1, 117:9, 117:16

**JUDGE** [1] - 1:12

**Judge** [17] - 22:20, 23:8, 24:8, 25:14, 26:24, 27:15, 28:10, 57:20, 58:18, 59:1, 61:2, 67:8, 71:7, 82:4, 86:9, 100:11, 117:20

**Julio** [4] - 12:25, 37:4, 41:25, 42:2

**July** [1] - 92:2

**jumping** [2] - 17:2, 92:11

**jurors** [1] - 7:16

**JURY** [2] - 1:10, 109:14

**jury** [27] - 4:8, 4:9, 4:11, 5:7, 6:6, 12:19, 29:19, 42:11, 45:18, 51:2, 51:5, 51:13, 52:16, 64:1, 64:5, 70:23, 73:18, 79:13, 80:22, 85:2, 85:21, 103:25, 105:8, 107:18, 109:12, 110:2, 114:20

**juvenile** [1] - 5:20

## K

**Kely** [1] - 66:21
**kept** [1] - 91:1
**kids** [1] - 14:14
**Kiffin** [1] - 116:20
**killed** [1] - 44:16
**killer** [1] - 62:2
**killers** [1] - 61:14
**kilo** [9] - 104:8, 104:9, 105:24, 107:12, 109:17, 111:14, 111:18, 111:25, 114:4
**kilogram** [4] - 111:15, 111:17, 111:20, 111:24
**kind** [18] - 5:24, 6:7, 8:24, 9:13, 11:16, 11:22, 13:18, 14:2, 14:11, 32:19, 34:18, 43:12, 74:25, 75:20, 75:21, 76:12, 77:12, 81:19
**Kindelan** [2] - 84:3, 84:7
**kindly** [1] - 79:12
**knowing** [1] - 45:1
**knowledge** [13] - 11:17, 17:9, 20:18, 33:23, 34:4, 69:11, 69:13, 99:6, 99:9, 99:24, 100:3, 102:14, 102:18
**known** [2] - 7:2, 49:20
**knows** [1] - 56:24

## L

**lab** [2] - 33:14, 33:15
**label** [1] - 49:11
**ladies** [5] - 4:13, 50:25, 51:7, 86:12, 114:16
**lady** [2] - 13:23, 105:19
**land** [3] - 8:10, 11:17, 50:14
**large** [2] - 93:19, 102:22
**larger** [1] - 77:18
**last** [4] - 5:22, 51:10, 79:15, 92:4
**latent** [1] - 69:15
**Lauderdale** [1] - 1:21
**lay** [3] - 8:10, 11:17, 102:3
**laying** [1] - 54:23
**lead** [6] - 6:3, 6:7, 6:15, 12:14, 49:12,

116:16
**leading** [4] - 31:15, 40:20, 84:19, 111:21
**learn** [1] - 107:24
**learned** [3] - 10:11, 10:20, 19:2
**leave** [2] - 13:2, 14:14
**leaves** [1] - 53:17
**leaving** [6] - 10:15, 10:22, 10:25, 15:25, 17:2, 17:17
**led** [2] - 104:11, 104:14
**left** [8] - 38:15, 39:17, 39:20, 48:5, 51:10, 53:21, 104:18, 105:18
**legal** [1] - 54:12
**Leo** [2] - 31:4
**Leojardin** [2] - 66:24, 67:1
**Leonardo** [17] - 4:2, 7:2, 10:20, 32:9, 32:22, 50:20, 53:9, 55:25, 88:18, 88:24, 91:22, 91:24, 92:17, 92:19, 93:1, 95:5, 98:12
**LEONARDO** [1] - 1:7
**license** [1] - 63:10
**life** [1] - 74:15
**lifted** [1] - 60:11
**light** [1] - 83:11
**limitations** [1] - 64:23
**line** [20] - 28:9, 29:10, 52:8, 52:11, 52:16, 52:19, 52:25, 53:8, 53:11, 53:12, 53:21, 55:3, 73:24, 75:22, 76:2, 76:5, 76:9, 76:24, 102:16
**line-up** [10] - 52:11, 52:16, 52:19, 52:25, 53:8, 53:11, 53:12, 53:21, 76:2, 76:5
**line-ups** [2] - 52:8, 75:22
**lines** [2] - 81:19, 87:20
**link** [2] - 23:5, 23:14
**linked** [1] - 82:24
**lips** [1] - 112:15
**list** [5] - 24:17, 59:1, 82:24, 87:2, 116:22
**listed** [5] - 95:9, 95:10, 102:9
**Listen** [1] - 106:3
**live** [6] - 12:1, 12:2, 12:5, 80:1, 104:2, 104:4
**lives** [1] - 37:2

**local** [1] - 91:7
**location** [4] - 15:21, 37:1, 38:22, 42:12
**locations** [4] - 45:14, 46:3, 55:17
**locking** [1] - 9:10
**log** [1] - 88:12
**logged** [1] - 93:22
**long-sleeved** [1] - 48:15
**look** [23] - 11:4, 28:24, 32:5, 33:11, 43:8, 59:11, 64:16, 65:11, 65:24, 66:7, 67:16, 69:23, 75:14, 77:10, 86:3, 88:16, 91:16, 95:3, 95:4, 105:1, 105:24, 106:10, 114:9
**Look** [1] - 106:6
**looked** [10] - 10:1, 65:11, 66:5, 70:10, 87:9, 87:19, 96:23, 96:24, 97:5, 99:16
**looking** [46] - 8:22, 8:24, 12:10, 16:8, 16:20, 17:16, 18:12, 24:15, 29:6, 32:8, 32:23, 34:4, 34:5, 39:12, 41:15, 41:16, 49:3, 49:9, 52:24, 58:20, 63:7, 63:9, 63:12, 63:23, 63:25, 65:25, 66:23, 74:7, 74:8, 74:11, 74:14, 78:2, 87:1, 87:11, 90:18, 91:14, 91:15, 91:24, 92:4, 93:10, 94:7, 94:16, 109:16, 110:13, 111:3
**looks** [4] - 32:20, 44:25, 66:1, 75:5
**lower** [2] - 16:11, 49:6
**lowering** [1] - 112:16

## M

**MACKENZIE** [1] - 1:15
**magazine** [4] - 71:23, 71:24, 72:7, 72:24
**MAGDALENA** [2] - 2:11, 103:18
**Magdalena** [13] - 103:6, 104:1, 104:2, 104:4, 105:8, 106:14, 106:23, 109:16, 110:5, 110:10, 111:1, 113:17, 114:1
**maintain** [2] - 23:8,

24:8
**man** [6] - 105:17, 105:19, 106:1, 109:17, 112:7
**Manolo** [3] - 65:2, 68:1, 68:2
**map** [2] - 15:21, 16:9
**maps** [1] - 93:6
**mark** [2] - 58:16, 109:20
**marked** [19] - 14:16, 15:13, 15:17, 18:23, 19:11, 19:17, 19:21, 19:25, 24:3, 26:5, 26:22, 26:25, 27:14, 35:3, 58:24, 81:8, 81:11, 108:8, 108:23
**Markowitz** [3] - 62:25, 63:2, 63:4
**marks** [1] - 49:1
**married** [1] - 95:23
**MARSHALL** [1] - 103:9
**Marshals** [1] - 103:6
**mask** [2] - 10:12, 76:4
**masked** [1] - 76:1
**Matatan** [27] - 23:14, 28:19, 28:22, 29:12, 29:24, 30:14, 31:2, 31:3, 31:4, 31:10, 64:19, 66:9, 68:5, 84:11, 84:23, 87:6, 88:18, 88:24, 91:20, 92:5, 92:22, 95:9, 99:9, 100:1
**Matatan-associated** - 88:18
**Matatans** [1] - 68:6
**match** [3] - 12:5, 101:21, 101:25
**matched** [2] - 25:16, 94:15
**material** [1] - 81:16
**Matojito** [10] - 26:16, 26:19, 31:10, 65:12, 65:16, 65:19, 87:6, 89:3, 95:9, 99:12
**Matojitos** [1] - 68:10
**matter** [6] - 35:13, 73:21, 98:3, 101:20, 102:10, 118:5
**McKee** [1] - 36:10
**mean** [20] - 8:12, 12:2, 22:25, 29:18, 40:1, 40:4, 40:22, 41:8, 49:10, 54:5, 75:18, 85:17, 87:25, 96:15, 98:11, 107:10, 110:12, 110:16
**meaning** [2] - 9:16,

10:23
**means** [7] - 12:11, 71:13, 72:19, 84:25, 85:1, 111:6, 113:4
**meantime** [2] - 31:19, 91:11
**Meantime** [3] - 91:4, 91:8, 91:11
**medical** [14] - 10:13, 41:22, 44:18, 60:23, 61:6, 61:8, 74:5, 74:6, 74:12, 75:8, 75:12, 75:13, 76:16, 76:20
**medication** [2] - 61:17, 61:22
**medicine** [1] - 61:11
**meet** [2] - 8:16, 106:1
**meeting** [2] - 114:2, 117:10
**members** [12] - 5:6, 6:6, 12:19, 13:16, 13:21, 79:12, 79:21, 80:22, 103:24, 105:8, 107:18, 109:12
**men** [1] - 108:2
**mental** [1] - 9:5
**mention** [1] - 8:25
**mentioned** [2] - 37:15, 40:8
**message** [1] - 87:22
**messages** [1] - 18:8
**messaging** [1] - 88:19
**met** [11] - 8:3, 8:19, 8:21, 9:18, 9:23, 13:11, 13:13, 59:17, 59:21, 63:2, 117:9
**mi** [1] - 31:4
**MIAMI** [1] - 1:2
**Miami** [10] - 1:4, 1:16, 1:18, 1:24, 1:25, 104:3, 104:5, 116:17, 118:9, 118:9
**Michael** [1] - 8:4
**Micheli** [14] - 37:4, 41:25, 42:2, 53:8, 53:9, 54:21, 54:23, 54:25, 55:10, 55:16, 55:21, 56:2, 57:15, 57:17
**Mickey** [2] - 100:20, 101:13
**middle** [1] - 117:15
**midnight** [2] - 7:4, 60:7
**Miesposita** [1] - 66:24
**might** [6] - 6:16, 8:25, 19:7, 102:15, 107:22, 116:6

127

**MIGUEL** [1] - 1:7
**mind** [3] - 54:9, 62:23, 106:18
**mine** [2] - 88:6, 95:21
**minor** [1] - 114:25
**minute** [1] - 21:14
**minutes** [2] - 51:1, 109:5
**Miramar** [12] - 4:18, 5:8, 5:11, 5:12, 5:13, 5:16, 7:7, 7:9, 27:6, 27:10, 36:9, 36:22
**Mobile** [3] - 96:25, 97:15, 102:4
**model** [1] - 18:16
**moment** [7] - 42:6, 42:13, 54:9, 59:22, 67:8, 78:16, 100:11
**Monday** [1] - 1:5
**money** [14] - 73:9, 73:14, 104:21, 105:15, 105:16, 105:20, 107:8, 107:9, 107:10, 112:17, 113:13, 113:21, 113:23, 114:3
**monikers** [2] - 87:8, 94:15
**monitor** [1] - 36:23
**monitored** [1] - 13:18
**month** [2] - 29:8, 96:8
**monthly** [1] - 95:19
**MORALES** [5] - 1:7, 72:15, 72:21, 72:25, 73:2
**Morales** [34] - 4:2, 7:2, 10:20, 32:9, 32:22, 38:5, 41:11, 42:5, 42:12, 45:15, 45:17, 46:19, 50:20, 50:23, 53:8, 53:9, 56:5, 57:4, 57:25, 67:18, 71:13, 72:6, 88:18, 88:24, 91:22, 92:17, 92:23, 95:6, 98:12, 111:24, 112:5, 112:14, 113:2, 113:17
**Morales'** [5] - 45:22, 90:17, 91:24, 92:19, 93:1
**morning** [13] - 4:7, 4:13, 5:4, 5:5, 8:20, 37:10, 37:11, 50:25, 79:10, 79:11, 103:22, 103:23, 114:17
**morphine** [4] - 62:9, 62:11, 62:14, 62:19

**most** [1] - 7:22
**mother** [5] - 13:13, 13:22, 57:25, 58:4, 104:18
**Mouse** [2] - 100:20, 101:13
**move** [16] - 15:3, 16:1, 20:3, 24:6, 24:24, 25:12, 26:21, 27:13, 28:2, 35:21, 44:13, 81:22, 102:10, 108:20, 113:4, 114:14
**moved** [1] - 9:13
**moves** [1] - 77:9
**movie** [1] - 83:13
**MR** [241] - 4:17, 5:3, 15:3, 15:5, 15:8, 16:1, 16:3, 16:6, 17:4, 17:6, 17:11, 19:4, 19:6, 20:3, 20:7, 20:9, 20:10, 20:12, 20:14, 20:21, 20:22, 21:1, 21:5, 21:10, 21:17, 21:20, 21:22, 22:1, 22:4, 22:6, 22:9, 22:15, 22:20, 22:24, 23:8, 23:13, 23:19, 24:6, 24:8, 24:12, 24:13, 24:24, 25:4, 25:12, 25:14, 25:21, 26:7, 26:21, 26:24, 27:2, 27:13, 27:15, 27:18, 28:2, 28:6, 28:10, 28:12, 28:13, 28:17, 29:2, 29:4, 29:5, 29:16, 29:20, 29:21, 31:15, 31:17, 32:15, 32:17, 33:20, 34:1, 35:11, 35:15, 35:21, 35:23, 36:2, 37:7, 37:9, 42:7, 42:9, 42:10, 46:20, 46:22, 47:8, 47:10, 51:9, 54:12, 54:15, 56:7, 56:16, 56:25, 57:3, 57:19, 57:20, 57:22, 58:18, 58:19, 58:23, 59:3, 60:25, 61:2, 61:3, 67:8, 67:10, 67:12, 67:23, 68:22, 69:1, 69:5, 69:7, 69:12, 69:20, 69:22, 70:2, 70:9, 70:14, 70:19, 71:4, 71:6, 71:11, 71:16, 71:18, 71:23, 71:25, 72:3, 73:10, 73:13, 73:15, 73:19, 74:19, 75:3,

77:21, 78:16, 78:18, 78:21, 78:22, 79:1, 79:9, 81:21, 81:23, 82:1, 82:4, 82:9, 82:12, 82:15, 82:19, 82:22, 83:1, 83:6, 83:9, 83:11, 83:15, 83:17, 83:19, 83:22, 83:24, 84:2, 84:7, 84:10, 84:16, 84:19, 84:23, 85:3, 85:10, 85:15, 85:19, 86:5, 86:9, 86:10, 86:23, 88:15, 94:17, 94:19, 100:11, 100:13, 100:16, 100:18, 100:21, 100:25, 101:6, 101:8, 101:15, 101:18, 101:22, 102:1, 102:3, 102:8, 102:13, 102:24, 103:2, 103:3, 103:5, 103:21, 105:5, 105:7, 105:21, 106:17, 106:22, 108:20, 108:22, 109:1, 109:5, 109:9, 109:11, 109:13, 109:15, 109:23, 110:4, 110:9, 110:23, 110:25, 111:9, 111:21, 111:23, 112:2, 112:4, 112:9, 112:13, 112:24, 113:1, 113:16, 114:13, 114:25, 115:2, 115:12, 115:14, 115:20, 115:22, 116:2, 116:3, 116:6, 116:12, 116:14, 116:16, 116:19, 116:20, 116:21, 116:22, 117:6, 117:16, 117:20
**multiple** [2] - 109:6, 109:9
**muscles** [1] - 33:4

## N

**name** [44] - 13:23, 14:10, 22:8, 22:14, 23:14, 23:25, 25:16, 26:14, 27:5, 36:11, 47:13, 47:14, 63:4, 64:13, 64:19, 65:8, 65:12, 66:9, 68:20, 69:2, 79:15, 83:25,

84:4, 87:3, 87:18, 88:17, 90:16, 91:20, 95:15, 96:11, 97:24, 98:6, 98:16, 98:20, 98:22, 99:6, 99:9, 100:1, 100:4, 102:1, 103:25, 104:1
**named** [2] - 28:22, 36:16
**names** [13] - 23:14, 65:1, 65:3, 65:13, 84:2, 84:11, 84:13, 84:21, 87:6, 87:18, 100:19, 101:1, 101:4
**narcotic** [3] - 61:25, 62:1, 62:10
**narcotics** [1] - 5:21
**narrative** [1] - 105:21
**nature** [2] - 44:13, 76:8
**necessarily** [3] - 54:19, 101:23, 101:24
**necessary** [2] - 60:23, 72:11
**neck** [1] - 46:1
**need** [9] - 22:21, 70:21, 71:8, 77:16, 77:18, 103:6, 113:10, 114:23, 116:13
**needs** [1] - 69:11
**nephew** [1] - 112:8
**never** [4] - 76:3, 76:4, 88:7, 107:3
**next** [15] - 4:16, 6:11, 7:4, 12:21, 15:23, 22:13, 22:14, 31:11, 45:19, 54:21, 66:25, 79:2, 103:5, 105:14, 114:14
**nickname** [3] - 23:15, 68:19, 84:8
**nicknames** [4] - 65:5, 82:23, 84:10, 84:16
**night** [1] - 8:20
**nighttime** [1] - 14:14
**nine** [2] - 112:24, 114:17
**NO** [1] - 1:2
**nobody** [1] - 14:14
**normally** [1] - 56:1
**north** [1] - 16:11
**North** [4] - 1:24, 36:5, 116:16, 118:9
**Northeast** [1] - 1:17
**note** [1] - 9:5
**noted** [4] - 93:11, 93:17, 93:25, 94:3
**notes** [2] - 37:20,

63:24
**nothing** [7] - 13:18, 51:13, 79:5, 103:14, 107:8, 107:12, 110:6
**notice** [2] - 8:10, 103:7
**noticed** [1] - 9:15
**number** [74] - 12:8, 16:8, 16:19, 17:12, 18:17, 18:18, 18:20, 19:2, 19:9, 19:10, 19:13, 20:2, 20:18, 21:13, 23:24, 24:19, 24:20, 24:21, 25:6, 25:8, 25:16, 26:1, 26:3, 26:11, 26:19, 27:5, 27:10, 27:20, 27:22, 28:10, 28:15, 28:22, 29:17, 29:23, 29:24, 30:2, 30:8, 30:9, 30:16, 64:14, 64:16, 64:17, 65:14, 65:20, 66:1, 82:6, 82:16, 82:17, 84:6, 87:3, 87:4, 87:12, 87:13, 88:3, 88:16, 88:18, 88:23, 89:7, 89:19, 92:16, 92:22, 96:25, 97:3, 97:15, 97:25, 98:7, 98:9, 98:12, 98:16, 98:17, 99:25, 101:16, 101:24, 102:21
**Number** [1] - 15:10
**number's** [1] - 23:25
**numbers** [37] - 18:2, 18:7, 18:16, 18:21, 20:19, 21:16, 21:17, 22:3, 22:8, 22:12, 22:13, 22:18, 23:6, 24:2, 29:14, 67:21, 68:1, 81:15, 81:20, 82:10, 82:24, 83:14, 84:14, 87:2, 87:19, 87:23, 89:24, 91:17, 92:13, 93:14, 93:17, 93:20, 94:7, 95:12, 98:2, 99:4, 100:10
**numbers'** [1] - 91:2

## O

**object** [1] - 74:19
**Objection** [1] - 69:5
**objection** [44] - 15:5, 16:3, 17:4, 19:4, 20:7, 20:12, 20:23, 22:21, 23:9, 24:8, 25:2, 25:14, 25:21, 26:24, 27:15, 27:16,

28:4, 31:15, 33:20, 35:11, 35:23, 42:7, 46:20, 47:8, 54:12, 56:7, 57:19, 60:25, 68:22, 69:20, 70:2, 81:23, 82:3, 82:5, 83:23, 83:24, 85:4, 100:21, 100:24, 101:6, 105:21, 106:17, 108:22, 111:21
**observations** [2] - 8:8, 8:19
**obtain** [1] - 14:4
**obtained** [1] - 54:1
**obvious** [2] - 95:16, 98:24
**obviously** [4] - 44:21, 52:11, 55:8, 102:21
**occasion** [6] - 7:1, 13:9, 32:5, 33:6, 36:13, 57:24
**occasions** [1] - 77:6
**occurred** [9] - 7:13, 88:13, 89:12, 91:23, 92:1, 92:2, 92:3, 92:6, 92:7
**Ochill** [3] - 30:4, 31:3, 84:11
**October** [15] - 5:12, 31:11, 38:3, 45:19, 50:17, 60:1, 60:16, 92:11, 92:25, 93:10, 93:15, 93:18, 93:21, 93:24, 94:2
**OF** [2] - 1:1, 1:4
**offensive** [3] - 44:7, 44:8, 44:11
**offering** [2] - 83:2, 85:19
**Office** [2] - 1:16, 36:6
**OFFICER** [6] - 4:9, 70:22, 73:4, 73:6, 114:19, 117:22
**officer** [3] - 8:4, 74:4, 82:21
**officers** [3] - 5:18, 8:3, 37:22
**Official** [1] - 1:23
**often** [1] - 98:4
**Oggunda** [1] - 66:25
**once** [2] - 12:23, 58:13
**one** [71] - 8:4, 12:24, 21:25, 22:1, 24:2, 25:9, 38:3, 47:20, 47:22, 48:15, 49:1, 51:15, 52:13, 53:14, 56:14, 56:17, 56:21, 57:4, 57:10, 57:14, 59:10, 64:10, 65:1,

65:3, 66:13, 66:25, 67:20, 68:9, 68:11, 68:13, 68:15, 68:17, 71:16, 71:17, 71:19, 71:22, 73:8, 74:23, 78:16, 87:25, 88:1, 88:8, 90:17, 91:5, 91:19, 92:1, 92:6, 92:7, 95:8, 95:9, 95:10, 97:9, 102:22, 104:8, 107:12, 108:18, 109:7, 109:10, 109:17, 111:14, 111:15, 111:25, 114:25, 115:2, 116:22, 117:14, 117:16, 117:17
**one-by-one** [1] - 97:9
**one-minute-34-second** [1] - 109:20
**one-word** [2] - 65:1, 65:3
**ones** [1] - 106:10
**open** [8] - 9:11, 9:13, 13:17, 23:17, 70:20, 86:11, 102:11, 115:21
**opens** [1] - 115:15
**operate** [1] - 79:18
**operating** [2] - 99:25, 100:3
**operator** [1] - 94:9
**opinion** [2] - 102:7, 102:8, 102:10
**opportunity** [4] - 33:11, 41:24, 59:11, 81:3
**opposed** [1] - 44:7
**order** [1] - 4:1
**original** [1] - 75:15
**Osvaldo** [2] - 104:1, 112:11
**OSVALDO** [2] - 2:11, 103:18
**otherwise** [3] - 23:3, 49:20, 100:24
**ounces** [1] - 111:17
**outgoing** [7] - 29:25, 30:8, 31:22, 31:23, 66:5, 92:17, 92:19
**outside** [5] - 13:17, 14:6, 14:8, 42:15, 63:19
**overheard** [1] - 57:24
**overruled** [3] - 74:22, 105:23, 106:19
**oversee** [1] - 6:17
**own** [3] - 34:5, 84:7, 113:24

**owner** [1] - 72:19
**ownership** [1] - 72:23
**owning** [1] - 72:18

**P**

**P.A** [1] - 1:19
**p.m** [8] - 1:8, 32:3, 59:18, 59:25, 60:1, 114:20, 117:23
**Pacific** [1] - 91:5
**Padrino** [3] - 104:24, 113:7, 113:19
**page** [31] - 23:20, 26:9, 27:3, 27:19, 28:10, 29:10, 29:25, 31:6, 32:7, 32:18, 32:23, 63:25, 65:11, 65:25, 66:6, 66:8, 66:18, 67:3, 67:16, 67:17, 68:7, 87:1, 87:10, 91:14, 99:17, 99:18, 110:10, 110:23, 112:2, 112:9, 112:24
**PAGE** [1] - 2:2
**PAGES** [1] - 1:11
**pages** [2] - 90:18, 100:8
**pain** [2] - 61:14, 62:2
**palm** [1] - 10:1
**panel** [6] - 9:8, 9:14, 9:21, 16:21, 16:25, 17:14
**paperwork** [1] - 13:5
**paragraph** [2] - 91:18, 92:4
**paralyzed** [3] - 113:4, 113:7, 113:11
**parenthesis** [1] - 96:25
**parents** [2] - 14:12, 14:13
**Parkway** [1] - 7:7
**part** [6] - 24:14, 39:19, 61:10, 79:19, 80:4, 113:9
**participated** [1] - 26:17
**particular** [8] - 18:17, 19:9, 25:15, 25:25, 67:21, 79:17, 82:24, 96:25
**particularity** [1] - 72:2
**parties** [1] - 90:4
**parts** [1] - 45:9
**passed** [2] - 60:9, 75:7
**passes** [1] - 44:18
**past** [1] - 7:4
**path** [1] - 76:20

**pathway** [1] - 43:22
**pathways** [1] - 88:23
**patrol** [1] - 5:18
**pattern** [1] - 68:3
**pause** [4] - 67:9, 78:17, 100:12, 103:11
**paused** [6] - 110:3, 110:15, 110:24, 111:8, 112:1, 113:15
**pay** [2] - 95:19, 95:25
**pays** [1] - 95:21
**people** [15] - 6:18, 17:2, 25:18, 40:4, 44:12, 44:13, 55:1, 57:6, 57:8, 67:5, 69:10, 84:5, 84:11, 101:16, 107:20
**per** [2] - 74:3, 87:14
**percent** [2] - 111:3, 111:7
**period** [3] - 81:15, 102:20, 115:6
**permanently** [2] - 78:19, 103:1
**permission** [2] - 109:1, 114:25
**person** [45] - 6:1, 7:2, 7:3, 19:2, 28:22, 41:18, 44:2, 44:3, 44:18, 44:19, 45:12, 45:25, 50:13, 50:14, 50:15, 50:20, 52:4, 52:21, 52:24, 52:25, 53:3, 54:3, 55:3, 57:10, 57:14, 68:9, 68:11, 68:13, 68:15, 68:17, 68:19, 74:12, 74:16, 75:1, 76:1, 78:13, 82:20, 88:1, 97:25, 99:20, 100:3, 104:25, 113:6, 116:10
**person's** [2] - 45:8, 74:15
**personal** [11] - 17:9, 34:4, 34:23, 69:13, 69:17, 95:23, 99:6, 99:9, 99:24, 100:3, 102:18
**personally** [2] - 34:24, 69:23
**personnel** [4] - 8:13, 11:12, 38:15, 75:8
**Peru** [3] - 31:10, 66:13, 67:3
**phone** [169] - 7:17, 10:5, 10:14, 10:18, 10:21, 10:24, 17:20, 17:22, 17:25, 18:1,

18:2, 18:4, 18:5, 18:6, 18:8, 18:10, 18:13, 18:16, 18:17, 18:21, 19:2, 19:9, 19:13, 19:15, 19:19, 19:23, 20:2, 20:18, 20:19, 21:2, 21:4, 21:6, 21:11, 21:12, 21:13, 21:15, 21:17, 21:23, 21:25, 22:1, 22:3, 22:11, 22:12, 22:13, 22:18, 23:1, 23:5, 23:25, 24:14, 24:16, 24:21, 25:9, 25:16, 25:25, 26:1, 26:15, 26:18, 27:6, 27:10, 28:14, 28:22, 29:24, 30:19, 31:2, 32:6, 33:6, 37:17, 63:23, 64:6, 64:11, 64:14, 64:17, 64:20, 64:22, 65:9, 65:14, 65:17, 65:23, 66:11, 66:15, 67:19, 67:25, 79:22, 80:24, 81:2, 81:7, 81:14, 81:17, 81:20, 82:16, 82:20, 82:22, 82:24, 82:25, 83:1, 83:5, 84:6, 84:13, 85:22, 87:2, 87:3, 87:4, 87:8, 87:12, 87:13, 87:19, 87:23, 88:7, 88:13, 88:14, 89:24, 90:17, 91:2, 91:17, 91:18, 91:22, 91:25, 92:4, 92:9, 92:12, 92:16, 92:18, 92:19, 93:1, 93:14, 93:16, 94:6, 94:10, 94:13, 94:25, 95:4, 95:5, 95:12, 95:16, 95:19, 95:25, 96:2, 96:21, 96:24, 97:3, 98:2, 98:4, 98:9, 98:10, 98:16, 98:18, 98:21, 98:23, 99:4, 99:16, 99:21, 99:25, 100:4, 100:10, 100:19, 101:1, 101:9, 101:16, 101:21, 101:24
**phones** [9] - 10:23, 88:13, 90:6, 90:11, 90:13, 90:17, 91:3, 97:23, 102:22
**phonetic** [1] - 68:16
**photo** [11] - 52:8, 52:11, 52:16, 52:19, 53:7, 53:11, 53:12, 53:21, 75:22, 76:1,

76:4
**photograph** [3] - 38:18, 48:18, 52:25
**photographs** [9] - 8:15, 11:20, 34:24, 40:22, 48:25, 49:17, 52:21, 52:24, 63:7
**photos** [4] - 11:14, 12:14, 45:24, 48:12
**phrase** [1] - 110:11
**physically** [3] - 7:15, 39:4, 64:17
**pick** [3] - 14:13, 35:17, 36:3
**picked** [2] - 22:3, 35:7
**picking** [2] - 89:9, 99:17
**picks** [1] - 109:24
**picture** [8] - 9:2, 9:3, 33:2, 33:3, 37:18, 38:23, 39:12, 49:6
**pictures** [4] - 15:23, 32:25, 40:1, 40:18
**piece** [1] - 114:10
**pieces** [2] - 10:4, 43:8
**pin** [1] - 117:10
**pinball** [1] - 77:1
**pinging** [1] - 36:23
**pistol** [1] - 34:22
**placed** [2] - 18:22, 44:21
**planned** [1] - 115:3
**planning** [1] - 117:19
**plate** [1] - 63:10
**played** [1] - 110:1
**point** [12] - 12:24, 13:6, 14:12, 16:13, 17:21, 22:21, 25:5, 42:19, 55:19, 56:12, 64:23, 102:6
**pointed** [1] - 14:8
**pointing** [2] - 16:14, 105:1
**Police** [6] - 4:19, 5:8, 5:11, 5:13, 5:16, 36:10
**police** [6] - 8:2, 13:3, 13:4, 13:12, 41:15, 74:4
**Pompano** [1] - 36:5
**porch** [1] - 10:8
**portion** [3] - 14:9, 18:13, 112:11
**posing** [1] - 113:6
**position** [1] - 72:18
**positioning** [1] - 45:7
**possession** [2] - 23:1, 71:6
**possible** [3] - 48:8, 49:10, 49:11

**possibly** [1] - 116:17
**powerpoint** [1] - 81:13
**POWERS** [2] - 1:23, 118:8
**Powers** [1] - 118:7
**practical** [2] - 24:10, 43:3
**practice** [1] - 102:5
**preceding** [1] - 28:18
**precise** [4] - 29:13, 42:12, 42:16, 59:22
**precisely** [1] - 56:5
**precision** [1] - 42:16
**present** [11] - 13:20, 64:11, 64:13, 64:17, 64:19, 65:13, 65:16, 65:19, 98:9, 98:20, 99:2
**presentation** [1] - 81:13
**presented** [1] - 23:15
**preserve** [1] - 43:5
**presiding** [1] - 4:6
**pretty** [1] - 11:16
**prevent** [1] - 72:18
**previous** [1] - 90:18
**previously** [2] - 17:20, 87:19
**price** [3] - 111:10, 112:16, 113:12
**print** [2] - 10:1
**prison** [3] - 104:6, 104:7, 107:3
**probable** [1] - 13:5
**probation** [1] - 104:10
**proceed** [2] - 4:7, 4:14
**proceedings** [6] - 67:9, 78:17, 100:12, 103:11, 117:23, 118:4
**process** [5] - 9:6, 9:20, 9:23, 9:25, 43:13
**processed** [2] - 8:25, 9:20
**processing** [1] - 9:1
**production** [1] - 83:13
**projectile** [16] - 33:7, 33:9, 33:11, 33:12, 33:16, 33:21, 34:6, 35:7, 35:10, 35:19, 46:9, 46:16, 46:18, 46:24, 47:2, 47:22
**projectiles** [2] - 35:18, 47:25
**pronounce** [1] - 66:25
**properly** [3] - 20:9, 20:11, 21:7
**property** [3] - 16:21, 33:7, 71:19

**prosecution** [3] - 89:11, 97:20, 97:21
**Prosecutions** [1] - 1:16
**prosecutor** [1] - 88:4
**prove** [2] - 23:4, 84:18
**provided** [4] - 89:10, 97:7, 97:12, 97:14
**provider** [2] - 96:5, 97:3
**psychoactive** [3] - 62:17, 62:19, 62:23
**publish** [1] - 109:1
**puff** [1] - 50:9
**purchase** [2] - 104:15, 105:9
**purchasing** [1] - 107:2
**pure** [4] - 110:14, 110:16
**purpose** [2] - 53:2, 112:10
**purposes** [5] - 58:23, 58:25, 59:2, 74:1, 117:19
**pursuant** [1] - 25:10
**put** [19] - 33:14, 41:23, 43:5, 44:22, 49:4, 52:25, 64:11, 64:14, 64:17, 64:19, 65:8, 65:14, 65:16, 76:1, 76:4, 77:5, 84:12, 98:20, 101:2
**putting** [3] - 74:15, 98:22, 115:16

**Q**

**quadriplegic** [1] - 60:21
**qualify** [2] - 102:8, 116:13
**questioning** [3] - 73:24, 76:9, 102:16
**questions** [6] - 44:15, 67:10, 73:1, 78:18, 100:16, 102:24

**R**

**raise** [3] - 4:20, 79:3, 103:12
**random** [1] - 99:17
**rang** [1] - 88:13
**Raonel** [2] - 36:16, 36:19
**raw** [2] - 83:12, 83:14
**re** [2] - 42:8, 74:7
**re-entry** [1] - 74:7
**re-state** [1] - 42:8
**read** [1] - 30:18

**reading** [1] - 30:18
**ready** [4] - 4:7, 4:14, 105:14, 114:3
**real** [3] - 101:23, 106:20, 108:6
**realized** [1] - 108:2
**really** [5] - 24:9, 56:12, 83:7, 83:20, 101:20
**reams** [2] - 85:21
**reason** [5] - 14:15, 44:14, 53:13, 53:15, 54:2
**rebut** [1] - 115:24
**rebuttal** [4] - 115:16, 115:18, 115:21
**receive** [5] - 69:13, 85:25, 86:3, 86:6, 86:17
**received** [34] - 7:17, 15:6, 15:7, 16:4, 16:5, 18:6, 18:19, 22:18, 23:13, 25:1, 25:3, 26:5, 26:6, 26:25, 27:1, 27:16, 27:17, 28:4, 28:5, 29:3, 35:10, 35:12, 35:14, 35:16, 35:24, 35:25, 61:22, 86:19, 86:21, 95:12, 107:6, 107:17, 108:23, 108:24
**RECEIVED** [1] - 3:2
**receives** [1] - 96:2
**receiving** [1] - 28:19
**recess** [4] - 51:1, 51:4, 73:3, 73:5
**recipient's** [1] - 88:14
**recognize** [8] - 7:11, 14:17, 18:24, 35:4, 77:23, 80:8, 81:9, 108:9
**recollection** [2] - 58:13, 59:13
**reconstruction** [11] - 42:20, 43:19, 43:21, 44:5, 44:15, 51:11, 51:16, 51:17, 51:25, 55:20, 76:11
**reconstructions** [1] - 76:7
**record** [11] - 16:23, 21:10, 21:15, 25:9, 28:11, 32:15, 84:12, 86:22, 101:24, 105:5, 112:10
**recorder** [1] - 14:4
**recording** [9] - 15:16, 108:15, 108:17, 109:19, 109:24, 109:25, 110:5,

114:14
**recordings** [2] - 108:18, 116:7
**records** [56] - 19:15, 19:19, 19:23, 20:2, 21:4, 21:12, 24:3, 26:18, 27:9, 27:21, 27:24, 36:13, 36:19, 36:22, 41:8, 41:23, 69:23, 70:7, 70:10, 70:16, 79:22, 80:4, 80:24, 81:1, 81:2, 81:3, 81:17, 81:18, 82:25, 83:1, 85:11, 85:22, 87:5, 88:6, 91:1, 91:15, 91:24, 92:8, 92:16, 92:18, 93:13, 94:5, 94:25, 95:12, 96:24, 97:5, 97:19, 101:1, 101:4, 101:8, 101:9, 101:21, 102:14, 102:18
**recover** [1] - 46:12
**recovered** [16] - 11:2, 12:4, 24:21, 26:9, 27:6, 33:12, 33:16, 33:17, 34:5, 35:7, 46:18, 47:2, 47:22, 71:11, 94:13, 116:9
**Redirect** [2] - 2:7, 2:10
**REDIRECT** [1] - 100:17
**reduction** [1] - 93:19
**reenact** [1] - 13:1
**refer** [1] - 58:12
**reference** [3] - 7:18, 66:9, 111:1
**referencing** [3] - 63:8, 63:24, 111:2
**referring** [4] - 29:1, 35:19, 58:21, 90:4
**refers** [1] - 73:9
**reflect** [2] - 32:15, 105:5
**reflects** [1] - 16:9
**refreshed** [2] - 58:13, 59:13
**regard** [6] - 6:25, 17:22, 33:20, 33:21, 71:2, 113:18
**regarding** [2] - 17:25, 80:25
**register** [3] - 88:2, 100:19, 101:16
**registered** [3] - 31:25, 32:2, 67:14
**registering** [1] - 30:19
**registry** [1] - 69:18
**related** [3] - 7:3,

11:21, 89:11
**relates** [1] - 71:18
**relation** [2] - 54:17, 57:8
**relationship** [1] - 107:15
**relative** [2] - 56:6, 91:1
**relevance** [6] - 20:7, 20:13, 36:18, 81:24, 83:25, 100:23
**relevant** [4] - 20:20, 22:22, 97:22, 102:7
**religion** [1] - 107:16
**relying** [3] - 42:18, 55:10, 55:21
**remain** [1] - 4:9
**remaining** [1] - 80:11
**remember** [9] - 9:19, 14:10, 36:11, 41:1, 48:6, 48:10, 48:20, 49:10, 58:7, 114:17
**removed** [1] - 48:8
**renew** [1] - 24:24
**repair** [1] - 74:11
**repeated** [1] - 68:1
**repeatedly** [2] - 67:18, 102:20
**rephrase** [5] - 33:22, 46:21, 61:2, 68:24, 69:21
**report** [18] - 24:14, 58:9, 58:11, 58:22, 58:25, 59:2, 59:5, 59:6, 59:7, 59:8, 59:10, 59:11, 64:3, 64:5, 64:6, 81:10, 81:14, 85:5
**REPORTED** [1] - 1:23
**reporter** [1] - 66:14
**Reporter** [1] - 1:23
**reports** [1] - 59:4
**request** [3] - 69:14, 107:6, 107:17
**rescue** [7] - 38:7, 38:15, 39:9, 39:11, 39:17, 39:20, 48:23
**Reserves** [1] - 14:21
**residence** [7] - 7:12, 7:19, 7:20, 7:25, 9:24, 10:6, 12:24
**residue** [6] - 49:20, 50:3, 50:9, 50:14, 50:19, 50:22
**resolves** [1] - 73:16
**respect** [2] - 71:9, 114:12
**respond** [2] - 7:18, 67:22
**responded** [4] - 7:19, 13:3, 14:3, 37:17

**responsibility** [2] - 6:17, 11:12
**rest** [2] - 115:9, 116:18
**resting** [1] - 116:5
**results** [1] - 76:15
**resume** [2] - 114:16, 114:17
**resumed** [6] - 110:8, 110:22, 112:3, 112:12, 112:23, 113:14
**resumes** [2] - 51:6, 73:17
**retired** [1] - 115:4
**retrieve** [1] - 103:6
**retrieved** [4] - 21:24, 22:18, 25:17, 26:1
**returned** [2] - 72:10, 72:16
**returns** [2] - 69:14
**review** [15] - 11:20, 12:13, 33:6, 33:16, 36:13, 36:18, 67:13, 67:25, 69:18, 70:9, 80:4, 90:19, 92:16, 94:5, 94:25
**reviewed** [12] - 15:11, 80:9, 80:13, 80:15, 80:18, 81:1, 83:2, 90:20, 92:8, 94:14, 102:15, 108:14
**reviewing** [2] - 13:25, 34:24
**ricochet** [2] - 75:16, 75:17
**rise** [5] - 70:22, 73:4, 73:6, 114:19, 117:22
**road** [1] - 5:18
**robberies** [1] - 6:2
**robbery** [4] - 12:16, 27:7, 35:1, 37:5
**rod** [3] - 77:5, 78:9
**rods** [5] - 44:20, 44:22, 76:8, 76:18, 77:6
**role** [1] - 94:25
**Room** [1] - 1:17
**roped** [1] - 8:3
**rotation** [1] - 6:10
**rotations** [2] - 6:8, 6:9
**rotunda** [6] - 14:13, 15:22, 15:24, 16:22, 17:17, 63:20
**rounds** [5] - 12:1, 12:2, 12:3, 12:5
**Rox** [1] - 65:12
**RPR** [1] - 118:8
**Rule** [1] - 81:22
**run** [1] - 36:6
**running** [1] - 59:7

**S**

**sample** [3] - 112:19, 113:20, 114:5
**San** [1] - 66:15
**Sarahi** [4] - 31:3, 31:5, 66:13, 67:1
**SARAHI** [1] - 66:14
**saving** [1] - 74:15
**saw** [13] - 8:18, 9:10, 9:11, 11:14, 13:10, 37:18, 57:17, 57:18, 91:23, 91:25, 93:6, 104:24, 114:6
**scapula** [1] - 48:5
**scene** [60] - 6:18, 7:5, 7:6, 8:6, 8:11, 8:13, 8:14, 8:18, 8:21, 10:15, 10:18, 10:19, 10:22, 11:2, 11:4, 11:6, 11:7, 11:8, 11:11, 11:19, 11:22, 12:13, 12:20, 12:23, 13:2, 13:25, 24:22, 26:9, 27:7, 27:11, 33:17, 34:23, 37:21, 37:22, 37:25, 38:2, 38:4, 38:21, 39:9, 39:23, 39:24, 40:13, 43:11, 45:25, 48:12, 48:14, 51:17, 52:5, 53:18, 53:21, 53:22, 54:3, 54:5, 55:12, 55:13, 55:23, 71:10, 76:13, 77:24
**Scene** [5] - 8:13, 37:24, 43:12, 49:16, 52:6
**scenes** [2] - 40:5, 40:9
**scheduled** [1] - 117:8
**Scheduled** [1] - 1:7
**school** [7] - 14:9, 16:10, 16:15, 16:21, 43:17, 43:18
**scissors** [3] - 39:15, 39:17, 39:19
**scope** [1] - 68:23
**SCOTT** [2] - 2:8, 79:7
**Scott** [2] - 79:2, 79:15
**screen** [3] - 16:13, 87:17, 109:16
**se** [1] - 74:3
**search** [4] - 18:1, 18:3, 18:4, 22:11
**searched** [1] - 22:18
**searching** [1] - 105:13
**seated** [4] - 4:12, 4:24, 51:7, 103:17
**second** [2] - 66:7, 112:11

**secondary** [1] - 85:4
**Section** [1] - 1:16
**secure** [4] - 14:1, 27:9, 27:21, 27:24
**secured** [2] - 24:3, 25:10
**securing** [1] - 24:20
**SECURITY** [6] - 4:9, 70:22, 73:4, 73:6, 114:19, 117:22
**security** [1] - 14:2
**see** [56] - 8:9, 8:10, 9:3, 9:13, 11:22, 12:14, 14:11, 23:22, 28:9, 32:10, 32:14, 32:18, 38:22, 39:3, 39:4, 39:14, 48:12, 48:18, 48:24, 49:1, 49:10, 53:3, 53:9, 53:18, 53:22, 60:21, 65:1, 65:2, 70:15, 77:7, 77:12, 78:8, 86:3, 87:15, 87:17, 88:12, 89:13, 89:14, 90:15, 91:18, 92:5, 92:11, 92:12, 92:16, 92:21, 92:25, 93:6, 93:16, 96:25, 98:18, 113:12, 113:21
**seeing** [4] - 38:23, 39:3, 48:6, 48:20
**seek** [1] - 74:16
**seeking** [6] - 71:14, 71:21, 72:6, 72:12, 72:17, 73:12
**seized** [1] - 71:9
**self** [1] - 84:7
**self-identify** [1] - 84:7
**sell** [2] - 106:2, 107:22
**seller** [2] - 113:6, 113:10
**selling** [2] - 107:2, 107:20
**sends** [1] - 96:8
**sense** [1] - 56:11
**sent** [3] - 33:14, 33:15, 111:25
**sentenced** [1] - 104:9
**separating** [1] - 104:18
**September** [34] - 6:21, 6:25, 35:1, 60:5, 66:11, 66:16, 66:23, 67:17, 87:16, 89:13, 89:15, 89:17, 89:18, 89:20, 89:21, 89:23, 90:1, 90:9, 90:12, 90:14, 90:15, 90:19, 90:21, 91:21, 91:23, 92:1, 92:2, 92:3,

92:7, 92:15, 92:19, 93:4, 93:8, 93:9
**serial** [1] - 18:16
**serious** [2] - 60:19, 61:8
**serve** [1] - 6:3
**service** [7] - 11:25, 34:14, 74:1, 79:17, 80:3, 96:5, 97:3
**serving** [1] - 79:23
**session** [2] - 73:7, 117:2
**seven** [7] - 30:1, 30:3, 41:9, 41:11, 41:21, 104:10, 112:9
**several** [6] - 80:25, 81:14, 95:8, 99:16, 116:7
**severe** [1] - 38:13
**sex** [1] - 5:20
**shape** [1] - 75:12
**sheet** [1] - 95:3
**Sheriff's** [1] - 36:6
**shirt** [15] - 48:15, 48:17, 48:20, 48:21, 48:23, 49:3, 49:4, 49:8, 77:24, 78:3, 78:4, 78:5, 78:7, 78:8, 78:14
**shoes** [1] - 11:9
**shooter** [3] - 50:11, 54:17, 54:18
**shooting** [18] - 42:20, 43:18, 43:21, 44:3, 44:5, 44:14, 51:11, 51:16, 51:25, 54:23, 54:25, 55:8, 55:15, 55:19, 60:4, 76:7, 76:11
**short** [1] - 79:20
**shot** [25] - 12:16, 17:18, 41:9, 41:11, 41:16, 41:18, 42:13, 44:2, 44:6, 44:10, 44:12, 45:4, 45:17, 45:22, 46:6, 46:7, 50:13, 50:15, 54:3, 54:5, 54:7, 54:22, 56:14, 57:10, 104:16
**shots** [3] - 42:6, 73:22, 74:17
**show** [27] - 10:16, 12:7, 15:13, 16:7, 18:11, 18:23, 32:7, 34:11, 34:20, 36:22, 38:18, 48:24, 53:2, 53:8, 77:14, 77:22, 78:7, 80:6, 80:11, 81:8, 82:13, 82:14, 82:15, 86:14, 88:6,

108:8
**showed** [1] - 114:6
**showing** [18] - 7:10,
15:21, 15:23, 16:19,
17:7, 17:12, 17:15,
19:11, 19:17, 19:21,
19:25, 32:23, 33:4,
35:3, 80:12, 80:17,
80:19, 86:24
**shown** [2] - 32:21,
66:6
**shows** [3] - 18:13,
81:14, 84:19
**side** [3] - 9:4, 9:7,
16:11
**sidebar** [8] - 20:14,
20:15, 70:3, 81:25,
101:10, 116:24,
117:2, 117:19
**Sidebar** [10] - 20:16,
23:17, 70:5, 70:20,
82:2, 86:11, 101:11,
102:11, 116:25,
117:21
**signature** [2] - 108:10
**significance** [1] - 37:1
**significant** [1] - 16:25
**significantly** [1] - 93:8
**similar** [3] - 52:24,
68:3, 75:21
**similar-looking** [1] -
52:24
**simple** [1] - 39:2
**simpler** [1] - 62:22
**simply** [1] - 25:24
**single** [1] - 59:10
**sitting** [1] - 59:22
**situation** [2] - 61:6,
61:8
**six** [6] - 6:9, 52:25,
58:7, 58:8, 91:25,
112:2
**six-person** [1] - 52:25
**six-something** [1] -
58:8
**skin** [2] - 74:24, 75:1
**skip** [1] - 75:20
**skipping** [1] - 28:20
**skips** [1] - 74:25
**skull** [1] - 10:12
**sleeve** [4] - 48:17,
48:21, 48:22, 49:8
**sleeved** [1] - 48:15
**slide** [1] - 93:17
**slides** [1] - 93:7
**sliding** [2] - 9:5, 9:20
**small** [2] - 61:4, 76:25
**so..** [3] - 44:13, 56:15,
59:7
**sold** [1] - 106:21

**solemnly** [3] - 4:21,
79:4, 103:13
**someone** [16] - 23:11,
41:16, 44:21, 52:3,
53:17, 53:21, 56:1,
57:9, 57:15, 74:3,
75:7, 76:4, 88:1,
88:11, 107:21
**sometime** [1] - 60:15
**sometimes** [7] - 6:1,
45:5, 75:10, 76:22,
77:3, 101:20
**somewhere** [2] - 46:2,
77:19
**son** [2] - 105:19,
106:11
**soon** [1] - 117:18
**sorry** [12] - 5:15,
11:23, 14:24, 19:24,
25:23, 30:12, 41:10,
43:2, 46:25, 51:22,
55:17, 90:24
**sort** [2] - 43:18, 83:20
**sound** [1] - 66:1
**sounds** [2] - 70:7,
84:24
**south** [1] - 7:7
**Southeast** [1] - 1:20
**SOUTHERN** [1] - 1:1
**Southern** [1] - 4:5
**Southwest** [1] - 7:8
**space** [1] - 6:12
**Spanish** [4] - 4:3,
103:18, 110:1, 113:2
**speaking** [2] - 13:21,
73:20
**Special** [1] - 1:16
**specific** [4] - 14:5,
59:4, 91:16, 93:14
**specifically** [9] - 9:19,
9:25, 11:21, 13:12,
14:8, 15:23, 41:1,
63:8, 99:21
**speculation** [1] -
106:17
**speech** [1] - 50:1
**spell** [1] - 66:13
**spent** [2] - 10:4, 12:11
**spoken** [2] - 67:5,
94:22
**square** [2] - 111:18,
111:19
**stamp** [1] - 63:9
**stamped** [2] - 38:20,
48:25
**stand** [3] - 44:12,
51:6, 73:17
**standing** [4] - 4:9,
42:5, 42:12, 54:24
**standpoint** [1] - 24:10

**start** [5] - 28:8, 30:1,
37:12, 66:8, 67:17
**started** [4] - 5:18, 8:9,
59:6, 106:15
**state** [5] - 42:8, 54:9,
75:15, 95:16, 106:18
**statement** [11] - 41:25,
42:4, 57:24, 58:5,
58:15, 59:15, 59:19,
62:4, 62:7, 62:12,
62:15
**statements** [1] - 59:16
**STATES** [3] - 1:1, 1:4,
1:12
**States** [9] - 1:16, 1:24,
4:4, 4:18, 79:2, 80:2,
103:2, 116:3, 118:8
**status** [1] - 71:1
**stay** [1] - 45:4
**staying** [1] - 25:5
**STENOGRAPHICAL
LY** [1] - 1:22
**step** [1] - 70:24
**steps** [3] - 51:3, 70:25,
114:22
**stick** [1] - 11:9
**still** [4] - 8:6, 24:8,
44:13, 88:12
**stipulation** [2] - 20:13,
21:5, 116:8
**stomach** [1] - 46:1
**stone** [1] - 75:20
**stood** [1] - 13:17
**stop** [1] - 75:9
**straight** [2] - 54:25,
76:23
**Street** [2] - 1:17, 1:20
**street** [4] - 8:2, 41:2,
41:4, 41:6
**strike** [3] - 39:10,
46:23, 96:23
**strikes** [1] - 45:9
**stuff** [4] - 10:13,
11:16, 55:24, 75:6
**stuffing** [1] - 75:8
**subject** [4] - 36:16,
68:18, 68:20, 69:3
**subjects** [1] - 45:3
**subpoena** [5] - 21:1,
24:3, 24:20, 25:10,
26:18
**subpoenaed** [2] -
25:15, 25:24
**subpoenas** [2] - 18:1,
18:21
**subscribed** [1] - 98:4
**subscriber** [9] - 96:17,
96:20, 97:6, 97:7,
97:12, 97:14, 97:21,
98:5, 100:14

**subsequently** [1] -
71:11
**success** [1] - 107:21
**suffered** [1] - 60:18
**suggest** [1] - 54:20
**Suite** [1] - 1:20
**sulfate** [4] - 62:9,
62:11, 62:14, 62:20
**summarize** [1] - 81:16
**summarizes** [1] -
81:19
**summary** [9] - 83:7,
85:11, 85:12, 85:14,
85:17, 85:20, 86:14,
86:15
**superficial** [1] - 74:25
**surveillance** [4] -
14:5, 14:20, 63:13,
63:16
**Survey** [1] - 79:19
**surveyed** [1] - 43:12
**survive** [1] - 74:12
**suspect** [1] - 53:23
**sustain** [3] - 73:22,
100:24
**sustained** [11] - 17:5,
19:5, 20:8, 31:16,
47:9, 54:14, 57:21,
69:6, 69:21, 102:12,
111:22
**SUV** [3] - 15:24, 17:17,
63:19
**swear** [3] - 4:21, 79:4,
103:13
**switches** [2] - 9:15,
9:21
**sworn** [1] - 4:25
**system** [1] - 14:2

## T

**T-Mobile** [3] - 96:25,
97:15, 102:4
**tag** [1] - 78:4
**tape** [13] - 109:4,
110:1, 110:3, 110:8,
110:15, 110:22,
110:24, 111:8,
112:1, 112:3,
112:23, 113:14,
113:15
**tapes** [1] - 109:5
**targeted** [1] - 88:2
**task** [1] - 79:21
**tax** [1] - 32:20
**tax-type** [1] - 32:20
**Team** [1] - 79:19
**Technician** [4] -
37:24, 43:12, 49:16,
52:6

**techniques** [1] - 44:22
**telephone** [36] - 18:20,
19:19, 19:23, 23:24,
24:2, 24:19, 24:20,
25:6, 25:8, 25:25,
26:8, 26:11, 26:12,
26:19, 27:5, 27:9,
27:20, 27:21, 27:24,
29:17, 29:22, 30:2,
30:8, 30:9, 31:21,
68:1, 82:17, 84:14,
88:3, 88:17, 89:7,
92:21, 93:4
**tender** [1] - 37:7,
94:17
**term** [2] - 62:22, 96:20
**testified** [9] - 4:25,
21:1, 37:21, 46:15,
59:19, 63:13, 79:7,
84:5, 103:19
**testify** [3] - 64:21,
85:5, 117:11
**testifying** [2] - 37:20,
106:23
**testimony** [14] - 4:21,
23:13, 39:14, 47:23,
60:25, 63:8, 79:4,
84:12, 85:12, 85:13,
85:23, 86:1, 94:9,
103:13
**tests** [1] - 43:3
**text** [3] - 18:8, 87:22,
88:19
**THE** [181] - 1:12, 1:15,
1:19, 4:7, 4:12, 4:23,
15:6, 16:4, 17:5,
17:8, 17:10, 19:5,
20:8, 20:11, 20:15,
20:17, 20:24, 21:3,
21:6, 21:14, 21:19,
21:21, 21:23, 22:2,
22:5, 22:7, 22:10,
22:16, 22:23, 22:25,
23:10, 23:16, 23:18,
24:9, 25:1, 25:15,
25:18, 25:20, 25:22,
25:23, 25:24, 26:2,
26:3, 26:4, 26:5,
26:25, 27:16, 28:4,
28:14, 28:25, 29:3,
29:13, 29:18, 31:16,
33:22, 34:3, 35:12,
35:24, 42:8, 46:21,
47:9, 50:25, 51:7,
54:14, 56:8, 56:10,
56:12, 56:14, 56:23,
57:1, 57:21, 58:16,
61:1, 67:22, 68:24,
69:6, 69:9, 69:21,
70:3, 70:6, 70:12,

70:15, 70:21, 70:24, 71:1, 71:8, 71:13, 71:17, 71:21, 71:24, 72:1, 72:5, 72:17, 72:22, 73:1, 73:3, 73:8, 73:12, 73:14, 73:16, 74:20, 74:21, 74:22, 74:23, 77:19, 78:19, 78:20, 78:23, 78:24, 79:6, 81:25, 82:3, 82:8, 82:10, 82:13, 82:18, 82:20, 82:25, 83:4, 83:7, 83:10, 83:13, 83:16, 83:18, 83:20, 83:23, 84:1, 84:4, 84:9, 84:15, 84:18, 84:21, 84:24, 85:8, 85:12, 85:16, 85:23, 86:6, 86:12, 88:10, 88:12, 100:22, 101:7, 101:10, 101:12, 101:17, 101:19, 101:23, 102:6, 102:9, 102:12, 103:1, 103:8, 103:9, 103:10, 103:16, 105:23, 106:19, 108:23, 109:3, 109:7, 109:10, 109:14, 109:21, 111:22, 114:15, 114:21, 114:23, 115:11, 115:13, 115:18, 115:21, 115:23, 116:4, 116:11, 116:13, 116:15, 116:23, 117:2, 117:14, 117:18
**themselves** [2] - 81:18, 89:11
**thereafter** [1] - 7:1
**therefore** [2] - 72:10, 75:10
**thigh** [1] - 46:1
**thousands** [1] - 81:18
**three** [8] - 12:4, 51:19, 92:2, 93:16, 104:10, 107:5, 110:10, 111:17
**tie** [4] - 22:8, 84:4, 84:15, 84:16
**tied** [1] - 22:2
**to..** [1] - 58:17
**today** [4] - 32:10, 106:23, 115:3, 117:12
**together** [2] - 43:5, 74:15

**tomorrow** [4] - 114:17, 115:8, 115:9, 116:5
**took** [5] - 8:5, 42:4, 49:16, 51:11, 51:15
**tool** [1] - 49:23
**toolbox** [1] - 49:23
**tools** [2] - 49:23, 52:13
**top** [4] - 16:14, 16:23, 30:1, 87:15
**topic** [1] - 52:8
**total** [2] - 89:1, 91:25
**totally** [1] - 74:11
**totals** [1] - 87:24
**touch** [1] - 9:12
**towards** [1] - 9:7
**Tower** [1] - 1:20
**trail** [3] - 41:2, 41:3, 41:6
**trained** [1] - 79:21
**training** [1] - 43:18
**trajectory** [9] - 43:25, 44:20, 44:22, 55:20, 76:8, 76:18, 77:6, 78:9
**transaction** [2] - 106:1, 113:24
**transcript** [6] - 108:17, 109:2, 109:13, 112:10, 112:11, 112:24
**transcription** [1] - 118:4
**Transcripts** [1] - 109:12
**transported** [1] - 38:7
**travel** [3] - 75:19, 76:23, 80:1
**travels** [1] - 48:9
**treat** [1] - 60:24
**treated** [2] - 39:9, 60:13
**treatment** [1] - 60:23
**trial** [2] - 5:7, 79:13
**TRIAL** [1] - 1:10
**tried** [1] - 114:10
**tries** [1] - 76:20
**true** [1] - 42:4
**trusted** [1] - 114:7
**truth** [7] - 4:22, 35:12, 79:5, 103:14
**try** [6] - 43:8, 43:22, 44:6, 44:15, 77:5, 109:23
**trying** [10] - 53:22, 58:25, 70:8, 85:10, 86:20, 101:8, 101:14, 101:15, 107:8, 113:3

**turn** [14] - 12:8, 23:20, 25:5, 26:8, 27:3, 27:19, 28:7, 29:10, 32:18, 87:10, 110:10, 112:9, 115:11
**turned** [1] - 58:6
**turning** [1] - 31:6
**turns** [1] - 9:9
**two** [20] - 6:9, 6:10, 48:17, 48:21, 49:1, 59:16, 63:18, 71:14, 87:10, 91:20, 91:22, 92:2, 92:6, 92:8, 93:16, 93:20, 93:25, 94:3, 94:8, 108:2
**two-week** [1] - 6:9
**tying** [1] - 22:17
**type** [3] - 18:16, 32:20, 65:3

## U

**under** [4] - 81:22, 85:10, 85:19, 100:19
**undercover** [2] - 5:21, 108:14
**underlying** [3] - 70:12, 70:13, 70:17
**underneath** [1] - 32:14
**understood** [2] - 72:20, 72:24
**unit** [2] - 5:23, 5:24
**UNITED** [3] - 1:1, 1:4, 1:12
**United** [9] - 1:16, 1:24, 4:4, 4:18, 79:1, 80:2, 103:2, 116:3, 118:8
**unlike** [1] - 44:24
**unusual** [1] - 8:23
**up** [34] - 6:10, 8:5, 10:7, 14:13, 17:19, 22:17, 23:15, 35:7, 35:17, 36:4, 40:20, 45:24, 52:11, 52:16, 52:19, 52:25, 53:8, 53:11, 53:12, 53:21, 54:21, 54:24, 76:2, 76:5, 76:8, 84:20, 85:2, 86:14, 88:5, 88:6, 109:24, 111:4, 115:21
**ups** [2] - 52:8, 75:22
**upward** [1] - 54:25
**user** [1] - 98:22
**uses** [1] - 14:14

## V

**Valhuerdis** [2] - 36:16, 36:19
**van** [10] - 15:24, 16:21, 16:25, 17:1, 17:14, 63:9, 63:10, 63:19, 69:19, 70:1
**various** [1] - 43:8
**Vazquez** [7] - 2:6, 2:7, 2:9, 2:10, 2:12, 85:5, 115:8
**VAZQUEZ** [162] - 1:15, 4:17, 5:3, 15:3, 15:8, 16:1, 16:6, 17:6, 17:11, 19:6, 20:3, 20:10, 20:12, 20:21, 21:5, 21:17, 21:20, 21:22, 22:1, 22:4, 22:6, 22:9, 22:15, 22:24, 23:13, 23:19, 24:6, 24:12, 24:13, 24:24, 25:4, 25:12, 26:7, 26:21, 27:2, 27:13, 27:18, 28:2, 28:6, 28:12, 28:17, 29:2, 29:4, 29:5, 29:16, 29:20, 29:21, 31:17, 32:15, 32:17, 34:1, 35:15, 35:21, 36:2, 37:7, 42:7, 46:20, 47:8, 54:12, 56:7, 57:19, 60:25, 67:12, 67:23, 69:1, 69:7, 69:12, 69:22, 70:9, 70:14, 70:19, 71:4, 71:11, 71:16, 71:18, 71:23, 71:25, 72:3, 73:10, 73:13, 73:15, 73:19, 75:3, 77:21, 78:16, 78:18, 78:21, 79:1, 79:9, 81:21, 82:12, 82:15, 82:19, 82:22, 83:1, 83:6, 83:9, 83:11, 83:15, 83:17, 83:19, 83:22, 84:16, 84:19, 84:23, 85:10, 85:15, 85:19, 86:5, 86:9, 86:23, 88:15, 94:17, 100:18, 100:25, 101:8, 101:15, 101:18, 101:22, 102:1, 102:8, 102:13, 102:24, 103:2, 103:5, 103:21, 105:5, 105:7, 106:22, 108:20, 109:1, 109:5, 109:9,

109:11, 109:13, 109:15, 109:23, 110:4, 110:9, 110:23, 110:25, 111:9, 111:23, 112:2, 112:4, 112:9, 112:13, 112:24, 113:1, 113:16, 114:13, 114:25, 115:14, 115:20, 115:22, 116:3, 116:6, 116:12, 116:14, 116:16, 116:20, 116:22
**vehicle** [1] - 17:19
**vehicles** [3] - 63:16, 63:18, 63:20
**verdict** [1] - 72:11
**verify** [1] - 48:11
**versa** [1] - 88:25
**version** [1] - 79:20
**versions** [1] - 80:24
**versus** [4] - 6:7, 74:12, 75:7, 111:17
**vice** [1] - 88:24
**victim** [5] - 37:2, 37:3, 52:20, 53:22, 54:1
**victim's** [2] - 34:13, 71:18
**Video** [5] - 110:3, 110:15, 111:8, 112:3, 112:12
**video** [13] - 15:11, 15:16, 15:25, 63:17, 108:15, 110:1, 110:8, 110:22, 110:24, 112:1, 112:23, 113:14, 113:15
**videotaped** [1] - 13:1
**visit** [3] - 14:1, 57:23, 104:17
**visitors** [1] - 7:24
**voice** [1] - 87:22
**volume** [2] - 109:21, 109:22
**voluminous** [3] - 81:16, 85:11, 86:21
**vs** [1] - 1:5

## W

**wait** [1] - 21:14
**waiting** [1] - 110:6
**walk** [5] - 8:5, 9:17, 11:19, 12:24, 12:25
**walk-through** [3] - 11:19, 12:24, 12:25
**walked** [5] - 8:18, 8:21, 9:3, 10:7,

12:19

**walking** [1] - 8:9
**walkway** [1] - 40:20
**wall** [2] - 75:18
**wants** [1] - 117:11
**warrant** [4] - 18:1, 18:3, 18:4, 22:11
**watch** [1] - 59:22
**water** [1] - 75:21
**weapon** [2] - 34:25, 72:16
**wearing** [1] - 76:4
**week** [4] - 6:9, 51:21, 51:23, 51:24
**week-long** [3] - 51:21, 51:23, 51:24
**weeks** [1] - 6:10
**weight** [1] - 84:24
**weird** [1] - 47:14
**welcome** [1] - 4:13
**west** [1] - 14:9
**white** [12] - 15:24, 16:21, 16:25, 17:1, 17:14, 32:14, 63:9, 63:10, 63:19, 69:19, 70:1, 105:4
**white-panel** [3] - 16:21, 16:25, 17:14
**whole** [2] - 87:24, 103:14
**wife** [8] - 13:12, 13:22, 31:4, 58:4, 96:2, 104:18, 115:5
**wife's** [2] - 95:25, 96:10
**Winchester** [1] - 12:6
**window** [3] - 9:3, 63:21, 63:22
**wise** [1] - 108:15
**wish** [1] - 96:1
**Witness** [4] - 51:3, 51:6, 78:25, 103:4
**witness** [25] - 4:16, 23:14, 32:15, 37:7, 52:20, 53:2, 53:3, 70:25, 73:17, 78:19, 79:2, 94:17, 102:24, 103:1, 103:5, 105:5, 114:22, 115:2, 115:11, 115:17, 115:19, 115:24, 116:7, 116:17
**WITNESS** [17] - 2:4, 4:23, 17:10, 25:18, 25:23, 26:2, 26:4, 28:14, 56:10, 56:14, 74:21, 74:23, 78:20, 78:24, 79:6, 88:12, 103:16
**witnesses** [3] - 84:17,

94:22, 117:4
**woman** [1] - 105:18
**word** [7] - 65:1, 65:3, 65:16, 65:19, 69:3, 111:4, 113:2
**words** [3] - 22:10, 64:23, 72:9
**works** [1] - 53:5
**world** [1] - 115:21
**wound** [20] - 44:9, 44:11, 45:1, 48:5, 74:3, 74:17, 74:18, 74:23, 75:2, 75:4, 75:5, 75:9, 75:10, 75:11, 75:14, 75:17
**wounds** [16] - 41:21, 44:6, 44:7, 44:24, 45:2, 45:14, 45:17, 45:22, 60:18, 73:21, 74:7, 74:9, 77:25
**write** [1] - 58:11
**wrote** [6] - 18:1, 18:21, 37:20, 58:9, 59:5, 59:6

## X

**X's** [1] - 22:14
**XL** [1] - 77:16
**XXX-XXX-0441** [1] - 27:8
**XXX-XXX-3387** [1] - 26:13
**XXX-XXX-3940** [1] - 24:1
**XXX-XXX-9385** [1] - 89:7

## Y

**Yakey** [2] - 47:14, 47:15
**year** [1] - 29:9
**years** [8] - 5:19, 5:20, 5:21, 42:22, 51:19, 79:24, 104:10
**Yorlan** [1] - 65:12
**yourself** [7] - 5:6, 61:10, 61:14, 61:17, 61:21, 79:12, 103:24

## Z

**ZACCA** [81] - 1:19, 15:5, 16:3, 17:4, 19:4, 20:7, 20:9, 20:14, 20:22, 21:1, 21:10, 22:20, 23:8, 24:8, 25:14, 25:21, 26:24, 27:15, 28:10,

28:13, 31:15, 33:20, 35:11, 35:23, 37:9, 42:9, 42:10, 46:22, 47:10, 51:9, 54:15, 56:16, 56:25, 57:3, 57:20, 57:22, 58:18, 58:19, 58:23, 59:3, 61:2, 61:3, 67:8, 67:10, 68:22, 69:5, 69:20, 70:2, 71:6, 74:19, 78:22, 81:23, 82:1, 82:4, 82:9, 83:24, 84:2, 84:7, 84:10, 85:3, 86:10, 94:19, 100:11, 100:13, 100:16, 100:21, 101:6, 102:3, 103:3, 105:21, 106:17, 108:22, 111:21, 115:2, 115:12, 116:2, 116:19, 116:21, 117:6, 117:16, 117:20
**Zacca** [3] - 1:19, 2:7, 2:9
**Zeller** [1] - 10:23
**zones** [1] - 91:3